Moreover, we have read the paragraphs of IRS's Counterclaim, and of Suzuki's Answer, that the parties have highlighted -- not as discrete, isolated, and unconnected allegations, but as an integrated whole -- and, in the context of the paragraphs, and allegaions, which surround them, we conclude that Suzuki was not placed on any notice, let alone one that was fair, that IRS intended to challenge more than Suzuki's components in Arctic Cat snowmobiles. In reaching this conclusion, we have not resorted to exacting, technical rules of pleading for, had IRS intended a broader based attack on Suzuki's EFI-equipped engines, it could have provided a plain and simple statement of that intent, and it did not. Instead, IRS would now have us pinch, and strain, much like Cinderella's step-sisters, to force a result that plainly does not fit. Suzuki was not brought into this case alone, as the claims against Suzuki were accompanied with claims against Arctic Cat. It defies credulity that, by the simple expedient of joining Arctic Cat and Suzuki in a single Counterclaim, IRS intended a wholesale siege against all of Suzuki's unjoined customers of EFI-equipped engines.[4]

---

[4]We recognize that Suzuki's prayer for relief, insofar as it asks, in part, "[t]hat the '803 patent be adjudge not infringed, contributorily infringed, or infringed through inducement by Suzuki," may suggest a broader ruling than an adjudication solely as to Arctic Cat's employment of Suzuki EFI-equipped engines. As de-
(continued...)

2. Claims Charts.

Suzuki has argued that the omission of its non-Arctic Cat products, on IRS' Claims Chart, also evidenced the absence of fair notice, to Suzuki, that IRS intended to litigate a broader scope of claims against Suzuki. IRS responds that it did not include non-Arctic Cat products on its Claims Chart because IRS was not obligated to do so under our Order of May 15, 2002, which directed the production of such charts. See, Docket No. 77.

By way of background, in our Order of May 15, 2002 Order, we instructed the parties on the preparation, and exchange, of Claims Charts. In an early discovery dispute between the parties, Arctic Cat had moved the Court to compel an answer to an Interrogatory it had propounded to IRS. We interpreted that Interrogatory as a

(...continued)
noted, however, this is a prayer for relief, which bears no independent standing other than as supported by the previously recited allegations of Suzuki's Answer. What is not litigated -- here, Suzuki's sale of EFI-equipped engines to entities or persons other than Arctic Cat -- cannot serve as the basis for the entry of Judgment. Even if this were not so, at the time of the Hearing, counsel for Suzuki, in discussing Suzuki's prayer for relief, stated that, if what IRS "wants is a representation or a concession from Suzuki that it is not seeking a declaration that none of its engines infringe," then he "would state on the record right now that [Suzuki] will limit that to a request for a finding that none of the engines sold to Arctic Cat for use in its snowmobiles infringe." Transcript of the Hearing, at 33-34. Suzuki's Counsel continued, saying "[t]hat's what [Suzuki was] asking for in the pleading," "[a]nd certainly [Suzuki's] willing to limit the pleadings to what it was intended to." Id.

Contention Interrogatory, and shared with the parties our general dissatisfaction with Interrogatories, except in limited circumstances, as a discovery tool. In our experience, particularly in patent cases, the exchange of Claims Charts effectively advances the parties' reciprocal discovery, with the least amount of dispute, expense, and Court intervention. As a result, we directed the parties to "meet and confer" so as to adopt an acceptable plan for the creation, and exchange, of such Claims Charts. Unfortunately, but characteristically, the parties were unable to reach a an accord on that issue. As such, our Order of May 15, 2002, established the Claims Chart procedure to be employed here.

IRS contends, however, that our Order only required IRS to produce a Claims Chart as to those products that were common to both Arctic Cat and Suzuki, and not to those which were separately Suzuki's products. While this may be IRS' interpretation of our Order, we find that construction incorrect. As pertinent, we directed as follows:

> 1. On or before June 4, 2002, the Defendants shall serve upon the Plaintiff and Counter-defendant a claims chart, which shall identify: (a) which claim(s) of the four patents in suit that it alleges are being or have been infringed; (b) which specific products or methods of the Plaintiff and Counterdefendant it alleges literally infringe each claims [sic]; and (c) where each element of each claim listed in (a) is found in each product or method listed in (b), including the bases

> for each contention that the element is present.
>
> * * *
>
> 3. If, within the period for taking discovery, the Defendants become aware of additional claims that they contend are infringed and/or additional products that they contend infringe their patents, then they shall promptly amend their claims charts to reflect the additional claims and/or accused products.

Docket No. 77, at pp. 8-10.

IRS contends that the phrase "Plaintiff and Counterdefendant," as employed in paragraph 1(b), so as to require IRS to identify "which specific products or methods of the Plaintiff and Counterdefendant it alleges literally infringe each claims [sic -- claim]," only obligated IRS to identify those products which were common to Arctic Cat and Suzuki, and not to obligate IRS to identify the allegedly infringing products of Arctic Cat, and of Suzuki.

To find this construction erroneous is understatement. At the time our Order issued, IRS had made claims against both Arctic Cat and Suzuki. To be sure, we have understood, since the service and filing of IRS's Counterclaim, that IRS was litigating identical claims against Arctic Cat and Suzuki, either directly and/or derivatively, there is nothing in the language of our Order, nor in any reasonable interpretation of that language, which would suggest an intent to confine the Claims Charts so as to avoid discovery in areas both relevant and non-privileged. We conclude, given IRS's

current construction of our Order, that, at best, the construction is a after-the-fact rationalization. If, as IRS now contends, it had intended to litigate claims against Suzuki on products that had not been sold to Arctic Cat, we would have expected -- no, demanded -- that IRS employ the same means to effectuate full discovery against Suzuki, and vice versa.

To the extent that IRS now urges that this Order could not have required it to identify separate products of Suzuki as infringing, because discovery from Suzuki was in its infancy, we find the urging to be specious on two counts. First, at the time our Order issued, IRS had already commenced its action against Suzuki. Under Rule 11(b)(3), Federal Rules of Civil Procedure, IRS represented, on penalty of sanction, that "the allegations and other factual contentions," in that Counterclaim, had "evidentiary support."[5] Consequently, before we directed IRS to prepare its Claims Charts, it held sufficient knowledge, as to Suzuki's purportedly infringing products so as to responsibly allege that Suzuki was infringing on IRS's Patents, without the completion of full scale

[5]Under Rule 11(b)(3), Federal Rules of Civil Procedure, a party filing a pleading could, alternatively, represent that the allegations contained in the pleading "are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery," but only when there is a specific identification of such a belief. Here, no such designation had been made by IRS, and therefore, IRS was representing, by the filing of its Counterclaim, that its allegations had "evidentiary support." Id.

discovery against Suzuki. Second, our Claims Chart procedure expressly includes a means of supplementing the Charts as discovery progresses. While IRS may not have had all of the discovery against Suzuki it desires, this would not have prejudiced IRS in reducing to a Claims Chart those products of Suzuki, other than Arctic Cat snowmobile engines, that IRS regarded as infringing the '803 Patent. Again, on this separate basis, we find that IRS's true intendment, from the outset, was to limit its infringement claims, in this action, to infringement by Arctic Cat, and Suzuki, in the manufacture, and sale, of Arctic Cat snowmobiles. Accordingly, wholesale discovery as to Suzuki's products, other than those sold to Arctic Cat, is not appropriate in this action, and IRS's Motion to Compel, in that respect is denied.

Lastly, we leave open, as we must, the potential that, notwithstanding the fact that broad discovery, as to Suzuki, has been denied on the foregoing grounds, same greater scope of discovery, as to non-Arctic Cat products in which Suzuki engines are incorporated, would be appropriate on other grounds. Unfortunately, we are not able to specifically rule on those issues given the larger contention with which we were confronted, and of which we have now disposed. Accordingly, the parties are directed to "meet and confer" forthwith, and if they are unable to resolve the remnants of

the discovery dispute presented, they should seek prompt Court intervention.[6]

B. Discovery of Suzuki's Financial Documents.

IRS complains that Suzuki's refusal to produce certain financial documents has hampered its ability to develop its damage computations under a reasonable royalty theory; to defend against Suzuki's assertion of obviousness; and to demonstrate that Suzuki, and Arctic Cat, derived their EFI technology from IRS, rather than by developing the technology on their own. As part of that contention, IRS relates that the financial documents it has requested rom Suzuki, even as to products other than the Arctic Cat snowmobile engines, are discoverable under its reasonable royalty theory of damages. Reasonable royalty damages compensates the owner of an infringed patent, based upon the price of a license for that patent which is equal to "the amount that a willing licensor and licensee would bargain for at an arm's length hypothetical negotiation occurring on the date the infringement began." Proctor & Gamble v. Paragon Trade Bonds, Inc., 989 F. Supp. 547, 612-613 (D. Del.

---

[6]At the time of the Hearing, IRS represented that the resolution parties' dispute would largely be controlled by the Court's ruling on two global issues: 1) Whether IRS had sued Suzuki for infringement as to non-Arctic Cat engines; and 2) IRS's entitlement to Suzuki's financial documents. As we related at the Hearing, it appeared to the Court that we would have to rule on "some fairly broad issues" and then remand the matter to the parties for a "meet and confer." Transcript of Hearing, at p. 26.

1997), citing Unisplay S.A. v. American Elec. Sign Co., Inc., 69 F.3d 512, 517 (Fed. Cir. 1995); Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078 (Fed. Cir. 1983).

In determining the amount that would be paid for such a license, the Court assumes that the patent-at-issue is valid and enforceable, and will be infringed, by the opposing party, if they do not negotiate a license. Id., citing Mobile Oil Corp. v. Amoco Chem. Corp., 915 F. Supp. 1333, 1352-53 (D. Del. 1994). In addition, the Court assumes that all parties would have known all of the relevant information. Id., citing Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1121 (S.D.N.Y. 1970), modified and aff'd, 446 F.2d 295 (2nd Cir. 1971). In "determin[ing] the amount of a reasonable royalty for a patent license," Courts apply the fifteen-factor "comprehensive list of [relevant] evidentiary facts," which was complied by the Court in Georgia-Pacific Corp. v. United States Plywood Corp., supra at 1121. Not all of the factors will be relevant to every consideration, but they serve as a general guide to any case involving the computation of a reasonable royalty.

Again, the parties dispute the scope of discovery that is allowed under this theory of damages. Specifically, their dispute revolves around what product, or royalty base, should be applied. Suzuki complains that IRS intends to use the value of the entire

Arctic Cat snowmobile as its royalty base, because the higher the value of the royalty base, the larger the reasonable royalty award. Suzuki responds that the proper base is the EFI system itself, because the '803 patent concerns only an EFI system, not an engine, and certainly not a snowmobile. Accordingly, Suzuki believes that, although "[t]he cost to Suzuki of the EFI systems is clearly relevant," when the more narrow EFI-only royalty base is assumed, "discovery on the cost, revenue, profit, expense, overhead, and administrative costs on Suzuki's engines ha[s] no relevance." Suzuki Motor Corporation's Opposition to Injection Research Specialist Inc.'s Motion to Compel Production of Documents, at 12. Suzuki claims that its financial records, as to the engines in general, would only be relevant if IRS were claiming that its engines were the reasonable royalty base -- a claim IRS does not make.

IRS strenuously disagrees and urges, under Georgia-Pacific, that it is entitled to a broad scope of discovery concerning Suzuki's finances as they pertain to any EFI-equipped two-cycle engine, because that information could be relevant to the reasonable price that Suzuki might pay for a license to employ the EFI system, under a reasonable royalty hypothetical. We agree, in part. We find that the financial records, which pertain to Suzuki's engines, are relevant to a reasonable royalty computation because, if the success of the engine is dependent on the EFI technology, or if the

EFI system is what makes the engine attractive to purchasers, then that information would be relevant to the determination of how much Suzuki would be willing to pay for a license to use that EFI technology. Accordingly, the cost and value of Suzuki's engines, the profits made on their sale, and the extent to which the EFI technology is relied upon to achieve those other sales, is discoverable.

Such a scope of discovery under is counseled by the Georgia-Pacific factors. For example, the sixth such factor instructs Courts to consider "[t]he effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales." Georgia-Pacific Corp. v. United States Plywood Corp., supra at 1120.[7] Thus, the extent to which Suzuki utilizes the EFI technology in its engines would be relevant to a reasonable royalty calculation.

In addition, the eleventh factor, which requires consideration of "[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use," would

---

[7]" 'Convoyed' or 'derivative' sales occur when the sale of one thing is likely to cause the sale of another, such as selling a razor and then also being able to sell the blades to go with it." Proctor & Gamble v. Paragon Trade Brands, Inc., supra at 610.

require the production of Suzuki's financial information beyond that which is related to its use of the EFI technology in Arctic Cat products. Id. IRS is entitled to discover the extent to which Suzuki utilizes EFI technology, and the value to Suzuki of that use. Likewise, factors twelve and thirteen, under which Courts consider the portion of profits from sales of its accused products as attributable to an infringing product, would also permit IRS to discover financial documents concerning Suzuki's engines employing EFI technology.

However, Suzuki argues that, even if it must produce its financial information concerning its engines, and not just the EFI systems, that production should still be limited to its EFI-equipped, two-cycle snowmobile engines. According to Suzuki, having narrowed the scope of the accused products to the snowmobile engines, the issue before the Court, in a reasonable royalty determination, would be the amount that Suzuki was willing to pay for a license to permit it to sell snowmobile engines, and not the value it would be willing to pay for a license allowing it to use the EFI technology in any of its other engines. We find this argument persuasive.

Since we have limited the scope of the accused products, if we were to permit a reasonable royalty determination to be based upon Suzuki's use of EFI technology in any type of engine, and not just

the snowmobile engine, the Court would be obligated to conduct mini-infringement Hearings on each of those other engines, in order to determine if they, too, had infringed the '803 Patent. Under this construct, if those other engines were infringing, then they could be included in the calculation of what Suzuki would reasonably pay for a license to sell snowmobile licenses with EFI systems. If, however, Suzuki's use of the EFI technology in those engines was not infringing, then including those products, in the calculation of a reasonable license fee, would be improper. Accordingly, while we will not limit the discovery of Suzuki's financial records to only those documents related to the EFI technology, and will require it to produce financial information concerning its engines, Suzuki need only produce such financial information concerning its EFI-equipped two-cycle snowmobile engines.

IRS contends, however, that, even if this information would not be relevant to the issue of reasonably royalty, it would remain relevant to rebut Suzuki's affirmative defense, that the '803 Patent is invalid under Title 35 U.S.C. §103 for obviousness. One of the factors employed in determining the validity of a patent, under an obviousness challenge, is objective evidence of commercial success. See, Apple Computer, Inc. v. Articulate Systems, Inc., 234 F.3d 14, 26 (Fed. Cir. 2000). According to IRS, if the EFI technology was highly profitable to Suzuki, then that technology

must not have been obvious for, if it were, then someone else would have produced it, such that Suzuki's profits would have decreased. IRS asserts that, under this theory, Suzuki's success in selling any EFI-equipped, two-cycle engines, would be relevant to the issue of obviousness, as would the success of any third party who sold EFI-equipped two-cycle engines. Accordingly, IRS urges that Suzuki's financial documents, as to all of its EFI-equipped two-cycle engines, should be discoverable, if not because they are relevant to the reasonable royalty theory, then because they would be relevant to the obviousness determination under Section 103.

Suzuki disagrees, and contends that the only relevant commercial success inquiry should be directed at its snowmobile engines, as those are the accused products, since commercial success is only relevant to the extent that it flowed from the claimed invention. See, In re Huang, 100 F.3d 135, 140 (Fed. Cir. 1996)(holding that "success is relevant in the obviousness context only if there is proof that the sales were a direct result of the unique characteristics of the claimed invention -- as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter."); Cable Elec. Prods. Inc. v. Genmark, Inc., 770 F.2d 1015, 1027 (Fed. Cir. 1985); Sjolund v. Musland, 847 F.2d 1573, 1582 (Fed. Cir. 1988).

With respect to Suzuki, the only issue in this case is whether Suzuki's use of the EFI system, as it is incorporated into Suzuki's snowmobile engines, infringes on the '803 Patent. Thus, Suzuki's affirmative defense of obviousness is also limited in scope, and relates only to the adaptation of EFI technology to this specific application, and not to the other possible applications that the technology might have in other engines. For example, Suzuki might earn significant profits from the use of a similar EFI system in engines for All-Terrain Vehicles. If IRS had alleged that Suzuki was infringing the '803 Patent as to those engines -- which we have held that it has not -- Suzuki's commercial success in selling those engines, and the extent to which that success was dependent on the EFI technology, would be relevant to the issue of obviousness, and Suzuki's financial records concerning its All-Terrain-Vehicle engines would be discoverable.

Here, however, we have determined that IRS has only alleged infringement, on the part of Suzuki, as to the manufacture of snowmobile engines. Thus, Suzuki's financial documents, which are relevant to the commercial success of those engines, and the extent to which that success is dependent upon the EFI technology, are discoverable. We cannot otherwise find any relevance in compelling the disclosure of sensitive financial documents which relate to

any other Suzuki engines that incorporate the EFI technology, given the limited scope of the accused products in this action.

NOW, THEREFORE, It is --

ORDERED:

That the Motion of IRS to Compel Discovery [Docket No. 103] is GRANTED, in part.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE