prejudice Suzuki in the infringement determination.[1] Suzuki has asserted that it would agree to permitting IRS to conduct discovery on the issue, even after the close of discovery, in order to remedy any prejudice that would otherwise be caused by the delayed disclosure.

We deny IRS' Motion at this time. In so doing, we note that it is this Court's practice to vigorously protect the doctrine of attorney-client privilege, and to only find a waiver of that privilege in the most compelling circumstances. While IRS does not ask us to find a waiver here, but rather, asks us simply to instruct Suzuki to decide whether it will voluntarily waive that privilege, we agree with Suzuki that, until the Court had decided the issue of claims construction, requiring Suzuki to make the election could well result in it having to more broadly waive its privilege, than would be necessary following the Court's claim construction. See, Medtronic, Inc. v. Guidant Corp., Civ. No. 00-1473 (D. Minn., July

[1]Suzuki had also argued that it should not be made to elect an advice-of-counsel defense, until such time as the District Court has decided the issue of the breadth of that waiver -- an issue that was pending on an appeal, to the District Court, of an earlier decision of this Court. As the District Court has now issued an Order in that appeal, and the scope of the waiver occasioned by an assertion of that defense has now been fully delineated, we do not address that portion of Suzuki's objection.

25, 2002), citing Rules 3-8, N.D. Cal. Patent Local Rules.[2] We also find that any prejudice, which might be caused by Suzuki's delayed election, can be cured by permitting some additional discovery after the claims construction Hearing. IRS has made no showing that this evidence is relevant to anything other than the issue of willfulness, which will, in any event, not be an issue until after this Court has issued its claims construction ruling.

Finally, we also find a distinct risk of prejudice to Suzuki, beyond that of making a more broad waiver of its attorney-client privilege than is necessary, if we required it to make its election at the present time. Namely, there is a risk that a forced, early election, might "give the patent-holder a tactical advantage on the liability issue." F & G Scrolling Mouse v. IBM Corp., 190 F.R.D. 385, 391 (M.D.N.C. 1999)(Discussing consequences of advice-of-counsel election in the context of a Motion to Bifurcate.). In fact, IRS seems to suggest that it is entitled to such evidence in order to support its case in chief. See, Memorandum of Points and Auth-

---

[2]IRS urges that we not follow such reasoning, claiming that it is misguided because, under the Patent Local Rules of the Northern District of California, claims construction occurs much earlier in the litigation process. Such an urging, however, does not undercut the reasoning of the District Court in Medtronic. The Court's concern was based on a desire to zealously protect the attorney-client privilege from a waiver that was broader than required by the case. Regardless of when claims construction occurs, that policy is meritorious.

orities in Support of IRS' Motion to Compel Production of Documents Relating to Opinions of Counsel from Suzuki, or to Preclude Use at Trial, at 6 ("Admissions in its opinions of counsel relating to Suzuki's willfulness defense and other documents being withheld on privilege grounds directly impact IRS' liability case in chief."). Accordingly, we deny IRS' Motion.[3]

E. Arctic Cat's Motion to Compel IRS and Pacer to Produce Documents for Re-Inspection.

Arctic Cat seeks to compel IRS and Pacer to produce, for Arctic Cat's re-inspection, the documents that they had produced for inspection in March of 2002. While initially IRS and Pacer had agreed to such production, if Arctic Cat would pay for the costs associated with it, that offer was withdrawn when Arctic Cat demanded that it itemize the costs prior to the inspection, which IRS and Pacer felt they were unable to do. IRS and Pacer now contend that they should not have to allow the production, because there is no provision under the Federal Rules of Civil Procedure that would require it to do so.

Arctic Cat does not contend that it had no previous access to the documents which are requested for re-inspection. Rather,

---

[3]We make clear, however, that our ruling is based solely upon Suzuki's argument concerning claims construction, and we simply hold that Suzuki need not make its election until we have issued our ruling on claims construction. In the event that the we grant Suzuki's Motion to Bifurcate, we may well reconsider the issue.

Arctic Cat's Motion is premised on the assertion that IRS and Pacer had admitted that their previous production responses, on which Arctic Cat relied, when it made its initial inspection of the records, were inaccurate. According to Arctic Cat, when IRS and Pacer responded to Arctic Cat's First Set of Document Requests, they asserted various objections, including a refusal to produce certain of the documents requested. Arctic Cat relates that, as to some of the requests to which they objected, IRS and Pacer simply made objections, and did not state that, subject to those objections, they would be producing responsive documents. In other instances, Arctic Cat states that IRS and Pacer narrowed the scope of the documents that they would produce under the requests. Consequently, Arctic Cat claims that, when it initially reviewed IRS and Pacer's production, it was under the mistaken impression that IRS and Pacer had not produced documents responsive to some of the issues, and had only made a partial production of documents.

Arctic Cat relates that, after raising some concerns over the scope of production with IRS and Pacer, they agreed to permit Arctic Cat to re-inspect the documents. Arctic Cat claims that it did not act on that offer until sometime in January of 2003, when Arctic Cat learned that IRS' former counsel, Kutak Rock, had destroyed documents, possibly originals, which are relevant to this action. Arctic Cat then requested an opportunity to inspect IRS'

original production. According to Arctic Cat, at that time, it was denied access to the documents, on the ground that it was expensive and inconvenient to IRS and Pacer's counsel. Arctic Cat claims that, since January of 2003, IRS and Pacer have further asserted that they did not produce Rule 26 expert reports from the Polaris litigation, whereas Arctic Cat had believed that they had produced those materials. Given the foregoing, Arctic Cat asks that we compel IRS to produce its original production, for Arctic Cat's re-inspection.

In response, IRS and Pacer maintain that much of Arctic Cat's argument is a "red herring." They maintain that Arctic Cat's new counsel simply wants access to the documents so as to ensure that the document review, which was completed by its prior counsel, was adequate. In their opposition, IRS and Pacer argue that there is no basis, in the law, for requiring a re-inspection, and that Arctic Cat must live with the inspection it previously made, and with its elections to copy only certain of the documents. It maintains that, like Suzuki, Arctic Cat could have designated all of the documents for copying and, having failed to do so, it cannot require IRS to reproduce the documents. Finally, IRS and Pacer contend that the alleged destruction of documents by Kutak Rock is irrelevant to the issue, as there is no connection between the documents allegedly destroyed, and those Arctic Cat seeks to re-

examine. IRS and Pacer relate that none of the documents, which Arctic Cat examined in the first production, were sent to Kutak Rock, and that, therefore, Kutak Rock could not have destroyed any of the documents originally produced to Arctic Cat.

While we agree with IRS and Pacer that the destruction of documents by Kutak Rock is irrelevant to this issue, and that there is no provision in the Federal Rules of Civil Procedure requiring that documents be produced twice, we grant Arctic Cat's Motion because of our concern over IRS's and Pacer's initial discovery responses, and their assertions as to the scope of the production that was completed, as compared to what it now claims was produced. While it is true that Arctic Cat should have carefully reviewed the documents produced, the fact that it believed that IRS had not produced documents responsive to some of the categories, might reasonably have affected that review. Given the number of documents produced, it would be reasonable for Arctic Cat to focus its search on those areas where it believed the production had been complete.

However, Arctic Cat must reimburse IRS and Pacer for all reasonable costs of the second production. We will not require IRS and Pacer to enumerate those costs prior to the re-inspection, but will allow IRS and Pacer reimbursement for "all attorneys fees incurred in reassembling the documents, all paralegal time incurred in reassembling the documents and in supervising the inspection,

and any other incidental costs, including the copying of any additional documents." See, Exhibit 3 attached to Declaration of Michael S. Wilcox in Support of Opposition to Arctic Cat's Motion to Compel Production of Documents for Re-Inspection. We would commend counsel to "meet and confer" so as to minimize the expenses involved, by either limiting the scope of the second production, or by engaging in other cost-saving measures.

F. Arctic Cat's Motion to Compel IRS to Produce Documents Related to Damages.

Arctic Cat asks that we compel IRS and Pacer to produce documents related to its theory of damages. In particular, Arctic Cat seeks to compel production of documents responsive to Request No. 32, in the First Set of Requests for Production, and Requests Nos. 38, 40, 41, 45, 46, and 50, in the Second Set of Requests for Production. According to Arctic Cat, when it asked IRS to state what it contended to be a reasonable royalty, as well as the basis for that royalty, IRS responded that "the per unit damages proposed by IRS and Pacer and that may have been used to calculate damages by the jury in the litigation between IRS and Polaris Industries, et al, would be an appropriate royalty measure." In the Polaris action, IRS presented expert testimony and opinions, that $600.00 per unit, would be an appropriate royalty. Accordingly, Arctic Cat seeks the production of the documents that undergird that opinion.

Arctic Cat claims that IRS's initial responses to the production requests suggested that IRS was not producing any documents relevant to the issues, but that IRS later claimed to have produced relevant documents, and then, thereafter, asserted that it had produced some, but not all of the documents, and had withheld some others on privilege grounds. In its opposition to this Motion, IRS and Pacer maintain that they have produced all non-privileged, responsive documents, apart from some which were covered by a Protective Order in the Polaris litigation, which they would produce as soon as they had received a written authorization to do so, from Polaris.[4] Given this representation, and the fact that Arctic Cat's Motion was predicated on its assertion that it was unsure if the production was complete, we grant Arctic Cat's Motion, to the extent that it requires IRS and Pacer to produce all non-privileged documents responsive to the Requests.

G. Arctic Cat's Motion to Compel a Further Deposition of IRS Pursuant to Rule 30(b)(6), and for Sanctions.

Arctic Cat moves to compel IRS to produce a fully prepared, and knowledgeable Rule 30(b)(6) deposition witness, for seven hours of testimony, and also seeks monetary sanctions, on the

---

[4]IRS and Pacer noted that they already obtained an oral authorization for the release, and were simply waiting for written confirmation of that authorization.

basis that Rodney Preisser ("Preisser"), who had been designated as IRS's 30(b)(6) deponent, had not been fully prepared on all of the noted topics. Arctic Cat had noted eleven topics for the 30(b)(6) deposition, and it claims that Preisser was unprepared as to five of those topics, and particularly, as to IRS' testing, review, and investigation, of Arctic Cat products, as well as the circumstances and the occurrence of any destruction, by IRS, of documents related to IRS' patents, or to the investigation of Arctic Cat's products.[5]

As to the testing topics, Preisser stated that he spoke with Ronald Chasteen ("Chasteen"), who was one of the named inventors, and Richard Hanes ("Hanes"), who was former IRS counsel, both of whom were involved in the testing, but that those conversations had been merely to confirm Preisser's own memory of the testing. Arctic Cat also claims that Preisser did not review any of IRS' actual testing, review, or evaluation documents, as to Arctic Cat's products. As an example, Arctic Cat relates that Preisser testified that Hanes had taken notes during the testing they conducted in 1993, but that Preisser had not asked Hanes what had happened to those notes. Further, Arctic Cat notes that IRS' privilege log

---

[5]Although Arctic Cat has also complained that Preisser was not fully prepared with respect to Topics 2-4, and 6, which related to the circumstances surrounding IRS' knowledge of, and accusations against, Arctic Cat for infringement, it has not sought to compel IRS to produce a knowledgeable deponent on those topics, and we do not address that issue further.

contains a number of entries, after 1993, for "opinion[s] of counsel regarding infringement," but that Preisser was unable to testify as to whether any of those opinions concerned testing of Arctic Cat products. Arctic Cat complains that, although Preisser testified to additional evaluations of Arctic Cat products in 1994, and 1995, he had asked neither Chasteen, nor Hanes, about those tests.

As to the document destruction topic, Arctic Cat contends that Preisser did not ask any employees of IRS, its affiliates, or its attorneys, if any documents had been destroyed,. It further complains that, while a list of documents shredded by Kutak Rock was produced at the deposition, Preisser was unprepared to answer any questions concerning that list, or its accuracy. Thus, Arctic Cat maintains that IRS failed to produce a properly prepared, and knowledgeable witness for the 30(b)(6) deposition, and it asks that we require IRS to produce a fully prepared and knowledgeable witness for deposition on Topic Nos. 1, 5, 7, 10, and 11, and compensate Arctic Cat $5,176.00 -- $335.00 per hour, for thirteen hours -- for the time spent at the initial Preisser deposition.

In response, IRS claims that Preisser was adequately prepared to answer questions concerning the attorney-directed testing, which was not protected by the attorney-client privilege, or the work product doctrine. As to the testing, IRS relates that Preisser testified that there was testing conducted in 1993, and in 2001,

and that Arctic Cat did not ask any questions about the testing in 2001. As to the 1993 testing of Arctic Cat products, IRS relates that Preisser testified that, besides him, there were three other participants in the testing, including Hanes, Chasteen, and John Balch ("Balch"), and that Preisser had spoken to each of those persons prior to the deposition.

IRS maintains that Arctic Cat has mischaracterized Preisser's conversations with Hanes, Chasteen, and Balch, as attempts to refresh Preisser's own recollection, saying that he, in fact, contacted those three in order to learn what they recalled about the testing. Further, IRS relates that, in addition to identifying the four principal participants in the testing, and speaking with each of them, Preisser recited those unprivileged details concerning the testing, and described his personal impressions following the testing. As to Arctic Cat's assertion that Preisser only spoke of the testing in 1993, and 2001, and not to testing he had alluded to in 1994, and 1995, IRS contends that Preisser's testimony is that the only hands-on testing had been conducted in those years.

IRS maintains that Arctic Cat's real objection to Preisser's testimony, concerning these topics, relates to IRS' claim of privilege and work product, and not to the adequacy of Preisser's preparation. IRS relates that, in response to Arctic Cat's deposition notice, it objected to the disclosure of information protected

by the work-product doctrine, or the attorney-client privilege, and made it clear that it would not provide a witness to answer questions concerning such information, including any tests of the accused products, which had been conducted under the direction of attorneys, in preparation for litigation. Accordingly, IRS informed Arctic Cat that it would not produce a witness as to Topics 1 and 7, and would only produce a deponent as to Topic 5, to the extent that it did not seek to invade those privileges. IRS relates that Arctic Cat never moved to compel a witness on those topics, and should not, now, be able to complain that Preisser was unprepared to testify on these topics.

IRS also maintains that Preisser was prepared to testify about information, that was reasonably available to IRS, on the topic of document destruction. IRS asserts that Preisser testified that IRS had no document destruction policy, generally kept copies of everything, had not destroyed any documents, and that any destruction, which was completed by Kutak Rock, had been performed without notice to, or authorization by, IRS. According to IRS, Preisser answered all questions concerning IRS' actions, and its knowledge of the actions of third parties, and that 30(b)(6) deponents are not required to obtain information from third parties.

Finally, IRS urges that, if we find that Preisser was not adequately prepared, that the remedy sought by Arctic Cat is, none-

theless, unreasonable. IRS relates that, despite Arctic Cat's admission, that Preisser was adequately prepared to testify as to six of the eleven topics, it still seeks compensation for an entire day's worth of deposition, plus an additional full day's deposition.

Although we are satisfied that the purposes of a Rule 30(b)(6) deposition are not unknown to either party, our analysis commences with a brief overview of the unique function served by such a specialized form of deposition. Rule 30(b)(6) bears heavily upon the parties' reciprocal obligations, first requiring the requesting party to reasonably particularize the subject of the intended inquiry, which triggers a requirement that the responding party produce a deponent who is suitably prepared to respond to questioning with that scope. To allow the Rule to effectively function, the requesting party must take care to designate, with painstaking specificity, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute. Correlatively, the responding party "must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the interrogator] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed by [the interrogator] as to the relevant subject matters." Protective Nat. Ins. v. Commonwealth Ins., 137 F.R.D.

267, 278 (D.Neb. 1989), quoting Mitsui & Co. v. Puerto Rico Water Resources Authority, 93 F.R.D. 62, 67 (D.P.R. 1981); Dravo Corp. v. Liberty Mut. Ins. Co., 164 F.R.D. 70, 75 (D. Neb. 1995).

By requiring the responding party to produce a witness who is capable of testifying as "to matters known or reasonably available to the organization," the Rule makes plain its preference that a party not subvert the beneficial purposes of the Rule by simply incanting that no witness is available who personally has direct knowledge concerning all of the areas of inquiry. Dravo Corp. v. Liberty Mut. Ins. Co., supra at 75-76; United States v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C. 1996)("If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers."), aff'd, 166 F.R.D. 367 (M.D.N.C. 1996). If need be, the responding party "must prepare deponents by having them review prior fact witness deposition testimony as well as documents and deposition exhibits." United States v. Taylor, supra at 362. Any other interpretation of the Rule would allow the responding corporation to "sandbag" the depositional process "by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial." Id. We understand that the burden upon the responding party, to prepare a knowledgeable Rule 30(b)(6) witness,

may be an onerous one, but we are not aware of any less onerous means of assuring that the position of a corporation, that is involved in litigation, can be fully and fairly explored.

Applying these considerations here, we are satisfied that Preisser was properly designated as a prepared and knowledgeable witness as to most, but not all, of the topics noticed for Arctic Cat's 30(b)(6) deposition. As to Preisser's preparedness on the topics related to testing, we find that, although Preisser was partially prepared, he was not fully prepared to address these issues. Arctic Cat asked Preisser about IRS' response to Interrogatories which indicated that "sometime prior to February 1995, IRS examined an Arctic Cat EFI model snowmobile." Preisser Deposition at 59. Preisser asserted that, in that response, he was not referring to the testing which had occurred in 1993, but instead, to testing that was done between December of 1994 -- when the '803 patent was issued -- and February of 1995. Id. at 58-60. He further testified that it was likely that Hanes and Chasteen had been involved in that testing, but that he had not inquired of them, prior to the deposition, about that testing. Further, Preisser stated that additional testing was done after February of 1995, that he believed that Chasteen, together with IRS' attorneys had been involved in that testing. Preisser then clarified that, when he referred to testing, he was not only describing hands-on

testing, but also reviews of documents, and computer simulations, and that the law firms had done these types of testing, while Chasteen did the hands-on testing.

We note from our reading of the deposition, that Arctic Cat did not ask Preisser about specific information as to the 1993 testing, or to the later testing in 2001. It is likely, as IRS asserts, that was due to IRS's claim of privilege as to those tests, which were done together with counsel -- an assertion that we have already addressed in the context of Arctic Cat's Motion for production of those documents. However, it is also apparent, from our reading of the deposition, that Preisser believed that some other testing was conducted, between December of 1994 and February of 1995, likely by Chasteen and Hanes, and that Preisser had not been prepared on that topic, as no inquiry as to that testing had been made.

While IRS asserts that Preisser testified that the 1993 and 2001 testing was the only hands-on testing conducted on Arctic Cat snowmobiles, we do not read his testimony as saying that. Instead, he appears to suggest that Chasteen, whom he stated was involved in hands-on testing, conducted tests during that period. We find that IRS had a duty to prepare Preisser on the topic of testing, and in so doing, to inquire as to what testing had occurred, when it occurred, and who was present. While it may be that no other

hands-on testing occurred, due to his failure to inquire on that topic, Preisser could not offer a binding answer to that effect, and instead, was only able to testify to a belief that some testing occurred. We find that response to have been insufficient to satisfy IRS' duty, under Rule 30(b)(6), to provide a deponent who was prepared to answer questions on the topics noted by Arctic Cat.

On the destruction of documents topic, we agree with IRS that, generally, a corporation is not required to contact third parties, in order to determine whether they had ever destroyed any documents, as "we are aware of no requirement that a Rule 30(b)(6) deponent must undertake an investigation, outside of the party he represents, in order to respond to questions that, properly, should be directed to a different party, or entity." Arctic Cat, Inc. v. Injection Research Specialists, Inc., 210 F.R.D. 680, 685 (D. Minn. 2002). However, we find that Preisser was less than fully prepared as to IRS' own document handling. Although Preisser did testify that IRS had no document destruction policy, that it normally kept copies of everything, and did not get rid of anything, and that, to the best of his knowledge, IRS had never destroyed documents, and had never authorized, nor been warned of the destruction of documents by Kutak Rock, he also testified that he never spoken with anyone else at IRS, or its affiliates, so as to determine whether, in fact, documents were destroyed.

While this, alone, might indicate that Preisser was unprepared on the topic, we think that the unique circumstances of the case, namely that IRS has no principal place of business where it has maintained its records throughout its years, reflects an even more troubling state of unpreparedness. Preisser testified that IRS had moved its offices a number of times, and that, IRS documents might have been retained, after one of those moves, by Chasteen himself, as opposed to being transferred to the new office space. He further testified, however, that he had not asked Chasteen whether he had ever destroyed any IRS documents. Further, he testified that some of IRS' documents had likely been transferred to Pacer, in one of the moves, but that he had not made any inquiries as to whether anyone from Pacer, or Echlin, which owns Pacer, had ever destroyed any of IRS' documents that were in their custody.

Nor did he inquire of any of IRS' former attorneys, including outside counsel, in-house counsel, or patent counsel, who retained files of IRS documents, whether they had any original IRS documents, and if so, whether they had destroyed those documents. Given that IRS has no document depository, we conclude that some additional inquiry on this topic was required, in order to fully prepare Preisser for that inquiry. Documents retained by IRS' agents, including its attorneys, remain IRS documents. While that inquiry might be somewhat onerous, that is only because of IRS'

election as to how, and where, to store its documents, as well as its apparent failure to adequately track who possesses, or stores, its relevant documents. Such an election should not preclude Arctic Cat from making a reasonable inquiry into the topic of document destruction.

Accordingly, we find that Preisser was ill-prepared on this topic and effectively blunted Arctic Cat's meaningful inquiry, and additional inquiry should be allowed on this and on the topic of IRS' testing.

In assessing the need for sanctions, a Federal District Court has the inherent authority, and responsibility, to regulate and supervise the bar practicing before it. See, Jenkins v. Missouri, 931 F.2d 470, 484 (8th Cir. 1991); Cook v. City of Columbia Heights, 945 F. Supp. 183, 185 (D. Minn. 1996). While this inherent power "ought to be exercised with great caution," Ex parte Burr, 22 U.S. 529, 531 (1824), the Court has wide discretion in framing sanctions to remedy abuses, including attorney disqualification, the assessment of attorney's fees, monetary sanctions, and the dismissal of an action. See, Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991). We conclude that, given IRS' designation of a plainly unqualified deponent, for Rule 30(b)(6) purposes, a sanction is warranted. Since the discovery abuse was modest, so should be the sanction.

Arctic Cat has asked the Court to award it sanctions in the amount of $5,176.00. The amount includes the cost of six hours of travel time, and seven hours of deposition time -- $4,355.00; airfare -- $540.00; transportation costs -- $135.00; and hotel costs -- $156.04. See, Exhibit V attached to Sorenson Declaration. We conclude that, under the totality of the circumstances, the sanction, that Arctic Cat requests, would be excessive. In view of the circumstances, a sanction in the amount of $1,923.02 is fully adequate. Not all of Preisser's deposition was valueless to Arctic Cat and, while a precise ascertainment of wasted time, owing to Preisser's lack of preparation, is difficult, we find a total award of $1,923.02, in attorneys' fees and costs, to be reasonable under the circumstances, and we direct IRS to promptly remit that amount to Arctic Cat as a result of the discovery abuses that we have detailed.[6]

---

[6]We note that Preisser's deposition commenced at 9:16 o'clock a.m., and was completed by 12:28 o'clock p.m., thereby totaling the expenditure of three hours. Perhaps, Arctic Cat is including, in its tabulation, the time expended during the Rule 30(b)(6) deposition that was noted, and taken, by Suzuki. We have no reason to award attorneys' fees as to a deposition that Arctic Cat did not note. While, ordinarily, we would be inclined to award fees for the time expended by counsel in preparing for the deposition, we find that any preparation could be completed during the six hours tabulated for the attorney's travel time. Since Arctic Cat concedes that Preisser responded to about one-half of the noted deposition topics, without complaint from Arctic Cat as to his state of preparedness, we reduce the total hours expended by one-

(continued...)

We also find that Arctic Cat's request that IRS produce a new Rule 30(b)(6) deponent for seven hours of deposition, is excessive. We find that an additional four hours of deposition is adequate to permit Arctic Cat to inquire into the areas that were eluded by virtue of Preisser's lack of preparation.

NOW, THEREFORE, It is --

ORDERED:

1. That Suzuki's Motion to Compel Production of Documents Relating to Tests Conducted by IRS [Docket No. 202] is GRANTED, to the extent provided in the text of this Order.

2. That Pacer's Motion to Compel Interrogatory Responses from Arctic Cat and Suzuki [Docket No. 185] is GRANTED.

3. That IRSs Motion to Compel Responses to Requests for Production [Docket No. 191-1] is DENIED.

4. That IRS' Motion to Compel Deposition Testimony from Suzuki [Docket No. 191-2] is GRANTED.

---

[6](...continued)
half, which produces a reasonable total in the amount of 4.5 hours. Further, we find an hourly fee of $335.00 to be reasonable under the circumstances, which produces a total fee award of $1,507.50. See, Arctic Cat, Inc. v. Injection Research Specialists, 210 F.R.D. 680, 684 (D. Minn. 2002). To this we add one-way of the travel expenses, to produce a total fees and costs award of $1,923.02.

5. That IRS' Motion to Compel Production of Documents Relating to Opinions of Counsel from Suzuki, or to Preclude Use of Such Opinions at Trial [Docket No. 188] is DENIED.

6. That Arctic Cat's Motion to Compel IRS's Production of Documents for Re-Inspection [Docket No. 178] is GRANTED, but that Arctic Cat is required to pay all reasonable costs associated with that production, as more fully detailed in the text of this Order.

7. That Arctic Cat's Motion to Compel IRS to Produce Documents Related to Damages [Docket No. 180] is GRANTED, to the extent provided in the text of this Order.

8. That Arctic Cat's Motion to Compel a Further Deposition of IRS Pursuant to Rule 30(b)(6) [Docket No. 182], is GRANTED, in part.

9. That Arctic Cat's Motion for Sanctions, [Docket No. 182] is GRANTED, in part, and IRS is directed to pay Arctic Cat $1,923.02 as a sanction for discovery abuses.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE