UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

ORDER

* * * * * * * * * * * * * * * * * * *

Arctic Cat, Inc., a Minnesota Corporation,

Plaintiff,

vs.

Injection Research Specialists, Inc., a Colorado corporation, and Pacer Industries, Inc., a Missouri corporation,

Defendants.

and

Injection Research Specialists, Inc., a Colorado corporation, and Pacer Industries, Inc., a Missouri corporation,

Counterclaimants,

vs.

Arctic Cat, Inc., a Minnesota corporation, and Suzuki Motor Corporation, a Japanese Corporation,

Counterdefendants. Civ. No. 01-543(MJD/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 30th day of September, 2003.

348

FILED SEP 30 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK JLG

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(A), upon the Motions of Counterdefendant Suzuki Motor Corporation ("Suzuki"), and of Plaintiff and Counterdefendant Arctic Cat, Inc. ("Arctic Cat"), to compel the Defendants Injection Research Specialists, Inc., and Pacer Industries, Inc. (jointly "IRS"), to produce documents relating to statements made in reissue oaths pertaining to U.S. Patent No. 4,901,701 (the "'701 Patent").

A Hearing on Suzuki's Motion was conducted on February 7, 2003, at which time, Suzuki appeared by Thomas H. Jenkins, Esq., and IRS appeared by Robert J. Blanch, Esq. A Hearing on Arctic Cat's Motion was conducted on September 4, 2003, at which time, Arctic Cat appeared by Annamarie A. Daley and Christopher J. Sorenson, Esqs., and IRS appeared by Anthony de Alcuaz, Esq. For reasons which follow, the Motions are granted in part.

## II. Factual and Procedural Background

As part of this litigation, IRS claims that Arctic Cat, and Suzuki, infringe upon IRS's '803 Patent, which was assigned by its inventor, Ronald E. Chasteen ("Chasteen"), to IRS. The '803 Patent has something of a convoluted history. Originally, the predecessor of the '803 Patent was Patent Application '626 which was filed by

Chasteen on November 12, 1987. Subsequently, on April 28, 1989, Chasteen abandoned that Application, and filed Continuation Application '803. The Continuation Application issued, on February 20, 1990, as Patent '701. In June of 1990 -- after it had been given Chasteen's interests in the '701 Patent -- IRS filed suit against Polaris Industries, Inc. ("Polaris"), alleging infringement of IRS's '701 Patent. According to Chasteen, during the course of that litigation, he came to understand that the claims of the '701 Patent were unduly narrow, owing to the errors of his then legal counsel, William O'Meara ("O'Meara"). As a result, on February 18, 1992, IRS sought a reissuance of the '701 Patent, which ultimately issued, on December 6, 1994, as the '803 Patent which, here, IRS alleges that Arctic Cat, and Suzuki, are unlawfully infringing.

As pertinent here, Arctic Cat, and Suzuki, attack the validity of the '803 Patent, on both reissuance, and recapture grounds. According to Arctic Cat, and Suzuki, Chasteen was less than truthful in the Reissue Oaths that he had submitted in support of his Reissuance Application. Further, they allege that through reissuance, Chasteen, and therefore IRS, regained subject matter, in the '803 Patent, that had been surrendered in an effort to obtain allowance of the original claims of the '701 Patent. "Reissued claims that are broader than the original patent's claims in a manner directly pertinent to the subject matter surrendered during

prosecution are impermissible." Pannu v. Storz Instruments, Inc., 258 F.3d 1366, 1371 (Fed. Cir. 2001), citing In re Clement, 131 F.3d 1464, 1468 (Fed. Cir. 1997), quoting in turn, Mentor Corp. v. Coloplast, Inc., 998 F.2d 992, 996 (Fed. Cir. 1993). Arctic Cat, and Suzuki, invoke both bases for invalidity, in seeking the disclosure of the attorney-client advices which Chasteen proffered to the Patent Examiner, in his Second Supplemental Reissue Oath.[1]

Chasteen's Second Supplemental Reissue Oath was filed because the Patent Examiner was not satisfied with the bases for a Reissued Patent, which Chasteen had proffered in his original Oath. In his Second Oath, Chasteen averred, in part, as follows:

> In the period of September, October through November, 1987, during the preparation of the parent application [i.e., the '626 Application], and on April 21, 1989, when I executed the Declaration and Power of Attorney for Patent Application for the continuation application [i.e., for the '701 Patent], I erred in not comprehending or appreciating the concept and legal significance of what I now understand to be a broad patent claim. The need to present an enabling disclosure with all of the operating details of a preferred form of the invention was impressed upon me by my attorney who prepared the application. Therefore, my disclosure to him was based on the full details of the working model of the inventive

[1]In actuality, in its Motion papers, Suzuki quotes excerpts from Chasteen's Fourth Supplemental Reissue Oath but, as IRS concedes, Chasteen's earlier Second Supplemental Reissue Oath, contains the same averments cited by Suzuki.

> fuel injection system which I had developed for snowmobile two stroke-cycle engines.

Exhibit D to the Declaration of Peter Van Mieghem ("Meighem Decl."), at p. 7

* * *

> When disclosing the invention to my attorney I erroneous imparted to him the idea that all of these prototype elements should be included within the protection of the patent instead of seeing to it that the attorney was focused on the basic elements of my fuel injection system for two cycle engines.

Id.

* * *

> I had no knowledge of the legal effect of including structural elements in the claim which were unnecessary in order to satisfy my statutory obligation to particularly point out and distinctly claim the subject matter which I regarded as my invention. I was not informed and did not know enough to ask regarding what I now understand is the customary approach of submitting in the original application a series of claims to the invention which are both broad and narrow in their potential patent coverage. I mistakenly and erroneously did not make inquiry of my attorney on this issue because I did not then know it was an issue.

Id. at 8.

* * *

> After the [Polaris] suit had progressed for several months, and generally in the September-December 1990 time frame, I was called upon to work with IRS's litigation attorneys in analyzing the scope and breadth of the claim of the Original Patent. It was through this process that I began to learn the difference between a narrow claim and a broad patent claim. However, it was not until late March

> 1991, when working with IRS attorneys, that I became fully aware of the error which I had made in approving the filing of the parent application and the Original Patent application without one or more claims which would more broadly cover my invention than did the single submitted claim No. 1 in the Original Patent application.

Id. at 9.

As related by Chasteen, his Continuation Application for the '701 Patent had the following "unnecessary" limitations: 1) "fuel supply means;" 2) "battery voltage sensing means * * *;" 3) "timing sensing means * * *;" 4) "means for * * * generating a priming control signal * * *;" 5) " * * * and a known fuel output rate capacity of said fuel injector means;" and 6) "means for * * * generating a pump control signal * * *." Id. at 5-6.

In conjunction with Chasteen's Second Supplemental Reissue Oath, his attorney, Richard W. Hanes ("Hanes"), filed "Remarks and Argument" which stated, in pertinent part:

> The description of how the errors were discovered also has been supplemented in the Second Oath to include date ranges and a more detailed description of how the discovery of the error was made. While it may be possible to even further detail the events, transactions and conversations which led to the discovery of the error by the affiant, to do so would compromise a fundamental right of the affiant and the patent owner -- the attorney/ client privilege. That basis right is hereby claimed by the affiant and the patent owner. Certainly, the information required to be supplied by the affiant to demonstrate that an error arose without deceptive intent does not

> have to be of such compass as to violate the attorney/client privilege. Requiring particulars and detail in addition to those now present in the submitted Second Oath would violate the attorney/client privilege. The facts now set forth therein are sufficient to demonstrate a lack of deceptive intent and satisfy the applicable regulation.

Exhibit F to Mieghem Decl., at p. 4.

Thereafter, Patent '803 issued. Suzuki, and Arctic Cat, complain that IRS employed confidential disclosures, between Chasteen and O'Meara, in the early Patent Applications, and Continuances, and later, the confidential disclosures between Chasteen and Hanes, in the Reissuance Application, in order to secure the '803 Patent, but the efforts of Suzuki, and Arctic Cat, to determine, through discovery, whether Chasteen's averments, in his Second Supplemental Reissue Oath, were truthful, and accurate, have been thwarted by objections founded upon the attorney-client privilege. Arguing that IRS should not be able to employ Chasteen's attorney-client confidences as a sword, and then seek to shield those confidences by the claimed privilege, Suzuki, and Arctic Cat, move to compel those assertedly privileged communications.

## III. Discussion

The Patent Reissue Statute, Title 35 U.S.C. §251, provides, in part, as follows:

> Whenever any patent is, through error without any deceptive intention, deemed wholly or partially inoperative or invalid, by reasons of a

> defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the commissioner shall, on the surrender of such patent, and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent.

"In accordance with 37 C.F.R. §1.175(a)(5) and (a)(3) the applicant for reissue must 'specify[] the errors relied upon, and how they arose or occurred,' and must 'distinctly specify[] the excess or insufficiency in the claims'; and in accordance with 37 C.F.R. §1.175(a)(6) the applicant must declare the absence of deceptive intention." Scripps Clinic & Research Foundation v. Genentech, Inc., 927 F.2d 1565, 1574 (Fed. Cir. 1991). Here, Chasteen attested that the '701 Patent "is deemed wholly or partly inoperative or invalid by reason of the patentee claiming less than he had the right to claim in the patent, through error and without any deceptive intent." Exhibit D to Mieghem Decl., at 4.

As the Court observed, in Hester Industries v. Stein, Inc., 142 F.3d 1472, 1479 (Fed. Cir. 1998), cert. denied, 525 U.S. 947 (1998):

> In considering the "error" requirement, we keep in mind that the reissue statute is "based on fundamental precepts of equity and fairness, and should be construed liberally." In re Weiler, 790 F.2d 1576, 1579, 229 USPQ 673, 675 (Fed. Cir. 1986). We also keep in

> mind that "not every event or circumstance that might be labeled 'error' is correctable by reissue." Id. Indeed, the reissue procedure does not give the patentee the right "to prosecute de novo his original application." Id. at 1582, 790 F.2d 1576, 229 USPQ at 677; see also Mentor Corp. v. Coloplast, Inc., 998 F.2d 992, 995, 27 USPQ2d 1521, 1524 (Fed. Cir. 1993).

"One of the most commonly asserted 'errors' in support of a broadening reissue is the failure of the patentee's attorney to appreciate the full scope of the invention during the prosecution of the original patent application." Id. at 1479-80, citing In re Amos, 953 F.2d 613, 616 (Fed. Cir. 1991), and In re Wilder, 736 F.2d 1516, 1519 (Fed. Cir. 1984), cert. denied, 469 U.S. 1209 (1985); see also, The Toro Co. v. Ariens Co., 1998 WL 34024138 at *14 (D. Minn., September 2, 1998); Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc., 783 F. Supp. 413, 416 (D. Minn. 1991).

In In re Wilder, supra at 1519, the Court explained the application of the Patent Reissue Statute, to patent attorney error, as follows:

> An attorney's failure to appreciate the full scope of the invention is one of the most common sources of defects in patents. The fact that the error could have been discovered at the time of prosecution with a more thorough patentability search or with improved communication between the inventors and the attorney does not, by itself, preclude a patent owner from correcting defects through reissue. In this case, the attorney's error was discovered after commercialization of the invention and

> issuance of the patent. An application for broader claims was filed within two years after the original patent issued. Under these circumstances, the attorney's explanation of his error in understanding the scope of the invention is sufficient to satisfy the error requirement of 35 U.S.C. §251.

Further, "[t]he law does not require that no competent attorney or alert inventor could have avoided the error sought to be corrected by reissue." <u>Scripps Clinic & Research Foundation v. Genentech, Inc.</u>, supra at 1575.

Here, of course, neither O'Meara, nor Hanes, filed a declaration corroborating Chasteen's contention that O'Meara committed error which necessitated the Reissuance Application. While we do not suggest that any such declaration was essential to the grant of the '803 Patent, for we are not required, at this discovery stage, to consider the substantive merits of the reissuance, we do note that, as is true elsewhere in the law, direct, personal evidence is preferable to hearsay. Moreover, we understand that "[s]ubjective intent is not determinative of whether the applicants erred in claiming less than they had a right to claim." <u>Scripps Clinic & Research Foundation v. Genentech</u>, supra at 1575, citing <u>In re Mead</u>, 581 F.2d 251, 255 (CCPA 1978). Rather, "[d]etermining what protection [an inventor] intended to secure by [an] original patent for the purposes of §251 is an essentially factual inquiry confined to

the objective intent manifested by the original patent." Id.; quoting In re Rowand, 526 F.2d 558, 560 (CCPA 1975).

We cannot say, given the law applicable to patent reissues, that, having relied upon legal counsel's advices, in securing the issuance of the '803 Patent, IRS may now claim attorney-client privilege in shrouding those advices from discovery, at least as to the advices of O'Meara. As we have observed elsewhere, in the somewhat analogous context of the advice of counsel defense,[2] that "'[f]airness dictates that a party may not use the attorney-client privilege as both a sword and a shield,' and therefore, parties asserting the advice-of-counsel defense 'may not selectively disclose privileged communications that it considers helpful while claiming privilege on damaging communications relating to the same subject." Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, L.P., 210 F.R.D. 673, 675 (D. Minn. 2002), quoting SNK Corp.

---

[2]IRS has suggested that there are no meaningful parallels between a purported infringer's resort to an advice of counsel defense as a parry to a willfulness allegation, and the resort to errors of legal counsel in seeking a reissuance. We find, however, the parallels to be striking. The defense to a willful infringement claim need not be supported by the opinion of a patent lawyer but, if it is, then the privilege, which would ordinarily shroud that opinion, is vitiated. Similarly, the patent holder, who seeks a reissuance, need not detail the patent holder's discussions with his patent attorney which, assertedly led to legal error on the attorney's part. However, if the patent holder volunteers that information, in order to sway the Patent Office to grant the reissuance, then the information, otherwise protected by privilege, should be discoverable.

of America v. Atlus Dream Ent. Co. Ltd., 188 F.R.D. 566, 570 (N.D. Cal. 1999), citing Handgards, Inc. v. Johnson & Johnson, 413 F.R.D. 926, 929 (N.D. Cal. 1976). In the final analysis, "[t]he attorney/client privilege is waived by the voluntary disclosure of privileged communications, and courts typically apply such a waiver to all communications on the same subject matter." PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership, 187 F.3d 988, 992 (8th Cir. 1999), citing United States v. Workman, 138 F.3d 1261, 1263 (8th Cir. 1998).

As might be expected in a fact-driven issue, the case authorities differ according to the facts presented. For its part, IRS relies upon Freeman v. Minnesota Mining and Manufacturing Co., 1986 WL 9480 (D. Del., August 15, 1986), Chore-Time Equipment, Inc. v. Big Dutchman, Inc., 258 F. Supp. 233 (W.D. Mich. 1966), and Principle Business Enterprises, Inc. v. United States, 1980 WL 30216 (Ct. Cl. 1980), while Suzuki, and Arctic Cat, principally rely upon Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 46 U.S.P.Q. 2d 1959 (S.D.N.Y. 1998), aff'd sub nom., In re Rhone-Poulenc Rorer, Inc., 185 F.3d 879, 1998 WL 968489 (Fed. Cir., December 23, 1998)[Table Decision]. Of these decisions, we find that the cir-

cumstances presented in Bristol-Myers are most closely aligned with those confronted here.[3]

[3]In Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer Inc., 46 U.S.P.Q.2d 1959, 1960 (S.D.N.Y. 1998), aff'd sub nom., In re Rhone-Poulenc Rorer, Inc., 185 F.3d 879, 1998 WL 968489 (Fed. Cir., December 23, 1998)[Table Decision], the Court explained the reissue applicant's waiver of the attorney-client privilege as follows:

> The inventors of the '001 patent and the '277 reissue patent have waived their attorney client privilege by their statements to the patent office on September 28, 1992 explaining why they had not previously made claims covering the intermediates, e.g. "applicants do not have even a basic knowledge of United States or French patent laws," "applicants were never advised to the contrary and apllicants were and are unfamiliar with French patent law," "it was believed by applicants that all of what was disclosed would be protected and applicants were never advised to the contrary" and "As noted above applicants were and are unfamiliar with United States patent law." Under these circumstances plaintiff is entitled to determine what legal advice the inventors had received concerning the French and United States patent laws and the scope of the patents applied for.

The Court of Appeals concurred in this reasoning. In re Rhone-Poulenc Rorer, Inc., supra at *1. Here, Chasteen's averments, in his Second Supplemental Reissue Oath, identify the specific subjects that he discussed with O'Meara, and detailed the reasons why the application for the '701 had the structure, and content, which was purportedly crafted solely by O'Meara.

In contrast, the decisions relied upon by IRS merely note that communications, whether oral or in writing, were received from legal counsel, which led the reissue applicant to believe that the applicant did not receive all of the patent coverage to which the applicant was entitled. See, Principle Business Enterprises, Inc.

(continued...)

Moreover, the cases relied upon by IRS employ a shortcut in logic, which defies common sense, and which precludes inquiry into a reissue applicant's reliance upon legal advice because a Reissue Patent is entitled to a presumption of validity. We do not quarrel with the presumption of validity which attaches to a Reissue Patent, see Superior Fireplace Co. v. Majestic Products Co., 270 F.3d 1358, 1367 (Fed. Cir. 2002), but, if such a presumption bars such an inquiry, without more, then we are at a loss to understand why those same Courts would allow inquiry into the knowledge of the reissue applicant, for the presumption those Courts apply would appear to be irrebuttable. Even IRS concedes that Chasteen is fair game for discovery as to his knowledge at the time of the Reissue Application, and only objects to inquiry at the threshold of any attorney-client exchanges. See, IRS Memorandum, at pp. 8-9 ("* * * Suzuki is to cross-examine Mr. Chasteen in deposition or at trial on ["how and when he learned of the 'errors,' the reasons for filing the reissue application for the '803 patent, and the preparation of the reissue oath,"] it explore its alleged "evidence

---

[3](...continued)
v. United States, 210 U.S.P.Q. 26, 27 (Ct.Cl. 1980); Chore-Time Equipment, Inc. v. Big Dutchman, Inc., 258 F. Supp. 233, 234 (W.D. Mich. 1966); Freeman v. Minnesota Mining and Manufacturing Co., 1986 WL 9480 at *2 (D. Del., August 15, 1986). None of these cases specify, with the same detail as did Chasteen, the precise topics that he discussed with O'Meara which caused him, at least purportedly, to wrongfully rely upon O'Meara's legal advice.

of misstatements.”). We are not persuaded that such an irrebuttable presumption should apply.

Nor are we convinced that Chasteen’s, and, therefore, IRS’s waiver of the attorney-client privilege was involuntary. We are mindful of Hanes’ written argument that, to disclose more, would have jeopardized Chasteen’s, and IRS’s, attorney-client privilege, but that conclusory statement is belied by the level of detail that Chasteen provided, with the assistance of Hanes, concerning Chasteen’s exchanges with O’Meara. While not cited by any party, we find guidance in the Court’s reasoning in Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc., supra at 414, where a reissue applicant asserted undefined error on the part of its attorney and, when requested by the Patent Examiner, to provide detail as to how the errors arose, the applicant filed a “supplemental declaration in which he stated “I am unaware of how the error occurred but it obviously occurred during the preparation and prosecution of the application * * *.” The reissue was allowed, and that decision was confirmed, in related litigation, with the Court observing, as follows:

> The patent examiner requested a more detailed explanation of the error, [the applicant] did the best he could, and the patent examiner accepted the explanation. To expect a detailed inquiry into the thought processes of the attorney who worked on the first application is simply not reasonable.

Id. at 416.

Here, Chasteen was not content to limit his Oaths to the shortcomings in his own knowledge; rather, he elected to provide details as to his specific exchanges with O'Meara and, having gained the relief he requested from the Patent Office, upon those showings, he should not now be permitted to preclude discovery as to the legitimacy of his attestations.

As we have already acknowledged, the Patent Reissue Statute is predicated on fairness and equity, as its purpose "is to avoid forfeiture of substantive rights due to error made without intent to deceive." Scripps Clinic Research Foundation v. Genentech, Inc., supra at 1575. If, as Chasteen has sworn, his attorney erred and caused him to claim less than the Patent coverage to which he was entitled, then no harm can follow the limited discovery we allow here.[4] On the other hand, if Chasteen's attribution of error to O'Meara is incorrect, and if Chasteen was not duped to the extent

---

[4]Suzuki, and Arctic Cat, underscore that, in another reissue proceeding, Chasteen has sworn that an attorney, at a time which predates the reissuance proceedings involving the '701 Patent, addressed with him the desirability of broad patent claims, and they further emphasize that, with respect to the '626 Patent Application, which Chasteen withdrew, the proposed claims were without some of the "unnecessary limitations," that Chasteen complained of in his Second Supplemental Reissue Oath. While these points may be of interest as to the merits of any challenge to the reissue of the '701 Patent, or any recapture claim, we have no showing, here, that inquiry into these areas was preempted by a claimed attorney-client privilege objection.

that he swore to, then Chasteen, and IRS in turn, should not profit by any "deceptive intention." Title 35 U.S.C. §251. Admittedly, Suzuki and IRS have a significant hurdle to overcome in demonstrating either a violation of Section 251, or the application of the recapture doctrine, but that hurdle should not be arbitrarily insurmountable where, as here, Chasteen disclosed so much of his attorney-client confidences as would assist him in obtaining the '803 Patent.

Lastly, we consider the scope of the waiver. Not unexpectedly, Suzuki, and Arctic Cat, seek a most expansive, and invasive waiver. We concur, however, with IRS that the waiver only extends to the communications between O'Meara, and Chasteen and/or IRS, as they relate to the precursor patent applications to the '803 Patent. We recognize that Chasteen obliquely swore, in his Second Supplemental Reissue Oath, that he discovered the claimed errors in the '701 Patent, as he was litigating a claim, with Hanes, against Polaris, but Chasteen does not disclose any confidences than would be inferred when a client, and legal counsel, litigate a patent infringement claim. The communications, which Chasteen detailed, were between himself and O'Meara, and those are the confidences which have been waived.

Suzuki, and Arctic Cat, have identified certain documents on IRS's Privilege Log, which appear to relate to communications

between O'Meara and Chasteen, but they have not been submitted for our in camera review. We can readily perceive that, at least potentially, some of those documents could contain unrelated, confidential advices, which are distinct, and unrelated, to the waiver we have found. IRS should be allowed to redact any such confidences but, given the history of these litigants, IRS should not view the prospect of redaction as a means of rendering any disclosures unintelligible. As a result, if redactions are necessary, IRS shall produce the subject documents in both redacted, and unredacted form, for this Court's in camera review. If we find abuse in the redaction process, we will not be hesitant to react. The production of documents, for in camera purposes, should be completed **by no later than October 15, 2003.**

In addition, Suzuki, and Arctic Cat, challenge IRS's objections, based upon the attorney-client privilege, during the depositions of O'Meara, and Chasteen, consistent with the waiver we have found, those objections are overruled, and Suzuki, and Arctic Cat, will be allowed to promptly complete the depositions of those two witnesses, but the depositions must be closely tailored so as to only address the communications between Chasteen, and O'Meara, relating to the Patent proceedings which served as the precursor of the '803 Patent.

NOW, THEREFORE, It is --

ORDERED:

That the Motions of Counterdefendant Suzuki Motor Corporation [Docket No. 144], and of Plaintiff and Counterdefendant Arctic Cat, Inc. [Docket No. 314] to compel the Defendants Injection Research Specialists, Inc., and Pacer Industries, Inc., to produce documents relating to statements made in the Reissue Oaths pertaining to U.S. Patent No. 4,901,701 are GRANTED.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE