UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

ORDER

* * * * * * * * * * * * * * * * * * *

Arctic Cat, Inc., a Minnesota Corporation,

Plaintiff,

vs.

Injection Research Specialists, Inc., a Colorado corporation, and Pacer Industries, Inc., a Missouri corporation,

Defendants.

and

Injection Research Specialists, Inc., a Colorado corporation, and Pacer Industries, Inc., a Missouri corporation,

Counterclaimants,

vs.

Arctic Cat, Inc., a Minnesota corporation, and Suzuki Motor Corporation, a Japanese Corporation,

Counterdefendants. Civ. No. 01-543(MJD/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 12th day of February, 2004.

FILED FEB 12 2004
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD ______
DEPUTY CLERK ______

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(A), upon the following Motions: 1) The Motions of Counterdefendant Suzuki Motor Corporation ("Suzuki") to Supplement its Invalidity Claim Chart, and to Separate Adjudication of Willfulness and Damages Issues; 2) The Motions of the Defendants, and Counterclaimants, Injection Research Specialists, Inc., and Pacer Industries, Inc. (jointly "IRS") for Sanctions, for Leave to Amend Infringement Claim Chart, to Compel the Plaintiff and Counterdefendant Arctic Cat, Inc. ("Arctic Cat"), to Produce Documents from the Trade Secret Litigation, for an Order to Enforce Compliance with Subpoena Duces Tecum, and to Compel Arctic Cat, and Suzuki, to Produce Documents Related to Arctic Cat 2003 Models, and Supplement their Disclosures for 2004 Models; and 3) The Motion of Arctic Cat to Compel Discovery.[1]

A Hearing on the Motion of Suzuki to Supplement its Invalidity Claims Chart, and one of IRS's Motions for Sanctions, was conducted on September 4, 2003, at which time, Suzuki appeared by Thomas H.

---

[1]IRS also filed two Motions for leave to file additional papers, which support of its Motions for sanctions and, without objection from the opposing parties, those Motions were granted.

Jenkins, Esq.; IRS appeared by Anthony de Alcuaz, Esq.; and Arctic Cat appeared by Annamarie A. Daley and Christopher J. Sorenson, Esqs. A Hearing on the remainder of the Motions was conducted on November 13, 2003, at which time, Arctic Cat appeared by Annamarie A. Daley, Esq.; IRS appeared by Anthony de Alcuaz, and Robert J. Blanch, Esqs.; Suzuki appeared by Thomas H. Jenkins, Esq.; and the law firm of Robins, Kaplan, Miller & Ciresi appeared by Christopher J. Sorenson, Esq.

For reasons which follow, we deny IRS's Motions for Sanctions; we grant Suzuki's Motion to supplement its Invalidity Claims Chart; we deny IRS's Motion to amend its Infringement Claim Chart; we grant, in part, IRS's Motions to Compel, and to enforce compliance with the Subpoena, but deny IRS's Motion to compel with respect to Arc-tic Cat's 2003 and 2004 models; and we deny Suzuki's Motion to Bifurcate.[2]

## II. Factual and Procedural Background

As part of this litigation, IRS claims that Arctic Cat, and Suzuki, have infringed upon IRS's '803 Patent, which was assigned by its inventor, Ronald E. Chasteen ("Chasteen"), to IRS. The '803 Patent has something of a convoluted history. Originally, the pre-

---

[2]Many of the Motions were resolved from the Bench, but others were not and, in the interests of completeness, we reduce our prior rulings to writing, in conjunction with our rulings on the other pending Motions.

decessor of the '803 Patent was Patent Application '626 which was filed by Chasteen on November 12, 1987. Subsequently, on April 28, 1989, Chasteen abandoned that Application, and filed Continuation Application '803. The Continuation Application issued, on February 20, 1990, as Patent '701. In June of 1990 -- after having been assigned Chasteen's interests in the '701 Patent -- IRS filed suit against Polaris Industries, Inc. ("Polaris"), alleging infringement of IRS's '701 Patent. According to Chasteen, during the course of that litigation, he came to understand that the claims of the '701 Patent were unduly narrow, owing to the errors of his then legal counsel, William O'Meara. As a result, on February 18, 1992, IRS sought a reissuance of the '701 Patent, which ultimately issued, on December 6, 1994, as the '803 Patent. As noted, IRS alleges, in this action, that Arctic Cat, and Suzuki, are unlawfully infringing the '803 Patent.

## III. Discussion

### A. The Motion of IRS for Sanctions Against Arctic Cat for False and Misleading Disclosure and Failure to Comply with Order Pursuant to Rule 37(B)(2), and (C), Federal Rules of Civil Procedure.

With respect to IRS's counterclaim against Arctic Cat, and Suzuki, for infringement of the '803 Patent, IRS contends that one of the bases for Arctic Cat's affirmative defense of non-infringement is the alleged activation of a "skip pulse" feature in

some of their fuel-injected snowmobiles. IRS asserts that, in reliance upon Arctic Cat's representations, both in Arctic Cat's Answers to Interrogatories, and through its Rule 30(b)(6) deponent, that its F7 Firecat product employed skip pulse technology, IRS selected an F7 Firecat for testing. IRS further contends that, after its expert, Dr. William Ribbens ("Ribbens"), examined the F7 Firecat, he discovered that the product did not employ the skip pulse feature. IRS maintains that, after confronting Arctic Cat with Ribbens' finding, Arctic Cat amended its discovery responses, and claims that the F7 Firecat is the only product which Arctic Cat it misidentified as having the skip pulse feature. IRS seeks, as sanctions, the reasonable costs it incurred by in testing the F7 Firecat, and it seeks to shift the burden, to Arctic Cat, of proving that all of the other products it identified, as employing the skip pulse feature, actually have that characteristic.

In response, Arctic Cat represents that, in November of 2002, its discovery responses were correct, to the best of its knowledge, when it stated that all of its 2003 EFI Models, including the 2003 Firecat 700 -- that is, the F7 Firecat -- used "intermittent injection," which Arctic Cat claims to mean the same thing as "skip pulse." IRS contends otherwise but, for the purposes of this Motion, the distinction is without a difference. Arctic Cat further maintains that, in making its discovery disclosures, it relied

on the manufacturer of the engine, Kokusan, when it stated that the F7 Firecat implemented the intermittent injection feature.

Further, Arctic Cat states that, on March 18, 2003, after having been advised by Kokusan that a problem in the computer programming of the engine prevented intermittent injection from occurring in the F7 Firecat, Suzuki served Supplementary Interrogatory Answers on both Arctic Cat and IRS. Given Suzuki's supplementation, Arctic Cat contends that, prior to IRS's purchase of the F7 Firecat, which IRS tested in April 22, 2003, it was apprised, by Suzuki's discovery responses, that the 700 EFI engine did not employ a skip pulse. IRS argues that Suzuki's responses were limited to types of engines, and did not explain which engines were in the Arctic Cat products. IRS further contends that Arctic Cat was responsible for knowing which engines were in which of Arctic Cat's products. Thereafter, on July 9, 2003, Arctic Cat supplemented its discovery responses.

As we expressed at the Hearing, we find no subterfuge in Arctic Cat's erroneous response that its F7 Firecat product employed a skip pulse. Arctic Cat, in reliance on representations of the engine manufacturer, believed that the F7 Firecat employed the skip pulse feature, and we refuse to shift the burden of proof on IRS's claims of infringement regarding the F7 Firecat to Arctic Cat. Consequently, we deny the Motion of IRS for Sanctions.

B. The Motion of Suzuki to Supplement its Invalidity Claim Chart.

On May 15, 2002, we issued an Order setting June 4, 2002, as the deadline by which the Defendants should serve their Claims Chart. We provided that, "[a]fter the close of discovery, the Defendants can amend their claims charts, so as to add additional claims and/or accused products, only by leave of the Court, upon a showing that it could not reasonably have included those claims, and/or accused products, earlier and upon a showing that the prejudice to the Defendants if leave to amend is denied outweighs the prejudice to the Plaintiff." See, Docket No. 77. However, on May 13, 2003, Suzuki served an Amended Invalidity Claim Chart without first seeking leave of the Court. On May 16, 2003, IRS responded to that Claims Chart and, now, by this Motion, which was not filed until August 19, 2003, Suzuki seeks leave to supplement its Claim Chart, and IRS, for the first time, objects that Motion as untimely, even though IRS had already responded to the merits of Suzuki's supplemental Claim Chart.

As we expressed at the Hearing on the Motion, the action that Suzuki now seeks leave to compete was completed in May of 2003 -- some three months prior to the filing of this Motion. Further, it was not until Suzuki brought this Motion that IRS objected. Prior to the Motion, IRS acquiesced in Suzuki's supplementation by re-

sponding to its merits and, therefore, IRS cannot now claim it has been prejudiced by the supplementation. Accordingly, we grant this Motion.

C. The Motion of IRS for Leave to Amend Infringement Claim Chart with Respect to '803 Patent Claim 1 and for Issue and Monetary Sanctions Against Arctic Cat and Suzuki.

This Motion is similar to the Motion of IRS for sanctions as to Arctic Cat's erroneous discovery responses regarding the F7 Firecat. IRS contends that Arctic Cat also made false representations as to whether its products "issued a priming pulse [during start-up] based on engine speed and throttle position, as required by Claim 1 of the '803 Patent." Memorandum in Support, at p. 4 [Docket No. 364]. In reliance on Arctic Cat's representation, that its products did not employ a "priming pulse," IRS contends that it did not assert a claim, in its Infringement Claim Chart, for infringement as to Claim 1 of the '803 Patent.

Both Arctic Cat and Suzuki have stated, in their Answers to IRS's Interrogatories, that priming pulse, or priming control signals, were not determined by throttle position. As stated, IRS argues that those assertions were false, and that it relied on those assertions in deciding not to bring an infringement claim against Claim 1 of the '803 Patent. Further, IRS claims to have evidence which proves that throttle position affects priming pulse during start-up, and it seeks to amend its Claim Chart to assert a

claim for infringement as to Claim 1 of the '803 Patent. In addition, IRS seeks to prohibit Arctic Cat, and Suzuki, from defending against this claim, in addition to an award of monetary sanctions with respect to the amendment of its Claim Chart in order to assert this new claim. Arctic Cat and Suzuki continue to assert that the priming pulse of the JECS engine is not dependent on throttle position, and both take exception to the "proof" offered by IRS, that the JECS engine priming pulse is determined, or affected, by throttle position.

In Interrogatory No. 7, IRS asked Suzuki to "[e]xplain how fuel injection is affected and/or varies as a function of throttle angle and RPM during start-up mode in the accused products, including at all throttle opening degrees and at all RPM levels." Id. Suzuki responded that "[t]he duration and timing of the first injection pulse is not affected at all by throttle angle." Id. at 5. In its response to IRS's Interrogatories, Arctic Cat also stated that "[t]he systems do not generate a priming control signal to either inject or not inject fuel based on engine speed and throttle position." Id. at 3.

In support of its assertion, that newly discovered evidence reveals that priming pulse is affected by throttle angle, and that Arctic Cat and Suzuki either should have known, or knew, that the pulse was so affected, IRS submits two items of evidence. First,

IRS points to Arctic Cat's Operator's Manual which states: "'When the engine is being started, DO NOT COMPRESS THE THROTTLE CONTROL LEVER,'" and warns that, "'[i]f the throttle control lever is compressed, the engine will not start because the fuel/air mixture will be too lean.'" Id. at 6, quoting, Document No. A27427. IRS then argues that "[s]omeone at Arctic Cat and Suzuki obviously knew enough about the operation in the accused products to warn users that it was not advisable to utilize the throttle if they wanted to start the engine and thus knew that the throttle had some affect upon the 'fuel/air mixture' at start up." Id. In response, Suzuki submits that IRS did not ask whether throttle angle affected fuel/air mixture, but rather, IRS asked if throttle angle affected impulse. As Suzuki argues, "while the throttle position does not affect the occurrence or duration of the 'first starting injection' during cold start conditions, throttle position can affect engine performance during that condition due to excess air." Suzuki's Memorandum in Opposition, at p. 6.

The second piece of evidence, which is proffered by IRS, is a report from its expert, Dr. William Ribbens ("Ribbens"), who tested the JECS equipped snowmobiles, and determined that "the first pulse feature in the JECS products is affected dramatically by throttle angle." Memorandum in Support, at p. 6. Suzuki challenges this finding, and states that Ribben's test is unverified. As a result,

Suzuki continues to maintain that throttle angle does not affect the priming pulse.

As both Suzuki and Arctic Cat maintain that their responses to IRS's Interrogatories were correct, it appears there is a factual dispute as to whether throttle angle affects priming pulse in the accused products. Consequently, sanctions are inappropriate in this instance, and in that respect, the Motion is denied.

Further, we find the requisite "good case," which would allow IRS to amend its Claim Chart, to be lacking. See, Rule 16, Federal Rules of Civil Procedure. As Suzuki notes, IRS has failed to demonstrate why it waited until October 30, 2003, to bring this Motion when its expert purportedly discovered the discrepancy, with respect to priming pulse, as early as August of 2003. Further, IRS has failed to demonstrate why it waited until July of 2003, to purchase a snowmobile to test. Therefore, in the absence of conclusive evidence that the discovery responses of Suzuki and Arctic Cat are false, and in the absence of "good cause" to allow further amendments to IRS's Claims Chart, we deny this Motion in its entirety.

D. The Motion of IRS to Compel Arctic Cat to Produce Documents from the Trade Secret Litigation.

IRS seeks to compel documents from Arctic Cat's files in an earlier litigation involving IRS for trade secret misappro-

priation. Both parties agree that, at one time, an offer was made, by Arctic Cat, to allow IRS to inspect those documents. However, IRS never followed-up on that offer and, now, Arctic Cat contends that the request is untimely. IRS further argues that Arctic Cat has failed to provide an adequate privilege log which identifies all of the documents that have been withheld as privileged.

On two prior occasions, we have exhaustively considered Arctic Cat's assertion of privilege, and IRS's subsequent contention that Arctic Cat was withholding non-privileged documents. On November 12, 2002, after an in camera review of Arctic Cat's purportedly privileged documents, we found that the privilege properly attached to all but two documents, and we issued an Order granting, in part, IRS's Motion to Compel. See, Docket No. 122. We also allowed Arctic Cat to file an Affidavit in which it could explain the privileged nature of the two documents we found non-privileged. After considering the supplemental Affidavits, which were prepared by the authors of the two documents, we issued an Order, on December 20, 2002, which, again, directed Arctic Cat to produce the two documents. See, Docket No. 134. In our Order of November 12, 2002, we also noted that "IRS takes exception to certain of the documents listed on Arctic Cat's Privilege Log, and contends that, since IRS produced a 61-page Privilege Log, it is unconvincing that Arctic Cat's single-page roster of privileged documents is complete."

Docket No. 122. Thus, to the extent IRS again challenges the scope of Arctic Cat's claim of privilege, and the sufficiency of Arctic Cat's privilege log, IRS offers nothing to suggest, let alone demonstrate, that the issue warrants a reconsideration.

With respect to the discoverable documents in Arctic Cat's possession, we find that IRS's delay in accepting Arctic Cat's invitation to inspect the documents should not preclude IRS from now having access to otherwise discoverable materials. Discovery in this matter has been heatedly contested by all of the parties, and any delay caused by IRS's renewed interest in the documents is de minimis. Thus, we grant IRS' Motion in this respect, but subject to our prior Orders, and we direct Arctic Cat to allow IRS to inspect those discoverable documents, which are in its possession, custody, or control.

E. The Motion of IRS for an Order to Enforce Compliance with Subpoena Duces Tecum to Robins Kaplan for Polaris Litigation.

IRS seeks to compel the production of documents from Arctic Cat's current counsel -- Robins Kaplan Miller & Ciresi ("Robins Kaplan") -- who also served as counsel to Polaris, a third-party, in prior litigation between Polaris and IRS. Arctic Cat objects to IRS's Subpoena on grounds that: 1) Arctic Cat complied with the Subpoena; 2) The Motion to Compel was not properly served on Robins, Kaplan -- a non-party; and 3) The documents requested do

not relate to Arctic Cat, but rather, relate to Polaris, which is a non-party.

Robins Kaplan asserts that it complied with IRS's Subpoena by offering to make available, for inspection, those discoverable documents, which were in its possession, but that IRS declined to inspect those documents. For its part, IRS concedes that Robins Kaplan offered to make the documents available for inspection.

The Federal Rules of Civil Procedure do allow discovery as to third-parties in some instances. Rule 45(c)(1), Federal Rules of Civil Procedure, makes express provision for the protection of those who are subject to a Federal Subpoena, by providing as follows:

> A party or an attorney responsible for the issuance of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

The Rule also contemplates the issuance of an Order to compel compliance with a Subpoena, but expressly imposes, in the following terms, a protective role upon the issuing Court:

> Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense re-

> sulting from the inspection and copying commanded.

Rule 45(c)(2)(B), Federal Rules of Civil Procedure.

The provision was promulgated by the 1991 amendments to the Rule, and its intent has been explained, by the Drafters, as follows:

> A non-party required to produce documents or materials is protected against significant expense resulting from involuntary assistance to the court. This provision applies, for example, to a non-party required to provide a list of class members. The court is not required to fix the costs in advance of production, although this will often be the most satisfactory accommodation to protect the party seeking discovery from excessive costs. In some instances, it may be preferable to leave uncertain costs to be determined after the materials have been produced, provided that the risk of uncertainty is fully disclosed to the discovering party. See, e.g., United States v. Columbia Broadcasting Systems, Inc., 666 F.2d 364 (9th Cir. 1982).

Advisory Committee Notes, 1991 Amendment to Rule 45.

"Before the amendment, costs could be shifted, but the decision to do so was within the discretion of the district court." Linder v. Calero-Portocarrero, 251 F.3d 178, 182 (D.C. Cir. 2001), citing United States v. CBS, Inc., 666 F.2d 364, 371 n. 9 (9th Cir. 1982). As a result, the 1991 amendment was "intended 'to enlarge the protections afforded persons who are required to assist the court.'" Id., quoting Advisory Committee Notes, 1991 Amendment to Rule 45.

Those Courts, which have construed the 1991 amendment to Rule 45(c)(2)(B), have recognized the "shall protect * * * from signi-

ficant expense" language is a mandatory directive. See, e.g., Linder v. Calero-Portocarrero, supra at 182 ("[the Plaintiffs] claim the court erred in concluding that fee shifting was mandatory," "[b]ut Rule 45 requires precisely that -- the district court 'shall protect' a non-party from 'significant expense.'"); In re First American Corp., 184 F.R.D. 234, 240 (S.D.N.Y. 1998)(noting that prior discretion in Rule 45(c)(2)(B) "has now become mandatory."); In re Exxon Valdez, 142 F.R.D. 380, 383 (D.D.C. 1992)("The mandatory language of this rule represents a clear change from old Rule 45(c)."); David D. Siegel, Practice Commentaries, 28 U.S.C.A., Fed. R.Civ.P. 45 ("If the court does grant the motion, and makes an order to compel, and the person against whom it is made is not a party, the court is required to ("shall") include in the order a provision for defraying the expenses that the production, inspection, copying, etc., may require.").

While accepting that a fee-shift, from the responding to the requesting party, is mandatory under the revised Rule 45, some Courts have continued to apply the decisions interpreting the pre-1991 amendment to the Rule, in determining when the fee-shift should remain discretionary. See, e.g., In re Exxon Valdez, supra at 383 ("While the drafters of new Rule 45 clearly intended to expand the protection for non-parties such as disinterested witnesses, see Advisory Committee Note to 1991 Amendment, there is no

indication that they also intended to overrule prior Rule 45 case law, under which a non-party can be required to bear some or all of its expenses where the equities of a particular case demand it."); In re First American Corp., supra at 241 ("'Protection from significant expense does not mean that the requesting party necessarily must bear the entire cost of compliance.'"), quoting Linder v. Calero-Portocarrero, 180 F.R.D. 168, 177 (D.D.C. 1998), quoting, in turn, In re Exxon Valdez, supra at 383.

Of course, Courts have declined to fully shift the costs of production, pursuant to a Federal Subpoena, from the responding non-party, to the requesting party, where the responding non-party has an "interest" in the legal proceeding from which the Subpoena issued. See, e.g., In re First American Corp., supra at 242 ("[W]here the nonparties were 'involved in litigation * * * arising out of the same facts,' courts have viewed such parties as 'not neutral' for purposes of awarding costs."), quoting Jackson Jordan Inc. v. Kyle Railways, 1988 WL 236172 at *2 (D. Kan., March 23, 1988).

Robins Kaplan does not object to the relevancy of the subpoenaed materials and, as stated, has previously agreed to make those documents available for inspection by IRS. Accordingly, we grant IRS's Motion insofar as they seek to inspect any discoverable documents that Robins Kaplan has in its possession. Under the

cost-savings envisioned by Rule 45, and its progeny, however, we deny IRS's Motion to the extent it seeks to compel Robins Kaplan to produce the requested documents at its expense. Further, our granting of the Motion is subject to Robins Kaplan's assertion that it does not have in its possession most of the documents requested by IRS. See, Lumber v. PPG Industries, Inc., 168 F.R.D. 641, 643 n. 1 (D. Minn. 1996).

F. The Motion of IRS for Sanctions for Discovery Abuse.

IRS contends that Arctic Cat and Suzuki have abused discovery by failing to produce a Rule 30(b)(6) deponent who was prepared to testify regarding: 1) the identity and location of documents which "record information" as to Suzuki's sales to Arctic Cat; and 2) the commercial success and popularity of Suzuki's EFI-equipped engines sold to Arctic Cat. IRS also contends that Arctic Cat has failed to produce discovery related to the commercial success and popularity of the accused products, which IRS requested in Document Requests Nos. 37 and 38.

As for IRS's first objection to Suzuki's Rule 30(b)(6) deponent, IRS does not point to a single question that was asked of Suzuki's Rule 30(b)(6) deponent -- Jun Ito ("Ito") -- that Ito was unable to answer. Instead, IRS argues that Ito was unprepared because he testified that he did not review any documents. While Suzuki notes that not only was Ito prepared, unlike many 30(b)(6)

deponents, he testified from personal knowledge and did not rely on documents for all of his testimony.

With respect to IRS's objection that Ito was unprepared to testify concerning the commercial success and popularity of Suzuki's EFI-equipment, IRS does not argue that Ito failed, or refused, to answer any questions regarding the commercial success or popularity of Suzuki's EFI-equipment, but rather, IRS again expresses its concern as to which documents Ito reviewed in preparation for his testimony. Further, IRS argues that, when asked about the location of documents related to sales, Ito testified that the documents were in storage. IRS argues that Suzuki failed to produce those documents, which Ito testified as being in storage, and seeks to compel the production of those documents.

IRS contends that Arctic Cat is withholding relevant discovery and, to support the contention, IRS points to two documents that were produced to it, by Suzuki, but which were created by, or originally received by Suzuki, from Arctic Cat. The first is a 1992 questionnaire Arctic Cat sent to its EFI customers, which clearly relates to the popularity of EFI. However, Arctic Cat argues that Document Request Nos. 37 and 38 sought documents pertaining to the "Accused Products," which IRS defined as post-1994 products. Thus, Arctic Cat contends that the 1992 questionnaire is

outside the scope of the Document Requests and, therefore, was not produced.

In addition, IRS cites a 1997 letter, which was also produced by Suzuki, and which was authored by Arctic Cat's Vice President of Marketing, Mark Blackwell ("Blackwell"), to Jun Ito and Tony Furuya of Suzuki. In the letter Blackwell states as follows:

> As you know, over the past few years, the success of our EFI models have increased the popularity of this technology to the point where our EFI models now represent approximately 19% of our production and sales.

IRS' Motion for Sanctions, at p. 8 [Docket No. 371].

Arctic Cat responds that this letter was not requested, but it appears that the letter does address the demand for, and success of, the accused products.

After filing its Motion for Sanctions, IRS requested leave to file additional papers in support of its Motion, in which IRS cites a second letter which was authored by Blackwell. In that letter, Blackwell states, "[a]s you know, we have invested significant resources in our EFI development over the past 10 years and view this technology as a strategically valuable competitive advantage." The letter was also produced by Suzuki.

With respect to Suzuki's Rule 30(b)(6) deponent, we do not find that Ito was unprepared to testify on any subject. Further, with respect to Ito's representation, that the documents as to

which IRS was inquiring were in storage, a Rule 30(b)(6) deponent need not be able to pin-point every relevant document in a party's possession. Thus, IRS's Motion for Sanctions in that respect is denied.

As for IRS' contention, that Arctic Cat is withholding relevant documents with respect to the 1992 questionnaire, IRS requested documents related only to the accused products, and it ran the risk of being under-inclusive in its discovery requests. Thus, we find that Arctic Cat's failure to produce the 1992 questionnaire is not sanctionable. In addition, with respect to Blackwell's letters, although we agree that the letters are discoverable and should have been produced, Arctic Cat contends that it produced all discoverable material in its possession. Thus, although IRS has drawn the inference that Arctic Cat's failure to produce Blackwell's letters indicates that Arctic Cat must have additional discoverable materials in its possession, IRS fails to set forth a factual basis to support its contention that Arctic Cat is willfully withholding discoverable documents, or has engaged in other sanctionable abuses of its discovery obligations. Therefore, we also deny IRS' Motion for Sanctions against Arctic Cat.

In addition, insofar as IRS seeks to compel the production of the documents that were referenced by Ito as being in storage, or other discoverable documents in Arctic Cat's possession, Arctic Cat

has averred that it has produced all discoverable materials to IRS and, as stated, we cannot compel the production of documents from a party who attests that they have no discoverable documents in its possession.

G. The Motion of IRS to Compel Arctic Cat and Suzuki to Produce Documents Related to Arctic Cat 2003 Models and Supplement Their Disclosures for 2004 Models.

IRS seeks to compel the production of all discovery that is related to Arctic Cat's 2003 models, and to compel Arctic Cat, and Suzuki, to supplement their disclosures for Arctic Cat's 2004 models. IRS fails to identify any specific requests for production with which Arctic Cat, and Suzuki, have failed to comply. Further, discovery terminated on July 7, 2003, and IRS has also failed to set forth the requisite "good cause" to extend the discovery disclosure deadline. See, Rule 16(b), Federal Rules of Civil Procedure.

In any event, Arctic Cat and Suzuki represent that they have produced all discovery related to Arctic Cat's 2003 models, and they object to IRS's request that they supplement their discovery production as to Arctic Cat's 2004 models. Arctic Cat and Suzuki argue that the discovery cut-off date should serve as the date on which the parties' obligation to supplement discovery also terminated. We agree. If we were to allow the continual supplementation of discovery, this litigation would have no end. None-

theless, Arctic Cat represented that it would produce some documents related to its 2004 models, and IRS expressed some acceptance of that representation. Accordingly, we deny this Motion.

H. The Motion of Arctic Cat to Compel Discovery.

Arctic Cat seeks to compel the production of discovery related to the destruction of documents by IRS's prior counsel -- the law firm of Kutak Rock. Arctic Cat also alleges that, in the days after it served a Subpoena on Kutak Rock, Kutak Rock transferred documents out of its possession. IRS concedes that the transfer may have occurred, but represents that neither IRS, nor its current legal counsel, participated in any transfer of documents, or have any control over the actions of Kutak Rock. IRS also avers that it has no documents which are related to the destruction of documents in its possession. While we are troubled by the suggestion that Kutak Rock failed to produce documents responsive to a Subpoena and, instead, transferred those documents, as we have repeatedly reiterated to the parties in this litigation, we cannot compel IRS to produce documents that are not in its possession, custody or control. Therefore, Arctic Cat's Motion to Compel is denied.

I. The Motion of Suzuki to Separate Adjudication of Willfulness and Damages Issues and to Stay Discovery of Advice of Counsel Defense.

Under Rule 42(b), Federal Rules of Civil Procedure, a Trial Court is granted discretion in determining whether bifurcation of a Trial is appropriate, and provides as follows:

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Rule 42(b), Federal Rules of Civil Procedure.

"In exercising discretion, district courts should consider the preservation of constitutional rights, clarity, judicial economy, the likelihood of inconsistent results and possibilities for confusion." O'Dell v. Hercules, Inc., 904 F.2d 1194, 1202 (8th Cir. 1990), citing Koch Fuels, Inc. v. Cargo of 13,000 Barrels of No. 2 Oil, 704 F.2d 1038, 1042 (8th Cir. 1983); see also Wright & Miller, 9 Federal Practice and Procedure 2d § 2388. A Court should resort to bifurcation "only in the exercise of informed discretion when the Court believes the separation will achieve the purposes of the rule." Wright & Miller, 9 Federal Practice and Procedure 2d §2388, at 474.

In order for a Trial to be bifurcated, such that particular issues are tried during each phase of the Trial, a Court must find the issues to be "clearly separable." O'Dell v. Hercules, Inc., supra at 1202, citing Beeck v. Aquaslide 'N' Dive Corp., 562 F.2d 537 (8th Cir. 1977). For issues to be clearly separable, factual determinations should be unique to each phase of the Trial and not require reexamination, by a second Jury, or by the same Jury, during a later phase of the Trial.

The Courts are split on whether the issue of willfulness should be bifurcated from the issue of damages in patent infringement cases. While some Courts have observed that "bifurcation of complex patent Trials has become common," Ciena Corporation v. Corvis Corporation, 210 F.R.D. 519, 521 (D. Dela. 2002), other Courts have expressed the view that "[b]ifurcation in patent cases, as in others, in the exception, not the rule." Kos Pharmaceuticals, Inc. v. Barr Laboratories, Inc., 218 F.R.D. 387, 391 (S.D.N.Y. 2003); Real v. Bunn-O-Matic, 195 F.R.D. 618, 620 (N.D. Ill. 2000); see also, Windsor Industries, Inc. v. Pro-Team, Inc., 87 F. Supp.2d 1129, 1132 (D. Colo. 2000)("Without doubt, the liability and damages issues are intertwined and not clearly separable."); Nitinol Medical Technologies, Inc. v. AGA Medical Corp., 135 F. Supp.2d 212, 216 (D. Mass. 2000(Noting that "many courts have found that the issue of willfulness is inextricably inter-

twined with issues of liability."); Fuji Machine Mfg. Co., Ltd. v. Hover-Davis, Inc., 982 F. Supp. 923, 924 (W.D.N.Y. 1997).

As the District Court for the Southern District of New York, in Kos Pharmaceuticals, Inc. v. Barr Laboratories, Inc., recently remarked:

> [I]n the ordinary case, dividing the ultimate resolution of a dispute into separate Trials equates to a formula that inevitably works against some of all of the very values of convenience, expedition, economy and avoidance of prejudice that Rule 42(b) prescribes as grounds to warrant bifurcation. Extending the adjudication into two or more proceedings necessarily implicates additional discovery; more pretrial disputes and motion practice; empaneling another jury or imposing more on the jurors who decide the earlier phase of the litigation; deposing or recalling some of the same witnesses; and potentially engendering new rounds of trial and post-trial motions and appeals. The inconveniences, inefficiencies and harms inherent in these probable consequences -- to the parties and third parties; to the courts, and to the prompt administration of justice -- weigh against separation of trials and suggest that, for those probable adverse effects to be overcome, the circumstances justifying bifurcation should be particularly compelling and prevail only in exceptional cases.

Id. at 390-391.

Although not controlling, we find those observations persuasive. In opposition to this Motion, IRS represented that there would be more than ten witnesses who would have to testify at both Trials. Thus, discovery into willfulness substantially overlaps with dis-

covery regarding damages and, therefore, the issues are not "clearly separable." Moreover, we find that the substantial delay, and real prejudice, that would result from either empaneling two separate Juries, or requiring one Jury to wait for adjudication of the damages phase, outweighs any potential prejudice that might occur if the issues are not separated.

Further, the piece meal adjudication of the issues in this case may actually cause greater confusion. Therefore, in this instance, we find that the policies set forth in Rule 42(b) would not be advanced if the issues were bifurcated. Consequently, we deny Suzuki's Motion to bifurcate. For the same reasons, we also deny Suzuki's Motion to Stay discovery. Such a stay amply demonstrates the proclivity for delay that ensues upon bifurcation. Thus, having denied Suzuki's Motion to bifurcate, it would be illogical to stay discovery.

J. Miscellaneous Motions.

On May 5, 2003, Motions were filed on behalf of Hanes to Quash Subpoena, and to Object to Subpoena. See, Docket Nos. 217-1 & 217-2. Those Motions were filed without compliance with our Local Rules, as the Motions were filed without first obtaining a date and time for a Hearing on the Motions. In any event, counsel have advised that the issues presented in those Motions are now

moot, and that the Motions have been withdrawn. Accordingly, we deny those Motions as moot.

IRS has also filed several Motions seeking to file additional papers in support of its Motions. See, Docket Nos. 355, 377 & 379. As Arctic Cat and Suzuki had no objection to these submissions, and in the interest of being fully informed, we considered those supplemental filings. Therefore, those Motions are granted, but we note that we did not find the additional filings particularly beneficial to our analysis of the issues presented.

Lastly, on September 5, 2003, Arctic Cat filed a Motion to Extend Time to File an Appeal. See, Docket No. 335. To the extent that the issue is not moot, we grant the Motion.

NOW, THEREFORE, It is --

ORDERED:

1. That the Motion of IRS for Sanctions Against Arctic Cat for False and Misleading Disclosure and Failure to Comply with Order Pursuant to Rule 37(B)(2), and (C), Federal Rules of Civil Procedure [Docket No. 318] is DENIED.

2. That the Motion of Suzuki to Supplement its Invalidity Claim Chart [Docket No. 309] is GRANTED.

3. That the Motion of IRS for Leave to Amend Infringement Claim Chart with Respect to '803 Patent Claim 1 and for Issue and

Monetary Sanctions Against Arctic Cat and Suzuki [Docket No. 363-1] is DENIED.

4. That the Motion of IRS to Compel Arctic Cat to Produce Documents from the Trade Secret Litigation [Docket No. 367-1] is GRANTED, in part.

5. That the Motion of IRS for Order to Enforce Compliance with Subpoena Duces Tecum [Docket No. 367-2] is GRANTED, in part.

6. That the Motion of IRS for Sanctions Against Arctic Cat and Suzuki for Discovery Abuse [Docket No. 370-1] is DENIED.

7. That the Motion of IRS to Compel Arctic Cat and Suzuki to Produce Documents Related to Arctic Cat 2003 Models and Supplement their Disclosures for 2004 Models [Docket No. 370-2] is DENIED.

8. That the Motion of Arctic Cat to Compel [Docket No. 373] is DENIED.

9. That the Motion of Suzuki to Bifurcate Issues of Willfulness and Damages is DENIED.

10. The Motion of IRS for Leave to Submit Newly Discovered Information [Docket No. 355-1] is GRANTED.

11. The Motion of IRS for Leave to File Additional Papers [Docket No. 377-1] is GRANTED.

12. The Motion of IRS for Leave to File Additional Papers [Docket No. 379-1] is GRANTED.

13. The Motion of Hanes to Quash Subpoena [Docket No. 217-1] is DENIED as moot.

14. The Motion of Hanes to Object to Subpoena [Docket No. 217-2] is DENIED as moot.

15. The Motion of Arctic Cat to Extend Time to File Appeal of Order Precluding Supplemental Invalidity Claim Charts [Docket No. 335-1] is GRANTED.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE