**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

ARCTIC CAT INC., a Minnesota corporation,

Plaintiff,

v.

INJECTION RESEARCH SPECIALISTS, INC., a Colorado corporation, and PACER INDUSTRIES, INC., a Missouri corporation,

Defendants,

INJECTION RESEARCH SPECIALISTS, INC., a Colorado corporation, and PACER INDUSTRIES, INC., a Missouri corporation,

Counterclaimants,

v.

ARCTIC CAT INC., a Minnesota corporation, and SUZUKI MOTOR CORPORATION, a Japanese corporation,

Counterdefendants.

Civil Action No. 01-CV-543 MJD/RLE

**REPLY MEMORANDUM IN SUPPORT OF ARCTIC CAT'S AND SUZUKI'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF INVALIDITY OF THE '803 PATENT UNDER 35 U.S.C. § 103**

Arctic Cat's and Suzuki's motion offered undisputed facts demonstrating that the '803 claims were non-inventive and invalid under 35 U.S.C. § 103. The '803 patent, far from claiming a novel EFI system, took the virtually identical OMC engine from the prior art and made a single, obvious modification. In response to this showing, IRS points to phantom evidentiary disputes and discusses the OMC sales statistics, but ignores the undisputed technical characteristics of the OMC prior art. Absent from IRS's memorandum is any genuine, substantive response to Arctic Cat's and Suzuki's showing that the '803 patent claims were obvious as a matter of law.

**1. The OMC engine and Mercury Marine engine are prior art.**

The OMC engine was undisputedly offered for sale and publicly used in the United States before the critical date. The fact that the OMC engine was used in outboard motor races does not exclude the OMC engine as highly relevant prior art to the '803 patent. A device in public use or on sale within the meaning of 35 U.S.C. § 102(b) is a prior art reference for purposes of analyzing obviousness under 35 U.S.C. § 103. *Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d 1558, 1563 (Fed. Cir. 1987) ("Section 103/102(b) deals with patent validity based on obviousness in view of the prior art. If a device was in public use or on sale before the critical date, then that device becomes a reference under section 103 against the claimed invention.") Public use is defined "as any use of that invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *In re Smith*, 714 F.2d 1127, 1134 (Fed. Cir. 1983).

The OMC and Mercury Marine engines addressed the same problem as the '803 patent: EFI for a two-stroke engine adaptable to changing weather conditions.

Those of ordinary skill in the art are presumed to have knowledge of arts reasonably pertinent to the problem addressed in the patent. *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 313 (Fed. Cir. 1985). IRS lacks any legal basis to suggest that the skilled artisan would somehow have lacked access to the OMC or Mercury Marine prior art, or that the person of skill in the art would have hesitated to look to both of these references because OMC and Mercury Marine were business competitors.

**2. IRS cannot reasonably assert that the OMC engine did not adjust fuel injection according to barometric pressure.**

Initially, it is puzzling that IRS belabors barometric-pressure sensing when its experts have consistently asserted that adjusting fuel injection according to barometric pressure would have been obvious to a person of ordinary skill in the art.[1]

Even without this contradiction from IRS's experts, the overwhelming evidence shows that the OMC engine was, in fact, equipped with a barometric pressure sensor and modified fuel injection according to barometric pressure. James Nerstrom and Gerhard Maier helped design the OMC engine and both testified to this fact.[2] Further, in its 1985 News Release OMC proclaimed for all the world that its two-stroke EFI engine "replaces carburetors with computerized fuel injection (CFI), a system that senses RPM, barometric pressure, throttle setting, and temperature and then determines optimum fuel flow."[3] This feature of the OMC

[1] *See* Exh. P ("At the time of the 803 parent filing, a person of ordinary skill in the art would have known that proper operation of the engine requires compensation of the fuel delivery for changing operating condition and environmental parameters such as atmospheric pressure … ."); Exh. O (sensing barometric pressure "commonly known").

[2] *See* Exh. B (Nerstrom dep.) at 46, 131, 134-35, 143; Exh. H (Maier dep.) at 277-78, 280, 281-82, 284-85, 290, 297-98. Despite IRS's objections, Mr. Nerstrom's former sworn testimony should be considered in support of this motion. Mr. Nerstrom helped design the same OMC engine now at issue, testified about the OMC engine in the context of the '803 patent claims, and was cross examined by IRS during his deposition.

[3] *See* Exh. C.

engine was also described in the April 1985 edition of *PowerBoat* magazine.[4] Finally, the barometric pressure sensor is depicted in the wiring diagram delivered with each OMC engine as well as the parts catalog for the OMC engine.[5]

But IRS ignores this evidence, noting only that the OMC engine contained an additional feature that allowed race technicians to alter fuel injection manually when they so desired. This feature did not change the fact that the OMC engine automatically adjusted fuel injection according to the same conditions (save engine temperature) as the '803 patent.[6] Moreover, IRS distorts the record in failing to disclose specific testimony that this characteristic did not substitute for the OMC engine's automatic fuel compensation according to barometric pressure. The following testimony clarifies the record:

> Q: (Mr. de Alcuaz): In your experience, were these switches used in some instances to compensate for changes in barometric pressure as well as humidity?
>
> A: I don't know what the racers would use it. But the system did have a barometric pressure sensor and it would use that to compensate for changes in ambient pressure. So I don't think an user should suddenly know, click any switches that would lead to over-compensation.[7] (Emphasis added).

Mr. Nerstrom offered the same clarification:

> Q: Now, on Page 3 of Exhibit 601,[8] there's a reference to the fact that the optimum air-fuel ratio has been determined by OMC and is incorporated in the computer chip. Is it your understanding, based upon your knowledge of the EFI two-stroke cycle engine which OMC was working on, that OMC was incorporating the optimum air-fuel ratio into the computer chip?

[4] *See* Exh. G ("[T]he new CFI system senses rpm, barometric pressure, throttle setting and temperature and then determines optimum fuel flow.")
[5] *See* Exh. E (showing "Barometric Pressure Sensor" wired to "computerized fuel injection module"); Exh. F at p. 12-13 ("Barometric Pres. Sensor Assy."); *See also* Exh. I at wiring schematic (marked as "604" and IRS/AC 183122) ("Throttle Position Sensor & Barometric Pressure Sensor Ana-", "Throttle Position Sensor & Barometric Pressure Sensor Ana+").
[6] Although the quoted excerpt from the Ribbens report, IRS brief at 19, discusses the additional manual-adjustment feature, Ribbens does not account for the OMC engine's automatic compensation of fuel injection according to barometric pressure.
[7] *See* Exh. S (Maier July 24, 2003 dep. at 95), attached to the Declaration of Andrew W. Horstman submitted with this Reply.
[8] *See* Exh. F.

…

> A: We -- we felt that the -- the map we put into the engine was, indeed, the best map. However, the engines were sold to customers, and it was common, in some cases, for customers to want to -- to modify the engines, to make changes on their own, and so to give them some latitude in -- in their ability to do that, we added a switch, which is what you see on Page 3, and that switch allowed the customer to vary the fuel map. He had to move the complete map, however. He couldn't change points on the map. He had to move the complete map, however. He couldn't change points on the map. Our customers didn't have the – the programs that allowed them to actually change the computer chip. This would just vary the -- the fuel compon -- move the map either up or down in -- as -- as a total.[9]

**3. A person of ordinary skill in the art would have the knowledge and motivation to add an engine temperature sensor to the OMC engine.**

IRS has already admitted that a person of ordinary skill in the art would have the knowledge and motivation to add engine temperature sensing to the OMC engine. IRS has submitted as evidence the report of its expert, Dr. William Ribbens, who has declared under oath:

> At the time of the '803 parent filing, a person of ordinary skill in the art would have known that proper operation of the engine requires compensation of the fuel delivery for changing operating condition and environmental parameters such as atmospheric pressure and air temperature. Proper fuel delivery requires compensation for different engine temperatures to achieve the proper fuel/air ratio. A person of ordinary skill in the art would have recognized the relationship between the variables and parameters like above and would understand how to create an algorithm to achieve optimum engine performance.

*(See Ribbens Declaration, Exhibit B, at p. 29).*

In a document finally released by IRS after 15 years of withholding it, Gary Divel, IRS vice-president, also admitted that disclosure of the '803 patent did not tell a person of ordinary skill in the art how to make an actual product work; that person would need to supply knowledge:

---

[9] *See* Exh. T (Nerstrom dep. at 53-54), attached to the Declaration of Andrew W. Horstman submitted with this Reply.

> We do end up having a published document, [the anticipated patent] if you will, but that published document in reality doesn't really release any of what I call secrets. They would still have to come up with the formulas, data and everything else to make this thing work.

*(See Horstman Declaration, Exhibit V, Transcript of November 27, 1989, p. 5, IRS/O'Meara Telephone Conversation).*

A person of ordinary skill in the art, at the time IRS filed the parent application for the '803 patent, would have known, as Dr. Ribbens testified, that engine temperature was a parameter to be considered in obtaining proper fuel delivery.

Contrary to IRS's assertion, Arctic Cat's and Suzuki's motion discussed at length the motivation of a person of ordinary skill in the art to combine the OMC and Mercury Marine references. *See* Arctic Cat and Suzuki memorandum at 9-13. As explained, a skilled artisan working on the problem of an EFI system adaptable for extreme weather conditions would have the knowledge and motivation to combine the OMC engine with the advantages of engine-temperature sensing already well known in the art and demonstrated in the Mercury Marine engine. "[T]he suggestion to modify the art to produce the claimed invention need not be expressly stated in one or all of the references used to show obviousness. 'Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art.'" *Cable Elec. Prods. v. Genmark, Inc.*, 770 F.2d 1015, 1025 (Fed. Cir. 1985), *overruled on non-related grounds*, 175 F.3d 1356, 1358 (Fed. Cir. 1999).

Further, as the skilled artisan is presumed to have knowledge of the prior art, there is no merit to IRS's unsupported assertion that the business competition between OMC and Mercury Marine would have dissuaded a skilled artisan from including elements from each engine in

designing an EFI system adaptable to extreme weather conditions. More plausible is the fact that the skilled artisan would have chosen the best attributes of each system.

IRS also argues that there is no evidence supporting the motivation to adapting a motorboat engine for the "extreme weather conditions" experienced by snowmobiles. This claim is inexplicable in light of the fact that the Mercury Marine and OMC engines indisputably modified fuel injection according to parameters like air temperature and barometric pressure. In fact, as already noted in Arctic Cat's and Suzuki's motion, IRS had specific knowledge that outboard EFI engines were being used in snowmobile races before IRS's patent application. *See* Arctic Cat and Suzuki memorandum at footnote 4.

IRS is also incorrect in suggesting that the OMC engine "teaches away" from the claimed invention. IRS's own experts have already proclaimed the obviousness of including an engine temperature sensor. *See* Arctic Cat and Suzuki memorandum at 5, 10. The fact that OMC considered including an engine temperature sensor on its engine (deciding against this because the sensor was not necessary under racing conditions) does not teach away from this element. A skilled artisan faced with the problem of designing an EFI engine adaptable for "cold start" conditions would appreciate that an engine temperature sensor would be less necessary on pre-warmed engines used in motorboat racing, and would also understand the desirability of including an engine temperature sensor on an EFI engine to be operated in cold start conditions. A prior art reference does not teach away because it had characteristics deriving from a specific use, when the person of skill in the art would understand that reference for its broader teaching. *See In re Heck*, 699 F.2d 1331, 1332-33 (Fed. Cir. 1983). And IRS's assertion that the OMC engine teaches away due to considerations of simplicity and cost savings lacks any merit. *See In re Dance*, 160 F.3d 1339, 1344 (Fed. Cir. 1998) ("simplicity of the prior art is rarely a

characteristic that weighs against obviousness of a more complicated device with added function”).

Finally, Arctic Cat and Suzuki are not required to define a person of ordinary skill in more detail than they have already done. “[T]he absence of specific findings on the level of skill in the art does not give rise to reversible error ‘where the prior art itself reflects an appropriate level and a need for testimony is not shown.’” *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001), cert. denied, 534 U.S. 1128 (2002). Arctic Cat and Suzuki have discussed the level of skill in the art. Arctic Cat’s and Suzuki’s motion makes clear, and IRS admits, that a skilled artisan is somebody who would appreciate the problem of an EFI system adaptable to extreme weather conditions, who would understand how environmental parameters would affect engine performance, and who would be able to design an EFI system adjusting fuel injection according to these environmental parameters.

**4. IRS’s purported evidentiary issues do not overcome the obviousness of the ‘803 patent claims as a matter of law.**

IRS devotes a substantial portion of its response imploring this Court to disregard the testimony of Messrs. Nerstrom and Maier on the grounds that these men are not qualified to render expert testimony. However, neither witness is providing expert testimony nor is an expert’s opinion on the legal conclusion of obviousness necessary. *See Nutrition 21 v. United States*, 930 F.2d 867, 871 n.2 (Fed. Cir. 1991) (“An expert’s opinion on [obviousness] is neither required nor indeed ‘evidence’ at all.”).

Mr. Nerstrom’s and Mr. Maier’s testimony on the operating characteristics of the OMC engine is highly probative to the question of whether the ‘803 patent is valid in light of the OMC prior art because Nerstrom and Maier actually helped design the specific OMC engine now at issue. The evidence that IRS would have this Court disregard is sworn testimony about the prior

art, coming from the very same men who helped design the prior art, arising in the context of the identical patent now at issue.[10] IRS's attempt to manufacture evidentiary disputes should not detract from IRS's failure to offer any genuine, substantive response to the overwhelming evidence showing the obviousness of the '803 claims in light of the OMC prior art.

Messrs. Nerstrom, Maier and Staerzl are not testifying as experts but rather as witnesses with knowledge of the respective products developed at their respective companies. Mr. Nerstrom's testimony is a telling example:

> I was responsible for the development of the engine that was sold to the public and I was responsible for building this engine, so I know exactly what's in this engine.

*(Exhibit B, p. 127)*.

Their testimony is admissible and is clearly not subject to the hearsay objections raised by IRS. IRS fails to provide to the Court the relevant rules of evidence and civil procedure which apply:

> Rule 32(a)(3)(B), FRCP, specifically provides that the deposition of a witness more than 100 miles from the place of the hearing may be used. Nerstrom, Maier and Staerzl are. *(See Horstman Exhibits S, p. 6; T, p. 6; U, p. 5)*.
>
> Rule 804(b)(1) of the Federal Rules of Evidence specifically provides that the testimony of these three witnesses may be used in this case. IRS was present at their depositions and had full opportunity to examine them.

There is no reasonable basis for IRS's objections. The testimony of Nerstrom, Maier and Staerzl is properly before the Court as are the documents and records they identified in their depositions:

---

[10] There is no merit to IRS's objection that Nerstrom and Maier were questioned in the context of the claim language, as patent claims are presumed to speak to those of skill in the art. *See Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002). Although the Nerstrom questioning quoted specifically from Claim 4, Nerstrom's testimony on the properties of the OMC engine demonstrates that the OMC engine contained each limitation of Claims 2-4 with the exception of engine-temperature sensing.

Mr. Nerstrom identified and authenticated Exhibit C. *(See Horstman Declaration, Exhibit T, Nerstrom Deposition at pp. 166-168 and 227-228).*

Mr. Nerstrom identified and authenticated Exhibit D. *(See Daley Declaration, Exhibit B, Nerstrom Deposition at pp. 164-168).*

Both Mr. Nerstrom and Mr. Maier identified and authenticated Exhibit E, an OMC wiring diagram. *(See Horstman Declaration, Exhibit T, Nerstrom Deposition at pp. 67-68, 69-70 and 200-201 and Horstman Declaration, Exhibit S, Maier Deposition at pp. 270-271).*

Mr. Nerstrom identified and authenticated Exhibit F. *(See Daley Declaration, Exhibit B, Nerstrom Deposition at p. 47).*

Both Mr. Nerstrom and Mr. Maier identified and authenticated Exhibit I, additional wiring diagrams for the OMC engine. *(See Horstman Declaration, Exhibit T, Nerstrom Deposition at pp. 63-64 and 69-70 and Horstman Declaration, Exhibit S, Maier Deposition at pp. 241-243).*

Mr. Maier identified and authenticated Exhibit J. *(See Daley Declaration, Exhibit H, at p. 305).*

Mr. Staerzl identified and authenticated Exhibit K. *(See Daley Declaration, Exhibit M, at p. MM005).*

Mr. Staerzl identified and authenticated Exhibit L. *(See Horstman Declaration, Exhibit U, Staerzl Deposition at pp. 62-63).*

Mr. Staerzl identified and authenticated Exhibit N. *(See Horstman Declaration, Exhibit U, Staerzl Deposition at pp. 54-56).*

IRS's objections to the evidence are without merit.

**5. IRS's "secondary considerations" provide no indicia of novelty.**

IRS argues there are "secondary considerations" that demonstrate the novelty of the '803 patent claims. For secondary considerations to have any probative value, the patentee must show some rational nexus between the claimed invention and the purported secondary considerations. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983). IRS shows absolutely no nexus. Tellingly, IRS cites no evidence of *its own* commercial failure in making or selling its EFI system. IRS has never shown that Arctic Cat copied what IRS disclosed in the '803 patent.

Its only argument is the vague assertion that IRS showed Arctic Cat its EFI system, a system that IRS itself could not make commercially viable. IRS's references to communications between Arctic Cat and Suzuki show no transfer of any intellectual property. IRS never states the connection between its claimed invention and Arctic Cat's snowmobile sales. IRS offers no secondary considerations showing the non-obviousness of the '803 claims.

## CONCLUSION

IRS has neither demonstrated a genuine issue of material fact nor come forth with any material evidence rebutting Arctic Cat's and Suzuki's showing that the '803 claims are invalid as obvious under 35 U.S.C. § 103. For all the above reasons, Arctic Cat's and Suzuki's motion should be granted.

Dated: May 21, 2004.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

By: s/Andrew W. Horstman

Annamarie A. Daley (MN #158112)
Andrew W. Horstman (MN #47259)
Aaron A. Myers (MN #0311959)
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402.2015
(612) 349-8500

ATTORNEYS FOR ARCTIC CAT INC.

HENSON & EFRON, P.A.

By: s/William F. Forsyth

William F. Forsyth (MN #31070)
220 South Sixth Street, Suite 1800
Minneapolis, MN 55402-4503
Telephone: (612) 339-2500
Facsimile: (612) 339-6364

-and-

Thomas H. Jenkins (Pro Hac Vice)
Bruce C. Zotter (Pro Hac Vice)
Christopher W. Day (Pro Hac Vice)
Finnegan, Henderson, Farabow, Garrett & Dunner L.L.P.
1300 I Street N.W.
Washington, D.C. 20005-3315
Telephone: (202) 408-4000
Facsimile: (202) 408-4400

ATTORNEYS FOR SUZUKI MOTOR CORPORATION

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2004 I electronically filed the foregoing with the Clerk of Court by using the ECF which will send a Notice of Electronic Filing to the following:

Anthony de Alcuaz, Esq.
McDERMOTT, WILL & EMERY
3150 Porter Drive
Palo Alto, CA 94304.1212
Facsimile: (650)-813-5100

Thomas H. Jenkins, Esq.
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.
1300 I Street NW
Washington, D.C. 20005.3315

David P. Pearson, Esq.
WINTHROP & WEINSTINE, P.A.
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402.4629
ATTORNEYS FOR INJECTION RESEARCH SPECIALISTS, INC. AND PACER INDUSTRIES

William F. Forsyth, Esq.
HENSON & EFRON, P.A.
220 South Sixth Street, Suite 1800
Minneapolis, MN 55402.4503
ATTORNEYS FOR SUZUKI MOTOR CORPORATION

Dated: May 21, 2004.

s/Andrew W. Horstman
Andrew W. Horstman
MN I.D. #47259
Attorney for Plaintiff Arctic Cat Inc.
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza, 800 LaSalle Avenue
Minneapolis, MN 55402-2015
(612) 349-8537 (telephone)
(612) 339-4181 (fax)
awhorstman@rkmc.com