# EXHIBIT S

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

COPY

| | |
|---|---|
| ARTIC CAT, INCORPORATED, a Minnesota Corporation, Plaintiff and Counterclaimants, -vs- INJECTION RESEARCH SPECIALISTS, INCORPORATED, a Colorado Corporation; PACER INDUSTRIES, INCORPORATED, a Missouri Corporation, Defendant and Counterdefendants. -vs- ARTIC CAT, INCORPORATED, a Minnesota Corporation and SUZUKI MOTOR CORPORATION, a Japanese Corporation, Counterdefendants. | No. 01-CV-543 MJD/RLE |

Videotaped deposition of GERHARD A. MAIER taken before KAREN KOSTAS, CSR, RMR, RDR and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at Suite 4500, 227 West Monroe Street, in the City of Chicago, Cook County, Illinois at 9:00 o'clock a.m. on the 24th day of July, 2003.

07:13 THE VIDEOGRAPHER: Here begins Tape No. 1 in the
09:07:15 videotaped deposition of Gerhard Maier in the matter of
09:07:20 Artic Cat, Incorporated versus Injection Research
09:07:24 Specialists, Incorporated, et al. Also counterclaim,
09:07:30 Injection Research Specialists, Incorporated, et al.
09:07:33 versus Artic Cat, Incorporated, et al. In the United
09:07:37 States District Court for the District of Minnesota.
09:07:40 Case No. 01-CV-543 MJD/RLE.
09:07:51 This deposition is being held at 227 West
09:07:55 Monroe, Chicago, Illinois, on July 24th, 2003 at
09:08:02 approximately 9:08 a.m.
09:08:05 My name is Walter Cwik and I'm a certified
09:08:09 legal video specialist from the firm of LegaLink
.08:12 Chicago. The court reporter today is Karen Kostas in
09:08:15 association with LegaLink Chicago.
09:08:17 Will counsel please introduce themselves for
09:08:19 the record.
09:08:22 MR. de ALCUAZ: I'm Tony de Alcuaz for IRS and
09:08:25 Pacer.
09:08:25 MS. DALEY: Annamarie Daley, counsel for Artic Cat.
09:08:30 MR. ZOTTER: Bruce Zotter, counsel for Suzuki Motor
09:08:34 Corporation.
09:08:35 THE VIDEOGRAPHER: Will the court reporter please
09:08:36 swear in the witness.

·51:14 now, the number of four to the injection volume number,
11:51:18 that means technically the system should expel 4 percent
11:51:22 more fuel. And the ECU did this during further
11:51:28 calculations and actually kept the injectors a certain
11:51:34 amount of time longer open. So that if the fuel flow
11:51:40 was measured of the system, let's say on the dynamometer
11:51:45 or wherever, the operators will discover an increase of
11:51:49 4 percent in fuel flow.
11:52:07 Q In your experience, were these switches used in
11:52:10 some instances to compensate for changes in barometric
11:52:14 pressure as well as humidity?
11:52:18 A I don't know what the racers would use it. But
11:52:23 the system did have a barometric pressure sensor and it
.52:28 would use that to compensate for changes in ambient
11:52:32 pressure. So I don't think an user should suddenly
11:52:38 know, click any switches that would lead to
11:52:42 over-compensation.
11:52:50 Q Was there some kind of a diagnostic box or
11:52:56 system that was associated with this OMC racing engine?
11:53:00 A Yes.
11:53:01 Q What did it consist of physically?
11:53:04 A It was an aluminum box that had a LCD of a
11:53:09 numeric display and some push buttons.
11:53:13 Q And what did you at OMC use that diagnostic box

.05:14 A Charleston. I think that's South Carolina.
17:05:21 Q Have you seen any other boats that were equipped
17:05:24 with that V8 racing engine that you worked on at OMC?
17:05:29 A I have not seen myself, but apparently, the
17:05:33 grapevine says every now and then one of them surface in
17:05:38 an open class race.
17:05:39 Q Other than Mr. Nidal, Mr. Cahoon and
17:05:43 Mr. Robertson, I think you said his name was?
17:05:46 A Yes.
17:05:46 Q Can you think of anybody else who, to your
17:05:48 knowledge, has one of those boats and might still have
17:05:50 it today?
17:05:52 A Might still have it. There is a guy in France
.06:00 who was tending to the race boat of a French competitor.
17:06:09 There were several of them in England. And you may
17:06:11 easily trace it by going through the 1985, 1986, 1987
17:06:18 Formula One race records.
17:06:23 Q I'm going to show you a document and ask the
17:06:25 reporter to mark as next a schematic diagram.

17:06:29 (document marked as requested)

17:06:31 MR. de ALCUAZ: Q Referring you to Exhibit 727, up
17:07:07 in the upper right-hand corner, I just want to go down a

list of who it says worked on this schematic.

It says Drawn By somebody, G. Ketterhagen; Layout, Bernau, a gentleman you have already mentioned; Approved By G. Maier and another name J. Holt appears underneath that.

Does the fact that it says approved by G. Maier mean that you reviewed this and approved this if everyone did their job correctly?

A Yes.

Q And who was J. Holt?

A Jim Holt was my supervisor at the time.

Q And who was Mr. Ketterhagen?

A I don't know. I will -- I assume he was a draftsman.

Q Now, over in the right side, it says Start Date, 2-25-86.

Do you see that?

Over here, sir. I'm sorry to point.

A Yes.

Q What, in ordinary practice at OMC, would that indicate, the day that the drawing was begun?

A I forgot.

Q Take a look at the diagram itself. Can you tell me what it depicts?

08:32 A It depicts the inner schematic of the ECU for the OMC racing V8 engine.
17:08:48 Q Now, over on the right-hand side, there is a list of several things. The first number of which is barometric pressure sensor.
17:08:57 Do you see that?
17:08:57 A Yes.
17:08:58 Q And then there is a line that goes from that. And if you could trace that line --
17:09:05 A It goes right to Pin 22 on the microprocessor.
17:09:13 Q And does that indicate to you anything with respect to what the function was of the barometric pressure sensor?
.09:19 A Maybe it's Pin 21.
17:09:19 Yes, I think this voltage was fed into an A to D channel of the microprocessor.
17:09:27 Q And does this bring back any recollection as to how the barometric pressure sensor was used in the OMC racing engine?
17:09:38 A It has always been used that way since I used barometric sensors or other pressure sensors on the ECUs.
17:09:47 Q With respect to the way in which the microprocessor that's depicted on this schematic used

21:11 7,000 or 7,500 rpm. So the fuel number for 7,000 or
18:21:19 7,500 would not be correct. If the engine happens to
18:21:23 run at 7,200 rpm, then linear operation will bring us a
18:21:30 mean value between those two numbers and 40 percent
18:21:37 shifted away from the 7,000 rpm value.
18:21:44 MS. DALEY: I'm going to have the court reporter
18:21:49 mark this as Exhibit 731, please.

18:21:56 (document marked as requested)

18:21:57 MS. DALEY: Q Mr. Maier, do you recognize
18:23:02 Exhibit 731?
18:23:03 A Yes.
.23:04 Q What is it?
18:23:05 A It is a wiring harness drawing for the OMC
18:23:08 racing V8.
18:23:10 Q The engine that you referred to as the
18:23:14 Formula One or the Johnson outboard engine?
18:23:16 A Yes.
18:23:20 Q Now, on Exhibit 731, I see that there is a start
18:23:25 date at the top of December 6, 1985; is that correct?
18:23:29 A I believe so, yes.
18:23:31 Q And then it says under the box Approved By
18:23:35 there, the initials GM.

23:37 Are those your initials?
18:23:39 A Yeah, that looks like my handwriting.
18:23:42 Definitely.
18:23:48 Q Now, I would like you to take the copy of the
18:23:55 '803 patent, which is Exhibit 301 which I've given you,
18:24:00 and turn to Column 16. I wanted to review the claims,
18:24:11 Claims 2 through 4 in the '803 patent.
18:24:14 And I wanted you -- As we go through these
18:24:22 claims, I'm going to ask you to refer to either
18:24:26 Exhibit 731 or Exhibit 727 if you prefer which is the
18:24:30 earlier diagram that has been marked.
18:24:32 A Okay.
18:24:33 Q Depending upon whichever diagram you would like
.24:36 to use.
18:24:37 Now, again, Exhibit 731 is for the OMC
18:24:41 Formula One or Johnson outboard engine; right?
18:24:44 A Yes.
18:24:46 Q Claim 2 of the '803 patent begins in Column 16,
18:24:51 Line 22.
18:24:54 A fuel injection system for a two-stroke cycle
18:24:56 engine of the type comprising at least one cylinder, a
18:25:00 crankcase associated with said cylinder.
18:25:06 A Can I answer to you now?
18:25:08 Q Yes.

# EXHIBIT T

CERTIFIED COPY

S35604

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| INJECTION RESEARCH SPECIALISTS, INC., a Colorado corporation,<br><br>Plaintiff,<br><br>vs.<br><br>POLARIS INDUSTRIES L.P., a Delaware limited partnership, FUJI HEAVY INDUSTRIES, LTD., a Japanese corporation, and UNISIA JECS CORPORATION, a Japanese corporation,<br><br>Defendants. | ) | Civil Action Nos. 90-C-1143 and 91-C-663 |

Deposition of JAMES NERSTROM, called as a witness by Defendant Polaris Industries L.P., pursuant to the provisions of the Federal Rules of Civil Procedure pertaining to the taking of depositions, before Gary L. Sonntag, C.S.R., R.D.R., a Notary Public in and for the County of DuPage, State of Illinois, taken in the offices of Outboard Marine Corporation, 100 Sea Horse Drive, Waukegan, Illinois, on the 14th day of August,

duly sworn.)

THE NOTARY: Thank you.

JAMES NERSTROM

called as a witness by Defendant Polaris Industries L.P., pursuant to the provisions of the Federal Rules of Civil Procedure pertaining to the taking of depositions, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. DALEY:

Q Would you state your name and address.

A James Nerstrom, 735 Sunrise Road, Green Oaks, Illinois.

Q Mr. Nerstrom, who do you work for?

A I work for Outboard Marine Corporation.

Q And where is Outboard Marine Corporation or OMC located?

A They're located in Waukegan, Illinois.

Q I am an attorney for Polaris Industries, and we are here today taking your deposition in connection with a lawsuit that has been filed by a company called Injection Research Specialists against Polaris Industries, Fuji Heavy Industries and UNISIA JECS.

our objection to Exhibit 600. It's hearsay and no foundation.

MS. DALEY: Let me ask you a question.

BY MS. DALEY:

Q Did you receive a copy of Exhibits -- let me go back to Exhibit 600.

Did you receive a copy of Exhibit 600 in late 1982?

A Yes, I did.

Q And you received that in con -- connection with your responsibilities as an employee of OMC; correct?

A That's correct.

Q You've had a chance to look at Exhibit 601.

Do you know what that is?

A Yes.

Q What is it?

A This is a -- this was a description of the computer-controlled fuel injection system.

Q Was it generated on or about October 24, 1983?

A Yes.

Q And is this the kind of document which OMC generally creates in the course of its

business?
A Yes, it is.
Q And is it the kind of document which OMC generally maintains in their -- in the ordinary course of its business?
A Yes.
Q Now, the -- the second page of Exhibit 601, there's a reference to an automatic starting enrichment.
Do you know what that is?
MR. HANES: Before we talk about Exhibit 601 in substance, let the record show that we object to that on the same basis, hearsay and lack of foundation.
BY MS. DALEY:
Q Are you familiar with the information which is contained in Exhibit 601, Mr. --
A Yes.
Q -- Nerstrom?
A Yes, I am.
Q And how is it that you're familiar with the information in Exhibit 601?
A I was -- this was -- this was put together as part of the -- the racing program.

Q And did you review it in late -- late 1983 when it was created?

A Yes, I did.

In fact, I was responsible for -- for the approval of -- of anything that went onto that engine, including the fuel-injection system, and the way it operated.

Q Now, there's a reference, on Page 2 of Exhibit 601, to an automatic starting enrichment.

What is a -- what was -- what is the automatic starting enrichment?

MR. HANES: Objection still stands instanter.

BY MS. DALEY:

Q Let me ask you this question:

What -- what would be an automatic starting enrichment?

A It would be a -- a method of -- of adding additional fuel at the time you go to start an engine.

Q Like a priming function?

A Similar to a priming function or a choking function.

Q And what is the -- why do you need to prime?

overly-rich, and -- and not want to start; might actually want to fall.

So our attempt was to automate the process so that every start off the beach was a clean start.

Q Now, on Page 3 of Exhibit 601, there's a reference to the fact that the optimum air-fuel ratio has been determined by OMC and is incorporated in the computer chip.

Is it your understanding, based upon your knowledge of the EFI two-stroke cycle engine which OMC was working on, that OMC was incorporating the optimum air-fuel ratio into the computer chip?

MR. HANES: Objection; leading.

A We -- we felt that the -- the map we put into the engine was, indeed, the best map.

However, the engines were sold to customers, and it was common, in some cases, for customers to want to -- to modify the engines, to make changes on their own, and so to give them some latitude in -- in their ability to do that, we added a switch, which is what you see on Page 3, and that switch

allowed the customer to vary the fuel map.

He had to move the complete map, however. He couldn't change points on the map.

Our customers didn't have the -- the programs that allowed them to actually change the computer chip. This would just vary the -- the fuel compon -- move the map either up or down in -- as -- as a total.

(Indicating.)

BY MS. DALEY:

Q I think -- taking back a step, what kind of information went into the computer chip that OMC built?

A The -- the -- I'm not sure I -- I -- I know how to answer that question.

Q Would the -- the air-fuel ratio information go into the computer chip?

A The map would go into the computer chip -- would be programmed into the chip, yes.

Q Now, if we turn to Page 4 of Exhibit 601, there's a reference to the fuel supply system.

Did the OMC EFI two-stroke cycle engine have a fuel pump?

A Yes, it did.
Q Did it have a fuel rail?
A Yes, it did.
Q Did it have injectors?
A Yes.
Q Did it have a pressure regulator?
A Yes.
Q What kind of injectors did it have; do you know?
A They were Bosch.
Q Were you able to buy Bosch with -- was -- were Bosch injectors commercially available in 1983?
A Yes, they were.
Q And --
A They were used in automotive.
Q Bosch injectors were used in cars?
A Yes, the injectors we bought were the same injectors used in cars.
Q And how did you determine the fuel pressure that you would use -- what the fuel pressure would be set at in the EFI two-stroke cycle engine?
A We based our fuel pressure on available

six-digit number on the drawing indicates that it's a released part; and this drawing is an assembly drawing for the microprocessor and socket which were used on our V-8 racing engine.
Q What would the microprocessor do on the OMC EFI two-stroke cycle engine?
A It -- it controlled all of the electronic fuel-injection functions.
Q Do you know who the manufacturer was of the --
A It was -- it was manufactured by Motorola.
Q Let me show you what has been marked as Exhibit 604.

(Indicating.)

MR. HANES: 603 is likewise objected to as hearsay and lack of foundation.

BY MR. DALEY:
A What is Exhibit 604, Mr. Nerstrom?
A This is a -- a print -- a schematic of the computerized fuel-injection electronics.
Q The OMC computerized fuel injection --
A Yes.
Q -- the one that was sold to the public --
A Yes.

Q -- in 1985 to 19 -- 1988?
A That -- that's correct.
Q Okay. What operating parameters does this schematic diagram show the OMC system was sensing?
A It shows that we sensed barometric pressure, it -- it shows that we sensed, on -- on the drawing, air or power head temperature. We actually ended up with air temperature. It shows that we sensed power throttle position. It --
Q Did you sense engine speed at that time?
A Yes, we did, and I'm not sure just which -- which part of this senses speed, but we did sense speed.
I -- the ring gear sensor was speed. We had a magnetic pickup that -- that sensed RPM off of the ring gear, and that's -- that's the speed sensor, Item -- Item 3 over on the right-hand side.
(Indicating.)
Q Did you -- you decided to -- strike that.
When you were trying to determine how much fuel to inject into the system, did you

Q You used the phrase there was an established point when you injected.

A Correct, we -- we injected at the same point on every revolution.

Q Did that same point vary?

A No, it did not.

Q Let me hand you what has been marked as Exhibit 605.

(Indicating.)

MR. HANES: We object to 604 on the basis of hearsay and lack of foundation.

A 605 is a wiring diagram that was sent with every engine.

BY MS. DALEY:

Q What was the date of 605?

A The -- the start date was 12/6 of '85, and --

Q Is it -- oh, go ahead.

A -- the release date was 5/2 of '86.

Q You said this wiring diagram was sent with every engine.

Was it publicly available to the consumers of your OMC EFI two-stroke cycle engines?

A Yes, it was.

Q I -- I notice that there are the initials G. M. under the "Approved by" box at the upper right-hand corner of Exhibit 605.
Do you know whose initials those are?
A Those would most likely be Gerhard Maier.
Q Was Gerhard Maier approving the wiring diagrams in late 1985?
A Yes, Gerhard Maier was responsible for the wiring diagrams, and it's typical for the -- the project engineer responsible to -- to approve a final drawing.
Q Would you have seen this wiring diagram in late 1985 as part of your responsibilities as an OMC employee?
A Yes.
Q Does Exhibit 605 accurately reflect the wiring diagram for the OMC EFI two-stroke cycle engine that was sold to the public 1985 to 1988?
A Yes, it does.
Q Now, just so the record is clear, and this is to deal with some of the objections that Mr. Hanes has made, let me deal with Exhibits 601 -- or 600 through 605 as a group.

MR. HANES: Now, let me state my objection to 605 first.

MS. DALEY: Okay. Go ahead.

MR. HANES: On the basis of hearsay and lack of foundation.

BY MS. DALEY:

Q Were Exhibits 600 through 605 made by persons with knowledge of the information contained therein?

A Yes, they were.

Q Were they made at or near the time of the dates which are reflected on each of the exhibits?

A Yes.

Q And were they made as part of the regular practice of OMC's business activities?

A Yes, they were.

Q And were they kept in the course of OMC's regularly-conducted activities?

A Yes, they were.

MS. DALEY: Sure. Would you like to take a break?

THE WITNESS: I'd love one.

THE VIDEOGRAPHER: We are off the

video record at 10:34 A. M.

(Whereupon a recess was had, after which the deposition was resumed as follows:)

THE VIDEOGRAPHER: We are back on the video record at 10:46 A. M.

BY MS. DALEY:

Q Mr. Nerstrom, before the break, we were reviewing Exhibit 600 through 601.

Did -- where were the originals of Exhibits 600 through 605 before they were brought to the conference room today?

A 604 is in our engineering records files; 603 is in our engineering records files; 602 came from my file; 601 came from my personal file; 600 came from my personal file; and 605 came from our engineering records files.

Q And did you pull Exhibits 600 through 605 to give to your lawyer?

A Yes, I did.

Q And these file cabinets or drawers where you pulled Exhibits 600 through 605, were they file cabinets and drawers maintained at OMC's premises?

record, Mr. Nerstrom, identify the various documents --

MR. HANES: Where's the mark?

MR. NIMZ: 612.

(Indicating.)

BY MR. HANES:

Q All right. And Exhibit 12 comprises the following documents.

I'll --

MS. DALEY: 612.

BY MR. HANES:

Q -- just hand them to you.

(Indicating.)

MS. DALEY: I'm sorry.

You mean Exhibit 612?

MR. HANES: Yes.

What did I say?

MS. DALEY: 12.

MR. HANES: 612.

A Exhibit 612 is a news release announcing the 1985 Formula 1 V-8 racing engine and describing a number of its features, which included computerized fuel injection.

BY MR. HANES:

Q Was that document ever published?
A Published?
Q In a newspaper or trade magazine or some --
A Yes.
Q -- other source.
A Yes, it was.
Q Do you know where?
A I think there were some internal OMC publications of this which went to dealers.
The engine was announced to the public in Milan, Italy, at a big meeting of -- of the UIM, which is the international organization that controls marine racing.
Q How was it announced?
A There was a big press conference, a big party kind of a thing.
Q Was it essentially the same information that's contained in that document?
A Exactly the same information.
(Indicating.)
Q All right
A Well, yeah.
Q All right. Then going --
A That was handed out, as I recall.

Q -- to the second part of Exhibit 612, can you identify that?

(Indicating.)

A This is a parts book for the OMC Formula 1 V-8 racing engine. It's dated 1986. The part number is 568046. This parts book is -- gives a parts listing of all the parts that were used in the -- the engine we have here, the engine that was sold to our customers.

This parts book was -- was shipped with every engine so that a -- a customer could buy parts when he needed them.

Q And the third document.

(Indicating.)

A This is a copy of the catalog produced by Second Effort, and it shows the -- the parts that they offered to the public, which included the -- the Formula 1 V-8.

(Indicating.)

Q The fourth document.

(Indicating.)

A This is a copy of the 1986 Johnson recreational engine catalog. This was distributed to all of our dealerships, and any

their objectives were?
A To invalidate your patent, as I understand it.
Q Okay. And did you agree to cooperate in that effort?
A I agreed to answer questions as honestly as I could.
Q And you've done that?
A To the best of my knowledge, yes, I have.
Q Now, the documents that you produced, which have been marked as exhibits in this case, are documents that were confidential to OMC?
A That's correct, with -- with the exception of -- of the wiring diagram and that diagnostic user sheet, and then the -- the catalogs which you have and the parts book, those were all in the public domain.
Q All right. Well, let's go through it, then, exhibit by exhibit, just so I understand.
Exhibit 612, which is the news release and the catalogs, are -- were -- are -- were not ever confidential?
A That's correct.
Q And you say you gave the wiring diagram out to --

A That went with every engine.
Q And so that wasn't confidential?
A That's correct.
And the --
Q I see you've marked it "confidential," however.
A Whenever we run a print, we stamp it.
That -- that drawing need not be confidential. It's in the public domain.
(Indicating.)
Q That's Exhibit 605?
A 605; that's correct.
Q And how did it get into the public domain?
A It was supplied with each engine sold -- sold.
Q To the -- the purchaser?
A Uh-huh.
Q All right.
A He needed that to wire his boat.
Q And the other one that was the --
A 602.
Q 602?
A Right. Those instructions were supplied with a diagnostic box.
Q And so even though it's marked "confidential,"

Exhibit 615.

(Indicating.)

Mr. Hanes had asked you some questions about whether or not the information in the press release, which is -- is the first part of Exhibit 612, was ever in the published form.

Exhibit 615 is an excerpt from a magazine called Powerboat.

Have you ever seen that magazine before?

A Yes, I -- I subscribe to that magazine.

Q Does Exhibit 615 accurately describe the OMC engine -- OMC EFI two-stroke cycle engine?

A Yes, it does.

Q Let me hand again what has been marked as Exhibit 612.

(Indicating.)

And does Exhibit 612 contain information which was kept by OMC in the course of its regularly-conducted business?

A Yes.

Q And does -- does Exhibit 612 contain documents which were made as a part of OMC's regular business activities?

A Yes, it does.
Q And were those documents made at or near the time of the dates indicated on the various pages of Exhibit 612?
A As far as I know, they were.
Q And are the documents which are part of Exhibit 612 made by people with knowledge of the facts or from information transmitted by people with knowledge of the facts contained in those documents?
A Yes.
Q Exhibit 611 is a two-stroke cycle engine; correct?
A That's correct.
Q And it's an electronically fuel injected two-stroke cycle engine; correct?
A That's correct.
Q It doesn't sense engine temperature, although you considered it and could have put it on there if you wanted to; correct?
A Yes.
MS. DALEY: No further questions.
THE VIDEOGRAPHER: This concludes the Nerstrom videotape deposition at 2:15 P.

# EXHIBIT U

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

---

INJECTION RESEARCH SPECIALISTS INC., a Colorado corporation,

Plaintiff,

vs. Case No. 90-Z-1143

POLARIS INDUSTRIES L.P., a Delaware limited partnership, et al.,

Defendants and Counterclaim-Plaintiffs,

vs.

PACER INDUSTRIES, INC., a Wisconsin corporation, et al.,

Counterclaim Defendants.

---

AND CONSOLIDATED CIVIL ACTION NO. 91-Z-663.

---

CONFIDENTIAL SUBJECT TO REVIEW

DEPOSITION OF

RICHARD STAERZL

February 6, 1996

Taken by ANNAMARIE DALEY, Attorney, ROBINS, KAPLAN, MILLER & CIRESI, at the Law Offices of Andrus, Sceales, Starke & Sawall, 100 East Wisconsin Avenue, Suite 1100, Milwaukee, WI 53202; pursuant to Rules 30(b)(6) and 45 of the Federal Rules of Civil Procedure; reported by Holly J. Ford, a Notary Public and Registered Professional Reporter in the State of Wisconsin, on February 6, 1996, commencing at 9:40 a.m.

Curtis, Morris & Safford, P.C., for Fuji Heavy Industries and Unisia Jecs Corporation.

MS. DALEY: Annamarie Daley, Robins, Kaplan, Miller & Ciresi, representing Polaris Industries.

MR. ESSMANN: Gary Essmann and Mike Taken, Andrus, Sceales, Starke & Sawall, representing Brunswick/Mercury Marine.

D E P O S I T I O N O F

RICHARD STAERZL,

called as a witness, being first duly sworn, testified as follows:

EXAMINATION BY MR. SANTISI:

(9:40 a.m.)

Q Mr. Staerzl, would you please repeat your name and address for the record?

A Name is Richard Staerzl, 871 South Main, Fond du Lac, Wisconsin.

Q And who are you currently employed by?

A Mercury Marine.

Q And how long have you been employed by Mercury Marine?

A Little over 25 years.

Q Could you briefly recount your education beyond a high school level and any employment up to the time



CONFIDENTIAL

MM 0002

Marine fuel injection systems used in the 1986 version of its engine?

A Yes.

Q Next page. Is the next page -- It's the EFI Electrical Diagram. Do you see that?

A Yes.

Q Is that an accurate pictorial representation of the EFI electrical system in use on the Mercury Marine engines in 1986?

A Yes, it is.

Q As a matter of fact --

MR. SANTISI: Let me have the reporter mark as Exhibit 2106 a copy of --

(Whereupon Exhibit 2106 was marked for identification.)

BY MR. SANTISI:

Q Well, I'll have you tell me what Exhibit 2106 is now that it has been marked.

A Okay. This is another Service Manual.

Q From what year?

A And this is from the 1986.

Q Okay. Is there -- let me ask you to go through what has now been 2106, marked as 2106, to the page that has the legend -- And how do you know it's the 1986 version of the manual, is there any code on the



CONFIDENTIAL MM 0014

document itself which tells you that?
A Yes. There is a code on the lower right-hand corner of the page, there is a part number followed by a dash 986. That means it's 9th month, '86 year.
Q Okay. And 2105 in that same location has a code Number 491?
A Yes. That's the 4th month, '91 year.
Q And would this manual, this 1986 manual, excerpts of which have been marked as 2106, have been distributed to the public in September of 1986?
A Yes.
Q Okay. That's not the page I wanted, let me -- Okay, let me get to it. All right. The page I want you to compare is Page 9A-9 in Exhibit 2105. Do you have that?
A Yes.
Q With the page numbered 9A-1 in Exhibit 2106 and it's the 3rd page in. Do you have them? Yes?
A Okay.
Q Okay. In Exhibit 2105 there is a description of the Air Temperature Sensor. While the words are not the same, are they describing the same sensor in Exhibit 2106 and 2105?
A Yes.
Q Okay. There is also a description on Page 9A-9 of

2105 of a Manifold Absolute Pressure (MAP) Sensor. Is there also a description of that type of sensor on Page 9A-1 of Exhibit 2106?
A Yes.
Q Were the same type of sensors used in 1986 as in 1991?
A Yes.
Q Did the same -- did the signal get processed in the same manner in 1986 as it did in 1981?
A Yes.
Q Okay. There is also a Throttle Position Sensor on Page 9A-9 of 2105 and Page 9A-1 of 2106. Does that describe the same sensor?
A Yes.
Q Was the same type of potentiometer used in 1986 as it was in 1991?
A Yes.
Q And could you explain what a potentiometer is?
A Potentiometer is a verbal voltage device that responds to either angler rotation or linear rotation. In our case we are using angler rotation. So as you vary the throttle opening you will get a varying voltage.
Q Okay. Other sensors described on Page 9A-9 of Exhibit 2105 and Page 9A-1 of Exhibit 2106 is an

Q Okay. Then the next thing I will want the reporter to mark is 2 pages bearing production numbers F-4003476 and 3477. Do you have that, it has a picture of a Mercury XR4 on the cover, first page, Dick?

MR. HANES: Tell me how many pages.

MR. SANTISI: 2, 2.

MR. HANES: Was that 2108?

MR. SANTISI: 2108 is from 248 to 267, so it's 19 pages.

MR. HANES: All right. Just a minute. And what's your next exhibit, the Bates number?

MR. SANTISI: Fuji, F-4003476 and 3477.

MR. HANES: 2 pages?

MR. SANTISI: Yeah.

(Whereupon Exhibit 2109 was marked for identification.)

MR. HANES: That's 2109?

MR. SANTISI: Yes.

Q I am handing you now what has been marked as Exhibit 2109, Mr. Staerzl, and have you ever seen that before?

A Yes.

Q And what is that?

A That is a line folder for our EFI engine.
Q You called it a line folder?
A It tells the features of our 220 Laser XRi.
Q In the description here, is there any indication of the date of this publication?
A The only way of telling the date is the fact that it says "220 Laser XRi" and the 220 was only brought out in '86.
Q Okay. So this is the first engine?
A The first engine.
Q Okay. That's the good way of dating it. Let's stick with the EFI system that you used -- that you designed for the Mercury Laser series of engines from 1986 on.
A Okay.
Q Okay. Did that system have fuel injectors for injecting fuel for combustion within a cylinder of an engine?
A Yes.
Q Did that system have a fuel supply means for supplying fuel to the fuel injectors?
A Yes.
MR. HANES: Excuse me, Less, what engine are we talking about now?
MR. SANTISI: The Laser XRi series of

# EXHIBIT V

27 November 1989
Telephone conversation with Bill O'Meara.

*Good morning Gary.* Hi Bill. How you doing? *Pretty good.* I have you on the speaker phone. I also have Rodney Preisser, Ron Chasteen and Judi Mattox here with me. *OK, great, the whole crew.* I wanted to walk through this letter of yours dated 14 November 1989 and also make a decision and give you the go ahead on a couple of these items.

*All right. Let me dig my letter out of my file here. OK, I've got it in front of me now.* One basic question up front, Bill. This IRS U.S.1(a) Application was approved on 5 September 1989 by the Patent Office. Does that thing go all the way back to the original filing date of November 1987? *Yes.* What piece of paper proves that or shows that to me? *It's the fact that it's just the way the Application itself was filed. It was filed as a Continuation Application and we called it a Continuation Application.* There should be a document, though, that references the original date, I would think, somewhere, isn't there. *Yes, there is. You should have a copy of that Application as we filed it.* We've got the original one, yes. *Look at the document that you have. We filed a second Application. I sent it down to Judi and Ron read it and signed it and sent it back to me. I thought that I had sent you a copy of it, but look at the copy that you have. On the very first page it says "The present Application is a Continuation of U.S. Patent Application Serial No. 119626 filed November 12, 1987.* That's it then. OK. *When you say it's a Continuation, it automatically means that you get that filing date.*

OK. Next question. With respect to certain foreign countries such as Japan, Korea and EPO, we want to go with a single PCT Application. You indicate that it may be filed, to preserve our rights to file in these countries, up to 20 months. *Japan, Korea and EPO. You gave me a list of countries at different times. Some countries are members of the PCT and some aren't. I think that Japan, Korea and EPO are all members of, there is a difference (it really confuses me). There are different types of membership in the PCT and, I believe, in Japan and EPO we can extend up to 30 months by going through a request for examination. I think that Korea is not a member of what is called Chapter 2 of the PCT and, so, for Korea we can only extend for 19 months.* That's fine. What's it going to cost me to get that done? *I think I gave you an estimate at one time.* You gave me the individual countries. I didn't recall one on PCT. *I may not have. I can ask my foreign associate for that. I would guess that it's probably going to be in the ball park of $2-3,000. I will get you an exact for it.* Get me an estimate on that. When would you file that if we turn you on? *Immediately.* OK. It doesn't matter if we go ahead and file the patent then and file immediately for that? It doesn't have to be done before the patent is actually filed here? *Since we've got the base specification on file here, we can file the PCT making any claims that we want based upon the specifications. What I would suggest is that we get this new U.S. Application ready to go, assuming you want to do that, and that we file the same claims in the PCT Application as we file in this new U.S. Continuation Application.*

All right. I'm going to get to that in a minute. On page 2 of your 14 November letter there is one correction relative to an understanding in the next to the last paragraph on the page, where you indicated it is your understanding that a former "employee" was hired away from IRS by Polaris. That should read former "consultant" instead of "employee". *OK.*

Next question from a general standpoint. On page 3 you first start talking about, "..as an inventor you are under a continuing obligation to bring forward any information of which you are aware or which may be important to the allowability of any claims of your Patent Application." *Right.* We are certainly aware of some published PR type

Exhibit No.: 1001
Deponent: O'Meara
Date/RPR: 4/7/04 [illegible]
Hunter + Geist, Inc.

PRIV0223

From reading it, I can't see where you say he used the wrong reason. You made the point that if he's going to be questioned, he's going to stick to his own approval rather than change it, right? *We want him to stick to his own approval. What we want to do is give him a chance to look at it, give him a chance to get rid of this reason that he puts down and come up with a better reason or put down no reason at all. The problem is that if he didn't consider temperature control of electrical and electronic circuitry to be a portion of the claim, he simply wouldn't have made that statement in the initial part of that sentence.* That seems like an awful big assumption. It sounds like you open Pandora's Box again to go back in there. *You're really not. If you're going to have a patent and you are going to litigate it, and it sounds to me like you guys are going to litigate it, you want to have a good strong prosecution. You want to give the Examiner every chance to consider all the relevant art and then take your chances with reexamination and litigation. But in this situation now, the Examiner isn't in any sort of position where he's got two adversaries looking at his every move. This is an exparte prosecution; it's just us and the Examiner going back and forth. The Examiner doesn't even know that this thing is going to go under litigation and we're just in a better situation now to get all loose ends cleaned up than we will be after this thing goes into litigation.* I don't know that we're ever going to have to litigate on this thing, Bill.

I guess my concerns are twofold: 1) We've had a long, lengthy discussion this morning among ourselves. There are certain advantages to going ahead and getting the patents in place. *Have you considered the trade secrecy thing.* I don't think that bears as much weight as we might have previously given it. If we look at the marketplace out here, from a pure business standpoint, I believe that the patent, at this point in time, gives us some protection, gives us some business opportunity and provides an opportunity for us to have something in for us that we can actually show potential clients. We do end up having a published document, if you will, but that published document in reality doesn't really release any of what I call secrets. They would still have to come up with the formulas, data and everything else to make this thing work.

*Okay. There is one further consideration and this may be a big one. By letting this information out now, you are giving your competition a chance to look at your Patent Application, to look at your specifications and, potentially, dance around what you are doing as opposed to putting them in a position where they are committing themselves to a particular type of design that's going to infringe your patent so that they are going to be locked into something where you can request a license from them.*

I agree with you, but with the Continuance effort if we are going to press for the battery and timing device and the heat control, we think we've probably locked off 99% of the entry available for people who are going to be building this thing no matter it looks like.

The other thing is, can't you clean up this language in your Continuance? *Yes, we can and we intend to do that. Put down broader claims.* Include Claim C at pending C, take out the battery and the timing thing and then do the Continuation and if he gives the same reason that time around, then clean it up then. *He's not likely to give us the same reason this next time around. I suppose there is always the possibility he will, but it's going to be a much broader set of claims and I think that this is a very rare situation when the Examiner gives the wrong reason. In fact, I think it's the first one that I've ever directly encountered. So, it's not likely to happen again.*

I don't know that we agree that it's necessarily the wrong reason. What do you base that on? *I'm basing it on the fact that we don't, in the loud claim, there is no temperature control circuitry for controlling the operation of the computer and I think that's what the Examiner is talking about. Temperature control of electrical and electronic circuitry. He is not talking about temperature control of the engine. What it seems to me that he's talking about is*

PRIV0227