UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ARCTIC CAT, INC., a Minnesota Corporation,

Plaintiff,

vs.

INJECTION RESEARCH SPECIALISTS, INC., a Colorado Corporation, and PACER INDUSTRIES, INC., a Missouri corporation,

Defendants.

AND RELATED COUNTERCLAIMS.

No. 01-CV-543 MJD/RLE

CERTIFIED COPY

DEPOSITION OF BERNARD CUZZILLO, Ph.D.

Palo Alto, California

Wednesday, January 21, 2004

Reported by:
KELLI COMBS
CSR No. 7705
Job No. 49371

.4:23:06 claim construction is, but if The Court or the jury needs education about what the technology is that we are talking about, I would certainly be prepared to offer that.

14:23:20 Q Okay.

Well, I'm trying to distinguish between offering an opinion as to the proper claim construction and something else.

Your understanding is you're not going to 14:23:29 offer an opinion as to the proper claim construction because you have been instructed as to the claim construction by counsel, haven't you?

A That's right. I have been asked to assume what the claim construction is. So to that extent, I am 14:23:45 assuming what it is.

Q Okay.

And similarly, you're not going to offer any opinions as to a proper claim construction as you understand your engagement at this moment, right?

14:23:58 A That's correct.

Q Okay.

All right. Just to make sure --

A Except for the -- if The Court needs explanation about what the technology is.

14:24:09 Q Right.

14:24:10 A In other words, just like in the Polaris case, there was a hearing where the judge wanted to hear from the experts and have them explain to her what the technology is and what are the issues that are before her. She wanted to see it in person. And that may happen again.

Q Right.

You're familiar with the term "tutorial"?

A Sure.

14:24:38 Q As you understand things, you might be given the opportunity to give a judge or a jury a tutorial?

A Absolutely. Just like in the -- that videotaped animation --

Q Sure. Okay.

14:24:50 A -- that I provided.

Q Can you think of --

Has counsel at any time up until today brought to your attention, excuse me, any areas in which your report fails to express an opinion that they do want you to express at trial?

14:25:04

A No.

Q Have you brought to counsel's attention that same issue where, oh, I have realized there is an opinion I wish to express, with the exception of the first and second processors, which we have already

14:25:15

14:25:18 talked about, but it's not in your report?

A No.

Q Okay.

With regard to the two reports, 651 and 975 by exhibit number, I want to just visit with you for a couple of minutes about the process of preparing them.

First, in terms of who sat down at a machine and input words into a word processor which then resulted in them being put on a page, with respect to both the reports, and distinguish between them if it was different, please, who sat down at a keyboard and input this stuff?

14:25:28

14:25:46

A Okay. They were different.

On 651 I typed every character in here and prepared every graphic and every table. And not only that, I took all the data that was in every graphic and every table.

14:26:05

Q Okay.

Just staying with 651, therefore, at some point you sat down at some kind of a machine and you began to input stuff?

14:26:26

A Yes.

Q The report 651 is the June report, right? Am I getting that right?

A Right.

14:26:37

15:37:24 THE WITNESS: Certainly.

BY MR. de ALCUAZ:

Q Okay.

Just a couple of other questions about your

15:37:27 May report, 975. Turn to the page four of your numbered report, if you would, please.

There is references -- there is a description there of what you looked at to prepare this report. I take it from your prior testimony that you actually

15:37:42 looked at these things before you did the Polaris report, so some eight or nine years ago?

A Sure.

Q Okay.

In E it says "pertinent research sources."

15:37:53 Can you tell me what those were?

A In the Polaris case I collected a pretty voluminous volume that was either supplied to me or there was a lot of stuff that I found in the literature myself that went in the file, so there is a lot of

15:38:28 research articles. I had a few books on two-stroke-cycle engines. So it was kind of a broad literature search. I think it included a Ph.D. dissertation from somebody.

Q Okay.

15:38:54 Is there any list that you can think of either

15:38:56 as part of this report or someplace else that would tell us what exactly you looked at to prepare the original Polaris report which was the basis for Exhibit 975, your May report?

15:39:07 A There is no list listing it exactly, but all of those materials were left in the files, so they were probably produced to you.

Q Okay.

Have you or your organization -- I keep

15:39:24 wanting to say "BEAR," but I'm not sure whether that's the right way --

A That's fine.

Q BEAR Engineering is it?

A Well, actually, it's an acronym.

15:39:31 Q Okay. So BEAR, Inc.?

A Right.

Q Have you and BEAR begun preparing any demonstrative exhibits for this case?

A Yes.

15:39:40 Q Okay.

What work have you done so far?

A Not a heck of a lot, but we have begun it.

Q What have you begun working on?

A What we have begun working on is pretty

15:39:51 analogous to the exhibit that we demonstrated in the

15:39:57 Polaris case, and that is a flash lamp system that will demonstrate live in the courtroom using a dry dyno, the computed injection timing, and it's -- and we'll probably show ignition timing, as well, on the same
15:40:24 working mockup or dry dyno.

Q Okay.

When you say "dry dyno," do you mean you're going to bring the whole dry dyno setup into the courtroom?

15:40:34 A Absolutely. Yeah, we did it last time.

Q And have you started working on any other demonstrative exhibits of any type, you know, even words on paper, boards --

A No.

15:40:46 Q -- slides, animations?

A Nothing.

Q Does your organization do animations?

A No.

Q Okay.

15:40:51 Are you working --

A Well, I don't know. There might be one person that does some animation to a degree.

Q Are you, yourself, working with any organizations on behalf of the folks that you are
15:41:03 helping in this case with an animation company to

15:41:06 produce an animation?

A No.

MR. de ALCUAZ: Okay.

Let's take a break.

15:41:12 THE VIDEOGRAPHER: This concludes tape two in the deposition of Dr. Bernard Cuzzillo. We are going off the record. The time is 3:41.

(Recess taken at 3:41 p.m. resumed at 4:06 p.m.)

16:06:13 THE VIDEOGRAPHER: Here marks the beginning of tape three in the deposition of Dr. Bernard Cuzzillo. We are on the record. This time is 4:06.

MR. JENKINS: Tony, I believe the witness would like to clarify one piece of testimony if you 16:06:28 could give him an opportunity here.

MR. de ALCUAZ: Sure.

BY MR. de ALCUAZ:

Q Just tell me what piece of testimony you want to clarify, Dr. Cuzzillo, and then have at it.

16:06:36 A Okay. On Exhibit 975, which is my May report, the date on it says May 21st, that's an error. It was May 22nd that I signed it.

Q How did you determine that?

A Well, two ways. First of all, I remembered it 16:06:58 was a Thursday, and at the break I looked at my calendar