HANES & SCHUTZ
Attorneys at Law professional corporation

RICHARD W. HANES
TIMOTHY J. SCHUTZ

February 11, 1997

Mr. Ray Niro
Niro, Scavone, Haller & Niro
181 West Madison Street
Chicago, IL 60602-4515

Dear Mr. Niro:

Pursuant to Mr. Hanes' request, enclosed is the transcript from the Hearing on Cross-Motions for Summary Judgment, which was held on January 28, 1997.

Yours truly,

HANES & SCHUTZ, P.C.

Richelle Kelley

Richelle M. Kelley

RMK/s

Enclosure

IRS/AC0213974

Respond to:
Suite 243, 7222 Commerce Center Drive, Colorado Springs, Colorado 80919 • 719-260-7900 • FAX 719-260-7904

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action Nos. 90-Z-1143 and 91-Z-663

INJECTION RESEARCH SPECIALISTS, INC.,

Plaintiff,

vs.

POLARIS INDUSTRIES, *et al.*,

Defendants.

---

REPORTER'S TRANSCRIPT
(Hearing on Cross-motions for Summary Judgment)

---

Proceedings before the HONORABLE ZITA L. WEINSHIENK, Judge, United States District Court for the District of Colorado, commencing at 9:45 a.m., on the 28th day of January, 1997, in Courtroom C-400, United States Courthouse, Denver, Colorado.

APPEARANCES

RICHARD W. HANES, Attorney at Law, Hanes & Schutz, P.C., Suite 243, 7222 Commerce Center Drive, Colorado Springs, Colorado, 80919, and RAYMOND P. NIRO and DEAN NIRO, Attorneys at Law, Niro, Scavone, Haller & Niro, 181 Madison, Suite 4600, Chicago, Illinois, 60602-4515, appearing for Plaintiff Injection Research Specialists.

Proceeding Recorded by Mechanical Stenography, Transcription Produced via Computer by Paul Zuckerman, 1929 Stout Street, P.O. Box 3563, Denver, Colorado, 80294, (303) 629-9285

WESLEY W. WHITMYER, JR., Attorney at Law, St. Onge Steward Johnston & Reens, 986 Bedford Street, Stamford, Connecticut, 06905-5619, appearing for Plaintiff Pacer.

J. NICHOLAS McKEEVER, Attorney at Law, Netzorg & McKeever, P.C., 5251 DTC Parkway, Penthouse One, Englewood, Colorado, 80111, and ANNAMARIE A. DALEY, Attorney at Law, Robins, Kaplan, Miller & Ciresi, 2800 LaSalle Plaza, 800 LaSalle Avenue, Minneapolis, Minnesota, 55402-2015, appearing for Defendant Polaris.

WILLIAM A. BIANCO and CAROLE JEFFERY, Attorneys at Law, Davis, Graham & Stubbs, L.L.C., Suite 4700, 370 17th Street, P.O. Box 185, Denver, Colorado, 80201-0185, and LEONARD J. SANTISI, Attorney at Law, Curtis, Morris & Safford, P.C., 530 Fifth Avenue, New, York, 10036, appearing for Defendants Fuji and UNISIA JECS.

* * * * *

PROCEEDINGS

THE COURTROOM DEPUTY: The matter now before the Court is Injection Research Specialists, Inc. vs. Polaris Industries, *et al.*, 90-Z-1143 and 91-Z-663.

THE COURT: We'll take about a five-minute recess while the attorneys come and make sure the reporter knows who you are for the record.

(Recess at 9:45 a.m.)

(Reconvened at 10 a.m.)

THE COURT: I'm going to ask you to move that so I can see all counsel.

Thank you.

Representing plaintiff?

MR. RAYMOND NIRO: Good morning, your Honor. Raymond Niro for the plaintiff, Injection Research.

THE COURT: Would you introduce everyone else at the table.

MR. RAYMOND NIRO: Yes, I will, your Honor.

Dick Hanes, representing Injection Research; and my son, Dean Niro, represents Injection Research.

Mr. Whitmyer represents Pacer Industries. He's back here.

THE COURT: And representing Polaris?

MS. DALEY: Your Honor, Annamarie Daley with Polaris Industries; and with me is Nick McKeever.

MR. MCKEEVER: Good morning, your Honor.

THE COURT: All right. Thank you.

And representing Fuji?

MR. BIANCO: Good morning, your Honor. William Bianco and my partner Carole Jeffery of Davis, Graham & Stubbs; and with us is Leonard Santisi of Curtis, Morris & Safford, all representing Fuji and JECS.

THE COURT: You're representing both Fuji; and you're going to be referring to the other defendant as JECS, rather

than "UNISIA"?

MR. BIANCO: UNISIA JECS Corporation; but we'll refer to it as "JECS" in the course of this proceeding.

We have with us a representative of Fuji, Mr. Choji Nishizaki, who is charge of the intellectual property department of Fuji Heavy Industries.

THE COURT: Do you want him to sit next to you?

MR. BIANCO: I think it's not necessary for him to sit at counsel table. He's, I'm sure, comfortable where he is.

THE COURT: Let's do a few ground rules. This is a hearing on pending motions for summary judgment; and as you've been told, each side will have two hours, for a total of four hours. When I'm talking about two hours each side, I'm not separately counting direct and cross. I'm talking about the plaintiff resting after two hours no matter what has happened up to that point or resting subject to reserving ten minutes for rebuttal or however much you want to reserve. And the same thing for the defendants.

This is a chance hopefully for us to get these motions resolved and also to see how this system is going to work for the trial, which is coming up.

What I need to say to all of you is that you are going to have to cooperate on a system for the trial. We don't have enough -- it's a small well, as you know, in this courtroom. We don't have enough space or room for each side to have their

own system. You are going to have to cooperate on one system, and you can each have a different person handling exhibits, or you can work with Janine and let her assist you; but it is going to have to be one system and not two separate systems. And I hope that's what you've talked about and done.

MR. RAYMOND NIRO: It is, your Honor; and I think we will resolve that. But basically, I think we'll be using this ELMO machine and perhaps some other equipment, but it may just be the ELMO machine.

THE COURT: And this has worked out -- actually, we have three different parties, so it's been worked out with all three?

MR. BIANCO: Today, your Honor, we have no plans to use the ELMO, and we have different systems; but I expect that it should be easy to resolve that for trial to use one system and decide what it's going to be.

MS. DALEY: Your Honor, might I say that Mr. Niro has been gracious enough to allow me to use the ELMO. I am familiar with using it. Although I don't know his specific equipment, I'm sure he'll help me out; but I intend to use it.

THE COURT: And by the way, you are going to have to talk twice as slowly as you talk.

MS. DALEY: I will, your Honor.

THE COURT: I don't want you to wear out my reporter.

I have 10 of 6 (sic). Maybe before we start the

timing, it would be helpful for you to tell me what the road map is. How you are going to use the two hours? And I will keep track and hold you to it.

MR. RAYMOND NIRO: We've talked with the lawyers for the defendants about this, your Honor. Basically, it was my hope to spend somewhere between 1 hour and 20 minutes and 1 hour and 30 minutes in the opening phase of the presentation, which would be broken up into two parts. The first would be a focus on what the issues are and an attempt to do that by focusing on the claims; then to hear testimony from the inventor, Ron Chasteen, about some of the terminology, some of the work that was done to develop the invention, and to assist the Court in understanding the technical issues that are here.

As your Honor knows, we have a stipulation which limits the extent to which experts can testify about claim interpretation or scope or things that are the province of the Court, infringement and the like; but basically, we would try and do that with Mr. Chasteen.

After cross-examination of Mr. Chasteen, we would then have an a brief argument on some of the specific claim limitations that are at issue on the pending motions. At that point in time, we would stop and discuss with the deferments what the next stage would be. They suggest they need about an hour and 30 minutes or an hour 45 minutes to do their presentation. After their presentation, we would have a chance

to cross-examine their expert.

THE COURT: No, I don't think you understand. The two hours includes cross-examination of whoever is going to testify.

MR. RAYMOND NIRO: We understand that.

THE COURT: So if it's an hour 45 minutes, that includes cross-examination.

MR. RAYMOND NIRO: Does that time count against us?

THE COURT: No, I'm not going to separately count cross and direct. I'm going to say starting now, and you end, plaintiff, at two hours, less time for your rebuttal. You start now, defendant, and you end at two hours, direct, cross, redirect, recross.

MR. RAYMOND NIRO: That's fine, your Honor. We can do that. I think the cross will be very brief.

THE COURT: And the cross-examination, in all fairness, should not exceed the time of the direct, so you have to allow for cross in figuring your time.

MR. RAYMOND NIRO: Correct. We would be very brief. I would suspect no more than 35 minutes of cross on our part. I don't know how much time --

THE COURT: I hope both sides will do this.

Now, this two hours also will include opening statement and -- there really isn't closing argument because this is --

MR. RAYMOND NIRO: We would then save some time for rebuttal, your Honor; and there was talk of them coming back and us coming back. But I think if we do ours, theirs, and then a rebuttal, that would be sufficient.

THE COURT: If we get started and it's not quite 10:10, we do need a break sometime in the middle of the morning. So that means at 12:10, 12:20, you'll be done, if I'm understanding; and then we'll start with the defendants after lunch.

MR. RAYMOND NIRO: We would have some rebuttal, your Honor, of course.

THE COURT: You can reserve 5 or 10 minutes for rebuttal.

MR. RAYMOND NIRO: I think 15 would be preferable. If we go an hour 30 to an hour 45 we would have 15 minutes.

THE COURT: If you go an hour 45 minutes, then an hour 45 minutes from now.

Is that understood?

MR. BIANCO: That is understood, your Honor.

May I raise another point? Mr. Niro has informed us for the first time just now that Mr. Chasteen, the purported inventor, is to testify today.

My understanding when the Court set up this hearing, the Court invited some testimony from expert witnesses. Regardless of whether Mr. Chasteen may qualify as an expert or

not, my understanding from discussions with Mr. Niro was that Dr. Martin would be offered as an expert witness. We agreed to permit Dr. Martin to testify, though he has not been listed earlier as an expert, simply for the purposes of this hearing. We now hear for the first time that Mr. Chasteen is going to testify. Mr. Chasteen, of course, has been on the record at some considerable length in this case, your Honor; and we have simply not been -- come prepared to examine him.

In addition, Mr. Niro in his remarks a moment ago indicated that Mr. Chasteen was going to talk about the history of the invention. I think that type of testimony is proscribed in this type of hearing. In the **Vitronics** and in the **Southwall** case, the testimony of what the inventor intended or did or may have thought is not appropriate in this type of hearing to construe the claims; so we would object to the testimony of Mr. Chasteen for both of those reasons.

MR. RAYMOND NIRO: First, your Honor, we don't plan to have him talk about his intent. He'll talk about his background and qualifications to testify as an expert. He is the inventor. I can't think of anyone more prepared to testify --

THE COURT: Yes, but what really disturbs me is that apparently Mr. Bianco was not aware of this. Absolutely, I don't want surprises. Each side should know exactly what the other side is going to do.

MR. RAYMOND NIRO: I don't think either side knew with certainty who was going for testify. But I might note, your Honor, we had a very difficult time with the scheduling because of the following events that took place: Dr. Ribbens, who we had intended to have testify and whose affidavit is filed in support of the motion, suffered a serious injury and is undergoing surgery today. He's out of commission for close to two months.

THE COURT: You explained this to defendants?

MR. RAYMOND NIRO: Absolutely. We discussed that. Dr. Foster, from the University of Wisconsin, was in Japan and would not be back until yesterday coming back from Japan. He was unavailable. And the third witness, Dr. Blair, is in Ireland and unavailable as well. And we explained all of that.

There was great urgency on the part of the defendants to have a hearing on the 28th; and we agreed to that, indicated that we would have to scramble to get somebody to testify on what I consider to be noncontroversial areas. Mr. Chasteen's testimony, as your Honor will hear it, is about how engines operate, what fuel injection is, things --

THE COURT: Who besides Mr. Chasteen will testify?

MR. RAYMOND NIRO: There is no one else. We have one other person here who may testify in rebuttal, if necessary; and that is Dr. Jay Martin, who is a colleague of Dr. Foster's. We just contacted him, brought him along very quickly to see if

he would be available to testify in rebuttal; but that's the extent of his testimony, if any, that would be given.

THE COURT: From now on, I want every witness, everything you're going to do, to be told to the other side. And if you don't, if there are surprises, the person will not be permitted to testify. But let's -- apparently there is some exceptional circumstances.

Is there anything else that's going to happen that you have not told the other side?

MR. RAYMOND NIRO: In fact, what we did last evening was to provide them a copy of every exhibit that we intended to use. We had some difficulty getting from them the reciprocation on that. We saw some of their things today. But I can assure your Honor we tried to give them everything we had in advance; and I think it's unfortunate they object to Mr. Chasteen, after having taken his deposition for 11 days in this. I think surprise is hardly what they could claim on a noncontroversial witness.

THE COURT: Who are your witnesses, Mr. Bianco?

MR. BIANCO: As we informed Mr. Niro much earlier, we intend to call Mr. Bernard Cuzzillo, who has been designated for some time in this case.

I would like to correct the record on something Mr. Niro just said. He did in fact tell us about Dr. Ribbens and his problems with Dr. Foster and in a letter to me, I

believe, or to me and Ms. Daley indicated that for those reasons their witness would be Dr. Jay Martin. And we consented to that. This business about Mr. Chasteen is something I literally did not hear before this morning. It's true that we have deposed Mr. Chasteen at length; and for that very reason, it would have been nice to know so that we could have been prepared to examine him as to statements he's made in the past. But this is a total surprise.

As to the exhibits, they delivered to us a folder of exhibits last night which they intend to use today. Many of those have not been on their exhibit list before. I did not intend to object to those or to raise the issue; but every single exhibit that we are using today has been disclosed months ago to Mr. Hanes, Ms. Sasso when she was involved in the case, and other lawyers involved in the case.

We agreed to be here early today to show those to Mr. Niro. We did that. He had an opportunity. Dr. Martin had an opportunity to look at it. Mr. Chasteen had an opportunity to look at it as well, so I'm troubled by that implication.

I apologize, your Honor. I hate to do this sort of thing and to get into this kind of squabbling; and I apologize to the Court, but I felt I had to respond.

THE COURT: What we'll do is we'll hear Mr. Chasteen; and if there is parts of his testimony that you fuel are a surprise or that you're not prepared, object, and I'll consider

the objection.

MR. RAYMOND NIRO: I might note, your Honor, not to belabor this point, when we indicated that we might have to use Dr. Martin as a substitute, we asked for permission to have him cleared under the protective order. That was never given by Polaris, and it was only this morning that I was told by Mr. Bianco that they wouldn't even object to him testifying.

So I don't think this is an appropriate thing to say on their part; and I apologize to the Court if the impression is created that we're trying to do something that they weren't aware of; but the fact of the matter is they understood all along that we had some difficulties.

THE COURT: Let me be ultimately clear when I say no surprises. There is to be nothing like this presented to the Court. Everything is to be discussed with the other side beforehand; so if you intended to call Mr. Chasteen, you absolutely should have discussed it with the other side. But I want to go forward. Time is awasting.

Is Cuzzillo the only expert for both defendants?

MR. BIANCO: That is correct, your Honor.

THE COURT: All right. This is actually a hearing on the law, motion for summary judgment; so I don't think we need any opening statement; but let's -- we're going to start the timing now for the plaintiff, and let's go ahead and either hear argument or first witness.

I have no objection if you want to break your argument in parts, present part of it, call a witness and present another part, and so forth.

MR. RAYMOND NIRO: That would be our preference, your Honor.

OPENING STATEMENT

MR. RAYMOND NIRO: Very briefly, to focus the Court on the issues -- and I know your Honor is familiar with these issues: The briefs in the case are quite voluminous, as well as the exhibits.

This is a case that involves two issues, trade secret misappropriation and patent infringement. We're here on the issue of patent infringement claim interpretation.

There are two patents in this case, as your Honor knows. Both relate to snowmobiles. One of the patents that we call the '803 patent, using the last three digits of the patent, as is customary in patent cases, has to do with electronic fuel injection; specifically, the subject of how you can deliver electronically fuel to a two-cycle engine. And there will be some testimony about what a two-cycle engine is.

The second patent, the '079 patent, has to do with an automatic shutoff mechanism to prevent the battery in a snowmobile from going dead. One of the things that happens when you use these computers, sometimes called CPUs or ECUs, for fuel injection on a snowmobile is they draw power away from

the battery; and if someone hits the so-called "kill switch," which stops the engine, but keeps the ignition key on, it's not too long before the battery is dead.

THE COURT: Same thing happens on a car if you leave the lights on.

MR. RAYMOND NIRO: Exactly. Exactly. You draw that current for a period of time, and the battery goes down.

So the second of the two inventions has to do with the specifics and details of an automatic shutoff system.

The inventor, of course, is Mr. Chasteen. We're here on the cross-motions for summary judgment. Each side has filed motions for summary judgment of infringement or non-infringement.

The patents, as your Honor knows -- and I realize this is not your first patent case. I read the **Micro Control** (sic) case recently. But patents are, as your Honor has before her -- patents have three parts to them. There are typically drawings that describe what we call embodiments, examples of how the invention can be practiced. And then there is a specification, which describes in words some of these examples of how the invention can be practiced. And then, of course, there are the claims which define the invention. That's the metes and bounds of the invention, define the last part of the patent like the deed to property: What are the territorial rights that are staked out by the patent applicant, in this

case, Mr. Chasteen?

Now, it is patents here as your Honor knows are a little different in terms of the examination process than the typical patents, in that the defendants in this case chose to take the original patent for the 803 -- that's the fuel injection patent -- back to the patent office in a reexamination proceeding, which they convinced the Court was an efficient way to resolve the issues of validity and to present back to the patent office their arguments on invalidity.

There was also a reissue proceeding that took place in the patent office; and after the stay period of some number of years, the patent office rendered its decision and found that the '803 patent should be issued; and Claim 1 of that patent, which is at issue here, was allowed again by the patent office without change, without amendment, as it was in the original patent.

The second of the two patents, the '079 patent, or the battery saver patent, was also reissued, so that both patents were reexamined, examined twice in the process by the Patent and Trademark Office. That's unusual. Typically patents issue, and that's the end of it.

Now, the book that we provided the Court sets forth some of the Federal Circuit cases that deal with the issue of claim interpretation, which is really what brings us here today. But like all the efforts to define the law, the Federal

Circuit has set forth rules for claim interpretation, many of which, I might note the Court itself applied in the **Micro Chemical** case, where Mr. Bianco's firm represented the patent owner, **Micro Chemical**; and Kutak Rock, our local counsel, represented the defendant, as local counsel at least.

And in that case, as the Federal Circuit has said, the court noted that claims define inventions. You read claims in accordance with the plain language of the words used in claims.

The court noted -- the Federal Circuit has agreed -- that you can look to dictionaries, for example, for the plain meaning of words, unless the inventor ascribes some other specific meaning to the terms used in the patent in the specification itself.

Claims can't be limited to the examples. If you give an example in your patent, that's not a limitation on the claims. You look at the words of the claims to find out whether the accused device is inside or outside the scope of those claims.

Claims are read the way people of ordinary skill in the art read them. Again, that's something that this court adopted and agreed with; and indeed, that is the law as discussed by the Federal Circuit.

You can't take a dependent claim, as the Court knows -- that is, a claim that depends on an independent claim that has further limitations -- and say in construing the

claim, independent claim, I take those limitations and I put them in the independent claim.

You can't add words to a claim; and you'll see, your Honor, as we go through the argument here, that in fact in some of the claims, the defendants attempt to add words that aren't there. For example, one of the claims talks about a pump. They insist that the words "variable speed" have to be added in front of the word "pump."

The Federal Circuit is again clear that you can't add words to a claim and then say, Well, gee I don't use what's added.

Claims have to be interpreted without reference to the accused product. Again, the Federal Circuit has said that. There are means clauses in these claims; and means clauses, where you say a means for doing something, are interpreted under a specific provision of the patent law called Section 112 subparagraph (6); but it all comes down to this: When interpreting a means clause in a patent claim, you look at what's disclosed in the specification and you say, Is that what they're doing, or the equivalent? And if they're doing what's there or the equivalent, then that's the way that term has to be interpreted. That's the way a means clause is to be interpreted.

Where there is literal infringement -- that is, you don't have to resort to the doctrine of equivalents; and we'll

touch on that in little bit -- you don't even look at the prosecution history for purposes of estoppels and things of that sort. If the claims say it and they use it, that's it.

So those are some of the rules. If you add some features, some bells and whistles to a device but you still use what's in the claims, then you infringe. For example, if you claimed a car, the fact that you might make a Chevrolet or a red car or a blue car doesn't avoid infringement if what the claim says is a car. If the claim said a dog, the fact that you make a spotted dog or some narrower definition of a dog doesn't avoid infringement.

Now, in this case, as your Honor has seen from the briefs, the initial brief that was filed and the initial position of the plaintiff in this case relied solely upon the admissions that were made by the defendants in this case. And we had a very interesting thing happen, unusual again for patent cases. We had one of the parties through persons of ordinary skill in the art -- their technical engineers in Japan -- take a look at the claims, take a look at the words, and say, Do we have it, or do we not? That was done by Fuji and JECS. And in a document produced in this case, sworn to in a deposition as being their interpretation of critical aspects of these claims in the '803 patent, they said, We do that. We have that element.

These are people of ordinary skill. These are

admissions by a defendant who had already been charged with infringement and was named as a defendant in the case.

We have their own manuals as to what they do. We have their expert report. We have an admission in response to an interrogatory, where Polaris says, We agree that we have a critical disputed element. And those admissions remained unchanged, unrefuted, unaltered, for more than six years, until this motion was brought, at which time they said, Whoops, we didn't mean it.

Now, what's in dispute?

One of the rules of interpretation of a patent is that each claim defines a separate invention. Each claim has to be looked at differently. And you'll see, your Honor, as we briefly go through some of the claims -- and we've tried to take this mass of words and reduce them into something perhaps a bit more understandable. And you'll see as we look at Claim 1. What Claim 1 of the '803 patent has to do with is an electronic fuel injection system for a two-cycle engine in which you have a whole series of sensors. And the patent claim talks about what these sensors are. And those sensors sense things like battery voltage and air temperature and throttle position and timing and engine speed and barometric pressure, the kinds of climate-induced criteria that you have to look at to decide when to inject this fuel.

I'm sure most of us have had the experience here in

Colorado -- I know I have -- driving from a low altitude environment to a high altitude environment, going up the hill. And you say with your carbureted device, my goodness, what's happened to my car? I can't go up the hill.

Well, you'll hear from Mr. Chasteen that carbureted devices used for engines give you the same amount of air, the same amount of fuel, and they don't adjust for the climate. And this became a particularly unique and difficult problem for snowmobiles and small engines, and he'll describe why that was the case.

But you then have in addition to the sensors a computer. Now, the computer sometimes is called an ECU or a CPU. Acronyms seem to be the name of the game with the computer field. CPU means central processing unit; or ECU, electronic control unit. But they're the same thing. It's a computer that now takes this data coming in from these sensors and manipulates it, deals with it, and sends out signals to do certain things. One of the signals it has to send out, of course, is when do I inject the fuel and how much fuel do I inject?

And Claim 1 talks about controlling the pump: How do I control the fuel pump, keep it at optimum conditions, and what data do I take in? What do I sense to do that? And the pump control is a result of engine speed, throttle position; and then priming you'll see is another aspect of Claim 1.

But in any event, to look at Claim 1, it comes down to this: It's an apparatus claim. It defines an apparatus for use in a two-cycle engine. It has 19 elements; that is, 19 separate pieces or parts. They're not all shown here; but if you look at the detailed words of the claim, you see 19 elements or limitations or pieces, and three of them are in dispute. That's it.

If we move to Claim 2, the same patent, you see that now we don't have any limitations up here about the fuel pump control, and we don't have any limitations about prime, when you prime the engine or how you prime it. You have fewer sensors that are discussed in the claim, and you have instead of 19 elements at issue, you have 15 elements at issue or 15 elements in the claim. Two of them are at issue. And the words that are at issue are things like timing, sensing, means for sensing, each occurrence of a predetermined cyclically repeating state. And there will be a lot of discussion about that subject.

And then a second limitation: Means for generating a control signal for opening said injection means for said determined injector open interval. When reduced to just plain English -- why we patent attorneys insist on using words like "means," and so forth, is sometimes beyond me, certainly, beyond many that have to deal with patents; but in its simplest terms, all this is saying really is, Look, I want to sense

timing. I want to sense some occurrence that's taking place on a cyclic basis, and then I want to send a signal off to say to the injectors, It's time to deliver fuel.

Claim 3 is even less limiting and therefore broader than Claims and 2. Again, apparatus; but you see different sensors, less that the computer has to do, no limitation with respect to fuel pump control or priming. So you're now defining the invention in a broader fashion. Eight elements instead of the 19 in Claim 1 or the 15 in Claim 2 -- there are only 8 elements in Claim 3. So it's broader, broader in the sense that it defines the invention with less words; and defining it in less words gives it more breadth.

THE COURT: Let me ask you a technical question: This is the third chart you've shown me; and if at some point the Tenth Circuit is reviewing what happened at this hearing or at a later hearing, how are we identifying these various charts? Are they marked as exhibits, or not?

MR. RAYMOND NIRO: We can mark them. I have a set for your Honor in total, and we could -- we provided it to the other side. And I would propose that we mark them collectively as hearing Exhibit 1.

I have not put exhibit stickers on them, but we can do that.

THE COURT: And with this new system, I don't know if you need exhibit stickers. But there has to be some way of

identifying so that the Court of Appeals knows what I'm looking at.

MR. RAYMOND NIRO: And maybe I can summarize that. I think that's a good point, your Honor.

The first three charts, four charts that I showed are charts summarizing Claims 1 through 3 of the '803 patent, attempting to express the words of the claims pictorially by showing the elements of the claims and what's at issue.

The Claim No. 3 has 8 elements at issue -- I'm sorry -- 8 elements with one at issue. And you see now the only terms really at issue here are timing, sensing means for generating an electrical signal responsive to a predetermined cyclically repeating occurrence in the engine and then what you do with that to say when you want to inject.

Now, the fourth claim and the only other claim at issue on the '803 patent is different than all the rest. It's different because -- and we have an overhead of that again shown pictorially as part of the exhibits for the hearing; but Claim 4, unlike Claims 1, 2 and 3, deal with a method. And for those young lawyers that write patents, patent applications, I think we frequently tell them, Use action verbs when you're writing a method claim. And you see the action verbs: storing and selecting and modifying and controlling and then controlling the occurrence of the fuel injector operation and then sensing a predetermined cyclically recurring state or

occurrence.

So now instead of expressing the invention in terms of apparatus, the invention is described as a method. We now have Claim 4 saying this is a method, this is a way, doesn't make any difference what apparatus you use; but now we have a series of steps in this method that you have to carry out to practice the invention as defined in Claim 4. And that's a very important claim, because it is the broadest claim at issue in this case. It has -- it has only six elements. Those are the six action verbs: storing an array of values, selecting the base fuel flow rate, modifying the base fuel flow rate, and so forth. And only one is at issue; and that one is defined again as sensing a predetermined cyclically repeating occurrence in the rotation of the engine and then sending a signal that says open up, injectors, it's time to inject fuel.

Battery saver patent -- and those are the four claims, your Honor, that are at issue. And after Mr. Chasteen gets a chance to testify on what engines are like, and so forth, we'll have an opportunity to look more carefully at those claims and the disputed language; but I don't want to preempt an explanation of the basics of the technology. I think that really should precede any discussion of the specific elements of the claims and what they mean.

Briefly, the '079 patent -- and that's the patent having to do with the battery saver -- there are 23 claims in

that patent. But for purposes of what we can discuss today, there are really just two of them that are necessary to discuss.

Claim 1 -- and I apologize. We're now giving you all the words, no little chart; but you'll see that there are four things, a fuel injection means, an ignition means, an electronic control means, and a switch means, all of which are defined in terms of some function that has to be performed.

But again, means clauses in patents -- and this has four separate means clauses -- are interpreted under the law to mean what's shown in the specification and equivalents.

Now, if we jump to Claim 5, I indicated earlier, your Honor, about independent claims and dependent claims, we go back to Claim 1 for just a moment. The you see Claim 1 says in a snowmobile engine having a battery and at least one spark plug; and then it goes on to define what the invention is in a snowmobile.

Claim 5 is dependent on 1, and here's what 5 does: It says the apparatus of Claim 1 -- so it says everything that I just discussed in Claim 1, all those four things, but I'm going to get more specific: wherein said ignition means comprises . . . So it's saying I'm now going to tell you with specificity in this claim what it is that can be the ignition means.

And the ignition means includes an alternator for

producing an electrical current, and then an electrical discharge unit and an ignition coil. Key words here are "alternator for producing an electric current."

That claim is dependent on Claim 1, so it's narrower than Claim 1; but that claim is infringed because their defense -- that is, Polaris' defense, is at least as they initially stated it that they didn't use an ignition means; they used an alternator to send the signal to say, Battery, shut down.

But it's a *non sequitur*, because the patent says the ignition means includes an alternator; so it can't exclude it, and it certainly can't be excluded from Claim 1, since it's not excluded from Claim 5. And if you look at the specification again, because that's how you have to read a limitation of a means --

This is almost illegible. I apologize for that.

If you look at the specification, column 3, beginning at line No. 32, it says -- and this is the way you're supposed to read it: Ignition means. Let's go to the specification and see what it says. It says the ignition system, 22 -- or 12, includes a conventional alternator, 22.

THE COURT: I have a hard copy, so I can follow more easily on that.

MR. RAYMOND NIRO: Okay. And if you look at the drawings, your Honor -- I won't put this up on the ELMO

machine.

Would it be possible to disconnect the ELMO?

If you look at the drawings, your Honor, Figure 1, you see that it also defines -- I must confess, your Honor, that my years of practice of law, this is my favorite machine. It -- I hope we can use it in trial. I think it will really assist the jury.

But you see, I just sketched up some of the things that are in what's called the ignition system. Ignition system, 12; and it has, for example, an alternator, 22; and I just colored that red. And then it has a capacitive discharge unit and an ignition coil; so the patent is saying everything that's around this box here is part of the ignition system or the ignition means. And what's right inside there? An alternator.

They can't avoid infringement in this case by arguing that they use an alternator, not an ignition means. It's a *non sequitur*.

And those, your Honor, are the issues at least in terms of what claims have to be considered by the Court; and with the Court's permission, I'd like to call as our witness to assist the Court in understanding some of the technical terms Mr. Chasteen, Ron Chasteen.

THE COURT: I think probably the middle aisle is the least congested.

THE WITNESS: Okay.

THE COURT: Would you raise your right hand, please.

Would you raise your right hand, please, sir.

(Ronald Chasteen was sworn.)

THE COURT: Have a seat, please.

MR. BIANCO: Excuse me, your Honor. Before we begin, I think Mr. Niro and I agreed before the hearing that we would exchange CVs of our experts so that qualification process wouldn't be necessary; so we'd be happy to look at Mr. Chasteen's CV and --

MR. RAYMOND NIRO: They've taken his deposition for 11 days, your Honor. I don't have a CV to give him. I think they certainly can't claim surprise after asking him every possible question.

THE COURT: You don't have a CV?

MR. RAYMOND NIRO: I intend to ask him a few questions about his background.

THE COURT: You intend to qualify him as an expert?

MR. RAYMOND NIRO: Yes.

THE COURT: Well, Mr. Bianco?

MR. BIANCO: Well, we'll have to proceed on that basis, your Honor. That wasn't my understanding, but --

THE COURT: Have a seat, please.

Speak into the microphone.

DIRECT EXAMINATION

BY MR. RAYMOND NIRO:
Q. Would you state your full name, please.
A. Ronald E. Chasteen.
Q. And how old are you, Mr. Chasteen?
A. 46.
Q. You were born here in Denver; is that right?
A. That's correct.
Q. And you're the inventor of the two patents in this lawsuit?
A. Yes, I am.
Q. I've already indicated to the Court what the subject matter of those patents are. Would you tell us how it is that you got interested in engines?
A. Started when I was about eight years old or so. My dad -- he was a professor of mechanical engineering at University of Colorado in Fort Collins. He was always working with engines with me, and we were building go-carts and minibikes and ended up repairing the neighbors' minimotorcycles and minibikes and go-carts and anything else that had an engine on it. And this started in the early 60's. And I kind of developed a love for them.
Q. What kind of things did you do with engines when you were a kid?
A. Oh, I would rebuild them. I'd soup them up, make more horsepower. I would make minibikes and go-carts and sell them. That's how I got my first job in the business and repairing the

local lawn and garden equipment for the neighborhood.
Q. Your father was a professor of mechanical engineering?
A. That's correct.
Q. Where did he teach?
A. Fort Collins.
Q. At what university?
A. University of Colorado.
Q. And what kinds of engines did you work with?
A. I worked in those days with some old Jacobson two-cycles and Briggs & Stratton, Clinton, Kohler, Tecumseh four-cycles.
Q. What kinds of equipment?
A. Lawn mowers, tillers, chain saws, garden tractors, all the small engines.
Q. By the time you got to high school, did you continue to work with engines? And if so, what did you do?
A. Well, I was graduating a little bit out of the small engines and got into cars. At about 15, 16, I started building engines for cars and swapping engines between cars and supporting myself repairing small engines.
Q. Were you trained as a mechanic at any point in time?
A. Yes. I got my first job -- well, I learned a lot of it on my own and from my dad; but my first job was as a mechanic for a local John Deere lawn and garden equipment store; and there I was trained in chain saw repair, transmissions, transaxles, engines, chain saws, lawn mowers, tillers, the entire gamut.

Q. Were these both two-cycle and four-cycle engines?

A. Yes. Most of your chain saws are two-cycles and most of the lawn and garden equipment was four-cycle in those days.

Q. In total, how many years experience have you had working with engines?

A. 35, 36.

Q. Have you done any work with car engines; and if so, what?

A. Yes. I've built car engines. I've raced cars. I've -- went to an automotive college where I majored in engine control here in Denver when I graduated high school and supported myself as I went through automotive college fixing small engines.

Q. Other than your self-teaching, did you do any formal study after high school in the field of engines or engine technology?

A. Yes. I -- well, I graduated high school and I came to Denver to -- I was in Connecticut at the time and came to Denver. I had family here, and I went to Denver Automotive and Diesel College.

Q. And where is that located?

A. It's right here in Denver.

Q. And what did you study at that school?

A. Engine control, engine management, tune-up and transmission.

Q. How did you get interested in snowmobiles, the subject matter of the patents in this case?

A. Well, I got sick; and I had to leave Denver, leave college to go recuperate with my parents in Arizona, where I started repairing lawn mowers at a local lawn mower shop and chain saws and went through a series of that and got married and ended up with one of the owners of the companies I worked for asked me to be a partner; so we sold everything we owned and came up with enough cash to go into halves in a business with him in the White Mountains of Arizona. And we moved there with my wife and I, and we opened a snowmobile -- well, we actually purchased an existing snowmobile shop. And they sold motorcycles, chain saws, lawn and garden equipment and snowmobiles.
Q. What kind of work did you do with snowmobiles in this business in the mountains of Arizona?
A. I sold them new. I repaired them. I repaired all makes and models and years and brands: I raced them. I coordinated the races. I modified them. I -- if you could do it to a snowmobile, I probably did it to them. I turbocharged them. I did a lot of things to snowmobiles. I really just loved the sport and repaired them myself, as well as I had mechanics working for me.
Q. How did you get interested in fuel injection for snowmobiles?
A. Well, we lived in a little trailer --
MR. BIANCO: Objection, your Honor. This is getting

into the history of the purported invention by Mr. Chasteen and exceeds the scope of what we're to cover at this hearing.

THE COURT: The objection will be sustained.

BY MR. RAYMOND NIRO:

Q. All right. Would you tell us, then -- you've actually worked as a mechanic. Is that correct?

A. That's true.

Q. And you've taken apart two stroke engines?

A. Yes.

Q. Have you modified them?

A. Yes.

Q. Have you raced vehicles that use them?

A. Oh, yes.

Q. Have you repaired them?

A. Yes.

Q. Have you redesigned them?

A. Yes.

Q. What's your current position?

A. I'm presently the research and development manager for Echlin Technical Center.

Q. Where is that located?

A. It's located in Washington, Missouri.

Q. What do you do as research and development manager at Echlin Technical Center?

A. I design engine management systems for them, covering two-

cycle, four-cycle, industrial, aircraft. If it has an engine, we probably worked on an engine management system. That includes fuel injection, ignition, governors and idle controllers and all kinds of things.

THE COURT: Could you spell Echlin, please.

THE WITNESS: E-C-H-L-I-N.

THE COURT: Thank you.

BY MR. RAYMOND NIRO:

Q. Are you still working in the field of fuel injection?

A. Yes.

Q. What kinds of products does Echlin make that you work on in terms of fuel injection or engine design or the things that you mentioned?

A. We manufacture and design the computer, we write the software, we design the electronics, we design sensors, we test the engines there. We do gasoline fuel injection, and we also do fuel injection for propane and alternate fuels, ignition control. And Echlin is involved internationally. They're a Fortune 300 company, I believe, and they manufacture auto parts all over the world.

Q. That is the NAPA auto parts?

A. We manufacture a lot of parts for NAPA. You'll see the Echlin name once in a while on a NAPA auto parts box.

Q. All right. Mr. Chasteen, to help the Court better understand engines and fuel injection, some of the issues in

this case, I'd like to turn now to the technology as it relates to this case and ask you the question, what's an engine?

MR. BIANCO: Objection, your Honor. Having now laid the foundation, I assume Mr. Niro is going to offer him as an expert witness.

MR. RAYMOND NIRO: He certainly is the inventor in the case, and I think after 35 years of experience --

THE COURT: You are offering him?

MR. RAYMOND NIRO: Correct.

THE COURT: As an expert in what area, please.

MR. RAYMOND NIRO: In the area of explaining to the Court the technology that's at issue in this case, what an engine is, what fuel injection is, how you fuel injection --

THE COURT: If you'll be more specific what area of expertise you're offering him.

MR. RAYMOND NIRO: In the design and repair and development of engines, including specifically fuel injection engines and engines that have been fuel injected for snowmobiles and other products, both two-cycle and four-cycle.

THE COURT: Any objection, or did you want to *voir dire*?

MR. BIANCO: May I examine on *voir dire*, your Honor?

THE COURT: You may.

Why don't you use your own podium.

MR. BIANCO: I'm sorry. Excuse me.

VOIR DIRE EXAMINATION

BY MR. BIANCO:

Q. Mr. Chasteen, you're acquainted with a gentleman named Ward Gatza? G-A-T-Z-A, is it?

A. Yes.

Q. Who is Mr. Gatza?

A. Ward Gatza was an electrical engineer that used to work for me.

Q. And he in fact is named first as the inventor of the '079 patent; is that correct?

MR. RAYMOND NIRO: Objection to "first," your Honor.

THE COURT: The objection will be sustained. You're not cross-examining now. You're just questioning him on his expertise.

MR. BIANCO: I understand, your Honor.

BY MR. BIANCO:

Q. Mr. Chasteen, have you ever had any training in the field of electronics?

A. No.

Q. Have you any degree in the field of electronics?

A. No, I don't.

Q. Have you had any training or degree in the field of computers, Mr. Chasteen?

A. Well, you can define "training." I'm self-taught. I work at it every day.

Q. You've never gone to computer school?
A. I've taken classes. Yes, I've taken classes.
Q. Have you any degree in the field of computers?
A. No.
Q. Mr. Gatza is a gentleman who is knowledgeable about electronics; is that correct, sir?
A. That's correct.
Q. And with regard to electronics issues, whether for the '803 or the '079, did you rely on Mr. Gatza? Isn't that correct, Mr. Chasteen?
A. No.
Q. You know a gentleman named Gerhardt Maier?
A. Yes, I do.
Q. And would you describe him as knowledgeable in the field of electronics?
A. I have -- I don't know his background.
Q. Mr. Chasteen, you're familiar with Mr. Maier's résumé, or you have been in the past?
A. I've never seen his résumé.
Q. At the time you were developing what's become the device claimed in the '803 patent, Mr. Chasteen, you used Mr. Maier to assist you to some extent. Is that correct?
A. Yes, ma'am.
Q. Isn't it true that in the past you've referred to Mr. Maier AS the developer of the electronics for the '803 patent?

A. He put some of the electronics together for us.

Q. And at that time, Mr. Chasteen, you had no knowledge of electronics either in an ECU or anywhere else in a fuel injection system; is that right?

A. That's correct.

Q. You've heard of a gentleman named Mr. Fritzler; is that right?

A. Yes.

Q. You've worked with Mr. Fritzler on electronics issues both with regard to the '803 and the '079; is that right?

A. No.

Q. Did Mr. Fritzler do electronics work for you at any time?

A. Yes.

THE COURT: Could you try to finish up, please. This should be very brief.

MR. BIANCO: Yes, your Honor.

BY MR. BIANCO:

Q. You mentioned diesel college or automotive college in Denver.

A. Yes.

Q. You were primarily being trained as a diesel mechanic; is that correct?

A. No, I never entered the diesel courses.

Q. You did not complete that schooling; is that correct?

A. That's correct.

Q. Approximately how long were you in that school?

A. I cannot remember for sure.

Q. A few months? Is that right, Mr. Chasteen?

A. I think I was there a year, a year and a half. I became very ill, and a lot of that part of my life is gone.

Q. And you dropped out. You don't have any recollection of what you did or didn't do at that automotive college. Is that correct, sir?

A. Oh, no. I studied engine control. That was my major.

THE COURT: Okay. Would you finish up, please.

MR. BIANCO: Your Honor, I'm completed at this time.

I would object to Mr. Chasteen offering any testimony as an expert in the area of electronics, electronic control units, and the like as it applies to either the '803 or the '079 patent.

THE COURT: The Court will accept Mr. Chasteen as an expert in the design and repair and development of engines, including specifically fuel injection engines.

The rule which we're concerned with, 702, does not say that someone does have to have a degree. Their knowledge can be based on experience and skill as well as education; and for purposes of this hearing, I'll hear his testimony in the area offered.

If there is some specific objections, if we get into other areas, then you can object.

Go ahead, please.

MR. RAYMOND NIRO: I might note, your Honor, Thomas Edison had a third grade education, the greatest inventor of our time.

DIRECT EXAMINATION CONTINUED

BY MR. RAYMOND NIRO:

Q. Would you tell us what an engine is?

A. Well, fundamentally an engine -- it's a device that can take a fuel and convert a fuel of some type to energy, like burning gasoline. And from that it can convert it to work and can cause some kind of motion to drive you down the road.

Q. All right. What types of engines are there?

A. Fundamentally, there is two-cycle engines -- or excuse me. There would be like an internal combustion engine, like we're dealing with; an external combustion engine, for instance, there is steam engines, jet engines. Also steam engines would be a category.

So I would classify them as internal, external, and steam.

Q. What are the types of engines that are at issue in this case of those categories?

A. At issue in this case would be the internal combustion engine.

Q. All right. Now, we've put up an overhead that says "basic internal combustion engine." It's a chart, a diagram; and by

reference to that, would you -- and if necessary, I have a pen.

A. You have a little pointer here. Okay.

This is not really any kind of an engine. It's just the basic concept of what an engine does. It has an air source that will be drawn into the engine. It also has a fuel source that will be drawn into the engine, and they're mixed in the engine.

Generally, a spark plug will light that mixture, driving this piston down. As this piston is driven down, it will rotate the shaft; and then it comes back up. When it comes back up, it compresses this mixture that was just drawn into this just before, compresses it, ignites it, pushes it back down.

It comes back up. Depending on what kind of a engine it is, it will push out the burned gasses. We call that the exhaust. And engines internally have what we call four strokes. They have an intake, compress it, ignite it, have a power stroke, where it causes power, and then the exhaust stroke, which pushes out the burnt gases. That would be a four-stroke. That's one cycle. If this engine, if it was a four-stroke, it would take four strokes to create one power cycle.

Q. You have some things identified there. You're mixing air and fuel in a combustion chamber?

A. This would be your combustion chamber.

Q. And there is a piston that moves up and down?
A. Right.
Q. And then you have this thing called a crankcase and a crankshaft. Tell us briefly what those two things are?
A. Crankshaft is connected to the piston through this thing we call a connecting rod. It is what spins. It's what you can attach things to that you want to drive, like your transmission in your car.
The crankcase here houses all this mechanism; and in some cases, if it's full of oil, like your car, you put oil in there; and in other cases, two-stroke, it's used as a secondary chamber to store air and fuel that's going to be burned later.
Q. All right. You've mentioned four-stroke and two-stroke engines. By reference to some charts that I'd like to show you, would you just briefly explain to the Court the series of steps or things that take place in a four-stroke or four-cycle stroke engine?
A. Sure.
Q. Looking at No. 1, which is stroke No. 1 intake, explain very briefly what happens in this first stroke.
A. Okay.
Q. And again, we're talking about a four-cycle engine.
A. This is a four-cycle engine, like you'd find in your car. And you have four strokes. And this, we're looking at the intake stroke here, which we will call No. 1 stroke. There is

intake, compression, power, and exhaust in all four-stroke-cycle engines.

You start off with the air coming in right here, and this is a throttle. When you push the --

THE COURT: Could I suggest that since you have limited time and even though this may be important to show to a jury, I'm not sure it's really important to show to the Court for purposes of this hearing. And if you do want to get right to the two-stroke, I think that would be --

BY MR. RAYMOND NIRO:

Q. Run through -- without an explanation, take us through the four strokes and make it as brief as you can.

A. This is the intake stroke. The piston goes down. The intake valve is open, it draws air and fuel in.

Q. Stroke No. 2?

A. Compression stroke. You see the piston is up. Both valves is open. You've got a mechanical driven camshaft and stuff up here, and you're compressing it.

The next stroke is the power stroke or combustion, where you light the mixture, drive the piston down, and it spins the crankshaft.

And then the next stroke is your exhaust stroke, and all the burned gases go out the muffler.

Q. Why is that kind of engine called a four-stroke engine?

A. It takes four strokes. This piston has to go up and down

four times to make one power stroke.
Q. And the power stroke is what?
A. It's when you have the combustion and the energy forces the piston down and it makes work.
Q. Now, let's go to the two stroke engine, which is the subject matter of this case. You have a chart entitled intake and compression combined in a single stroke.
A. I need to mention that very important to a four-stroke-cycle engine, the engine has to go around twice, 720 degrees, to make one power stroke. It's very important.
It takes them twice as long to do the same amount of work.
Q. Now we're at a two-stroke engine. How does that work; and differentiate it, if you can, from the four-stroke.
A. Sure. Two-stroke cycle does the same thing but only two piston motions, down and up, one rotation of the crankshaft. And it accomplishes all the work that a four-stroke does in half the time and half the motion.
In this case, it draws the air and fuel in past your throttle, pulls the gasoline outside of the carburetor based on how much air is flowing by. And in this case, it pulls it into the crank case here. This is the crank case. It sucks it in, because this piston has just gone up; and as this piston went up, it creates a suction in this crank case and draws the air and fuel in.

At the same time it went up, there was a previous mixture of air and fuel up here, and it's compressing that. That's why we say intake and compression is combined in a single stroke; so the piston has started down here, and it went up at the same time. There is two things that have happened here. It's drawing the air and fuel in, and then it's compressed.

Now we go to the next slide, if you'd like.

Q. All right. And the second stroke is what?

A. This is where you've lit the mixture and it's forced the piston down. We call this combustion and --

Q. When you say lit the mixture, that's the explosion?

A. That's the explosion. That's the internal combustion caused by the spark plug. Spark comes to the spark plug, it lights the mixture of air and fuel, which has to be mixed very carefully to the right proportions, or it won't burn. It explodes, drives the piston down; and as the piston is driven down, there is -- you have work. You just created work. You turned this shaft.

Also, this chamber out here we call the crank case is compressed, and there is a little -- there is passages that go from the crank case to back up to the combustion chamber; so as you had this whole chamber full of air and fuel, you now squeeze it out. And it goes through these transfer ports. And there are little ports that the air and fuel that came from the

carburetor is forced out and now is on back on top of the combustion.

In this stroke, you've had the combustion; and as you exploded the mixture here, part of it went -- the burned gases went out the exhaust pipe. That's your exhaust stroke.

The new fresh charge is coming in through the transfer ports, and you created work by turning the crankshaft. All this happens at the same time, and it all happens very quickly.

Q. So in the two-stroke you do the same thing that you would do in the four-stroke only faster?

A. Right. And you don't have the camshaft and valves and all the hardware associated with a four-stroke. This all functions on fluid dynamics through an engine. It's completely different.

Q. What are the differences between two-stroke and four-stroke, just in summary fashion?

A. Well, four strokes and two strokes have a -- a four-stroke has an advantage of being very fuel efficient and very controllable. Everything happens very slowly in respect to a two-stroke. They have valves and things.

And a two-stroke compared to the four-stroke, two strokes are generally light and small. They're high-powered, like a Weedeater chain saw. There is a lot of horsepower in a small package.

Q. You say twice as much power as a four-stroke?

A. If they're the same size displacement engines, you'll get twice the power out of a two-stroke that you can out of a four-stroke or more. They're very light, inexpensive. They don't have very many parts.

Q. What are some of the applications for two-stroke engines in terms of equipment that they're used on?

A. Oh, popular one today is the Weedeater. Little gasoline hedge trimmers. Certain lawn mowers are two strokes. Chain saws are almost all two strokes. You're outboard motors are two strokes, most of them; and the reason is they're very high powered and very lightweight small package.

Q. What about snowmobiles?

A. Snowmobiles exclusively use two strokes, to my knowledge.

Q. And jet skis and things like that?

A. Jet skis, personal water craft, are two strokes. You can run them upside down, you can flip them over. They don't care what attitude they're in. They run in any position, most of them.

Q. Are there some disadvantages? You talked about size being smaller, more powerful. What are some of the disadvantages in two-strokes over four-stroke?

A. One, they burn a lot of fuel. They make a power stroke every revolution. They waste a lot of fuel. A lot of fuel goes out of the exhaust. They're not very efficient, have high emissions. They're very difficult to control. There is no

mechanical valves opening and closing that gives you fixed flow rates. Two-stroke is controlled by its exhaust pipe temperature and air pressures and how fast things are moving. Very complicated. They're very, very sensitive. Because the little piston has to go up and down every time, it doesn't get any time to cool off; so they're very sensitive to damage from heat.

Q. All right. How do you go about controlling, if you could tell us -- how do you control the mixture of fuel and air in an internal combustion engine, whether it be two-stroke or four-stroke?

A. Traditionally, it was with a carburetor, and you'd have -- here is a carburetor rough view.

Q. Tell us again very briefly how a carburetor works, and then we'll get into fuel injection.

A. It's a mechanical device. It's kind of dumb. It doesn't know anything. It knows that the engine is drawing or sucking air through it; and as this air in a vacuum is drawn through it, the air flowing past this little siphon tube here sucks fuel out of the siphon tube. And depending on how, there is generally a jet or an adjustment mixture down here somewhere. That controls how much fuel will come out of a carburetor's tube and into the engine; so you have air coming in, it draws the fuel with it, and then it goes to the engine. And then you have what we call a homogenous (sic) mixture. They're mixed --

Q. I'm sorry. Does it adjust for climate?

A. It can't adjust for anything. An operator or a mechanic would adjust that as a fixed mixture. And if I had just a carburetor in San Diego and it's warm, it's not going to run by the time you get to Pikes Peak. Your car will be blowing black smoke, if it will even run at all.

Q. Why is that, briefly?

A. No ability compensate for anything. It doesn't know that the environment around it has changed.

Q. Let's turn to fuel injection for a moment as an alternative to carbureted engines. And tell us in the briefest possible terms what fuel injection is by reference to the basic components of an electronic fuel injection system.

A. Fuel injection is really a pressurized system, where in this case it's electronic and you have all your hydraulic parts like a pump and an injector and you have to have sensors and the brain. The brain is the computer. Okay. And the sensors might be your eyes and hands and your ability to smell and hear. That's kind of what this computer does. And it looks at the environment that the engine is in: Am I in San Diego, or at the top of Pike's Peak? And then it adjusts the fuel flow from the appropriate mixture for the conditions of the engine.

Q. Now, just taking these things one at a time, computers, sensors, the injector, and the software, could you tell us very briefly what each of those things does? You mentioned sensors.