They sense conditions?
A. Yes. I'll start with sensors. A sensor might look at how hot is the engine, what's the air temperature, what's the barometric measure, how high up in altitude or how low am I, because the air pressure and the air temperature controls how much oxygen is in the air. The more you compress it, the more oxygen; and the engine needs to know how much oxygen is available.
Q. I'm sorry. Go ahead.
A. Sometimes there will be an air flow meter where they actually measure the air going into the engine; and in all your cars today, you'll have a little sensor in your exhaust pipe that senses if there is any extra oxygen down there that shouldn't be there, if there is too much or not enough fuel, throttle position sensors to know what your gas pedal is, what are you demanding the engine to do.
Q. What's the computer do with this data?
A. Computer takes all the data, sorts it out, looks at the speed and the loads and the requirements you're asking of this engine and delivers the appropriate amount of fuel for the driver's demand and the environmental conditions.
Q. And what do the injectors do?
A. Injector delivers fuel to the engine under pressure.
Q. And it has to know how much and when?
A. Yeah. The injector has to be told when to inject and how

much fuel to inject.

Q. Can you simply apply electronic fuel injection from an automotive system, a car, four-stroke engine, to two-cycle engines?

A. No.

Q. Why not?

A. Well, they're different. An automotive is a four-cycle engine. They've got air flow meters and air flow sensors and exhaust sensors in them. None of these can be used in a two-cycle engine.

Q. Why can't you sense air flow and exhaust conditions in a two-stroke?

A. Well, in a two-stroke you've got an exhaust pipe -- we call it an "expansion chamber," and it pulses. There are very high powered pulses, and they come back through the crank case and out the carburetor; and you have a violent pulse here at the crank case and then at the exhaust. So the air flow is constantly going like this, and an air flow meter measures both directions, but it can't control it. And also a lot of liquid fuel being sprayed, and the air flow meter gets wet and they don't function.

And you can't put an exhaust oxygen sensor in the exhaust pipe because there is always excess oxygen and fuel in a two-stroke exhaust pipe. Up to 30 percent of what you put in it goes out in pure waste and it can't measure it; so the

automotive technology sensors just simply do not work on a two-cycle.

Q. All right. Now, they put up the next chart. I want to ask you a question about two-cycle engines, fuel injection, and where the options are as to where you can inject the fuel itself. We talked about the computer saying when to do it, how much to do it. Where are the places that you can inject the fuel in a two-cycle engine?

A. You can direct -- what we call direct injection, where you shoot it right into the combustion chamber, which requires very, very high pressure and high speed injection.

You can inject into the intake manifold. You can inject fuel into the crank case or into the transfer ports I talked about, here and here. There is those little passages that go from the crankcase to the combustion chamber. Anywhere you can squirt the fuel in these four positions. You could probably put it in more places; but as far as industry goes, those are the four common points of injection.

Q. For purposes of this case, where did you choose to inject?

A. I injected -- I chose to do the intake manifold.

Q. That is where Polaris injects?

A. Yes, it is.

Q. By injecting into the inlet manifold instead of the crank case or one of these other places, do you provide any benefits in terms of flexibility or anything else by going there instead

of someplace else?

A. Yes. If I inject in the intake manifold, this pressure here is constant enough in this area not to affect the flow through the injector. But if I were to put an injector up here and inject when this is under extreme pressures, I'd have to have an extreme pressure to force the fuel through an injector; but because I can do it in the inlet manifold, I can inject anywhere in the cycle that I want to. It doesn't make any difference to the engine. It gives me a lot of flexibility because the pressures -- there is a high pressure which takes places in the crank case. It's fluctuating. The transfer port has dramatic fluctuations in its pressures, and I have a nice constant pressure here that I can work with and always inject the same amount of fuel through the injector and anywhere in the cycle. It doesn't matter where the piston is. It will suck the fuel in the next time the piston comes around. And all that is averaged out in the crankcase down here.

So I could have a couple injections if I wanted, and the engine doesn't care. It's very flexible. And my objective was to make an after-market product that we wouldn't have to modify the engine.

Down here, I'd have to make special fittings; up here, fittings. This is a whole different kind of system, so I could pretty much bolt on an external after-market product and be able to sell it.

Q. We discussed where you inject and how much you inject. I want to talk for a moment and have you discuss when you inject. What choices after you've decided you're going to inject at the intake manifold followed? What choices do you have concerning when you will inject?
A. Well, that's the beauty of the inlet manifold injection, is I can choose to follow anything. As long as it happens at least once per cycle, I can follow it; and just all I need to know is that it's gone around one time so I can get at least one squirt of fuel per revolution in the engine; so I might sense ignition, or I might sense piston top dead center.
Q. What's that?
A. If the piston was all the way at the very top. I might sense that.
Q. What else could you sense, possibly?
A. I might sense when the spark plug fires. I might sense when the piston is at the bottom, or I could sense when the exhaust flows out the pipe. The flexibility is I can take anything, as long as it happens at least once per revolution, and sync up to that and then trigger the injection based on that event.
Q. What of those various states or conditions did you pick for the "when," the thing to trigger the injection?
A. I chose to trigger off the ignition pulses.
Q. And why did you choose that?

A. They were there. It was easy. They had a nice pulse coming off of there, and they gave me -- I got three pulses for every revolution on a three-cylinder, two for a two-cylinder engine. And don't get "cylinder" and "cycles" mixed up. Cycle, two- and four-cycle engines are different; but a cylinder is how many pistons it has, one, two, or three pistons.

Q. So you could have a three-cycle?

A. No, three-cylinder.

Q. I've already confused it. A three-cylinder engine that's two-stroke?

A. Right.

Q. All right. Now, you use ignition to trigger the injection. Does Polaris do the same thing?

A. Yes.

Q. Does your system have to inject the fuel at any specific point in this cycle; that is, any specific crank case angle?

A. No.

Q. Can you explain why not?

A. When I inject is irrelevant. It does not affect how much fuel is coming out of the injector; so I can inject anywhere in that 360 degree rotation that I want to, and I'll always get the same amount of flow through the injector.

Q. Now, if you were to inject into the crank case, would you have the same flexibility?

A. No.
Q. Why not?
A. Well, the pressures change in the crankcase. If the piston is coming down and pressurizing this chamber, if I've got 30 PSI, 30 pounds of pressure of fuel trying to come out the injector and 30 pounds of pressure in the crank case, I won't have any fuel flow.
Q. All right. I just want to ask you some questions about some of the other subjects that will come up in terms of the claim elements. And one has to do with priming. Can you explain to the Court what priming is?
A. Priming is just simply sending a large amount of fuel to help the engine start, usually when it's cold.
Q. How do you do that?
A. We open the injector for an abnormally long period to shoot in a large volume of fuel while we're trying to start the engine.
Q. What do you sense to make that determination?
A. We look at the throttle position and the engine speed.
Q. And that's sent to what?
A. That's sent to the computer, and it sends the signal to the injector whether it should inject or not inject.
Q. Okay. And your system utilizes a fuel pump as well? That's one of the other issues?
A. Yes.

Q. And what's a pump?
A. A pump is just some device, electrical or mechanical, whatever, to bring up a pressure in some kind of fluid conduit, or in this case it brings fuel pressure up.
Q. I just want to turn briefly to the battery saver or shut-off aspects of the hearing.
Does your battery saver automatic shutdown system use the ignition system in any way to shut down the battery?
A. Yes.
Q. And where does the ignition system get its energy?
A. From the alternator.
Q. In a snowmobile application, can you get ignition without an alternator?
A. No.
Q. Why not?
A. Well, we're working -- their electrical supply is the alternator; so if you don't have the alternator, you can't have ignition.
Q. Explain very briefly, if you could, did the fact of using a computer in a snowmobile create any particular problems in terms of battery life?
A. Yes.
Q. What specific problem?
A. Well, the battery installed is very small and the charging systems are very small; and in the ten years I spent in the

business, when we would come in to stop a snowmobile, we'd just hit the switch up on the handle bar to shut the engine off. We'd almost never turn the key off. They'd stay off all season, and people were ingrained in that mentality. And when I added a computer to it that turned on and off with a key, they'd leave the key on and drain the battery. If they drove 20 miles into the wilderness to go ice fishing and didn't turn the key off, they had a big problem; so I wanted to teach the system to turn itself off if the operator forgot.

Q. Now, just to wrap up, I want to ask you a question about engine speed. These two-cycle engines for snowmobiles have a speed, I take it, an engine speed?

A. Yeah, they run at different speeds.

Q. How do you measure the speed of an engine for a snowmobile?

A. Well, it's called rpm, in revolutions per minutes.

Q. The number of times that this piston and crankshaft are turning?

A. Yeah. How many times does the crankshaft go around in a minute.

Q. Now, what percentage of time is a typical snowmobile operated below 3800 rpm; that is, 3800 revolutions per minute?

A. Very little. That's idle. A snowmobile won't move. It is just idling. Most people don't idle their snowmobiles a lot. They drive them.

Q. What's the normal operating speed when you're moving a

snowmobile?
A. Kind of depends on what engine you've got. Almost all of them function between 7- and 8- or 9000 rpms.
Q. If I were to put a governor -- that is, some limiting device -- on an engine to restrict the engine rpm for a snowmobile below 3800 rpm, would that be a saleable snowmobile?
A. No, it wouldn't move. Snowmobile won't move until it hits about 35- to 4000 rpms, 3500 to 4000 rpms, because that's where the clutch engages. So you'd have a product that wouldn't go anywhere. It would just sit there.

MR. RAYMOND NIRO: Thank you, Mr. Chasteen. I have nothing further.

THE COURT: I think we need a break. And let me indicate that -- let's see. You started at 10:17, and it's now 11:25; so it's been about an hour and just short of ten minutes of your time.

Let's take a morning break. And Janine, would you hold us very tight to 15 minutes, please, or less, if we can do it.

(Recess at 11:25 a.m.)

(Reconvened at 11:40 a.m.)

THE COURT: Just a moment.

Cross-examination, please.

MR. BIANCO: Your Honor, with the Court's permission, I would like to begin, and then I think Ms. Daily has some

brief cross-examination on the '079 patent.
May we proceed in that manner?
THE COURT: Yes. The direct examination was approximately 38 minutes, and the cross should hopefully be a lot less than that. In any case, no more.
MR. BIANCO: Yes, your Honor.

CROSS-EXAMINATION

BY MR. BIANCO:
Q. Mr. Chasteen, you testified that you worked for Echlin, Inc.
A. Yes.
Q. Echlin owns a company called Pacer Industries; correct?
A. Yes.
Q. And Pacer Industries is a party to this lawsuit; correct?
A. Yes.
Q. So you're associated with a party to this lawsuit in addition to your capacity as the alleged inventor of this -- these devices; is that right?
A. Yes.
Q. Mr. Chasteen, you testified somewhat about four-cycle systems that use EFI, and you indicated reasons you believe those four-cycle fuel injection systems were not transferrable to two-cycle. Do you recall that?
A. I believe I said automotive systems.
Q. Oh. So there are other four-cycle systems not automotive

systems; is that correct?
A. Yes.
Q. For example, there are four-cycle motorcycle systems; correct?
A. Uh-huh. Yes.
Q. And those systems might not use a mass air flow meter; is that correct?
A. That's possible, yes.
Q. And you in fact know that there are some that do not use a mass air flow meter; isn't that right, sir?
A. That's right.
Q. And they don't use an oxygen sensor; isn't that right?
A. Some do, some don't.
Q. You're aware of some that don't.
A. Yes.
Q. And those systems would not experience the same kind of problems in a transfer from four-cycle to two-cycle that you describe when you testified about automotive systems; correct?
A. What do you mean by that, sir?
Q. The kinds of problems you testified to with regard to air flow meters, for example. If a four-cycle system doesn't have an air flow meter, it won't experience those problems. Isn't that right, sir?
A. That would be correct, yes. Doesn't have it.
Q. And if it doesn't have an oxygen sensor, it wouldn't have

those types of problems; isn't that right, sir?

A. Well, technically, yeah.

Q. Okay. And you are, in fact, aware that there are other four-cycle systems that operate using throttle angle and engine speed as the principal parameters of fuel injection?

A. Yes.

Q. And you're aware that those systems existed before the date of your alleged invention; isn't that correct, sir?

MR. RAYMOND NIRO: Your Honor, we're into validity, and I don't think that's the purpose of this hearing. I think it's so far beyond the scope of direct as to now get into the merits of the case.

THE COURT: To what issue that I have to decide does this go?

MR. BIANCO: It's cross on the transferability of such systems; and I don't intend to pursue this any further, your Honor. I intend to move on.

THE COURT: Go ahead, please.

BY MR. BIANCO:

Q. Could you answer, Mr. Chasteen?

A. The one system that we have apparently existed before.

Q. And that was a system that used throttle angle and engine speed as the base parameters; correct?

A. Among others, yes.

Q. Among others. It also monitored engine temperature; is

that correct, sir?
A. Yes.
Q. Air temperature; is that correct, sir?
A. Uh-huh. Yes.
Q. Barometric pressure; is that correct?
A. Yes, it is.
Q. So you didn't invent any of those parameters; correct? They existed, as far as you know?
MR. RAYMOND NIRO: We're into validity issues, your Honor.
MR. BIANCO: Withdraw the question, your Honor.
THE COURT: Continue, please.
BY MR. BIANCO:
Q. You testified -- let's focus on the automotive side for a minute. You testified that automotive sensors wouldn't be used on a two-cycle system, or words to that effect. Is that right?
A. I believe I stated the sensors involved with that, yes.
Q. Do you recall that when you put the first system together that was ultimately shown to Polaris -- remember that time back in 1987?
A. Yes.
Q. Isn't it in fact true that you used automotive sensors on that system?
A. Yes.
Q. Mr. Chasteen, you talked a little bit about carburetors.

Remember that?
A. Yes.
Q. And there are carburetors on two-cycle engines?
A. There is.
Q. And there are carburetors on four-cycle engines?
A. There are.
Q. And they both perform the same function, don't they, sir?
A. Yes.
Q. They deliver a charge of air that's mixed with fuel to the appropriate point to be sucked into that engine to work; correct?
A. Yes.
Q. And they both deliver it to the same place, don't me they?
A. Yes.
Q. And the way where they deliver is the intake of the engine?
A. That's correct.
Q. And that's the place that you testified that you chose to inject fuel; correct?
A. That's correct.
Q. Precisely where a carburetor would deliver the mixture of fuel and air; correct?
A. Yes.
Q. Your system was not the only one ever to inject fuel at that point; is that right?
A. No. Well, there has been fuel injection systems.

Q. There are others that inject there, too; correct?
A. Yes.
Q. Mr. Chasteen, with regard to two-cycle and four-cycle engines, if you have a two cycle engine and a four-cycle engine that perform essentially the same, that have the same intake air requirements, you'd use the same carburetor on those engines, wouldn't you, sir?
A. It could be done, yes.
Q. Okay. You indicated in talking about where you inject and when you inject that it perhaps didn't make a difference, if I heard you right, when the injection took place in the cycle of the engine. Is that right, when you use that air intake?
A. I said when I inject in the manifold, it doesn't matter when I injected?
Q. Yes.
A. That's correct.
Q. Do you recall, Mr. Chasteen, whether that is what you told the patent office or was told to the patent office on your behalf?
MR. RAYMOND NIRO: Your Honor, now we're into questions of inequitable conduct. I didn't think that this hearing was for any purpose other than to get to the issue of infringement. We tried to narrow this witness' testimony just to the question of explaining the technology.
THE COURT: Yes. Unless you can show me how this

question goes to the issues that I have to decide, the objection will be sustained.

MR. BIANCO: Your Honor, I raised that question simply because I think it goes not only to unethical conduct -- and I agree that it does go to that -- but I think it also goes to Mr. Chasteen's credibility as a witness.

MR. RAYMOND NIRO: Your Honor, dealings with the patent office are a separate issue that has been raised with respect to inequitable conduct. I don't think it has anything to do with anything.

THE COURT: For purposes of this hearing, I am going to sustain the objection. Let's continue.

MR. BIANCO: Thank you, your Honor. I'll move on.

BY MR. BIANCO:

Q. Mr. Chasteen, you testified with regard to priming. Remember that?

A. Yes.

Q. I want to talk to you about what you said on the issue of priming. You said that your invention as described in the '803 patent looks to throttle position and engine speed. Remember that?

A. Yes.

Q. Okay. And in fact, it looks to a particular engine speed; isn't that right, before it primes?

A. It looks at rpm, engine speed.

Q. Right. And what it looks to is zero rpm; isn't that right?
A. That's -- in one of the embodiments, yes.
Q. Well, for example, it wouldn't prime at 100 rpm or a thousand rpm; is that right?
A. That's correct.
Q. Okay. So what it looks to as defined in the patent is zero rpm, when the engine essentially isn't running?
A. I think that's only in the preferred embodiment, not in the claim.
Q. In the preferred embodiment that's described in the specification; correct?
A. Yes.
Q. And you mentioned throttle position as well; that there has to be a throttle position, I believe the patent says, for example, 20 degrees or greater?
A. In the embodiment, yes.
Q. So as described in the specification, Mr. Chasteen, what you're talking about is starting a cold engine, giving it some extra fuel at the start by depressing the throttle when the engine is not running; isn't that right?
A. In one of the embodiments, yes.
Q. As described in the specification. That's what we're talking about?
A. That's what it says in the specification.
Q. Okay. So that -- isn't that the equivalent, Mr. Chasteen,

of the way we used to do it on cold mornings in Colorado and lots of other places: Before you started your car engine, you stepped on the accelerator and gave it a shot of fuel and then you turned the key. Isn't that the equivalent?

MR. RAYMOND NIRO: Again we're dealing with issues of validity, what's in the prior art, what the components are in the prior art.

THE COURT: The objection is overruled. I think this goes to priming issues.

BY MR. BIANCO:

Q. Is that correct, sir?

A. Yes.

Q. Okay. Let's talk now about the fuel pump issue. You remember you've got a Claim 1 of the patent that talks about a fuel pump and how it's operated. Recall that?

A. Yes.

Q. Okay. And Mr. Niro has said in his argument that we're trying to insert the words "variable speed." Remember that?

A. Yes.

Q. There in fact are words in the patent, Mr. Chasteen, that suggest you could be using a variable speed fuel pump; correct?

A. Yes.

Q. And in fact, there came a time when you sought a reissue application with regard to the patent. Do you recall that?

A. Yes.

Q. And you -- you took an oath at the time of the reissue. Do you remember that?
A. Yes.
Q. And you described why it was that you wanted to make certain changes in subsequent claims that were going to be added to the patent. Remember?
A. No.
Q. You don't remember that?
A. No, not clearly.

MR. BIANCO: Your Honor, as I've indicated, I did not come prepared to cross-examine Mr. Chasteen. However, there are two volumes of exhibits that were appended to our briefs in this case. I have an extra it set that I asked -- that we brought for the convenience of the Court, assuming we would get into it in argument.

One of those exhibits at Tab 23, I believe it is, is Mr. Chasteen's fourth supplemental reissue oath.

I wonder if we may request that we place it in front of Mr. Chasteen at this time. And we have the two volumes that the Court could review as well.

THE COURT: All right. You don't have it marked as an exhibit for this hearing?

MR. BIANCO: I did not intend to use it as an exhibit but only in argument with the Court, but we do have extra copies; and I know that our appendix was served on all parties

to the case.

THE COURT: Hand it to the clerk, who will hand it to the witness, then.

MR. BIANCO: Your Honor, would the Court like a copy as well?

THE COURT: Not necessary. Let's continue.

MR. BIANCO: Okay.

BY MR. BIANCO:

Q. Mr. Chasteen -- I have one. Thank you.

The clerk has handed you what's been marked as -- well, it's an appendix containing a number of tabbed items in it. Do you see that, Mr. Chasteen?

A. Yes.

Q. Would you look at Tab 23 of that item?

A. Yes.

Q. Okay. And what is Tab 23?

A. Fourth supplemental reissue.

Q. Does that appear to be a sworn document that you filed with the patent office?

A. Yes.

Q. You've testified at deposition and other times that you were familiar with what was being submitted to the patent office? Do you recall that?

A. Yes.

Q. You looked at things. You didn't just allow your lawyer or

somebody else to submit things. You, in fact, knew what was being submitted. You were on top of it. Isn't that right?
A. No. Not totally.
Q. We'll pass that for now.
Mr. Chasteen, in the fourth supplemental reissue oath, you discuss the question of a pump. Do you recall that?
A. In the fourth reissue?
Q. Yes, the thing you have in front of you?
A. No, I don't remember that.
Q. Well, take a look at page 5 in general, stating what the purpose of the document is. Would you do that, Mr. Chasteen?
A. Sure. Okay.
Q. And there is a paragraph approximately the middle of the page. I believe it's the first full paragraph that begins "the single claim."
A. Yes.
Q. And what I would like you to look at is the last sentence of that paragraph that says, quote, "This claim defines the inventive apparatus as it would appear in a commercial embodiment but it includes a number of structural elements which unnecessarily limit my patent protection." Do you see that?
A. Yes.
Q. I've read that correctly; correct?
A. Yes, you did.

Q. And one of those elements that you felt unnecessarily limited your protection was a variable speed fuel pump; isn't that right?

A. I don't know. I'd have to look at this and see what it says.

Q. Let's take a look at the next page. Very bottom is a paragraph dated at the left as I-9. Very bottom of the page?

A. I see.

Q. See that refers to the pump?

A. Yes.

Q. Okay. And it says, quote, "As taught in the specification, the fuel pump may be operated at a choice of different speeds and output pressures to maximize the efficiency of the engine operation." Do you see that so far?

A. Yes.

Q. And it goes on to say, quote, "But controlling the pump speed is not essential to the basic inventive combination of elements which control the open duration," etc. Do you see that?

A. Yes.

Q. Isn't it true, Mr. Chasteen, you were telling the patent office in this supplemental oath, in this sworn statement, that you didn't believe a variable speed fuel pump as defined in Claim No. 1 of your patent was necessary to the basic inventive combination and that other claims could describe the invention

without it?

A. I'm not sure I understand what you just said.

Q. Well, that's not a good question. I apologize for that, Mr. Chasteen.

Weren't you trying to remove the variable speed fuel pump as one of the elements of your invention for those other claims? Isn't that true?

A. I didn't -- it doesn't need to be a variable pump, just a pump.

Q. Okay. But it was originally described as a variable pump; isn't that right?

A. No.

Q. If it wasn't so described, Mr. Chasteen, do you have any explanation for why you would have put this sentence in the reissue oath?

A. Sure.

Q. It has nothing to do with variable speed pump?

A. I'm not sure we're on the same track.

Q. Apparently not.

Mr. Chasteen, you talked earlier in your testimony about idle speed. Remember that?

A. Yes, I do.

Q. You said, I believe, that 3800 rpms or thereabouts was the idle speed of the snowmobile?

A. No, I didn't say that.

Q. Well --
A. No.
Q. -- let me read from the real time, if I may, Mr. Niro's question and your answer.
"Question: Now what percentage of time is a typical snowmobile operated below 3800 rpm; that is, 3800 revolutions per minute?
"Answer: Now it's -- that's idle. A snowmobile won't move. It just --" word I can't see -- "idling. Most people don't idle their snowmobiles a lot. They drive them."
Remember saying that or words to that?
A. Yes.
Q. Were you not intending to tell the Court that 3800 rpm was idle speed?
A. No.
Q. No. In fact, it's not. Right?
A. No.
Q. Idle speed is like 15- or 1600 rpm?
A. 1500, 2000 rpm is the usual idle speed. I think I said clutch engagement is 3800 to 4,000.
Q. But idle speed is substantially below that?
A. Oh, yeah.
MR. BIANCO: Thank you, Mr. Chasteen. No further questions at this time.
Thank you, your Honor.

THE COURT: All right. Let's see. Ms. Daley, did you have questions?

MS. DALEY: Might I ask Mr. Niro if he could turn that machine off so I could use the ELMO? Thank you.

BY MS. DALEY:

Q. May I proceed, your Honor?

THE COURT: Please.

CROSS-EXAMINATION

BY MS. DALEY:

Q. Mr. Chasteen, I would like to follow up on the issue that Mr. Bianco finished with, and that is the issue with respect to the speed of the fuel pump.

Maybe it would be easier if I use the ELMO.

MS. DALEY: Your Honor, do I need to use the microphone if I'm by the ELMO?

THE COURT: I don't know how loud your voice is.

MS. DALEY: Let me try to speak very loudly and very slowly.

BY MS. DALEY:

Q. In the next sentence that Mr. Bianco had read to you, you had included this sentence in your supplemental reissue oath, which is Tab 23 to Fuji and JECS's exhibits which are filed September 6: "The function of the inventive combination would not be disturbed or impaired if the fuel pump was operated at a single constant speed."

Were those your words, Mr. Chasteen?
A. Yes.
Q. Now, further on in that same page -- and we're at page 7 now of Tab 23 -- you were explaining to the PTO why it was that you had not previously asserted the claims which you were attempting to assert in the reissue application; correct? For instance, you seem to be confused, so let me point to a specific portion of your reissue oath. You stated, "The need to present an enabling disclosure with all of the operating details of a preferred form of the invention was impressed upon me by the attorney who prepared the application."
Was that correct? Do you see that at the bottom of the screen, Mr. Chasteen?
A. Yeah. I got to read it here.
I've got to put it in context.
What page is this on in my thing? I'd like to read --
Q. Page 7 of Tab 23, your fourth supplemental reissue oath.
A. Okay.
Q. Okay. So Claim 1, or the original claim of your patent application, disclosed and claimed, as you claim, the operating details of the preferred form of invention; correct?
MR. RAYMOND NIRO: Your Honor, we're beyond the stipulation that was entered into by the parties as to the scope of expert testimony. Specifically, that stipulation provides that expert testimony shall not include any

interpretation of the claims of the patents in suit, any analysis of the prosecution histories, any application of the claims to the accused devices, or any arguments supporting or negating the motions made. We're specifically in violation of the provision that talks about interpretation of the claims of the patent in suit. We did not ask the witness any such questions. It's a violation of the stipulation that we entered into in advance of the hearing to ask those kinds of questions.

THE COURT: To what question on direct does this issue go?

MS. DALEY: He asked Mr. Chasteen questions about the operation of the fuel pump, and I -- those questions relate to how the few pump operates.

THE COURT: If it relates to how the fuel pump operates, you may ask it.

MS. DALEY: I only have one further question with respect to this issue, your Honor.

THE COURT: All right. Continue to keep your voice loud, please.

MS. DALEY: I will try, your Honor.

BY MS. DALEY:

Q. And right beneath that statement, you stated that that preferred embodiment included a feature of efficient fuel pump operation. Do you have Tab 23 in front of you, Mr. Chasteen?

A. Yes.

Q. Do you see that sentence?
A. I'm looking at it up here.
Q. I'm sorry. Let me move. Can you see it now?
A. "Efficient fuel pump operation." Okay. I've got it.
Q. Mr. Chasteen, do you still own stock in IRS?
A. Yes.
Q. Have you ever met with an individual by the name of Dr. Blair?
A. Yes.
Q. And you're aware that Dr. Blair submitted affidavits in connection with the Patent and Trademark Office proceedings?
A. Yes, I am.
Q. And that Dr. Blair provided technical information to the Patent and Trademark Office?
A. Yes.

MR. RAYMOND NIRO: Now we're into prosecution history estoppel. It's a violation of the stipulation.

THE COURT: The objection will be sustained. Let's please go to issues that are before the Court.

BY MS. DALEY:
Q. I want to make sure I heard your testimony on direct clearly, and that was that you said that there were three ignition pulses per cycle in the Polaris snowmobile.
A. On the three-cylinder engine, I believe I said that, yes.
Q. Now, Mr. Niro established on direct that you are one of the

named inventors of the '079 patent; is that correct?
A. That's correct.
Q. And as a matter of fact, in connection with this case, you have had an opportunity to review the claims of the '079 patent; correct?
A. Yes.
Q. And you understand what the word "ignition" means?
A. I think so, yes.
Q. How would you define "ignition"?
A. You could put that in a wide variety of contexts; but generally ignition would be the point at which you combust some air/fuel ratio, or it could be ignition meaning the spark plug sparking, or it could mean an ignition system that might include a whole series of components.
Q. So you would have a number of different definitions for the word "ignition"; is that what you're telling me?
A. Well, you have to put it in the right context in order to use it properly.
Q. Are you familiar with a person by the name of Ivars Breikss?
A. Yes.
Q. Mr. Breikss was an employee of IRS; correct?
A. Yes, he was.
Q. Mr. Breikss was an electrical engineer?
A. Yes.

Q. And did you receive a memo from Mr. Breikss in late November, 1988, regarding a system to shut off the battery from the ECU?
A. Yes.
Q. As a matter of fact, not only did you receive that memo, but you instructed Mr. Breikss to prepare a patent disclosure memorandum describing his invention. Correct?
A. It wasn't his invention, ma'am.
Q. Describing an invention?
A. Yes.
Q. And did you send Mr. O'Mera -- excuse me -- did you send Mr. Breikss to your patent lawyer, Mr. O'Mera?
A. Breikss. Yes.
Q. I'm sorry. I didn't mean to mispronounce his name.
Let's move to another topic, and that is the alternator. During Mr. Niro's direct, you were asked some questions about the alternator. Are you familiar with the alternator, Mr. Chasteen?
A. Which alternator?
Q. Let's say the alternator that's on a Polaris snowmobile.
A. Yes, I am.
Q. It's also referred to as the charging system; right?
A. Yes.
MS. DALEY: Your Honor, may I -- I think it might assist the witness in explaining how an alternator -- well, let

me just ask Mr. Chasteen this question first:
BY MS. DALEY:
Q. Would it assist you in -- and I want to ask you to explain how the alternator works. Would it assist you in that explanation in using an actual alternator?
A. No.
Q. No? Then Mr. Chasteen, are you familiar that the alternator is made up of several coils?
A. Yes, I am.
Q. Are you familiar with an alternator that has a battery charging coil?
A. Yes, I am.
Q. Where does a battery charging coil send its electrical output?
A. To the battery. Well, to a regulator, rectifier.
Q. But the battery charging coil sends its electrical output to the battery; correct?
A. Eventually, yes.
Q. Where does the lighting coil send its electrical output?
A. To a regulator.
Q. Does it send it to the lights -- which sends then sends it to the lights?
A. Eventually, yes.
Q. Where would the ignition coil send its electrical output?
A. To whatever type of ignition system is on there. In the

Polaris snowmobile application, it goes to a CDI box.
Q. And ultimately, then, the ignition coil would provide the electrical output to enable the spark plugs to ignite; correct?
A. Yes.
MS. DALEY: I have no further questions, your Honor.
THE COURT: Redirect, please.

REDIRECT EXAMINATION

BY MR. RAYMOND NIRO:
Q. Mr. Chasteen, Mr. Bianco asked you some questions about your trip to Polaris in 1987. Do you recall that?
A. Yes.
Q. And the -- he asked you whether you were using automotive sensors on the fuel injection system that you showed to Polaris in September of 1987. Is that right?
A. Correct.
Q. Recall that? And you said yes.
A. Yes. I used automotive sensors.
Q. Do you recall the reaction of Polaris engineers to your work at that time?
MS. DALEY: Objection, your Honor.
THE COURT: The objection is sustained. I don't see what this has to do with any issues that I have to decide.
MR. RAYMOND NIRO: Your Honor, it has to do with Mr. Bianco's implication that this invention was not well regarded by Polaris; and indeed, the documents would suggest

they considered it the greatest breakthrough in engine design that they had seen. And that's the only point I wished to make.

BY MR. RAYMOND NIRO:

Q. In Claim 1 of your '803 patent -- I'll put this on the ELMO -- you see where it refers to in Item Roman Numeral IX, "means for receiving and processing said engine speed sensing signal for generating a pump control signal in response thereto for maintaining a pump at an optimum operating speed"? See that?

A. Yes.

Q. Do the words "variable speed" appear in Claim 1?

MR. BIANCO: Objection. Leading.

THE COURT: No, he can answer yes or no.

THE WITNESS: No, there is no "variable speed" there.

BY MR. RAYMOND NIRO:

Q. Did those words ever appear in Claim 1?

A. No.

MR. RAYMOND NIRO: We have nothing further, your Honor.

THE COURT: Any further cross, Mr. Bianco?

MR. BIANCO: Nothing further, your Honor.

THE COURT: Do you have any further cross?

MS. DALEY: Nothing further, your Honor.

THE COURT: All right. Thank you, and you may step

down, Mr. Chasteen.

THE WITNESS: Take this?

THE COURT: Would you give that to the clerk, please.

Did you have another witness, or did you wish to make argument?

MR. RAYMOND NIRO: No, your Honor.

PLAINTIFFS' ARGUMENT

At this point in time, we can direct the Court's attention to the language that will require interpretation as a matter of law; and I'll try to do that very quickly and as efficiently as we can with some of the overheads.

First of all, your Honor, there are two ways to infringe a patent. You can do it literally --

THE COURT: Okay. What are you referring to? We're going to have -- if you're going to just call all of this as Exhibit 1 --

MR. RAYMOND NIRO: This shouldn't be up.

THE COURT: -- you're going to have to mark these pages so that --

MR. RAYMOND NIRO: We don't have to put that up. It has nothing to do with what I'm saying, and I apologize.

There are two ways to infringe: literally, or under the doctrine of equivalents. Literally means you have every limitation or element in the accused process. Doctrine of equivalents means that there is something that's difference but

the change is insubstantial. And the United States Supreme Court said in the famous **Graver Tank** case, as the Federal Circuit in fact has agreed, that the doctrine of equivalents frees inventors from verbalism and literalism, because those who pirate inventions, like those who copy books and music, can be expected to make minor changes because outright and forthright duplication is a dull endeavor.

That's the second basis for infringement, doctrine of equivalents. We will deal really in terms of argument only with the literal infringement.

I'd like to quickly go through some of the disputed claim language with the Court, starting first with Claim 1, if we can put the overhead; and I will describe it for the Court and for the record.

This is a diagram of language in Claim 1 that is in dispute, and that language in detail talks about a predetermined cyclically repeating state and then a timing sensing means and then a means to determine how much fuel gets in and then when the fuel gets in.

We could go to the more simplified and second chart, which is simplified statement of what Claim 1 really says at this point, which is the disputed claim element.

It says, You look at a cyclically repeating state, you predetermine it, then you sense that condition -- in this case, ignition -- and you tell -- you send that to the computer. And

that determines when you open the injector. That's what all that language really comes down to. You sense something that's going through the cycle, and you say, When do I open the injector? I open it when, in this case, ignition takes place.

That's one of the conditions that can take place. Now, instead of ignition, you might look at piston position, or exhaust stroke, or power stroke, or when you have top dead center, or whatever.

Now, the patent defines -- and maybe before I get to that, you could go back to the word "predetermined." And what's the dictionary say "predetermined" means? "Predetermined" is defined as deciding something in advance. It's the "before." "Pre" means before, and "determined" means decide or make a choice.

It's not a synonym for fixed or unchanged. And an example, your Honor, might be helpful here; and I hope it will be: If we were to wake up each morning, shut off our alarm, brush our teeth, make coffee, add sugar and cream to the coffee, you'd go through a series of states, a series of events, a series of occurrences each day. And they would be cyclic if they occurred each day, if that's the pattern, that's the habit, that's what you did each day. They would be repeating. They would be recurring.

And if I decided to get the paper right after I put the coffee on each morning, immediately after coffee, then I

could send a signal to somewhere, my brain, perhaps, saying it's time to go get the paper.

In the simplest terms, that's what this claim language is talking about. You make a choice. You say, Of all the things that I go through in my cycle each day, I'm going to wait until I put on the coffee to send a signal to go out and get the paper.

And what happens here is that in advance, somebody made a decision that they would use ignition as one of the myriad of cyclically recurring events that would then be used to say, Open the fuel jets, it's time to deliver fuel.

And that's in its simplest terms what that claim says. That's what they do. That's what we do. Ignition is making the coffee. It's the event. It's a predetermined cyclically recurring event. It happens every cycle. You sense when you have ignition. You send a signal; and it says, Open the injectors, just like you might send a signal that says, The coffee is on, it's time to get the paper.

"Predetermined" means I know that in advance. I make that decision, so that instead of saying I'm going to get the paper as soon as I shut off the alarm or after I brush my teeth or it's after I put the sugar in the coffee, I'm doing it in advance, making a decision that I do it when that event, getting the coffee on, takes place.

Again, it's exactly what they do. They sense

ignition, they send a signal, and they inject. And the testimony on this subject is unrefuted.

We went to the preeminent engineer on testing in the United States, Dr. Ribbens, from the University of Michigan, who runs the automotive testing facility at the University of Michigan. He unfortunately can't be here today because he's suffered a serious injury and he's being operated on today, in fact; but Dr. Ribbens concluded in his affidavit which supports the motion for summary judgment that every element of the claims is there and most importantly the predetermined cyclically recurring event is there.

The patent examiner understood this. It's what the specification says; and if we could jump to the specification for a moment just very briefly. What's the patent say? Two places, it refers to -- it says -- and I can barely read this: "Next, as illustrated in blocks 314 and 315, the CPU determined whether a predetermined cyclically recurring state repeating once per engine revolution of the engine, such as, for example, a top dead center position of a selected one of the pistons has been reached."

So it says, I'm going it look at one of those states and make a decision if I'm going to use that to say, Open the injectors; and if you go to the next portion of the specification, it talks specifically -- and this is at column -- the initial one was at column 13, lines 11 to 29.

The second is at column 9, lines 34 to 30 -- to 51. And there, there is a discussion concerning ignition timing sensor being used as the vehicle to now say it's time -- it's the "when" -- inject fuel.

THE COURT: You wanted me to remind you when you had 15 minutes left. You have 15 minutes left.

MR. RAYMOND NIRO: Okay, your Honor. I'll take 5 of my 15 and try to wrap this up, because there are some other important issues here that I'd like to discuss.

The patent examiner understood this clearly during the prosecution. Let me just put that up quickly. What the patent examiner said is Chasteen argues that predetermined cyclically repeating state means, for example, a point where ignition takes place, or top dead center, or some number of degrees ahead of top dead center: or, or, or.

What's predetermined mean? It means you make that choice. In this case, ignition in advance.

Oldest trick in the book for an infringer is to add something to the claim that's not there and then say, I don't have it.

But the engineers that reviewed this claim limitation from Fuji and from JECS admitted it was there. It's contained in the exhibits attached.

If we could put up the analysis where they say "same or different," you'll see Item No. 7 in this analysis. "Timing

sensor means for sensing each occurrence of a predetermined cyclically repeating state: JECS product, same; opinion, same." These are people of ordinary skill in the art interpreting that language.

What did Polaris say in their interrogatory answer where they were asked, Tell us, if you would, what is not present in that Claim 1.

Go to, if you would, the Polaris.

On the basis of this understanding, Polaris system -- Polaris states that its snowmobiles with electronic fuel injection do not have the following, underlines, elements; and you'll note what's not underlined is Item (f), the predetermined cyclically repeating state. These admissions stand in the record unrefuted for six years.

Now, I'd like to briefly address two other so-called "limitations" in the claims, and specifically -- and I'll be brief about these -- the limitations in Claims 1 with respect to priming and fuel pump operation.

We'll just quickly put up the priming.

This chart shows the complex language. The reduced-in-plain-English language is, Look, you're going to sense two things, engine speed, total throttle position. You're going to send those into a computer that will process those signals and then inject or don't inject and generate a priming control signal. Precisely what they do. They sense

engine speed, throttle position. They inject or don't inject as they process that; and how do we know that? In their very opposition to the motion for summary judgment in this case -- can we go to that? We'll skip what it says in the spec. Go to exactly right to -- right here.

This is from their non-infringement brief. What do they say about priming? You look at throttle position, you look at rpm -- that's engine speed -- or you look at throttle position again and you send a signal that says prime or don't prime. That's what the element of the claim says, precisely what they do. And the only point I would make here, your Honor, is this in fact is a limitation only in Claim 1. It has nothing to do with Claims 2, 3 and 4. The only other limitation of Claim 1 that they debate has to do with fuel pump.

And again, the plain English -- that's the complex language now on the overhead, subsection (j), Roman Numeral IX. It just says, Sense engine speed, send it to the computer, process that, send a pump control signal that runs the pump at optimum speed. That's it. It doesn't say run a variable speed pump, run the pump at optimum speed. That's precisely what's in their manual. I won't put it up. But basically, they say exactly that. We take a signal from the engine, we receive it, we create a pump control signal, and we send it to the fuel pump.

The '079 patent: That's a moving target; and the only thing I would say about that is their argument that they don't have an alternator doesn't make sense, because whether they have an alternator that's part of the injection mechanism doesn't make sense, because that's in fact precisely what they have, precisely what they use.

They make arguments about power latches, some that I would note -- too many to even address here, your Honor; but they say things like, You had to distinguish a patent on power latch; we copied the prior art; you can't read the claims on us because that would be invalid.

Then they turn around a year later and they say, But we got a patent on the very thing we said was old.

You can't have it both ways. They can't get a patent on something that's old. This is a straw man, as we would contend, not an issue worthy of the Court's consideration. The infringement here is clear-cut.

Every word of Claims 1, 2, 3 and 5 of that patent -- that is the '079 patent -- are present, and they've been compared by an expert in the field unrefuted.

Now, in the 30 years -- and I'll wind up, your Honor, with this thought: In the 30 years I've been doing this, meaning appearing before courts like this and representing clients -- I tell my son that the stories are the same, the actors just keep changing. As one famous judge once said from

the Sixth Circuit, Discovery is like the lost purse along the highway: Hundreds pass it by until somebody more observant discovers it.

That's what Ron Chasteen did. He had an idea. He went to Polaris. The engineers said it was the greatest breakthrough in engine design they had seen. It was the state of the art. Fuji couldn't do it. It took them two years to catch up. And ten days after Chasteen left that meeting, the vice president of engineering of Polaris was on a plane going to Japan to disclose the information he had learned from Ron Chasteen.

There is literal infringement here. There is infringement under the doctrine of equivalents, just as Ron Chasteen found in one of the eleven days of deposition testimony they took from him in this case, when he took every part of their product apart on videotape. And the questions asked by Polaris' attorneys showed how each and every one of the claims applied.

Thank you, your Honor. That concludes our presentation.

THE COURT: Thank you. You should have approximately 6 minutes left for your rebuttal.

Let's take a lunch break, and then we will start with defendants' presentation.

How long do you need for lunch?

MR. SANTISI: We have to set up. We have a courtroom demonstration. It will take some time to set it up.

THE COURT: I'm happy to have a hour, or we can make it an hour and 5 minutes. You tell me.

MR. SANTISI: Hour and 15, your Honor.

THE COURT: We'll reconvene at 1:45.

(Recess at 12:30 p.m.)

(Reconvened at 1:50 p.m.)

THE COURT: Let me just clarify. I think I misspoke and said 6 minutes left; and Mr. Niro, you have 8 minutes left.

MR. RAYMOND NIRO: Thank you, your Honor.

THE COURT: Now let's start with defendants.

And I take it you folks have worked it out between yourselves on this timing.

MR. BIANCO: We have, your Honor.

THE COURT: Okay.

OPENING STATEMENT

MR. BIANCO: Your Honor, may it please the Court, I briefly just want to indicate what we're going to be covering in our two hours. First, we will be orienting the Court briefly on the technology, and we've brought some demonstrative exhibits to that effect.

We will then discuss the intrinsic evidence relating to the patent; that is, the claims, the specifications and the part neglected by the plaintiffs, the prosecution history; and

then we'll discuss the technology involving the Polaris, Fuji, and JECS equipment as it's compared to the claims.

Before I turn the floor over to Mr. Santisi, I'd like to very briefly address one comment made by Mr. Niro during his presentation and just correct the record. Mr. Niro stated that the alleged admission, the infringement opinion that was written in July of 1990, was written at a time when Fuji and JECS were defendants in a lawsuit. That is not true. It was about a year or so -- a little more than a year before they were joined in the lawsuit. So they were not defendants at that time.

In addition, that was written before the prosecution history took place; and finally, it is not -- didn't stand unmodified for six years, as Mr. Niro said. In fact, there was a supplemental answer to interrogatories that was prepared when this case was reactivated after a stay that in fact explained precisely what was thought at the time in 1990 and what was thought following the prosecution history, which I think is so crucial in this case.

But again, we'll address those issues later in argument. Rather than waste any more time, I'd like Mr. Santisi to --

MR. SANTISI: I'd like to call Bernard Cuzzillo.

(Bernard Cuzzillo was sworn.)

THE COURT: Have a seat, please.

MR. SANTISI: I thought I had an agreement this morning with Mr. Niro that I would stipulate to the expertise of Dr. Martin, if he would stipulate -- and he indicated he would stipulate to Mr. Cuzzillo's expertise to offer expert testimony on engine technology and electronic fuel injection.

Let me ask you: Would you still stipulate, or should I *voir dire?*

MR. RAYMOND NIRO: I think it's better if they will *voir dire* briefly. I've known Mr. Santisi for 25 years. We talked briefly. I have no recollection of any offer to stipulate to it. I don't object to a brief summary of his CV. I intend to cross-examine briefly about it because of the witness' qualifications or lack thereof in a particular field.

THE COURT: Well, if you folks have read my checklist and notes for hearing -- and I'm not sure it really went out for this hearing -- it indicates that when it's a trial to court, you're to give me a *vitae* or résumé.

MR. SANTISI: We have that.

THE COURT: And then you don't have to qualify.

So you're offering this witness as an expert in engine technology?

MR. SANTISI: Yes, and electronic fuel injection systems.

MR. RAYMOND NIRO: Could we briefly *voir dire*, your Honor?

THE COURT: Go ahead. We'll just try to cut this as short as we can.

MR. RAYMOND NIRO: It will be very short.

THE COURT: Actually, before we even go forward, I think we should have him identify himself for the record.

DIRECT EXAMINATION

BY MR. SANTISI:

Q. Mr. Cuzzillo, could you please repeat your name and spell it for the record, please.

A. Bernard Cuzzillo, C-U-Z-Z-I-L-L-O.

VOIR DIRE EXAMINATION

BY MR. RAYMOND NIRO:

Q. Mr. Cuzzillo, Mr. Bianco handed me your CV a few minutes ago; and I've had a brief opportunity to read it. It says that you are a forensic engineer, or you have experience in forensic engineering; is that correct?

A. I'm a mechanical engineer, and most of my work is in the forensic area.

Q. But you between 1988 and the present have worked as a litigation consultant in some 13 trials and 40 depositions; is that correct?

A. That's been the number of trials I've testified in and depositions given, yes.

Q. And that testimony is principally in the area of product liability; is that right?

A. No, it's not. A certain proportion is in product liability, but it's basically in mechanical engineering and also auto mechanic's standard of care.
Q. Nowhere in your CV do you mention two-cycle engines; is that correct?
A. It's probably not mentioned in there, no.
Q. Have you ever designed a two-cycle engine?
A. No, I haven't; but I've designed an engine lubrication test for Chevron research using two-stroke cycle engines.
Q. And you have not designed fuel injection systems for two-cycle engines; is that correct?
A. That's correct.
Q. And you have no writings on that subject; correct?
A. Right.
Q. And you've done no research on that subject; correct?
A. Except for this case, I have not.
Q. And you've done no work in terms of repair or modification or alteration or design of those kinds of systems; correct?
A. Well, in the forensic area, in some cases, it does get into engine technology and EFI technology.
Q. In terms of two-cycle engines, have you ever given testimony on two-cycle engines before?
A. Not that I recall, no.
Q. And other than your work in this case, you've done no analysis, study, or evaluation of the performance

characteristics of a fuel-injected two-cycle engine; is that correct?
A. That's correct.
MR. RAYMOND NIRO: Nothing further, your Honor.
THE COURT: Did you want to ask some further questions, Mr. Santisi?
MR. SANTISI: Yes, your Honor.

DIRECT EXAMINATION CONTINUED

BY MR. SANTISI:
Q. Could you describe your education, beginning high school level?
A. Yes. I have a master and bachelor's agree in mechanical engineering from U.C. Berkeley, and I've completed all the requirements except for the dissertation for the Ph.D. also at U.C. Berkeley; and I'm currently working on completing my dissertation for the Ph.D. also in mechanical engineering.
Q. And did you have a master's thesis?
A. Yes, I did; and the topic was -- had to do with a spark ignition engine.
Q. And as a graduate student, were you a course instructor?
A. I was a graduate student instructor for two graduate level courses in mechanical engineering dealing with microprocessor controlled systems and interfacing.
Q. Is the electronic fuel injection system that you've studied here a microprocessor control system?