No. 17 of our papers, of our appendix, May 11, 1994. Mr. Hanes on behalf of Chasteen and IRS filed Paper No. 30. Also filed at the same time was an affidavit of Dr. Gordon Blair, the expert from afar, from Northern Ireland, who was brought in to assist in the patent office.

And I'd like to focus for a bit, if I could, on those documents. Let's first talk about paper No. 30. Mr. Hanes and IRS in that document attempted to again distinguish the Okumura reference and indicate why Okumura was different from the way Chasteen did it. And essentially what they focused on, among some other things, was the meaning of the term "predetermined."

Okay. If we look at -- well, let me invite the Court's attention first to page 16 of that document, where Mr. Hanes writes just above the last paragraph about the electrical pulse which controls injection. The -- quote, "This electrical pulse controls the open duration of an electrical fuel injector which is operated at the same predetermined point in the time during an engine's cycle for each cycle." Each cycle.

Further on, in talking about the cycle and attempting to distinguish the Okumura reference, Mr. Hanes stated the following at page 25: They attempted to distinguish what the patent examiner said, referring to the patent examiner's comment that the detection of a reference point for each cycle is considered to be a predetermined cyclically repeating event

in the engine. That's the language I talked about earlier. Essentially, that's what JECS thought when it looked at this. That's what the patent examiner thought at the first time.

Mr. Hanes in his discussion went on to state at bottom of page 25, quote, "The examiner's statement shows no appreciation or recognition of the fact that the reference position of Okumura is a variably selected point within the 360 degree rotation of the engine."

He went on, on the next page, to indicate the following. I'm about at the middle of page 26, your Honor, and I apologize for not having this up on the board; but I'm quoting approximately the middle of the page. "The variably selected reference point of Okumura is patently not predetermined and not cyclically repeating; that is, the Okumura reference point is not the same point or state of the engine for every revolution, as required by this claim element."

Now, let's compare that to what Mr. Niro said a little bit earlier. In questioning Mr. Cuzzillo, he asked about, suggesting that predetermined simply means some engineer decided in advance when this was going to happen. Well, of course, that happened in Okumura. Of course, that happens in every, every fuel injection system, two-cycle, four-cycle, simple, complex, whatever. Some engineer always decides. But that's not what they meant by predetermined.

He went on to explain, "The Okumura reference point may be different for every revolution, depending on the existing conditions. If it were cyclically repeating, the fuel would be injected at the same point in the cycle for every revolution, as it is in the applicant's device."

And so what was done was "predetermined" was defined as a fixed point that was determined in advance that occurred at the same time and occurred in every revolution of the engine.

In addition to Paper No. 30, again, I think the heart of the manner in which Chasteen and IRS determined this issue and define their word "predetermined" is the Blair affidavit.

THE COURT: How would you like to start with the Blair affidavit after we have an afternoon recess? I think we've been going over an hour and a half.

MR. BIANCO: That would be very well, your Honor. Maybe in the meantime I could figure out how to put it on the ELMO and show you the passage I'm referring to.

THE COURT: I'm sure opposing counsel will help you.

Okay. It's 3:30, and we will start up again in 15 minutes. Recess.

(Recess at 3:30 p.m.)

(Reconvened at 3:50 p.m.)

THE COURT: When we recessed at 3:30, you had 23 minutes left. You still have 23 minutes left.

MR. BIANCO: Thank you, your Honor.

I'll try not to use even most of that, if I can avoid it.

I was inviting the Court's attention to Tab No. 18, which was the second affidavit of Dr. Blair. And in particular I would ask the Court to look at page 4 of 9. I have that up on the ELMO with the help of my friends here. We figured out how to do it, but it's also easy to read in the document.

What I want to point out there is this: Dr. Blair focused in on what he meant by what he understood the word "predetermined" to mean and why that word "predetermined" should be used to distinguish the Okumura reference, which had twice before been used as a means by the patent examiner to deny the patent to Mr. Chasteen.

The paragraph I'm referring to is in approximately the middle of the page, begins "With regard to claim element F, the value of crankshaft angle which is being sensed is necessarily," quote, "'predetermined' in a much more rigorous interpretation of the word than that required by Okumura as interpreted in the official translation of his system. Chasteen has to sense on each production engine equipped with his fuel injection system precisely the very same crankshaft/ engine which was used the fuel injection timing when the fuel injection map was determined experimentally," etc.

He goes on at the end of that paragraph: "Thus, the

word 'predetermined,'" in quotes, "stems from a design decision taken prior to the experiments used to create the base fuel map and must be continued rigorously through to the production system."

On the following page, page 5, just above where the break begins for paragraph or Section 4, Dr. Blair goes on to say, "Chasteen does precisely what Okumura states is impossible; that is, Chasteen injects fuel at a predetermined recurring fixed point in the cycle." And then he gives the three examples.

What Dr. Blair said there was what was then used by the patent examiner as the definition of the word "predetermined" and which made all of the difference in whether or not this patent was allowed was issued. And it was indeed issued based upon that definition.

If Dr. Blair's definition, which was used, not Webster's definition, not the Random House Unabridged Dictionary's definition, but Dr. Blair's definition of "predetermined" -- that's used with reference to the engine which is in issue in this lawsuit, there is no design determination. There was no design decision in the Fuji engine which decided that injection would be done at a fixed point in each cycle of the engine.

It does not occur in each cycle, it does not occur in a fixed point, because it varies with speed. And perhaps most

importantly, there is a randomness to it. The design decision is not followed rigorously through to production, because it can vary, depending on how the engine happens to be positioned when it stops. And there are a variety of different crank angles that can be used to or that -- at which injection can take place based upon randomness, based upon speed, and so forth.

Following the convincing presentation by Mr. Hanes and Dr. Blair, the patent did, in fact, issue. Initially, all of the claims were not -- patent was not issued on all of claims. Some were rejected, and the patent examiner focused on the word "predetermined."

The definitive paper on this point, your Honor, is Paper 31, which appears in our materials at Tab No. 19. Claims 1, 2 and 4 were allowed. Claims 3, 5 and 6 were rejected. The word -- the determining factor was the word "predetermined."

The examiner held on page or stated on page 4 of his allowance of this paper that the -- quote, "The applicant has limited the scope of this claim language in subparagraph (f) of Claim 1 and in the corresponding portions of Claims 2 and 4 upon which subparagraph small Roman (viii) depends to the same non-variable cyclically repeating point in the operating cycle of the engine."

That's the basis upon which this was done.

THE COURT: Now, you're talking about 19, page 4?

MR. BIANCO: I'm -- yes, your Honor. 19 page 4.

THE COURT: And which paragraph.

MR. BIANCO: Subparagraph (d).

THE COURT: All right.

MR. BIANCO: Later, in fact, there were some adjustments made. It turned out one of the claims allowed did not in fact have the word "predetermined"; and though Mr. Hanes argued convincingly that it really meant the same thing without the word "predetermined," in fact, the examiner rejected that, and IRS or Chasteen amended claims to take care of the problem so that claims with the word "predetermined" could be allowed and without the word "predetermined," they were not allowed.

The patent examiner -- this is at Tab 22, Paper No. 30 -- rejected the argument that Claim 4 -- the words in Claim 4 that use the words "cyclically repeating state" means the same thing as "predetermined cyclically repeating state." And because he hadn't realized that difference before he withdrew the allowance, later to clean it up, that word was reinserted and then the claim was allowed.

Excuse me a moment.

Very briefly, in terms of the two other issues, priming and variable speed fuel pump, as to priming, we only have the language of the patent, of the claims and of the specification. But they and Mr. Chasteen's testimony make clear that what they're talking about by priming is precisely

what we all used to do when we tried to start our car on a cold morning: step on the gas, get a shot of fuel in, engine is not running yet, then you turn on the key and turn it over.

That's not the way the Fuji system works, as Mr. Santisi will explain. In the Fuji system, there is a map, and it's based completely on temperature.

Second, as to variable speed fuel pump, the key document is the fourth supplemental reissue affidavit of Mr. Chasteen, which talks about seeking broader claims because he unnecessarily limited himself.

Again, I'm looking at document No. 23, Tab No. 23. It's paper 33 1/2. If you look at pages 5 and -- 5 -- the bottom of 6 and top of 7, that deals with the question of why broader claim language was felt to be necessary by Mr. Chasteen.

As my former partner Bob Harry used to say to me, "Bill, if it ain't broke, don't fix it." He fixed it, and the reason he fixed it is because he was limiting himself to a variable speed fuel pump.

Your Honor, let me finish with referring to the so-called "admission" that's occurred in the infringement opinion. First it was dated 1990, before any of this happened. There was no way that the people in Japan could take into account prosecution history that hadn't yet occurred. They were not in a lawsuit. They were looking at it. They

concluded that they did not infringe the patent because of the variable speed fuel pump and because of the priming function, and they essentially needed to look no further.

Following the reissue of the patent and the history that went along with it, they looked at it again; and they said, If that's what "predetermined cyclically repeating state" means, we don't do it; and that's the declaration of Mr. Iwasa which is filed with our papers here. It is not an admission. It is certainly not a judicial admission, and it certainly doesn't bind us in these circumstances.

We did file a supplemental interrogatory response which made clear exactly what I've said today.

Your Honor, thank you very much. I'll turn this over to Ms. Daley now.

MS. DALEY: Your Honor, I want to address very briefly the '079 patent and then a few comments on the '803. I have not been left with much time, so I will try to talk slow and be quick.

I need to advise the Court that for the first time, when I came into court today, I found out that the plaintiffs thought they were moving for summary judgment on Claim 5 of the '079 patent. If you will review their motions which they filed on August 1 and October 18, you will see that they moved on Claims 1, 2, 3 and 15 with respect to the '92 models; in Claims 1 and 15 only with respect to all models.

Since I didn't hear anything about Claim 15, your Honor, today, I assume they've dropped that.

Let me address the substance. With respect to the '93 models, your Honor, the uncontroverted record confirms that the Polaris snowmobiles do not have a detector means; that the detector means is not part of the processor and rather is part of the alternative -- the alternator control switch.

Column 7, lines 46 to 51 of the '079 patent, require that the detector means be part of the microprocessor.

I found it interesting, your Honor, that in the exhibits which the plaintiffs had prepared for today that they actually prepared a diagram which showed that exact limitation on that claim.

You can see that the plaintiffs themselves identified that the detector means had to be within the microprocessor, the electronic control means.

It's undisputed that the detector means in the Polaris snowmobiles from 1993 and later -- the detector means is located not in the microprocessor but in the alternator control switch -- alternator control system. Excuse me, your Honor.

It's also unrefuted, your Honor, that the 1992 and 1993 and later snowmobiles have a power latch system, and that's something that the plaintiffs distinguished from when they were attempting to convince the Patent and Trademark Office to continue to allow their claims despite the

reexamination proceedings we had filed.

Your Honor, what I'm showing you has been marked as Tab 13 in our exhibits filed November 21, 1996; and you will note that in the language in the claim, in Claim 1, which requires a battery disconnect signal, in order to convince the Patent and Trademark Office that they should still receive these claims, they advised the Patent and Trademark Office that their patent, the '079 patent, was different from the Pauwels prior art which we had provided to the Patent and Trademark Office. You will see that the way in which the plaintiffs distinguish their system from the Pauwels system is that the Powell system has a power latch system which maintains the voltage. That's the same system Mr. Cuzzillo described for us, and that's the same manner in which the Polaris snowmobiles; operate.

Additionally, your Honor -- additionally, your Honor, a question arose as to whether a battery disconnection signal is received. The plaintiffs distinguished the '079 patent from the Pauwels prior art by saying that their system was different because a battery disconnection signal was received. But in the Pauwels system, the disconnection was made when the power latch signal is removed. That's the same kind of removal that Mr. Cuzzillo described in the power latch circuit he explained to the Court and that -- the testimony regarding Polaris' system. And the fact that it operates as a power latch system

is unrebutted in the record.

Mr. Niro stated that he couldn't figure it out, wasn't going to respond. Well, it's no response to a motion for summary judgment by coming in without a response. The plaintiffs had a duty under Rule 56 if they thought that our evidence -- that there was a genuine issue of material fact to bring forward that evidence to this court.

Let me say very briefly that --

THE COURT: What about the 1992 model?

MS. DALEY: The 1992 model, your Honor, also has a power latch system.

THE COURT: And before?

MS. DALEY: Before 1992, the 1992 models are actually manufactured in 1991; and this patent did not issue until June 18, 1991. So we're only talking about the 1992 and later models.

Let me say very briefly, your Honor, as well that in their brief, the plaintiffs said that the question was what is the ignition means, not the ignition system; however, before you today they have confused the phrase "ignition means" and "ignition system"; and I know you're aware of the Federal Circuit's affirmance of your finding of non-infringement in **Microchem.** And in that case, the Federal Circuit confirmed that for a means limitation to read on an accused device, it must perform the identical function specified in the claims.

Now, the plaintiffs keep pointing you to the specification that talks about ignition system. If you look at the claim -- if you look at the claim, your Honor -- and I apologize. I'm not -- the means -- the function of the means is to provide an electrical output to said spark plug sufficient to enable said plug to ignite.

Mr. Chasteen testified the battery charging coil does not provide electrical output to the plugs; it provides electrical output to the battery. That's what Polaris looks at in its 1993 and later models.

Importantly, your Honor, in probative value is the fact that Polaris obtained a patent on its system that's in its 1993 and later snowmobiles. That patent -- they cited the '205 or '079 patent to the Patent and Trademark Office when they filed that patent application, and the examiner that allowed the '205 patent or what ended up as the '079 patent also reviewed Polaris' patent application and issued that patent.

Let me turn very briefly, your Honor, to -- I just have two comments about the '803 patent. Polaris was involved, your Honor, in the proceedings before the Patent and Trademark Office in terms of filing the protest. It read the papers that the plaintiffs had filed. It's entitled as a member of the public to rely upon the statements that the plaintiffs made there.

The examiner, in describing, dealing with this issue

of predetermined cyclically repeating state, made the comment -- not made comment -- stated that -- he stated not once but twice that Chasteen does define predetermined cyclically repeating state as repeating once per revolution. And I ask that you would see Tabs 19 and 25 at pages 4 and 6 respectively in the Fuji and JECS exhibits.

I also want to cite to the Court the **General Mills** decision which we filed last week, a very recent 1997 Federal Circuit decision regarding the issue of whether or not an infringement, a device which accused -- which supposedly infringes part of the time can be found to have infringed a patent. I'll direct your attention to that case. I think that case is dispositive on the issue of plaintiffs' argument that the Polaris system infringes part of the time and therefore should be found to be an infringing item.

Let me just say real briefly, your Honor, as well with respect to the issue of the definition of "ignition," you will note that the plaintiffs do not refer the Court to the dictionary. My fourth grade son two weeks ago had the word "ignite" on his bonus vocabulary list. When I got to that word with him and we started talking about the word and the fact that that word was at issue in this case, he asked, Why don't you go to the dictionary, Mom?

If you look at the dictionary, ignition occurs when something is ignited, not just a spark, but a fuel is ignited.

Polaris respectfully requests the Court grant its motions for summary judgment and deny plaintiffs'.

THE COURT: Okay. Let's be mindful of your time because.

MR. SANTISI: How many minutes do I have?

THE COURT: 2 minutes -- 3.

MR. SANTISI: 3. Okay. Ms. Daley quoted **General Mills**. It's also instructive for another reason. I only have the slip opinion. **General Mills Inc. vs. Hunt Wesson**, Court of Appeals for the Federal Circuit, Docket No. 96-1238. Mr. Niro talked about doctrine of equivalents, infringement by that. This was an affirmance of summary judgment of non-infringement. And in that, the Court of Appeals for the Federal Circuit said, "With respect to infringement under the doctrine of equivalents **General Mills** had a duty to submit evidence tending to show equivalence with respect to limitations not literally met by the accused infringing device," citing **Intellecall.**

I submit to you there has been no evidence submitted by IRS of infringement by the doctrine of equivalents.

Let's go to direct infringement: Mr. Cuzzillo's demonstration here today and Mr. Kurosu's declaration, which has been filed in support of Fuji and JECS' motion, establish this: There is no injection at top dead center of any piston, there is no injection at any fixed crank angle, there is no injection at ignition, and injection does not repeat every

cycle up to about 3500 rpm. Injection point varies as a function of engine speed. Injection may occur at random crank angles depending upon the position of the crank at start-up, and injection does not occur at precisely the same crank angle used for the fuel injection timing when the fuel map was determined experimentally, as Professor Blair defined it.

It cannot happen there, if there is a random pick of which signal to use as the injection signal. One of them cannot be the signal which was used to create the base fuel map when the fuel map was determined experimentally.

These are means plus function claims, as Mr. Niro explained. Means plus function means you must look to what was disclosed in the specification and equivalents thereof.

As to the predetermined cyclically repeating state, the only three examples given in the specification and discussed in the prosecution were at ignition, at top dead center, or a fixed number of degrees crank angle.

There is none of that in the Polaris engine supplied by Fuji and JECS, and the manner in which the Fuji and JECS engine injects fuel is not equivalent to one of those fixed points. It varies as a function of rpm. It's a random selection at start-up, depending upon the position of the crank; and more importantly, up to a significant rpm range past idle, up to 3800 rpm, it injects on alternate cycles, rather than every revolution.

THE COURT: One minute.

MR. SANTISI: Briefly on the so-called "prime" issue, I direct your attention to Mr. Kurosu's declaration of record here, paragraphs 37 to 43, where he quite carefully explains -- and this is not controverted by any evidence from IRS -- that the cold start system is temperature dependent only; rpm is not a factor in whether an enriched fuel supply is used.

There are three fuel maps: a cold fuel map, a restart map, and the regular base fuel map. Depending on the sensed engine temperature, the CPU selects the appropriate map and issues the appropriate signal. It is not dependent on rpm. It is dependent only on throttle position. It is dependent only on sensed temperature.

I think I have made it. Right?

THE COURT: Well, one minute over. We'll give the extra minute to plaintiffs, also.

Nine minutes.

REBUTTAL ARGUMENT

MR. RAYMOND NIRO: Thank you, your Honor. I appreciate that. I'll try not to speed through this.

I feel as though I'm responding to a shotgun pattern approach to this.

I first want to start with **General Mills**. New case, just given to us on Friday. **General Mills** is a good example of the overstatement of these folks on the other side of this

room, and I'll tell you why: **General Mills** had a claim that said you had to do something throughout the entire cooking cycle. There is no claim like this here. To suggest that **General Mills** says and overrules established Federal Circuit law that says, "If you infringe part of the time, you infringe," is wrong. And they're inviting reversible error by pointing this court to a case that has a specific claim limitation. And it's at page 6 of that opinion where it says the Claim 7 requires a susceptor that resides proximally adjacent to the surface of a food item throughout the entire cooking process.

You have an express limitation. That's a different situation than what's here. Clearly, they know that. To suggest that case controls this court's decision on whether or not when they operate at 3800 or above or 3800 or below that there is no infringement is, we would say, ridiculous. They couldn't sell a snowmobile if it only operated at 3800 rpm, and they know it.

There is infringement because they use the invention.

Claim 1: Mr. Bianco said we didn't know in 1990 what was going to happen during reexamination that they initiated; that is, Polaris. And Polaris and Fuji are together in this case because Fuji makes the engines.

Claim 1 of the '803 patent didn't change, not one word, not one sentence, not one limitation, not one expression,

not one amendment. From 1990 all the way through the reexamination process, it wasn't amended to distinguish Okumura, it wasn't amended to distinguish the prior art. It stayed the same, exactly the same as when the Japanese engineers examined that claim and determined as people of ordinary skill in the art what it meant, concluding that they infringe.

They now for the other patent want to add the words "power latch." The Court can search through the entirety of that patent for power latch words and limitations. They're not there. They create straw men; and then they say, Oh, by the way, this somehow means we don't infringe.

Dr. Blair: They take a file history that is filled with expressions and statements and characterizations and they try to blow it down to just a couple of points; but in doing so, they distort the real meaning of what happened in the prosecution history. Dr. Blair filed a nine-page affidavit in the second affidavit he filed. He was talking about one embodiment when he made the comments that they refer to, a top dead center or crankshaft angle type of predetermination. And the examiner recognized right up front the difference between having predetermination of the same point or the same state. And the word "state" becomes extremely important. It's not the same point on the crank case, it's the state or occurrence, the event.

And the examiner, who looked at the totality of what was said in the file history: This is what is said by the applicant: "Detecting a variable crank angle position where the pressure in the crank case meets certain instantaneous criteria is not the same or even similar to applicant's apparatus for sensing each occurrence of a predetermined and cyclically repeating state such as, for example, the point where ignition takes place or top dead center or some number of degrees ahead of top dead center or options, decisions to be made."

What happens? Dr. Blair in the portions of his affidavit that they don't cite -- he says, "Chasteen does precisely what Okumura says is impossible; that is, Chasteen injects fuel at a predetermined recurring fixed point in the cycle such as, for example, at ignition," precisely what they do.

Okumura distinguishes by Dr. Blair in a different portion of this nine-page affidavit: The Okumura principle of using crank chamber back pressure as a base parameter for controlling fuel flow actually teaches away from the Chasteen combination; and the examiner himself says, "Chasteen argues that predetermined cyclically repeating state means, for example, the point where ignition takes place or top dead center or some number of degrees ahead of top dead center. His disclosure supports that argument. Okumura does not teach this

or render it obvious."

The patent examiner himself is concluding that he understands the argument that's made; and it's not what they're saying to you today, your Honor.

You have to look at the entire prosecution history, if you're going to use the prosecution history to interpret the words. And it's not how I define "predetermined." It's not how anyone defines it except the plain meaning of those words as understood in the context of this invention.

If "predetermined" means what it says; that is, you pick an event and that event is predetermined, as Mr. Cuzzillo says, in advance, the charge coil pulse, an event, which is cyclically repeating and decided in advance, just like the examiner said and just like the patent says, that's it. Claim 1 -- or Claims 2, 3 and 4 are infringed.

And I point the Court's attention to what's said in the patent itself: "Thus, for example, in a three-cylinder engine, the CPU would respond to only the first injection coil pulse in each three-pulse set associated with a complete engine revolution."

THE COURT: I think it says ignition.

MR. RAYMOND NIRO: Ignition. Sorry, your Honor. It does say ignition. I'm saying "injection" instead of "ignition," for which I apologize. But that's precisely what the test that was performed, what this court does. Exactly the

same thing. And that's at Column 9 beginning at line 35.

The Court obviously has the obligation to interpret the claims. That's a question of law. The two-step process is that once the claims are interpreted, the jury or the fact-finder determines them as a matter of fact. It compares how the claims are interpreted with what the accused device is.

Here, the defendants did the comparing first. They admitted it twice. Those admissions, as the Federal Circuit has said in the **Auld** case, can't just be withdrawn. You can't in summary judgment make an admission, somebody relies on it, and then you turn around and say in an affidavit later, Oh, I didn't mean that.

The **Auld** case, we commend the Court's attention to, because it deals with precisely this kind of situation where in hindsight they say, I didn't mean to say what I said.

Your Honor, I think I have about a minute or two minutes. We've had a witness come here from Wisconsin. I'd like to ask him three or four questions, if the Court would permit me to do it.

THE COURT: And this is in rebuttal?

MR. RAYMOND NIRO: And it is rebuttal. It's Dr. Martin.

THE COURT: All right. Come on up.

His résumé has been shared with --

MR. SANTISI: We get an opportunity to cross-examine?

THE COURT: They should allow you sufficient time to cross-examine.

MR. RAYMOND NIRO: We'll do that, your Honor.

THE COURT: Two minutes.

MR. RAYMOND NIRO: Two minutes.

(Jay Martin was sworn.)

THE COURT: Have a seat.

DIRECT EXAMINATION

BY MR. RAYMOND NIRO:

Q. You're a professor of mechanical engineering at the University of Wisconsin; is that correct?

A. Yes.

THE COURT: First name, please.

THE WITNESS: Jay. Jay Martin.

BY MR. RAYMOND NIRO:

Q. Have you a Ph.D. in mechanical engineering?

A. That's correct.

Q. And you're the inventor of three patents in the engine field?

A. That's right. That's correct.

Q. And director of the Engine Research Center --

A. I'm one of the directors.

Q. -- at the University of Wisconsin?

A. Yes.

Q. And you do work on small engine design and testing; is that

correct?

A. Yes.

Q. Were you here today when Mr. Cuzzillo testified?

A. Yes, I was.

Q. Have you studied the Okumura patent?

A. Yes, I have.

Q. Now, is the Polaris engine that you understand, based upon the testimony you heard from Mr. Cuzzillo, like the Okumura patent, or like the predetermined cyclically repeating occurrence that's set forth in the patent in suit?

MR. SANTISI: I object, your Honor. Two grounds: (1) The Okumura patent is not relevant to your determination of interpreting the claim; (2) the stipulation specifically said that the experts that were going to come testify were not going to testify about claim language. He's asking him about claim language.

THE COURT: I think the objection must be sustained.

BY MR. RAYMOND NIRO:

Q. Let me ask you a different question: Did you hear Mr. Cuzzillo testify about the charge coil?

A. Yes, I did.

Q. Is that related in any way to ignition?

A. Yes, it is.

Q. How?

A. It's the beginning of the ignition sequence.

Q. And is that charge coil pulse predetermined?
A. Yes, it is.
Q. Can you explain why?
A. It's fixed by the system, as you can -- as has been demonstrated up here; and they have a couple of the parts of that part of the ignition system. The overall charging and ignition system, yes.
Q. And now, is there any difference between the way the Polaris engine operates and the way the engine described in the patent operates? And that's the '803 patent.
MR. SANTISI: Excuse me, your Honor. That's the ultimate issue for you to determine. And this witness should not be asked to give you an opinion of whether there is an infringement or not an infringement.
THE COURT: If you're asking him whether it infringes, then the objection is proper.
MR. RAYMOND NIRO: I'm not asking that question. I'm asking about the description in the patent, and I'm not asking you to make a determination.
THE COURT: Why don't you restate the question.
You are over, and I'm going to give the time to the defendant to cross-examine, but --
MR. RAYMOND NIRO: Your Honor, I have about three more questions, if you --
THE COURT: You started with two, and you're now up to

three.

MR. RAYMOND NIRO: I guess I'm accelerating, and I apologize for that.

THE COURT: Why don't you ask a last question and then we'll hear cross and finish this up.

BY MR. RAYMOND NIRO:

Q. Did you hear Mr. Bianco say that you can always ask any engineer to predetermine how much he can inject? Did you hear that?

A. Yes, I did.

Q. Is that statement correct?

A. No, it isn't.

Q. Why not?

A. Because there are systems out there, for example, the typical system on an automobile, where the decision on how much fuel to inject is actually controlled by sensors that are -- by sensing that is occurring within that engine cycle. That's really where the difference is between that kind of technology and what's in this patent.

MR. RAYMOND NIRO: Thank you. Nothing further.

THE COURT: Cross-examination, please.

Plaintiff went over almost 3 minutes, so you can add 3 minutes for cross.

CROSS-EXAMINATION

BY MR. SANTISI:

Q. Dr. Martin, when Mr. Niro asked you whether the signal that is used there is predetermined, what definition of "predetermined" did you use in your answer?

MR. RAYMOND NIRO: Aren't we doing exactly what was objected to?

MR. SANTISI: No. That's in his answer.

THE COURT: He's asking him to explain his answer.

Go ahead.

THE WITNESS: When I referred to "predetermined" in that case, what I was talking about was an engineer or whoever is the engine designer making a decision ahead of time.

BY MR. SANTISI:

Q. Thank you.

Have you had an opportunity in preparing for your testimony to review the prosecution history of the '803 patent?

A. No.

Q. Does the definition of "predetermined" that you use comport with the description of how "predetermined" was used that Mr. Bianco said?

MR. RAYMOND NIRO: Your Honor, we're beyond the scope of the stipulation. We were precluded from getting into these very kinds of issues.

I have numerous questions to ask him on that subject which I didn't get because of the objection on "you can't get into the prosecution history."

MR. SANTISI: I didn't get into the prosecution history. I asked him if he paid attention to what Mr. Bianco was explaining.

THE COURT: Let's just find out if he heard the explanation of the history.

MR. SANTISI: Right.

THE COURT: I think you were in the courtroom.

THE WITNESS: I did hear the explanation, yes.

BY MR. SANTISI:

Q. Does your definition of "predetermine" comport with the explanation that Mr. Bianco gave?

THE COURT: Are you talking about Mr. Bianco, or Mr. Hanes?

MR. SANTISI: Mr. Bianco quoting Mr. Hanes and Dr. Blair.

THE WITNESS: I believe -- this question is kind of tough to me to answer because I don't -- I'm not really familiar with all of what's occurred here.

BY MR. SANTISI:

Q. Thank you. That's a good answer.

In answer to the question does the signal from the charge coil -- is that related to ignition, your answer was?

A. Yes, it is.

Q. Okay. From the charge coil -- and I'm assuming that we're talking about the same thing. What do you mean when you say

"charge coil"?

A. Well, when I talk about charge coil, it's one of the -- I think it's one of the six coils or so that are down there in that apparatus.

Q. All right. What happens to that signal before it becomes an ignition signal in this engine? Do you understand?

A. Yes, I think I understand. It goes to the -- I assume that that signal goes to the capacitive discharge system.

Q. Typically, how low a voltage is the signal coming from a charge coil?

A. About 300 volts.

Q. And how many volts do you need to fire a spark plug?

A. Well, there is two different issues. How many volts do you need to fire a spark plug? That depends upon what the spark gap is, what the environmental conditions are.

Q. Typically, is it in the range of about 30,000 volts?

A. Oh, no. It doesn't have to be. It can be much less than that.

Q. Do you know what it is for that spark plug?

A. I have an idea.

Q. What is your idea?

A. Somewhere about 25- to 30,000 volts.

Q. Thank you.

And that is an ignition signal, isn't it?

A. Which?

Q. The 30,000 volts signal?
A. Let's see. I would call that the ignition -- well, it's the electrical signal that's going to produce ignition, yes.
Q. Thank you.
And the 300-volt signal cannot fire that spark plug, could it?
A. No, but the -- of course, the ignition --
Q. Excuse me. That's the answer to my question.
THE COURT: Well, let him finish his answer.
Go ahead.
THE WITNESS: I was going to say that ignition could not occur in this case without the charge coil.
BY MR. SANTISI:
Q. But a 300-volt signal could not ignite a spark plug. Do you agree?
A. As a matter of fact, you can get a spark with 300 volts.
Q. That spark plug, because that's the one at issue -- would you tell me that that spark plug could be ignited with 300 volts?
A. Again, I think what we're probably arguing about is what the definition of "ignition" is.
Q. What is your definition?
A. Could I initiate a flame with 300 volts? Absolutely.
Q. Through that spark plug that's used on those Fuji engines?
A. To be honest, I don't know about that particular spark

plug.

MR. SANTISI: Thank you. No further questions, your Honor.

THE COURT: Thank you, and you've used your time, and everyone has used your time.

And thank you. You may step down.

And this court is going to take into very serious consideration what I've heard today from both sides; and I will either let the local counsel know to come in for me to verbally, orally give you a decision, or else I will put it in writing. And I'll try to do it soon. I'm not going to make any real promise, but I will try to get it done -- let's see. When is our trial date on this case?

MR. RAYMOND NIRO: April 7, your Honor.

THE COURT: We'll try to get this done in February.

Let me just clarify: How does my ruling -- does my ruling on today's motions affect the time of the trial?

MR. RAYMOND NIRO: It could, your Honor. It depends, of course, on what the ruling is. In the event that you ruled that there is either infringement or there is not infringement; that is, you collapse the interpretation and comparison into one, then it will shorten the trial. If you conclude that the claims can be interpreted but the question of comparison has to be left to the jury, then it would seem that it probably will not shorten the trial. That would be my view of it.

THE COURT: You agree?

MR. SANTISI: Yes. I was waiting for him to say the last thing.

THE COURT: Thank you very much.

MR. RAYMOND NIRO: Thank you, your Honor.

THE COURT: And we're in recess, and I will certainly let you folks know.

(Recess at 4:32 p.m.)

* * * * *

# INDEX


| Item | Page |
|---|---|
| OPENING STATEMENTS | |
| By Mr. Raymond Niro | 14 |
| By Mr. Bianco | 95 |
| WITNESSES | |
| Ronald Chasteen | |
| Direct Examination by Mr. Raymond Niro | 30 |
| Voir Dire Examination by Mr. Bianco | 37 |
| Direct Examination Continued by Mr. Raymond Niro | 41 |
| Cross-examination by Mr. Bianco | 61 |
| Cross-examination by Ms. Daley | 76 |
| Redirect Examination by Mr. Raymond Niro | 83 |
| Bernard Cuzzillo | |
| Direct Examination by Mr. Santisi | 98 |
| Voir Dire Examination by Mr. Raymond Niro | 98 |
| Direct Examination Continued by Mr. Santisi | 100 |
| Direct Examination by Ms. Daley | 122 |
| Cross-examination by Mr. Raymond Niro | 125 |
| Jay Martin | |
| Direct Examination by Mr. Raymond Niro | 173 |
| Cross-examination by Mr. Santisi | 176 |
| PLAINTIFFS' ARGUMENT | 85 |
| DEFENDANTS' ARGUMENT | 143 |
| PLAINTIFF'S REBUTTAL ARGUMENT | 167 |

**REPORTER'S CERTIFICATE**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Dated at Denver, Colorado, this 3d day of January, 1997.

Paul A. Zuckerman