UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

REPORT AND RECOMMENDATION

* * * * * * * * * * * * * * * * * * *

Arctic Cat, Inc., a Minnesota Corporation,

Plaintiff,

vs.

Injection Research Specialists, Inc., a Colorado corporation, and Pacer Industries, Inc., a Missouri corporation,

Defendants.

and

Injection Research Specialists, Inc., a Colorado corporation, and Pacer Industries, Inc., a Missouri corporation,

Counterclaimants,

vs.

Arctic Cat, Inc., a Minnesota corporation, and Suzuki Motor

Corporation, a Japanese
Corporation,

Counterdefendants. Civ. No. 01-543 (MJD/RLE)

* * * * * * * * * * * * * * * * * * *

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the parties:

1. The Motion of Arctic Cat, Inc. ("Arctic Cat"), and Suzuki Motor Corporation ("Suzuki"), for Partial Summary Judgment Based on Res Judicata and Legal Estoppel.

2. The Motion of Arctic Cat for Partial Summary Judgment on Invalidity and Non-Infringement of the '374 Patent.

3. The Motion of Arctic Cat and Suzuki for Summary Judgment on Champerty and Maintenance Grounds.

4. The Motion of Injection Research Specialists, Inc., and Pacer Industries, Inc., (herein collectively referred to as "IRS") for Summary Judgment Concerning Obviousness Contentions on which Plaintiffs' Experts Rendered No Opinion.

5. The Motion of IRS for Summary Judgment that the Bench Systems Developed by Cuyuna Engine

Company and Arctic Cat do not Anticipate Any Claim of the ‘803 Patent.

6. The Motion of Arctic Cat and Suzuki for Summary Judgment on the Invalidity of the ‘803 Patent Under Title 35 U.S.C. §102(b).

7. The Motion of Arctic Cat and Suzuki for Summary Judgment on the Basis of Equitable Estoppel and Laches.

8. The Motion of Arctic Cat for Partial Summary Judgment on IRS’s Claims of Willful Infringement, and IRS’s Motion for Partial Summary Judgment on Willfulness.

On April 5, 2004, the Court heard argument on the Motions, at which time, Arctic Cat appeared by Annamarie A. Daley, and Andrew W. Horstman, Esqs.; Suzuki appeared by Thomas H. Jenkins, and William F. Forsyth, Esqs.; and IRS appeared by Anthony de Alcuaz, and Robert J. Blanch, Esqs.

For reasons which follow, we recommend that the Motion of Arctic Cat and Suzuki for Partial Summary Judgment Based on Res Judicata, and Legal Estoppel, be denied insofar as it is based on res judicata, but we recommend the grant of the Motion on the basis of legal estoppel, and we recommend that all of the other Motions be denied, with the exception of Arctic Cat’s Motion for Partial Summary Judgment on IRS’s claims of Willful Infringement, which we recommend be granted.

## II. Factual and Procedural Background

Arctic Cat is a manufacturer of snowmobiles, while Suzuki is a manufacturer of engines which, with regularity, are employed in snowmobiles. Suzuki supplied Arctic Cat with engines for use in Arctic Cat's snowmobiles. IRS claims that the Arctic Cat snowmobiles, which were equipped with Suzuki engines, infringe IRS's patents.

One of the patents, which is at issue in this litigation, is United States Patent No. 34,803 (the "'803 Patent"), which was issued on December 6, 1994, and which is a reissue of United States Patent No. 4,901,701 (the "'701 Patent"). Also at issue is United States Patent No. 5,813,374 (the "'374 Patent"), which was issued on September 29, 1998, and which claims priority, as a continuation of the '803 Patent. The '374 Patent contains broader claims than the '803 Patent. United States Patent No. 6,062,202 (the "'202 Patent"), which was issued on May 16, 2000, is a continuation of the '374 Patent. All of the patents cover electronic fuel injection ("EFI") systems.

In addition, United States Patent No. 34,079 (the "'079 Patent") is also involved in the case. The '079 Patent is a reissue of United States Patent No. 5,024,205 (the "'205 Patent"). The '079 Patent is directed to a narrow improvement in EFI systems -- specifically, a battery conservation circuit that disconnects the battery from the

electronic control unit ("ECU") of the EFI system, if the ECU determines the battery voltage is falling low.

In 1990, IRS filed suit against Polaris Industries ("Polaris"), Fuji Heavy Industries, Ltd. ("Fuji") -- which was Polaris's engine supplier -- and Unisia JECS Corporation ("JECS") -- which was the company that supplied an EFI system to Fuji, for use in the Polaris snowmobiles. In that suit, which the parties refer to as the "Polaris Litigation," IRS alleged that Polaris, and Fuji, had misappropriated IRS's trade secrets and that Polaris, Fuji, and JECS, infringed the '701 and '205 Patents. The suit was stayed during the reissue proceedings that involved the '701 and '205 Patents, which resulted in the issuance of the '803, and the '079 Patents.

After that reissuance, the Court granted Summary Judgment in favor of Polaris, Fuji, and JECS, on the patent infringement claims, finding that none of those entities had infringed the '803 or the '079 Patents. The trade secret claims went to Trial, at which IRS ultimately succeeded, and was awarded a Verdict of approximately $44.6 million. JECS also supplied Suzuki with EFI systems for use in Suzuki engines, which were, in turn, installed in Arctic Cat's snowmobiles. JECS is not, however, the only supplier of EFI systems to Suzuki for use in the Arctic Cat snowmobiles.

While the Polaris suit was pending, IRS wrote to Arctic Cat, accusing it of infringing the '803 Patent, and notifying Arctic Cat that IRS would, "no later than conclusion of the Polaris litigation, [ ] bring suit against [Arctic Cat] for infringement of the '803 patent claims, and for other causes of action based on misuse by [Arctic Cat] of the information supplied by IRS in 1988 and 1989." Arctic Cat, Inc. v. Injection Research Specialists, Inc., 2001 WL 1628634 at *1 (D. Minn., September 12, 2001)(Order denying IRS's Motion to Dismiss), quoting Doscotch Declaration, Exhibit 8. IRS did bring suit against Arctic Cat, alleging claims of trade secret misappropriation and fraud. However, no patent infringement claims were asserted against Arctic Cat. Arctic Cat was granted Summary Judgment in that case, and the case was dismissed.

On March 28, 2001, Arctic Cat initiated this action which seeks a Declaratory Judgment for non-infringement and invalidity of the '803 Patent, and the '374 Patent. On September 26, 2001, IRS filed Counterclaims alleging infringement of the '803 Patent against both Arctic Cat and Suzuki. Also on September 26, 2001, IRS applied for a reissue of the '374 Patent in the United States Patent and Trademark Office.

We reserve further, more elaborate, discussion of the factual and procedural background of the parties' claims, and defenses, for recitation as appropriate in the

context of each individual Motion, for the pertinent background information varies according to the Motion under consideration. Consequently, with the foregoing as a backdrop, we turn to the merits of the parties' Motions.[1]

III. Discussion

A. The Motion of Arctic Cat and Suzuki for Partial Summary Judgment Based on Res Judicata and Legal Estoppel.

Arctic Cat and Suzuki argue that IRS's claims for infringement of the '803 Patent, which covers certain EFI systems, are barred by the doctrines of res judicata, and legal estoppel, because IRS previously litigated claims for infringement of the '803 Patent against Polaris, Fuji, and JECS, in the Polaris Litigation.

[1]The standard of review we apply to Summary Judgment Motions has been consistently, and repeatedly stated. See, e.g., North Star Mutual Ins. Co. v. Zurich Ins. Co., 269 F. Supp.2d 1140, 1141 (D. Minn. 2003); Medalen v. Tiger Drylac U.S.A., Inc., 269 F. Supp.2d 1118, 1121-22 (D. Minn. 2003); Rosati v. Cleveland Cliffs, Inc., 259 F. Supp.2d 861, 867-68 (D. Minn. 2003). Succinctly stated, the question before the Court "is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 565 (8th Cir. 2000). For these purposes, "[t]he non-moving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record," and "[t]he non-moving party may not merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial." Id. at 565-66 [citations omitted].

On June 28, 1990, IRS sued Polaris, which is a snowmobile manufacturer, and a direct competitor to Arctic Cat, in the United States District Court for the District of Colorado. IRS subsequently added Fuji, which supplied engines to Polaris, and JECS which, in turn, supplied EFI systems to Fuji. As noted, JECS also supplies EFI systems to Suzuki for use in Arctic Cat's snowmobiles.

In the Polaris Litigation, on February 11, 1997, the Court granted JECS Summary Judgment on IRS's claims for infringement of the '803 Patent, concluding that the JECS EFI systems did not infringe the '803 Patent. Declaration of Jill Kastner in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibit 6. On February 19, 1997, IRS moved to sever, and stay, all of the remaining patent issues, from IRS's claims of trade secret misappropriation. On March 13, 1997, the Court granted IRS's Motion to sever and stay IRS's trade secret claims, which were asserted against Polaris and Fuji, but not against JECS, and the trade secret claims proceeded to Trial. On April 25, 1997, the Jury returned a Verdict favorable to IRS.

After the Jury rendered its Verdict, the parties filed several post-Judgment motions, appeals, and cross-appeals. IRS gave notice that it intended to appeal the

Court's Order of February 11, 1997, which granted Summary Judgment on the issue of infringement, and which dismissed IRS's claims for infringement of the '803 Patent. However, on August 4, 1997, IRS stipulated to a covenant not to sue Polaris, Fuji, and JECS, for infringement of the '803 Patent. Thereafter, on August 28, 1997, the Court issued an "Order Correcting Amended Judgment," in which the Court observed that "it appears that the parties have stipulated to a dismissal with prejudice of all remaining claims on the patent issues, including defendants' declaratory judgment counterclaims for invalidity and unenforceability." Declaration of Jill Kastner in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibit 13. The Court then dismissed all of the patent claims with prejudice.[2]

Since JECS was the manufacturer of the EFI systems which IRS alleged as infringing the '803 Patent in the Polaris Litigation, and because JECS is also the

---

[2]The Polaris Court first entered final Judgment on May 5, 1997, but amended its Order on July 24, 1997, and again, on August 28, 1997. See, Declaration of Jill Kastner in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibits 9 & 10.

manufacturer of some of the EFI systems that are used in Suzuki engines for installation in Arctic Cat snowmobiles, Arctic Cat and Suzuki argue that IRS's claims of infringement, with respect to their use of JECS's EFI systems, are barred by the doctrine of res judicata. In addition, Arctic Cat and Suzuki argue that, by granting JECS a covenant not to sue in the Polaris Litigation, IRS authorized JECS's sales of its EFI systems to its customers, including Suzuki and Arctic Cat. Arctic Cat and Suzuki further assert that those authorized sales exhausted IRS's patent rights. As such, Arctic Cat and Suzuki argue that IRS is legally estopped from challenging JECS's sales of EFI systems to them. We first consider the argument of Arctic Cat, and Suzuki, that IRS's claims for infringement of the '803 Patent are barred by the doctrine of res judicata.[3]

1. Res Judicata. "'Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" Gurley v. Hunt, 287 F.3d 728, 731 (8th Cir. 2002), quoting Allen v. McCurry, 449 U.S. 90, 94 (1980). "The test applied to

---

[3]Notably, we recognize that the JECS is not the only supplier of EFI systems to Suzuki and Arctic Cat, but this Motion applies only to IRS's claims for infringement as to those products of Suzuki, and Arctic Cat, that employ JECS's products.

determine whether res judicata bars litigation of a claim is: (1) whether the prior judgment was rendered by a court of competent jurisdiction; (2) whether the judgment was a final judgment on the merits, and (3) whether the same cause of action and same parties or their privies were involved in both cases." Id., citing De Llano v. Berglund, 183 F.3d 780, 781 (8th Cir. 1999); see also, Leonard v. Southwestern Bell Corp. Disability Income Plan, 341 F.3d 696, 701 (8th Cir. 2003); Canady v. Allstate Ins. Co., 282 F.3d 1005, 1014 (8th Cir. 2002); Black Clawson Co., Inc. v. Kroenert Corp., 245 F.3d 759, 762 (8th Cir. 2001); Lundquist v. Rice Memorial Hosp., 238 F.3d 975, 977 (8th Cir. 2001).

There is no dispute that the United States District Court for the District of Colorado is a Court of competent jurisdiction. IRS argues, however, that the Colorado Court's grant of Summary Judgment was not a final Judgment on the merits. IRS also argues that Arctic Cat and Suzuki were not parties to the Polaris Litigation, and that the accused products, in the Polaris Litigation, were not the same as the Accused Products in this action. We first address IRS's contention that there was no final Judgment on the merits.

a. Final Judgment on the Merits. IRS contends that, by the time that final Judgment was entered in the Polaris Litigation, on August 28, 1997, the

patent claims were no longer in the case. IRS contends that its covenant not to sue JECS, with respect to the patent claims, which was filed in the Polaris Litigation on August 4, 1997, divested the Court of jurisdiction over the subject matter of the covenant -- namely, IRS's claim for patent infringement of the '803 Patent. Thus, IRS argues that no final Judgment on the merits was entered on the patent claims.[4]

Although IRS contends that the Colorado Court's final Order -- the Order of August 28, 1997, Correcting Amended Judgment -- dismissed the patent claims for lack of jurisdiction, that Court did not state in its short, two-page Order, that it lacked subject matter jurisdiction over any claim. Rather, the Court merely stated that "[i]t

---

[4]IRS cites Mann Design Ltd. v. Bounce, Inc., 138 F. Supp.2d 1174, 1178 (D. Minn. 2001), for the proposition that a covenant not to sue divests a Court of jurisdiction over the claims covered by the covenant. Id. ("The Federal Circuit has held that 'a patentee defending against an action for a declaratory judgment of invalidity can divest the trial court of jurisdiction over the case by filing a covenant not to assert the patent at issue against the putative infringer.'"), quoting Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1058 (Fed. Cir. 1995). While we do not quarrel with IRS's cited proposition of law, whether the Court was divested of jurisdiction over the patent claims covered in the covenant not to sue is irrelevant to our determination of whether the Colorado Court's Order of February 11, 1997, which granted Summary Judgment against IRS, on IRS's claims for infringement of the '803 Patent, constituted a final Judgment on the merits. To be sure, IRS did not file its covenant not to sue until August 4, 1997, and therefore, the Court clearly had jurisdiction over the claims at the time that the Court granted JECS's Motion for Summary Judgment.

appears that the parties have stipulated to a dismissal with prejudice of all remaining claims on the patent issues, including defendants' declaratory judgment counterclaims for invalidity and unenforceability." See, Declaration of Jill Kastner in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibit 13. The Court then directed that all of the patent claims be dismissed with prejudice. Id.

Further, while we agree with IRS, that the Colorado Court's Order of February 11, 1997, which granted JECS Summary Judgment on IRS's claims of infringement, and which found that the JECS's EFI systems did not infringe the '803 Patent, did not become a final Judgment on the merits until the Court entered its Order of August 28, 1997, we do not accede to IRS's view that, by granting JECS a covenant not to sue, after the Colorado Court had twice entered final Judgments, and then twice amended its final Order, the Judgment that JECS's EFI systems did not infringe the '803 Patent was not a final Judgment on the merits. See, Hartley v. Mentor Corp., 869 F.2d 1469, 1472 (Fed. Cir. 1989)("[A] stipulated final judgment may rest in part on a court's rulings during the course of a trial and in part on the agreement of the parties," and "[t]hus, that a judgment is entered by stipulation does not in and of itself remove the

effect of a court's prior determination of specific issues in the litigation.")[emphasis in original].

Moreover, as our Court of Appeals has explained, "[w]hen the parties to a previous lawsuit agree to dismiss a claim with prejudice, such a dismissal constitutes a 'final judgment on the merits' for purposes of res judicata." Larken, Inc. v. Wray, 189 F.3d 729, 732 (8th Cir. 1999), citing Chase Manhattan Bank, N.A. v. Celotex Corp., 56 F.3d 343, 345 (2nd Cir. 1995)(voluntary dismissal with prejudice); Brooks v. Barbour Energy Corp., 804 F.2d 1144, 1146 (10th Cir. 1986); Clark v. Haas Group, Inc., 953 F.2d 1235, 1238 (10th Cir. 1992)("[S]tipulated, voluntary dismissal of [the plaintiff's] first suit, approved by the court with prejudice, was a judgment on the merits" for res judicata purposes.), cert. denied, 506 U.S. 832 (1992); see also, Black Clawson Co., Inc. v. Kroenert Corp., supra at 763 ("[T]he settlement agreement has the effect of a final judgment on the merits of the case."); Plotner v. AT & T Corp., 224 F.3d 1161, 1169 (10th Cir. 2000); but see, In re Piper Aircraft Distribution Sys. Antitrust Litig., 551 F.2d 213, 219 (8th Cir. 1977)(res judicata and collateral estoppel generally inapplicable to voluntary dismissal without prejudice). As a consequence, even if we were to agree with IRS's proposition that, by granting JECS a covenant not to sue, the Colorado Court was divested of jurisdiction over the patent claims, the

covenant not to sue, and the stipulated dismissal with prejudice, to which the Colorado Court referred in its Order of August 28, 1997, constitute a final Judgment for purposes of res judicata.

IRS also argues that, to apply the doctrine of res judicata to the Colorado Court's Order of February 11, 1997, which granted Summary Judgment to JECS, would be against public policy because it would require parties to continue to litigate an action even after a favorable Verdict or a final settlement. Given the policy rationales for the doctrine of res judicata -- namely, to prevent the relitigation of issues that have already been decided -- IRS's public policy rationale is hollow. See, Foster v. Hallco Manufacturing Co., Inc., 947 F.2d 469, 475-76 (Fed. Cir. 1991)("The principles of law denominated 'res judicata' embody the public policy of putting an end to litigation."). The doctrine of res judicata serves to protect the defendants, against whom claims are made, from having to defend the same claims, again, after a final Judgment has been rendered. If settlements were not given res judicata effect, then parties would be loathe to settle patent claims, which would run contrary to the strong public policy interest in the early settlement of patent litigation. Id. at 477 ("[T]he Federal Circuit has repeatedly expressed the view that there is a strong public interest in settlement of patent litigation," and "[a] binding consent judgment

encourages patent owners to agree to settlement and to remove its force would have an adverse effect on settlement negotiations.”).

Lastly, while IRS argues that Arctic Cat and Suzuki were not parties in the Polaris litigation, that inquiry has no bearing on our determination of whether a final Judgment on the merits was rendered in the Polaris Litigation as to some party -- namely, JECS. Accordingly, we find that there was a final Judgment on the merits in the Polaris Litigation on the claim as to whether the JECS EFI systems, that were installed in the Fuji engines, infringed the ‘803 Patent. As a result, we turn to consider whether IRS’s claims against Arctic Cat, and Suzuki, constitute the same cause of action against the same parties, or their privies, as IRS’s infringement claims against JECS in the Polaris Litigation.

b. Same Cause of Action. While the technology at issue in both this action, and in the Polaris Litigation -- as reflected in the ‘803 Patent -- is the same, and the legal basis for IRS’s claim of infringement of the ‘803 Patent is also the same, IRS contends that, because the JECS EFI systems, that were alleged to infringe the ‘803 Patent in the Polaris Litigation, differ from the JECS EFI systems that are used by Arctic Cat and Suzuki, and which are the Accused Products in this action, the

claims asserted here do not constitute the same cause of action for res judicata purposes. We agree.

"‘"When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar * * * the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose."’" Murphy v. Jones, 877 F.2d 682, 684 (8th Cir. 1989), quoting Poe v. John Deere Co., 695 F.2d 1103, 1106 (8th Cir. 1982), quoting in turn, Restatement (Second) of Judgments §24(1) (1982). "What constitutes a 'transaction' or 'series of connected transactions' is '"to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."’" Id., quoting Poe v. John Deere Co., supra at 1106, quoting in turn, Restatement (Second) of Judgments § 24(2) (1982). "Put another way, whether two claims are the same for res judicata purposes depends on whether the claims arise out of the same nucleus of operative fact or are based upon the same factual predicate." Id. at 684-85, citing Hufsmith v. Weaver, 817 F.2d 455, 461 (8th Cir. 1987); Ruple v. City of Vermillion,

714 F.2d 860, 861 (8th Cir. 1983), cert. denied, 465 U.S. 1029 (1984). If the elements of res judicata are satisfied, "the parties are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" Lundquist v. Rice Memorial Hosp., supra at 977.

In considering whether subsequent patent litigation, involving claims of infringement against purportedly different accused products, is subject to the constraints of res judicata, the Federal Circuit Court of Appeals, in Foster v. Hallco Manufacturing Co., Inc., supra at 479, reasoned, as follows:

> "With respect to patent litigation, we are unpersuaded that an "infringement claim," for purposes of claim preclusion, embraces more than the specific devices before the court in the first suit. Adjudication of [liability for] infringement is a determination that a thing is made, used or sold without authority under the claim(s) of a valid and enforceable patent. Thus, the status of an infringer is derived from the status imposed on the thing that is embraced by the asserted patent claims, the thing adjudged to be infringing."

Id., quoting Young Engineers, Inc. v. United States International Trade Commission, 721 F.2d 1305, 1316 (Fed. Cir. 1983).

The Court then observed that, "for claim preclusion to apply here, the devices in the two suits must be essentially the same." Id. at 479-80; see also, Realex Chemical Corp. v. S.C. Johnson & Son, Inc., 849 F.2d 299, 303 (8th Cir. 1988)("[W]hile the

theory of recovery, i.e., infringement under the Lanham Act may be the same, the basis for plaintiff's claim is completely different -- a newly designed label used on an entirely different product."); Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1324 (Fed. Cir. 1987)("The district court found that type B was not identical to either type A or type C" and, "[o]n this basis the district court correctly held that absent a prior determination of infringement with respect to type B, neither res judicata nor issue preclusion applied," for "[a] device not previously before the court, and shown to differ from those structures previously litigated, requires determination on its own facts.").[5]

Here, there appears to be no dispute that the JECS products, which were used in the Fuji engines for installation in the Polaris snowmobiles, that were at issue in the

[5]The Federal Circuit, in Foster v. Hallco Manufacturing Co., Inc., 947 F.2d 469, 475-76 (Fed. Cir. 1991), engaged in a choice of law analysis to determine whether to apply Federal Circuit law, or the law of the Circuit in which the case was venued, to the application of res judicata in the context of consent decrees holding a patent valid, given the conflicting policy rationales of seeing an end to litigation, and determining the validity of patents at the earliest opportunity. Ultimately, the Federal Circuit applied Federal law. Such a conflict is not present in this action and, at any rate, the law is the same in the Federal Circuit, and within the Eighth Circuit, as it relates to the application of res judicata to subsequent claims of infringement against similar devices made by the same manufacturer, which made products that were adjudged non-infringing in prior litigation. Thus, we need not engage in a choice of law analysis.

Polaris litigation, differ from those JECS products that are employed in the Suzuki engines for use in the Arctic Cat snowmobiles. In their joint Reply Memorandum, Arctic Cat and Suzuki concede that "[t]he JECS EFI systems sold to Fuji Heavy Industries ("Fuji") and used in Polaris snowmobiles were **admittedly different** in one respect than the JECS EFI systems sold to Suzuki and used in Arctic Cat snowmobiles." Reply Memorandum in Support of Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, at p. 1 [emphasis supplied]. Arctic Cat and Suzuki do not, however, either explain the difference, or explain the similarities between the two lines of JECS's EFI systems.

As well, in its Answer to IRS's counterclaims, Suzuki alleged, as follows:

> On information and belief, at least by October, 1998, and during the pendency of the trade secret misappropriation lawsuit, IRS and Pacer were aware that Arctic Cat considered the EFI systems on its snowmobiles to be **substantially different** from the JECS-supplied EFI system used by Polaris. IRS and Pacer also were aware at that time that the Suzuki engines sold to Arctic Cat for use in its snowmobiles included EFI systems supplied not only from JECS, but also from a second vendor, Kokusan Denki Company, Ltd.

Declaration of Jill Kastner in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibit 21 [emphasis supplied].

In addition, in their discovery responses in prior trade secret litigation, between IRS, and Arctic Cat and Suzuki, both Arctic Cat and Suzuki acknowledged that the JECS EFI systems, which were employed in the Fuji engines for use in the Polaris snowmobiles, were different from the JECS EFI systems used in the Suzuki engines for installation in the Arctic Cat snowmobiles. In its Interrogatory Responses, Suzuki responded that "SMC [Suzuki] believed that its EFI systems were substantially different from Polaris' EFI system." Id., Exhibit 16.

Similarly, in its Interrogatory Responses, Arctic Cat stated that it "believed that its EFI system was substantially different from Polaris' EFI system." Id. at Exhibit 17. Lastly, at the Hearing on the Motions, counsel for Suzuki, when asked if the products were the same, responded, as follows:

> The EFI system that JECS sold to Fuji and Polaris differs in a material respect from the EFI system sold to Arctic Cat and Suzuki and we readily admit that. So when we talk about the product being the same or when we are trying to show that there is res judicata here, the same I am talking about is the products that IRS was claiming damages on and asserted within the scope of its count against JECS included the products that JECS was selling to Arctic Cat and Suzuki. So those products are the same products that are now being accused in this case.

Transcript of the April 5, 2004 Motions Hearing, at p. 30 [Docket No. 579].

At the Hearing, seeking a clarification from Suzuki, which was largely absent from its pleadings, we asked: "But are you saying that because they offered damage figures that incorporated sales to Suzuki and Arctic Cat?" Id. Counsel for Suzuki responded: "Yes," "[a]nd they argued that they -- well, they asserted a claim in the case, they asserted a claim against the sales that JECS was making to Arctic Cat and Suzuki." Id. Seeking further clarification, we then inquired whether the claim was in Count 7 to which Suzuki had previously made reference. Suzuki again responded affirmatively, and stated: "They were clearly asserting that in the case, they made that statement very clear." Id. at 31.

In truth, however, it is not clear from IRS's Seventh Claim, in the Polaris Litigation, that it was asserting a claim against JECS for sales to Suzuki and Arctic Cat, but rather, the claim is limited to JECS's sales to Fuji. In that Seventh Claim, IRS alleged as follows:

> On information and belief, JECS manufacturers and sells to Fuji the material component parts of an electronic fuel injection system for use on and in connection with the EFI engines manufactured and sold in the United States by Fuji.

Declaration of Naoki Yoshida in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibit 2.

Thus, from the express language of that Seventh Claim, it appears that IRS was only asserting a claim against JECS with respect to its sales to Fuji, and not as to sales to Suzuki, or Arctic Cat.

Arctic Cat and Suzuki also argue that IRS sought damages for JECS's sales to Arctic Cat and Suzuki, and Arctic Cat and Suzuki point to IRS's First Set of Interrogatories to JECS, in the Polaris Litigation. In Paragraph F, in the definitions that precede the Interrogatories, IRS defined the "Accused Devices" as "the electronic fuel injection system, including all component parts, in any Polaris snowmobile and in all other makes or models of snowmobiles made, sold or being designed by any of the defendants, or containing parts made by any of the defendants." Declaration of Christopher W. Day in Support of Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibit 1.

Notably, absent from the definition of the "Accused Devices" is any mention of Suzuki, or Arctic Cat. While a reasonable interpretation of IRS's definition of the "Accused Devices" could include snowmobiles manufactured by Arctic Cat, which employed Suzuki engines, that a party -- IRS -- would seek discovery that exceeded the scope of the claims would not be a novel concept in this, or in any other litigation.

In fact, in its Responses to IRS's First Set of Interrogatories, JECS specifically objected to IRS's definition of the "Accused Devices" in the following terms:

> JECS objects to Definition F on the grounds that the inclusion of snowmobiles "containing parts made by any of the defendants" asks for information that is not relevant to the subject matter of this lawsuit and is not reasonably calculated to lead to the discovery of admissible evidence.

Declaration of Christopher W. Day in Support of Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibit 2 [FILED UNDER SEAL].

Thus, just as it is reasonable to read IRS's definition of the "Accused Devices" to include Arctic Cat snowmobiles with Suzuki engines, it is equally reasonable to construe that definition as IRS's less than subtle attempt to employ its Interrogatories to ferret out possible acts of infringement by other manufacturers of snowmobiles, as IRS's definition of the "Accused Devices" vastly outreaches the express language of its Seventh Claim, which is restricted only to JECS's products sold to Fuji. Arctic Cat and Suzuki offer no authority, nor do we suspect that any exists, which holds that the language of an Interrogatory trumps, or otherwise amends, the specific language of a Complaint, in defining the scope of a plaintiff's claim.

Moreover, in support of their res judicata argument, and specifically, in support of their assertion that the claims, which IRS had asserted in the Polaris Litigation, were

the same as the claims that IRS is now asserting against them, Arctic Cat and Suzuki highlight IRS's damage expert report, in the Polaris Litigation, of September 15, 1997. In that report, IRS's expert, George F. Rhodes, Jr., stated as follows:

> I have also estimated the incremental profits earned by Arctic Cat and Suzuki from the sale of snowmobiles and engines incorporating trade secrets misappropriated by JECS.

Id., Exhibit 3.

First, there is neither any explanation, in the report, as to why damages were estimated for sales to Arctic Cat and Suzuki, nor is there any explication in the Record presented. Further, the computation related to damages is from trade secret misappropriation, not from patent infringement, and therefore, the report involves damages as to a claim that is based upon an entirely different legal basis than the claims Arctic Cat and Suzuki now contend are barred by res judicata. In addition, it is unpersuasive that IRS was attempting to claim damages, in the Polaris Litigation, for claims that it did not allege. In fact, in a Motion in Limine, that is precisely what JECS argued.

In its Motion in Limine, JECS urged as follows:

> The grounds for this motion are based on the report of George F. Rhodes, Jr., dated September 15, 1995, which includes as an item of damage the "incremental profits" on

> JECS' "Sales to Suzuki * * *." [citation omitted]. However, the simple fact is that such profits do not form any part of plaintiffs' claims in this case. Where such claims are volunteered only by an expert in a report, they may not be considered.

Declaration of Jill Kastner in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibit 5.

The Court never ruled on the Motion, but instead, held that all of the patent issues were moot because the parties had stipulated to a dismissal. Thus, there was no final Judgment on the merits, for purposes of res judicata, on the issue of whether IRS pled a claim for damages arising from JECS's sales to Suzuki. Of course, from the language of IRS's Seventh Claim, it is evident that IRS only pled a claim for damages arising from JECS's sales to Fuji.

In sum, Arctic Cat and Suzuki concede that the JECS products, that were employed in the Suzuki engines for use in the Arctic Cat snowmobiles, were admittedly, and substantially, different from the JECS products sold to Fuji. Further, in the Polaris Litigation, IRS's claim against JECS -- Claim Seven -- was explicitly limited to JECS's sales to Fuji. Thus, the Accused Products, which are at issue in this litigation, are not the JECS EFI systems that were alleged to infringe the '803 Patent in the Polaris Litigation, and therefore, res judicata does not bar IRS's infringement

claims against Arctic Cat and Suzuki. As the Federal Circuit has observed, "[w]hen applying res judicata to bar causes of action that were not before the court in the prior action, due process of law and the interest of justice require cautious restraint." Kearns v. General Motors Corp., 94 F.3d 1553, 1556 (Fed. Cir. 1996). In accord with that sentiment, we need not address whether Arctic Cat or Suzuki were in privity with JECS for purposes of res judicata, and accordingly, we recommend that the Motion for partial Summary Judgment by Arctic Cat and Suzuki be denied in this regard.

2. Legal Estoppel. As an alternative proposition, Arctic Cat and Suzuki argue that IRS is legally estopped from asserting claims of infringement, as to the '803 Patent, against Arctic Cat and Suzuki arising from their use of JECS's EFI systems. Arctic Cat and Suzuki argue that, by granting JECS a covenant not to sue, IRS authorized JECS's sales of its EFI systems to JECS's customers. Arctic Cat and Suzuki also argue that IRS's grant of a covenant not to sue also extended an implied license to JECS, and JECS's customers. Arctic Cat and Suzuki maintain that JECS's authorized sales exhausted IRS's right to enforce the '803 Patent against JECS's customers.

IRS first argues that Arctic Cat, and Suzuki, have waived their estoppel defense by failing to plead it affirmatively. Rule 8(c), Federal Rules of Civil Procedure, provides, as follows:

> In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, **estoppel**, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense.

Rule 8(c), Federal Rules of Civil Procedure [emphasis supplied].

In its Amended Complaint, Arctic Cat affirmatively pled, as follows:

> Plaintiff is not liable for infringement of the '803 patent because Defendants' threatened suit for infringement is barred, in whole or in part, by doctrines of laches, **estoppel**, acquiescence, waiver, intervening rights, res judicata, collateral estoppel, and statute of limitations.

Declaration of Jill Kastner in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibit 20 [emphasis supplied].

Again, in Arctic Cat, Inc.'s Reply to Counterclaim for Patent Infringement and Affirmative Defenses, Arctic Cat alleges that the "Counterclaimants' claims are barred, in whole or in part, by doctrines of laches, **estoppel**, acquiescence, waiver, intervening

rights, res judicata, collateral estoppel, and statute of limitations." Id. at p. 4 [Docket No. 30] [emphasis supplied].

Similarly, in its Answer, Suzuki affirmatively pled, as follows:

> Suzuki is not liable for infringement of the '803 patent because IRS's and Pacer's counterclaim for infringement is barred or should be barred, in whole or in part, by doctrines of laches, **estoppel**, acquiescence, waiver, intervening rights, res judicata, collateral estoppel, and statute of limitations.

Declaration of Jill Kastner in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibit 21 [emphasis supplied].

Plainly, both Arctic Cat and Suzuki affirmatively pled estoppel as a defense.

To the extent that IRS now demands greater particularity in the pleadings of Arctic Cat and Suzuki, as they relate to their estoppel defense, the notice pleading requirements are satisfied by merely pleading "estoppel" as an affirmative defense, as Rule 8(c), in its lists of defenses that must be pled affirmatively, lists "estoppel" as a defense, without any further elaboration, or without further particularization. In contrast, Rule 9, Federal Rules of Civil Procedure, requires that certain affirmative defenses, including: fraud, mistake, malice, intent, knowledge, and other conditions of the mind, be plead with greater particularity. However, estoppel is not among those

defenses that must be plead with particularity. As a result, both Arctic Cat and Suzuki affirmatively, and adequately, pled estoppel as a defense in conformity with Rule 8(c).

IRS also contends that neither Arctic Cat, nor Suzuki, affirmatively pled "license" as a defense. Although Rule 8(c) mandates that the defense of "license" must be plead affirmatively, here, insofar as Arctic Cat's and Suzuki's Motion for Partial Summary Judgment is based on a license defense, it is an implied license that arises from legal estoppel.[6] A legal estoppel defense leads to an implied license, while

---

[6]Contrary to IRS's suggestion, that Arctic Cat and Suzuki were required to plead a "license" defense, there is a distinction between a license that conveys proprietary rights, and an implied license arising from a covenant not to sue. As the Court, in Jac USA, Inc. v. Precision Coated Products, Inc., 2003 WL 1627043 at *10 (N.D. Ill., March 25, 2003), observed, "[t]he distinction between the license conveyed in a covenant not to sue and a license that conveys proprietary rights was explained in Ortho Pharmaceuticals Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1031 (Fed. Cir. 1995), which discussed the consequences for standing to sue:

> A license may amount to no more than a covenant by the patentee not to sue the licensee for making, using or selling the patented invention, the patentee reserving the right to grant others the same right. * * * 'In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent. Such a license grants to the licensee merely a privilege that protects him from a claim of infringement by the owner of the patent monopoly. * * * He has no property interest in the monopoly of the patent nor any contract with the patent

(continued...)

a license does not necessarily lead to legal estoppel. See, Winbond Electronics Corp. v. International Trade Commission, 262 F.3d 1363, 1374 (Fed. Cir. 2001)("An implied license may arise by equitable estoppel, acquiescence, conduct, or legal estoppel."); Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc., 103 F.3d 1571, 1580 (Fed. Cir. 1997)("[C]ourts generally have first looked for facts which give rise to an estoppel in the process of concluding that there is an implied license.")[internal quotation omitted]; Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1080 (Fed. Cir. 1987) ("The doctrines of legal estoppel and equitable estoppel have been applied by courts to imply a license."), citing AMP, Inc. v. United States, 389 F.2d 448, 452 (Cl. Ct. 1968), cert. denied, 391 U.S. 964 (1968); see also, Travelers Exp. Co., Inc. v. American Exp. Integrated Payment Systems Inc., 80 F. Supp.2d 1033, 1038 (D. Minn. 1999)("An implied license may arise by acquiescence, conduct, equitable estoppel or by legal estoppel," and "[t]hese labels describe not different kinds of licenses, but

---

[6](...continued)

> owner that others shall not practice the invention.'"

JAC USA, Inc. v. Precision Coated Products, Inc., supra at *10, quoting Ortho Pharmaceuticals Corp. v. Genetics Institute, Inc., supra at 1031, quoting in turn, Western Electric Company v. Pacent Reproducer Corp., 42 F.2d 116, 118 (2nd Cir. 1930).

rather different categories of conduct which lead to the same conclusion: an implied license.")[internal quotation omitted]. Accordingly, Arctic Cat and Suzuki were correct in pleading an estoppel defense affirmatively, rather than pleading a license affirmatively.

In its Motion to Dismiss, or in the alternative, to Strike, which was filed on June 19, 2001, IRS moved to dismiss, or strike, Arctic Cat's affirmative defenses of acquiescence, laches, estoppel and waiver. See, Docket No. 17. With respect to Arctic Cat's acquiescence and waiver defenses, IRS had argued that waiver and acquiescence were merely categories of conduct used to describe an implied license, and therefore, IRS argued that waiver and acquiescence are not themselves defenses. Id. In rejecting IRS's argument, the District Court, the Honorable Michael J. Davis presiding, held as follows:

> The Court similarly rejects Defendants argument that acquiescence must be plead as an implied license. Defendants provide no authority for such a position, and it is contrary to the rule that a complaint need only contain a short plain statement giving Defendants fair notice of the claim.

Arctic Cat, Inc. v. Injection Research Specialists, Inc., 2001 WL 1628634 at *3 (D. Minn., September 12, 2001) [Docket No. 26].

As a result, it is the law of the case that Arctic Cat need not plead an implied license in order to assert defenses that describe an implied license, such as waiver, acquiescence, and estoppel. As we previously stated, and in conformity with the District Court's holding, we find that Arctic Cat's, and Suzuki's, pleading of "estoppel" provided IRS adequate notice of their reliance on that defense. Accordingly, we find that Arctic Cat and Suzuki have not waived their legal estoppel defense, which includes their exhaustion, and implied license, arguments.

Further, IRS's argument, that it has been prejudiced, because Arctic Cat's, and Suzuki's, assertion of a legal estoppel, which is based on IRS's covenant not to sue, comes as a surprise, must fail, as both Arctic Cat and Suzuki long ago gave notice that their legal estoppel defense was premised on IRS's grant, to JECS, of a covenant not to sue. On October 23, 2002 -- well over a year before this Motion for Partial Summary Judgment was filed -- Suzuki supplemented its responses to IRS's First Set of Interrogatories and, in response to Interrogatory No. 17, Suzuki attested:

> IRS's covenant not to sue JECS covers all JECS's EFI systems, and IRS is estopped from asserting a patent infringement claim as to Suzuki engines incorporating EFI systems purchased from JECS.

Declaration of Christopher W. Day in Support of Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibit 10.

Similarly, in Arctic Cat Inc.'s Supplemental Response to Injection Research Specialists, Inc.'s First Set of Interrogatories, Arctic Cat averred that "IRS's covenant not to sue JECS covers all of JECS's EFI systems, and IRS is estopped from asserting a patent infringement claim as to Arctic Cat EFI-equipped snowmobiles incorporating EFI systems purchased from JECS." Id., Exhibit 11.

In addition, in a letter dated February 4, 2003, counsel for Suzuki notified counsel for IRS of Suzuki's intention to file a Motion for Summary Judgment with respect to IRS's covenant not to sue JECS. Specifically, counsel for Suzuki stated:

> As to our intended summary judgment motion based on IRS' covenant not to sue JECS, our answer to IRS interrogatory no. 17 put IRS on notice that we intended to rely on this defense. We believe the defense is properly characterized as an "estoppel," which we pled. But regardless of [the] label given to the defense, IRS has been put on notice.

Id., Exhibit 12.

As we already expressed, we agree with Suzuki's statement, that the defense arising from the covenant not to sue is properly characterized as an estoppel defense. We also agree that IRS was placed on notice of that defense, and the fact that Suzuki considered its pleading of estoppel to constitute a defense arising out of IRS's covenant not to sue JECS. If IRS disagreed, it could have filed a Motion to Strike,

or a Motion for a More Definite Statement. Accordingly, we find that IRS is not prejudiced by Arctic Cat's, and Suzuki's, assertion of a properly pled defense of estoppel, and we turn to the merits of the Motion.

Arctic Cat and Suzuki argue that IRS's claims of infringement of the '803 Patent, insofar as those claims are based upon their use of JECS's EFI systems, are barred by an implied license, through legal estoppel, that was granted to JECS, and which is extended to them by the doctrine of exhaustion. As a threshold observation, we note that the exhaustion doctrine is closely related to the grant of an implied license. See, Anton/Bauer, Inc. v. PAG, Ltd., 329 F.3d 1343, 1350 (Fed. Cir. 2003) ("The Court's statements in [United States v. Univis Lens Co., 316 U.S. 241, 249 (1942)] demonstrate how closely related the exhaustion doctrine is to the grant of an implied license," as "they suggest that an implied license stems from the exhaustion of a patent right."). Therefore, Arctic Cat's, and Suzuki's, two arguments in support of their contention, that IRS is legally estopped from asserting its patent rights under the '803 Patent against JECS's customers, are properly considered in conjunction with each other.

"Legal estoppel refers to a narrow[] category of conduct encompassing scenarios where a patentee has licensed or assigned a right, received consideration,

and then sought to derogate from the right granted." Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc., supra at 1581. In other words, legal estoppel is an estoppel that arises out of a contract. See, Application of National Distillers & Chemical Corp., 297 F.2d 941, 950 (Cust. & Pat. App. 1962)("[L]egal estoppel, that is, an estoppel by contract."); Hall Laboratories, Inc. v. National Aluminate Corp., 224 F.2d 303, 306 (3rd Cir. 1955)("The terminology of estoppel by sanction of tradition rather than strictly logical appropriateness has been employed to designate the truth that a contract involving a patent is as binding as any other contract."). Legal estoppel leads to the grant of an implied license. See, Travelers Exp. Co., Inc. v. American Exp. Integrated Payment Systems Inc., supra at 1038 ("An implied license may arise by acquiescence, conduct, equitable estoppel or by legal estoppel."), citing Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc., supra.

"An implied license, like an express license, is a complete defense to a claim of patent infringement." Id., citing Carborundum Co. v. Molten Metal Equipment Innovations, Inc., 72 F.3d 872, 878 (Fed. Cir. 1995). "In the area of patent law, the granting of a license 'signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention.'" Id., quoting Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc., supra at 1580. Further,

"[l]icenses are considered as nothing more than a promise by the licensor not to sue the licensee." Jim Arnold Corp. v. Hydrotech Systems, Inc., 109 F.3d 1567, 1577 (Fed. Cir. 1997) , citing Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, supra at 1081; see also, In re Yarn Processing Patent Validity Litigation (No. II), 602 F. Supp. 159, 169 (W.D.N.C. 1984)("[Title 35 U.S.C. §287] applies to all 'persons' who make or sell 'for or under' the authority of the patentee and thus applies to authorizations by patentee of other persons to make and sell patented articles regardless of the particular form these authorizations may take and regardless of whether the authorizations are 'settlement agreements,' '**covenants not to sue**' or 'licenses.'")[emphasis supplied], citing General Pictures Corp. v. Elec. Co., 304 U.S. 175, 181 (1938) (nonexclusive patent license nothing more than "a mere waiver of the right to sue").

As a consequence, the grant of a covenant not to sue may create a license to make and sell the patented device. See, Jac USA, Inc. v. Precision Coated Products, Inc., 2003 WL 1627043 at *10 (N.D. Ill., March 25, 2003)("[N]o formal language is necessary to create an implied license," and "[f]urthermore, a license in the form of a covenant not to sue need not necessarily convey any proprietary rights."). Therefore, IRS's grant of a covenant not to sue to JECS also granted JECS an implied license.

To determine the scope of that license, quite logically, we must turn to the language of the covenant.

A covenant not to sue is an agreement to which general contractual rules of interpretation and construction apply. See, e.g., Lake Durango Water Co., Inc. v. Public Utilities Com'n of State of Colorado, 67 P.3d 12, 19 (Colo. 2003)(applying contract principles to the interpretation of a settlement agreement); Truong v. Smith, 28 F. Supp.2d 626, 630 (D. Colo. 1998)("[A] release is an agreement to which general contractual rules of interpretation and construction apply."), citing Rocky Mountain Ass'n of Credit Management v. Hessler Mfg. Co., 553 P.2d 840, 842 (Colo.App. 1976).[7] "In interpreting a contract, we seek to give effect to the intent and reasonable expectations of the parties." Thompson v. Maryland Cas. Co., 84 P.3d 496, 501 (Colo. 2004), citing Allen v. Pacheco, 71 P.3d 375, 378 (Colo. 2003). "[W]e seek to

---

[7]IRS asserts that State contract law applies to the interpretation of the covenant not to sue. We agree. See, S & T Mfg. Co. v. County of Hillsborough, 815 F.2d 676, 678 (Fed. Cir. 1987). IRS further asserts that, "[s]ince, at the time of the agreement, IRS was a Colorado corporation headquartered in Colorado, the covenant was entered into in Colorado and settled a lawsuit which was pending in the United States District Court in Colorado, Colorado law should apply." Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, at p. 21 n. 7. We also agree with IRS that Colorado contract law applies to our interpretation of the covenant not to sue JECS.

give the words in a policy their plain and ordinary meaning, unless the intent of the parties indicates otherwise." Cotter Corp. v. American Empire Surplus Lines Ins. Co., 90 P.3d 814, 820 (Colo. 2004); see also, Thompson v. Maryland Cas. Co., supra at 501 ("[U]nless the parties intend otherwise, terms in [a covenant] should be assigned their plain and ordinary meaning."), citing Compass Ins. Co. v. City of Littleton, 984 P.2d 606, 613 (Colo. 1999). "If the terms are clear, a court will neither look outside the four corners of the instrument, nor admit extrinsic evidence to aid in interpretation." City of Golden v. Simpson, 83 P.3d 87, 93 (Colo. 2004).

"[T]he issues of a contract's ambiguity and correct interpretation are matters of law to be determined by the court." Cary v. United of Omaha Life Ins. Co., 91 P.3d 425, 427 (Colo.App. 2003), citing Kaiser v. Mkt. Square Disc. Liquors, Inc., 992 P.2d 636 (Colo.App. 1999); see also, KN Energy, Inc. v. Great Western Sugar Co., 698 P.2d 769, 776 (Colo. 1985). "Normally, the interpretation of an ambiguous release is an issue for the trier of fact to decide in the same manner as other disputed factual issues," however, "[w]here a valid and unambiguous release defeats the cause of action, [] the court has a duty to grant summary judgment." Truong v. Smith, supra at 630, citing DeJean v. United Airlines, Inc., 839 P.2d 1153, 1161 (Colo. 1992).

Here, IRS covenanted, as follows:

> Plaintiffs [IRS and Pacer] further hereby irrevocably covenant not to sue the defendants for infringement of United States Patents Nos. Re. 43,803 [the '803 Patent] and Re. 34,079 for **any** past, present or future **acts**.

Declaration of Naoki Yoshida in Support of Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibit 8 [emphasis supplied].

Giving effect to the plain and ordinary meaning of the language of the covenant, IRS clearly covenanted not to sue JECS for infringement of the '803 Patent, as well as the '079 Patent. Further, the scope of this covenant clearly exceeded the scope of the claims involved in the Polaris Litigation, as IRS covenanted not to sue JECS for past and present acts, and also for future acts, which could not have then been part of the Polaris Litigation, as those future acts were unknown to the parties. As a result, we find that the clear and unambiguous language of the covenant extends to **any** claims of infringement of the '803 Patent against JECS and, as the covenant applies to any future claims, we find that the covenant extends to not only those JECS EFI systems that were sold to Fuji for use in the Polaris snowmobiles -- which were directly at issue in the Polaris litigation -- but also to all JECS's products, including its EFI systems sold to Suzuki for use in the Arctic Cat snowmobiles.

Further, the clear and unambiguous language of the covenant extends IRS's promise, not to sue JECS, to "**any** past, present or future **acts**." Id. [emphasis

supplied]. The actions of JECS, which were challenged by IRS in the Polaris Litigation, include both making, and selling, EFI systems. Accordingly, we find that, in its covenant, IRS promised not to sue JECS for any act, including expressly, the acts of making or selling EFI systems. Quite plainly, JECS had an implied license to make and sell products which, otherwise, IRS could contend were infringing the '803 patent.[8] The issue then resolves to whether the implied license, that was granted to JECS, extends to bar IRS's claims against Arctic Cat and Suzuki. At this point, the exhaustion doctrine enters our analysis.

---

[8]Our conclusions are further bolstered by IRS's reservation of the right to sue JECS, Arctic Cat, and Suzuki, for trade secret misappropriation, but not for patent infringement. In its Order of Dismissal with Prejudice of November 5, 1998, the Court in the Polaris Litigation directed as follows:

> Nothing in this Order shall constitute a waiver, release or discharge of those claims now pending in Civil Action No. 97-Z-2606 pending before this Court against Unisia JECS Corporation, Suzuki Motor Corp., Arctic Cat, Inc. or Arctic Cat Sales, Inc.; all such rights and claims are expressly reserved by plaintiffs in this action.

If the Court, or IRS, felt compelled to expressly reserve IRS's rights to sue JECS, Arctic Cat, and Suzuki, for trade secret misappropriation, even though the covenant not to sue quite plainly referred only to claims of infringement of the '803 Patent, and notwithstanding that Arctic Cat and Suzuki were not even parties to the Polaris Litigation, it is reasonable to conclude that neither the Court, nor IRS, contemplated IRS bringing claims for infringement of the '803 Patent against Arctic Cat and Suzuki.

"The exhaustion doctrine is based upon the proposition that '[t]he unrestricted sale of a patented article, by or with the authority of the patentee "exhausts" the patentee's right to control further sale and use of that article by enforcing the patent under which it was first sold.'" Anton/Bauer, Inc. v. PAG, Ltd., supra at 1349, quoting Jazz Photo Corp. v. International Trade Commission, 264 F.3d 1094, 1105 (Fed. Cir. 2001). The Federal Circuit, in Anton/Bauer, supra, explained that "[t]he Supreme Court enunciated this doctrine when it stated that 'incident to the purchase of any article, whether patented or unpatented, is the right to use and sell it.'" Id., quoting United States v. Univis Lens Co., supra at 249. The Court went on to say, "[i]n other words, sale of an unpatented article exhausts the seller's right to control the future sale and use of that article." Id. at 1350.

The Court explained that, "[a]t the same time, it is well settled that all or part of a patentee's right to exclude others from making, using, or selling a patented invention may be waived by granting a license, which may be express or implied." Id. In other words, "'[t]he Patent Exhaustion Doctrine applies as well to the disposition of a product under a license as it does to [an] outright sale.'" Forest Laboratories, Inc. v. Abbott Laboratories, 1999 WL 33299123 at *23 (W.D.N.Y., June 23, 1999), quoting Cyrix Corporation v. Intel Corporation, 846 F. Supp. 522, 538 (E.D. Tex. 1994), aff'd

without opinion, 42 F.3d 1411 (Fed. Cir. 1994), citing in turn, United States v. Masonite Corp., 316 U.S. 265, 278 (1942).

In Forest Laboratories, Inc. v. Abbott Laboratories, supra, the United States District Court for the Western District of New York determined that the patent holder was equitably estopped from asserting a claim of infringement against a manufacturer of a purportedly infringing product. Id. The Court held that the patent holder had granted an implied license to the manufacturer, and further held that the implied license exhausted the patent holder's right to enforce its patent against the manufacturer's customers. In so holding, the Court observed:

> [The customer] is also entitled to the benefit of [the manufacturer's] estoppel because to hold otherwise would significantly undercut, if not wholly vitiate, the purpose of equitable estoppel. If distributors and customers were not protected by [the manufacturer's] equitable estoppel, not only would [the manufacturer] be unable to sell its product to [the customer], it would also be unable to sell its products directly, or through sales representatives, to [others]. In effect, [the manufacturer] could never sell its product.

Id.

The same holds true here. If, as we have found, the covenant not sue bars IRS from suing JECS for infringement of the '803 Patent, then the exhaustion doctrine works to

also bar IRS from suing JECS's customers for, to hold otherwise, would render meaningless the covenant not to sue.

In opposition to Arctic Cat's, and Suzuki's, Motion for Summary Judgment on estoppel grounds, IRS first argues that, under Intel Corp. v. ULSI System Technology, 995 F.2d1566, 1568 (Fed. Cir. 1993), for a license to exhaust patent rights, there must be "an authorized sale of a patented product." In other words, IRS argues that "the product Suzuki purchased from JECS was not a 'patented product,' as the items actually sold by JECS [were] merely EFI components -- without the two-cycle engine required by the patent." Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, at p. 19. Further, IRS argues that, "[n]ot only have Arctic Cat and Suzuki failed to show that the component Suzuki purchased from JECS was a 'patented product,' they deny their own products, which use this component, come within the patent claims." Id.

While Arctic Cat, and Suzuki, do deny that their products infringe the '803 Patent, for IRS to argue that Arctic Cat's snowmobiles, and Suzuki's engines, are not covered by the '803 Patent is disingenuous, as IRS has asserted claims of infringement of the '803 Patent against both Arctic Cat and Suzuki, and both urge that there is no

infringement by virtue of the covenant not to sue. Further, IRS's argument, that JECS's sales of component parts of the '803 Patent does not constitute a sale for purposes of exhaustion, must fail. As Arctic Cat and Suzuki correctly note, in their Reply Memorandum, as a matter of law, the exhaustion doctrine applies to the sale of unpatented components that "'embod[y] essential features of [the] patented invention' and are 'destined * * * to be finished by the purchaser in conformity to the patent.'" Anton/Bauer, Inc. v. PAG, Ltd., supra at 1351, quoting United States v. Univis Lens Co., supra at 251. JECS's EFI systems are specifically designed for use in two-cycle engines, and therefore, the exhaustion doctrine applies to JECS's sales to Suzuki, and Suzuki's subsequent sales to Arctic Cat.

As stated, the exhaustion doctrine applies to the disposition of a product under a license, as well as a sale. See, Forest Laboratories, Inc. v. Abbott Laboratories, supra at *23. Thus, to apply the exhaustion doctrine in this case, where IRS granted an implied license to JECS through a covenant not to sue, there need not be any sale whatsoever. IRS's patent rights were exhausted by the covenant not to sue. As Courts have observed, that demonstrates how closely related the exhaustion doctrine is to an implied license.

Another way to consider the exhaustion doctrine's application to an implied license is to describe the extension of the implied license, to customers of the implied licensee, as if the customers had been granted an implied sublicense. See, Jacobs v. Nintendo of America, Inc., 370 F.3d 1097, 1101 (Fed. Cir. 2004). In Jacobs, supra, the Court did not have to rely on the exhaustion doctrine because the patent holder granted the defendant's supplier -- a manufacturer of component parts, against whom the patent holder had previously asserted claims of infringement -- both a covenant not to sue, as well as a license. Nonetheless, the patent holder still attempted to assert claims of infringement against the manufacturer's customer, who was the defendant in the case. The Court held that the license granted that defendant an implied sublicense. Id. Similarly, here, we have held that IRS granted JECS an implied license by its covenant not to sue, and we find that, if an implied sublicense can arise from a license, then an implied sublicense can also arise from an implied license.

IRS next argues that JECS's sales to Suzuki did not exhaust IRS's patent rights because those sales were made outside of the United States. In support of this argument, IRS cites Jazz Photo Corp. v. International Trade Commission, supra at 1105, for the proposition that, "[t]o invoke the protection of the first sale doctrine, the authorized first sale must have occurred **under** the United States patent." Id.

[emphasis supplied]. As Arctic Cat and Suzuki point out, IRS confuses sales occurring "**under** the United States patent," with sales physically occurring in the United States. Jazz Photo, supra, does not stand for the proposition that JECS's sales must be made in the United States. IRS neither cites any other authority in support of this argument, nor did our independent research reveal any such authority.

JECS's sales to Suzuki were authorized by IRS's covenant not to sue JECS for any acts, past, present, or future, which infringe the '803 Patent. As stated, the covenant was executed in the United States, in the Polaris Litigation. As a result, JECS's sales to Suzuki were made under the '803 Patent. Further, we agree with the observation of Suzuki, and Arctic Cat, that "the only reason for granting a covenant not to sue under a U.S. patent is to authorize ultimate sales in the United States, the only jurisdiction where those patents created any rights." Reply Memorandum in Support of Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, at p. 16. As such, to hold that JECS's sales to Suzuki were not authorized by the covenant not to sue would also render the covenant not to sue legally meaningless. Again, we note that, because IRS's patent rights were exhausted not by a sale, but by its covenant not to sue, IRS's argument has no merit.

Accordingly, we find that IRS's second argument, against the application of the exhaustion doctrine to JECS's sales to Suzuki, must fail.

Lastly, IRS argues that it did not intend its covenant not to sue JECS to extend to Arctic Cat and Suzuki. IRS points to the language of the covenant, in which IRS stated that it covenanted not to sue "the defendants," and that Arctic Cat and Suzuki were not "the defendants" in the Polaris Litigation, and that the issues in that litigation were different from the issues in this case. As a consequence, IRS argues that there is at least an issue of fact as to whether the covenant not to sue was intended to cover Arctic Cat and Suzuki.

We concur that IRS's covenant not to sue does not expressly cover Arctic Cat and Suzuki, as the language of the covenant clearly covers only the defendants in the Polaris Litigation, and Arctic Cat and Suzuki were not defendants there. Nevertheless, Arctic Cat and Suzuki are not attempting to enforce the terms of the covenant, but instead, they argue that the covenant granted JECS an implied license to make, and sell, its EFI systems free from the encumbrances of the '803 Patent, and that the authorization exhausted IRS's right to enforce the '803 Patent against JECS' customers. Part of IRS's misapprehension appears to stem from its apparent misunderstanding of the distinction between a covenant not to sue, and a release. In

fact, IRS referred to the covenant not to sue as a "release" in its Motion papers, by stating that "it defies logic that IRS would intend that a release of JECS (a seller of EFI systems) would also cover Suzuki (selling more highly priced snowmobile engines) or Arctic Cat (selling even more highly priced snowmobiles)." Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, at p. 21.

In truth, it defies logic that a covenant not to sue JECS -- on infringement claims that IRS lost on Summary Judgment -- would have any real legal significance if JECS could not sell its products to JECS's own customers, especially when JECS indemnified Suzuki for those sales. Moreover, "[a] release is a provision that intends a present abandonment of a known right or claim," while "a covenant not to sue also applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue." Medtronic Ave, Inc. v. Advanced Cardiovascular Systems, Inc., 247 F.3d 44, 55 n. 4 (3rd Cir. 2001). Clearly, IRS's covenant not to sue had broader implications than merely releasing JECS from the claims at issue in the Polaris Litigation, and we are unable to envision that IRS's attorneys were not fully aware of that legal consequence.

While we have agreed with IRS, that its claims of infringement against Arctic Cat and Suzuki are not barred by res judicata because the claims at issue in the Polaris Litigation were not the same as the claims at issue in this litigation, since the JECS products, which were involved in the Polaris Litigation, were different from the JECS products at issue here, for purposes of legal estoppel, it does not matter that the subject matter of the Polaris Litigation, and this litigation, is not the same. What is critical is that the covenant not to sue extends to "any past, present or future acts" that infringe the '803 Patent, which we have already determined to include all of the JECS products, against which IRS could assert claims of infringement under the '803 Patent.

Insofar as IRS suggests interpretations of the covenant not to sue which are contrary to the covenant's plain and ordinary meaning, as the drafter of the covenant, we construe all of the covenant's terms against IRS. See, Thompson v. Maryland Cas. Co., supra at 501-02 ("We also recognize that unlike a negotiated contract, an insurance policy is often imposed on a 'take-it-or-leave-it' basis," and "[a]ccordingly, ambiguous terms in an insurance policy are construed against the insurer."); City of Golden v. Simpson, supra at 93 ("If the contract involved is a stipulation, such as this change decree, any party that participated in the original stipulation is proscribed from introducing legal contentions contrary to the plain meaning of the decree."). We

conclude that, given the plain language of the covenant, we need not, and should not, look beyond the clear and ordinary meaning of the covenant's terms. Accordingly, to the extent that IRS maintains that there is an issue of disputed fact, we disagree. As we have noted, the interpretation of an unambiguous contract is a matter of law for the Court to decide, see, Cary v. United of Omaha Life Ins. Co., supra at 427, and where the unambiguous language defeats a cause of action, the Court has a duty to grant Summary Judgment. See, Truong v. Smith, supra at 630.

In sum, having determined that IRS granted a covenant not to sue to JECS, which granted JECS an implied license to make and sell all of its EFI systems, and which, in turn, exhausted IRS's right to enforce the '803 Patent against JECS's customers, we conclude that IRS is legally estopped from asserting claims of infringement of the '803 Patent against Arctic Cat and Suzuki for their use of JECS's EFI systems. Accordingly, we recommend that the Motion of Arctic Cat and Suzuki for Partial Summary Judgment be granted in this respect.

B. The Motion of Arctic Cat for Partial Summary Judgment on Invalidity and Non-Infringement of the '374 Patent.

In its Amended Complaint, Arctic Cat seeks a judicial declaration that the '374 Patent is invalid, and that Arctic Cat snowmobiles, with Kokusan EFI systems, do not infringe the '374 Patent.[9] IRS did not allege a counterclaim, based on the '374 Patent, against either Arctic Cat or Suzuki, and IRS contends that all issues related to the '374 Patent are moot, given its covenant of December 31, 2003, not to sue Arctic Cat for any infringement of the '374 Patent.

On April 30, 2002, the inventor of the '374 Patent, Ronald E. Chasteen ("Chasteen") admitted that the '374 Patent was invalid. In his Combined Reissue Declaration and Power of Attorney, Chasteen represented to the Patent and Trademark Office ("PTO") that: "my original patent, U.S. Patent No. 4,901,701, became prior art against the '374 Patent." Declaration of Annamarie A. Daley, Exhibit A, at p. 2. As a consequence, in March of 2003, Arctic Cat sought a covenant not to sue on the '374 Patent from IRS, but IRS refused. Id., Exhibits D & E. Instead, on May 1, 2003,

[9]As mentioned, in addition to JECS, Kokusan also supplies the EFI systems that are used in some of Arctic Cat's snowmobiles and, as previously noted, Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel related only to their products that use JECS's EFI systems.

IRS moved to sever and stay all issues relating to the '374 Patent. Subsequently, on August 29, 2003, the District Court, the Honorable Michael J. Davis presiding, denied IRS's Motion. See, Arctic Cat, Inc. v. Injection Research Specialists, Inc., 2003 WL 22047872 at *2 (D. Minn., August 29, 2003)(Order denying Motion to Sever and Stay)[Docket No. 326].

In its Order, the District Court noted that "[t]he parties essentially agree that the '374 Patent should not be a part of this action at this time," "[h]owever, they cannot agree on how to get rid of it," as "IRS maintains that it should be severed, while Arctic Cat maintains that a voluntary covenant not to sue from IRS would suffice." Id. at *1. In denying IRS's Motion to Sever and Stay, the Court observed that Arctic Cat had argued that "this matter has been underway for approximately two years, with significant exchange of discovery" and, "given the late stage of this litigation, and the amount of discovery exchanged, that IRS has failed to establish a clear case of hardship" such as would warrant severing and staying the issues. Id. at *2. Agreeing with Arctic Cat's argument, the Court then held that, under the circumstances, it was inappropriate to sever the '374 Patent, and the Court denied IRS's Motion. Id.

Thereafter, on December 31, 2003, IRS filed a covenant not to sue Arctic Cat for infringement of the '374 Patent. See, Docket No. 468. Consequently, rather than

responding to the merits of Arctic Cat's arguments in support of invalidity and non-infringement of the '374 Patent, IRS filed what it terms "Injection Research Specialists, Inc.'s and Pacer's Industries, Inc.'s Statement of Mootness with Respect to Arctic Cat's Motion for Partial Summary Judgement on Invalidity and Non-Infringement of the '374 Patent." In that Statement, IRS argues that, by granting Arctic Cat a covenant not to sue, the Court was divested of jurisdiction over all claims related to the '374 Patent. With the additional passage of time, and the expenditure of resources, Arctic Cat now argues that the invalidity of the '374 Patent should be decided on its merits, rather than by the covenant not to sue, which would potentially allow IRS to litigate the same claims in the future.

Arctic Cat also expressed the concern that, notwithstanding IRS's covenant not to sue, IRS could still sue Arctic Cat's customers in the future and, given that IRS is now litigating claims of infringement as to the '803 Patent against JECS' customers -- Arctic Cat and Suzuki -- years after the conclusion of the Polaris Litigation, we should be appreciative of Arctic Cat's interest in having this issue resolved on the merits so as to avoid future litigation. In light of our discussion of the legal ramifications of IRS's covenant not to sue JECS in the Polaris Litigation, and our recommendation that the Motion of Arctic Cat and Suzuki for Partial Summary Judgment on the ground that

IRS is legally estopped from asserting claims of infringement against Arctic Cat's and Suzuki's use of JECS' EFI systems should be granted, we find Arctic Cat's and Suzuki's fears of future litigation to be illusory, even if the issues, which relate to the '374 Patent, are now found to be moot.

In Mann Design Ltd. v. Bounce, Inc., 138 F. Supp.2d 1174, 1178 (D. Minn. 2001), the Court, quoting Med-Tec, Inc. v. Kostich, 980 F. Supp. 1315, 1323 (N.D. Iowa 1997), stated, as follows:

> "The existence of an actual controversy is an absolute predicate for declaratory judgment jurisdiction * * *. As the Federal Circuit Court of Appeals has noted: '[t]he "actual controversy" requirement is met only if there is a justiciable case or controversy in the constitutional sense.' [GAF Building Materials Corp. v. Elk Corp. of Dallas, 90 F.3d 479, 481 (Fed.Cir. 1996)(quoting Jervis B. Webb Co. v. Southern Sys., Inc., 742 F.2d 1388, 1398 (Fed. Cir. 1984))("[T]he case or controversy requirement for declaratory judgment jurisdiction has been defined to be the same as the case or controversy requirement in the constitutional sense.")."
>
> To establish an "actual controversy" for a declaratory judgment action seeking a ruling of non-infringement or invalidity, the declaratory judgment plaintiff must meet a two prong test. "First, the accused infringer must have actually produced or prepared to produce an allegedly infringing product. * * * Second, the patent holder's conduct must create an objectively reasonable apprehension on the part of the accused infringer that the patent holder will initiate suit

> if the allegedly infringing activity continues." Spectronics Corp. v. H.B. Fuller, 940 F.2d 631, 634 (Fed.Cir.)(citations omitted), cert. denied, [502 U.S. 1013 (1991)].

Id. at 1177-78.[10]

The Court, in Mann, went on to state, as follows:

> The Federal Circuit has held that "a patentee defending against an action for a declaratory judgment of invalidity can divest the trial court of jurisdiction over the case by filing a covenant not to assert the patent at issue against the putative infringer." Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1058 (Fed. Cir. 1995). The patent holder's covenant must cover past, present and future claims arising out of the putative infringer's past and current activities; the court can then say that the patent holder is "forever estopped" from asserting the patent. See, [Spectronics Corp. v. H.B. Fuller, supra at 636].

Id. at 1178.

Lastly, the Court held that "[t]he Amended Statement of Non-Liability accomplishes this," as "Mann no longer faces a 'reasonable apprehension' that Bounce could sue Mann for infringement of [its] patent if Mann continues its present conduct," and therefore, "[t]here is no longer an actual controversy with respect to the [] patent and,

---

[10]"[A]n 'actual controversy' exists if there has been a charge of infringement," "[h]owever, such a charge need not be express and can be found in any conduct or course of action on the part of the patentee which would lead a reasonable man to fear that he or his customers face an infringement suit or the threat of one if he continues or commences the activity in question." Sherwood Medical Industries, Inc. v. Deknatel, Inc., 512 F.2d 724, 727-28 (8th Cir. 1975)

accordingly, the Court will dismiss with prejudice both Count I of the Second Amended Complaint and the Counterclaim filed by Bounce, which alleges infringement of [its] patent." Id.

As stated, Arctic Cat has expressed concern that, while the covenant not to sue would preclude IRS from bringing claims of infringement as to the '374 Patent directly against Arctic Cat, IRS might still be permitted to file suit against Arctic Cat's customers, thereby rendering the covenant not to sue meaningless. If that were truly the case -- that IRS's covenant not to sue would not "forever estop[]," Mann Design Ltd. v. Bounce, Inc., supra at 1178, IRS from asserting the '374 Patent against Arctic Cat, or its customers -- then there would still be a case or controversy, and we would still have subject matter jurisdiction over Arctic Cat's declaratory judgment claims of invalidity and non-infringement of the '374 Patent, as the apprehension of suit against one's customers creates an actual case or controversy in a declaratory judgment action. See, Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1342 n. 8 (Fed. Cir. 2001)("We recognize that 'apprehension' also may apply to a declaratory plaintiff's customers as discussed in Arrowhead Industrial Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, [736] (Fed. Cir. 1988)."); C.R. Bard, Inc. v. Schwartz, 716 F.2d 874, 881 n. 6 (Fed. Cir. 1983)("Other factors

courts have relied on in finding a reasonable apprehension of infringement include actual or threatened suits against the declaratory plaintiff's customers."); Sherwood Medical Industries, Inc. v. Deknatel, Inc., 512 F.2d 724, 727 (8th Cir. 1975)("Such an action [for patent infringement] must be based on the plaintiff's well grounded fear that should he continue or commence the activity in question, he faces an infringement suit or the damaging threat of one to himself and his customers."); see also, In re Papst, 55 Fed.Appx. 543, 544, 2003 WL 236248 at *1-2 (Fed. Cir., January 21, 2003)(denying patent holder's petition for a writ of mandamus on whether the patent holder's covenant not to sue the declaratory judgment plaintiff divested the lower court of jurisdiction where the apprehension of suit related to claims against the plaintiff's customers). To determine whether there exists a reasonable apprehension of suit against Arctic Cat, or its customers, we look to the language, and scope, of IRS's covenant not to sue, as well as the legal ramifications of that covenant.

In its covenant not to sue Arctic Cat, IRS has covenanted as follows:

> In order to eliminate any case of controversy with respect to Arctic Cat's infringement of the '374 patent or the patent's validity, Injection Research Specialists, Inc. and Pacer Industries, Inc. hereby covenant not to sue Arctic Cat for infringement of U.S. Patent No. 5,813,374:

> Plaintiff Arctic Cat, Inc. ("Arctic Cat") has no liability to Injection Research Specialists, Inc. ("Injection Research") and Pacer Industries, Inc. ("Pacer"), or any successors-in-interest to U.S. Patent No. 5,813,374, for any past or present or future infringement of any claims of U.S. Patent No. 5,813,374 by products currently or previously advertised, successors-in-interest to U.S. Patent No. 5,813,374, unconditionally agree not to sue Arctic Cat for any past or present or future infringement of any claims of U.S. patent No. 5,813,374 by products currently or previously advertised, manufactured, marketed or sold by Arctic Cat.

Injection Research Specialists, Inc.'s and Pacer's Industries, Inc.'s Statement of Mootness with Respect to Arctic Cat's Motion for Partial Summary Judgement on Invalidity and Non-Infringement of the '374 Patent, Exhibit 1 ("Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Statement of Non-Liability with Respect to U.S. Patent No. 5,813,374.").

We read IRS's covenant not to sue to preclude both future suits against Arctic Cat on **any** claims related to the '374 Patent, as well as any claims related to the '374 Patent that IRS attempts to assert against any of Arctic Cat's past, present, or future customers.[11]

---

[11]In finding that the covenant not to sue precludes the future litigation of **any** claims related to the '374 Patent, we again note the distinction between a release and a covenant not to sue: "[a] release is a provision that intends a present abandonment of a known right or claim," while "a covenant not to sue also applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which

(continued...)

The implied license that was granted to Arctic Cat, by IRS's covenant not to sue Arctic Cat, for making, marketing, and selling its products, which IRS could otherwise claim as infringing upon IRS's '374 Patent, is more specific than IRS's covenant not to sue JECS in the Polaris Litigation. Here, IRS explicitly agreed that Arctic Cat shall be allowed to make, market, and sell Arctic Cat's products, whereas the covenant, in the Polaris Litigation, merely stated that the covenant applied to all acts, without identifying what acts were covered by the covenant. Since the covenant here allows Arctic Cat to make, market, and sell its products, this has the effect of granting Arctic Cat an implied license -- if not an actual license -- see, Jac USA, Inc. v. Precision Coated Products, Inc., supra at *10, which extends to Arctic Cat's past, present, and future customers either through the exhaustion doctrine, see, Forest Laboratories, Inc. v. Abbott Laboratories, supra at *23, quoting Cyrix Corp. v. Intel Corp., supra at 537-38, citing in turn, United States v. Masonite Corp., supra at 278, or by way of an implied sublicense. See, Jacobs v. Nintendo of America, Inc., supra at 1099 (recognizing that a license may create an implied sublicense for the licensee's

[11](...continued)
either exists or which may accrue." Medtronic Ave, Inc. v. Advanced Cardiovascular Systems, Inc., 247 F.3d 44, 55 n. 4 (3rd Cir. 2001). Thus, IRS's covenant not to sue Arctic Cat is broader than the claims at issue in this litigation.

customers). Thus, we find that IRS' covenant not to sue Arctic Cat legally estops IRS from suing Arctic Cat's past, present, or future customers, for any claims of infringement related to the '374 Patent. In further support of our interpretation of the covenant not to sue, and the legal ramifications of the covenant, we rely on our previous, detailed discussion in support of our Recommendation that the Motion of Arctic Cat and Suzuki for Partial Summary Judgment, on the basis of legal estoppel, be granted.[12]

Since we read the covenant not to sue, in conjunction with the exhaustion doctrine, and the implied license which necessarily arises from the grant of a covenant not to sue, to bar all future claims of infringement of the '374 Patent against Arctic Cat, and all of Arctic Cat's past, present, and future customers, we find that there is no reasonable apprehension of suit against Arctic Cat, or its customers. Since there

[12]In turn, we find that the scenario created in this litigation, where IRS has only agreed to a covenant not to sue after Arctic Cat filed its Motion for Summary Judgment, demonstrates that, when IRS's back is against the law, as it was in the Polaris Litigation, where IRS had lost on Summary Judgment but then entered into a covenant not to sue, it is facile for IRS to attempt to preserve its right to litigate in the future, by entering into covenants not to sue, from which it will try to distance itself in the future. Thus, the circumstances, here, lend further support for our determination that IRS is legally estopped from asserting claims of infringement, against Arctic Cat and Suzuki, on the '803 Patent with respect to their use of JECS's EFI systems.

is no actual case or controversy present, we lack subject matter jurisdiction over Arctic Cat's claims for declaratory relief against IRS on the '374 Patent, and therefore, we recommend that Arctic Cat's Motion for Partial Summary Judgment in this regard be denied and, because the Court lacks subject matter jurisdiction over the claims, we further recommend that all claims related to the '374 Patent be dismissed with prejudice. Accordingly, we also recommend that IRS's cross-Motion to Dismiss be granted.[13]

C. The Motion of Arctic Cat and Suzuki for Summary Judgment on Champerty and Maintenance Grounds.

Arctic Cat and Suzuki seek the dismissal of the entirety of this lawsuit on that ground that an agreement, between IRS, Pacer, and their respective parent companies, Dana Corporation ("Dana") and Arctic Slope Regional Corporation ("ASRC"), is champertous. Arctic Cat and Suzuki assert that the agreement is void under Ohio law which, IRS contends, is controlling, because Ohio law prohibits

---

[13]There is no indication in the Record that IRS's Motion to Dismiss was ever filed. While there is a Motion for leave to file its Motion to Dismiss, see, Docket No. 510, and a Motion requesting a Hearing for the Motion to Dismiss, see, Docket No. 558, it does not appear that any Motion to Dismiss was ever properly filed, and no such Motion is on the Court's list of pending Motions. Nonetheless, since we find that we are without subject matter jurisdiction over the claim, we dismiss those claims sua sponte.

champerty and maintenance. Therefore, Arctic Cat and Suzuki argue that IRS's claims should be dismissed as a matter of law.

Arctic Cat and Suzuki maintain that this litigation is governed by the Agreement of April 13, 2000 (the "2000 Agreement"), between IRS, Pacer, Dana, and ASRC. In that agreement, Pacer agreed to grant IRS "a limited royalty and other fee free license with respect to the licensed patents and related trade secret and intellectual property to pursue the Arctic Cat litigation and against such other infringers of the Licensed Patents and related trade secrets and intellectual property (infringement claims)." Declaration of Annamarie A. Daley, Exhibit E, p. 2; see also, Declaration of John Balch in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Motion for Summary Judgment on Champerty and Maintenance Grounds, Exhibit 6, at p. 2.

In the 2000 Agreement, Dana, Pacer, and ASRC, also agreed that IRS would control the litigation, and that IRS's president, John Balch ("Balch"), would have the authority to make the final decisions in the litigation. Id. at p. 3. Further, it was agreed that IRS would contribute 75% of the expenses, and would receive 75% of the proceeds, while Pacer would contribute the remaining 25% of the expenses, and receive 25% of the proceeds. Id. at p. 4. In addition, the 2000 Agreement authorized

IRS to hire counsel and consultants, and it provided that consultant's fees would be determined by the "results achieved." Id.

The 2000 Agreement also contains a choice-of-law clause which provides as follows:

> This agreement is made and entered into in accordance with and shall in all respects be interpreted, enforced and governed under the laws of the State of Ohio.

Id. at p. 9.

In opposition to this Motion, IRS first argues that Arctic Cat and Suzuki failed to affirmatively plead a champerty and maintenance defense, as required by Rule 8, Federal Rules of Civil Procedure. IRS then argues that the 2000 Agreement is not champertous, and that it does not constitute maintenance. Lastly, IRS maintains that the 2000 Agreement is not binding, but instead, it contends that a later agreement among the parties, which was executed on August 2, 2001 (the "2001 Agreement"), is controlling. As a result, IRS argues that California law, which governs the 2001 Agreement, is the governing law, and that, under California law, the defenses of champerty and maintenance are nonexistent. We first consider IRS's argument that Arctic Cat and Suzuki failed to affirmatively plead champerty and maintenance.

There is no authority in this District, or Circuit, which requires that the defense of champerty and maintenance -- to the extent there exists such a defense to claims of patent infringement -- be plead affirmatively. There is, however, authority from outside this jurisdiction which refers to the defense of champerty as an affirmative defense. See, e.g., LNC Investments, Inc. v. First Fidelity Bank, 126 F. Supp.2d 778, 779 n. 4 (S.D.N.Y. 2001); LNC Investments, Inc. v. First Fidelity Bank, 2000 WL 375236 at *1 (S.D.N.Y., April 11, 2000)("The defense of champerty falls within the catchall phrase in Rule 8(c), Fed.R.Civ.P.: 'any other matter constituting an avoidance or affirmative defense.'"); Clou Container Leasing G.m.b.H. v. Ariel Maritime Group, 1992 WL 122786 at *2 (S.D.N.Y., May 22, 1992). Regardless, whether or not the defenses of champerty and maintenance must be plead affirmatively, in accordance with Rule 8, we find the better course is to address the Motion on its merits -- since such changes affect the inherent authority of th Court to protect judicial integrity -- and we turn to consider what law should govern the Motion.

IRS argues that California law is controlling based on the choice of law provision in the 2001 Agreement, which provides, as follows:

> 11. This Agreement shall be governed by and construed in accordance with the laws of the State of California (excluding conflicts of law rules) and of the United States.

Declaration of John Balch in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Motion for Summary Judgment on Champerty and Maintenance Grounds, Exhibit 7, at p. 2.

IRS argues that the 2001 Agreement supercedes the 2000 Agreement. In the 2001 Agreement, IRS and Pacer agreed to the following provision:

> 7. PACER in turn grants IRS a limited royalty and other fee free license with respect to the Patent Properties [the '803 Patent, the '374 Patent, and the '202 Patent] to pursue litigation, for all past, accrued and future damages, against Arctic Cat and any additional parties in the Arctic Cat, Inc. v. Injection Research Specialists, Inc. and Pacer Industries, Inc. case, Civ. No. 01-CV-543 MJD/RLE, currently pending in the United States District Court for the District of Minnesota, and against such other infringers of the Licensed Patents on such terms as set forth in a Memorandum of Agreement executed by the parties on April 13, 2000 which is specifically incorporated by reference herein.

Id.

Based on this provision, IRS contends that California law which, IRS argues, explicitly states that champerty and maintenance are not recognized defenses, should apply. See, Abbott Ford, Inc. v. Superior Court, 43 Cal.3d 858, 885 n. 26 (Cal. 1987) ("California, however, has never adopted the common law doctrines of champerty and maintenance."); In re Cohen's Estate, 152 P.2d 485, 489 (Cal.App. 1944)("California is one of the many states that has never adopted the common law doctrines of

champerty and maintenance."); Bush v. Superior Court, 10 Cal.App.4th 1374, 1380, 13 Cal.Rptr.2d 382, 385 (Cal.App. 1992)("Under the early English common law the doctrines of champerty and maintenance prohibited an assignment of a chose in action," but "[i]n California this common law doctrine has been superceded by statute."); but see, Baum v. Duckor, Spradling & Metzger, 72 Cal.App.4th 54, 66 (Cal.App. 1999)(recognizing that the assignment of claims to attorneys would "(1) encourage unjustified lawsuits; (2) generate increased malpractice lawsuits, burdening the profession, the court system and (to the extent malpractice premiums would inevitably rise and be passed to the consumers) the public; and (3) promote champerty.").

If we were to allow IRS to supercede the 2000 Agreement, after this litigation was commenced, by executing the 2001 Agreement, we would allow IRS to choose what law to apply and, as is the case here, the law they chose, retroactively, to have applied under the 2001 Agreement, appears, to no one's astonishment, not to recognize the defenses of champerty and maintenance. Moreover, the 2001 Agreement explicitly incorporates the 2000 Agreement in its entirety, with the exception of the choice of law provision. While we do not suggest that IRS had the intention of thwarting a champerty and maintenance defense, when the 2001 Agreement was

drafted, we find that it would be unfair to allow a litigant to alter a choice of law provision, in a contract, once litigation has ensued on claims that are implicated by that contract. This lawsuit was commenced when the 2000 Agreement, with its choice of law provision, was in effect, and after-the-fact efforts to alter this Court's choice of law analysis, by a purportedly superseding Agreement, which has no apparent effect other than to alter, quite dramatically, the choice of law provision of the earlier agreement, should not be allowed to impermissibly fetter our analysis, for any burden imposed by a champertous claim falls upon this Court, and not upon the Courts of California.[14] Consequently, we find that Ohio law governs the agreement of the parties.

In support of their assertion, that the 2000 Agreement -- or the 2001 Agreement for that matter -- is void as champertous, Arctic Cat and Suzuki rely principally on Rancman v. Interim Settlement Funding Corp., 789 N.E.2d 217, 221 (Ohio 2003). They also rely on Rancman, supra, for the proposition that a lawsuit cannot be maintained under a champertous agreement. In addition, they rely upon Martin v.

[14]We do not overlook that IRS is a Defendant in this Declaratory Judgment action, but it is undisputed that the action was commenced only after IRS threatened Arctic Cat with infringement litigation of the type envisioned by the 2000 Agreement.

Morgan Drive Away, Inc., 665 F.2d 598, 604 (5th Cir. 1982), and Sampliner v. Motion Picture Patents Co., 255 F. 242 (2nd Cir. 1918). Lastly, Arctic Cat and Suzuki argue that IRS is not a "real party in interest," under Rule 17(a), Federal Rules of Civil Procedure, and therefore, that IRS does not have standing to sue. As authority for that proposition, Arctic Cat and Suzuki rely on Refac Int'l, Ltd. v. Lotus Development Corp., 131 F.R.D. 56, 58 (S.D.N.Y. 1990)("Because REFAC is a 5% owner of the patent in question simply for the purpose of pursuing litigation on FRS's behalf, REFAC's agreement with FRS is nothing but a hunting license -- which is to say, it is champertous and therefore void.").

"'Maintenance' is assistance to a litigant in pursuing or defending a lawsuit provided by someone who does not have a bona fide interest in the case," and "'[c]hamperty' is a form of maintenance in which a nonparty undertakes to further another's interest in a suit in exchange for a part of the litigated matter if a favorable result ensues." Rancman v. Interim Settlement Funding Corp., supra at 219, citing 14 Ohio Jurisprudence 3d (1995), Champerty and Maintenance, Section 1. As the Ohio Supreme Court recently expressed, in Rancman, "'[t]he doctrines of champerty and maintenance were developed at common law to prevent officious intermeddlers from stirring up strife and contention by vexatious and speculative litigation which would

disturb the peace of society, lead to corrupt practices, and prevent the remedial process of the law.'" Id. at 219-20, citing 14 Corpus Juris Secondum (1991), Champerty and Maintenance, Section 3.

As the Court, in Rancman, further explained:

> The ancient practices of champerty and maintenance have been vilified in Ohio since the early years of our statehood. Key v. Vattier (1823), 1 Ohio 132, 136, 1823 WL 8. We stated in Key that maintenance "is an offense against public justice, as it keeps alive strife and contention, and perverts the remedial process of the law into an engine of oppression." Id. at 143. We have held the assignment of rights to a lawsuit to be void as champerty. Brown v. Ginn (1902), 66 Ohio St. 316, 64 N.E. 123, paragraph two of the syllabus. We have also said "that the law of Ohio will tolerate no lien in or out of the [legal] profession, as a general rule, which will prevent litigants from compromising, or settling their controversies, or which, in its tendencies, encourages, promotes, or extends litigation." Davy v. Fid. & Cas. Ins. Co. (1908), 78 Ohio St. 256, 268-269, 85 N.E. 504.
>
> In recent years, champerty and maintenance have lain dormant in Ohio courts. Historically, champertors and maintainors were attorneys, and these practices by attorneys have been regulated by DR 5-103 of the Code of Professional Responsibility. See, e.g., Disciplinary Counsel v. Williams (1990), 51 Ohio St.3d 36, 553 N.E.2d 1082. Nonetheless, the codification of these doctrines for attorney discipline did not remove them from the common law. "[T]he doctrines of champerty and maintenance appear in numerous Ohio cases as contract defenses * * *." Tosi v.

> Jones (1996), 115 Ohio App.3d 396, 400, 685 N.E.2d 580, appeal dismissed upon the application of appellant in (1997), 78 Ohio St.3d 1430, 676 N.E.2d 535.

Id. at 220.

The decision of the Ohio Supreme Court, in Rancman, supra, on which Arctic Cat and Suzuki principally rely, is readily distinguishable from this case.

In Rancman, supra, the appellee was injured in a serious automobile accident. She filed suit against State Farm Insurance Company ("State Farm") claiming uninsured motorist benefits, but she was unwilling to wait until the resolution of her case in order to receive the insurance proceeds. Consequently, the appellee contacted the appellant Interim Settlement Funding Corporation ("Interim") seeking an advance payment of the expected recovery from her pending claim against State Farm. Thereafter, Interim's president entered into an agreement with the appellee, on behalf of a second company, Future Settlement Funding Corporation ("FSF"). Pursuant to that agreement, FSF paid the appellee $6,000 in exchange for the first $16,800 she would recover if the case was resolved within 12 months, the first $22,200 if resolved within 18 months, or the first $27,600 if resolved within 24 months. In the event the case was not resolved in the appellee's favor, then she would have no obligation under

the agreement. Later, Interim advanced the appellee an additional $1,000 in exchange for the next $2,800 she expected to collect on her claim. Id.

The appellee then settled her case against State Farm for $100,000 within 12 months. However, rather than pay the appellants the $16,800 that was due in exchange for the $6,000 advance, and the $2,800 that was due in exchange for the additional $1,000 advance, the appellee merely returned the $7,000 the appellants had advanced her, with eight percent interest. The appellee later filed a Declaratory Judgment action against Interim and FSF. After a Bench Trial, the Court held that transactions were loans, and that those loans violated Ohio's usury laws. Consequently, the Court held that the contract was void. Interim and FSF then appealed. On appeal, the Ohio Supreme Court held that the contract was void under the doctrines of champerty and maintenance. Id.

Rancman is distinguishable because Interim and FSF were attempting to enforce the contract against the appellee. While the Ohio Courts have recognized "the doctrines of champerty and maintenance * * * as contract defenses," id., there is no Ohio authority for the proposition that champerty and maintenance are defenses to claims of patent infringement. Rather, there is authority in Ohio for the opposite proposition of law: that champerty and maintenance are not defenses to claims that are

not based on champertous agreements. See, Pennsylvania Co. v. Lombardo, 29 N.E. 573, 574 (Ohio 1892). In Pennsylvania Company v. Lombardo, supra, the Ohio Supreme Court observed, as follows:

> It would seem that the law, on grounds of public policy, goes quite far enough when it defeats any advantages that may be sought by an enforcement of the agreement, without visiting upon the plaintiff a forfeiture of his right of action in the suit for the prosecution of which the attorney was employed. This is in analogy to our law in regard to usurious contracts, which simply defeats the usurious agreement, without affecting the right of the usurer to recover the principal loaned, with interest at the legal rate; champerty, like usury, not being an offense punishable by indictment in this state. It is stated by the author of a well-written article on the subject, contained in 3 Amer. & Eng. Enc. Law, 68, 86, that, 'the better opinion would appear to be that the defense of champerty can only be set up when the champertous contract itself is sought to be enforced, and that the existence of a champertous agreement between the plaintiff and his attorney, or the fact that the plaintiff is prosecuting the case upon a contingent interest in the subject-matter of the litigation dependent upon success, is no defense to the action against the defendant.

Id.

The Ohio Supreme Court then affirmed the lower Court's rejection of the defendant's motion to dismiss the plaintiff's negligence claim against the defendant, on the basis that the plaintiff's agreement with his attorney was champertous. Id. Given that

holding, even if the agreement between IRS and Pacer was void as champertous, that would only impact a contract claim brought by one of the parties to that contract. Whether the agreement was champertous has no bearing on IRS's claims of patent infringement.

The other authority relied on by Arctic Cat, and Suzuki, fails to support their contention that IRS's claims should be dismissed, or that the 2000 Agreement, or any other agreement, between IRS and Pacer, is champertous. In Martin v. Morgan Drive Away, Inc., supra at 605, a case that Arctic Cat and Suzuki rely upon for the proposition that champerty is "a defense [] available to a party to a lawsuit prosecuted under a champertous agreement," Memorandum of Law in Support of Arctic Cat's and Suzuki's Motion for Summary Judgment on Champerty and Maintenance Grounds, at p. 13, the Court held that the agreement, there at issue, was not champertous. See, Martin v. Morgan Drive Away, Inc., supra at 605 ("It has long been settled in Louisiana that [the] prohibition [against champerty] does not apply to persons who are not 'officers of the court,'" and "[h]ence under Louisiana law, the 1978 agreement was not champertous."). Since IRS is not an officer of the Court, under Martin, the 2000 Agreement is also not champertous.

Similarly, in Sampliner v. Motion Picture Patents Company, supra, a case cited by Arctic Cat and Suzuki to support their assertion, that champertous assignments of rights to sue warrants the dismissal of claims unrelated to the champertous agreement -- in Sampliner, it was the assignment of Sherman Act claims -- the Court's holding was actually limited to agreements between injured, prospective litigants, and attorneys to whom the rights to sue were assigned. Id. at 252. In so holding, the Court of Appeals for the Second Circuit reasoned as follows:

> The general tendency of such agreements as the attorney and client made in this case is contrary to the public interests. The agreement concerns the administration of justice in the courts, and it is made by an officer of the courts, who undertakes to speculate in his client's suit. The attorney knows much better than his client can possibly know the value of a particular cause of action and the chances as to its successful prosecution in the particular case, and even if there is a full and honest disclosure to the client there are strong reasons which should forbid the purchase. It would be a gross impropriety in a judge to buy a lawsuit. The impropriety may be less in degree, but it is none the less an impropriety for an attorney, who is an officer of the court and a minister of justice, to speculate in the suits of his client. It would tend to impair public confidence in the profession and in the administration of justice itself.

Id.

Moreover, the Court stated that, had the lower Court found that the assignment was for the payment of past debts, then the agreement would not have been champertous. Id. As a result, the Court, albeit in dicta, indicated that some assignments of claims, even assignments to lawyers, were not champertous. Notably, the Court of Appeal's decision, in Sampliner, was reversed on appeal by the United States Supreme Court, which found that the jury had not been given all of the available evidence on whether the assignment in question was for the payment of past debts. See, Sampliner v. Motion Picture Patents Company, 254 U.S. 233, 240 (1920). Again, IRS is not an attorney and, as such, the 2000 Agreement is not champertous under the holding in Sampliner.

Arctic Cat and Suzuki's reliance on Stewart v. Welch, 41 Ohio St. 483, 494 (1885), is also misplaced. There, a claimant disputing the distribution of his grandfather's estate assigned his right in the estate to an attorney. Id. Once again, as the Court of Appeals for the Second Circuit had explained, in Sampliner, supra, 255 F. 242, the assignment of claims to attorneys is strongly disfavored on public policy grounds. Those same concerns are not presented by Pacer's assignment of claims to IRS.

The Court's holding, in Refac International, Ltd. v. Lotus Development Corporation, supra at 58, which is another case relied upon by Arctic Cat and Suzuki, is readily distinguishable from the facts confronting us. There, the plaintiff, REFAC, was granted a 5% interest in the patent in suit by the patent holder, FRS, in exchange for REFAC's obligation to sue at least two alleged infringers of the patent. REFAC, and FRS, would then split equally any recovery from the ensuing litigation. The Court stated that, "[b]ecause REFAC is a 5% owner of the patent in question simply for the purpose of pursuing litigation on FRS' behalf, REFAC's agreement with FRS is nothing but a hunting license -- which is to say, it is champertous and therefore void." Id. The plaintiff REFAC did not have any other connection with the patented technology, and FRS was not a party to the litigation. Consequently, the Court held that REFAC was not the real party in interest, under Rule 17(a), Federal Rules of Civil Procedure. As a consequence, the Court directed as follows:

> If FRS does not agree voluntarily to join this action as plaintiff, this action will be dismissed with prejudice pursuant to Fed.R.Civ.P. 19(a) for failure to join a necessary party. Accordingly, this action is dismissed with prejudice absent the substitution of FRS for REFAC as named plaintiff, or the addition of FRS as a named party, within ten days.

Id.

Here, the relationship between IRS and Pacer demonstrates that IRS's interest in the patents-in-suit is substantially more than a mere litigation interest. In 1986, IRS was incorporated for the purpose of funding, and commercializing, Chasteen's invention. On November 12, 1987, when Chasteen filed an application for the '701 Patent, he assigned the patent to IRS in his application to the PTO. When the '701 Patent was issued on February 20, 1990, Chasteen was listed as the inventor, and IRS as an assignee. On December 6, 1994, the '701 Patent was reissued as the '803 Patent, which also listed Chasteen as the inventor, and IRS as the assignee. Quite obviously, IRS has substantial ties to the patents at issue here.

Further, IRS's relationship with Pacer dates back to at least September 25, 1991, when IRS sold most of its assets to Pacer, for which Pacer paid substantial consideration. IRS and Pacer agreed to jointly fund, and to divide the proceeds from, litigation pertaining to IRS's trade secrets and patents. It was IRS's patents and trade secrets, and not Pacer's, that were originally conveyed, and it was Pacer who was assigned an exclusive license to IRS's patents in the first instance. Accordingly, the 2000 Agreement cannot accurately be described as a "hunting license." At the very least, there exists a factual issue as to whether the 2000 Agreement, which was entered into nearly a full decade after the parties first entered into a litigation agreement, as part

of the 1991 asset sale, was entered into for the sole purpose of pursuing litigation, that is, whether the 2000 Agreement was a "hunting license."

Moreover, even if the 2000 Agreement could be construed as a "hunting license," under the Court's holding in Refac, dismissal would be inappropriate. In contrast to Refac, where only the assignee was a party to the litigation, here, both IRS and Pacer were named as Defendants by Arctic Cat, in its Complaint, and both IRS and Pacer are named Counterclaimants in their Answer and Counterclaims. Therefore, a dismissal under Rule 19(a), Federal Rules of Civil Procedure, which was threatened in Refac if the patent holder was not joined, would be inappropriate here.

In contrast to the authorities relied upon by Arctic Cat, and Suzuki, we find the facts, here, to be more analogous to those presented in Welch v. Coro, Inc., 97 F. Supp. 185, 186 (S.D.N.Y. 1951). In Welch, supra, the original plaintiffs, Charles L. and Charles E. Welch, who were Administrators for the estate of Horace H. Welch, alleged claims of patent infringement against the defendant. Robert N. Rose, to whom the Administrators assigned the patent rights -- including all rights to bring infringement actions of the patent -- in exchange for $1,500 plus one half of the proceeds of any recovery, less $1,500 -- was later added as an additional plaintiff. The defendant alleged that the assignment to Rose was champertous, and therefore, that Rose had no

standing to sue on the patent. In rejecting the defendant's argument, the Court held as follows:

> The action is brought in the name of the Administrators as well as Rose for 'damages sustained by plaintiffs' and it is clear that Rose may have sustained damage independently of any damages sustained by the Administrators and therefore his cause of action is not based on the alleged champertous agreement. Rose is not a stranger to the action buying his way in. Undoubtedly in trying to control the entire patent infringement action Rose is merely seeking to protect a legitimate business interest of his own, which protection he could not expect from mere administrators of an estate. See Chester H. Roth, Inc., v. Esquire, decided by the Court of Appeals for this Circuit on January 17, 1951. 186 F.2d 11. Therefore the defendant cannot avail himself of the doctrine of champerty as a defense to this action.
>
> In addition, it appears that the doctrine of champerty could not be applied to the assignee of a patent. An assignee of a patent can validly and legally have assigned to him all past claims for damages due to infringement. 35 U.S.C.A. § 47, and cases decided under that Section, e.g., Lewis Invisible Stitch Mach. Co. v. Columbia Blindstitch Mach. Mfg. Corp., D.C.S.D.N.Y. 1937, 22 F. Supp. 705, 711. This being so, there can be no allegation of champerty in this case against the bona fide assignee of the patent in question.

Id. at 186-87.

The same holds true here. IRS is the original bona fide assignee of the Patent, and IRS's subsequent assignment to Pacer was also a bona fide transfer as part of IRS's

1991 sale of most of its assets, which occurred almost a full decade before this litigation was commenced.

In fact, although the 1991 asset sale agreement also contained a provision related to the Polaris Litigation, and trade secret claims, there was no mention of infringement claims against Arctic Cat and Suzuki. Thus, it appears that the claims against Arctic Cat and Suzuki were not even contemplated at the time IRS and Pacer first entered into contractual relations. It only became necessary for IRS and Pacer to supplement their contractual relationship, with additional contracts -- such as the 2000 Agreement -- upon the discovery of additional claims related to their patents. Consequently, there is much more to the relationship between IRS and Pacer than just the 2000 Agreement.

We also find the Court's analysis, in Fischer Bros. Aviation, Inc. v. NWA, Inc., 117 F.R.D. 144, 147 (D. Minn. 1987), both compelling and apposite to the facts of this case. There, the Court stated:

> Defendants, in their admonishment that antitrust claims ought not be traded on the market as commodities, assert that the assignment here is champertous, citing Ohio law, and Morgan Drive Away. In that case, at 603, the Fifth Circuit defined champerty as "officious intermeddling in a suit in which one has no interest * * * maintenance with compensation derived from the proceeds of the suit." This

> is neither a champertous effort on the part of the assignees, nor an investment gambit by a disinterested party attempting to use this action to collect a windfall. Instead, the assignees here preserved their very real interest in the case as shareholders, up until the May, 1987 sale of the plaintiff corporation, through the assignment of the claim. Taking their allegations as true, for the purposes of this motion, it appears reasonable that they sold their company after its loss of an exclusive contract, obtaining what value they could, and retaining the rights of the corporation to collect for its diminished value and damages, by way of the assignment. The assignees here cannot fairly be referred to as strangers to the events involved in this litigation, either prior to or after the assignment.

Id.

Similarly, neither IRS, nor Pacer, can accurately be described as strangers to this litigation, given their substantial history with the patents in suit, and the assignment of rights that they have received in the Patents in suit.

Further, as IRS argues, even if we were to find that the 2000 Agreement was champertous and, as such, was void, that would simply reverse the assignment of the ‘803 Patent from IRS to Pacer. Consequently, IRS would be the sole owner of the Patent, and Pacer would be the exclusive licensee. In either event, both IRS and Pacer would still have standing to sue, as they would both be real parties in interest under Rule 17. “The general rule is that the question of whether a person is a real party in interest under Rule 17(a) is decided by the substantive law of the forum which created

the right being sued upon." Martin v. Morgan Drive Away, Inc., supra at 604. Under Federal Circuit precedent, it is clear that both an exclusive licensee, and the owner of the patent, may jointly have standing to sue for infringement. See, Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., supra at 1348 ("[A]n exclusive licensee having fewer than all substantial patent rights possesses standing under the Patent Act as long as it sues in the name of, and jointly with, the patent owner."). Under this authority, both IRS and Pacer have standing to sue Arctic Cat and Suzuki for infringement. Accordingly, based on the foregoing, we recommend that the Motion of Arctic Cat and Suzuki for Summary Judgment on grounds of champerty and maintenance be denied.[15]

D. The Motion of IRS for Summary Judgment Concerning Obviousness Contentions on which Plaintiffs' Experts Rendered No Opinion.

IRS argues that it should be granted Summary Judgment on the issue of obviousness given that Arctic Cat, and Suzuki, will not present expert testimony regarding the obviousness of seventeen (17) combinations of prior art. Specifically,

[15] Arctic Cat objected to much of the evidence cited by IRS, in its pleadings, and moved to strike that material. Having found that some of the statements made, and evidence relied upon, by IRS, have no relevance to this Motion, we did not address that material in our analysis of the Motion. We address Arctic Cat's Motion to Strike in a separate Order.

IRS seeks Summary Judgment as to Count 1 of Arctic Cat's Amended Complaint, which states that "[t]he '803 Patent is invalid, at least for failure to comply with the provisions of 35 U.S.C. §§102, 103 [obviousness], 112, and/or 116," and as to Arctic Cat's, and Suzuki's, affirmative defenses under Title 35 U.S.C. §103. As a consequence, we must determine whether expert testimony is required in order to prove obviousness at Trial.

1. Standard of Review. The invalidity of a patent for obviousness is governed by Title 35 U.S.C. § 103(a), which provides as follows:

> A patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

"The ultimate determination of whether an invention would have been obvious under section 103(a) is a legal conclusion based on underlying findings of fact." Velander v. Garner, 348 F.3d 1359, 1363 (Fed. Cir. 2003), citing In re Kotzab, 217 F.3d 1365, 1369 (Fed. Cir. 2000); see also, Akamai Technologies, Inc. v. Cable & Wireless Internet Services, Inc, 344 F.3d 1186, 1195 (Fed. Cir. 2003)("While the ultimate

conclusion of obviousness is for the court to decide as a matter of law, several factual inquiries underlie this determination.”).

“The underlying factual inquiries include (1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; and (3) the differences between the claimed invention and the prior art.” Id., citing Graham v. John Deere Co., 383 U.S. 1, 17 (1966); see also, National Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1334 (Fed. Cir. 2004) (listing the factors as: “‘(1) the scope and content of the prior art; (2) the differences between the prior art and the claims; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness.’”), quoting Riverwood Int’l Corp. v. Mead Corp., 212 F.3d 1365, 1366 (Fed. Cir. 2000).

“If all the elements of an invention are found in a combination of prior art references, a proper analysis under [Section] 103 requires, inter alia, consideration of two factors: (1) whether the prior art would have suggested to those of ordinary skill in the art that they should make the claimed composition or device, or carry out the claimed process; and (2) whether the prior art would also have revealed that in so making or carrying out, those of ordinary skill would have a reasonable expectation of success.” Id., citing In re Vaeck, 947 F.2d 488, 493 (Fed. Cir. 1991) ; In re Dow Chem. Co., 837 F.2d 469, 473 (Fed. Cir. 1988); see also, Noelle v. Lederman, 355

F.3d 1343, 1352-53 (Fed. Cir. 2004). Further, "[w]hen a rejection depends on a combination of prior art references, there must be some teaching, suggestion, or motivation to combine the references." Akamai Technologies, Inc. v. Cable & Wireless Internet Services, supra at 1196, citing In re Geiger, 815 F.2d 686, 688 (Fed. Cir. 1987). "Although the suggestion to combine references may flow from the nature of the problem, the suggestion more often comes from the teachings of the pertinent references, or from the ordinary knowledge of those skilled in the art that certain references are of special importance in a particular field." Akamai Technologies, Inc. v. Cable & Wireless Internet Services, supra at 1196 [internal citations omitted], citing, Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc., 75F.3d 1568, 1573 (Fed. Cir. 1996), citing in turn, Ashland Oil, Inc. v. Delta Resins & Refractories, Inc., 776 F.2d 281, 297 n. 24 (Fed. Cir. 1985).

Therefore, "[w]hen determining the patentability of a claimed invention which combines two known elements, 'the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination.'" In re Beattie, 974 F.2d 1309, 1311-12 (Fed. Cir. 1992) , quoting Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co., 730 F.2d 1452, 1462 (Fed. Cir. 1984). "Although the ultimate determination of obviousness is a legal

conclusion, '[t]he presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact.'" Medical Instrumentation and Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1221 (Fed. Cir. 2003), quoting In re Gartside, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

2. Legal Analysis. Although IRS concedes that a Jury must decide whether the seventeen (17) combinations at issue were obvious, at the time the invention was made, to a person having ordinary skill in the art, IRS submits that Arctic Cat's and Suzuki's expert witness, Roger Berry, opined that "an ordinarily skilled person would have at least 5 years of engine control system related experience, awareness of the benefits of fuel injection vs. carburetion, general knowledge of engine function and EFI systems, knowledge of basic electronics and carburetors, knowledge of control system suppliers as well as an appreciation of the use of microprocessors in control systems." Memorandum of Points and Authorities in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Motion for Summary Judgment Concerning Obviousness Contentions on which Plaintiffs' Expert Rendered No Opinion, at p. 6. As a result, IRS argues that, without such knowledge, or the aid of an expert witness, the Jury would not be able to determine what would be obvious to a person of ordinary skill in the art, and therefore, that Arctic Cat and Suzuki have

failed to present evidence of an essential element of obviousness. Consequently, IRS argues that there is no genuine issue of material fact in dispute, because Arctic Cat and Suzuki have failed to identify any expert opinions on obviousness in any of their expert reports.

While it is clear that, "[i]f complex scientific principles are involved or expert testimony is needed to explain a disputed term, for example, then an underlying factual question may arise which makes summary judgment improper," Howes v. Medical Components, Inc., 814 F.2d 638, 643 (Fed. Cir. 1987), it is unclear whether the absence of essential expert testimony can support an award of Summary Judgment, especially where, as here, the expert testimony is not over a contested fact, in support of which IRS has presented expert testimony. Arctic Cat responds that there is no requirement that it present expert testimony, citing Petersen Manufacturing Co., Inc. v. Central Purchasing, Inc., 740 F.2d 1541 (Fed. Cir. 1984), rev'd on other grounds.

IRS concedes that Petersen states that expert testimony is not always necessary, but it distinguishes Petersen on the basis that, there, the dispute involved a simple hand tool, and asserts that where, as here, the technology is complicated, expert testimony on obviousness is required. However, IRS offers no authority for that proposition, nor could any such authority be found. See, Dayco Products, Inc. v. Total

Containment, Inc., 329 F.3d 1358, 1362 (Fed. Cir. 2003)("[T]he reference and the claimed invention are easily understandable without the need for expert testimony.")[dicta]; Harvestall Industries, Inc. v. Hochstetler, 656 F.2d 1232, 1234 (7th Cir. 1981)("Moreover, in a patent case expert testimony is not always necessary to determine the scope of the prior art or the obviousness of the alleged invention."); Deuer Manufacturing, Inc. v. Kent Products, Inc., 907 F.2d 158, 1990 WL 78997, at *1 (Fed. Cir., June 12, 1990)("Even if none of [the defendant's] expert witnesses were able to point to prior art which expressly suggested the proposed combination of references to arrive at the invention, such an express suggestion is not always necessary to show obviousness.").

To be sure, unlike claims of medical malpractice, or legal malpractice, which require expert testimony, there is no such requirement for patent invalidity on obviousness grounds. See, e.g., Hall v. Arthur, 141 F.3d 844, 847 (8th Cir. 1998)("[A] medical malpractice case must be established by expert testimony."); Kaempe v. Myers, 367 F.3d 958, 966 (D.C. Cir. 2004)(noting that, in a legal malpractice action, "the plaintiff must present expert testimony establishing the standard of care"); Meyer v. Dygert, 156 F. Supp.2d 1081, 1091 (D. Minn. 2001)("The law in Minnesota has long held that expert testimony is generally required in legal malpractice cases.").

Further, as the Court of Appeals for the Seventh Circuit has noted, "[p]atent cases are in most circumstances unsuited for resolution upon motions for summary judgment." Harvestall Industries, Inc. v. Hochstetler, supra at 1234; see also, Federal Laboratories, Inc. v. Barringer Research Limited, 696 F.2d 271, 274 (3rd Cir. 1982) ("We have characterized summary judgment as a drastic remedy, and have made clear that courts are to resolve any doubts as to the existence of genuine issues of fact against the moving parties."). While it will always remain Arctic Cat's, and Suzuki's, burden to prove obviousness at Trial, it is IRS's burden, as the moving party, to prove there are no material facts in dispute with respect to obviousness. Moreover, as the Supreme Court first recognized, in Graham v. John Deere Co., supra at 17, "the legal question of obviousness must be answered on the factual findings regarding prior art, its differences from the disputed patent, and the level of skill in the art." Medical Laboratory Automation, Inc. v. Labcon, Inc., 670 F.2d 671, 673-74 (7th Cir. 1981), citing Graham v. John Deere Co., supra.

Here, IRS has presented no evidence describing the purported prior art, or how the purported prior art is different from the disputed Patent. As a consequence, we find that an award of Summary Judgment would be inappropriate. See, B & G Plastics, Inc. v. Eastern Creative Industries, Inc., 269 F. Supp.2d 450, 453 (S.D.N.Y.

2003)("The [Magistrate's] Report correctly concludes that summary judgment is inappropriate because '[t]he parties have provided little in the way of evidence' for the Court to make [a] factual determination."). In B & G Plastics, supra, the patent holder, who was seeking Summary Judgment on the basis of obviousness, argued that the patent at issue was presumptively valid given the alleged infringer's failure to offer any admissible evidence on the issue of validity. In rejecting the patent holder's argument, the Court stated that "[a] presumption 'does not constitute "evidence" to be weighed against a challenger's evidence.'" Id., citing Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1562 (Fed. Cir. 1988). The Court then held that the alleged infringer, "by presenting evidence of prior art and combination, has met its burden at this stage." Id., citing Kalman v. Berlyn Corp., 914 F.2d 1473, 1476 (Fed. Cir. 1990).

Here, Arctic Cat and Suzuki have presented evidence of prior art, and listed the combinations that they maintain invalidate IRS's patents. In addition, Arctic Cat and Suzuki have identified several fact witnesses who, they represent, will provide testimony on obviousness at the time of Trial. See, Arctic Cat's Memorandum in Opposition to IRS and Pacer's Motion for Summary Judgment Concerning Obviousness Contentions on which Plaintiff's Expert Rendered No Opinion, at pp.

3-4. While IRS argues that some of the evidence, which is relied upon by Arctic Cat and Suzuki, will be inadmissible at Trial under Rule 701, Federal Rules of Evidence, that determination is premature on this Record. Consequently, without knowing, conclusively, what evidence Arctic Cat and Suzuki will present at Trial, it is premature to grant Summary Judgment to IRS, especially when IRS has failed to demonstrate, by expert testimony or otherwise, that the combinations are not obvious. See, WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1359 (Fed. Cir. 1999) ("Objective evidence of non-obviousness may be used by a patentee to rebut a prima facie case of obviousness based on prior art references.").

Of course, at Trial, if Arctic Cat and Suzuki fail to offer sufficient evidence to sustain a finding of obviousness, IRS can then move for the entry of Judgment as a matter of law, on obviousness. At this time, however, we recommend that IRS's Motion for Summary Judgment on obviousness be denied.

E. The Motion of IRS for Summary Judgment that the Bench Systems Developed by Cuyuna Engine Company and Arctic Cat do not Anticipate Any Claim of the '803 Patent.

In its Complaint, Arctic Cat alleges that the '803 Patent is invalid under Title 35 U.S.C. §102 because it is anticipated by several prior inventions. See, Docket

No. 1. In response to this assertion, in Interrogatory No. 5, IRS asked Arctic Cat to answer the following:

> Separately with respect to each claim of the Patents-in-Suit, state the date and the circumstances surrounding the development of each prior invention pursuant to 35 U.S.C. §102(g) that Arctic Cat alleged anticipates each of the claims of the Patents-in-Suit * * *.

Declaration of Michael S. Wilcox in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Motion for Summary Judgment that the Bench Systems Developed by Cuyuna Engine Company and Arctic Cat do not Anticipate any Claim of U.S. Patent No. RE 34,803, Exhibit F ("Arctic Cat Inc.'s Supplemental Answers to Pacer Industries, Inc.'s Interrogatory Nos. 5-6"), at p. 2.

In its Supplemental Answers to Interrogatory No. 5, Arctic Cat listed, and described, several prior inventions that it contends anticipated the '803 Patent. Arctic Cat first stated that "Mercury Marine developed the two-stroke EFI system described in the patents in suit before Chasteen's purported invention." Id. at p. 4. In addition, Arctic Cat responded that "Gerhard Maier developed the EFI system claimed in the patents in suit before Chasteen's purported invention * * * while working for the Robert Bosch Corporation and Outboard Marine Corporation." Id. Lastly, Arctic Cat stated that "Intelligent Controls, Inc., in connection with Cuyuna Engine Company and/or Arctic Cat, developed the subject matter embodied in the patents in suit before Chasteen's purported invention." Id. at 7.

IRS argues that the third prior invention, which was referred to by Arctic Cat in its Supplemental Answers to Interrogatory No. 5 -- the EFI system developed by Intelligent Controls, Inc. ("Intelligent Controls"), Cuyuna Engine Company ("Cuyuna"), and Arctic Cat (which we shall refer to as the "Cuyuna EFI System") -- does not anticipate any claim in the '803 Patent. IRS does not, however, seek Summary Judgment on either the Mercury Marine prior art, or the Gerhard Maier prior art. Rather, IRS's Motion for Summary Judgment is limited to the single question of whether the Cuyuna EFI System anticipated the '803 Patent. As a result, Arctic Cat argues, in opposition, that IRS's Motion "is not a Motion for Summary Judgment but rather a very narrow evidentiary motion." Arctic Cat Inc.'s Opposition to IRS's and Pacer's Motion for Summary Judgment that the Bench Systems Developed by Cuyuna and Arctic Cat Do Not Anticipate Any Claim of U.S. Patent No. Re. 34,803, at p. 1.

1. Standard of Review. "Section 102(g) provides that a person is not entitled to a patent if 'before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it.'" Union Carbide Chemicals & Plastics Technology Corp. v. Shell Oil Co., 308 F.3d 1167, 1189 (Fed. Cir. 2002), quoting Title 35 U.S.C. §102(g). "An inventor can

establish that she was the first to invent under [Section] 102(g) by demonstrating either that she was the first to reduce the invention to practice or that she was the first to conceive of the invention and then, prior to the other party's conception, exercised reasonable diligence in reducing the invention to practice." Id.; citing Griffin v. Bertina, 285 F.3d 1029, 1032 (Fed. Cir. 2002); see also, Dow Chemical Co. v. Astro-Valcour, Inc., 267 F.3d 1334, 1338 (Fed. Cir. 2001)("Therefore, if a patentee's invention has been made by another, prior inventor who has not abandoned, suppressed, or concealed the invention, [Section] 102(g) will invalidate that patent."); Sandt Technology, Ltd. v. Resco Metal and Plastics Corp., 264 F.3d 1344, 1350 (Fed. Cir. 2001)("A prior art device can anticipate a claimed invention under [Section] 102(g)(2) if it was conceived and reduced to practice prior to the filing date of the patent."), citing New Idea Farm Equip. Corp. v. Sperry Corp., 916 F.2d 1561, 1565 (Fed. Cir. 1990). Further, "[t]o prove actual reduction to practice, an inventor must establish that he actually prepared the composition and knew it would work." Id., citing Estee Lauder Inc. v. L'Oreal, S.A., 129 F.3d 588, 592 (Fed. Cir. 1997).

Of course, "[o]ne who is first to conceive but last to reduce to practice is entitled to priority only on a showing of reasonable diligence extending from a time prior to the other party's conception to its own reduction to practice." In re Jolley,

308 F.3d 1317, 1325 (Fed. Cir. 2002), citing Title 35 U.S.C. § 102(g); Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1578 (Fed. Cir. 1996). "Our case law has not set strict time limits regarding the minimum or maximum periods between a prior inventor's first making of the invention and the subsequent disclosure of the invention necessary to establish or infer suppression, or concealment." Dow Chemical Co. v. Astro-Valcour, Inc., supra at 1342, citing Checkpoint Sys., Inc. v. U.S. Int'l Trade Com'n, 54 F.3d 756, 761 (Fed. Cir. 1995)("[T]here is no particular length of delay that is per se unreasonable.").

"Although unreasonable delay in bringing knowledge of the invention to the public may raise an inference of suppression or concealment, [m]ere delay, without more, is not sufficient to establish suppression or concealment." Id. [internal citations omitted]. Rather, "each case involving the issue of suppression or concealment must be considered on its own particular set of facts." Id.; see also, Bey v. Kollonitsch, 806 F.2d 1024, 1029 (Fed. Cir.1986)(holding that "work on a related case is to be credited toward reasonable diligence if the work on the related case contributes substantially to the ultimate preparation of the involved application.").

2. Legal Analysis. As the Federal Circuit held, in Apotex USA, Inc. v. Merck & Co., Inc., 254 F.3d 1031, 1035 (Fed. Cir. 2001), the challenger to the

validity of a patent must establish prior invention by clear and convincing evidence and, if the challenger does so, the burden of production shifts to the patentee to produce evidence sufficient to create a genuine issue of material fact as to whether the prior inventor abandoned, suppressed, or concealed the invention. If the patentee carries this burden of production, the challenger may rebut the evidence of abandonment, suppression, or concealment, with clear and convincing evidence to the contrary. Id.; see also, Dow Chemical Co. v. Astro-Valcour, Inc., supra at 1338. Further, as the Federal Circuit expressed, in Sandt Technology, Ltd. v. Resco Metal and Plastics Corp., supra at 1350, "[t]he presumption of validity, 35 U.S.C. § 282 (1994), requires those challenging validity to introduce clear and convincing evidence on all issues relating to the status of a particular reference as prior art." Id., citing Mahurkar v. C.R. Bard, Inc., supra at 1576.

However, in both Apotex USA, Inc. v. Merck & Co., Inc., and Sandt Technology, Ltd. v. Resco Metal and Plastics Corp., the patent holders were appealing the lower Court's finding that the patents-in-suit were invalid as anticipated by prior art, as well as the Court's subsequent grant of the alleged infringers' Motions for Summary Judgment. Here, Arctic Cat has not filed a cross-Motion for Summary Judgment. Rather, it is IRS, the patent holder, who is the moving party, and who must

establish the validity of the ‘803 Patent, against the Cuyuna EFI System. In other words, IRS bears the burden of demonstrating that the Cuyuna EFI System did not anticipate the ‘803 Patent. See, Rule 56, Federal Rules of Civil Procedure.

While we acknowledge, in the context of Summary Judgment, that “an adverse party may not rest upon the mere allegations or denials of the adverse party’s pleading, but the adverse party’s response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial,” Rule 56(e), Federal Rules of Civil Procedure, and that a “the movant is entitled to Summary Judgment where the nonmoving party has failed ‘to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial,’” Goddard, Inc. v. Henry’s Foods, Inc., 291 F. Supp.2d 1021, 1031 (D. Minn. 2003), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), IRS still bears the burden of proving that it is entitled to Summary Judgment. Further, in contrast to IRS’s assertion, that Arctic Cat has failed to present any evidence that the Cuyuna EFI System anticipated the ‘803 Patent, Arctic Cat’s response to Interrogatory No. 5 reveals that there is evidence, in the Record, that shows, at least, the presence of a material issue of fact as to whether the Cuyuna EFI System anticipated the ‘803 Patent.

In its Answer to Interrogatory No. 5, Arctic Cat averred as follows:

> Intelligent Controls EFI controller could either fix or vary injection timing and was capable of varying injection pulses width based on a variety of operating conditions. The fuel injection system included maps for storing fuel injection values based on engine speed and throttle valve angle. The system included inputs for air temperature, altitude, and engine temperature. The system sensed battery voltage.

Declaration of Michael S. Wilcox in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Motion for Summary Judgment that the Bench Systems Developed by Cuyuna Engine Company and Arctic Cat do not Anticipate any Claim of U.S. Patent No. RE 34,803, Exhibit F ("Arctic Cat Inc.'s Supplemental Answers to Pacer Industries, Inc.'s Interrogatory Nos. 5-6"), at p. 7.

Arctic Cat also explained that, "[i]n 1987, Kim Chervestad built and tested a prototype EFI-system for a two-stroke snowmobile engine that utilized an Intelligent Controls EFI controller," and "[t]his fuel injection system was based on a map that stored fuel injection times based on engine speed and throttle valve angle, with inputs for air temperature, altitude and engine temperature, and a means to sense battery voltage." Id. at p. 7-8.

We find that this evidence raises a genuine issue of material fact concerning whether the Cuyuna EFI System anticipated the invention embodied in the '803 Patent. Accordingly, we recommend that IRS's Motion be denied.[16]

F. The Motion of Arctic Cat and Suzuki for Summary Judgment on the Invalidity of the '803 Patent Under Title 35 U.S.C. §102(b).

Arctic Cat and Suzuki argue that the '803 Patent is invalid, under the "on-sale bar," because Chasteen offered to sell the invention, which is embodied in the '803 Patent. See, Title 35 U.S.C. §102(b). Specifically, Arctic Cat and Suzuki contend that, in September of 1986, Chasteen offered to sell an EFI kit, which

[16]As we have noted, this Motion is limited in scope to the Cuyuna EFI System, and therefore, even if we were to grant the Motion, Arctic Cat would still have an anticipation defense based on the Mercury Marine prior art, and the Gerhard Maier prior art. While we agree with IRS, that Rule 56 vests us with the authority to grant partial Summary Judgment on a claim or defense, IRS has presented no authority, nor have we found any, for the proposition that Summary Judgment is appropriate, as to one piece of evidence that may, or may not, be offered at Trial to support a claim or defense. As a practical matter, the only relief that Arctic Cat is seeking in this Motion is to preclude evidence of the Cuyuna EFI System from being offered in support of Arctic Cat's defense, that the '803 Patent was anticipated by the Cuyuna EFI System. A grant of this Motion will not narrow the issues at Trial, as Arctic Cat can still support its anticipation defense with the Mercury Marine, and Gerhard Maier prior art. Instead, granting this Motion will only limit the evidence that Arctic Cat could offer in support of its defense.

embodied the invention described in the ‘803 Patent, to Peter Andrews (“Andrews”), who is a snowmobile racer in St. Mary’s, Alaska.

1. Standard of Review. “Under [Section] 102(b) ‘[a] person shall be entitled to a patent unless * * * the invention was * * * on sale in this country, more than one year prior to the date of the application for patent in the United States * * *.’” Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc., 322 F.3d 1335, 1346 (Fed. Cir. 2003), quoting Title 35 U.S.C. § 102(b). “A two-prong test governs the application of the on-sale bar: ‘First, the product must be the subject of a commercial offer for sale,’” and “‘[s]econd, the invention must be ready for patenting.’” Id., quoting Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 67 (1998); see also, Minnesota Mining & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1301 (Fed. Cir. 2002); In re Kollar, 286 F.3d 1326, 1328 (Fed. Cir. 2002).

Thereafter, “a comparison of the asserted claims with the device or process that was sold” must be made, and the “determination that a claim is invalid as being anticipated requires factual findings that ‘each and every limitation is found either expressly or inherently’ in the device or process that was sold.” Minton v. National Ass’n of Securities Dealers, Inc., 336 F.3d 1373, 1376 (Fed. Cir. 2003), citing Celeritas Techs., Ltd. v. Rockwell Int’l Corp., 150 F.3d 1354, 1360 (Fed. Cir. 1998).

Further, "[b]ecause 'a patent is presumed to be valid, 35 U.S.C. § 282, and this presumption can only be overcome by clear and convincing evidence of facts to the contrary,' [Dana Corp. v. Am. Axle & Mfg., Inc., 279 F.3d 1372, 1375 (Fed. Cir. 2002)], the facts underlying a conclusion that a claim is unpatentable in light of a sale must be proven with clear and convincing evidence." Id.

We first consider whether [the patent] was "on sale" within the meaning of Title 35 U.S.C. § 102(b). See, Minton v. National Ass'n of Securities Dealers, Inc., supra at 1376. "Subject matter that is 'on sale' includes that which is (1) subject to a commercial offer for sale and (2) 'ready for patenting' at the time of the offer for sale." Id., citing Pfaff v. Wells Elecs., Inc., supra at 67. As the Federal Circuit recently observed, in Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc., supra at 1347, "[i]n [Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1045-46 (Fed. Cir. 2001)], we held that '[o]nly an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance * * * constitutes an offer for sale under [Section] 102(b).'" Id.; see also, Elan Corp., PLC v. Andrx Pharmaceuticals, Inc., 366 F.3d 1336, 1341 (Fed. Cir. 2004). The Court then stated that, "[i]n so holding, we noted that Federal Circuit law, not state contract law, would control and that we would look

to the Uniform Commercial Code ("UCC") for guidance as to whether a particular communication rose to the level of a 'commercial offer for sale.'" Id.

"The 'ready for patenting' requirement may be satisfied in at least two ways: (1) by proof of reduction to practice before the critical date; or (2) proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." Minton v. National Ass'n of Securities Dealers, Inc., supra at 1376.

2. Legal Analysis. The Record reveals, as evidenced by Andrews's testimony, that Chasteen did not sell an EFI system to Andrews. See, Declaration of Annamarie A. Daley, Exhibit D ("Declaration of Peter Matthew Andrews, Jr."), at p. 3. Even though no sale was made, "[a] single offer to sell is enough to bar patentability whether or not the offer is accepted." A.B. Chance Co. v. RTE Corp., 854 F.2d 1307, 1311 (Fed. Cir. 1988); see also, Pfaff v. Wells Elecs., Inc., 124 F.3d 1429, 1436 (Fed. Cir. 1997), aff'd, 525 U.S. 55 (1998)("The on-sale bar is not limited solely to a sale of, or an offer to sell, a product that anticipates the later patented invention," as "[i]t also applies if the subject matter of the sale or offer to sell would have rendered the claimed invention obvious by its addition to the prior art.").

Therefore, we must first determine whether Chasteen offered to sell an EFI kit to Andrews as Arctic Cat and Suzuki have alleged.

Arctic Cat and Suzuki proffer the deposition of Andrews as evidence of Chasteen's offer to sell an EFI system to him. In his deposition testimony, Andrews reported that he telephoned Chasteen because he had seen an advertisement in a magazine for an EFI system, as well as a "turbo" system. See, Declaration of Annamarie A. Daley, Exhibit E ("Videotaped Deposition of Peter M. Andrews"), at p. 7. Andrews also testified that, during his telephone conversation with Chasteen, Chasteen provided information about the EFI system. Id.

At the outset, we note that, while it appears that Arctic Cat and Suzuki contend that Chasteen made a commercial offer to sell, during his telephone conversation with Andrews, to the extent that it is argued that the advertisement constituted a commercial offer, that argument fails. As stated, to determine if Chasteen made a commercial offer to Andrews, we must look to the UCC for guidance. See, Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc., supra at 1347. However, "[t]he UCC does not define 'offer,'" and "[a]ccordingly, courts must look to the common law for the definition." Jeneric/Pentron, Inc. v. Dillon Co., Inc., 171 F. Supp.2d 49, 67 (D. Conn. 2001), citing Ronald A. Anderson, 2 Anderson on the Uniform Commercial

Code § 2-206:12 (3d ed. 1997). "[A]lthough neither Pfaff nor the UCC provide a clear definition of what constitutes a commercial offer, the authorities appear to be in agreement on certain business activities that do not constitute offers, but rather constitute invitations to make an offer." Id.

As the Court, in Jeneric/Pentron, Inc. v. Dillon Co., Inc., supra at 67-68, explained:

> Frequently, negotiations for a contract are begun between parties by general expressions of a willingness to enter into a bargain upon stated terms, and yet the natural construction of the words and the conduct of the parties is that they are inviting offers, or suggesting the terms of a possible future bargain, rather than making positive offers. This is especially likely to be true where the words in question are in the form of an advertisement, circular, catalog or the like. Thus, if goods are advertised at a certain price, it is generally not an offer, and no contract is formed by the statement of an intending purchaser that he will take a specified quantity of the goods at that price. Rather, the courts routinely hold that such advertisements or other expressions of intention are invitations to solicit offers or to enter into a bargain rather than offers themselves. Similarly, a published price list is not an offer to sell the goods listed at the published prices.
>
> The cases are legion on this point; and though they are grounded on various bases, including the absence of quantity terms, the absence of apparent intent to form a contract, or potentially unlimited liability of the offeror if an offer is held to exist, they all share two other common

> characteristics: first, in virtually all of the cases there is the absence of a promissory undertaking; and second, in all the cases a reasonable person receiving the communication has reason to know, from the circumstances under which the manifestation is made, that no offer exists.

Citing Richard A. Lord, 1 Williston on Contracts § 4.7, at 285-290 (4th ed. 1990).

As a consequence, the advertisement, on the Record here, was not a commercial offer. Such a conclusion is all the more supported by the fact that Arctic Cat and Suzuki are unable to produce the advertisement as evidence.

As to whether Chasteen made an oral offer, during his telephone conversation with Andrews, in the portion of the deposition testimony which was provided by Arctic Cat and Suzuki, at no time did Andrews explicitly state that Chasteen explicitly offered to sell an EFI system to him. Similarly, in his declaration, Andrews stopped short of stating, explicitly, that Chasteen offered to sell him an EFI system. Indeed, during the course of his deposition, Andrews was not even sure that he, and Chasteen, spoke of the price of the EFI system during their telephone conversation. See, Declaration of Annamarie A. Daley, Exhibit E, at p. 11. At that deposition, the following exchange ensued:

> Q Do you recall that the advertisement had a price in it?
>
> A I believe so. If he didn't tell me over the phone of the price.

Id.

This suggests that all of the terms of the offer may not have been discussed during the telephone conversation. Moreover, from Andrews's description of the conversation, the exchange would appear to have been more of an invitation to accept offers, or a suggestion of the terms of a possible future bargain, rather than the making of a positive offer. See, e.g., Jeneric/Pentron, Inc. v. Dillon Co., Inc., supra at 67. Even if Chasteen quoted a price to Andrews, during their conversation, "a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract." White Consol. Industries, Inc. v. McGill Mfg. Co., Inc., 165 F.3d 1185, 1190 (8th Cir. 1999), citing Litton Microwave Cooking Products v. Leviton Manufacturing Co., 15 F.3d 790, 794 (8th Cir. 1994).

Arctic Cat and Suzuki also point to Andrews' letter to Chasteen of September 12, 1986, as evidence of an offer. See, Declaration of Annamarie A. Daley, Exhibit C. In that letter, Andrews makes reference to an earlier conversation that he had with Chasteen, and he states, as follows:

> Earlier, we discussed about Electronic fuel injection w/a turbo over the phone. I am very interested in getting both for my 1986 400 Indy Polaris.

* * *

Please let me know when the kit is available.

Id.

While this letter suggests that Andrews, and Chasteen, spoke about the EFI system, it fails to demonstrate that Chasteen made a commercial offer, during the prior telephone conversation. Further, this letter may actually undermine Arctic Cat's, and Suzuki's argument, as the letter implies that Chasteen had informed Andrews, during the prior telephone conversation, that an EFI kit was not available. Plainly, Andrews asked Chasteen to "[p]lease let me know when the kit is available," id., yet intuitively, a consumer responding to an advertised item would properly assume that the advertised item was available for sale, at least in the absence of being told otherwise.

Further, as noted, "only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance constitutes an offer for sale under [Section] 102(b)." Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc., supra at 1347. What is clear from Andrews's letter is that it is not an acceptance of any offer. Moreover, under the UCC, it is unclear if Andrews would have been able to form an acceptance of Chasteen's purported offer. See, Uniform Commercial Code §2-201, which provides as follows:

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

Id.

Thus, any contract, which was entered by the parties, would have had to have been in writing, as both Andrews and Chasteen agree that the price of the EFI system well exceeded $500. However, we have found no authority for the proposition that, where a contract must be in writing, the offer must also have been made in writing. Of course, the Statute of Frauds is designed as a protection against fraud, as contracts in writing provide greater evidentiary weight. Here, Andrews's admittedly hazy recollection of Chasteen's purported oral offer to sell an EFI system certainly is of diminished evidentiary value.

To that end, IRS offers the declaration of Chasteen, who avers as follows:

> To the best of my knowledge, at no time did I, Power-Tech or IRS ever offer to sell any electronic fuel injection system to Mr. Andrews.

Declaration of Ronald E. Chasteen in Support of Opposition to Arctic Cat's and Suzuki's Motion for Summary Judgment on the Invalidity of U.S. Patent Re 34,803 Under 35 U.S.C. Section 102(b), at p. 2.

Chasteen also denied any recollection of ever conversing, or corresponding, with Andrews. Id.

Of course, we recognize that, in his deposition, Chasteen admitted that he recalled discussing fuel injection systems and turbos with people on the telephone around September of 1986 -- that is, during the time when Andrews claims to have spoken with Chasteen -- and that Chasteen conceded that Andrews could have been one of the individuals with whom he spoke. See, Declaration of Annamarie A. Daley, Exhibit B, at p. 1448-49. We also note that Chasteen even admitted that he was discussing the possible sale of electronic fuel injection systems for two-cycle engines. Id. at p. 1450. However, discussing the possibility of future sales is akin to an invitation for an offer, and is not a commercial offer. In the portion of the deposition provided by Arctic Cat and Suzuki, Chasteen does not state that, at any time, he made an offer to sell an EFI system to anyone.

In sum, the evidence in the Record fails to conclusively establish that Chasteen made a commercial offer for the sale of an EFI system. In any event, at the very least, there exists a factual issue as to whether Chasteen made a commercial offer during a

telephone conversation with Andrews. However, from the language of Andrews's letter, it appears that Andrews and Chasteen were engaged in an exchange of information, and perhaps negotiations. As stated, it appears that Andrews believed that EFI systems were not then available for purchase. Accordingly, we recommend that the Motion of Arctic Cat and Suzuki for Summary Judgment on grounds that the '803 Patent is invalid under Section 102(b) be denied.

Further, there also exists a factual dispute as to whether the '803 Patent had been reduced to practice before the critical date, or that, prior to the critical date, Chasteen had prepared drawings, or other descriptions of the invention, which were sufficiently specific to enable a person skilled in the art to practice the invention. See, Minton v. National Ass'n of Securities Dealers, Inc., supra at 1376. In his declaration, Chasteen avers that he had not reduced the '803 Patent to practice, nor had he prepared drawings or other sufficient descriptions of the '803 Patent, so as to have enabled a person skilled in the art to practice the invention. See, Declaration of Ronald E. Chasteen in Support of Opposition to Arctic Cat's and Suzuki's Motion for Summary Judgment on the Invalidity of U.S. Patent Re 34,803 Under 35 U.S.C. Section 102(b), at p. 2.

Arctic Cat and Suzuki object to this declaration, on the ground that a witness cannot contradict sworn deposition testimony by an affidavit. However, the deposition testimony, to which Arctic Cat and Suzuki refer, and which is the only evidence relied upon by them in their initial Memorandum in support of the Motion, is not directly contradicted by Chasteen's declaration. In his deposition, Chasteen was asked by counsel for Suzuki whether, before he met Gerhard Maier, he had a sufficient conception of the EFI system to have filed a patent application without his input. See, Declaration of Annamarie A. Daley, Exhibit F ("Deposition of Ronald Chasteen"), at pp. 318-19. The way counsel phrased the initial question, in terms of whether Gerhard Maier contributed to Chasteen's invention and patent, adds confusion to the issue. In his subsequent declaration, Chasteen explained his testimony at his deposition as follows:

> My answer was based on the fact that I had conceived of the invention before I met Mr. Maier. As a lay person, unfamiliar with legal terminology, I understood the question to be confirming that fact.
>
> * * *
>
> I had conceived of my invention prior to my first meeting with Mr. Maier but had not reduced it to practice and had not prepared drawings or other written descriptions of the

> invention of the '803 patent that were sufficient to enable a person skilled in the art to practice the invention.

Declaration of Ronald E. Chasteen in Support of Opposition to Arctic Cat's and Suzuki's Motion for Summary Judgment on the Invalidity of U.S. Patent Re 34,803 Under 35 U.S.C. Section 102(b), at p. 3.

Of course, we recognize, under Eighth Circuit authority, "that a party cannot create a 'sham' issue of fact in an effort to defeat summary judgment by filing an affidavit directly contradicting deposition testimony." Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1030 (8th Cir. 2000), citing Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365-66 (8th Cir. 1983). But we also recognize that, in Camfield, our Court of Appeals recognized "that there are 'narrow circumstances' in which a subsequent affidavit is appropriate, such as to explain certain aspects of the deposition testimony or where the prior testimony reflects confusion on the part of the witness." Id. at 1030-31, citing Camfield Tires, Inc. v. Michelin Tire Corp., supra at 1364-65. On the state of this Record, we conclude that Chasteen's Declaration falls within the "narrow circumstances" exception recognized in Camfield, and Herring, and properly creates a factual issue for the Jury's determination. For this additional reason, we recommend that the Motion for Summary Judgment, based upon the "on sale bar," be denied.

G. The Motion of Arctic Cat and Suzuki for Summary Judgment on the Basis of Equitable Estoppel and Laches.

On March 23, 2001, Balch, who is IRS's president, wrote a letter to Arctic Cat's president, Christopher A. Twomey ("Twomey"), expressing IRS's belief that Arctic Cat was, and had been, infringing upon IRS's patents. See, Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches, Exhibit 12. Balch expressed his desire to reach a business solution to the issue, rather than having to resort to litigation. Balch made reference to the Polaris Litigation, and the substantial recovery that had been secured by IRS. Balch estimated Arctic Cat's liability to be over $100,000,000. The spirit of the letter very much communicated IRS's intention to file suit if a settlement agreement could not be reached. Id. Five days after receiving that letter, on March 28, 2001, Arctic Cat filed its Complaint in this action. See, Docket No. 1.

This Motion is premised upon IRS's allegedly unreasonable delay in asserting claims of infringement against Arctic Cat, and Suzuki. Arctic Cat and Suzuki contend that, on or before November 6, 1989, IRS threatened Arctic Cat with litigation if IRS discovered that Arctic Cat's, and Suzuki's, EFI system resembled IRS's EFI system. See, Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches, Exhibit 32.

In an internal Memorandum, which is dated November 6, 1989, Gary L. Divel ("Divel") wrote that he had warned Arctic Cat "that I had better not see, smell, or taste anything on the Suzuki EFI system that resembled IRS or we would have to get our lawyers involved." Id.

On October 2, 1990, Divel wrote to Arctic Cat's vice president of engineering, Roger Skime ("Skime"), offering to sell, and license, an IRS EFI system for use in Arctic Cat snowmobiles. Id., Exhibit 23. On February 11, 1991, after Arctic Cat apparently declined IRS's offer, an attorney for IRS, Robert P. Cummins ("Cummins"), wrote a letter to Skime. Id. In that letter, Cummins communicated that IRS was aware of Arctic Cat's attempts to develop, and market, its own EFI system. Cummins then requested Arctic Cat to "provide immediate confirmation that [its] EFI effort does not and will not implicate * * * reliance on any IRS proprietary technology." Id.

On February 7, 1995, IRS's counsel, Richard W. Hanes ("Hanes"), wrote to Skime, and informed him that IRS's "examination and electronic testing of the engine's EFI system in the ARCTCO snowmobile, apparently also furnished by UNISIA JECS [which Hanes informed Skime had been added as a defendant in the then pending Polaris Litigation], indicates that the system, as installed on the engine in

the snowmobile, infringes claim 1 of the original '701 patent, as well as the identical claim in the '803 reissue patent, and also infringes the additional broader claims, 2 to 4, in the '803 patent." Id., Exhibit 2. Hanes then wrote the following warning:

> Be advised that IRS intends, no later than the conclusion of Polaris, et al. litigation, to bring suit against ARCTCO for infringement of the '803 patent claims, and for other causes of action on misuse by ARCTCO of the information supplied by IRS in 1988 and 1989.

Id.

On December 22, 1995, counsel for Arctic Cat, Albert L. Underhill ("Underhill"), of the law firm of Merchant & Gould, replied to Hanes's letter which had accused Arctic Cat of infringement. Id., Exhibit 3. Underhill stated that Arctic Cat was not infringing upon IRS's patents, and he set forth the reasons supporting his opinion. Underhill also referred to an earlier letter, of June 27, 1995, from Paul Welter ("Welter") of Merchant & Gould, in which Welter advised that, in 1991, Merchant & Gould reviewed the '701 Patent, and concluded that the electronic fuel injection system of ARCTCO did not infringe upon the claims of that patent. Id. Arctic Cat and Suzuki maintain that neither IRS, nor its counsel, ever responded to that letter. In his deposition, Balch testified that he could not recall whether IRS responded to the letter. Id., Exhibit 1, at p. 173.

As we have previously related, on February 11, 1997, the United States District Court for the District of Colorado granted Summary Judgment on IRS's claims of infringement in favor of Polaris, Fuji, and JECS, and against IRS. Id., Exhibit 4. In August of 1997, the Court dismissed all of the patent claims in the Polaris litigation.[17] In August of 1998, the United States Court of Appeals for the Federal Circuit affirmed the District Court's decision on the trade secret claims. See, Injection Research Specialists, Inc. v. Polaris Industries, L.P., 168 F.3d 1320, 1998 WL 536585 (Fed. Cir., August 13, 1998). Thus, the Polaris litigation was at a conclusion.

On August 27, 1997, IRS brought suit for trade secret misappropriation against Arctic Cat, Suzuki, and JECS, in the United States District Court for the District of Missouri. See, Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches, Exhibit 5 ("Complaint"). IRS did not assert any claims for patent infringement. Id. After Arctic Cat moved for a dismissal, IRS voluntarily dismissed the Missouri action.

[17]As stated previously, the Polaris Court first entered final Judgment on May 5, 1997, but amended its Order on July 24, 1997, and again, on August 28, 1997. See, Declaration of Jill Kastner in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Arctic Cat's and Suzuki's Motion for Partial Summary Judgment Based on Res Judicata and Legal Estoppel, Exhibits 9 & 10.

On December 12, 1997, IRS filed a second action against Arctic Cat, Suzuki, and JECS, for trade secret misappropriation in the United States District Court for the District of Colorado. Id., Exhibit 6. Again, no claims for patent infringement were asserted against Arctic Cat, Suzuki, or JECS, in that action. Id. On December 14, 1998, the Court, in Colorado, granted the Motion of Arctic Cat, Suzuki, and JECS, to dismiss the action as barred by the statute of limitations. Id., Exhibit 7. On July 5, 2000, the United States Court of Appeals for the Tenth Circuit affirmed the District Court's dismissal of IRS's trade secret claims. See, Chasteen v. Unisia JECS Corp., 216 F.3d 1212 (10th Cir. 2000).

At no time, after the conclusion of the Polaris Litigation, did IRS bring suit against Arctic Cat or Suzuki for patent infringement. Further, from Hanes's letter of February 7, 1995, until Balch's letter of March 23, 2001, IRS did nothing to inform Arctic Cat, or Suzuki, that it still considered Arctic Cat and Suzuki to be infringing its patents. Consequently, Arctic Cat and Suzuki assert that "IRS' delay lulled Arctic Cat and Suzuki into believing that IRS was not going to sue for infringement of the '803 patent." Memorandum of Law in Support of Motion of Arctic Cat and Suzuki for Summary Judgment on the Basis of Equitable Estoppel and Laches, at p. 1. Therefore, Arctic Cat and Suzuki argue that IRS's claims for patent infringement are

barred by equitable estoppel and laches. We address each of their arguments in turn, commencing with the argument that IRS's claims are barred by equitable estoppel.[18]

1. Equitable Estoppel. "Equitable estoppel is an equitable defense to infringement and may serve as an absolute bar to a patentee's claim of infringement." Scholle Corporation v. Blackhawk Molding Co., Inc., 133 F.3d 1469, 1471 (Fed. Cir. 1998), citing A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992). "A party raising equitable estoppel as a defense must prove, by a preponderance of the evidence, three elements: '(1) the patentee, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence; (2) the accused infringer relies upon that communication; (3) and the accused infringer would be harmed materially if the patentee is later permitted to assert any claim inconsistent with his earlier conduct.'" Vanderlande Industries Nederland BV v. I.T.C., 366 F.3d 1311, 1324 (Fed. Cir. 2004), quoting A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1041; see also, Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358, 1370 (Fed. Cir. 2001).

---

[18]We again note that IRS previously moved to dismiss Arctic Cat's equitable estoppel and laches defense and, on September 12, 2001, the District Court denied IRS's Motion. See, Arctic Cat, Inc. v. Injection Research Specialists, Inc., 2001 WL 1628634 at *3 (D. Minn., September 12, 2001).

a. Misleading Conduct. "The first element of equitable estoppel requires conduct by the patentee that misleadingly suggests that the patent holder will not assert its rights." Vanderlande Industries Nederland BV v. I.T.C., supra at 1324. However, as the Federal Circuit Court of Appeals, in A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1042 [internal citations omitted], observed:

> In the most common situation, the patentee specifically objects to the activities currently asserted as infringement in the suit and then does not follow up for years. In [Dwight & Lloyd Sintering Co. v. Greenawalt, 27 F.2d 823, 827 (2nd Cir. 1928)], Judge Learned Hand noted that estoppel was regularly based on "no further assurance [that a known competitor would not be sued than] the patentee's long inaction." There is ample subsequent precedent that equitable estoppel may arise where, coupled with other factors, a patentee's "misleading conduct" is essentially misleading **inaction.** [emphasis in the original]. However, plaintiff's inaction must be combined with other facts respecting the relationship or contracts between the parties to give rise to the necessary inference that the claim against the defendant is abandoned.

Thus, inaction or silence, when combined with other facts, may give rise to an inference that the claim has been abandoned.

This case presents the "most common situation," in which a claim of equitable estoppel can arise, as expressed by the Federal Circuit in Aukerman. Id. IRS last communicated with Arctic Cat in Hanes' letter of February 7, 1995, which warned

Arctic Cat of IRS's claim of infringement. Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches, Exhibit 2. Then, IRS waited until March of 2001, to re-assert its allegations of infringement. During the intervening six-year period, IRS remained in complete silence, with respect to Arctic Cat and Suzuki, on its allegations of infringement. Unlike the laches defense, which we next address, delay is not a requirement for asserting an equitable estoppel defense, however, "[d]elay in filing suit may be evidence which influences the assessment of whether the patentee's conduct is misleading." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1042; see also, Wafer Shave, Inc. v. Gillette Co., 857 F. Supp. 112, 120 (D. Mass. 1993)("[A] threat of litigation became misleading when it was followed by several years during which the patentee did not reassert the infringement claim."). IRS did not reassert claims of infringement for more than six years. Such a lengthy period of time certainly creates a reasonable inference that IRS had abandoned its claims.

We need not rely on the inference of abandonment that arose from IRS's silence alone, however, because that inference is corroborated by other conduct and inaction. On June 27, 1995, and again, on December 22, 1995, Arctic Cat's counsel, Merchant & Gould, wrote letters to IRS which rebutted IRS's charge of infringement.

Those letters put the onus on IRS to respond, or to bring an action, as it had threatened, before the conclusion of the Polaris Litigation. See, Hemstreet v. Computer Entry Systems Corp., 972 F.2d 1290, 1295 (Fed. Cir. 1992)(finding last communication to put onus on other party to respond). IRS never responded to Merchant & Gould's letters which had been written on behalf of Arctic Cat.

Not only did Hanes's letter of February 7, 1995, threaten Arctic Cat with suit, but IRS expressly threatened a suit by "no later than the conclusion of Polaris, et al. litigation, * * *." Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches, Exhibit 2. IRS concedes that the Polaris Litigation was concluded, at the latest, by December of 1998. Yet, IRS still did not file suit against Arctic Cat, or Suzuki, for patent infringement, or even communicate its continued intention to file suit, or the reasons for its delay. As stated, IRS did not communicate with Arctic Cat, or Suzuki, regarding the patent infringement claims, until March of 2001-- over two and a half years after the conclusion of the Polaris Litigation. When the Polaris Litigation concluded, and IRS had not filed suit, as it had threatened it would, the reasonable inference would have been that IRS had abandoned its infringement claims.

Further, in Hanes's letter of February 7, 1995, he made specific reference to Arctic Cat's use of JECS's EFI systems. As we have previously addressed, in some detail in the context of the Motion of Arctic Cat and Suzuki for Summary Judgment based on legal estoppel, in the Polaris Litigation IRS granted JECS a covenant not to sue, which is properly interpreted as extending to JECS's customers, including Arctic Cat and Suzuki. The covenant would have only bolstered any inference that IRS had abandoned its claims. While IRS had no duty to give Arctic Cat notice of the Polaris Litigation, see, Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1554 (Fed. Cir. 1996), by giving notice, expressing its intent to file suit against Arctic Cat before the conclusion of the Polaris Litigation, and then failing to carry through with its threat to sue, IRS misled Arctic Cat, perhaps unintentionally, into believing that its infringement claims had been abandoned, especially given IRS's grant of a covenant not to sue JECS, rather than a mere release from the pending litigation.

As the Federal Circuit expressed, in Scholle, "when the course of dealings between a patentee and an alleged infringer is such that the alleged infringer reasonably infers from the patentee's misleading conduct or inaction that the patentee has waived its patent rights, then the first element of equitable estoppel has been established absent a statement to the contrary by the patentee." Scholle Corp. v. Blackhawk Molding

Co., Inc., supra at 1472. When the Polaris Litigation concluded, and IRS had not filed patent infringement claims against Arctic Cat or Suzuki, IRS had a duty to communicate its continued intention to file suit. See, Advanced Hydraulics, Inc. v. Otis Elevator Co., 525 F.2d 477, 480 (7th Cir. 1975)(noting that the patent holder had a "virtual duty" to respond to the alleged infringer's letter denying any infringement). In the absence of any communication, an inference that IRS had abandoned its claims of infringement properly arose.

Lastly, while IRS did not bring patent infringement claims against Arctic Cat, or Suzuki, prior to the conclusion of the Polaris Litigation, on August 27, 1997 -- which was prior to the conclusion of the Polaris litigation -- IRS filed claims of trade secret misappropriation against JECS, Arctic Cat, and Suzuki. IRS asserts that it intended to include the infringement claims against Arctic Cat, and Suzuki, in both the Missouri action, and the subsequent Colorado action, but was unable to do so because the defendants, there, were granted Summary Judgment too quickly. IRS then argues that it also postponed filing any claims of patent infringement because the '374 Patent, and reissue, were still pending. However, IRS's reasons for not filing suit are immaterial, since the reasons for the delay were never communicated to Arctic Cat or Suzuki. See, Wafer Shave, Inc. v. Gillette Co., supra at 121 ("It is, therefore,

immaterial to the issue of estoppel that there were reasons for the delay in filing suit, since those reasons were not communicated to Gillette or otherwise known by it," and "[t]hus, the only inference a reasonable factfinder could draw in this case is that plaintiff's conduct was misleading.").

Here, the only reasonable inference that could have been drawn by Arctic Cat and Suzuki, after not having received a response from IRS to Arctic Cat's letters asserting non-infringement, for a period of over six years -- during which time the date by which IRS had threatened suit had passed -- and with IRS granting Arctic Cat's and Suzuki's EFI supplier, JECS, a covenant not to sue, is that IRS had abandoned its claims of infringement. Then, when IRS commenced not one, but two subsequent actions against JECS, Arctic Cat, and Suzuki, for trade secret misappropriation, and did not include claims of patent infringement, and did not express its reasons for delaying the commencement of patent infringement claims, that reasonable inference was further corroborated. As a result, we find that there was ample misleading conduct, on the part of IRS, to satisfy the first requirement of equitable estoppel.[19]

---

[19]We note that, while other pending litigation may excuse delay in the analysis of a laches defense, since delay is not a requirement of an equitable estoppel defense, it is immaterial that IRS was engaged in litigation during most of the six years, between (continued...)

b. Reliance. As the Federal Circuit, in Aukerman, has explained:

> The second element, reliance, is not a requirement of laches but is essential to equitable estoppel. Heckler v. Community Health Svcs., 467 U.S. 51, 59 (1984). The accused infringer must show that, in fact, it substantially relied on the misleading conduct of the patentee in connection with taking some action. Reliance is not the same as prejudice or harm, although frequently confused. An infringer can build a plant being entirely unaware of the patent. As a result of infringement, the infringer may be unable to use the facility. Although harmed, the infringer could not show reliance on the patentee's conduct. To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead with building the plant.

A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1042-43.

Here, Arctic Cat and Suzuki have failed to demonstrate, as a matter of law, that they relied on IRS's misleading conduct.

In support of their argument, that they relied on IRS's misleading conduct, Arctic Cat and Suzuki first argue that "Arctic Cat continued to sell EFI snowmobiles between August 1997 and March 2001." Memorandum of Law in Support of Motion of Arctic Cat and Suzuki for Summary Judgment on the Basis of Equitable Estoppel

---

[19](...continued)
its letter in 1995, and its letter in 2001.

and Laches, at p. 13. However, this is akin to "building the plant," which the Court, in Aukerman, used to exemplify a type of prejudice that would not constitute reliance. A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1043. As the Court explained, reliance and the prejudice that follows are different, but commonly confused. Id. Here, Arctic Cat and Suzuki have confused their prejudice -- the continued sales of snowmobiles after 1997 -- with reliance.

As we have noted, IRS's misleading conduct -- namely its letter of February 7, 1995, which threatened a lawsuit before the conclusion of the Polaris Litigation -- created a reasonable basis upon which Arctic Cat and Suzuki could properly infer that IRS had abandoned its claims once the Polaris Litigation had concluded, and IRS had not filed suit. Arctic Cat and Suzuki could not have relied on misleading conduct prior to the conclusion of the Polaris Litigation. Thus, that Arctic Cat "**continued** to sell EFI snowmobiles between August 1997 and March 2001," Memorandum of Law in Support of Motion of Arctic Cat and Suzuki for Summary Judgment on the Basis of Equitable Estoppel and Laches, at p. 13 [emphasis supplied], merely shows that Arctic Cat continued to act as it had before the misleading conduct -- the conclusion of the Polaris Litigation -- as Arctic Cat was also selling snowmobiles from 1995 until 1997. Arctic Cat and Suzuki do not argue that, at any time, based upon IRS's threats of

litigation, that Arctic Cat refrained from selling snowmobiles. Consequently, the argument of Arctic Cat, and Suzuki, actually undercuts any finding that Arctic Cat or Suzuki relied on IRS's misleading conduct.

Of course, we recognize that the assertion, that Arctic Cat continued selling snowmobiles is related to, and is intended to support, Arctic Cat's, and Suzuki's, contention that reliance is demonstrated by the fact that neither of them took remedial action to shield themselves from incurring further liability. However, this is also confusing prejudice with reliance. Moreover, the same argument could be made by any alleged infringer, in any infringement action, and as a result, such damages are not considered economic prejudice for the purposes of equitable estoppel, or laches. A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1033 ("Such damages or monetary losses are not merely those attributable to a finding of liability for infringement," because "[e]conomic prejudice would then arise in every suit."). Similarly, any infringer could use its continued infringement as an argument to prove reliance. Again, to demonstrate that they relied on IRS's misleading statements by not taking remedial actions, Arctic Cat and Suzuki would have to demonstrate that, prior to the misleading conduct, which we have identified as IRS's failure to carry through with its threat to sue them prior to the conclusion of the Polaris Litigation, Arctic Cat

and Suzuki did take any remedial action. Rather, on the Record presented, it appears that Arctic Cat and Suzuki merely continued to operate as they had prior to the conclusion of the Polaris Litigation.

Of course, this is not to suggest that Arctic Cat's, and Suzuki's, failure to protect themselves from claims of infringement does not constitute evidence of reliance. In Wafer Shave, Inc. v. Gillette Co., supra at 124, the Court observed that "the fact that Gillette failed to take affirmative actions to protect itself from a lawsuit * * * is evidence of its reliance." The Court held that "a reasonable factfinder could only infer that Gillette actually relied on plaintiff's misleading conduct." Id. However, the Court also had other, stronger evidence of reliance upon which to rely, including that "Gillette also continued to expand its lubricating strip lines." Id. at 123. Further, the procedural posture, there, was different, and the Court did not hold that Wafer Shave's claims of infringement were barred by equitable estoppel, but rather, the Court was considering Wafer Shave's Motion for Summary Judgment on Gillette's defenses, and merely held that Gillette's equitable estoppel defense would be allowed at Trial. Id. at 129. Thus, the burden was not on Gillette, like it is on Arctic Cat and Suzuki, to conclusively demonstrate their reliance, but instead, Gillette only had to present some evidence from which a factfinder could conclude that it relied.

Arctic Cat and Suzuki also rely on ABB Robotics, Inc. v. GMFanuc Robotics Corp., 828 F. Supp. 1386, 1398-1400 (E.D. Wis. 1993). We do not find that case to stand for the proposition that failure to take remedial action -- continued infringement -- will, alone, demonstrate reliance. ABB Robotics does, however, undercut IRS's assertion, that Arctic Cat relied on advice of counsel, and not on IRS's misleading conduct. As the Court explained, "[t]o hold that a defendant who believes his device does not infringe, but also relied upon the inaction of the patentee may not assert the defense of estoppel, is contrary to the principles of equity." Id. at 1399 n. 27. Thus, reliance on the advice of counsel does not negate misleading conduct. Of course, in the absence of any conclusive evidence of reliance, ABB Robotics adds little to our determination here.

Arctic Cat and Suzuki cite a third case, Forest Laboratories, Inc. v. Abbott Laboratories, supra at *19, in support of their assertion that their failure to take remedial action demonstrates reliance. However, the facts of that case are easily distinguished. The Court observed that the alleged infringers had no reason to take steps to protect themselves. Of course, Arctic Cat had reason to take steps to protect itself from on or before February 7, 1995, when it received Hanes's letter threatening litigation, until after 1998, when the Polaris Litigation was concluded. Thus, while the

Court noted the alleged infringer's "continued" heavy investment, the alleged infringer was not earlier threatened with a suit. Id. Thus, there was not a critical date, there, by which some change in behavior should have been demonstrated.

To conclusively demonstrate reliance, Arctic Cat and Suzuki would have to show some evidence that, after the Polaris Litigation concluded, they changed their behavior. Accordingly, instead of merely stating that "[t]he undisputed evidence shows that in addition to investing heavily in the development and sale of EFI snowmobiles from 1997 forward," Memorandum of Law in Support of Motion of Arctic Cat and Suzuki for Summary Judgment on the Basis of Equitable Estoppel and Laches, at p. 14, Arctic Cat and Suzuki would have to demonstrate that Arctic Cat, or Suzuki, increased their investment in the development and sale of EFI snowmobiles after 1997, or 1998.

Lastly, Arctic Cat's and Suzuki's assertion, that Arctic Cat's decision to terminate the Ficht license, in 1999, also fails to conclusively demonstrate its reliance on IRS's misleading conduct. Arctic Cat's Rule 30(b)(6) designated witness, Ole E. Tweet ("Tweet"), testified that the decision to termination the Ficht license was a business decision, and that, "whether or not IRS had a pending claim against [Arctic Cat's] products" was not a factor that affected Arctic Cat's decision to terminate the

Ficht license. Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches, Exhibit 26, pp. 34-38; see also, Fuji Machine Mfg. Co., Ltd. v. Hover-Davis, Inc., 60 F. Supp.2d 111, 116 (W.D.N.Y. 1999)(stating that business decisions do not satisfy reliance requirement). It appears from the questioning of Tweet that he may have misinterpreted some of the questions asked of him, as he explained, after answering that the prospect of an infringement claim, from IRS, did not impact upon Arctic Cat's decision to terminate the license, that IRS did not have a claim against Arctic Cat at that time. Thus, in finding that this evidence does not conclusively establish reliance, we do not suggest that it precludes a factual finding of reliance. Rather, we merely conclude that there exists a genuine issue of material fact and, for that reason, we recommend that the Motion of Arctic Cat, and Suzuki, for Summary Judgment on equitable estoppel be denied. Accordingly, we need not address the prejudice element here, but do so in the context of Arctic Cat's, and Suzuki's, Motion for Summary Judgment on the basis of laches, to which we now turn.

2. Laches. "Laches is cognizable under [Title] 35 U.S.C. § 282 as an equitable defense to a claim for patent infringement." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1027; see also, Hair v. United States, 350 F.3d 1253,

1257 (Fed. Cir. 2003). As the Federal Circuit Court of Appeals observed, in Aukerman, Courts have, in the past, confusingly intertwined the elements of laches and equitable estoppel. Id. at 1042, citing Jamesbury Corporation v. Litton Indus. Prods., Inc., 839 F.2d 1544 (Fed. Cir. 1988)(applying a delay element to an equitable estoppel defense). While both defenses are based upon the patentee's failure to timely bring claims of infringement, "'laches focuses on the reasonableness of the plaintiff's delay in suit' while 'equitable estoppel focuses on what the defendant has been led to reasonably believe from the plaintiff's conduct,'" and "equitable estoppel requires misrepresentation by the plaintiff and reliance on the misrepresentation by the alleged infringer." State Contracting & Engineering Corp. v. Condotte America, Inc., 346 F.3d 1057, 1065 (Fed. Cir. 2003), quoting A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1041. While similar, the affirmative defense of laches is based on different considerations.

"The laches defense has two underlying elements: first, the patentee's delay in bringing suit must be 'unreasonable and inexcusable,' and second, the alleged infringer must have suffered 'material prejudice attributable to the delay.'" Intertool, Ltd. v. Texar Corporation, 369 F.3d 1289, 1297 (Fed. Cir. 2004), quoting A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1028; see also, State Contracting &

Engineering Corp. v. Condotte America, Inc., supra at 1065; Ecolab, Inc. v. Envirochem, Inc., supra at 1371. While "the length of time that may be deemed unreasonable has no fixed boundaries," Ecolab, Inc. v. Envirochem, Inc., supra at 1371, "a presumption of laches arises 'where a patentee delays bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity.'" Intertool, Ltd. v. Texar Corp., supra at 1297, quoting A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1028 ("[A] prima facie defense of laches is made out upon proof by the accused infringer that the patentee delayed filing suit for six years after actual or constructive knowledge of the defendant's acts of alleged infringement."). However, the "laches period does not begin to run until the patent issues," as an infringement suit cannot be brought until after the patent has issued. State Contracting & Engineering Corp. v. Condotte America, Inc., supra at 1065-66, citing Meyers v. Asics Corp., 974 F.2d 1304, 1307 (Fed. Cir. 1992).

"Once a presumption of laches arises, the patentee may offer proof directed to rebutting the laches factors." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1038. "Such evidence may be directed to showing either that the patentee's delay was reasonable or that the defendant suffered no prejudice or both." Id. "By raising a genuine issue respecting either factual element of a laches defense, the presumption

is overcome." Id. As the Federal Circuit clarified, in Hemstreet v. Computer Entry Systems Corp., supra at 1293, a presumption of unreasonable delay and prejudice does not require the patent holder to affirmatively prove that the delay was excusable, and the absence of any prejudice to the accused, "[i]nstead, the presumption of laches which arises after a defendant proves a six-year delay is a 'double bursting bubble' which the plaintiff punctures with introduction of evidence sufficient to raise a genuine dispute as to either delay or prejudice." Id. Thus, "the defendant bears the ultimate burden of persuasion of the affirmative defense of laches." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1038.

Accordingly, we first consider whether Arctic Cat, and Suzuki, have presented a prima facie defense of laches, which would give rise to a presumption of unreasonable delay and prejudice.[20]

---

[20]We note that a laches defense is quite different from a statute of limitations defense. See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1030 (Fed. Cir. 1992). The Patent Act, Title 35 U.S.C. §286, provides that, "[e]xcept as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action." See also, Sierra Applied Sciences, Inc. v. Advanced Energy Industries, Inc., 363 F.3d 1361, 1376 (Fed. Cir. 2004). As explained in Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co., Ltd., 754 F.2d 345, 347-48 (Fed. Cir. 1985), Section 286 is not a statute of limitations in the sense of barring a suit

(continued...)

a. The Presumption of Unreasonable Delay and Prejudice. Here, the '803 Patent issued on December 6, 1994. The Record plainly demonstrates that IRS had knowledge of the basis of its claims by no later than February 7, 1995, when Hanes wrote a letter to Arctic Cat, which expressed IRS's contention that Arctic Cat was infringing IRS's patent rights, and threatening suit by no later than the conclusion of the Polaris Litigation. IRS did not complain of infringement to Arctic Cat, again, until Balch's letter of March 23, 2001, to Arctic Cat, and IRS did not file its counterclaims against Arctic Cat, and Suzuki, until November 26, 2001. See, Docket No. 29. Thus, more than six years had elapsed since the date on which IRS had knowledge of the allegedly infringing activity, until the date it filed its counterclaims of infringement. As a consequence, a presumption exists that IRS's delay in filing its

[20](...continued)
for infringement, but rather, assuming a finding of liability, the effect of Section 286 is to limit recovery to damages for infringing acts committed within six years of the date of the filing of the infringement action. Id.; see also A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1030. Thus, in applying Section 286, "[o]ne counts backwards from the date of the complaint to limit pre-filing damages arbitrarily," while "[t]he six years for laches begins with a patentee's knowledge of infringement and counts forward," and "[t]hus, the two periods in real time may be completely unrelated," as "[t]hey have in common only the same number of years." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1034-35. Further, Section 286 does not preclude, or limit, the defense of laches. Id. at 1030.

claims of infringement was unreasonable, and that Arctic Cat, and Suzuki, have been prejudiced by that delay.

Further, Arctic Cat and Suzuki have presented evidence -- in the form of Chasteen's deposition testimony -- that IRS first obtained an Arctic Cat snowmobile in February of 1993, and inspected it for possible infringement. See, Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches, Exhibit 33, at p. 7. Upon inspection, IRS either knew, or should have known, that Arctic Cat's device infringed IRS's construction of its patents. In addition, Divel's letter in 1990, and Cummins's letter in 1991, both revealed IRS's suspicion that Arctic Cat was, according to IRS, infringing IRS's patents. Also, by the time the '803 Patent had issued, on December 6, 1994, the Polaris Litigation had been pending for over four years, and therefore, IRS knew, or should have known, that Arctic Cat and Suzuki were using JECS's EFI systems, as JECS was a defendant in the Polaris Litigation. After four years of litigation, surely IRS would have been aware that JECS was supplying Arctic Cat, and Suzuki, with its EFI system. Accordingly, we find that the presumptive period of unreasonable delay commenced on December 6, 1994 -- the date on which the '803

Patent issued -- and concluded on November 26, 2001, which is a period of just days short of seven years.

b. Unreasonable Delay. "The presumption of laches may be eliminated by offering evidence to show an excuse for the delay or that the delay was reasonable, even if such evidence may ultimately be rejected as not persuasive." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1038. As the Court, in Aukerman, explained:

> Such evidence need only be sufficient to raise a genuine issue respecting the reasonableness of the delay to overcome the presumption. Evidence, for example, directed to the excuses discussed in section II B, supra [i.e. other litigation], will eliminate the laches presumption if sufficient to raise a genuine issue. By destroying the presumption in its entirety upon presentation of evidence which may justify the delay, the patentee is not disadvantaged by having to prove a negative. Moreover, such evidence is within the patentee's knowledge.

Id.

Here, IRS contends that its delay in filing suit should be excused by the pendency of the Polaris Litigation, from 1990 to 1998, and the subsequent pendency of the trademark litigation in Missouri, and Colorado. IRS's final appeal in the Colorado trademark case -- which was the latter of the two trademark actions -- was denied on July 5, 2000. See, Chasteen v. Unisia JECS Corp., supra. IRS also argues that its

delay should be excused by the '374 Patent application, which was pending before the PTO until September 29, 1998.

"Excuses which have been recognized in some instances, and we do not mean this list to be exhaustive, include: other litigation." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1033; see also, Hemstreet v. Computer Entry Systems Corp., supra at 1293 ("Delay may be excused by a host of factors, including involvement in other litigation."). "The 'other litigation' excuse normally applies when a patentee defers suit against an alleged infringer until the conclusion of another lawsuit" and, "[i]f the party is ultimately sued and had received proper notice, the time delay consumed by the original proceeding may be excused in evaluating whether laches occurred." Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870, 876 (Fed. Cir. 1991). As the Court, in Hemstreet, further explained:

> It is true that prior precedent could be read to require explicit notice to the defendant of both the existence of the other proceedings and the patentee's intent to enforce its rights against the alleged infringer at the conclusion of other litigation. Aukerman has clarified that this is far from a hard and fast requirement. Instead, Aukerman restores equitable flexibility: "The equities may or may not require that the plaintiff communicate its reasons for delay to the defendant."

Id., quoting A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1033.

Of course, "the existence of other pending litigation over the patent does not automatically excuse delay in the bringing of suit." Advanced Hydraulics, Inc. v. Otis Elevator Co., supra at 480.

It has been held that a pending patent application, on a related patent, also excuses a patentee's delay in filing suit. Meyers v. Brooks Shoe Inc., 912 F.2d 1459, 1462 (Fed. Cir. 1990)("Awaiting issuance of [a] second patent to sue on both at once conserved both the parties' and the courts' resources."), overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1038-39. The Court then acknowledged, however, that "there are times when a patentee must bring suit before the expected issuance of the second of two related patents." Id., citing A.C. Aukerman Co. v. Miller Formless Co., Inc., 693 F.2d 697, 699 n. 4 (7th Cir. 1982).

We find that, by presenting evidence of the Polaris Litigation, the subsequent trade secret litigation, and the application of the '374 Patent to the PTO, IRS has burst the bubble as to the presumption of unreasonable delay and substantial prejudice. However, "elimination of the presumption does not mean that patentee precludes the possibility of a laches defense; it does mean, however, that the presumption of laches plays no role in the ultimate decision," and therefore, "[t]he facts of unreasonable delay and prejudice then must be proved and judged on the totality of the evidence

presented." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1038. Of course, the burden shifts back to Arctic Cat, and Suzuki, to establish the defense of laches. Id.

As stated, "[p]atentees have no obligation to sue all alleged infringers at the same time, Armstrong v. Motorola, Inc., 374 F.2d 764, 769 (7th Cir.), cert. denied, 389 U.S. 830, (1967), but concern with litigation against one asserted infringer does not automatically excuse the patentee from delays in bringing suit against others." A.C. Aukerman Co. v. Miller Formless Co., Inc., supra, 693 F.2d at 700, citing Advanced Hydraulics, Inc. v. Otis Elevator Co., supra at 480. Resultantly, we find that IRS's delay in not bringing suit before the conclusion of the Polaris Litigation, as to which IRS gave notice to Arctic Cat, was not unreasonable. Accordingly, IRS's delay is excused until the conclusion of the Polaris Litigation, on August 13, 1998.

However, IRS did not file suit before the conclusion of the Polaris Litigation, nor did IRS file claims of infringement against Arctic Cat, and Suzuki, until September 26, 2001, over three years after the conclusion of the Polaris Litigation. "The [Federal] Circuit has pronounced a three or four-year delay unreasonable only when that delay was accompanied by extraneous improper tactics or misleading conduct by the plaintiff." IXYS Corp. v. Advanced Power Technology, Inc., 321 F. Supp.2d 1156,

1163 (N.D. Cal. 2004), citing MCV, Inc. v. King-Seeley Thermos Co., 870 F.2d 1568, 1572 (Fed. Cir. 1989)(plaintiff told defendant "that possessing some right to the patent was unimportant to him"); Rosemount, Inc. v. Beckman Instruments, Inc., 727 F.2d 1540, 1550 (Fed. Cir. 1984) ("Beckman informed Rosemount of the Model 960B shortly after the complaint was filed and long before trial," but "Rosemount's charge that the 960B infringed was made three years after it was first informed."); see also, Bingo Brain, Inc. v. California Concepts, Inc., 2001 WL 1631920 at *4-5 (N.D. Ill., December 19, 2001); Hall v. FADR International, Inc., 152 F.3d 945, 1998 WL 133270 at *2 (Fed. Cir., March 25, 1998).

IRS argues that the trade secret litigation should further excuse its delay and, while the cases state that a patentee need not file suit against all infringers at the same time, IRS cites no authority, and none has been independently found, for the proposition that the patentee can delay filing patent claims while suing the alleged infringer on entirely different claims. Further, as our discussion of Arctic Cat's, and Suzuki's, equitable estoppel defense reveals, we find that IRS's conduct, namely Hanes's letter of February 7, 1995, which threatened litigation before the conclusion of the Polaris Litigation, lulled Arctic Cat, and Suzuki, into believing that IRS's claims of infringement had been abandoned. When IRS brought trade secret claims against

Arctic Cat and Suzuki, but no infringement claims, and did not even mention claims of infringement, it only corroborated Arctic Cat's, and Suzuki's, belief that the infringement claims had been abandoned.

Further, IRS's assertion, that it was waiting until the '374 Patent should issue, is unconvincing. IRS litigated infringement claims against Polaris, Fuji, and JECS, notwithstanding its '374 Patent application. Moreover, the '374 Patent was issued on September 29, 1998, while the Colorado trade secret case was not dismissed until December 14, 1998. IRS could have either moved to amend its Complaint, so as to add claims of infringement, or it could have filed a new action to litigate its claim of patent infringement. However, as stated, IRS continued to sit on its infringement claims. IRS offers nothing to excuse its delay after the issuance, on September 29, 1998, of the '374 Patent, other than the pendency of its appeal from the dismissal of the trade secret claims in Colorado.

Lastly, the Federal Circuit has held that "[t]he equities may or may not require that the plaintiff communicate its reasons for delay to the defendant." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1033. Here, not only did IRS fail to communicate its reasons for delaying suit against Arctic Cat, and Suzuki, after the conclusion of the Polaris Litigation, notwithstanding its prior threat to commence suit

before the conclusion of that litigation, and its subsequent commencement of trade secret claims, the equities would certainly require IRS to communicate the reasons for its additional delays. There is nothing in the Record to suggest that IRS ever communicated any reasons for its delays. Moreover, when Hanes wrote his letter of February 7, 1995, to Arctic Cat, IRS had already filed the '374 Patent application, yet Hanes never mentioned that application. As a consequence, we find that the equities might well tip in favor of Arctic Cat, and Suzuki. See, Wafer Shave, Inc. v. Gillette Co., supra at 128 (finding that threatening suit, and then delaying the filing of the suit, is additional conduct that affects the balance of the equities, but ultimately finding that a fact issue was created for Trial).

Nonetheless, the use of laches to bar claims of infringement is an extreme sanction that is reserved only for the most egregious situations. See, Mile High Industries v. Cohen, 222 F.3d 845, 858 (10th Cir. 2000)("[T]he laches defense is reserved for those rare cases where a protracted acquiescence by plaintiff induces a defendant to undertake substantial activities in reliance on the acquiescence."), quoting First Nat'l Bank v. First Wyoming Sav. and Loan Ass'n, 592 P.2d 697, 702 (Wyo. 1979); see also, Tonka Corp. v. Rose Art Industries, Inc., 836 F. Supp. 200, 219 (D.N.J. 1993)("[T]he laches defense is reserved for those rare cases where a

protracted acquiescence by plaintiff induces a defendant to undertake substantial activities in reliance on the acquiescence."). As the Court, in Tonka Corp. v. Rose Art Industries, Inc., supra at 219, stated, "[w]hile the laches defense is narrow, such a defense should generally not be disposed of in pretrial motions," "'[b]ecause the correct disposition of the equitable defense of laches can only be made "by a close scrutiny of the particular facts and balancing of the respective interests and equities of the parties, as well as of the general public," [which] usually requires the kind of record only created by full trial on the merits.'" Id., quoting Country Floors v. Partnership of Gepner and Ford, 930 F.2d 1056, 1066 (3rd Cir. 1991)(denying summary judgment on issue of laches in trademark infringement claim).

Courts have also expressed a reluctance to resolve patent issues on Motions for Summary Judgment. See, A.C. Aukerman Co. v. Miller Formless Co., Inc., supra at 702. Further, "laches bars relief on a patentee's claim only with respect to damages accrued prior to suit." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1041; see also, Tonka Corp. v. Rose Art Industries, Inc., supra at 219 ("Even if proven, laches generally will bar a claim for an accounting of past infringement but not a claim for prospective injunctive relief."). Even if we were to find that Arctic Cat, and

Suzuki, were entitled to Summary Judgment on laches, it would not limit the issues for Trial, as it would merely limit the period as to which IRS could seek damages.

Ultimately, the unreasonableness of the delay is an issue of fact for the factfinder to resolve after considering the totality of the evidence presented. Given the Record presented, we find that a genuine issue of material fact exists as to the reasonableness of the delay. While we find that there are facts that certainly weigh in favor of Arctic Cat, and Suzuki, at this stage, and given that the rebuttable presumption has been refuted, we are obligated, under the framework we are compelled to employ, to consider all factual disputes in favor of IRS, as the non-moving party. We find that, given that IRS's appeal in the Colorado trade secret litigation was not denied until July 5, 2000, a factfinder could conclude that IRS's delay was reasonable. See, e.g., Hemstreet v. Computer Entry Systems Corp., supra at 1293 (finding that the introduction of evidence that the patentee was engaged in other litigation "was more than sufficient to raise a genuine dispute as to whether the delay was excusable."). Accordingly, we recommend that the Motion of Arctic Cat, and Suzuki, for Summary Judgment on laches should be denied. However, in the interests of completeness, we proceed to address the prejudice element of laches.

c. Prejudice. Prejudice may be either evidentiary, or economic, but the prejudice must have been caused by the delay. See, State Contracting & Engineering Corp. v. Condotte America, Inc., supra at 1065, citing A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1033; see also, Beam Laser Systems, Inc. v. Cox Communications, Inc., 144 F. Supp.2d 464, 472 (E.D. Va. 2001). "By definition, actions undertaken before the delay period, however prejudicial, may not figure at all in the analysis." Hall v. Aqua Queen Mfg., Inc., supra at 1557.

"Economic prejudice arises when a defendant suffers the loss of monetary investments or incurs damages that likely would have been prevented by earlier suit." State Contracting & Engineering Corp. v. Condotte America, Inc., supra at 1065; see also, Bridgestone/Firestone Research, Inc. v. Automobile Club De L'Ouest De La France, 245 F.3d 1359, 1363 (Fed. Cir. 2001)("Economic prejudice arises from investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period adds weight to the evidence of prejudice." ), citing Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 821 (7th Cir. 1999)(the longer the use and the lengthier the period of delay, the lighter the burden of showing economic prejudice in support of the defense of laches). "A nexus must be shown between the patentee's delay in filing suit and the expenditures; the

alleged infringer must change his position 'because of and as a result of the delay.'" State Contracting & Engineering Corp. v. Condotte America, Inc., supra at 1065, quoting Hemstreet v. Computer Entry Systems Corp., supra at 1294.

"Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1033, citing Barrois v. Nelda Faye, Inc., 597 F.2d 881, 885 (5th Cir. 1979); Smith v. Sinclair Refining Co., 257 F.2d 328, 330 (2nd Cir. 1958); Gillons v. Shell Co., 86 F.2d 600, 608-09 (9th Cir. 1936), cert. denied, 302 U.S. 689 (1937); VI Restatement Law of Torts §939 (1936).

As evidence of economic prejudice, Arctic Cat, and Suzuki, contend that "IRS's damage expert intends to offer an opinion for damages from sales from 1995 forward and admits that his reasonable royalty rate is higher because he used Arctic Cat's increased sales for 2002 and 2003." Memorandum of Law in Support of Motion of Arctic Cat and Suzuki for Summary Judgment on the Basis of Equitable Estoppel and Laches, at p. 8. However, as we have previously stated, damages from increased infringement liability is the sort of prejudice that would arise in every

infringement action and, as such, increased damages are not economic prejudice for purposes of finding laches. See, A.C. Aukerman Co. v. R.L. Chaides Constr. Co., supra at 1033 ("Such damages or monetary losses are not merely those attributable to a finding of liability for infringement."); see also, State Contracting & Engineering Corp. v. Condotte America, Inc., supra at 1066. Arctic Cat, and Suzuki, fail to offer any other specific evidence of economic prejudice.

Arctic Cat and Suzuki do, however, offer a glut of evidentiary prejudice, including the following: 1) IRS instructed its expert, William Ribbens, to destroy a file; 2) over 100 boxes of documents, which were in the possession of the law firm of Kutak Rock, were destroyed in May and June of 2002; 3) the file of one of the patent prosecuting attorneys, Wesley Whitmyer, is missing; 4) William O'Meara's inventor notebook is missing; 5) Chasteen's original prototype EFI system, which existed as late as 1997, is missing; and 6) several witnesses have forgotten relevant, and material facts.

"[E]videntiary prejudice [may arise] as a result of unavailable or deceased witnesses and lost or destroyed documents and prototypes." Wanlass v. General Elec. Co., 148 F.3d 1334, 1337 (Fed. Cir. 1998). Further, the destruction of documents can also give rise to evidentiary prejudice. See, e.g., Beam Laser Systems,

Inc. v. Cox Communications, Inc., supra at 472; Mosel Vitelic Corp. v. Micron Technology, Inc., 162 F. Supp.2d 307, 310 (D. Del. 2000). Moreover, as to the destruction of documents, the Court, in Mosel Vitelic Corp. v. Micron Technology, Inc., supra at 310-11, explained as follows:

> A party, who is aware that evidence might be relevant to a pending or future litigation, has an affirmative duty to preserve this material. See Howell v. Maytag, 168 F.R.D. 502, 505 (M.D. Pa. 1996), citing Baliotis v. McNeil, 870 F. Supp. 1285, 1290 (M.D. Pa. 1994)); accord Telecom Intn'l Am., Ltd. v. AT&T Corp., 189 F.R.D. 76, 81 (S.D.N.Y. 1999) (citing, inter alia, Kronisch v. United States, 150 F.3d 112, 126 (2nd Cir. 1998)). This duty extends to that party's attorneys. In fact, as the Telecom court stated, "the obligation to preserve evidence runs **first** to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation." 189 F.R.D. at 81 (emphasis added)(relying on Kansas-Nebraska Natural Gas Co. v. Marathon Oil Co., 109 F.R.D. 12, 18 (D. Neb.1983)). Thus, when a party or its counsel fails to preserve relevant evidence, the court has the power to impose an appropriate sanction. See Shamis v. Ambassador Factors Corp., 34 F. Supp.2d 879, 888 (S.D.N.Y.1999).

Clearly, with respect to the destroyed documents, especially those in the possession of the law firms which, at one time, represented IRS, or had some relationship with IRS's counsel, there was an affirmative duty to preserve those records. Consequently, the destruction of the documents could be sanctionable. When the

destruction of documents is coupled with unreasonable delay, the sanction might well be to bar suit under laches.

Given the quantity of the missing and destroyed evidence, we find that there exists ample evidence from which a factfinder could conclude that Arctic Cat, and Suzuki, have suffered evidentiary prejudice.[21] Nonetheless, having found that there is a factual dispute regarding the reasonableness of IRS's delay, Arctic Cat's, and Suzuki's, laches defense is inappropriate for disposition on Summary Judgment, and should proceed to Trial. We would add, however, that we remain disquieted by the apparent volume of documents, within the possession, control, or custody of IRS, which no longer exist. Nonetheless, on the Record presented, we are unable to label the destruction spoliation, and that specific issue has not been adequately addressed, particularly in view of recent Eighth Circuit authority. See, e.g., Morris v. Union Pacific Railroad, 373 F.3d 896, 899-900 (8th Cir. 2004); Koons v. Aventis Pharmaceuticals, Inc., 367 F.3d 768, 780 (8th Cir. 2004); Stevenson v. Union Pac. Railroad Co., 354 F.3d 739, 746 (8th Cir. 2004). We doubt that a Jury would be less

---

[21]Having recommended the denial of Arctic Cat's, and Suzuki's, Motion for Summary Judgment on equitable estoppel and laches, we need not reach IRS's objection that, even if Arctic Cat is entitled to a defense of equitable estoppel and laches, that the defense does not run to Suzuki.

disquieted but, on this Record, the issue remains as one committed to resolution by the factfinder.

H. The Motion of Arctic Cat for Partial Summary Judgment on IRS's Claims of Willful Infringement, and IRS's Motion for Partial Summary Judgment on Willfulness.

IRS contends that "Arctic Cat has failed to provide IRS with any facts supporting a defense to IRS's charge of willful infringement for the period between February 7, 1995 (when Arctic Cat received actual notice of infringement of the '803 patent), and May 17, 2001 (the day before Arctic Cat received an opinion of counsel by John Gould, Esq.)" and, in "the absence of any evidence of non-willfulness during this time period, there is no substantial controversy with respect to Arctic Cat's willful infringement." Memorandum of Points and Authorities in Support of IRS's Motion for Partial Summary Judgment of Willfulness, at p. 1.

In addition to contesting IRS's contentions as to willfulness, Arctic Cat moves for partial Summary Judgment urging that IRS "cannot support [an] allegation [of willfulness] and it is now appropriate to dismiss [IRS's] claims of willful infringement * * *." Memorandum of Arctic Cat in Support of Its Motion for Partial Summary Judgment on IRS's Claims of Willful Infringement, at p. 2. Indeed, Arctic Cat urges that IRS's "claims of willful infringement are merely a cover under which to re-

introduce claims of misappropriation of trade secrets," even though IRS has previously litigated those claims in the United States District Court for the District of Colorado, where they were dismissed with prejudice, and the dismissal was affirmed by the United States Court of Appeals for the Tenth Circuit. Id.

We take our lead from the parties, and address their cross-Motions for Summary Judgment jointly.

1. Standard of Review. "Whether infringement was willful is a question of fact," Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings, 370 F.3d 1354, 1359 (Fed. Cir. 2004), which is determined by a totality of the circumstances surrounding the infringement. See, SRI International, Inc. v. Advanced Technology Laboratories, Inc., 127 F.3d 1462, 1465 (Fed. Cir. 1997); see also, American Med. Sys., Inc. v. Medical Engineering Corp., 6 F.3d 1523, 1530 (Fed. Cir. 1993)(stating that willfulness is "a factual determination to be made after consideration of the totality of the circumstances."). The test for willfulness is "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." Hall v. Aqua Queen Mfg., Inc., supra at 1555.

"Although there are no 'hard and fast per se rules' with respect to a finding of willfulness, various factors are relevant to the willfulness determination, including: (i) whether the infringer deliberately copied the ideas or design of another; (ii) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good faith belief that it was invalid or that it was not infringed; (iii) whether the infringer engaged in inappropriate behavior in the course of the litigation; (iv) the infringer's size and financial condition; (v) the closeness of the infringement and validity issues; (vi) the duration of the infringer's misconduct; (vii) any remedial action by the infringer; (viii) the infringer's motivation for continuing infringing conduct in the face of knowledge of the patent; and (ix) whether the infringer attempted to conceal its misconduct." Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 133 F. Supp.2d 843, 862 (E.D. Va. 2001), citing Rolls-Royce Ltd. v. GTE Valeron Corp., 800 F.2d 1101, 1111 (Fed. Cir. 1986); Bott v. Four Star Corp., 807 F.2d 1567, 1572 (Fed. Cir. 1986).

As we have previously observed, "'[w]hether infringement is "willful" is by definition a question of the infringer's intent.'" Cordis Corp. v. SciMed Life Systems, Inc., 980 F. Supp. 1030, 1032 (D. Minn. 1997), quoting Ortho Pharmaceutical Corp. v. Smith, 959 F.2d 936, 944 (Fed. Cir. 1992), citing in turn Gustafson, Inc. v.

Intersystems Indus. Prods., Inc., 897 F.2d 508, 510 (Fed. Cir. 1990), and King Instrument Corp. v. Otari Corp., 767 F.2d 853, 867 (Fed. Cir. 1985), cert. denied, 475 U.S. 1016 (1986). As stated, the focus of the inquiry is whether the alleged infringer "reasonably believes that it was not engaged in infringing activities." Cordis Corp. v. SciMed Life Systems, Inc., supra at 1032; see also, Ortho Pharmaceutical Corp. v. Smith, supra at 944.

"As a general matter, a potential infringer with actual notice of another's patent has an affirmative duty of care that usually requires the potential infringer to obtain competent legal advice before engaging in any activity that could infringe another's patent rights." Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1190 (Fed. Cir. 1998); see also, Ryco, Inc. v. Ag-Bag Corp., 857 F.2d 1418, 1428 (Fed. Cir. 1988); Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, supra at 1084; Kloster Speedsteel AB v. Crucible, Inc., 793 F.2d 1565, 1579 (Fed. Cir. 1986), cert. denied, 479 U.S. 1034 (1987); Underwater Devices Inc. v. Morrison- Knudsen Co., Inc., 717 F.2d 1380, 1389-90 (Fed. Cir. 1983)(noting that an accused infringer has an "affirmative duty to

exercise due care to determine whether or not [it] is infringing”).[22] Of course, the “[f]ailure to obtain an opinion of counsel is relevant evidence, but does not automatically require a finding of willful infringement.” Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1356 (Fed. Cir. 2001).

Further, as the Federal Circuit acknowledged, in Ortho Pharmaceutical Corp. v. Smith, supra at 944, the quality of the advice of counsel is also an important factor:

> While an opinion of counsel letter is an important factor in determining the willfulness of infringement, its importance does not depend upon its legal correctness. Indeed, the question arises only where counsel was wrong. Rather, counsel’s opinion must be thorough enough, as combined with other factors, to instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed or unenforceable. * * * Thus, [the infringer’s]

[22]It has generally been held that, where an infringer refuses to produce an exculpatory opinion of counsel in response to a charge of willful infringement, an inference may be drawn that either no opinion was obtained or, if it was, that it was an unfavorable opinion. See, Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1056 (Fed. Cir. 1994); see also, Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 133 F. Supp.2d 843, 862 (E.D. Va. 2001). Currently, the Federal Circuit is reconsidering, en banc, precedent “concerning the drawing of adverse inferences, with respect to willful patent infringement, based on the actions of the party charged with infringement in obtaining legal advice, and withholding that advice from discovery.” Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 344 F.3d 1336, 1336 (Fed. Cir. 2003).

> intent and reasonable beliefs are the primary focus of a willful infringement inquiry.

Id., citing Stickle v. Heublein, Inc., 716 F.2d 1550, 1565 (Fed. Cir. 1983)("The court must determine * * * that the infringer had no reasonable basis for believing that it had a right to do the acts.").

In addition, as the Federal Circuit, in Westvaco Corp. v. International Paper Co., 991 F.2d 735, 743-44 (Fed. Cir. 1993)[internal citations omitted], observed:

> In Read Corp. v. Portec, Inc., 970 F.2d 816, 829 (Fed. Cir.), reh'g in banc denied, (1992), this court stated that "objective evidence" must be considered to determine whether a defendant was justified in relying on patent counsel's advice, i.e., whether the patent counsel's opinion was competent. Opinion letters should be reviewed to determine whether they evidence an adequate foundation based on a review of all necessary facts or whether they are conclusory on their face. * * * "[C]ounsel's opinion must be thorough enough, as combined with other factors, to instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed, or unenforceable." * * * In considering the reasonableness of the accused infringer's reliance on an opinion of counsel, the opinion letter should be reviewed for its "overall tone, its discussion of case law, its analysis of the particular facts and its reference to equitable conduct."

In other words, "[t]he emphasis here must be on 'competent' legal advice." Minnesota Mining & Mfg. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1580 (Fed. Cir. 1992).

As recently expressed by the Court of Appeals for the Federal Circuit:

> The competency requirement applies to both the qualifications of the person giving the opinion and to the content of the opinion itself. * * * To reasonably rely on an opinion, it must be authoritative, not just conclusory, and objective. * * * If infringers could rely on any opinion to defeat willful infringement, no matter how incompetent, insulation from increased damages would be complete.

Jurgens v. CBK, Ltd., 80 F.3d 1566, 1572 (Fed. Cir. 1996).

Thus, "[g]iven the emphasis on 'competency,' as revealed by 'objective' evidence, we believe that a rigorous examination of the factual predicates for an opinion of patent counsel, in defense of a claim of willfulness, is essential" for, "[t]o conclude otherwise, would be to effectively insulate the potential infringer from increased damages." Cordis Corp. v. SciMed Life Systems, Inc., supra at 1033.

2. Legal Analysis. As noted, in its Motion, Arctic Cat contends that IRS is simply seeking to relitigate the previous trade secret case under the guise of a willful infringement allegation. Arctic Cat contends that IRS has supported its allegation of willful infringement solely on claims of trade secret misappropriation. In turn -- as we have noted -- IRS supports its own Motion, and opposes Arctic Cat's Motion, by representing that Arctic Cat was given notice of its infringing products as early as 1995, but continued to sell those products, and failed to take remedial action. IRS argues that Arctic Cat failed to obtain any advice of counsel prior to 2001, and

that Arctic Cat deliberately copied IRS's patent. In support of its assertion, that Arctic Cat copied IRS's patent, IRS does rely on evidence of trade secret misappropriation.[23]

As to Arctic Cat's argument, that the only evidence that IRS has to support its assertion, that Arctic Cat willfully infringed the '803 Patent, is evidence of trade secret misappropriation, even if that were true, a factfinder could find willfulness on the basis of trade secret misappropriation, alone. See, Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., supra at 1579; Chimie v. PPG Industries, Inc., 218 F.R.D. 416, 421 (D. Del. 2003)(citing the Federal Circuit's decision in Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., supra, for the proposition that a "willfulness finding properly rested in part on actions to misappropriate trade secrets prior to issuance of patent"); Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 1991 WL 441901 at *81 (D. Minn.

---

[23]Deliberate copying of the ideas or designs of another constitutes willful infringement. See, Stryker Corp. v. Intermedics Orthopedics, Inc., 96 F.3d 1409, 1414 (Fed. Cir. 1996). On the other hand, an infringer's intent to design around a patent is evidence of good faith on the part of an infringer. See, London v. Carson Pirie Scott & Co., 946 F.2d 1534, 1538 (Fed. Cir. 1991)("[D]esigning or inventing around patents to make new inventions is encouraged."); Rite-Hite Corp. v. Kelley Co., Inc., 819 F.2d 1120, 1122 (Fed. Cir. 1987).

1991)("The evidence also supports a finding that JJO willfully infringed [the] patents," and "JJO acquired the means to practice the [] invention by misappropriating 3M's trade secret."); Construction Technology, Inc. v. Lockformer Co., Inc., 781 F. Supp. 195, 201 (S.D.N.Y. 1990)("Here the jury made a finding of wilful infringement which was amply supported by the record including evidence that the defendant attempted to misappropriate plaintiff's trade secrets."). As a result, IRS is not attempting to relitigate claims of trade secret misappropriation, but rather, it is merely using evidence of alleged trade secret misappropriation to support its willfulness argument.

In support of the argument, that Arctic Cat copied its patent, IRS asserts that, "[o]nly after IRS demonstrated its EFI system to Arctic Cat in 1988 and worked with Arctic Cat for almost a year, was Arctic Cat finally able to put EFI-equipped snowmobiles on the market." Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Motion for Summary Judgment Dismissing Claims Against Arctic Cat for Willful Infringement, at p. 10. IRS, however, offers no evidence to support that assertion. IRS also argues that "JECS shared IRS technology with Arctic Cat." Id., citing Declaration of Jill Kastner in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Motion for Summary Judgment Dismissing Claims Against Arctic Cat for Willful

Infringement, Exhibit 22 ("Kastner Willfulness Declaration"). According to IRS, the "technology was stolen by Polaris, who Arctic Cat knew had been sued by IRS for patent infringement and trade secret misappropriation." Id., citing Kastner Willfulness Declaration, Exhibit 22. Thus, IRS asserts that "Arctic Cat's deliberate copying and use of technology obtained from a third party (JECS/Polaris) who had copied from the patentee (IRS) is evidence of willful infringement." Id.

Exhibit 22, which IRS proffers as evidence of copying, is a Memorandum dated February 20, 1990, from Polaris to, it appears, JECS. See, Kastner Willfulness Declaration Exhibit 22. In the Memorandum, Polaris expresses its surprise, and frustration, that Arctic Cat is already advertising an EFI system that Polaris believes is identical to the JECS EFI systems, which were employed in the Polaris snowmobiles. Polaris questions whether JECS was also providing EFI systems to Arctic Cat. However, the Memorandum does not demonstrate that JECS, or Polaris, provided IRS's trade secrets to Arctic Cat, much less does it show that Arctic Cat accepted what it knew to be trade secrets. Moreover, as we discussed in recommending the denial of Arctic Cat's, and Suzuki's, Motion for Summary Judgment on res judicata grounds, the JECS EFI systems, that were used in the Polaris

snowmobiles, according to Arctic Cat, are "admittedly different." For that reason, we recommended that that Motion for Summary Judgment be denied.

Of course, we recognize that copying need not be "slavish copying" -- which "occurs when the infringing product is virtually an exact copy of the patentee's product or is made using the patentee's product or is made using the patentee's product as a template" -- in order to constitute deliberate copying. Stryker Corp. v. Intermedics Orthopedics, Inc., 96 F.3d 1409, 1414 (Fed. Cir. 1996). IRS argues that the Polaris Memorandum, Exhibit 22, "shows beyond reasonable contention that a triable issue of fact exists as to whether Arctic Cat is guilty of willful infringement on the ground of deliberate copying." Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Motion for Summary Judgment Dismissing Claims Against Arctic Cat for Willful Infringement, at pp. 10-11. According to IRS, while "proof of copying is not required for IRS to prevail on willfulness grounds, the arguable existence of such an issue does not preclude judgment for IRS on willfulness grounds," but "[i]ts existence does [] preclude summary judgment for Arctic Cat because Arctic Cat must show the absence of such issue to prevail." Id. at 11 n. 2.

Although the Polaris Memorandum creates an issue of fact as to whether JECS provided an EFI system to Arctic Cat, it does not suggest that, even assuming that

Arctic Cat was using JECS's EFI systems before February 20, 1990, Arctic Cat knew, or had reason to know, that IRS's patents covered JECS's EFI systems. IRS does not provide any other evidence of copying. A bare assertion of copying does not suffice to defeat a Motion for Summary Judgment. See, Demerath Land Co. v. Sparr, 48 F.3d 353, 356 (8th Cir. 1995); Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994); Stokes v. CBS Inc., 25 F. Supp.2d 992, 1001 (D. Minn. 1998).

Further, on October 2, 1990, months after Arctic Cat was already advertising the EFI system, which was being addressed in the Polaris Memorandum of February 20, 1990, Divel, who we have previously identified as an employee of IRS, wrote to Arctic Cat's vice president of engineering, Skime, offering to sell, and license, IRS's EFI system for use in the Arctic Cat snowmobiles. See, Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches, Exhibit 23. Thus, in 1990, there is actually evidence that IRS did not have reason to believe that Arctic Cat was infringing the '803 Patent, or the earlier '701 Patent, as IRS was seeking to market products employing those Patents, to Arctic Cat. Accordingly, the Polaris Memorandum does not provide any evidence from which a factfinder could reasonably infer that Arctic Cat had deliberately copied IRS's patent.

Contrary to Arctic Cat's assertion, IRS does offer other evidence in support of its willfulness argument. IRS argues that "[t]he undisputed fact that Arctic Cat continued to sell the infringing products and failed to obtain opinions of counsel after receiving notice of IRS's patent rights in 1995 is, by itself, sufficient to support a finding of willful infringement in favor of IRS." Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Motion for Summary Judgment Dismissing Claims Against Arctic Cat for Willful Infringement, at p. 1. As stated, IRS contends that Arctic Cat continued to infringe the '803 Patent after receiving notice as to its existence, and yet failed to either obtain advice of counsel, or take remedial steps.

Our first inquiry then, in considering Arctic Cat's Motion, as well as the Motion of IRS, is whether IRS provided notice of its patent, and of Arctic Cat's infringement. On February 7, 1995, IRS's counsel, Hanes, wrote to Skime, and informed him that IRS's "examination and electronic testing of the engine's EFI system in the ARCTCO snowmobile, apparently also **furnished by UNISIA JECS,** [which Hanes informed Skime had been added as a defendant in the then pending Polaris litigation], indicates that the system, as installed on the engine in the snowmobile, infringes claim 1 of the original '701 patent, as well as the identical claim in the '803 reissue patent, and also infringes the additional broader claims, 2-4, in the '803 patent." Declaration of

Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches, Exhibit 2 [emphasis supplied].

It is clear that Hanes's letter of February 7, 1995, gave Arctic Cat notice of the '701 Patent, and the '803 Patent, and also gave Arctic Cat notice of IRS's belief that the Patents were being infringed by Arctic Cat's use of the JECS EFI systems. However, we have already recommended the dismissal of IRS's claims of infringement, with respect to Arctic Cat's and Suzuki's use of JECS's EFI systems, on grounds of legal estoppel, and therefore, the only remaining claims, on which IRS could recover damages for willful infringement -- if infringement is found -- is as to Arctic Cat's use of the Kokusan EFI systems. Hanes's letter did not provide Arctic Cat with any notice that Arctic Cat's use of the Kokusan EFI systems was infringing IRS's patents.

In interpreting the language of Section 287(a), which requires that an infringer be "notified of the infringement," the Federal Circuit Court of Appeals, in Amsted Industries Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 186-87 (Fed. Cir. 1994), held that "notice must be of 'the infringement,' not merely notice of the patent's existence or ownership," and that "[a]ctual notice requires the affirmative

communication of a specific charge of infringement by a specific accused product or device." Id. Therefore, without notice that the Kokusan EFI systems also infringed the '701 and '803 Patents, Arctic Cat had no affirmative duty of care to ensure that its use of Kokusan EFI systems was not infringing any of IRS's patents.[24] Since IRS has not provided any direct evidence of willful infringement, IRS's Motion necessarily hinges on Arctic Cat's breach of its affirmative duty of care, but in the absence of notice, Arctic Cat owed no duty of care. Accordingly, we recommend that the Motion of Arctic Cat for Summary Judgment on Willfulness be granted, and we recommend that IRS's cross-Motion be denied. Nonetheless, in the interest of completeness, and in view of the fact that our recommendation, here, necessarily relies on our earlier recommendation, that Arctic Cat's and Suzuki's Motion for Summary Judgment on legal estoppel be granted with respect to their use of JECS's EFI systems, we address the remaining issues that are related to willfulness.

With respect to IRS's contention, that Arctic Cat never obtained advice of counsel upon its receipt of Hanes's notice of infringement dated February 7, 1995, we

[24]We note that, even in IRS's letter of March 23, 2001, which purportedly gave notice of Arctic Cat's infringement, IRS did not identify which products allegedly infringed its patents.

find the evidence to demonstrate that Arctic Cat did obtain the advice of counsel shortly after receiving Hanes's letter. On December 22, 1995, counsel for Arctic Cat, Underhill, who practices at the law firm of Merchant & Gould, replied to Hanes's letter, which accused Arctic Cat of infringement. See, <u>Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches, Exhibit 3</u>. Underhill stated that Arctic Cat was not infringing IRS's patents, and he set forth the reasons supporting his opinion. Specifically, Underhill related, as follows:

> [T]he scope of [the '803 Patent claims] is limited by the arguments which were made to distinguish the claims over the prior art considered by the examiner. ARCTCO thus does not infringe claims 2-4 as well. In addition, it is our opinion that claims 2-4 are clearly invalid.
>
> Claims 2-4 of the '803 patent were allowed by the examiner because the Japanese patent in Okumura does not disclose sensing a "predetermined cyclically repeating state of said engine" and then causing fuel injection at a "predetermined point in time determined from said timing sensing signal." Chasteen distinguished Okumura on the grounds that in Okumura the fuel injection does not occur at a predetermined point in time determined from a timing sensing signal, but on the other hand varied during cycle based upon the crank chamber pressure.
>
> In this specification Chasteen defines the predetermined cyclically repeating state as the top dead center position of

> one of the pistons of the engine. In arguments made to the Patent Office Chasteen asserted that a "predetermined cyclically repeating state" means a point where ignition takes place, or top dead center, or some other number of degrees ahead of top dead center.
>
> If the claims of the '803 patent are limited according to In re Donaldson as argued by Chasteen, then the ARCTCO fuel injection system does not infringe any of the claims. The ARCTCO electronic fuel injection system does not sense a top dead center position of one of the pistons of the engine to provide a timing signal.
>
> Fuel injection at a predetermined point in time based upon a predetermined cyclically repeating state of the engine was well known in the prior art before the alleged invention by Chasteen. * * * The ARCTCO electronic fuel injection system is made according to the prior art and any attempts to read the claims of the '803 patent on the ARCTCO system would render them invalid.

Id.

In his letter, Underhill also referred to an earlier letter, of June 27, 1995, from Welter, who is also an attorney with Merchant & Gould, in which counsel advised that, in 1991, Merchant & Gould reviewed the '701 Patent, and concluded that the electronic fuel injection system of ARCTCO did not infringe the claims of that patent. Id.

The Underhill letter is prima facie evidence that Arctic Cat sought the advice of counsel in order to respond to Hanes's letter. Hanes's letter was addressed to Skime, Arctic Cat's vice president of engineering, however, Underhill, counsel for Arctic Cat,

responded to Hanes's letter. Obviously, Skime, or someone else at Arctic Cat, sought the advice of its counsel, and forwarded Hanes's letter to Underhill, or to someone who transmitted the letter to Merchant & Gould. Quite plainly, by uncontroverted evidence in the Record, Arctic Cat sought the advice of counsel in response to Hanes's letter in 1995. Accordingly, IRS's contention, that IRS failed to seek advice of counsel between 1995 and 2001, is patently false.

Further, a letter of May 2, 1997, from Welter, at Merchant & Gould, to Grant Thornton LLP, reveals that Arctic Cat had an ongoing relationship with Merchant & Gould from April 1, 1996, until at least May 2, 1997. See, Declaration of Andrew W. Horstman Regarding Arctic Cat's Motion for Partial Summary Judgment Dismissing All Claims of [sic] Counterclaims Against Arctic Cat for Willful Infringement, Exhibit 15. In his letter, Welter states, as follows:

> Our response is directed only to matters which have been given substantive attention by us in the form of legal consultation and where appropriate, legal representation since April 1, 1996.

Id. at p. 2.

The letter goes on to describe counsel's substantive representation of Arctic Cat as follows:

> Several years ago we were requested to give Arctco an opinion regarding possible infringement of U.S. Patent No. 4,901,701, which dealt with a two-cycle engine electronic fuel injection system. The owner of that patent, Injection Research Specialists Inc. had filed a suit against Polaris for infringement of that patent. On October 28, 1991, we provided a written opinion to Arctco, Inc. to the effect that the Arctco fuel injection system did not infringe the patent. A letter from that company to Arctco, Inc. dated February 2, [sic] 1995 again charges Arctco with infringement of U.S. Patent No. RE34,803, which is a re-issue of U.S. Patent No. 4,901,701. We have again advised Arctco, Inc. that the original claims of the 701 patent are, in our opinion, not infringed by Arctco. **We have also advised Arctco with respect to the claims of the 803 re-issue patent that in our opinion those claims are not infringed by Arctco**.

Id. [emphasis supplied].

While IRS concedes that Arctic Cat obtained a written opinion of counsel, in 1991, with respect to the ‘701 Patent, IRS urges that Arctic Cat never obtained a written opinion of counsel with respect to the ‘803 Patent, which did not issue until 1994, and which, purportedly, is broader than the ‘701 Patent. However, what is clear from Welter’s letter, in 1997, is that, at the very least, a factual issue exists as to whether Arctic Cat was provided an opinion of counsel, perhaps an oral opinion, on the ‘803 Patent.

We first note that oral opinions of counsel, while disfavored, see, W.R. Grace & Co.-Conn. v. Intercat, Inc., 7 F. Supp.2d 425, 473 (D. Del. 1997)(“Oral opinions

are not favored to establish competent advice of counsel," as "[o]ral opinions carry less weight because they have to be proved years later against the challenges of faded memories and the 'forces of contemporaneous litigation.'"), quoting Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., supra, 976 F.2d at 1580, are nonetheless evidence of non-willfulness. See, Century Wrecker Corp. v. E.R. Buske Mfg. Co., Inc., 913 F. Supp. 1256, 1273 (N.D. Iowa 1996)("[T]he evidence [] showed that [the alleged infringer] has consistently claimed that it was relying on the **oral** advice of counsel in forming a good-faith belief in the invalidity of Century Wrecker's patents.") [emphasis supplied]; Windsurfing Intern., Inc. v. Fred Ostermann GmbH, 668 F. Supp. 812, 821 (S.D.N.Y. 1987)("BIC Leisures continuation of the warranty program was reasonably based on the advice of counsel, both **oral** and written, and cannot be considered willful activity displaying indifference to WSI's rights.") [emphasis supplied]; see also, K.W. Muth Co. v. Bing-Lear Mfg. Group, L.L.C., 219 F.R.D. 554, 565 (E.D. Mich. 2003)(finding that oral evidence of advice of counsel was discoverable). Thus, Arctic Cat could have relied on an oral opinion, especially where, as here, that oral opinion was a mere recitation of an earlier written opinion on a related patent.

IRS maintains that Arctic Cat has denied that any oral opinions were rendered. In support of that assertion, IRS relies on an argument that counsel for Arctic Cat made in its Response to Defendants' Appeal of November 12, 2002 Order of Magistrate Judge Erickson. See, Declaration of Michael S. Wilcox in Support Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Motion for Partial Summary Judgment on Willfulness, Exhibit S. In its Response, counsel for Arctic Cat stated as follows:

> The defendant argues in part that Mr. Gould's credibility is at issue because he or others at Merchant & Gould rendered oral opinions to Arctic Cat. That argument is not only unsupported by the law, but it is also unsupported by the facts. The defendants have not cited to any facts of record, and, the fact that Merchant & Gould, and Mr. Gould specifically, provided very detailed and extensive written opinions to Arctic Cat belies such a factual allegation. That the defendants have to make up facts to support their argument in this respect speaks volumes about the lack of merit to the argument.

Id. at p. 3 n. 2.

As we read Arctic Cat's argument, it is unclear whether counsel is asserting that there was no evidence of oral opinions, or that, in light of the additional extensive written opinions, Gould's credibility is not at issue, as any oral opinion would be corroborated by written opinions. At any rate, this conflict of contentions merely

creates an additional factual dispute, which renders Summary Judgment in IRS's favor inappropriate.

Further, IRS argues that Arctic Cat did not rely on Underhill's letter of December 22, 1995, which opined that Arctic Cat was not infringing the '803 Patent, and listed his reasons in support of non-infringement, as well as his opinions in support of the invalidity of the '803 Patent. IRS relies on the deposition of Tweet, who is Arctic Cat's vice president, as evidence that Arctic Cat did not rely on Underhill's 1995 letter. At his deposition, Tweet was asked: "What was your understanding of the purpose of sending [Underhill's 1995 letter] to Mr. Hanes?" Declaration of Andrew W. Horstman Regarding Arctic Cat's Motion for Partial Summary Judgment Dismissing All Claims of [sic] Counterclaims Against Arctic Cat for Willful Infringement, Exhibit 13. Tweet responded, as follows:

> I believe that the purpose of this letter was to tell Mr. Hanes and IRS that we didn't believe that we infringed the '803 patent, and that we had told them in 1991 that we also did not infringe the '701 patent. And I think it was an attempt to show them a bit why we didn't -- why we didn't think we infringed, and I think this was a -- let's see, yeah, I guess, just to tell them that we thought we didn't infringe and why.

Id.

IRS argues that Tweet's testimony reveals that Underhill's letter to IRS was merely "to express Arctic Cat's belief that it did not infringe to IRS -- not to provide Arctic Cat with an opinion of counsel." Reply Brief in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Motion for Summary Judgment of Willfulness, at p. 7. The argument is attenuated, and widely misses the mark.

For advice of counsel purposes, the following are critical inquiries: 1) whether Arctic Cat sought advice, and the fact that Arctic Cat forwarded Hanes's letter of February 7, 1995, to its legal counsel, creates a factual issue as to whether such advice was sought; 2) whether an opinion of counsel was given, and Welter's letter of May 2, 1997, raises an issue of fact as to whether an opinion on the '803 Patent was rendered to Arctic Cat; and 3) whether Arctic Cat reasonably relied on that opinion of counsel. See, e.g., Minnesota Speciality Crops, Inc. v. Minnesota Wild Hockey Club, L.P., 210 F.R.D. 673, 676 (D. Minn. 2002)("'Under certain circumstances, a party's reasonable reliance on the advice of counsel may defuse otherwise willful conduct,'" provided that "'a client seeks counsel's advice in a timely manner, makes adequate disclosure to counsel, receives counsel's opinion and then acts upon it.'"), quoting Cuisinarts, Inc. v. Robot-Coupe Intern. Corp., 580 F. Supp. 634, 638 (S.D.N.Y. 1984). While Underhill's letter to IRS does not demonstrate that advice was rendered

to Arctic Cat, because Arctic Cat was not a recipient of the letter, see, Wildlife Exp. Corp. v. Carol Wright Sales, Inc., 18 F.3d 502, 512 (7th Cir. 1994) ("However, advice of counsel is proved by the letter counsel sends his client, not the letter counsel sends his adversary;" "[t]he former type of proof, either in writing or oral, was not offered by Defendant."), Underhill's legal opinions expressed in the letter are nonetheless advice of counsel on which Arctic Cat can rely, provided that those opinions were orally, or otherwise, communicated to Arctic Cat. It is not the letter on which Arctic Cat asserts it relied, but rather, Arctic Cat relied on the opinions that are also expressed in that letter. As a result, Tweet's deposition raises a factual dispute as to whether Arctic Cat relied on the opinions expressed in Underhill's 1995 letter.

Moreover, while the Federal Circuit has "stated that due care is often achieved by seeking the advice of competent counsel and receiving exculpatory advice, Vulcan Eng'g Co., Inc. v. Fata Aluminium, Inc., 278 F.3d 1366, 1378 (Fed. Cir. 2002), [the Court has] not held that obtaining the advice of counsel is the only means to avoid a finding of willfulness, regardless of the circumstances." State Contracting & Engineering Corp. v. Condotte America, Inc., supra at 1064, citing Kloster Speedsteel, AB v. Crucible, Inc., supra at 1579 ("[N]ot every failure to seek an opinion of competent counsel will mandate an ultimate finding of willfulness."). Thus, even if

Arctic Cat failed to obtain an opinion of counsel in 1995, or after, Arctic Cat offers other evidence that its continued sale of allegedly infringing products, after receiving notice in Hanes's letter of February 7, 1995, was non-willful.

For example, Arctic Cat points to the fact that neither IRS, nor its counsel, ever responded to Underhill's 1995 letter, which explicated Arctic Cat's non-infringement and invalidity arguments. In his deposition, Balch, who is IRS's president, testified that he could not recall whether IRS responded to that letter. See, Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches, Exhibit 1, at p. 173. Since, by all appearances, IRS failed to respond to Underhill's letter, Arctic Cat maintains that it relied on IRS's inaction as acquiescence, or as a concession that Arctic Cat's non-infringement and invalidity arguments were meritorious.

Of course, IRS argues that Arctic Cat has contradicted itself in arguing that it both relied on advice of counsel, and then, in its Motion for Summary Judgment on equitable estoppel, that it relied on IRS's inaction. However, leaving the legitimacy of arguing in the alternative to the side, it has been held that an alleged infringer can rely on both advice of counsel, and a patentee's misleading inaction. In ABB Robotics, Inc. v. GMFanuc Robotics Corp., supra at 1399 n. 27, the Court reasoned as follows:

> ABB/CM have argued that summary judgment is inappropriate because it has been foreclosed from discovering whether Fanuc relied upon its own counsel in its decision to manufacture and sell the accused device. ABB/CM argue that if Fanuc relied on its own determination that the P-150 did not infringe, it can not now assert an estoppel defense which requires reliance upon the patentee's conduct or statements. To hold that a defendant who believes his device does not infringe, but who also relied upon the inaction of the patentee may not assert the defense of estoppel, is contrary to the principles of equity. ABB/CM is suggesting that only a defendant who chooses to infringe knowingly may assert the defense of equitable estoppel. ABB/CM's argument is directly contradicted by the Seventh Circuit's opinion in Continental Coatings Corp. v. Metco, Inc., 464 F.2d 1375, 1378 (7th Cir. 1972). * * * Based on the foregoing, even if Fanuc relied, in part, on a determination that its wrist did not infringe the '536 patent, it does not negate its reliance on CM's conduct for purposes of estoppel.

We find that a factfinder could conclude that Arctic Cat reasonably relied on IRS's misleading inaction, when IRS failed to respond to Underhill's 1995 letter, especially when IRS had previously, in 1991, alleged infringement, which caused Arctic Cat to obtain a written advice of counsel, and when IRS never brought suit.

In sum, in addition to finding that IRS's Motion for Summary Judgment on willfulness should be denied for failure to provide notice that IRS believed that Arctic Cat's use of Kokusan EFI systems infringed the '803 Patent, we also find that genuine

issues of fact exist with respect to whether Arctic Cat timely sought, and was provided, competent advice of counsel, and then relied on that advice, as well as whether Arctic Cat reasonably relied on IRS's misleading inaction. Accordingly, we recommend that IRS's Motion for Summary Judgment on willfulness be denied for those additional reasons.

NOW, THEREFORE, It is --

RECOMMENDED:

1. That the Motion of Arctic Cat and Suzuki for Partial Summary Judgment Based on Res Judicata and Legal Estoppel [Docket No. 401] be denied, in part, and granted, in part.

2. That the Motion of Arctic Cat for Partial Summary Judgment on Invalidity and Non-Infringement of the '374 Patent [Docket No. 429] be denied.

3. That the Motion of Arctic Cat and Suzuki for Summary Judgment on Champerty and Maintenance Grounds [Docket No. 435] be denied.

4. That the Motion of IRS for Summary Judgment Concerning Obviousness Contentions on which Plaintiffs' Experts Rendered No Opinion [Docket No. 443] be denied.

5. That the Motion of IRS for Summary Judgment that the Bench Systems Developed by Cuyuna Engine Company and Arctic Cat do not Anticipate Any Claim of the '803 Patent [Docket No. 446] be denied.

6. That the Motion of Arctic Cat and Suzuki for Summary Judgment on the Invalidity of the '803 Patent Under Title 35 U.S.C. §102(b) [Docket No. 449] be denied.

7. That the Motion of Arctic Cat for Partial Summary Judgment on IRS's Claims of Willful Infringement [Docket No. 452] be granted.

8. That the Motion of IRS for Partial Summary Judgment on Willfulness [Docket No. 457] be denied.

9. That the Motion of Arctic Cat and Suzuki for Summary Judgment on the Basis of Equitable Estoppel and Laches [Docket No. 464] be denied.

August 6, 2004

s/ Raymond L. Erickson

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 23, 2004,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 23, 2004,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.