**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

ARCTIC CAT INC.,
a Minnesota Corporation,

Plaintiff,

v.

INJECTION RESEARCH SPECIALISTS, INC., a Colorado Corporation, and PACER INDUSTRIES, INC., a Missouri Corporation,

Defendants.

INJECTION RESEARCH SPECIALISTS, INC., a Colorado Corporation, and PACER INDUSTRIES, INC., a Missouri Corporation,

Counterclaimants,

v.

ARCTIC CAT INC.,
a Minnesota Corporation, and
SUZUKI MOTOR CORPORATION,
a Japanese Corporation,

Counterclaim Defendants.

Civil Action No. 01-CV-543 (MJD/RLE)

Hon. Michael J. Davis
Hon. Raymond L. Erickson (Magistrate)

**ORAL ARGUMENT REQUESTED**

**ARCTIC CAT'S AND SUZUKI'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION OF AUGUST 6, 2004**

# TABLE OF CONTENTS

Page

I. THE RECOMMENDATION TO DENY PARTIAL SUMMARY JUDGMENT ON THE BASIS OF *RES JUDICATA* ........ 1

UNDISPUTED MATERIAL FACTS ........ 2

LEGAL ARGUMENT ........ 5

CONCLUSION ........ 9

II. THE RECOMMENDATION TO DENY SUMMARY JUDGMENT ON THE BASIS OF LACHES AND EQUITABLE ESTOPPEL. ........ 9

UNDISPUTED MATERIAL FACTS ........ 11

LEGAL ARGUMENT RE: LACHES ........ 14

A. IRS's Excuse That it was Engaged in Other Litigation is Insufficient to Rebut the Presumption of Laches. ........ 14

B. Laches Is Properly Decided On Summary Judgment Where The Undisputed Facts Demonstrate The Unreasonableness Of The Patentee's Delay ........ 16

C. On This Record, IRS's Delay Was Unreasonable As a Matter of Law. ........ 17

LEGAL ARGUMENT RE: EQUITABLE ESTOPPEL ........ 20

A. IRS's misleading conduct lulled Arctic Cat and Suzuki into a sense of security ........ 21

B. Arctic Cat's and Suzuki's reliance is demonstrated by continued sales and investments in the accused technology. ........ 23

C. Arctic Cat's and Suzuki's reliance is shown by their failure to take actions to protect themselves from IRS's infringement claims. ........ 26

CONCLUSION ........ 29

III. ARCTIC CAT'S OBJECTIONS TO THE RECOMMENDATION OF A SUA SPONTE DISMISSAL WITH PREJUDICE OF ARCTIC CAT'S CLAIMS RELATING TO THE '374 PATENT ........ 29

Arctic Cat and Suzuki, through counsel, respectfully submit the following objections to Magistrate Judge Erickson's Report and Recommendation, dated August 6, 2004, regarding the nine motions for summary judgment heard during the April 5, 2004 Hearing.

## I. THE RECOMMENDATION TO DENY PARTIAL SUMMARY JUDGMENT ON THE BASIS OF *RES JUDICATA*

Although Magistrate Judge Erickson recommended granting Arctic Cat's and Suzuki's motion for partial summary judgment based on legal estoppel, he recommended denial of the motion for partial summary judgment based on *res judicata*. Since the result is the same for partial summary based on either ground -- dismissal of the accused devices that used EFI systems purchased from JECS (a party to an earlier suit by IRS, the so-called *Polaris* litigation) -- Arctic Cat's and Suzuki's motion based on *res judicata* will be moot if the Court accepts Magistrate Judge Erickson's recommendation to grant the motion based on legal estoppel. If the Court were to reject Magistrate Judge Erickson's recommendation, however, Arctic Cat's and Suzuki's motion based on *res judicata* provides an alternative basis for granting partial summary judgment.

Arctic Cat and Suzuki object to Magistrate Judge Erickson's recommendation to deny summary judgment based on *res judicata* because he denied summary judgment on the erroneous ground that "there was no final Judgment on the merits, for purposes of *res judicata*, on the issue of whether IRS pled a claim for damages arising from JECS's sales to Suzuki."[1] In fact, it is undisputed that IRS sought patent infringement damages from JECS during the *Polaris* litigation for JECS's sales of EFI systems to Arctic Cat and Suzuki. IRS failed in that attempt, and that failure was subsumed in the final judgment entered in the *Polaris* litigation. Thus, *res judicata* precludes IRS from relitigating those JECS sales to Arctic Cat and Suzuki in this case.

---

[1] Docket No. 646, Report & Recommendation dated Aug. 6, 2004 at 26 ("Report").

Arctic Cat's and Suzuki's motion for summary judgment is premised on the fact that IRS is seeking damages in this case for some of the very same EFI systems (the JECS systems sold to Arctic Cat and Suzuki) that were part of IRS's claims in the *Polaris* litigation. IRS has confused the *res judicata* analysis by focusing on the fact that the JECS systems sold to Arctic Cat and Suzuki differ from the JECS systems sold to Polaris and Fuji. Arctic Cat and Suzuki readily admit that the systems differ and have never contended otherwise. That fact is irrelevant, however, because Arctic Cat and Suzuki have never contended that *res judicata* arises from the *Polaris* court's judgment that the EFI systems that JECS sold to Polaris and Fuji do not infringe IRS's patent. Rather, Arctic Cat and Suzuki contend that *res judicata* arises because IRS attempted, and failed, to recover patent infringement damages from JECS in the *Polaris* litigation for <u>all</u> of JECS sales, including those sales to Arctic Cat and Suzuki.[2]

## UNDISPUTED MATERIAL FACTS

1. In IRS's complaint in the *Polaris* litigation, IRS alleged that JECS "manufactures and sells" infringing EFI systems, sought an injunction enjoining JECS from "further acts of infringement of U.S. Patent Re. 34,803" and sought an accounting from "JECS on their sales of products . . . that infringe IRS's patents."[3]

2. In discovery during the *Polaris* litigation, IRS defined the "accused devices" as EFI systems "in any Polaris snowmobile and <u>in all other makes or models of snowmobiles</u>, sold or being designed by any of the defendants, or <u>containing parts made by any of the defendants</u>."[4]

---

2 Yoshida Decl. dated Nov. 6, 2003, Ex. 3, IRS's Resp. to JECS's Mot. to Exclude dated Feb. 12, 1997 at 3 (emphasis in original).

3 *Id.*, Ex. 2, IRS Second Amended Compl. at 25, ¶¶ 78-79; *id.* at 26, ¶ 84; *id.* at 29-30, ¶¶ A & G.

4 Day Decl. dated Dec. 12, 2003, Ex. 1, IRS's First Substantive Set of Interrogs. to JECS dated April 5, 1993, at Definitions, ¶ F (emphasis added).

3. In discovery during the *Polaris* litigation, IRS served interrogatories on JECS seeking "the total dollar volume of your sales of electronic fuel injection systems, or components thereof, for two-cycle engines, broken down by sales to Polaris, and also to other purchasers."[5]

4. In discovery during the *Polaris* litigation, JECS answered IRS's interrogatories regarding JECS's sales to Arctic Cat and Suzuki.

5. In IRS's expert report on damages in the *Polaris* litigation, IRS's expert calculated the "Estimated Incremental Profits for Suzuki and Arctic Cat" and offered the opinion that "the portion of incremental profits Polaris and others might achieve from use of the patented technology and the portion of the incremental profits achieved are also proper measures of damages for patent infringement."[6]

6. After receiving IRS's expert report in the *Polaris* litigation, JECS filed a motion *in limine* to exclude damages evidence on JECS's sales to Arctic Cat and Suzuki.[7]

7. IRS opposed JECS's motion *in limine*, arguing that IRS's complaint covered all acts of infringement by JECS, including sales made to Suzuki and Arctic Cat, arguing:

> JECS has liability for all sales made to Fuji and all sales made to Suzuki, Arctic Cat or anyone else . . . . The measure of damages for infringement is no less than a reasonable royalty and that royalty can be based on end-user sales, e.g. sales to Fuji, Polaris, Suzuki, and Arctic Cat.[8]

8. On February 11, 1997, the *Polaris* court granted the defendants' motion for summary judgment of noninfringement.[9]

---

5 *Id.* at 14 (emphasis added).

6 *Id.*, Ex. 3, Suppl. Expert Report of George F. Rhodes dated Jan. 3, 1997 at 4-5; *id.* at 1-3 (citing Exhibit C).

7 Kastner Decl. in Support of IRS Opp'n, Ex. 5.

8 *Id.*

9 Yoshida Decl. dated Nov. 6, 2003, Ex. 4, Order dated Feb. 11, 1997 at 11-12.

9. After the summary judgment decision in the *Polaris* litigation, IRS moved "to sever and stay all remaining patent issues," arguing that the remaining patent issues were moot:

> Given the Court's February 11, 1997 Order granting summary judgment of noninfringement on all asserted claims of both patents in suit, the remaining patent issues are moot.[10]

10. In its oral argument on its motion to sever and stay the remaining patent issues, IRS argued that the summary judgment ruling decided all of its patent infringement claims against the *Polaris* defendants:

> The [patent invalidity] issue is moot, and it's moot for two reasons: (1) They spent two and a half years in the patent office contesting validity of the patent and (2) they won on infringement.
>
> * * *
>
> They brought a motion for summary judgment . . . . They convinced this court that they should win on infringement. Now it is time to try the only remaining issues in the case [trade secret issues], and we suggest that it just makes sense to do that and do it efficiently.[11]

11. The *Polaris* court granted IRS's motion to sever and stay the remaining patent issues, explaining:

> The Court is going to grant plaintiff's motion to sever and stay, even though I don't really think this is a question of severing and staying. I think it's a question of severing or cutting out the issues which are moot because of my ruling on the summary judgment.[12]

12. On July 24, 1997, following a jury trial on the trade secret issues, the *Polaris* court entered a judgment in which it decided several post-verdict motions and concluded by

[10] Day Decl. dated Dec. 12, 2003, Ex. 4, IRS's Mot. to Sever & Stay Remaining Patent Issues dated Feb. 19, 1997.

[11] *Id.*, Ex. 5, *Polaris* Hearing Tr. dated Mar. 4, 1997 at 23-24.

[12] *Id.* at 24-25.

ordering "all matters and claims in the cause of action have been determined and resolved, and the case may be closed."[13]

13. On August 4, 1997, IRS filed a pleading with the *Polaris* court in which it granted the defendants a covenant not to sue them for infringement of the patents at issue in the suit.[14]

14. On August 26, 1997, the parties filed a pleading with the *Polaris* court in which they stipulated that "all remaining claims on the patent issues (including defendants' declaratory judgment counterclaims for alleged invalidity and unenforceability) are moot."[15]

15. On August 28, 1997, the *Polaris* court issued an Order of Dismissal with Prejudice, ordering that "all remaining claims on the patent issues are dismissed with prejudice."[16]

## LEGAL ARGUMENT

In this litigation, IRS is attempting to recover patent infringement damages for the same JECS sales to Arctic Cat and Suzuki that were part of IRS's claim against JECS in the *Polaris* litigation. IRS's complaint in the *Polaris* litigation sought patent infringement damages for all JECS sales. IRS sought and obtained discovery from JECS in the *Polaris* litigation regarding its sales to Arctic Cat and Suzuki, and IRS included those sales in the expert report on damages that IRS submitted in the *Polaris* litigation. When JECS moved to exclude its sales to Arctic Cat and Suzuki, IRS opposed and argued that it had pled and was entitled to patent infringement damages from JECS for all its sales, including its sales to Arctic Cat and Suzuki. After the *Polaris* court granted summary judgment of no infringement, IRS abandoned its patent infringement claims against JECS for its sales to Arctic Cat and Suzuki.

---

13 Yoshida Decl. dated Nov. 6, 2003, Ex. 7, Order & Amended J. at 8.

14 *Id.*, Ex. 8, IRS's Resp. to Remittur & Consent to Reduce Verdict at 1.

15 *Id.*, Ex. 9, Joint Mot. Regarding Amended J. at ¶ 4.

16 *Id.*, Ex. 10, Order & Amended J. at 8.

Magistrate Judge Erickson questioned whether JECS's sales to Arctic Cat and Suzuki were part of the *Polaris* litigation.[17] He reviewed IRS's complaint in the *Polaris* litigation and concluded that IRS accused JECS of patent infringement for only the EFI systems sold to Polaris and Fuji. With due respect to Magistrate Judge Erickson, Arctic Cat and Suzuki believe that this conclusion is erroneous. Although IRS's count against JECS in the *Polaris* litigation only mentioned its sales to Polaris and Fuji, IRS's prayer for relief requested an injunction against and damages for all JECS sales. And when JECS attempted to exclude its sales to Arctic Cat and Suzuki from the *Polaris* litigation on grounds of lack of notice, IRS expressly argued that its complaint covered all acts of infringement by JECS, including "all sales made to Suzuki, Arctic Cat or anyone else." Moreover, Magistrate Judge Erickson focused too heavily on the allegations in the complaint and improperly discounted the discovery, expert report, and motions from the *Polaris* litigation showing that IRS put JECS's sales to Arctic Cat and Suzuki into issue there. It is "recognized that the liberality and simplicity of pleading under Federal Rule 8(a)(2) tends to reduce the value of the pleading as a device for determining what was in issue in a lawsuit for purposes of later applying the doctrine[ ] of res judicata." C. Wright and A. Miller, *Federal Practice and Procedure*, § 1225 (2004).

Magistrate Judge Erickson also questioned whether IRS's damages expert was computing damages arising from patent infringement by JECS's sales to Arctic Cat and Suzuki or computing damages arising from trade secret misappropriation.[18] But IRS's damages expert calculated the "estimated incremental profits for Suzuki and Arctic Cat" and, under the heading "Economic Loss from Infringement," offered the following opinion:

---

[17] Docket No. 646, Report & Recommendation dated Aug. 6, 2004 at 16-17.

[18] *Id.* at 25.

> In my opinion, Injection Research's actual economic loss from the defendants' patent infringement need not be measured by a *reasonable royalty* based upon Polaris's net income, but rather can be based on the incremental profits gained by defendants' infringement.[19]

Indeed, IRS did not even assert a "trade secret misappropriation claim" against JECS, resulting in JECS being dismissed from the case before the trade secret claim was tried.[20] Moreover, JECS's motion *in limine* and IRS's opposition to that motion make clear that IRS's damages expert was computing damages arising from patent infringement. As a consequence, the damages alleged by IRS for JECS's sales were necessarily damages for patent infringement.

Magistrate Judge Erickson correctly notes that the *Polaris* court never decided JECS's motion *in limine*, and he relies on this fact to support his recommended finding that there was no final judgment on the merits in the *Polaris* litigation as to the JECS's systems sold to Arctic Cat and Suzuki.[21] But Magistrate Judge Erickson is mistaken when he reports that the *Polaris* court held that the motion in limine was moot "because the parties had stipulated to a dismissal."[22] The *Polaris* court held that the motion was moot because IRS conceded after the court's summary judgment ruling that JECS and the other defendants had "won on infringement."[23] In other words, the *Polaris* court declined to decide the motion *in limine* because IRS acquiesced to the court's summary judgment decision as adjudicating IRS's claim for patent infringement damages for JECS's sales to Arctic Cat and Suzuki, even though those sales were not specifically mentioned in the summary judgment decision. Thus, under principles of *res judicata*, the

---

19 Day Decl. dated Dec. 12, 2003, Ex. 3, Suppl. Expert Report of George F. Rhodes dated Jan. 3, 1997 at 4-5 (emphasis added).

20 Yoshida Decl. dated Nov. 6, 2003, Ex. 2, Second Amended Compl., Count 2; Id., Ex. 7, Order & Amended J. dated July 24, 1997 at 2.

21 Docket No. 646, Report & Recommendation dated Aug. 6, 2004 at 26.

22 *Id.*

23 *See supra* Undisputed Facts 9, 10, and 11.

summary judgment decision in the *Polaris* litigation, which merged into the July 24, 1997 Final Judgment in that case,[24] should bar IRS's attempt to recover damages for JECS sales to Arctic Cat and Suzuki in this litigation.

If the July 24, 1997 Final Judgment did not adjudicate JECS's sales to Arctic Cat and Suzuki, then the *Polaris* court's August 28, 1997 Order that "all remaining claims on the patent issues are dismissed with prejudice" served as a final judgment as to all patent issues that were not resolved by IRS's intervening "covenant not to sue," including IRS's claim for patent infringement damages from JECS for its sales to Arctic Cat and Suzuki. The *Polaris* court entered that dismissal with prejudice after IRS granted the defendants a "covenant not to sue" for infringement of the patents at issue "for any past, present, or future acts" and after the parties stipulated to the dismissal with prejudice. If this court were to hold that IRS's "covenant not to sue" did not encompass JECS's sales to Arctic Cat and Suzuki, IRS's allegation that it was entitled to patent infringement damages for those sales would have been a "remaining claim on the patent issues" that was dismissed with prejudice. Moreover, Magistrate Judge Erickson acknowledged that a dismissal with prejudice is "a final adjudication on the merits for purposes of *res judicata*"[25] and that "a final adjudication on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."[26] Here, IRS not only could have accused JECS's sales to Arctic Cat and Suzuki of patent infringement in the *Polaris* litigation, it was IRS's position that it had accused those sales of infringement.

In sum, the undisputed facts reveal that (1) IRS sought patent infringement damages from JECS in the *Polaris* litigation for JECS's sales to Arctic Cat and Suzuki and (2) the parties in the

---

24 *See Barton v. Columbia Mut. Cas. Ins. Co.*, 930 F.2d 1337, 1338 n.2 (8th Cir. 1991).

25 Docket No. 646, Report & Recommendation at 14-15.

26 *Id.* at 10.

*Polaris* litigation, including IRS, believed that that claim was resolved by either the summary judgment decision or by the dismissal with prejudice of "the remaining claims on the patent issues." Thus, one way or the other, IRS's claim for damages from JECS's sales to Arctic Cat and Suzuki was resolved in the *Polaris* litigation. And one way or the other, *res judicata* should preclude IRS from relitigating patent infringement claims based on EFI systems that Arctic Cat and Suzuki purchased from JECS. As a matter of fairness and judicial economy, *res judicata* "bars a patent infringement action against a customer of a seller who has previously prevailed against a patentee because of invalidity or noninfringement of the patent." *See MGA, Inc. v. General Motors Corp.*, 827 F.2d 729, 734 (Fed. Cir. 1987).

**CONCLUSION**

For these additional reasons based on *res judicata*, Arctic Cat and Suzuki's motion for partial summary judgment as to the EFI systems purchased from JECS should be granted.

## II. THE RECOMMENDATION TO DENY SUMMARY JUDGMENT ON THE BASIS OF LACHES AND EQUITABLE ESTOPPEL.

On Arctic Cat's and Suzuki's partial summary judgment motion on laches, the Magistrate Judge's August 6, 2004 Report and Recommendation concluded the undisputed facts evidenced a more than six-year delay between the time IRS knew of the allegedly infringing activity and the filing of its counterclaim. Report at p. 136. "As a consequence, a presumption exists that IRS's delay in filing its claims of infringement was unreasonable, and that Arctic Cat, and Suzuki, have been prejudiced by that delay." Report at pp. 136-137. However, that Report then concluded that IRS had rebutted the presumption apparently applying a legal standard that laches "is an extreme sanction that is reserved only for the most egregious situations." Report at p. 144;

see also Report at 146. Arctic Cat and Suzuki object to the application of this standard since it is not based on Federal Circuit law in patent cases.

Additionally, Arctic Cat and Suzuki object on two grounds to the Report's conclusion that IRS's commencement of two other lawsuits against Arctic Cat and Suzuki (involving claims relating to IRS's proprietary EFI technology) is a basis on which a factfinder could conclude that IRS's delay in filing its patent infringement claim was reasonable. See Report at 146. First, the Report earlier concluded that IRS's counsel's letter of February 7, 1995 together with the actual commencement of a lawsuit regarding IRS's proprietary EFI technology, but which included "no infringement claims, and [which] did not even mention claims of infringement, . . . only corroborated Arctic Cat's and Suzuki's, belief that the infringement claims had been abandoned." Report at pp. 142-143. Second, no legal authority exists to support the conclusion that a patent holder can delay assertion of patent claims by waiting for the outcome of two other lawsuits based on the same operative facts against the same parties without any notice to the alleged infringers. IRS's conduct was unreasonable as a matter of law, whether viewed in the seven-year context from 1994-2001 or the shorter context in which IRS failed to assert patent claims following the conclusion of the *Polaris* litigation. IRS's claim for damages prior to its filing of a patent infringement action should be barred for laches.

Many of the undisputed facts supporting Arctic Cat's and Suzuki's laches motion also support their summary judgment motion that IRS is equitably estopped from asserting its patent claims against Arctic Cat and Suzuki. The Report concluded the record demonstrates that Arctic Cat and Suzuki had established two of the three elements of an estoppel defense to a patent infringement claim. Specifically, Magistrate Judge Erickson found that the uncontroverted record established IRS had engaged in misleading conduct which prejudiced Arctic Cat and

Suzuki. However, the Report concluded that a material issue remained as to the third element of an estoppel claim—whether Arctic Cat and Suzuki relied on IRS's misleading conduct. Magistrate Judge Erickson concluded that the applicable case law required Arctic Cat and Suzuki to prove that some action had been taken after the misleading conduct occurred and that such action must have been taken only "but for" IRS's misleading conduct. With all due respect, this heightened reliance standard is not the standard under the applicable law. Arctic Cat and Suzuki object specifically to the Report's conclusion that the undisputed facts do not demonstrate that Arctic Cat and Suzuki relied on IRS's misleading conduct.

## UNDISPUTED MATERIAL FACTS

1. On December 6, 1994, when the '803 patent issued, IRS believed that Arctic Cat snowmobiles with Suzuki engines infringed the '803 patent.[27]

2. On February 7, 1995, IRS's patent litigation counsel wrote Arctic Cat accusing Arctic Cat snowmobiles with Suzuki engines of patent infringement and advising that IRS would sue Arctic Cat for patent infringement "not later than conclusion of the Polaris et al litigation." In that letter, IRS's counsel stated the *Polaris* lawsuit involved claims against JECS, whom IRS understood was also supplying EFI systems for Arctic Cat snowmobiles.[28]

3. Arctic Cat, through counsel, investigated the allegations and responded on December 22, 1995. In that letter, counsel for Arctic Cat stated that Arctic Cat did not infringe the '803 patent, and that the '803 patent would likely be found invalid in any litigation. IRS

---

[27] Report at p. 137. IRS first accused Arctic Cat of using IRS's EFI technology in 1990. *Id.* IRS's patent litigation counsel then sent a letter to Arctic Cat (with a copy of the original patent, the '701 patent, of which the '803 patent is a reissue) in 1991. *Id.*

[28] Report at pp. 115-116.

never responded to that letter or objected to Arctic Cat's conclusion that its snowmobiles did not infringe the '803 patent or that the '803 patent would likely be found invalid.[29]

4. On February 11, 1997, the Colorado federal district court granted summary judgment against IRS on its patent infringement claims against Polaris, Fuji and JECS. The remaining trade secret misappropriation claim against Polaris and Fuji went to trial in April 1997.[30]

5. In August 1997, IRS gave Polaris, Fuji and JECS a covenant not to sue on the '803 patent and the Colorado federal district court dismissed with prejudice the remaining patent claims.[31]

6. The Federal Circuit issued its decision on the appeal on the trade secret claims in the *Polaris* litigation in 1998.[32]

7. IRS did not sue Arctic Cat or Suzuki for patent infringement either during or at the conclusion of the *Polaris* litigation. IRS did sue Arctic Cat and Suzuki on its EFI proprietary claims for trade secret misappropriation and fraud in 1997. IRS failed with both suits.[33]

---

[29] Report at p. 122.

[30] Report at p. 117.

[31] Report at pp. 8-9.

[32] Report at p. 117.

[33] Report at pp. 117-18. On December 12, 1997, IRS filed its second lawsuit on its EFI technology against Arctic Cat, Suzuki and JECS in the Federal District Court of Colorado, the same court in which IRS had originally asserted both trade secret and patent claims against Polaris, Fuji Heavy Industries (Polaris's engine supplier), and JECS. In that case, the federal court determined that IRS's trade secret misappropriation claims were barred by the statute of limitations, and the court dismissed the action. The Tenth Circuit affirmed that dismissal in July 2000. *See* Chasteen *v. Unisia JECS Corp.*, 216 F.3d 1212, 1222 (10th Cir. 2000).

According to IRS's president, the decision not to assert the patent claim was because the trade secret misappropriation claim was "a clean action."[34]

8. Arctic Cat and Suzuki did not file a declaratory judgment counterclaim in the trade secret lawsuits.

9. Arctic Cat and Suzuki continued to develop, build and market new EFI-equipped engines and snowmobiles after IRS commenced the trade secret lawsuit but did not assert any patent infringement claim.[35]

10. Arctic Cat and Suzuki decided not to pursue alternative forms of EFI technology after IRS commenced the trade secret lawsuit but did not assert any patent infringement claim.[36]

11. As described by Mr. Tweet of Arctic Cat in a Rule 30(b)(6) deposition, Arctic Cat allowed a license for Ficht EFI technology (alternative, non-infringing technology) to expire after IRS commenced the trade secret lawsuit but did not assert any patent infringement claim and the absence of a lawsuit from IRS on the patent infringement claims affected Arctic Cat's decision to let the license lapse.

12. By letter, dated March 23, 2001, IRS advised Arctic Cat for the first time since 1995 that it still intended to pursue a patent infringement claim against Arctic Cat.[37]

[34] Balch Dep. Tr. dated June 12, 2003 at pp. 184., Ex. L, Declaration of Christopher J. Sorenson of August 21, 2003 (Dkt. 316), submitted in support of Memorandum of Law in Support of Plaintiff's Motion to Compel Certain Discovery Improperly Withheld on the Basis of Attorney-Client Privilege and to Compel Defendants' Compliance with Rule 34 of the Federal Rules of Civil Procedure (Dkt. 315)(p. 3).

[35] Ole Tweet April 29, 2003 dep. at 23-26, 34-38 Exh. 26, Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches.

[36] Id.

[37] Report at 118. IRS's letter actually accused Arctic Cat of infringing three other patents in addition to the '803 patent. IRS subsequently granted covenants not to sue on those three patents including on the '374 patent, but only after IRS forced Arctic Cat to conduct full-scale discovery and only in response to Arctic Cat's summary judgment motion for no infringement.

13. On March 28, 2001, Arctic Cat commenced this declaratory judgment action seeking a judicial determination that its snowmobiles did not infringe the '803 patent and that IRS's claims were barred, among other reasons, on grounds of laches and estoppel.[38]

14. In response to Arctic Cat's declaratory judgment claims, in September 2001, IRS asserted its compulsory patent infringement claims against Arctic Cat and Suzuki.[39]

## LEGAL ARGUMENT RE: LACHES

With all due respect to the Magistrate's Report, IRS's presentation of non-material evidence does not rebut the presumption of laches. Additionally, the undisputed facts demonstrate no reasonable excuse exists for IRS's delay in asserting its patent infringement claims against Arctic Cat and Suzuki.[40]

### A. IRS's Excuse That it was Engaged in Other Litigation is Insufficient to Rebut the Presumption of Laches.

After reviewing the relevant, uncontroverted facts, the Report concluded that "a presumption exists that IRS's delay in filing its claims of infringement was unreasonable, and that Arctic Cat, and Suzuki, have been prejudiced by that delay." Report at pp. 136-137. However, the Report then found that IRS had rebutted that presumption. Arctic Cat and Suzuki object to that portion of the Report and Recommendation which finds that "*by presenting evidence* of the *Polaris* Litigation, the subsequent trade secret litigation, and the application of the '374 Patent to the PTO, IRS has burst the bubble as to the presumption of unreasonable delay

[38] Report at p. 6, pp. 118-19.

[39] Report at p. 6.

[40] The Report found that IRS's delay caused prejudice to Arctic Cat and Suzuki, so this submission does not discuss the prejudice element of laches. Arctic Cat and Suzuki respectfully object to the Report's finding that such prejudice was only evidentiary and not economic. IRS's delay resulted in economic prejudice as well as evidentiary prejudice.

and substantial prejudice." Report at p. 140 (emphasis supplied). As a matter of law, IRS's submission of unconvincing evidence cannot rebut the presumption.

As the *Aukerman* Court noted, and as Magistrate Judge Erickson acknowledged, "[e]vidence, for example, directed to . . . excuses . . .will eliminate the laches presumption *if sufficient to raise a genuine issue.*" *Aukerman*, at 1038 (emphasis supplied); Report at 138. Based on at least four undisputed findings of fact, however, Judge Erickson conceded that all of the excuses offered by IRS failed to justify the delay. In his Report, Judge Erickson, however, found that each of the three excuses offered by IRS was insufficient. First, the Report found with respect to the excuse of the *Polaris* litigation, "IRS's delay is excused until the conclusion of the Polaris Litigation, on August 13, 1998." Report at p. 141. Thus, the *Polaris* litigation did not excuse three years of the delay. Second, the Report found that with respect to the excuse of the trade secret litigation, in conjunction with the Hanes 1995 letter, "[w]hen IRS brought trade secret claims against Arctic Cat and Suzuki, but no infringement claims, and did not even mention claims of infringement, it only corroborated Arctic Cat's, and Suzuki's, belief that the infringement claims had been abandoned." Report at pp. 142-143.[41] And third, the Report found that "IRS's assertion, that it was waiting until the '374 Patent should issue, is unconvincing" because it occurred during the trade secret litigation and IRS never sought to add it in that suit. Report at p. 143. Finally, the Report recognized that IRS never communicated any reasons for its delay to Arctic Cat and Suzuki. Based on these undisputed facts, the Report concluded that the equities required IRS to communicate to Arctic Cat and Suzuki the reasons for additional delays. Report at pp. 143-144.

[41] Despite this finding, the Report subsequently and inexplicably reaches an ultimate conclusion that the trade secret lawsuit excuses the delay. See Report at p. 140.

Therefore, under *Aukerman*, IRS's *mere presentation* of other litigation evidence could not create a genuine issue, and is insufficient to eliminate the presumption. As a consequence, Arctic Cat's and Suzuki's summary judgment motion on laches should be granted.

**B. Laches Is Properly Decided On Summary Judgment Where The Undisputed Facts Demonstrate The Unreasonableness Of The Patentee's Delay.**

A laches defense to patent infringement is properly adjudicated on summary judgment where the defendant's delay was unreasonable on the undisputed facts. Many district courts routinely grant summary judgment of laches,[42] even where the period of delay is six years or less.[43] The Federal Circuit has also routinely upheld many district court decisions granting summary judgment on laches grounds.[44]

The Magistrate's Report does not properly rely upon controlling precedent in recommending that this case does not warrant summary judgment of laches. Instead, the Report relies upon the opinions in *Tonka Corp. v. Rose Art Industries, Inc.*,[45] a District of New Jersey decision, *Country Floors v. Partnership of Gepner and Ford*,[46] a Third Circuit ruling, and *Mile High Industries v. Cohen*,[47] a decision from the Tenth Circuit. These decisions are neither factually, nor legally applicable to this case. The decisions in *Tonka Corp.* and *Mile High*

[42] See, e.g., *North American Philips Corp. v. Taito America.Corp.*, No. 93-C-3261, 1997 U.S. Dist. LEXIS 13264 (granting partial summary judgment on laches grounds); *Bound v. Spencer Gifts, Inc.*, No. 95-2216, 1996 U.S. Dist. LEXIS 14325 (E.D. Pa. 1996) (same).

[43] *See Odetics, Inc. v. Storage Tech. Corp.*, 919 F.Supp. 911, 923-24 (E.D. Va. 1996) (granting summary judgment on laches grounds, deeming a three-year delay in filing suit unreasonable); *Wafer Shave, Inc. v. Gillette Co.*, 857 F.Supp. 112 (D. Mass. 1993) (granting summary judgment of laches based on three-year delay); *Digital Systems Int', Inc. v. Davox*, 30 U.S.P.Q.2d 1170, 1172 (W.D. Wash 1993) (rejecting other litigation and patent reexamination as excuses for the delay in filing suit in granting summary judgment on laches grounds for five and one-half year delay); *Gossen Corp. v. Marley Moldings, Inc.*, 977 F. Supp. 1346, 1352 (E.D. Wis. 1997) (granting summary judgment for six-year delay, finding (at 1349) that "[s]ummary judgment is appropriate in a patent case").

[44] *See, e.g., Wanlass v. General Electric Co.*, 148 F.3d 1334 (Fed. Cir. 1998) (upholding summary judgment of laches); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548 (Fed. Cir. 1996) (same).

[45] 836 F. Supp. 200 (D. N.J. 1993).

[46] 930 F.2d 1056 (3d Cir. 1991).

[47] 222 F.3d 845 (10th Cir. 2000).

*Industries* cited the absence of reliance in denying summary judgment of laches.[48] In doing so, they run directly counter to the Federal Circuit's opinion in *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*,[49] which dispelled any notion that reliance is a required element of laches.[50]

Moreover, the facts of these cases are also distinguishable. In *Tonka Corp.*, a trademark case, the court denied the plaintiff's motion to strike the defendant's laches affirmative defense very early in the case. In *Country Floors*, another trademark case, the court reversed a summary judgment granted on inadequate facts. Both *Tonka Corp.* and *Country Floors* are non-patent cases in which laches could not be granted at an early point in the litigation because the factual record was inadequately developed. These cases are markedly different from the present case, in which the factual record is extensively developed and the key facts supporting laches are undisputed.

**C. On This Record, IRS's Delay Was Unreasonable As a Matter of Law.**

The unreasonableness of IRS's delay is manifest under the undisputed facts. Whether viewed in the seven-year context from 1994-2001, or the shorter context, in which IRS failed to assert patent claims following the *Polaris* litigation's conclusion, IRS's delay is beyond excuse.

IRS's principal excuse for delay, the *Polaris* litigation, casts no doubt on the unreasonableness of IRS's conduct. The *Polaris* litigation should not excuse the *Aukerman* six-year presumption because IRS's actions following the *Polaris* litigation undermine the very purpose of the "other litigation" exception. To be entitled to the "other litigation" exception, the

---

[48] *See Mile High Industries*, 22 F.3d at 858 ("[T]he laches defense is reserved for those rare cases where a protracted acquiescence by plaintiff induces a defendant to undertake substantial activities ***in reliance*** on the acquiescence.") (emphasis added); *Tonka Corp.*, 836 F. Supp. at 219 ("[T]he laches defense is reserved for those rare cases where a protracted acquiescence by plaintiff induces a defendant to undertake substantial activities *in reliance* on the acquiescence.") (emphasis added).

[49] 960 F.2d 1029 (Fed. Cir. 1992) (*en banc*).

[50] *Id.* at 1042 ("The second element, reliance, is not a requirement of laches but is essential to equitable estoppel.").

patentee must promptly sue the next accused infringer as soon as the litigation with the other infringer concludes.[51] Otherwise, the patentee could merely divest the laches defense with notice that it is free to ignore, freeing itself to finish one litigation and commence the next at its own leisure, and subjecting the accused infringer to indefinite delay and uncertainty. This interpretation of the exception would swallow the rule.

The effect of IRS's conduct is, in fact, to negate any notice given to Arctic Cat and Suzuki of the *Polaris* litigation and IRS's intent to assert patent claims at that litigation's conclusion. Without adequate notice, the Federal Circuit has refused to allow other litigation to excuse a laches delay.[52] An accused infringer having been threatened with suit at a specific time, only for months or years to pass without suit, is put in an equal or greater state of uncertainty than the accused infringer who was given no notice at all. Here, IRS's failure to sue is even less reasonable because IRS chose to bring two trade secret lawsuits against Arctic Cat and Suzuki *without asserting the patent claims* that it promised it would bring following the *Polaris* litigation.

IRS also should not be permitted to use as an excuse its trade-secret litigation against Arctic Cat and Suzuki. First, as the Report found, the "other litigation" applies only to other patent lawsuits. Report at 140. Second, IRS undisputedly could have alleged patent infringement claims in that case, but, for strategic reasons, chose not to do so. In the *Polaris* litigation, IRS lost on its patent claims (receiving an adverse claim construction), but prevailed on its trade-secret claims. In the *Polaris* litigation, IRS asserted its patent and trade secret claims in one action. When IRS president John Balch was pressed to explain IRS's non-assertion of

[51] *See, e.g., Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290, 1291-92 (Fed. Cir. 1992) (patentee's delay excused by other litigation where the patentee promptly sued at conclusion of the other litigation).

[52] *See, e.g., Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1554 (Fed. Cir. 1996) (finding that other litigation did not excuse laches period because the patentee failed to provide notice of the other litigation).

patent claims in the trade secret action against Arctic Cat and Suzuki in contradiction to the 1995 letter, he stated that its trade secret lawsuit was a "clean action."[53] The law, however, strongly disfavors precisely this kind of "claim-splitting" gambit.[54] Thus, the *Aukerman* six-year presumption should apply here.

Additionally, IRS's delay is unreasonable as a matter of law whether viewed in the seven-year context from 1994-2001, or in the shorter context following the *Polaris* litigation's conclusion. Courts have found delays of much less than six years to warrant summary judgment on a laches defense. For example, in *Odetics, Inc. v. Storage Tech. Corp.*,[55] the Eastern District Court of Virginia decided that, in light of the patentee's unreasonable neglect, laches was appropriate regardless of whether the delay period was computed at six years or three years.[56] Similarly, in *Wafer Shave, Inc. v. Gillette Co.*,[57] the District Court of Massachusetts found laches warranted where the shorter delay was accompanied by the patentee's misleading conduct.[58] Much like in this case, the *Wafer Shave* court found that the patentee's "subsequent conduct and silence " after threatening suit "lulled [the defendant] into reasonably believing that the threat [of patent claims] had been abandoned."[59] Given the fact that Magistrate Judge Erickson concluded that IRS's three-plus years of delay following the conclusion of the Polaris litigation "lulled

---

[53] Balch Dep. Tr. dated June 12, 2003 at pp. 184., Ex. L, Declaration of Christopher J. Sorenson of August 21, 2003 (Dkt. 316), submitted in support of Memorandum of Law in Support of Plaintiff's Motion to Compel Certain Discovery Improperly Withheld on the Basis of Attorney-Client Privilege and to Compel Defendants' Compliance with Rule 34 of the Federal Rules of Civil Procedure (Dkt. 315)(p. 3).

[54] *See, e.g., Klipsch, Inc. v. WWR Tech.*, 127 F.3d 729 (8th Cir. 1997) (noting the "general rule against claim splitting 'is to protect the defendant from being harassed by repetitive actions based on the same claim'"(citing Restatement (Second) of Judgments, § 26)).

[55] 919 F. Supp. 911 (E.D. Va 1996).

[56] *Id.* at 923-24, 927.

[57] 857 F. Supp. 112 (D. Mass. 1993).

[58] *Id.* at 128 ("[T]he length of a delay in filing suit is not alone dispositive of the question of whether the delay was reasonable. The patentee's conduct also affects the reasonableness of the delay.")

[59] *Id.*

Arctic Cat, and Suzuki, into believing that IRS's claims of infringement had been abandoned," the holding in *Wafer Shave* mandates that this Court grant summary judgment on laches as a matter of law.[60]

IRS's conduct following the *Polaris* litigation was far more misleading than the patentee's conduct in *Wafer Shave.* IRS's decisions in these three-plus years are beyond excuse. Those decisions included: (1) failing to sue Arctic Cat for patent infringement as promised; (2) suing Arctic Cat and Suzuki for purported trade-secret theft and fraud, not in one forum but in two separate forums, and failing to include patent claims in either lawsuit; and then (3) sending Arctic Cat another letter charging patent infringement and trying to extort a settlement almost four years after commencement of the first trade secret lawsuit.

Following this conduct and the three-plus years of unexcused delay, it was Arctic Cat, not IRS, who finally initiated the present litigation. Only then did IRS assert its patent claim, which was compulsory to Arctic Cat's declaratory judgment claims. IRS's delay, whether six years or three years, can find no reasonable excuse and must subject IRS to a bar for laches.

## LEGAL ARGUMENT RE: EQUITABLE ESTOPPEL

Under the applicable Federal Circuit law described in the *Aukerman* decision, the elements of estoppel in a patent case require a party to establish three elements: "'(1) the patentee, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence; (2) the accused infringer relies upon that communication; (3) and the accused infringer would be harmed materially if the patentee is later permitted to assert any claim inconsistent with his earlier conduct.'" Report at p. 119.

---

[60] Report at 142. The Report erroneously states that the court in *Wafer Shave* ultimately found "that a fact issue was created for Trial." See id. at 144. The *Wafer Shave* court specifically stated that "the undisputed facts require the conclusion that Gillette [the accused infringer] has satisfied its burden of proving laches and estoppel, and there is no evidence of egregious conduct [on the part of Gillette] to affect the balance of the equities." *Wafer Shave*, 857 F. Supp. at 129.

As described above, the Report determined that, as a matter of law, IRS had engaged in misleading conduct, which satisfies the first element of an estoppel defense. That misleading conduct included (1) IRS's failure to respond to Arctic Cat's counsel's 1995 letter setting forth Arctic Cat's non-infringement and invalidity belief; (2) IRS's failure to appeal the adverse decision on its patent claims in the *Polaris* litigation, and abandoning the patent claims; (3) IRS's failure to file a patent infringement claims against Arctic Cat following the *Polaris* litigation as originally promised in the 1995 letter; (4) IRS's lawsuits against Arctic Cat and Suzuki on its proprietary EFI technology asserting claims of trade secret misappropriation and fraud; and (5) IRS's decision not to disclose to Arctic Cat or Suzuki that it still intended to pursue patent claims after the completion of the trade secret and fraud actions. The Report also found the third element in its conclusion that "Arctic Cat and Suzuki do . . . offer a glut of evidentiary prejudice. . .." Report at 149. As a result, the only remaining element is whether the uncontroverted record demonstrated that Arctic Cat and Suzuki relied upon IRS's communications.

**A. IRS's misleading conduct lulled Arctic Cat and Suzuki into a sense of security.**

In this case, and as the Report found, "IRS's conduct, namely Hanes letter of February 1995, which threatened litigation before the conclusion of the Polaris Litigation, lulled Arctic Cat, and Suzuki, into believing that IRS's claims of infringement had been abandoned. When IRS brought trade secret claims against Arctic Cat and Suzuki, but no infringement claims, and did not even mention claims of infringement, it only corroborated Arctic Cat's, and Suzuki's, belief that the infringement claims had been abandoned." Report at 142-143.

As a matter of law, reliance does not require evidence of discrete acts attributable solely to the patentee's misconduct and to no other cause. Rather, reliance requires a showing that the accused infringer "had a relationship or communication with the plaintiff which lulls the

infringer into a sense of security … ." *See, e.g., ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 828 F. Supp. 1386, 1398 (E.D. Wis. 1993), *aff'd*, 52 F.3d 1062 (Fed. Cir. 1995). This reliance results in the accused infringer taking action inconsistent with any expectation that an infringement lawsuit is forthcoming, as in continued investments and sales while "lulled" into the false sense of security. *See ABB Robotics* at 1398-1400.[61]

The Report imposes a standard of "but for" reliance that can be satisfied only with very specific evidence that decisions were caused *solely* by the patentee's misconduct, rather than demonstrating that the accused infringer was lulled into a false sense of security into continuing with its sales. Discussing *ABB Robotics*, for example, the Report states that "in the absence of any conclusive evidence of reliance, *ABB Robotics* adds little to our determination here." This statement indicates that the Report applied an incorrect legal standard for reliance. *ABB Robotics* demonstrates that an accused infringer, faced with misleading conduct, will demonstrate reliance by showing the misleading conduct lulled the defendant into a false sense of security. Notably, the Federal Circuit upheld the district court's finding of estoppel, stating:

> The trial court next found that GMF proved the second element of estoppel, reliance, because CM's completed negotiations with respect to the control patents, when viewed in light of the abrupt discontinuation in correspondence with respect to the '536 patent, gave rise to the 'necessary inference' that CM's infringement claim against GMF with respect to the '536 patent had been abandoned. … On appeal, ABB and CM contend that the trial court improperly decided whether GMF could have relied on CM's silence instead of using the correct standard, whether GMF actually relied on CM's conduct. We disagree. From its opinion, it is clear that the trial court did not consider abstract theoretical possibilities, but rather, looked at the conduct of the parties and decided that GMF had a relationship with CM that lulled GMF into a sense of security that it would not be sued.[62]

---

[61] Finding the reliance element met, the court stated: "The only possible inference that can be drawn from the evidence in this case is that CM would leave Fanuc unmolested. It is immaterial whether that inference is based upon Fanuc's belief that CM had decided the [accused product] did not infringe. Either belief supports the only possible inference – that CM would not assert its rights under the '536 patent against Fanuc." *Id.* at 1399-1400.

[62] *ABB Robotics v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1064 (Fed. Cir. 1995) (citing *Aukerman).*

The Federal Circuit's discussion demonstrates that the Report, in its search for specific, affirmative acts of reliance, gives inadequate weight to the false sense of security caused by IRS's misleading conduct. The finding that IRS "lulled Arctic Cat, and Suzuki, into believing that IRS's claims of infringement had been abandoned" can only mean that their future business decisions, like those in *ABB Robotics*, were made in reliance on IRS's failure to sue. As such, the reliance factor has been established.

**B. Arctic Cat's and Suzuki's reliance is demonstrated by continued sales and investments in the accused technology.**

Arctic Cat's and Suzuki's increased investments and sales are one type of action resulting from Arctic Cat's and Suzuki's reliance. In 1995, when IRS first accused Arctic Cat of infringement, Arctic Cat's investments in, and sales of, the accused EFI technology were relatively small by later years' standards. After IRS first accused Arctic Cat of infringing the '803 patent, Arctic Cat enlisted patent counsel to analyze the infringement accusations. Counsel contacted IRS, explaining that Arctic Cat did not infringe the '803 patent and that the '803 patent was invalid. IRS did not respond to this letter. Arctic Cat and Suzuki continued to invest in EFI, develop the accused EFI technology, and sell the accused products in increasing number. Once IRS lost its patent claims in the *Polaris* litigation, failed to appeal those claims, and failed to assert patent claims following the *Polaris* litigation, Arctic Cat and Suzuki continued to increase their investments and sales in EFI.

Reliance is evidenced by investments made to manufacture and sell the accused devices. *See Gossen Corp. v. Marley Mouldings*, 977 F. Supp. 1346 (E.D. Wis. 1997) (granting summary judgment on equitable estoppel grounds); *Wafer Shave, Inc. v. Gillette Co.*, 857 F. Supp. 112,

123 (D. Mass. 1993).[63] Arctic Cat's and Suzuki's increased investments and sales of the accused technology were made under the false sense of security that IRS would not seek to negate those sales and investments by accusing that technology of patent infringement. To conclude otherwise is to conclude that Arctic Cat and Suzuki, despite their perception that IRS had abandoned its infringement claims, made and sold the accused products without any reliance on the belief that IRS would not sue those products for patent infringement.

Here, the Report found that Arctic Cat needed to stop its sales of EFI snowmobiles prior to the misleading conduct, and then resumed sales thereafter, to establish reliance. See Report at 127-28. No legal authority supports such a requirement.

The Report also rejects evidence that Arctic Cat and Suzuki continued developing new models of EFI snowmobiles and continued increasing sales of EFI snowmobiles in reliance on IRS's misleading conduct. The Report quotes from *Aukerman*:

> An infringer can build a plant being entirely unaware of the patent. As a result of infringement, the infringer may be unable to use the facility. Although harmed, the infringer could not show reliance on the patentee's conduct. To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead with building the plant.[64]

Relying on this language, the Report finds that Arctic Cat's and Suzuki's continued investment and sales were akin to "building the plant" but then concludes that such actions do not support reliance. Contrary to the quoted language, Arctic Cat and Suzuki *were* aware of the '803 patent.

[63] Discussing *Wafer Shave*, the Magistrate's Report noted the court's finding of reliance because "Gillette also continued to expand its lubricating strip lines." Report at p. 129.

[64] Report at 126.

And, most important, there was a relationship and communication with IRS that lulled Arctic Cat and Suzuki into a sense of security in going ahead with its sales and investments.[65]

IRS itself clearly understood that Arctic Cat's actions after it commenced the trade secret lawsuit without any patent infringement claims had led to increased and continued sales by Arctic Cat and Suzuki. In the letter of March 23, 2001, IRS's president stated "[w]e have estimated Arctic Cat's exposure to past infringement of the '803 patent, for example, at not less than $100,000,000 (since Arctic Cat used it on approximately 2.5 x as many units as Polaris) . . . ." That number of Polaris units would have been based on Polaris's sales numbers through the 1997 trial.

Moreover, the Report's analysis exhibits a very narrow definition of "reliance" that relieves IRS of any responsibility for its actions. Arctic Cat's and Suzuki's continued investments and sales of EFI necessarily relied on IRS's taking no measures to enjoin them. Where a patentee exhibits misleading conduct inconsistent with asserting its patent monopoly, the defendant's investment and sales will grow, and purported damages will accumulate, in reliance on the patentee's doing nothing to stop it.[66] Arctic Cat's and Suzuki's growth in investment and sales of the accused technology relied on IRS's failure to challenge those sales.

[65] Arctic Cat and Suzuki also object to the Report's conclusion that Arctic Cat and Suzuki could not have relied on IRS's misleading conduct before the Polaris litigation concluded. This conclusion ignores IRS's other misleading conduct, including IRS's failing to respond to Arctic Cat's letter setting forth its non-infringement and invalidity position, and IRS's abandoning the '803 patent claims in the Polaris litigation.

[66] The *ABB Robotics* court cited to the Seventh Circuit in *Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d 1375, 1378 (7th Cir. 1972): "... Plaintiff argues that Metco was not damaged by IIT's delay ... and that, in any event, it relied on an opinion of invalidity rather than on IIT's inaction as its business expanded. ... It is no doubt true that Metco's decision in 1961 to risk litigation rather than to discontinue production was predicated on its opinion that the patent was invalid; but the growth in Metco's business in the ensuing years was permitted to continue without challenge by IIT or plaintiff."

**C. Arctic Cat's and Suzuki's reliance is shown by their failure to take actions to protect themselves from IRS's infringement claims.**

Arctic Cat also made specific decisions and relinquished certain opportunities in reliance on IRS's misleading conduct. The fact that an alleged infringer failed to take affirmative actions to protect itself from an infringement lawsuit is strong evidence of reliance. *See Wafer Shave*, 857 F. Supp. at 124;[67] *ABB Robotics*, 828 F. Supp. at 1398-1400; *Forest Labs., Inc. v. Abbott Labs.*, No. 96-CV-159-A, 1999 U.S. Dist. LEXIS 23215, *24-25 (D. N.Y. 1999), *aff'd*, 239 F.3d 1305 (Fed Cir. 2001) (noting that "the fact that [the alleged infringers] failed to insulate themselves from [the patentee's] infringement claims and, instead, continued to invest heavily in [the accused product] is strong proof of reliance."). Having been misled by IRS into believing that IRS had abandoned its patent claims, Arctic Cat and Suzuki forewent opportunities and actions that could have distanced them from the '803 patent. On this subject, Arctic Cat witness Ole Tweet testified as follows:

> A: I discussed with Mr. Twomey[68] about the -- the many, various IRS allegations of infringement and, of course, nonaction and time lapses and -- yeah. We're both quite familiar with that.
> ***
> And -- and then we also discussed to a great extent, you know, the options we might have had had IRS followed through with their claims of infringement by actually challenging it, and also our belief that since they had not challenged anything, we felt they agreed with us that we did not infringe. But we talked extensively about what could have happened had we really thought we had a -- an issue of -- with IRS on infringement and what courses of action we could have taken as a result of that.
> ***
> Q: What -- what information did Mr. Twomey provide you with respect to what Arctic Cat could have done?
> A: Well, we discussed a -- a variety of things we could have done, such as, you know, different systems that we could have used, and the opportunities that we had that -- to try use

[67] Arctic Cat and Suzuki respectfully disagree with the Report's interpretation of *Wafer Shave's* procedural posture or that *Wafer Shave's* procedural posture alters the applicability of that case to Arctic Cat's and Suzuki's motion.

[68] Christopher Twomey is Arctic Cat's CEO.

those, and maybe the absence of those opportunities now.
Q: When you say "the absence" now, what -- what do you mean? I just want to understand the words you're using.
A: Well, some of the systems that we had been working on developing or had licenses to, we no longer have access to.
***
A: Let's see, I have another document here that -- well, I guess -- yeah. Besides what I've said, we -- we could have had alternative forms of -- of fuel delivery, fuel injection, probably some of our biggest things. And, of course, we talked about the effects of the delay in -- in a number of vehicles we had produced with the systems that we did use with the -- I guess the -- what should I say? I guess mainly the missed opportunities maybe that we could have -- could have possibly used -- could have used, not possibly, but we could have used.
Q: When you say "could have used," do you mean EFI systems you could have used?
A: Yes.[69]

This testimony shows that Arctic Cat did not pursue the development of other available technologies, not only for business reasons, but also because Arctic Cat believed that IRS had no intentions to assert patent claims against Arctic Cat's then-current EFI technology. For specific example, one of the reasons Arctic Cat decided not to pursue the OMC-Ficht "direct injection" system – foregoing an available license on the technology – was because Arctic Cat believed IRS had abandoned its patent claims against the Suzuki EFI engines. Mr. Tweet testified:

A: **However, at that point in time, it really didn't appear like we had an issue with our existing system**, and it was going to cost time and money to complete the development of the Ficht system for snowmobiles. So we elected to terminate our license to Ficht -- I should say Ficht OMC. And as a result, later on, Ficht was -- Ficht OMC was purchased by a competitor, and that ended our ability, I believe, to -- or our desire and ability to put that system on things we were using.[70]
***
A: **I think the absence of a claim affected our decision**.[71]
***
A: **I guess my feeling is that the absence of the -- had there been an active claim, I believe we would have at least considered that. But the last notice we**

[69] Ole Tweet April 29, 2003 dep. at 23-26, Exh. 26, Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches.

[70] *Id.* at 36-37 (emphasis added).

[71] *Id.* at 37-38 (emphasis added).

**had was '95. That was, gee, I think almost five years earlier, because this was towards the end of '99. And so I guess I don't -- you know, I guess I didn't see it was anything active.**[72]

Here, Arctic Cat and Suzuki offer specific testimony that Arctic Cat and Suzuki failed to protect themselves from an infringement lawsuit due, at least partly, to a false belief that IRS would not sue them for patent infringement.[73] Even IRS admits that Arctic Cat had other, non-accused EFI technologies available to it.[74] With alternatives available to protect itself from an infringement lawsuit, Arctic Cat's and Suzuki's continued investments and sales in the disputed EFI technology should be sufficient as a matter of law to demonstrated reliance.

However, the Report takes exception with Arctic Cat's and Suzuki's failure to take remedial actions as a form of reliance, fearing that "the same argument could be made by any alleged infringer, in any infringement action . . . ." Id. at 128. But this is not true, for an infringer without knowledge of the patent, or without having been lulled by a patentee's misleading conduct, cannot make the same argument.

The Report also finds no reliance because Arctic Cat was not taking remedial steps before the misleading conduct of commencing the trade secret litigation without any patent infringement claim. However, IRS never responded to Arctic Cat's counsel's 1995 letter (which

---

[72] *Id.* at 39-40 (emphasis added). The Report characterized this testimony as evidence of a business decision, not a decision made in reliance on IRS's misleading conduct of filing the trade secret action without any patent infringement claim. Report at pp. 131-32.

[73] IRS is estopped to sue not only Arctic Cat, but also Suzuki who was and is in privity with Arctic Cat due to Suzuki's successive supplier/customer relationships with Arctic Cat for the EFI engine products used in the accused snowmobiles. *See Jamesbury Corp. v. Litton Industrial Prods., Inc.* 839 F.2d 1554, 1555 (Fed. Cir. 1988), *overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Construction Co.* 960 F.2d 1020 (Fed. Cir. 1992)(*en banc*), (Actions by patent owner gave rise to estoppel asserted by a "successor in interest."); *see also, Hayden v. Chalfant Press, Inc.,* 177 F.Supp. 303, 308-309 (S.D.Cal. 1959) (copyright owner estopped from asserting copyright infringement claim not only against a third party map publisher, but also against the defendant map printer who received permission from the publisher to print the maps).

[74] Even IRS recognized that non-accused alternatives were available to Arctic Cat. Exh. 18, Declaration of Annamarie A. Daley Regarding Arctic Cat and Suzuki's Motion for Summary Judgment on the Basis of Equitable Estoppel and Laches, Rodney Preisser June 13, 2003 dep. at 84, 173-74.

is further misleading conduct) and so why would Arctic Cat have taken remedial action before the commencement of the trade secret lawsuit when IRS's silence had previously led it to believe that IRS agreed with Arctic Cat's counsel's conclusions of non-infringement and invalidity? Arctic Cat and Suzuki also forewent their opportunity to file an earlier declaratory judgment action.

Arctic Cat and Suzuki have established that the uncontroverted record demonstrates reliance as a matter of law. Their summary judgment motion on grounds of estoppel should be granted.

## CONCLUSION

For all the above reasons, Arctic Cat's and Suzuki's motion for summary judgment on laches and equitable estoppel grounds should be granted.

## III. ARCTIC CAT'S OBJECTIONS TO THE RECOMMENDATION OF A SUA SPONTE DISMISSAL WITH PREJUDICE OF ARCTIC CAT'S CLAIMS RELATING TO THE '374 PATENT

At page 62 of the Report, Magistrate Judge Erickson recommends that since the Court lacks subject matter jurisdiction over Arctic Cat's claims relating to the '374 patent, that those claims should be dismissed, sua sponte, with prejudice. However, since the Court has determined it has no jurisdiction over those claims, the dismissal should be without prejudice. Such a dismissal could be interpreted as precluding Arctic Cat from litigating its invalidity and unenforceability defenses to the various patents in the '374 family including the '803 patent, which Arctic Cat has not had a full and fair opportunity to litigate.

SUZUKI MOTOR CORPORATION

By its attorneys

Dated: August 23, 2004

s/William F. Forsyth

William F. Forsyth (MN Atty ID #31070)
Henson & Efron, P.A.
220 South Sixth Street, Suite 1800
Minneapolis, MN 55402-4503
Telephone: (612) 339-2500
Facsimile: (612) 339-6364

Thomas H. Jenkins (Pro Hac Vice)
Bruce C. Zotter (Pro Hac Vice)
Christopher W. Day (Pro Hac Vice)
Finnegan, Henderson, Farabow,
Garrett & Dunner L.L.P.
1300 I Street, N.W.
Washington, D.C. 20005-3315
Telephone: (202) 408-4000
Facsimile: (202) 408-4400

ARCTIC CAT INC.

By its attorneys

Dated: August 23, 2004

s/Annamarie A. Daley

Annamarie A. Daley (MN #158112)
Aaron A. Myers (MN #311959)
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Telephone: (612) 349-8500
Facsimile: (612) 339-4181