# Exhibit D

1993 WL 632261 (N.D.Fla.), 29 U.S.P.Q.2d 1526
United States District Court, N.D. Florida,
Pensacola Division.
Kenneth A. MACPIKE and Paul E. Pence, Plaintiffs,
v.
AMERICAN HONDA MOTOR CO., INC., Defendant.
Civ. A. No. 92-30094/LAC.
Oct. 1, 1993.

J. Ralph King, King & Schickli, Lexington, KY, for plaintiffs.
John D. McConaghy, Los Angeles, CA, Robert C. Palmer, III, Pensacola, FL, for defendant.

*ORDER AND MEMORANDUM OPINION*

COLLIER, District Jduge.

***1** This case was tried before a jury beginning August 30, 1993. At the close of plaintiffs' case, the Court granted the defendant's motion for a directed verdict. The motion was granted on three separate grounds. First, and foremost, the plaintiffs lacked sufficient evidence to prove their case of infringement under the doctrine of equivalents. Second, they failed to establish the requisite notice which would have entitled them to an award of damages prior to the time suit was filed. And third, with regard to their claim of willful infringement, they failed to establish that the defendant deliberately copied their patent.

Plaintiffs' claim for patent infringement under the doctrine of equivalents surrounds the alleged infringement by American Honda of plaintiffs' patent on a rear wheel suspension system for a standard motorcycle. Plaintiffs were granted a patent on this device by the U.S. Patent Office in 1972. [FN1] The '697 patent includes ten apparatus claims, two being independent and eight dependent. Initially, plaintiffs asserted infringement of both independent claims, but then altered their position during trial to assert infringement of Claim number 5 only. At trial, plaintiffs argued that the infringement occurred through American Honda's sale or use of a rear wheel suspension system identified as, Honda's ProLink suspension system. They also claimed that the defendant's actions in this regard were willful and in wanton disregard of their rights under the '697 patent. American Honda denied plaintiffs' allegations of infringement and asserted that the '697 patent was invalid and unenforceable under the doctrine of obviousness and/or the doctrine of inequitable conduct.

The standard upon which the Court must base its decision on a motion for a directed verdict is whether, at trial, the nonmoving party presented "substantial evidence", meaning " 'evidence of such quality and weight that reasonable and fairminded persons in the exercise of impartial judgment might reach different conclusions....' " *Huff v. Standard Life Ins. Co.*, 683 F.2d 1363, 1366 (11th Cir.1982) (quoting, *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1371 (5th Cir.1982) (en banc)). In applying this standard, the Court must consider all of the evidence, look at it in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. *Huff,* at 1366.

A. *Failure of Proof*

Plaintiffs' sole expert on the issue of infringement under the doctrine of equivalents was Dr. Weins, a professor from Auburn University with a PhD in mechanisms, specializing in the area of robotics. Dr. Weins' opinion on infringement, namely that the Honda ProLink Suspension System performed substantially the same function in the substantially the same way to produce substantially the same result, was based first, on her comparison of a Honda XR-350 motorcycle containing the ProLink system with the '697 patent and second, on her comparison of plaintiffs' Exhibit 23 with the '697 patent. Each of these bases will be addressed in turn.

1. *XR-350--Honda One*

***2** The opinions and conclusions made by Dr. Weins' regarding this model were not appropriate for consideration by the jury because the Honda XR-350 examined by Dr. Weins was a 1983 model. Based on the six year statute of limitations applicable in this case, plaintiffs are unable to recover damages for any act of infringement occurring prior to 1986. *See* 35 U.S.C. § 286. Accordingly, a directed verdict for the defense is appropriate on the claim for damages related to infringement by the Honda XR-350.

2. *Exhibit 23--Honda Two, Three, & Four*

Plaintiffs' Exhibit 23 is an artist's rendition of four motorcycle rear wheel suspension systems. [FN2]

It was prepared by draftsmen employed with defense counsel's law firm, and was originally submitted by the defense as an exhibit in support of its motion for summary judgment. [FN3] The first drawing, Honda One, represents the Honda XR-350 described above. As discussed below, the record is unclear as to what models Honda Two, Three, and Four represent. What is clear, and relevant, however, is the fact that Dr. Weins did not physically examine the suspension systems represented by Honda Two, Three, and Four in reaching her conclusion of infringement. The only Honda motorcycle she examined was the XR-350. Thus, the defendant argues, Dr. Weins' analysis of Exhibit 23, with the exception of Honda One, cannot possibly establish evidence upon which reasonable minds could differ. The Court agrees.

The Court overruled defendant's motion to exclude Exhibit 23 during plaintiffs' case-in-chief because it felt the drawings were appropriate as illustrations; however, it became clear on defendant's cross-examination of Dr. Weins that the doctor used the drawings as much more than mere illustrations of the operation of the accused device. In fact, as is demonstrated below, she based her entire opinion on these drawings, [FN4] and did so without concern for whether they bore any measurable relationship to an actual rear wheel suspension system on a Honda motorcycle sold or used by American Honda: [FN5]

Q. What did you include in your study with respect to this case, can you tell us from point zero up to today?

A. Okay. I used the videotape which Ken MacPike sent me, which I believe is one of the exhibits, showing Skunkwork's mechanism and the Pro-Link operating, which I based my initial evaluation, plus the Patent 697. They sent me additional copies of patents, including Honda patents and brought up actual motorcycles, one was a Honda with a Pro-Link on it and one was a Kawasawki motorcycle with the Skunkworks on it, which I obtained dimensions of those for my analysis.

In addition I had the four figures and the summary that Honda provided or that Honda has written, which Ken MacPike provided me a copy of it, which I believe is Exhibit 23, showing the four models of devices in question.

Q. Dr. Weins, would you look at that document and see if you can identify it for us? A. Yes, this is Exhibit 23 which I used for the four different model types. The Honda One model I actually used dimensions from the motorcycle in my computer simulation.

***3** (TT: 9/1, pg. 23).

Later, Dr. Weins was cross-examined about her reliance on Exhibit 23:

Q. Dr. Weins, which Honda motorcycle did you inspect?

A. It was a Honda with a Pro-Link device as demonstrated by the Honda One configuration. I don't know the exact model.

Q. Do you know the year it was manufactured?

A. No. But it had the device, the Pro-Link, which is the progressive link.

..... (comment to and from court)

Q. You had heard about a video that the plaintiffs had. Is that your testimony earlier?

A. I had been given a copy of it to review.

Q. Was the motorcycle that you had an opportunity to look at shown in the video?

A. Yes.

Q. And is it correct that you used that motorcycle rather than Exhibit 23 in your testimony with regard to the first figure or the figure identified as Honda One on Exhibit 23.

A. Yes. Q. And as to types, Honda Two, Honda Three, and Honda Four, you didn't see any motorcycle with that general configuration?

A. No, I did not.

Q. So all of your testimony with regard to the figures of Honda Two, Honda Three, and Honda Four were based on assumptions, correct?

A. It was based on reviewing the summary statements that Honda had written that these represented the used devices.

Q. And they included assumptions; is that correct?

A. Right, it was the representative devices that Honda had. That was Page 10 of that summary statement, which is basically Exhibit No. 23.

(TT: 9/1, pgs. 83-84).

Concern over the basis for Dr. Weins' conclusions led to the following discussion between the Court and Dr. Weins: [FN6]

THE COURT: ... Let me ask, Doctor, the concern is these are representative drawings only, they are

not to scale. They are said to represent a concept, a mechanism for how they might work. Knowing that, that they're not to scale, they're not intended to be, they're just artist's rendition of how this concept is designed and presented, knowing that, do you feel that you're able to form any opinion to the degree that you would offer it from a mechanical engineering standpoint as to how they work, whether its progressive or not, and to what extent and degree and such? THE WITNESS: Okay. I feel that these being representative of the devices and from my experience with Honda One being so close, and from the summary statements that I read from Honda about these being representative of the devices, I felt with confidence that I could make these judgments on the progressivity of these devices.

THE COURT: Well, explain how you could do that without knowing to what extent they might be representative of one being No. 1, one being No. 2, we don't know whether they're drawn by different people or what circumstances they were put together?

THE WITNESS: If we're talking about the relative dimensions still being representative, I still feel I could make that judgment. If they're totally off, we'll have to reexamine that.

***4** THE COURT: Do you know that, though, sufficiently, would you base your PhD on that type of information?

THE WITNESS: I base it on these devices showing progressivity of what they do show. Of course, I do not have the mechanical drawings available to me.

THE COURT: Well, I know that, but would you take somebody's word and write in your PhD that you could take this type of data and reach those conclusions that you reach without knowing the scale or the relative dimensions or relative angles or anything of that sort, would you be willing to go that far?

THE WITNESS: I would want to see the device, if I could, to make those. But as far as conceptually showing that, it shows conceptually, if there's no major changes. Of course in a dissertation we want all exact measurement when you go and write a dissertation.

THE COURT: Well, I guess I'm not following you, because I understood you to be very hesitant to say that you would not be willing to do that, but then you say that you are willing to do that.

THE WITNESS: Well, I'm willing in this situation in that I feel they are representative of that. Now, in looking at all the embodiment, we can have changes in those locations and still come up with the same, as claimed in the patent, the same progress rate of resistance. Because since this is a whole class of these locations that you can choose and still be the same system, I feel that this would be representative. Now always there's a possibility of choosing a case where it's not, but from looking at these and based on Honda One, I feel I can show that is showing the concept of the functionality that's claimed in the patent.

(TT: 9/1, pgs. 58-60).

Based on Dr. Weins' testimony regarding the bases for her conclusion that the Honda ProLink suspension system performs substantially the same function in substantially the same way to produce substantially the same result as the '697 patent, the Court had no choice but to grant the defendant's motion for a directed verdict. Although the Court has no doubt that Dr. Weins felt her assessment of the devices was accurate, her testimony revealed a major flaw in the plaintiffs' case, namely that they had no accurate and reliable data upon which to base their claim of infringement as to Honda Two, Three, and Four. For example, accurate measurements of the arc length between certain points on the devices were critical to the plaintiffs' case. Plaintiffs failure to take such steps toward precision leaves them with no proof of what they claim, certainly not sufficient proof to go to a jury.

Assuming even that Dr. Weins was able to accurately measure Honda Two, Three, and Four from Exhibit 23 and conduct reliable tests, a directed verdict would still be in order because the plaintiffs have failed to establish that Honda Two, Three, or Four was ever sold or used by American Honda. [FN7] Moreover, to take it one step further, even if they showed that American Honda actually produced the systems depicted by the drawings, there was no evidence establishing a production date and model for any of the systems, with the exception of Honda One. This is a critical link in Dr. Weins' testimony, for irrespective of the accuracy of her analysis, there can be no conclusion of infringement absent this fundamental element of foundation. Accordingly, a directed verdict is appropriate on plaintiffs' claim of infringement regarding Honda Two, Three, and Four of Exhibit 23.

B. *Notice*

***5** As a prerequisite to the recovery of damages for patent infringement a plaintiff must establish either: "(1) that he gave public notice of his patent by affixing the word 'patent' or the abbreviation

'pat.' together with the patent number on the patented articles, or failing that, (2) that the infringer was notified of the infringement and continued to infringe thereafter, in which event, damages may be recovered only for infringement occurring after such notice." [FN8] Lemelson v. Fisher Price Corp., 545 F.Supp. 973 (S.D.N.Y.1982) (citing, 35 U.S.C. § 287). The purpose of this requirement is to prevent innocent infringement. *Horvath v. McCord Radiator & Mfg. Co.,* 100 F.2d 326 (6th Cir.1938), *cert. denied, Carrier Engineering Corp. v. Horvath,* 308 U.S. 581, 60 S.Ct. 101, 84 L.Ed.2d 486 (1939); *Motorola, Inc. v. United States,* 1 Cl.Ct. 131, 134 (C.Ct.1983), *rev'd on other grds.,* 729 F.2d 765 (D.C.Cir.1984). [FN9] As explained by the Supreme Court in the seminal case of *Dunlap v. Schofield,*

"[t]he clear meaning of this section is that the patentee or his assignee, if he makes or sells the article patented, cannot recover damages against infringers of the patent, unless he has given notice of his right, either to the whole public, by marking his article 'Patented,' or to the particular defendants, by informing them of his patent, and of their infringement of it."

*Dunlap v. Schofield,* 152 U.S. 244, 247, 14 S.Ct. 576, 38 L.Ed. 426 (1894). [FN10] In *Dunlap,* the Supreme Court makes clear that it is the plaintiff-patentee's burden to prove notice, either by marking or by actual notice. The reason for this is that the exclusive right to manufacture or sell under a patent carries with it the duty to inform others of the right, and absent such notice, plaintiff's damages are barred. *See id.*

1. *Notice To The Public At Large*

In an effort to survive defendant's motion for a directed verdict, plaintiffs argued that defendant had constructive notice of the '697 patent via the markings on the suspension units. The testimony at trial was that while some of the units were marked "patent pending," others were marked with the actual patent number. There, however, was no testimony as to the actual number of units marked. In fact, the record does not reflect even a close estimate.

Plaintiffs insist that there is no requirement in the law that every unit be marked. While this appears to be a matter of debate among some courts, there is no debate over the fact that it is the plaintiff-patentee's burden to prove that " 'substantially all' patented articles made or sold under the patentee's authority be marked." *Maxwell v. J. Baker, Inc.,* 805 F.Supp. 728, 733 (D.Minn.1992). Moreover, section 287 is not satisfied by the marking with the words "patent pending," or words of similar effect. The marking must contain the word "patent" or the abbreviation "pat." together with the authorized patent number. *See Steinthal v. Arlington Sample Book Co.,* 94 F.2d 748, 749 (3d Cir.1938) (recognizing that the requirement extends beyond registration of the item in the Patent Office, and holding that there is no notice until such time as the article is actually marked 'patented' and thus protected by the patent laws). [FN11]

***6** During argument on the motion for a directed verdict, plaintiffs' counsel suggested that the question of notice by marking is based on reasonableness. Although no legal support was offered for this proposition, even if the Court were to accept it, there simply was not enough evidence on this point during the trial for the jury to make a reasonableness determination. In sum, the Court refused to place the jury in the unfortunate position of having to speculate on these numbers. *See A. Stucki Co. v. Worthington Industries, Inc.,* 849 F.2d 593, 597 (D.C.Cir.1988).

2. *Notice To The Individual Defendant*

Most courts considering the question have concluded that notice to the defendant under § 287 requires actual notice. *See Lemelson,* 545 F.Supp. at 975 (listing numerous cases and giving their holdings); *see also Ceeco Machinery Mfg., Ltd. v. Intercole, Inc.,* 817 F.Supp. 979, 982-85 (D.Mass.1992). Quite clearly, actual notice was envisioned by the Supreme Court in *Dunlap:*

One of these two things, marking the articles, or notice to the infringers, is made by the statute a prerequisite to the patentee's right to recover damages against them. *Each is an affirmative act, and is something to be done by him.* Whether his patented articles have been duly marked or not is a matter peculiarly within his own knowledge; and if they are not duly marked, the statute expressly puts upon him the burden of proving the notice to the infringers before he can charge them in damages.

*Dunlap,* 152 U.S. at 247 (emphasis added).

As was done by the *Lemelson* court, this Court feels compelled to quote from a few cases to ensure that there will be no misunderstanding as to the Court's reasoning in this regard. In *Franklin Brass Foundry Co. v. Shapiro & Aronson, Inc.,* the court stated that

[a]ctual notice must be actually proved and cannot be assumed as a legal inference from any facts which amount not to actual proof of the fact, and we think that a defendant is not 'duly notified,'

within the meaning of the statute, unless the facts with which he is supplied would, if fixed upon the patented article, constitute 'sufficient notice.'

*Franklin Brass Foundry Co. v. Shapiro & Aronson, Inc.*, 278 F. 435, 437 (3d Cir.1921). The matter was again addressed and settled by *International Nickel Co. v. Ford Motor Co.*, wherein the court explained,

Evidence of Ford's [the infringer's] state of mind; i.e. that Ford knew of the patent and had the soundest possible reason to believe that INCO would regard quantity production of nodular iron as infringement, is irrelevant. To hold otherwise would be to read the statute to say: " '... damages may be recovered for infringement occurring after the infringer is, or should have been, aware of such infringement.' " This is not the law. The statutory requirement of " 'notice' " is unambiguous. There can be no recovery for the period before the defendant is expressly notified by the particular patentee that it is infringing a particular patent.

***7** *International Nickel Co. v. Ford Motor Co.*, 166 F.Supp. 551, 567 (S.D.N.Y.1958).

More recent cases are in accord. *See Devices for Medicine Inc. v. Boehl*, 822 F.2d 1062, 1066-67 n. 5 (D.C.Cir.1987) (publications by the patentee bearing a patent number and allegedly delivered by the patentee's license to a customer held insufficient to constitute notice under § 287); *W.L. Gore & Associates, Inc. v. International Medical Prosthetics Research Associates, Inc.*, 16 U.S.P.Q.2d 1241 (D. Ariz.1990) (concluding that "[m]ere knowledge by an infringer of the patent, or even of suits against others, is not a substitute for notice under the statute. Proof of an affirmative notice of the infringement is required."); *In re Yarn Processing Patent Validity Litigation*, 602 F.Supp. 159, 169 (W.D.N.C.1984) (recognizing that "trade journal advertisements have been held inadequate for notice under § 287 as a matter of law"); *Motorola, Inc.*, 1 C.Ct. at 134 (citing, *Carlisle v. Estes*, 157 U.S.P.Q. 6 (D.Colo.1967) and *Smith v. Dental Products*, 140 F.2d 140, 151-52 (7th Cir.) *cert. denied*, 322 U.S. 743, 64 S.Ct. 1146, 88 L.Ed. 1576 (1944) (finding "mere indirect notice" insufficient and holding that an infringer will not be "deemed to have actual notice of his infringement by virtue of information within his possession which might cause him to conclude there is infringement").

These decisions appear to foreclose plaintiffs' argument on notice to the defendant. The relevant evidence on this issue came in the form of testimony from various witnesses. First, plaintiffs-patentees MacPike and Pence testified that defendant had notice of the Skunkworks design through advertisements in trade journals. Second, MacPike testified that various "Honda Team" motorcycle riders had viewed the Skunkworks device while competing in the motorcross racing circuit, and that during one race in particular one of them was given a sample of a Skunkworks suspension kit. (TT: 8/30, pgs. 84- 85). Next, Richard Sieman, a motorcycle racer and magazine editor for various motorcross and dirtbike publications, testified that during the initial testing of the Skunkworks device in 1976, an employee of the defendant employed in Research and Design, George Ethridge, was present. Sieman also testified that during this testing, Honda "people" actually rode motorcycles equipped with the Skunkworks device, and that he mailed a copy of the instruction installation manual for the device to George Ethridge at the defendant's headquarters (TT: 9/1, pgs. 11-13). Based on the decisions noted above which have interpreted the notice requirement of § 287, the Court finds this testimony insufficient as a matter of law to constitute notice to American Honda of its infringement of the '697 patent. To hold otherwise, as recognized by the court in *International Nickel*, would be to read a negligence standard into the statute. The law instructs otherwise, and imposes an affirmative duty to act upon the patentee. This is not demonstrated by the testimony above.

***8** Arguably, plaintiffs satisfied the legal standard of actual notice through MacPike's testimony that he mailed a sample kit, together with a letter containing an offer to license the patent, to the defendant. (TT: 8/30, pg. 83). [FN12] The Court, however, finds this testimony insufficient to survive defendant's motion. Plaintiffs offered no evidence to support this assertion, no documents or records, no other testimony, nothing. Certainly, the sole statement from MacPike does not amount to substantial evidence. [FN13] *See Stucki*, 849 F.2d at 595-96 (rejecting " 'the mere existence of a scintilla of evidence' "). Accordingly, based on the absence of any affirmative act on the plaintiffs' part to provide notice of infringement to the defendant, a directed verdict on all damages occurring prior to the date of the lawsuit is proper.

C. *Willful Infringement*

Plaintiffs have the burden of proving willful infringement by clear and convincing evidence. *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1440 (D.C.Cir.), *cert. denied*,

488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). The test is one of the totality of the circumstances, and courts may look to many factors, including whether the infringer deliberately copied the ideas of another. [FN14] *Windsurfing International, Inc. v. Fred Ostermann GmbH,* 668 F.Supp. 812, 813 (S.D.N.Y.1987), *aff'd., Bic Leisure Products, Inc., Ostermann v. Windsurfing International, Drake,* --- F.3d ---- (D.C.Cir.1993). The question of notice becomes important in this regard, as the defendant cannot deliberately "copy" a product without notice of its existence. Plaintiffs presented no evidence demonstrating that the defendant used the '697 patent as a "blueprint" to create the Pro-Link system. *See id.* at 818. Their sole argument on willful infringement stemmed from allegations that the defendants had notice of the '697 patent and did nothing to investigate the claims. These allegations, however, are supported by little, if any, evidence.
The evidence is the same as outlined above, and as such, the Court's previous discussion on notice under § 287 is instructive, however, not altogether controlling because the motion for a directed verdict on plaintiffs' claim for willful infringement was granted not as a matter of law, but rather again due to a failure of proof, [FN15] as there was no evidence to support the claim that American Honda sold or used the ProLink device in the face of knowledge of the Skunkworks device.
For example, evidence that there were "Honda" people at two races held in Daytona Beach, Florida in 1976-77, and at one of these races, MacPike gave a "Honda Team" rider a sample kit does not establish willful infringement. First of all, there was no evidence that these persons were employees of American Honda as opposed to Honda of Japan. Second, even if they were American Honda employees, there was no evidence that they did anything with this information, or if they did, then what American Honda executives did with it. Similarly, Sieman's contention that George Ethridge was present during the initial testing of the device and that Sieman sent him information on the product does not establish willful infringement. Although Sieman testified that Ethridge was employed by American Honda in Research and Design, there was no evidence to indicate that he did anything with the information he allegedly received. [FN16]
***9** Thus, again based on the plaintiffs' failure to make a critical connection in the evidence presented, the Court must conclude that there was insufficient evidence to offer to the jury on the question of whether defendant willfully infringed the '697 patent. The Court rejects the argument that willfulness can be established through an inference of copying, especially where, as here, the evidence was so sparse and the two devices were not virtually identical. *See Windsurfing,* 668 F.Supp. at 818. Again, the Court emphasizes its unwillingness to force a jury into such speculation. Accordingly, the Court finds a directed verdict in favor of the defendant appropriate. A verdict and final judgment will be entered by separate order.
DONE and ORDERED.

FN1. This order will refer to the patent as either the '697 patent or the patent in suit. The device itself was identified at trial as the "Skunkworks device."

FN2. These drawings have been referred to as Honda One, Two, Three, and Four respectively.

FN3. The motion for summary judgment was argued on grounds of both literal infringement and infringement under the doctrine of equivalents. The Court granted the motion on the claim for literal infringement.

FN4. With the exception of the XR-350.

FN5. The drawings were not to scale.

FN6. The Court grew concerned because at one point during her testimony on redirect, Dr. Weins testified that she took measurements from

Honda Two, Three, and Four and included these dimensions in her computer analysis:

Q. Tell us initially what you did in inspecting the type three model on Exhibit 23, just as you told us initially what you did with respect to Honda One. This is Honda Three.

A. Okay. What I did was I took the drawing to be representative of the three Honda dimensions, scaled them off the drawing, and then put them into a computer model and went through the same articulation of the device causing the swing arm to move up vertically and then looked at the progressive resistance change, the resistance of the force as it changed with the movement of the vertical wheel.

(TT: 9/1, pg. 54).

FN7. Nor have they established manufacture by Honda of Japan.

FN8. This requirement is provided for by 35 U.S.C. § 287 which states in pertinent part:

Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word 'patent' or the abbreviation 'pat.', together with the number of the patent, or when, from the character of the article, this

can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recoverable by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

FN9. The Claims Court found that § 287 was incorporated into 28 U.S.C. § 1498 which permits a patent owner to recover compensation against the United States for its unauthorized taking and use of the patent owner's invention. The Federal Circuit disagreed and found no incorporation, holding therefore that the marking and notice requirements of § 287 did not apply to § 1498. The reversal, however, has no effect on the Claims Court's interpretation of § 287's notice requirements.

FN10. Despite the date of the opinion and the fact that it applies to § 287's predecessor statute, the Court considers the *Dunlap* decision highly persuasive on the question of notice under § 287.

FN11. There was no evidence to support the implied de minimis exception.

FN12. The Court uses the word "arguably" because there was no testimony on the information actually conveyed by the letter.

FN13. MacPike testified only that in 1976, he sent a letter to American Honda in Los Angeles, California. He could not recall a street address or to whom the letter was specifically addressed or directed, and as noted, he had no documentation of the letter.

FN14. Although the Court recognizes that willfulness is generally a question for the jury, it is not obliged to send the issue to the jury when reasonable minds could not differ on the question. *A. Stucki Co. v. Worthington Industries, Inc.*, 849 F.2d 593, 595-96 (D.C.Cir.1988).

FN15. The Court would find, however, as a matter of law that notice in trade journals that the patent was "pending" is insufficient to establish deliberate copying of a patent.

FN16. The Court declines to find constructive knowledge by American

Honda through Ethridge, absent a showing that he had some authority to make an independent decision regarding the Skunkworks device.

N.D.Fla.,1993.
MacPike v. American Honda Motor Co., Inc.
1993 WL 632261 (N.D.Fla.), 29 U.S.P.Q.2d 1526
END OF DOCUMENT

Copr. (C) 2004 West. No Claim to Orig. U.S. Govt. Works.

# Exhibit E

Statement of Work:

Cuyuna Engine Company (CEC) and its subcontrator, Intelligent Controls, Inc., will develop the electronic fuel injection system (EFI) which will meet the general specifications set forth below and to supply BMAC one FSD sample "flight ready" system.

Purpose:

The purpose of developing an EFI system is to substantially improve brake specific fuel consumption (BsFc) at as many flight conditions as possible and to electronically rather than mechanically control fuel flow at various air densities and during the start up sequence.

General Design;

Fuel is injected into each of the engine intake ports upstream of the piston by means of solenoid-operated injection valves. Each cylinder has one injection valve, which is actuated once per crankshaft revolution. The fuel to the injection valves is supplied by an electric fuel pump and the fuel pressure is regulated by the fuel pressure regulator. The quantity of fuel supplied to the cylinders per working stroke is metered by controlling the opening period of the solenoid valves. For this purpose, control pulses are supplied by the electronic control module (ECM), their duration depending on RPM, throttle valve opening (T.V.O.), air density, and possibly other correction variables.

General Specifications;

Major Components:

EFI Assembly

| | |
|---|---|
| Throttle bodys | Fig. 1 |
| Fuel pump | Fig. 2 |
| Fuel injectors | Fig. 3 |
| Fuel pressure regulator | Fig. 4 |
| ECM | |
| Electro/mechanical transducers | |

Operational Environment:

The EFI system will function properly at any elevation up to 15,000 ft. (20,000 ft goal) at temperatures from -30°C to 46° at relative humidities from 0% to 100 % and in the presence of free water in the form of rain, snow and ice while being subject to vehicle accelerations up to 6'gs in all directions and being radiated by a 30 v/meter field in the frequency range of 20 MHZ to 150 MHZ.

Storage Environment:

The EFI system will start and operate the engine after being installed in the vehicle and stored in a sealed container for (5) years with a (10) year goal within the temperature extremes of -40°C to +60° with a relative humidity equivalent to a desiccant controlled environment.

Performance:

The EFI system will supply the engine with a controlled amount of fuel such that the best engine performance will be obtained at the lowest fuel consumption rate (with goals of .72 BsFc or better @ w.o.t. and .65 BsFc or better @ cruise under all operating conditions.

Interfaces:

Fuel: To be determined.

Electrical: See Fig.5 for proposed interface.

fig 5




CUYUNA BLOCK DIAGRAM
INTELLIGENT CONTROL
CONTROL OVERVIEW

A 001987

# Exhibit F

# ELECTRONIC FUEL INJECTION

## PHASE II

## FSD PROPOSAL

CUYUNA ENGINE COMPANY
AUGUST 3, 1983

# ELECTRONIC FUEL INJECTION MAJOR BENEFITS

- REDUCTION OF ELECTRO-MECHANICAL COMPLEXITY
- 20% REDUCTION OF BRAKE SPECIFIC FUEL CONSUMPTION
- IMPROVED STARTABILITY USING STORABLE FUEL
- INCREASED RELIABILITY AND DURABILITY
- COMPARABLE WEIGHT TO CURRENT SYSTEM
- COMPARABLE COST TO CURRENT SYSTEM
- SCHEDULE IMPACT-

  ONE FLIGHT READY SYSTEM SIX (6) MONTHS FROM CONTRACT AWARD AND PRODUCTION COMPONENTS THREE (3) MONTHS LATER.

## OVERVIEW:

PHASE I OF THE ELECTRONIC FUEL INJECTION PROGRAM TO ELIMINATE THE PRESENT CARBURETOR SYSTEM HAS BEEN COMPLETED WITH VERY POSITIVE RESULTS (SEE PHASE I FINAL REPORT). CUYUNA ENGINE COMPANY (CEC) SUGGESTS A FULL SCALE DEVELOPMENT PROGRAM FOR AN ELECTRONIC FUEL INJECTION SYSTEM.

## OBJECTIVE OF F.S.D. PROPOSAL:

TO DEVELOP AND TEST A "FLIGHT READY" ELECTRONIC FUEL INJECTION (EFI) SYSTEM FOR THE ENGINE OF A PAVE TIGER TYPE VEHICLE.

## THIS EFI SYSTEM

- WILL OFFER SIGNIFICANT ADVANTAGES OVER THE PRESENT CARBURETOR SYSTEM.
- CAN BE READY FOR FLIGHT TEST WITHIN SIX (6) MONTHS OF FSD CONTRACT AWARD.
- CAN BE IN PRODUCTION NINE (9) MONTHS AFTER FSD CONTRACT.

# EFI SYSTEM DESCRIPTION

FUEL IS INJECTED INTO EACH OF THE ENGINE'S INTAKE PORTS BEFORE THE PISTON BY MEANS OF SOLENOID OPERATED INJECTION VALVES. EACH CYLINDER HAS ONE SOLENOID VALVE, WHICH IS ACTUATED ONCE PER CRANKSHAFT REVOLUTION. THE INJECTION VALVES ARE SUBJECT TO A CONSTANT FUEL PRESSURE SUPPLIED BY THE FUEL PUMP AND REGULATED BY THE FUEL PRESSURE REGULATOR TO APPROXIMATELY 36 PSI. THE QUANTITY OF FUEL SUPPLIED TO THE CYLINDERS PER WORKING STROKE IS METERED BY CONTROLLING THE OPENING PERIOD OF THE SOLENOID VALVES. FOR THIS PURPOSE, CONTROL PULSES ARE SUPPLIED BY THE ELECTRONIC CONTROL MODULE (ECM), THEIR DURATION DEPENDING ON THE R.P.M., THROTTLE VALVE OPENINGS (T.V.O.), AIR DENSITY AND POSSIBLY OTHER CORRECTION VARIABLES. THE ACTUATING VARIABLES ARE DETECTED AT THE ENGINE BY MEANS OF ELECTRO/MECHANICAL TRANSDUCERS OR FROM THE ON BOARD CENTRAL ELECTRONICS UNIT (CEU) AND ARE FED INTO THE ECM AS ELECTRICAL QUANTITIES.

# Exhibit G

# ELECTRONIC FUEL INJECTION

# PHASE I

# REPORT

Kim Chervestad
Project Engineer
Arctco, Inc.

10/8/87 6%

79.30
67.00 # 155.08

Marked up 10-13-87

A 002018

OBJECTIVE:

To bench test an EFI (electronic fuel injection) system, which allows the operator to manually control the fuel requirements of an engine.

BASIC DESCRIPTION OF ELECTRONIC FUEL INJECTION

The rate of fuel flow an engine equipped with electronic fuel injection is controlled by the amount of time a selected injector is open per revolution of the engine. A "map" of the engines fuel requirements is contained in the electronic control module (ECM) and is modified by sensors (altitude, temperature, throttle position, RPM, etc.)

The injection time is determined by the ECM which sends a signal to the injector for a specified time interval. This time interval is referred to as pulse width. As pulse width increases, fuel flow increases.

The ability to control fuel flow in this way with accurate "mapping" reduces fuel consumption vs. a normally carbureted engine.

SUMMARY:

An EFI system was prototyped and tested under laboratory conditions on the dynomometer. The system successfully operated the engine through all throttle valve openings and RPM's.

The results of the initial tests show a significant reduction in fuel consumption and an increase in horsepower. (See attached figures 1 through 8.)

Overall average percent fuel reduction at 4/4 = 20%, 1/2 = 42%, 3/8 = 39%, 1/4 = 54%. Assuming a typical trail ride at 37 MPH (see figure 9) at an engine RPM of 3000, you could expect fuel consumption of 15.6 MPG with carburetors and 31.9 MPG with electronic fuel injection or travel 75.7 miles on the same amount of fuel carburetors would use in 37 miles.

APPROACH:

Off the shelf fuel injection equipment was purchased. Built by Intelligent Controls Inc., a company that provides tools and expertise to assist in the development of EFI systems.

THE FUEL INJECTION EQUIPMENT CONSISTED OF:

| | |
|---|---|
| EFI Controller | IC 1050 and IC 1057 |
| Injectors | Bendix |
| Pressure Regulator | Bosch |
| Fuel Pump | AC Delco |
| Wire Harness | I.C.I. |
| Gate/Sync Sensor | I.C.I. |
| T.A.P. | I.C.I. |
| Throttle Bodies | Arctco, Inc. |

THE MONITORING/TEST EQUIPMENT CONSISTED OF:

| | |
|---|---|
| Dynometer | Schenk W150 |
| Dyno Controller | Schenk |
| Oscilloscope | Tektronic |
| Breakout Box | I.C.I. |
| Temp Equipment | Omega |
| Barometer | W.H. Curtis |
| Wet/Dry Bulb | Thermodynamics |

DATA REDUCTION EQUIPMENT:

| | |
|---|---|
| Computer | Tandy PC-3 |
| Calculator | Hewlett Packard 11C |

With this equipment a manual EFI system was prototyped, tested and evaluated on the 650 L/C Wildcat, Engine No. 100137.

The engine was set up on No. 2 dyno with the sync/gate sensors and the degree wheel installed on the flywheel. Two throttle bodies were prototyped to incorporate the fuel injectors. (See photo page 10).

Initial tests were performed to become familiar with the equipment and capabilities. Tests were also performed using the IC 1057 to determine the best phasing of injector timing vs. intake port opening.

All further testing was done with maximized phasing and sequential mode (one injector triggered independently of the other). Horsepower and fuel flow data was obtained while running the engine through a full set of throttle valve opening (4/4 to 1/4 TVO). The EFI data points were obtained by setting the pulse width of the injectors longer to obtain a rich condition and then steadily decreasing pulse width (shorter time) until the power at the given RPM's and TVO's started to decrease. All EFI data points reflect the leanest fuel flow to obtain the best horsepower.

Figures 1 through 4 show a comparison of EFI vs. carburetors on the 650 L/C Wildcat. The carburetor data was taken from previous performance runs. Figures 5 through 8 show a comparison of lbs/hr vs RPM vs. GALs/HR.

Figure 9 ~~8~~ is MPH vs. RPM and shows the typical operating range for trail riding with the 650 L/C Wildcat.

CONCLUSION:

The advantages of EFI are many:

(1) Fuel economy
(2) Altitude compensation - no more jet changing by consumer.
(3) Temperature compensation - no more jet changing by consumer, warm to cold days.
(4) Cold and hot restart - no more guessing as to when to choke or not to choke.
(5) Throttle freeze up - butterfly style throttle valve.
(6) Clean engine response.
(7) Short, light throttle pull.
(8) No vapor lock - pressurized fuel system.

(9) Data available from electronic control module:

A) Average miles per gal. (digital)
B) Fuel gauge (analog or digital)
C) Fuel remaining (digital)
D) RPM (digital or analog)
E) Outside temp. (digital)
F) Rev limiter (useful for warranty)

Electronic fuel injection is increasingly being used in the recreational vehicle market. Development by Arctco, Inc. should be continued to produce a marketable EFI system for the high performance snowmobile it produces, which has become the leader in the industry.

After reviewing Phase I, a Phase II proposal can be presented detailing a schedule to produce an "on board" driveable EFI system and a recurring and non-recurring cost impact to Arctco, Inc.

# INTELLIGENT CONTROLS, INC.

## INTRODUCING

# THE UNIVERSAL FUEL-INJECTION DEVELOPMENT TOOL




**IC 1050-REPRESENTS THE STATE OF THE ART IN ENGINE DEVELOPMENT TECHNOLOGY.**

The IC 1050 Manual Fuel Injection Control System allows the development engineer to map engine fuel requirements for a variety of engine sizes and types. The unit brings together five distinct functions; monitoring engine speed, monitoring fuel delivery, fuel delivery tracking with engine load, coordinating injection to intake valve timing, and outputting engine speed and fuel delivery as analog signals. This unit is compatible with all electric solenoid type fuel injection systems, these include: GM/Delco/Rochester; Bosch L Jetronic, LE Jetronic, Motronic; Ford EEC III and EEC VI; Bendix and Nipondenso.

**INJECTOR DRIVERS**
- Current fold back type
- 2 amp peak/0.5 amp holding or
- 4 amp peak/1.0 amp holding

**INJECTOR MODES**
- Sequential 2-cyl., 3-cyl., 4-cyl., 6-cyl., and 8-cyl.,
- Simultaneous double fire
- Manual fuel control - dial operated
- Semi-automatic - speed density -MAP input

**INJECTOR TIMING**
- Fixed
- Variable

**INPUT TRIGGER TYPES**
- CP magnetic
- Hall effect

**PULSEWIDTH MONITOR**
- Crystal controlled time base
- 3 digit display
- 2 ranges 0 to 10ms, 0 to 100ms,
- Analog output - 1 volt = 1ms, or 1 volt = 10ms
- Accuracy ± 10 microseconds

**RPM**
- Crystal controlled tachometer
- 3 digit display
- 2 ranges - 0-999 rpm, 0-9999 rpm
- Analog output - 1 volt = 1000 rpm accuracy - 0, + 10 rpm
- Number of cylinders selector 2-cyl., 3-cyl., 4-cyl., 6-cyl., 8-cyl.,