**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| ARCTIC CAT INC.,<br>a Minnesota corporation,<br><br>Plaintiff,<br><br>v.<br><br>INJECTION RESEARCH SPECIALISTS, INC.,<br>a Colorado corporation, and<br>PACER INDUSTRIES, INC.,<br>a Missouri corporation,<br><br>Defendants. | Civil Action No. 01-CV-543 (MJD/RLE)<br><br>Hon. Michael J. Davis<br>Hon. Raymond L. Erickson (Magistrate) |
| INJECTION RESEARCH SPECIALISTS, INC.,<br>a Colorado corporation, and<br>PACER INDUSTRIES, INC.,<br>a Missouri corporation,<br><br>Counterclaimants,<br><br>v.<br><br>ARCTIC CAT INC.,<br>a Minnesota corporation, and<br>SUZUKI MOTOR CORPORATION,<br>a Japanese corporation,<br><br>Counterclaim Defendants. | |

**DECLARATION OF CHRISTOPHER W. DAY IN SUPPORT OF ARCTIC CAT'S AND SUZUKI'S RESPONSE TO IRS'S OBJECTIONS TO MAGISTRATE JUDGE ERICKSON'S AUGUST 6, 2004 REPORT AND RECOMMENDATION**

I, Christopher W. Day, declare that:

1. I am an attorney with the law firm of Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., and one of the attorneys for Counterclaim Defendant, Suzuki Motor Corporation, in the above-captioned action. I submit this Declaration in support of Arctic Cat's and Suzuki's Response to IRS's Objections to Magistrate Judge Erickson's August 6,

2004, Report and Recommendation. I make this declaration based on my own personal knowledge. If called as a witness, I would testify as to each stated fact.

2. The attached Exhibits 1-7 are true and correct copies of:

Exhibit 1: pages 1, 14-15, 28-29, and 91 of Dr. Ribbens' Expert Report dated May 22, 2003;

Exhibit 2: pages 295-301 of Mr. Chasteen's Deposition Transcript dated May 28, 2003;

Exhibit 3: pages 1-14 of Mr. Berry's Expert Report dated May 22, 2003;

Exhibit 4: pages 85-86, 120-25, 151-56, 174-178, 180-96, and 225-35 of Mr. Berry's Deposition Transcript dated Oct. 21, 2003;

Exhibit 5: U.S. Patent No. Re. 34,803 ("the '803 Patent");

Exhibit 6: Arctic Cat's and Suzuki's Original Rule 26(a)(1) Disclosure dated June 17, 2003; and

Exhibit 7: Arctic Cat's and Suzuki's Amended Rule 26(a)(1) Disclosure dated July 7, 2003.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 7, 2004

s/Christopher W. Day
Christopher W. Day

# Exhibit 1

# EXPERT REPORT OF DR. WILLIAM B. RIBBENS

Injection Research Specialists, Inc. and Pacer Industries, Inc. v. Arctic Cat, Inc.
and Suzuki Motor Corporation
Civil Action No. 01-CV-543 MJD/RLE

## I. INTRODUCTION

### A. Scope Of Report

I have been asked by attorneys for Injection Research Specialists ("IRS") to prepare a report explaining the infringement by certain Arctic Cat ("AC") products of U.S. Patent Re 34,803 ("'803 patent") which is a reissue of U.S. patent 4,901,701 ("'701 patent"). I have been asked by attorneys for IRS to review the '803 patent file history as well as the file history for its parent, the '701 patent. This reissue patent has a relatively long history which included a reexamination as well as a protest. At the end of this process, the '803 patent reissued with four claims.

The patent that is involved in the present litigation is of the general subject matter of electronic fuel control of 2 stroke/cycle engines, which are commonly employed to power snowmobiles. This patent teaches an apparatus and method for electronic fuel injection for these engines that is a great advance over the prior art. A copy of the '803 patent is attached as Exhibit A.

AC has in the past, and continues at the present time to manufacture snowmobiles that incorporate electronic fuel injection. IRS alleges that AC infringes the above named patent, which has led to the litigation between them. This report presents my analysis of that infringement. A list of the accused products is attached as Exhibit B. I have been informed by attorneys for IRS that this list is based on Arctic Cat's and Suzuki's responses to discovery. I reserve the right to add to this list should discovery reveal additional accused products or should new models be produced by the accused infringers. I further reserve the right to supplement this report as new and/or additional information is made available to me.

map' stored in memory. The CPU determines a so-called 'base fuel value' from the fuel map using standard table look-up and interpolation procedures.

This base fuel value corresponds to or is representative of the correct fuel amount under standard or reference conditions for which the fuel map was created. However, the base value is not the correct fuel amount for conditions other than the standard conditions. Compensation for nonstandard conditions can be accomplished by modification of the base fuel value based on the measurements of barometric pressure, air and engine temperature. The modification can be accomplished under program control by computation in accordance with an algorithm.

The determination of the correct fuel amount can either be in terms of quantity of fuel (including a value representative of fuel quantity) or the duration of the fuel injector pulse as long as the fuel flow rate for the fuel injector is a known constant. For a given fuel injector this flow rate is a known function of fuel pressure.

Special procedures are normally followed for engine starting where the correct fuel amount is determined from a different procedure than described for the fully warmed operating engine. Special fueling is required for starting where the correct fuel amount depends strongly on temperature. Under some starting conditions, a special "priming pulse" is sent to the fuel injector to enhance starting, particularly in cold ambient conditions. Then following start, fuel amounts are adjusted as a function of temperature until the engine is fully warmed.

I have been asked by attorneys for IRS to examine various Arctic Cat products with respect to the claims of the '803 patent in the light of the background material presented above. The specific Arctic Cat products considered here are those snowmobiles that incorporate electronic fuel injection systems. Suzuki is Arctic Cat's engine supplier. There have been two suppliers of electronic fuel injection systems to Arctic Cat and Suzuki: (1) JECS and (2) Kokusan. We consider first, the many common features of both systems and then review the differences.

All fuel injection systems that are relevant to the lawsuit deliver fuel to 2 stroke/cycle engines. All of these systems have a configuration that includes the following components:

1. fuel supply
2. electric fuel pump
3. one fuel injector for each cylinder
4. tubing for supplying fuel under pressure to each fuel injector
5. various sensors
6. an electronic control system ECU/CPU
7. battery and/or electric power supply
8. interconnecting wiring and connectors

Each fuel injector is mounted in an intake pipe through which air flows into the crankcase. Fuel under pressure is supplied to each fuel injector which is operated in pulse mode under control of the ECU/CPU. During the time an injector is activated fuel is sprayed into the air that is being pumped into the crankcase through the intake manifold. The control signal that operates each fuel injector is generated in the ECU/CPU under program control in response to signals from the sensors.

The sensors incorporated in the Arctic Cat/Suzuki fuel injection system include measurements of: throttle position, crankshaft position, air temperature, engine temperature, and barometric pressure. An example of the crankshaft position; water temperature; throttle position and barometric pressure sensors are found on page 4-37 of the Arctic Cat Snowmobile Manual (IRS/AC-0150634). An example of the air intake temperature sensor is shown in the same reference on page IRS/AC-0150633.

The crankshaft position sensor yields a repetitive measurement of a point in the crankshaft angular position that bears a unique relationship to the engine cycle (e.g. relative to TDC). In addition, the signal from the crankshaft position sensor permits a computation of crankshaft angular speed (i.e. RPM) based upon the time interval between successive crankshaft position events. Other measurements are made that are specific to the two different fuel control systems.

to fuel control for 2 stroke engines. The description in the preamble is for a standard 2 stroke engine configuration. The recitation of an electrical energy source, including the battery, for operating the ignition system is not a requirement for the invention of the '803 patent. This appears to be in the preamble just as a recitation of the standard elements of a 2 stroke per cycle engine.

- Accused Products Employing an Electronic Fuel Injection System Manufactured by Unesia JECS

It is my opinion that the accused products manufactured by JECS are fuel control systems for 2 stroke engines. All of the components recited in the preamble for this claim are present in the JECS system.

If, as a result of a Markman hearing, the Court should find an interpretation that is different than the one I have used for a literal infringement analysis, I reserve the right to conduct an analysis of infringement under the doctrine of equivalents, as well as a new literal infringement analysis.

- Accused Products Employing an Electronic Fuel Injection System Manufactured by Kokusan Denki

It is my opinion that the accused products manufactured by Kokusan are fuel control systems for 2 stroke engines. All of the components recited in the preamble for this claim are present in the Kokusan system with the exception of the battery. As stated in my claim construction, the battery is not a requirement for the invention of the '803 patent.

If, as a result of a Markman hearing, the Court should find an interpretation that is different than the one I have used for a literal infringement analysis, I reserve the right to conduct an analysis of infringement under the doctrine of equivalents, as well as a new literal infringement analysis. For example, if the Court were to find that this preamble requires a battery "or electrical power supply for the ignition system", as argued in defendants' noninfringement charts, in my opinion this element would be present under the doctrine of equivalents.

Every system must have an electrical power source to operate the ECU, the ignition, and to drive the fuel injectors. That system can consist of an alternator or a generator that may or may not also include a battery (see, e.g., '803 patent at 10:63-11:5). The main function of the battery is to provide starting power, but once the engine is started, the system can operate off the electrical power provided by the alternator/generator. Unlike an automobile engine, a snowmobile engine can be manually started. It is thus possible to operate a small engine like a snowmobile without a battery. A person having ordinary skill in the art would find that the electric generator of the battery-less system performs the same function in essentially the same way with the same result as a system incorporating a battery.

b. **Claim 2, Element [1]: "fuel injection means for injecting fuel for combustion with air within said cylinder"**

This is a means plus function claim element. The corresponding structure in the '803 specification is a fuel injector 92 as shown in Figure 1. The term "for combustion with air within said cylinder" is merely the intended result of the function of this element. The fuel injector delivers fuel to an intake manifold 80 downstream from a butterfly valve 82, where it mixes with air being pumped into the crankcase. As pointed out in the background portion of this report this fuel injection system can function with either a port valve or a reed valve type of 2 stroke engine. This structure is also described in the specification at 8:3-8:21. It is my understanding that to infringe, the accused products must have the same structure or the equivalent thereof.

- Accused Products Employing an Electronic Fuel Injection System Manufactured by Unesia JECS

The JECS fuel control system operates with fuel injectors, as depicted and described on A 26050 of the 1996 Service Manual for the ZR 580 EFI ETT ("ZR 580 EFI Manual") as well as on A 27228 of the 1998 Service Manual for the EXT EFI DLX and Pantera 580 ("Pantera 580 Manual"), operating under the control of an electronic control unit and delivering fuel to an intake manifold of the associated engine. Since this is the same structure that is identified in the '803 patent specification for this element, in my opinion, this element is literally present.

I declare that the foregoing is true and correct.

Dated: May 22, 2003

Dr. William B. Ribbens
Professor Emeritus of Electrical Engineering and Computer Science
Professor Emeritus of Aerospace Engineering
University of Michigan

# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ARCTIC CAT, INC., a Minnesota Corporation, Plaintiff,

vs. No. 01-CV-543-MJD/RLE

INJECTION RESEARCH SPECIALISTS, INC., a Colorado Corporation, and PACER INDUSTRIES, INC., a Missouri Corporation, Defendants.

DEPOSITION OF RONALD CHASTEEN
Palo Alto, California
Wednesday, May 28, 2003
Volume

Reported by:
HEATHER M. COLLEY
CSR No. 10693
JOB No. 43519

1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ARCTIC CAT, INC., a Minnesota Corporation, Plaintiff,

vs. No. 01-CV-543-MJD/RLE

INJECTION RESEARCH SPECIALISTS, INC., a Colorado Corporation, and PACER INDUSTRIES, INC., a Missouri Corporation, Defendants.

Deposition of RONALD CHASTEEN, Volume 1, taken on behalf of Plaintiff/Counterclaim defendants, at 3150 Porter Drive, Palo Alto, California, beginning at 10:04 a.m. and ending at 5:13 p.m., on Wednesday, May 28, 2003, before HEATHER M. COLLEY, Certified Shorthand Reporter No. 10693.

2

APPEARANCES:

For Ronald Chasteen:
MC DERMOTT, WILL & EMERY
BY: ANTHONY DE ALCUAZ
Attorney at Law
3150 Porter Drive
Palo Alto, California 94304-1212
(650) 813-5193

For Plaintiff/Counterclaim defendants Arctic Cat:
ROBINS, KAPLAN, MILLER & CIRESI LLP
BY: ANNAMARIE A. DALEY
Attorney at Law
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota 55402-2015
(612) 349-8500

For Counterclaim defendant Suzuki Motor Corporation:
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.
BY: THOMAS H. JENKINS
Attorney at Law
1200 I Street, N.W.
Washington, D.C. 20005
(202) 408-4000

Videographer:
AIMEE MAJDOUB
ESQUIRE DEPOSITION SERVICES
505 Sansome Street, Suite 502
San Francisco, California 94111
(415) 288-4285

3

INDEX

| WITNESS | EXAMINATION |
|---|---|
| RONALD CHASTEEN Volume 1 | |
| BY MS. DALEY | 6 |

EXHIBITS

| DEPOSITION | | PAGE |
|---|---|---|
| 300 | Amended notice of deposition; 8 pages | 82 |
| 301 | United States Patent; 16 pages | 96 |
| 302 | Combined reissue declaration and power of attorney document; 35 pages | 119 |
| 303 | United States Patent; 15 pages | 119 |
| 304 | United States Patent; 6 pages | 127 |
| 305 | United States Patent; 9 pages | 127 |
| 306 | United States Patent; 7 pages | 127 |
| 307 | United States Patent; 5 pages | 127 |
| 308 | United States Patent; 10 pages | 131 |
| 309 | Photocopy of magazine article; 15 pages | 135 |
| 310 | Power Tech Proforma; 228 pages | 144 |
| 311 | (Retained by Mr. De Alcuaz) | 157 |
| 312 | Expert witness report; 25 pages | 175 |

4

THE WITNESS: November of '87?
BY MR. JENKINS:
Q Uh-huh.
A I would doubt it. I don't believe I did have finished fuel maps by then. We were still -- we were going through a lot of different engines.
Q Isn't it true that the numbers that are depicted in figure four of the 803 patent are made up?
A The numbers in this figure four are representative of my fuel map and all the trends of my fuel map. On the left side you can see the zeros for clearing a flooded engine. You can see all the ones in there for decel, very similar to what Firecat we just tested does. Actually, it's the same decel pattern that they are using.
The numbers in the actual power area here are engine specific. I did not want to make my patent only specific to one engine. And so leaving all the trends in, I had the girl that had the word processor -- because I didn't have the word processor in those days. She did. And I had her enter generic numbers that weren't representative of, for instance, the Indy 400 or the Indy 600 position. The rest of the map with the throttle positions, RPM changes indices are all accurate as to this day, as are the trends.

294

Q What's the name -- what was the name of the girl?
A '87 I wouldn't know that now.
Q Was she an employee of IRS?
A She would have probably -- she would have been an employee of Excel Corporation.
Q Did you give her a fuel map to start with to prepare the numbers that are in figure four?
A Yes, I would have.
Q And did you tell her to change the map that you had given her?
A Yes.
Q Okay. What map did you give her? Where did it come from?
A I don't recall that now.
Q Was it actual data from testing of an -- on a snowmobile?
A I don't know what map I gave her.
Q Did you tell her to change some of the numbers?
A I think I just answered that.
Q The answer is yes?
A Yes.
Q Why did you tell her to change some of the numbers?

295

A Because I didn't -- I believe that my patent would have been engine specific for a certain engine if I put in here fuel values are met for a certain engine, then my patent needed to be universal. This fuel map is universal for all of my engines. I did not want to put any -- necessarily engine specific for a specific model and year one engine into my patent. That's why I gave her all the throttle positions, all the trends, the RPMs, the zeros, the ones for decel. Those are all the things that establish the value and actually trade secrets of a map.
Q And you believe that if you had given her actual numbers from a map, that that somehow would have limited your patent to that particular map?
A That was my fear then, yes.
Q Was the actual map that -- strike that.
Was one of your concerns when you asked her to change the numbers that you believe that your map was a proprietary trade secret?
A Yes.
Q So as to that specific map that you felt was a proprietary trade secret?
A This one?
Q No. Did you consider -- let me rephrase that.
Did you consider the map with the actual

296

numbers that you had at that time to be a proprietary trade secret?
A Yes.
Q And you did not disclose that map in that packet?
A Yes, I did. It's right here.
Q But you changed the numbers?
A The data in there is not the trade secret part of the map. It's like a spreadsheet. If I patent Excel spreadsheets, the data that I put in there isn't the patentable part of the spreadsheet. It's the spreadsheet design.
The patentable part of the trade secret is the map, the x/y indices, the values in the fuel map, way the RPM is here, the throttle position here. The trends here are the same that we still used to, but that data is not -- the number 74 is not a trade secret to me. But the design and the concept of the map is.
Q So -- you are losing me. Did you -- did you have the girl change the numbers in the map that you gave her because you felt that the actual map was a proprietary trade secret?
A The -- I believe the map, as I recall, was for a specific engine and I did not want to make this patent patentable on a certain specific engine.

297

Q Okay. So you -- the map that you had was data for a particular engine and you had actually tested the engine to come up with the numbers for that map; correct?
A Yes.
Q So that was a map that you could load into memory and actually use in an engine that you knew about; correct?
A It was -- it would have been a Dyno map in those days.
Q Okay. But it was an actual map that could be used in an engine; correct?
A That's correct.
Q Okay. And you had the -- the secretary change those numbers; correct?
A Yes.
Q Okay. And who picked the numbers to go into the map, this map in figure four?
A I think I let her pick some numbers for the load area. The rest of them were already there from me. We didn't change those.
Q Why did you pick the load area as the area to put in made up numbers?
A Well, I could start an engine running on this map right here.



Q That's not my question. My question is why did you pick the load area as the area for adding in made-up numbers?
A Because that's what makes it engine specific.
Q Okay. Now, the actual map that you had with the actual numbers, was that proprietary separate and apart from the information that is depicted in figure four?
MR. DE ALCUAZ: Objection; vague, calls for a legal conclusion.
THE WITNESS: The data in the map?
BY MR. JENKINS:
Q Yes.
A The numbers?
Q Yes.
A All of our maps were proprietary. We had several by then.
Q Okay. So you had several proprietary maps that you did not disclose in the 803 patent; is that correct?
A No.
Q Explain to me why that's not correct.
A This is the map, same map, same everything. The only thing different is the values entered into this map, but the map is the same. The values are different for every engine, just as they still are today.



Q Well, this -- will the data in figure four work in any engine that you are aware of that's ever been made?
A I couldn't possibly answer that.
Q Are you aware of any engine that's ever been made where this map that's in figure four of the 803 patent would work?
A Yes, of course.
Q Name the engines.
A I could start an Indy 400, an Indy 500, an Indy 650, an Indy 600.
Q What would happen when the got into the load area with this map?
A It would stutter and miss perhaps, but it would start and run. But this map -- it would not be optimized for that specific engine. That's what I am trying to tell you. You had to optimize each map for that engine.
Q It would not be the best map for that engine; is that correct?
A No, it wouldn't be the best map. That's why you have a map, so you can program it.
Q Okay. And the best maps that you had for the engine you kept as proprietary; correct?
A No.



Q You did not keep the best map for that Polaris engine as proprietary trade secret?
MR. DE ALCUAZ: Objection; argumentative.
THE WITNESS: This is the map for all of my engines.
BY MR. JENKINS:
Q Okay. When I'm talking about the map, I'm talking about -- all right. Let me rephrase that.
What do you call a map with numbers in it?
A Figure four.
Q No. What do you call a map with -- I presume that you would say that figure four is a map regardless of what numbers are put in there; correct?
A No.
Q What makes it a map?
A The fact that it's included in this patent as a map, it's described in the patent as the map, the patent describes this figure four as a map.
Q In the load area are the trends consistent with what happens in an actual map?
A Yes.
Q For example, in an actual map at 170 throttle position, as you go from 6,000 to 8500 RPMs, you would expect to see the numbers drop from about 96 down to 29 back up to 47 onto 6670, and then at 9,000 you would

# Exhibit 3

Rule 26 Report

Roger D. Berry

Arctic Cat Inc. v. IRS/Pacer

May 22, 2003

TABLE OF CONTENTS


Page

**1. Background** .......... 1

1.1. Qualifications .......... 1

1.2. The CV of Roger D. Berry .......... 1

1.3. Compensation, Publications, Previous Testimony .......... 1

**2. Questions Presented** .......... 1

2.1. Purpose of Expert Witness Report .......... 1

**3. Materials Considered** .......... 1

3.1. Patents Re 34,803 and 5,813,374 and related prosecution histories .......... 2

3.2. Relevant sections of the patent statutes .......... 2

3.3. OMC Materials .......... 2

3.4. Mercury Marine Materials .......... 2

3.5. Bosch Automotive Handbooks .......... 2

3.6. SAE Paper 850293; A New Low Pressure Single Point Gasoline Injection System .......... 2

3.7. Technical Paper C189/81 .......... 2

3.8. Intelligent Controls, Inc. Materials .......... 2

3.9. Cuyuna Engine Company Materials .......... 3

3.10. Land & Sea Materials .......... 3

3.11. SAE Paper; 852233; Fuel Injection System for Motorcycles .......... 3

3.12. Kawasaki Materials .......... 3

3.13. G. Maier Materials and Deposition .......... 3

3.14. Okumura Laid Open Patent Application, 1984 .......... 3

3.15. SAE Paper 810061; New State-of-the-Art in Engine Controls ..... 3

3.16. Computer Dictionary and Handbook, 1980 ..... 3

3.17. 1993 Edition IEEE dictionary ..... 3

3.18. Oshiage patent number 4,565,173 ..... 3

3.19. Vielledent, SAE paper 780767: Low Pressure Electronic Fuel Injection System for Two Stroke Engines ..... 3

3.20. Design and Simulation of Two-Stroke Engines, G. P. Blair, 1996 ..... 3

3.21. Arctic Cat Memo: 1986 Eide/Chervestad Memo ..... 3

3.22. SAE Paper; 730128, Digitally Programmed Engine Fuelling Controls ..... 3

3.23. U.S. Patent No. 4,901,701 (Chasteen) ..... 4

3.24. Depositions of Chasteen, Strang, Cahoon ..... 4

3.25. Injection Research Specialists, Inc. Claim Construction Brief ..... 4

4. **Analysis** ..... 4

4.1. Relevant Law ..... 4

4.2. Prior Art that Anticipates '803 and '374 Patents ..... 5

4.3. Mercury Marine Prior Art that Makes '803 and '374 Obvious ..... 7

4.4. OMC Prior Art that Makes '803 and '374 Obvious ..... 9

4.5. Bosch Automotive Handbook Prior Art that Makes '803 and '374 Obvious ..... 10

4.6. Okumura Prior Art that Makes '803 and '374 Obvious ..... 11

4.7. Opinions relating to the disclosures of the '803 and the '374 patents ..... 12

1. **Background**

1.1. Qualifications

- I am qualified to opine on the validity of the '803 and the '374 patents because:
  - I have a Mechanical Engineering Degree (BSME, 1973, Oregon State University)
  - I have been employed in the engine and engine control system industry for 30 years
  - I developed engine control systems for Ford Motor Company for 9 years (1973 to 1982)
    - I led the design, development and production launch of the 1983 1.6 Liter EFI (Electronic Fuel Injection) control system at Ford from 1978 to 1982
    - I co authored the SAE technical paper: "New State-of-the-Art in Engine Controls in 1981
  - I lead the design and development of engine control systems at my company (Intelligent Controls, Inc.) for 14 years (1982 to 1996) where I worked on EFI systems for two and four stroke engine applications
    - I led the development of engine control systems for several two stroke fuel injected engines (from 1982 to 1988). These included electronic fuel injection systems for two stroke engines for Mercury Marine, Outboard Marine, Boeing and Lockheed. I consulted with Arctic Cat with regard to two stroke EFI systems

1.2. The CV of Roger D. Berry

My CV, providing additional detail on my background, is attachment A

1.3. Compensation, Publications, Previous Testimony

I have been engaged by counsel of Arctic Cat as a consultant in this litigation at a consulting rate of $280 per hour. I have published three articles in the past 10 years. These articles are attachment B. I have not testified as an expert at trial or by deposition for the preceding 4 years.

2. **Questions Presented**

2.1. Purpose of Expert Witness Report

I have been asked my opinion as to whether claims 1 through 4 of U. S. Patent Re 34,803 ('803) and claims 1 – 6 of Patent 5,813,374 ('374) are valid. I have also been asked to give an opinion as to the adequacy of the disclosure in the specifications of both the '803 and the '374 patents.

3. **Materials Considered**

In forming my opinion, I reviewed and considered the following materials:

3.1. Patents Re 34,803 and 5,813,374 and related prosecution histories[1]

3.2. Relevant sections of the patent statutes

3.3. OMC Materials

OMC marketing materials, publicly available technical information, news releases, trade magazine articles and depositions (specifically including but not limited to: IRS/AC 183127-43, IRS/AC 183110-14, 183116-18, 183124-25, 183175-204, 183122, 183145-46, 183172-74, 183205-40, 183290-93, 183116-18; *Power Boats* magazine article, April 1985; GM 00490, GM 00623; and Nerstrom dep., Maier dep.)

3.4. Mercury Marine Materials

Mercury Marine marketing information, publicly available technical information, trade magazine articles and depositions (specifically including but not limited to MM 0212-0215, 0733-34, 0765, 0077-85, IRS/AC0181912-25, MM 0077-86, 0733-34, 0765, 0216, 0217-21, 0733-34, 0077-85, 0227, 0257, 0222, 0261, 0212-0215, 0676-0730; and Staerzl dep.)

3.5. Bosch Automotive Handbooks

Bosch Automotive Handbooks (1st and 2nd editions) and technical papers

3.6. SAE Paper 850293; A New Low Pressure Single Point Gasoline Injection System

SAE Paper 850293; A New Low Pressure Single Point Gasoline Injection System (Bosch terms: Mono-Tronic and "Alpha-N")[2]

3.7. Technical Paper C189/81

The technical paper C189/81; A new microcomputer application for engine control system, NEC Corp., 1981

3.8. Intelligent Controls, Inc. Materials

Intelligent Controls, Inc. marketing brochures and operating manual, (specifically including but not limited to A002791-002798, A001983-

---

[1] The '803, '374, and '701 patents are reproduced in attachment C.

[2] Page 36, "The special features of such a throttle-angle/engine-speed-system for engine control have been well know within Bosch since the beginning of fuel injection development, so that it was possible to build on these experiences." The '803 and the '374 Patent describe what was commonly known in the industry as an Alpha-N system. This phrase comes from Alpha(α), which is an engineering symbol for angle (in this case it is throttle angle) and N is an engineering symbol for engine speed or RPM. Therefore, this is an engineering abbreviation for a fuel control system that is based on throttle opening and engine speed.

A001987, A42319-A42324, A006555, A006274-86, A006260-71, A006272-73, A006823-28, A002791-98, A002718)

**3.9.** Cuyuna Engine Company Materials

Materials from Cuyuna Engine Company reflecting early work with Intelligent Controls, Inc. (specifically including but not limited to A38894-906, A38864-76, A006547-64, A002803-13, A001983-87)

**3.10.** Land & Sea Materials

Land & Sea publicly available materials, technical materials and deposition (specifically including but not limited to L&S 0329-31, 0350-51, 0597, 0834, 0894; Bergeron dep.)

**3.11.** SAE Paper; 852233; Fuel Injection System for Motorcycles

SAE Paper; 852233; Fuel Injection System for Motorcycles, Y. Ohmori, et. al, 1985

**3.12.** Kawasaki Materials

Kawasaki publicly available materials (specifically including but not limited to IRS/AC 183379-82; A 51187-88, A 50990-96, A 51184-88, A 51240-42 and A 51498-554)

**3.13.** G. Maier Materials and Deposition

Marketing information, technical materials from G. Maier and G. Maier deposition (specifically including but not limited to IRS/AC 183103-08; L&S 0352-63, L&S 0438-0489)

**3.14.** Okumura Laid Open Patent Application, 1984

**3.15.** SAE Paper 810061; New State-of-the-Art in Engine Controls

SAE Paper 810061; New State-of-the-Art in Engine Controls, R. D. Berry, 1981

**3.16.** Computer Dictionary and Handbook, 1980

**3.17.** 1993 Edition IEEE 'dictionary'

1993 Edition IEEE 'dictionary' cited in Markman brief from IRS

**3.18.** Oshiage patent number 4,565,173

**3.19.** Vielledent, SAE paper 780767: Low Pressure Electronic Fuel Injection System for Two Stroke Engines

**3.20.** Design and Simulation of Two-Stroke Engines, G. P. Blair, 1996

**3.21.** Arctic Cat Memo: 1986 Eide/Chervestad Memo

Arctic Cat December, 1986 Eide/Chervestad memo. Bates nos. A 35010 through 35102

**3.22.** SAE Paper; 730128, Digitally Programmed Engine Fuelling Controls

SAE Paper; 730128, Digitally Programmed Engine Fuelling Controls, J. Soltau, et. al, 1973 (Lucas "Alpha-N" EFI system)

3.23. U.S. Patent No. 4,901,701 (Chasteen)

3.24. Depositions of Chasteen, Strang, Cahoon

3.25. Injection Research Specialists, Inc. Claim Construction Brief

## 4. Analysis

### 4.1. Relevant Law

#### 4.1.1. Assumptions based on U. S. Patent Law

I understand that, under the patent laws of the United States, a patent claim is invalid if a single prior art reference discloses each element of the claim and would allow one of ordinary skill in the art to make and use the claimed invention. I understand that a prior art reference that discloses each element of the claim is said to "anticipate" the claim. I understand that the relevant section of the patent statute setting out the law of "anticipation" states:

> § 102 Conditions for patentability; novelty and loss of right to patent
>
> A person shall be entitled to a patent unless ...
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States

I also understand that a patent claim is invalid if, even though all of the elements of the claim are not disclosed in a single prior art reference, the claim would have been obvious to one of ordinary skill in the art at the time the patent application was filed in light of the prior art. I understand that the relevant section of the patent statute setting out the law of "obviousness" states:

> §103 Conditions for patentability; nonobvious subject matter
>
> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Further, I understand that a patent is invalid if the patent specification fails to adequately set forth the claimed invention. I understand that the relevant section of the patent statute states:

> §112 Specification
>
> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, and exact terms as to enable any person skilled in the art to which it pertains,

or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

4.1.2. Person having ordinary Skill in the Art (PSA)

In my opinion, a Person having ordinary Skill in the Art (PSA), to which the '803 and the '374 patents apply, in the early and mid 1980's, would have been:

- A high school degree and at least 5 years of engine control system related experience
- Aware of the benefits of fuel injection in addressing the limitations and weaknesses of a carbureted fuel system
- Generally knowledgeable in engine function – having hands on experience with engines. Familiar with how several OEMs (Original Equipment Manufactures; engine and vehicle manufactures) used EFI technology in their products[3]
- Knowledgeable about control system suppliers – such as Bosch (largest and oldest free standing supplier of fuel injection control systems)
- Knowledgeable of basic electronics
- Appreciation of the benefits of a microprocessor in a control system
- Knowledgeable of the function of carburetors and their limitations

4.2. Prior Art that **Anticipates** '803 and '374 Patents

In my opinion, the prior art references identified in this section anticipate claims 1-4 of the '803 patent and claims 1 - 6 of the '374 patent.

4.2.1. Claims 1 through 4 of the '803 and claims 1 - 6 of the '374 patent were anticipated by the SAE Paper; 852233; Fuel Injection System for Motorcycles, Y. **Ohmori**, et. al, 1985

This reference discloses every claim element of the '803 and the '374 patents.

The reference discloses:

- The applicability and suitability of the described system to a "smaller engine" (page 456). The reference points out that because there is no air meter, the packaging of the EFI system is easier when adapting to a small engine
- That an airflow table (with 256 values) allows the calibration to match airflow dynamics, to be 'filled in' by running the engine on a 'dyno', to

[3] See A 35010-12. This memo lists users of EFI, including Mercury Marine and OMC, and it lists the benefits (motivations) that were driving Arctic Cat's approach to fuel injecting a two stroke engine; learning from and potentially combining the 'teachings' of several production applications of EFI.

follow "tortuous" paths of fuel delivery vs. the engine's needs as defined by engine speed and throttle position (page 457)

- That it is best to use a microprocessor (pg 457)
- That using the Ohmori teachings avoids having to modify the engine (pg 457)
- The use of a strategy for delivering fuel (or not delivering fuel) that is a function of throttle position and engine speed (priming, per '803 and '374)
  - Before ignition (page 459)
  - To limit the speed of the engine (page 459)
- That the throttle / speed system is superior to 'speed density' (use of a manifold pressure sensor) when fuel injecting a 'small engine' (page 456)

4.2.2. Claims 1 through 4 of the '803 patent and claims 1 - 6 of the '374 patent were anticipated by the 1986 production Mercury Marine fuel injected two stroke engine

My review of the Mercury Marine marketing information, publicly available technical information, trade magazine articles and depositions confirmed that the 1986 production engine anticipated the claim elements of the '803 and the '374 patents. This reference discloses:

- Absence of an air meter which improves packaging
- Dyno mapping which eliminates need for air flow calculation in the ECU
- Uses ignition pulse as injector trigger, which simplifies and reduces the cost of the system
- System compensates for engine temperature (cold start), air temperature and atmospheric pressure (reading the MAP sensor during crank and at wide open throttle) (altitude compensation)
- Fuel compensation for variable battery voltage (improves system accuracy)
- Computer controlled fuel pump for reduced energy use and for improved safety
- Fixed injector timing simplifies the system
- Automatic Priming to improve cold starting of the engine
- The Mercury Marine EFI system utilized an Alpha-N Fuel Map (table)
- The Mercury Marine EFI system utilized their MAP sensor to provide a BAP signal to the ECU

- The Mercury Marine EFI system used and stored an Alpha-N fuel table in a "data processor"[4]

4.2.3. Claims 1 through 6 of the '374 patent were anticipated by the **'701 patent**

I understand that the '374 patent is a 'standard utility patent', and not as a reissue patent. Therefore the '701 patent qualifies as prior art to the '374 patent. With that understanding, and given that all of the elements of the claims of the '374 patent are disclosed by the '701 patent, it is my opinion that the '374 patent is invalid because it is anticipated by the '701 patent.

**4.3.** Mercury Marine Prior Art that Makes '803 and '374 Obvious

In my opinion, the prior art references combined in this section make claims 1-4 of the '803 patent and claims 1 – 6 of the '374 patent obvious to a PSA.

If for whatever reason, the production **Mercury Marine** two stroke fuel injection system is not determined to be a prior art that anticipates the '803 patent and the '374 patent (which I believe they do) then knowledge and understanding of the production fuel injected Mercury Marine two stroke EFI engine would make the claims of the '803 and the '374 patents obvious to a PSA when they are combined with any of the following publicly available references:

4.3.1. The **Mercury Marine** two stroke EFI system when **combined with** the 1985 production **OMC** two stroke fuel injected engine rendered the claims of the '803 and the '374 patents obvious. The OMC engine was publicly marketed, promoted, sold and used. This engine was described in factory provided technical support documentation, marketing brochures and articles in boating and recreational magazines. The OMC EFI system used a **micro processor** in the fuel injection ECU. The opportunity to employ an EFI system that included the benefits of a micro processor, as well as all of the other features found in the Mercury Marine system would have motivated the PSA to combine these two EFI systems and to duplicate the '803 and the '374 EFI system. Indeed the prosecution history for the '803 and the '374 patents shows that the examiner recognized that the substitution of a digital microprocessor for an analog based ECU would have been obvious in 1982 (Feb. 22, 1994, PTO Office action, page 4 (A 000576)).

The examination, by a PSA, of the OMC support documentation and/or the process of physically handling, observing, tearing down, studying and operating ('reverse engineering') the OMC engine, in combination with the

---

[4] I am assuming (for purposes of this report only) that the definition of the term "data processor" is as cited by IRS in its claim construction brief: "Any device capable of being used to perform operations on data, for example, a desk calculator, tape recorder, analog computer, or digital computer," which comes from the 1993 edition of the IEEE Dictionary.

teachings of the production Mercury Marine two stroke fuel injection system, would have shown a PSA that the features of this combined two stroke fuel injected engine system made obvious all of the claims of the '803 and the '374 patents, including:

- "priming" as defined by the '803 and the '374 patents was disclosed in the OMC publicly available users manual (1985)
- the use of a microprocessor based control unit which accessed a fuel table in electronic memory (OMC)[5]
- A PSA would have been motivated to combine these two examples of two stroke fuel injection engines because:
    - o They were both promoted by their respective companies (and the media) as state of the art two stroke fuel injected engine systems. This motivation is demonstrated by searches by Arctic Cat in 1986 for related engine systems. Their documents show that they identified both OMC and Mercury Marine systems as being of interest.

4.3.2. The Mercury Marine fuel injection system also makes the claims of the '803 and the '374 patents obvious to a PSA when combined with the widely used **Bosch Automotive Handbook (2nd edition, 1986, pages 376 to 379).**

- o This reference manual describes two fuel injection systems that incorporate micro processors. One of the two micro processor based EFI systems uses throttle angle and engine speed to determine a table of base fuel delivery numbers. Bosch calls this system Mono-Tronic. Bosch and the industry in general, referred to the strategy (engine speed vs. throttle angle to select a fuel amount or pulse width) as "Alpha-N".

A PSA would have been motivated to combine these two references because a PSA would have been generally aware of the benefits of microprocessors in an EFI system. The Bosch Handbook lists benefits associated with microprocessors (pages 367 to 379).

4.3.3. The Mercury Marine fuel injection system also makes the claims of the '803 and the '374 patents obvious to a PSA when combined with any one of the following:

- The SAE Paper; 852233, Fuel Injection System for Motorcycles, Y. Ohmori, et. al, 1985 (Alpha-N)
- or the Bosch technical paper; 850293, A New Low Pressure Single Point Gasoline Injection System, H. Knapp, 1985 (Bosch Alpha-N)

---

[5] Regardless of the interpretations of "priming" and/or "data processor," the combination of the Mercury Marine and OMC systems makes the claims of the '803 and the '374 obvious to a PSA.

- or the NEC Technical Paper; C189/81; A new microcomputer application for engine control system (teaching digital design on EFI systems including NEC Alpha-N)
- or the SAE Paper; 730128, Digitally Programmed Engine Fuelling Controls, J. Soltau, et. al, 1973 (Lucas "Alpha-N" EFI system)

Each of these papers describes a relevant fuel injection control system that is based on the use of a microprocessor. Also, a PSA would have been motivated to combine any of these microprocessor based Alpha-N type systems with the production Mercury Marine two stroke fuel injection system to develop a fuel injection system that better manages and corrects the limitations of the previously used carburetor. Any of these references when combined with a knowledge of the Mercury Marine system would motivate a PSA to duplicate the '803 and '374 patents.

4.4. OMC Prior Art that Makes '803 and '374 Obvious

In my opinion, claims 1 – 4 of Patent '803 and claims 1 – 6 of the '374 patent would have been obvious to a PSA by the prior art of the 1985 production OMC two stroke fuel injected engine. The purchase and "reverse engineering" of the engine and/or the examination of the factory provided support documentation, would allow a PSA to understand and taught every feature of the system described in the '803 and the '374 patents, with the exception of:

- Engine temperature based fuel compensation
- Battery voltage based injector pulsewidth compensation and
- ECU control of the fuel pump

All three of these control system features were **common in EFI systems in 1986** and a PSA would have needed nothing beyond her/his personal knowledge and the understanding of the OMC engine system to duplicate the Alpha-N system(s) described in the '803 and the '374 patents.

4.4.1. **Bosch Technical Paper**; SAE 850293, 1985, H. Knapp

This publicly available paper taught the use of a fuel system whose basis of control was throttle angle and engine speed (Alpha-N). This reference described a system that included all of the elements of the '803 and '374 claims not taught in the OMC system. A PSA would have been motivated to combine these references because the OMC engine system (together with the available related documents) taught several specific control features in a manner that could be clearer to a PSA than the more general description offered in the Bosch Technical Reference. A PSA would have understood the benefits of the elements of the '803 and '374 claims not taught in the OMC system and would have been motivated to incorporate them into a two stroke fuel injection system.

4.4.2. **OMC** combined with SAE 852233, Fuel Injection System of Motorcycles, 1985, Y. Ohmori, et. al **(Ohmori)**

The PSA would be motivated to combine these two prior arts because the Ohmori technical paper describes in detail how several of the engine control systems work - while in some cases, this same understanding might have required some 'reverse engineering' if the OMC engine, were it used independently of the Ohmori prior art.

4.4.3. **OMC combined with NEC Technical Paper; C189/81, 1981, Y. Idogawa, et. al.**

The NEC prior art taught all of the elements of the '803 and '374 claims not taught in the OMC system. A PSA would have been motivated to combine the teachings of the NEC system with the OMC system because the PSA would recognize the absence of the elements of the '803 and '374 claims not taught in the OMC system. Further, she would appreciate that by incorporating these elements, the developed EFI system would be improved.

**4.5.** Bosch Automotive Handbook Prior Art that Makes '803 and '374 Obvious

In my opinion, claims 1 through 4 of the '803 patent and claims 1 – 6 of the '374 patent would have been obvious to a PSA by the prior art of the 1986 Bosch Automotive Handbook when combined with any of the following cited prior art references. The review of the relevant sections of this reference book, would allow a PSA to understand and incorporate every feature of the system described in the claims of the '803 and the '374 patents, with the exception of:

- Computer control of the electric fuel pump
- Control system specifics associated with applying EFI to a two stroke engine.

PSAs would be aware of the commonly used computer control of the fuel pump. PSAs would be familiar with some of the characteristics of fuel injecting a two stroke engine versus the fuel injecting of a 4 stroke engine (e.g. injecting every revolution, greater variations in crankcase pressure, greater variations of volumetric efficiency vs. speed and load, etc.). PSAs who wanted to improve on the function of a carbureted two stroke engine, would have tried to fuel inject the engine.

A PSA would have combined the teachings of the Bosch Handbook with the following additional reference materials to make the claims of the '803 and the '374 patented system obvious;

4.5.1. The combination of the **Bosch Automotive Handbook** (1986) combined with the teachings of the 1986 production **Mercury Marine** two stroke EFI system make the claims of the '803 and the '374 patents obvious to a PSA.

The Mercury Marine two stroke EFI system taught all of the elements of the claims of the '803 and '374 patents not taught in the Bosch Automotive Handbook. A PSA would have been able to access this information by buying

the engine and in the process, receive the factory provided technical information. She would appreciate the value of incorporating these features and given that her objective would be to improve on the previous fuel system (the carburetor) would have wanted the designed system to incorporate all of the features that she would be aware of and that would be appropriate for this application (including computer controlled fuel pump and the characteristics associated with fuel injecting the production Mercury Marine two stroke engine).

4.6. Okumura Prior Art that Makes '803 and '374 Obvious

In my opinion, claims 1 – 4 of the '803 patent and claims 1 – 6 of the '374 patent would have been obvious to a PSA by the combination of the Official Revised Translation of the Laid Open Patent Application of **Okumura**[6] and any one of the following references. The only '803 and '374 claim limitations not taught by Okumura are:

- Computer control of the electric fuel pump
- Battery Voltage fuel compensation
- "Fixed" Injection Timing

4.6.1. The **combination of Okumura** teachings and the teachings of the 1986 production **Mercury Marine** two stroke EFI system would have made obvious to a PSA the claims of the '803 and the '374 patents. The Mercury Marine prior art includes all of the '803 and the '374 elements that are not taught in the Okumura prior art. A PSA would have been motivated to combine these two references because:

The elements of the '803 and the '374 claims not taught by Okumura were common to EFI systems of the '80s. The benefits of these systems were commonly understood and appreciated. Therefore, a PSA would have been aware of the absence and the benefit of the elements not taught by Okumura.

4.6.2. The **combination of the Okumura** teachings and the teachings of the **Ohmori** SAE paper make the claims of the '803 and the '374 patents obvious to a PSA.

As shown above, this SAE paper taught all of the elements not taught by the **Okumura** system.

A PSA would have been motivated to combine the Ohmori teachings with the Okumura teachings because the Ohmori paper taught the use of all of the elements of the '803 and the '374 claims not taught by the Okumura system and a PSA would have understood the benefit of having each of these elements in her/his EFI system.

---

[6] Japanese Kokai Patent Publication No. 59-49337, published March 21, 1984; Application No. 57-158959, filed September 14, 1982; Int. Cl. No. F02 D 5/02; Inventor: Yoshihiro Gohara, Shigeo Okumura; Assignee: Sanshin Kogyo K. K. (Sanshin Industrial, Inc.), Yamaha Motors, Inc.; Japanese Title: Electrically Controlled Fuel Injector for Two-Cycle Internal Combustion Engine

In my opinion, it would have been obvious to a PSA with the system understanding taught by the combination of these two prior art references to build and bring to practice an EFI system having the characteristics of the system claimed by the '803 and the '374 patents.

4.6.3. **The combination of the Okumura teachings and the teachings of the Oshiage patent makes the claims of the '803 obvious to a PSA.**

During the prosecution history the patent examiner found that the combination of Okumura with Oshiage made the claims of the '803 obvious. IRS was able to argue that this combination did not make the claims of the '803 patent obvious. This argument was made on the basis that the use of 'fixed injector timing' made the claims of the '803 patent distinguishable and therefore patentable over the Okumura patent application. However this decision was made in the absence of several publicly available prior art examples of "fixed injector timing" (including the Ohmori paper and the Bosch 2nd edition Handbook). In my opinion, the combination of any of these references teaching fixed injection timing, along with the combination of Okumura and Oshiage, would have made the claims of the '803 patent obvious.

4.7. Opinions relating to the disclosures of the '803 and the '374 patents

4.7.1. Fuel Table

Figure 4 of the '803 patent and '374 patent depicts Chasteen's fuel map. The patent specification states that Figure 4 represents "a typical engine fuel map expressed in rectangular coordinates." ('803 patent, Col. 6, ll. 34-35; '374 patent, Col. 6, ll. 7-8).

It also states that:

> The data array shown in FIG. 4 indicates the optimum base fuel value in milliliters for an engine fuel injector single pulse under predetermined standard operating conditions for any given engine RPM and throttle position. ('803 patent, Col. 12, ll. 18-22; '374 patent, Col 11, ll. 35-39).

In my opinion, the 'fuel table' provided to the PTO by Chasteen is not representative or typical of a fuel table that would be created in the development of the two stroke fuel injection system described in the '803 and the '374 patents.

- Quantity: The table represented in Fig. 4 shows that an engine running at 6,000 RPM would inject approximately 1,900 gallons of fuel per hour per cylinder into the engine. This is, of course, anything but "the optimum based fuel value" for any snowmobile engine, and is certainly not a "typical" fuel map. The amount of fuel delivered to the engine is critical to the operation of the engine.
- Shape: The values in the table are represented as the amount (volume) of fuel that would be delivered to the engine for combustion with the air that is present in one cylinder filling. The correct amount of fuel to be delivered per cylinder filling is proportional to the amount of air that is inducted into

the cylinder. This filling is commonly referred to as volumetric efficiency (trapping efficiency). The volumetric efficiency of a two stroke engine is influenced by many design and operating engine characteristics including: the amount of throttle opening, the relationship of the intake and exhaust transfer ports, the speed of the engine, the temperature in the exhaust pipe, etc.

Although the interaction of these design and operating characteristics leads to varying volumetric efficiency curves, I would still expect to find certain expectable shapes and for those shapes to be somewhat "smooth." This is borne out by publicly available curves that show volumetric efficiency curves to be variable but reasonably continuous. *See* Fig. 7.9 Blair, *Design and Simulation of Two-Stroke Engines*, 1996.

The 'shapes' of the curves defined by the table values shown in Fig. 4 are so extreme I cannot conceive of an engine that would have generated them. In my opinion, these shapes are neither typical nor optimum for a snowmobile engine.

The teaching of Figure 4 (in fuel quantities delivered and in shapes of fuel flow curves, relating fuel flow to engine speed and throttle opening) as a representative control feature would have led a PSA to build an inoperable engine.

4.7.2. "Primer"

In my opinion, the teaching of the **"primer"** feature of the control system ('803 patent, column 11, lines 30 to 67; '374 patent, column 10, line 51 to column 11, line 19), including the specification of 100 ml of fuel per injector per priming pulse, would have led a PSA to build an inoperable engine.

The strategy defined in the flow chart (Fig. 2) introduces a flaw into the control system. Employing this strategy would allow the operator to introduce enough fuel into the engine to 'flood' it (actually wet the spark plug – thereby keeping the engine from starting). This could strand a snowmobiler, which is obviously a **safety risk**. In the extreme, this function could "hydraulically lock" the engine[7]. In the mid '80s, given the state of digital electronic design (for EMI and EMC), this flaw would have been more likely to have caused this latter failure mode than would be the case today.

Roger D. Berry    5/22/03
Date

[7] This can occur if enough liquid fuel is introduced to the engine to allow the cylinder and therefore the combustion chamber to be filled – thus potentially leading to the engine not being able to 'turn over' (crank) or worse, this can lead to mechanical damage to the engine (breaking pistons, connecting rods, etc.). This extreme 'failure mode' could occur if the ignition key is in the on position and EMI 'noise' is conducted to the throttle position sensor port, there by creating an oscillating signal that repetitively introduces the priming pulse to the engine. If for instance the source of this noise is a fluorescent light in a garage, the priming pulse would be injected at 60 times a second until the fuel tank was empty. No language is present in the '803 and the '374 patent that teaches the elimination of EMI noise on input lines.