# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

*************************************************

ARCTIC CAT, INC., Civ. Action No. 01-CV-543
a Minnesota corporation, MJD/RLE

Plaintiff,

v.

NJECTION RESEARCH SPECIALISTS, INC.,
a Colorado corporation, and PACER
INDUSTRIES, INC., a Missouri corporation,

Defendants.

***************************

INJECTION RESEARCH SPECIALISTS, INC.,
a Colorado corporation, and PACER
INDUSTRIES, INC., a Missouri corporation,

Counterclaimants,

v.

ARCTIC CAT, INC., a Minnesota corporation,
and SUZUKI MOTOR CORPORATION, a Japanese
corporation,

Counterdefendants.

*************************************************

COPY

VIDEOTAPED DEPOSITION OF
ROGER D. BERRY
Taken October 21, 2003
Scheduled for 9:00 a.m.

Reported By: Lori L. Morrow, RPR
PARADIGM REPORTING & CAPTIONING INC.
1400 Rand Tower, 527 Marquette Avenue South
Minneapolis, Minnesota 55402 * (612)339-0545
1(800)545-9668 * Fax (612)337-5575

Videotaped deposition of ROGER D. BERRY, taken on the 21st day of October, 2003, commencing at 9:04 a.m., at the Law Offices of Robins, Kaplan, Miller & Ciresi, L.L.P., 2800 LaSalle Plaza, 800 LaSalle Avenue, Minneapolis, Minnesota, before Lori L. Morrow, Registered Professional Reporter and a Notary Public in and for the State of Minnesota.

APPEARANCES:

On Behalf of the Plaintiff and Counterdefendant Arctic Cat, Inc.:

Andrew W. Horstman, Esquire
Aaron Myers, Esquire
Robins, Kaplan, Miller & Ciresi, L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota 55402-2015
(612) 349-8500

On Behalf of the Defendants and Counterclaimants:

Anthony de Alcuaz, Esquire
Robert J. Blanch, Esquire
McDermott, Will & Emery
3150 Porter Drive
Palo Alto, California 94304-1212
(650) 813-5000

On Behalf of the Counterdefendant Suzuki Motor Corporation:

Bruce C. Zotter, Esquire
Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.
1300 I Street, NW
Washington, DC 20005-3315
(202) 408-4000

ALSO PRESENT: Dave Young, Video Technician

NOTE: The original transcript will be delivered to Anthony de Alcuaz, Esquire, pursuant to the applicable Rules of Civil Procedure.

INDEX

WITNESS:
Roger D. Berry

EXAMINATION BY: PAGE:

Mr. de Alcuaz..............6

OBJECTIONS BY:
Mr. Horstman...............11, 25, 40, 41, 42, 74, 79, 82, 92, 122, 128, 130, 131, 132, 133, 135, 136, 171, 228, 230, 236, 242, 245, 254, 261

EXHIBITS MARKED AND REFERRED TO: PAGE:

850..Second Amended Notice of Deposition of R.D. Berry.....................9
851..Curriculum Vitae of R.D. Berry........18
852..Expert Report of R.D. Berry, BERRY 003150-3174..................36
853..Rule 26 Report of R.D. Berry dated 5/22/03......................43
854..6/17/03 Rebuttal Report of R.D. Berry dated 6/17/03................43
855..Optical Character Recognition document of the Okumura prior art reference, BERRY 002045-2051...55
856..3/20/03 Memo from R. Berry to Annamarie Daley Re: Expert Witness Report Outline for Arctic Cat v. IRS.........................59
857..Invoices of Pilot Systems, LLC, BERRY 000742-788...................65
858..6/5/01 Letter to Derek Vandenburgh from Roger Berry with Attachments..88

(EXHIBITS, CONTINUED:)

859..Notes of R.D. Berry, BERRY 001727-1737........................94
860..5/23/02 Email from Derek Vandenburgh to RD Berry, and 5/31/02 Letter from Jeffer Ali to R. Berry, BERRY 001928-1929........................101
861..8/13/03 handwritten notes, BERRY 001760-1766..................103
862..R.D. Berry working notes, BERRY 001768-1782..................137
863..Rebuttal Expert Report of Dr. William B. Ribbens with attached forwarding letter, BERRY 003194-3228..................146
864..Arctic Cat's Invalidity Claim Chart for US Patent Re. 34,803 with attached forwarding memo, BERRY 000212-234.1..................157
865..Arctic Cat's Invalidity Claim Chart for US Patent Re. 34,803, BERRY 000187-211.....................158
866..Arctic Cat's Invalidity Claim Chart for US Patent Re. 34,803 with handwritten notes, BERRY 001543-1563..................159
867..Arctic Cat's Invalidity Claim Chart for US Patent Re. 34,803 with attached forwarding memo, BERRY 000235-286..................162
868..Arctic Cat's Invalidity Claim Chart for US Patent Re. 34,803 with attached forwarding memo, BERRY 000473-483...................163
869..Arctic Cat's Invalidity Claim Chart for US Patent Re. 34,803...........165

82

A No. What the analysis section lists are the prior art references that I either cited as anticipatory or obvious in combination, and then I explained how those combinations would have made the '803 patent obvious. But I did not attempt to include every document in my analysis section that contributed to my opinion of the art at the time.

Q Okay. And again, that's because you were not told that you needed to have a complete statement in the basis and the reasons for your opinion, right?

MR. HORSTMAN: Objection, argumentative, misstates his testimony, asked and answered. You can answer again.

THE WITNESS: Again, I was never told that I didn't have to have a complete answer. I was told that I had to have enough detail to explain the basis of my opinions and that further detail would be provided later.

BY MR. DE ALCUAZ:

Q Okay. With respect to the opinions you express in your report about anticipation and obviousness, did you cite all of the references that you rely upon for anticipation and obviousness in the analysis section of your report?

A Again, in the process of determining which

83

references potentially could be combined to make the '803 or the '374 patent obvious, I listed the references that I was combining. I did not attempt to list references that may have again been in my history or experience and may have contributed to my understanding of the terms that were used.

Q Okay. But to the extent that you do rely on any reference for either a combination that renders one of the two patents obvious or a single reference that you think anticipates it, you do set forth at least those references in your reports, correct?

A Again, I list the references that were either freestanding or combined. I did not attempt to list documents or project information that might have contributed to my coming to those opinions in addition to the ones that I was combining.

Q Okay. Well, with respect to the references that you cite as anticipating either the '803 or the '374 patent, do you list all of those references in your analysis?

A That sounded like the same question. Can you say it again, please?

Q Sure. Are all the references upon which you intend to opine that they anticipate either the '374 or the '803 patent set forth in your report?

84

A The references that either are freestanding or anticipatory references and the references that I combined are listed. Information or reference material from my experience and history that might explain some of those opinions that I have I may use at some time in the future.

Q With respect to the combinations of references that form the basis of your obviousness opinion, is there any reference not discussed in your analysis section which provides an element which is required for the obviousness analysis?

A The references that are listed contain the elements that are -- either do or don't contain the elements that are used in my analysis of either anticipation or obviousness. And again, in some cases where a piece of information might be in my history that I may have used to understand the terms that were involved or to properly read those references in the context of a person of ordinary skill in the art, those documents and project notes and et cetera, while they, in my understanding they have been provided, may or may not be listed in this report.

Q Okay. Does your report -- you indicated earlier that your report lists all of the references that you combine for purposes of obviousness.

85

A Correct.

Q And that's a correct statement, right?

A Uh-huh.

Q Okay. So if something is not listed in the obviousness -- sorry. I'll rephrase that question. So if something is not listed in the analysis section of your report with respect to a combination there, it is not a reference upon which you rely to supply an element or some other information that is the basis for your obviousness opinion, right?

A You know, that's not true, either. I came to an opinion that the elements of the '803 and the '374 patent were made obvious by a combination of certain prior art references, but I did not attempt to list or combine every reference that I had collected in an effort to do that. So while the ones that I listed definitely it is my opinion they do, it could be that some combination of the additional pieces of prior art information could also have been combined to provide obvious.

Q Okay. When in your report you say that if you combine reference A with reference B, and that renders the invention in either the '803 or the '374 patent obvious, is there any other reference other than reference A and reference B that must be combined with reference A and reference B to support your obviousness

Page 86

argument, or do you only rely on reference A and reference B?
A For each instance where I combine prior art references, if I listed one, two, three, four or five, those were the references that I felt in combination contained all of the elements. But again, there may be references that are listed or that I have -- have provided from historical background that could also have been combined to provide obviousness.
Q Okay. I think you answered the question. Thanks.
With regard to your supplemental reports, which we'll discuss in more detail later, is there any reference that is listed only in one of your supplemental reports that you rely upon as the basis of either your obviousness or your anticipation opinion?
A Can you show me specifically what you're talking about?
Q Sure. Okay. I'll ask that question again when we get to the supplemental reports, and we'll --
A Okay.
Q -- put it in your hands. With regard to the supplemental reports that identify some new -- some additional references, were the references that are listed in your supplemental reports references that you

Page 87

possessed before May 22, 2003?
A Not necessarily. I know that some information was available after that date. So in some cases, information was provided to me after May 22 that was used in forming the opinions of the supplemental report.
Q Okay. You indicated earlier there wasn't any opinions in the supplemental report in --
A I'm sorry. I thought we were talking about the second data processor report.
Q I'm distinguishing between the rebuttal report and the original report. So let me rephrase the question.
A Okay.
Q Okay. With respect to the two supplemental reports that list additional references, were at least some of those additional references that you provided in the supplemental reports in your possession before May 22?
A Yes.
Q Okay. And were at least some of those references in your possession before June the 17th --
A Yes.
Q -- 2003? Okay. Can you provide for me an estimate in days or hours, whichever makes more sense to you, of the amount of time you spent reviewing materials

Page 88

that are listed in your original May 22 report and in your June 17 rebuttal?
A I would estimate a couple hundred hours.
Q Okay. And with regard to the time that you spent drafting what became your May 22, 2003, report, can you tell me how much time in hours or days it took you to come up with what became the final version on May 22?
A About 70 hours.
Q Okay. And with respect to your rebuttal report dated June 17 of 2003, can you tell me how many hours it took you to write the rebuttal report?
A I would estimate 8 to 20.
MR. DE ALCUAZ: Okay. Ask the reporter to mark as next, I believe it's 858, a copy of documents bearing Berry production numbers 1757 through 1759.
(Deposition Exhibit Number 858 was marked for identification and is attached herewith.)
BY MR. DE ALCUAZ:
Q Can you tell me what Exhibit 858 is, please, sir?
A It is a cover letter and an invoice. Oh, I'm sorry. It's a cover letter for an invoice, and it is notes from my calendar program. That's it.

Page 89

Q Okay. The second page, which bears production number BERRY 1758 on what's now Exhibit 858, it starts with a date 4/25/01.
A Uh-huh.
Q You mentioned a calendar program. Down at the bottom of the page, it mentions Lotus Development Corporation. Is this some sort of a Lotus notes calendar?
A Actually, it's an Outlook --
Q Okay.
A -- which is Microsoft, so I'm not sure what that is.
Q Okay. That's fine. Maybe that's just when we reprinted it or something or somebody else did. And we have several pages, some of which we'll talk about. Did you keep sort of a running journal of what you were doing in your discussions in that program?
A Yes.
Q And is that what this is?
A That's what this is.
Q Okay. So referring again to page 1758 in what's now Exhibit 858, under the date April 25, 2001, there's a statement that says, "Kim thinks the injection timing was 'fixed'. The strongest reason why it might have been 'variable' is that the application was two stroke." Let

118

Let's go back to the previously marked Exhibit 861. It's right here, sir. Let's get back to that. With regard to 861, it bears production numbers 1760 through 1766. Just a couple format questions. Looking at the second page in Exhibit 861, which has Berry production number 1761 on it, is the chart that exists on the page and that is filled in with some handwriting, is that template what you were provided with by counsel?
A No.
Q I see. Who generated that template?
A Aaron Myers.
Q Okay. Mr. Myers of Robins, Kaplan?
A Yes.
Q Okay. And when did Mr. Myers send you that template?
A He never sent it to me. When I arrived here to begin working on the report, I asked for a method of collecting information on the various prior art references that I was considering, and I suggested a table. And based on that, I told Aaron that I would like to keep track of whether the various references had inputs and outputs and other characteristics. And so he typed this up and made multiple copies.
Q Okay. So looking at those templates and the notes on them, on all the pages of Exhibit 861 that you

119

have in front of you, were all those notes made after May -- well, within a week of the time your report was finalized on May 22?
A Yes.
Q Okay. Before receiving the blank template that we were discussing that's depicted on page 1761 in a filled-in form, had you received anything like this from either Mr. Myers or any other lawyer for Arctic Cat?
A No.
Q Okay. Referring to the first page of Exhibit 861, is that all your handwriting?
A Yes.
Q And I notice the date is August 13, '03, or at least that's what it appears to be. Is that right?
A Yes.
Q Okay. What was the occasion on which you took these notes or made these notes?
A I was in Minneapolis at Robins, Kaplan preparing for the deposition, which at this time was scheduled about a week or ten days from this date.
Q Okay. And do these notes reflect your own thought process, a communication with counsel, both, neither? What do they reflect?
A Just my thought process.
Q Okay. Turn to the second page in what's now

120

Exhibit 861, which is production page 1761. The chart has the printed names of some attributes there. And underneath them, the word "microprocessor" is written. And then the word "yes" appears. Is that your handwriting?
A Yes.
Q Okay. Is all the handwriting on production page 1761 your handwriting?
A Let me take a look.
Q Sure.
A (Perusing document.) Okay. Two places where I'm guessing it's not my handwriting on 1761. Where it says, "Reference: Kawasaki," that's not my handwriting, and the number "852233." And then on page 1766, where it says, "Reference," and it says "Maier," that's not my handwriting. Otherwise, it's all my handwriting.
Q Okay. Going back to the page that says, "Kawasaki" --
A Yes.
Q -- which is 1761 in Exhibit 861, is that the Ohmori reference?
A Yes.
Q Okay. One of the entries in the left-hand column in the chart is "Fixed Timing." Can you tell me for purposes of making this analysis what you meant by

121

fixed timing?
A In the context of the claim construction, as I understood it, fixed timing in this instance was timing the initiation of injection was initiated by the sensing of the spark plug or a voltage spike from the coil. So there was no attempt in the system to vary the injection timing relative to ignition timing.
Q Does that mean that for purposes of this analysis you assumed that the injection timing happened at the same relative point in the engine rotation every cycle?
A Again, in the context of the claim construction, yes.
Q Okay. Is that based in part upon your understanding expressed earlier that you thought Judge Weinschenk had determined that the injection timing was fixed?
A Yes.
Q Okay. There's a note to the right of that that says, "sync with IG. timing." I assume that means synchronized with ignition timing?
A Yes.
Q And then it says, I think it says, "not timed phased." Have I read that right?
A Correct.

Q What did you mean by "not timed phased"?
A A term in the art is phasing. And if you vary the phase of an event, you're varying that event relative to another event. So if you were to have phased the injection timing, you would be varying it relative to ignition timing. So not timed phased means that it occurs at ignition timing.
Q Okay. Was it your understanding of the invention that ignition timing was fixed?
A Can you say that again, please?
Q Sure. Was it your understanding of the invention claimed in the '803 patent and the '374 patent that ignition timing was fixed?
A No.
Q So if ignition timing was linked to injection timing, therefore, injection timing could vary as a function of something, correct?
MR. HORSTMAN: Objection, misstates his testimony, lacks foundation, may call for a legal conclusion depending on how you intend to use the term. You can answer.
THE WITNESS: As I understand the history, the '803 history and the Weinschenk ruling, one of the ways that the '803 patent was differentiated from Okumura as a prior art



references was that Okumura demonstrated and taught variable injection timing, and that was to compensate for pressure in the crank case, which is where Okumura injected the fuel. And IRS argued in the consideration of the patent that the system described by IRS and by Chasteen deliberately did not vary the injection timing but rather had a simpler system that allowed the injection to occur at a single event, in this case being ignition timing. In that context, Judge Weinschenk ruled that for purposes of differentiation between systems where the timing was controlled and varied and systems where the timing was accepted at an event that occurred in the engine, that that strategy that did not vary the timing would be deemed fixed, and the strategy that did calculate and vary the initiation of the injection to be different than that sensed event would be considered variable. So in that context, yes, the injection is deemed and in my mind is fixed.
BY MR. DE ALCUAZ:
Q When you talk about the automatic priming in the next entry there, for purposes of this claim chart, what



attributes, if any, were you looking for of automatic priming to make a determination as to whether something was obvious or anticipated?
A The April 3 patent described priming as the introduction or lack of introduction of fuel based on sensed engine speed and throttle position. And so that's what I was looking for, that characteristic, whether or not it existed in other prior art references. And according to the language in Ohmori, there is a regime where fuel is introduced when zero rpm is sensed and the -- just prior to the initiation of cranking.
Q Doesn't Ohmori talk about engine speed as one of the functions --
A Yes.
Q -- that determines whether priming occurred?
A Yes.
Q Okay. So Ohmori describes, to your understanding, a system in which throttle angle and engine speeds determines whether or not a priming pulse was given?
A Yes.
Q Okay. Underneath those entries, you've written the word "microprocessor" and "yes." Did you write the word "microprocessor" there because at that time in your consideration you were thinking that a microprocessor was



required to satisfy at least one of the claims of the '803 patent?
A No.
Q Why did you write it there?
A To keep track of the nature of the controller.
Q Okay. At the bottom of the page, there's a bullet followed by the words that appear to read "fuel cut-out," quote, or not to deliver, closed quote. And I think it says, paren, '803, closed paren. Is that right?
A Yes.
Q Okay. That quote or not to deliver, closed quote, that's a quote from claim language in the '803 patent, isn't it?
A Yes.
Q Okay. And then it goes on to say, I think, "function." Can you just read me the rest of it? I'm not sure what you're saying there.
A Function of throttle angle and engine speed only. Page 459, rpm limiting.
Q Okay. So you're talking about Ohmori here?
A Yes.
Q With respect to the claim language you quote here, that's claim language that indicates that in some instances the claimed invention in at least one claim of the '803 patent might not deliver fuel to the engine,

150

is an engineering signal for angle, in this case, it is throttle angle, and N is an engineering symbol for engine speed or rpm. Therefore, this is an engineering abbreviation for fuel control system that is based on throttle opening and engine speed." Is that a description of what an Alpha-N system is that you continue to agree with?
A Yes. There might be more definitions or variations of that, but that definition does apply to an Alpha-N system.
Q Okay. For purposes of your analysis about infringement and validity – I'm sorry – about validity alone, did you construe the claims of the '803 and the '374 patent to require an Alpha-N system as you defined it in your footnote in your report?
A I did see that the system should have, would have throttle position and engine speed as inputs into determining a fuel value, yes.
Q Okay. More particularly, did you reach a conclusion during your analysis of the '803 and '374 patent that in order to fall within the scope of those claims in those two patents, a system would have to use a system based on throttle opening and engine speed?
A A system including the use of throttle opening and engine speed, yes.

151

Q Okay. If – what about a system that did not use throttle opening and engine speed to set the base values? Would that within your contemplation fall within the scope of any of those claims?
A Like what?
Q Like one that used MAP instead of alpha?
A If the system used MAP with absolute pressure exclusively and engine speed, then I would not see it being termed an Alpha-N system, and I would not see it applying to the '803 patent.
Q Okay. If the system used MAP and Alpha and engine speed, do you think it could fall within the scope of the '803 patent?
A Yes.
Q Okay. If the system used MAP and engine speed to set the base values in a fuel table, would that fall within the scope of either the '803 or the '374 patent?
A Possibly.
Q If a system used a airflow metering system where airflow and engine speed were used to set the base fuel values, would that fall within the scope of the '803 or the '374 patent claims?
A Possibly.
Q When you say possibly, what do you mean?
A I'm aware of, as an example, the Mercury Marine

152

system where the engine speed and the throttle position were used to determine the fuel to be delivered on an ongoing basis, not just on a transient basis, and that system also used manifold absolute pressure to obtain the fuel to be delivered to the engine. And that system, in my opinion, does fall within the description of an Alpha-N system.
Q Does it fall within the description in the claims of the '803 and the '374 patent?
A Yes.
Q And in that Mercury Marine system, the way you understood it, it was not an Alpha-N system, but rather it was a system that used MAP and engine speed and then modified that base value for alpha, correct?
A No.
Q How did it work?
A My understanding is that the data processor used inputs from barometric pressure, inlet air temperature, engine coolant temperature, throttle position, manifold absolute pressure and engine speed to determine an amount of fuel that would be delivered to the engine. Again, my understanding of that system used throttle position as an input in a manner that I would describe as Alpha-N.
Q In the system that we're discussing now at Mercury Marine, was MAP a correction to a base fuel value

153

that was based upon, pardon me, Alpha-N, or was MAP a third parameter that was used to calculate the base value?
A I don't know that either characterization is –
Q Let me back up then.
A – correct.
Q I'll withdraw the question.
A Okay.
Q In the Mercury Marine system as you understood it, did it calculate a base fuel value or a base value?
A Okay. In the context, and again, what I looked at in the context of this case was engine systems and whether or not they fell within the claims of the '803 and '374 patent. In my opinion, the manner in which the Mercury Marine system accomplished fuel flow fell within those claims, within that same description.
Q Okay. I need to distinguish between the description and the claims.
A Okay.
Q I'm sorry.
A Okay.
Q I thought your prior testimony was that your understanding of the Mercury Marine engine that's discussed in your report was that it would fall within the scope of the claims of either the '803, the '374

patent or both, correct?
A Correct.
Q Okay. Now, following up on that, did you read the claims of the '803 and '374 patent to require the calculation of a base value, which is then modified by other parameters?
A I read, and actually the specification points out that the order in which different modifiers are applied or the frequency within which certain modifiers are applied are not critical to the invention. And I read that to indicate to me that if the system accomplishes this fuel delivered with an input of throttle position and engine speed and then other modifiers, that that did fall within the claims of the '803 and '374 patent.
Q Okay. So for purposes of your obviousness and your anticipation opinions, you felt that any system that used alpha and used N among other parameters would fall within the scope of the claims?
A No.
Q Okay. Did you read the claims of the '803 and the '374 patent to require the storage of a base value which is then modified?
A Storage of a base value. Let me think about that for a second. No. What I looked at, and I tried to



look at the claims, the language, the prior arts in the context of the entire case, and what in that context, and I understand that there has been -- it has been alleged or there's been a suggestion that the Arctic Cat system infringes the '803 and '374 patent. And as I look at that suggestion and the inference as to the breadth of the type of system that might be considered to overlap those claims, I see the Mercury Marine system falling within that context.
Q Okay. I understand that. Are there any limitations in the claims of the '803 or the '374 patent that you understand to mean that a base value based upon alpha and N must be stored?
A Yes.
Q Okay. And in this Mercury Marine system we're talking about, was there a base value based upon Alpha and N that was stored?
A I'm sorry. What I thought you asked, and I'll clarify that --
Q Okay.
A -- was whether the relationship between throttle position, engine speed and fuel to be delivered was stored or contained in the ECU. That I understand is a requirement. But whether it is stored as something called a base value I did not see as a requirement.



Q Okay. And did you see a requirement that the base value be based on alpha and N? I assume from your answer you didn't, right?
A I assumed that the fuel delivered to the engine had to be effected by and/or chosen by the input of engine speed and throttle position.
Q All right. But you did not also understand the claims to require that alpha and N be used to calculate a base fuel value, right? You didn't understand it that way?
A That's correct.
Q Okay. Is manifold absolute pressure, MAP, also known sometimes as speed density?
A Yes -- well, no. I'm sorry. I should be careful. Manifold absolute pressure is a sensor that measures the pressure in the manifold. Absolute just means it takes into account atmospheric pressure. And that's all that means.
Q Okay. And are speed density systems usually systems that use a MAP sensor?
A Yes. Now, I didn't make a connection between a sensor -- a system having manifold absolute pressure as being a speed density system, just to be clear.
Q Okay. I want to ask you a question about a few more documents here. Okay. I want to go through the



ones at the top of page 15. Just a couple things basically just to identify a few things for us. Ask the reporter to mark as next, I think it's 864, a copy of a document bearing Berry productions 212 through 234.1.
(Deposition Exhibit Number 864 was marked for identification and is attached herewith.)
BY MR. DE ALCUAZ:
Q Mr. Berry, this seems to be something from you to Andy Horstman dated May 2, 2003. My question to you is is the thing that's attached as the remainder of Exhibit 864 something that you sent to Mr. Horstman on May 2, 2003, under cover of your e-mail?
A Yes.
Q Look at the last page of Exhibit 864, if you would, please.
A Uh-huh.
Q There's some strings of symbols there that relate to directories where things were stored. And in between them, it says, "Worked on by R.D. Berry, April 23, 2003." What's your understanding of what that indicates? In other words, does that indicate the last date it was worked on, the first day it was worked on or just a day it was worked on?
A Well, it certainly wouldn't have been the last

174

claims charts?
A Probably. I know that I did an element by element analysis. And a fairly convenient way to do that would have been using my claim charts. And I know that I formalized those claim charts within a couple weeks of doing the report. So my recollection is that I went through that claim chart in its, you know, ongoing draft form and kept track of the element by element analysis.
Q So that both the claim chart with regard to Ohmori and the claim chart with regard to Mercury Marine was something that you used and you relied on when rendering your opinion, correct?
A Correct, in some form. It wasn't the final claim chart provided to you, but it was in that general structure, yes.
Q Okay. With regard to your obviousness opinions – I'm changing the subject again.
A Okay.
Q Okay?
A Yeah.
Q Did anyone explain to you what the permissible – sorry – what references could be appropriately combined to render an obviousness opinion? Let me ask the question more artfully. Did anyone explain to you what the legal standard was that would

175

allow you to combine two references for purposes of an obviousness analysis?
A Yes.
Q What were you told?
A Well, my understanding, and I may leave something out here, but the reference had to be available to someone in the public prior to more than one year preceding the filing date of the patent, and it had to contain elements of the considered patent. I think that was it.
Q Okay. Did anybody provide you with any guidance concerning when it was appropriate or permissible to combine two references that might meet your two limitations that you just described so as to put those two references together and render an obviousness opinion on the combination of those two?
A No.
Q So in deciding whether it would be appropriate to combine Ohmori with something else, what standard did you use?
A The standard that I used, again, understand, I was a person of ordinary skill in the art in the early '80s, and I had actually been given an assignment to fuel inject a small two-stroke engine. And I tried to look at those references from the context of an engineer

176

who had been given that assignment. When I did that, and I looked at the various references, if I saw a reference that did not have an element that was in the '803 patent and that, in my opinion, a person of ordinary skill in the art would have had some reason to look for, then I felt comfortable looking at another reference that again I had reason to believe a person of ordinary skill in the art would have access to and looked to see if those elements were available in that reference and were taught in a manner that would be combinable and also where the person of ordinary skill in the art would have some motivation to combine those two references.
Q Okay. So the standard that you applied at least in part included examining the references to see what elements of the '803 or the '374 patent were missing and trying to decide where those elements were in other references, and that would provide a motivation to combine them?
A Well, that's a slight mischaracterization, I think. What I am saying is that, again, I've been given an assignment as an engineer to fuel inject a small two-stroke engine. And effectively, it was explained to me that if of these references they are available to me and, having been given this assignment, meeting the requirements of a person of ordinary skill in the art, I

177

then had this stack of information. And as a person who is – who has this assignment and flipping through these references, given the assignment to fuel inject a small two-stroke engine, those are the references that I felt would be most likely combined to create a system that I considered pretty typical of a system in that time. So that's – I really maintained that sort of thinking through my process to avoid what I saw as a potential downfall of second-guessing on my part or a deliberately looking for features.
Q Okay. Let's look at your report, if we could, just in a few specific instances. Okay. With regard to the combination that is described on page seven of your report of the Mercury Marine engine plus the OMC engine.
A Uh-huh.
Q You indicate on the top of page eight that a person of ordinary skill in the art "would have been motivated to combine these two examples of two stroke fuel injection engines because: They were both promoted by their respective companies "and the media" as a state of the art two stroke fuel injected engine systems," and then you go on and talk about an Arctic Cat document. Is that what you – is that your reason why you believe that it would be appropriate to combine the OMC engine with the Mercury Marine engine for purposes of an obviousness

178

examination?
A That's one reason, yes.
Q Are there other reasons not stated in your report?
A I put a certain amount of detail in here, but I'm not – it wasn't my intention to be, you know, comprehensive. That is to say, there are some cases where there are reasons that might explain either motivation or interpretation, and I will have always listed enough to do what I consider to be complete. But at the same time, I tried not to get into more detail than I thought was appropriate. So this is one example of a reason why a person of ordinary skill in the art would be motivated to combine those two.
Q Okay. Is it your intention to testify at trial or at some hearing concerning any other reasons why a person of ordinary skill in the art would be motivated to combine the Mercury Marine engine and the OMC engine?
A If I was asked a question and it illustrated the point and it was a reason that illuminated that decision, yes, possibly.
Q All right. Well, are there any other reasons why you believe sitting here today a person of ordinary skill in the art would have been motivated to combine the OMC engine and the Mercury Marine engine?

179

A Okay. Well, maybe I can explain that. These are – again, I've given this engineer an assignment to fuel inject a two-stroke engine, and it's reasonable to think that that engineer would look at examples that are currently in the marketplace to do that. In this case, the engineer could easily have decided that the fuel – two engines that are fuel injected that do happen to be two-stroke are available for study. And, in my estimation, if I look at what I would like to see in a what I consider to be a production complete system, the combination of those two systems would have provided that.
Q And a production complete system would be a system that has all the attributes claimed and disclosed in the '803 and the '374 patent, right?
A That would be one example of a production complete system, yes.
Q Okay. Is there any other reason why a person of ordinary skill in the art would have been motivated to combine the OMC and the Mercury Marine engines?
A You know, I should clarify that. You asked is a system described by the '803 and the '374 patent a production complete system. The inputs and the outputs and the description given in the patent could describe a complete system. But actually, the implementing of the

180

entire system would tell whether or not it is complete. So forgive me for the fine point. But at the end of the process, the implementation of the system described would be a complete system if it, you know, if it could be completed. And I'm not making a judgment on that now.
Q You're not making a judgment as to whether if one practiced the teachings of the '803 and the '374 patent one would get a complete system?
A I've been asked as an example whether I feel the table enables one of ordinary skill in the art. And I see a problem associated with that, that table.
Q Okay. We'll get to the table. Never fear.
A Okay. So I'm illustrating though why I'm saying that it may or may not describe a complete system.
Q Okay. All right. Let's go on with regard to your obviousness opinions here.
A Okay.
Q On page eight, you describe the combination of the Mercury Marine system and the Bosch Automotive Handbook from 1986. And you state, "A PSA would have been motivated to combine these two references because a PSA would have been generally aware of the benefits of microprocessors in an EFI system." Is that a statement of why you believe it would be appropriate for purposes of an obviousness analysis to combine the Bosch Handbook

181

with the Mercury Marine engine?
A One of the – again, if I'm this person of ordinary skill in the art, and I look at the Mercury Marine system, in that time frame, one feature of that system that I would look to improve is the control system. I think the one that's in there is unnecessarily difficult to work with. And having said that, I could easily – if that was my objective was to improve that proportion of the control system, a reference I easily could have used is the Bosch Automotive Handbook, which described the use of a microprocessor and many of the algorithms that go into it. So yes, that is a reasonable combination.
Q Okay. Well, your report says "would have been generally aware of the benefits of microprocessors in an EFI system" and that that's the reason why somebody would combine it. Can you explain what you meant by that, please?
A I just did.
Q Okay. Is there any other reason why you believe that a person of ordinary skill in the art would have been motivated to combine the Mercury Marine engine and the Bosch Automotive Handbook from 1986?
A Well, again, the Mercury Marine system would have been seen as a application of fuel injection to a

182

two-stroke engine, and the Bosch Handbook is a very commonly held book, generally well respected as far as the information that it provides. So it would be understandable or even expectable for a person of ordinary skill in the art to use the Bosch Automotive Handbook to address any improvements in the system that he might be looking to introduce.
Q Going on, on page eight, you describe the combination of the Mercury Marine engine with several references that are listed on the crossover between pages eight and nine. And on the top of page nine, you state that a person of ordinary skill in the art "would have been motivated to combine any of these microprocessor based Alpha-N type systems with the production Mercury Marine two stroke fuel injection system to develop a fuel injection system that better manages and corrects the limitations of the previously used carburetor." Is there any other basis or reason why you believe it would be appropriate to combine the -- sorry -- the Mercury Marine engine in any of those four listed references there?
A Well, there may be. There certainly are other reasons why a person of ordinary skill in the art might be motivated. This is an example of why that person might be motivated or would be motivated. But I'm sure

183

that if you talk to 100 engineers with the same assignment, you would come up with 20 or 30 or 40 reasons that they would consider different references for different portions of the system.
Q Okay. My question is a little different, and that is, do you as the expert testifying on behalf of Arctic Cat and Suzuki in this case have any other reason that you are going to assert that's not stated in your report why a person of ordinary skill in the art would be motivated to combine the Mercury Marine engine with any of these four listed references on pages eight and nine?
A Well, again, if in the process of this case I'm asked to illustrate a motivation, and any sort of a context is given to me, I could have a new or different motivation as to why this person might be motivated to do this. This is an example of how that person would be motivated.
Q As you sit here today, are you prepared to express any other opinion as to why a person of ordinary skill in the art would have combined the Mercury Marine engine with any of the four references listed at the bottom of page eight and the top of page nine in the report?
A Okay. Let's take a look.
(Perusing document.) Yes. As an example, once

184

a microprocessor is introduced into the system, it reduces the need for manifold absolute pressure as a feed forward component of the control system. Therefore, to simplify the system, the person of ordinary skill in the art would have looked at the Bosch Handbook. Once that person looked at the Bosch Handbook, he would have found numerous examples of control systems that are simpler than the Mercury Marine system. So that would be another motivation.
Q Let me stop you there because I need to ask a clarifying question. So now you're indicating that the motivation to combine the Mercury Marine engine with the four references listed at the bottom of page eight and the top of page nine of your report would have been provided by the Bosch Handbook?
A I'm sorry. I was actually giving you an example of another motivation of the Bosch Handbook. But the other reason why it is somewhat relevant is because some of the references cited here talk and teach the Alpha-N system or the Mono-Tronic system, which is produced by Bosch. And so to the extent that that same information is provided in these references as it is handled in the Bosch Handbook, the person of ordinary skill in the art could have used or would have been motivated to use a paper that taught a system that was simpler, more direct,

185

and actually played more to the strengths of a microprocessor based system as opposed to an analog based system.
Q So the suggestion to combine one of the four references listed at the bottom of page eight and the top of page nine of your report with the Mercury Marine engine would have been provided by the Bosch Handbook?
A No.
Q The '86 handbook?
A I'm sorry. I wasn't clear. What I was saying was that, again, I'm this person of ordinary skill in the art, I've been given an assignment to fuel inject a two-stroke engine, and I'm in the presence of the 100 or so references that are available in this case. That person of ordinary skill in the art would have been motivated having the Mercury Marine system. That person is aware of the fact that most systems in the early '80s and mid '80s used microprocessors, and that's a fairly straightforward improvement on a Mercury Marine system. Most would have been aware of some other features that could potentially improve and -- if they were added to the Mercury Marine system. And the features that I'm talking about, for instance, using only a throttle position sensor instead of having to use a MAP sensor to partially accomplish the pulsewidth. That's one example.

The other improvements in the systems that are described in these references include table usage, storage of pulsewidths in a table, strategies for accomplishing the modification and the control of the engine. All of those again in the hands of a person of ordinary skill in the art would have provided motivation to use those references to combine and improve on the Mercury Marine system.
Q Let's go on in your report. On page nine, you combine the OMC prior art with "nothing beyond his or her personal knowledge" as a person of ordinary skill in the art. So for purposes of 4.4 in your report on page nine, you seem to be saying that someone with knowledge of the OMC engine and nothing beyond that person's generalized personal knowledge as a person of ordinary skill in the art would have rendered the inventions in the '803 and '374 patent obvious. Is that right?
A That's correct.
Q Okay. With regard to the generalized personal knowledge of a person of ordinary skill in the art, is there any particular generalized personal knowledge that you are thinking of there?
A Specific -- I've listed them there. The "Engine temperature based fuel compensation; Battery voltage based injector pulsewidth compensation," and "ECU control



of the fuel pump." All three of those features were commonly known to persons of ordinary skill in the art and would have been easily added to the OMC system.
Q Okay. Then you go on, and you say, "and the understanding of the OMC engine system to duplicate the Alpha-N system(s) described in the '803 and the '374 patents." So as I understand what you're saying is that if a person wanted to have the same features of the '803 and '374 patents, he would have, he or she would have known to go look for those three elements someplace else, right?
A No, that's not what I'm saying. Because I understand that -- if the question were asked of me like that, that would come across as hindsight and second-guessing, and that's not the motivation nor the context that I'm offering these combinations in. I'm saying that it is reasonable for a person of ordinary skill in the art to put together a system which would fuel inject this small two-stroke engine, which would have the features of a control system similar to the '803 or '374 patent. And with that as an objective, those references could be added together, not to accomplish the '803 or '374 patent but rather to develop a system which is not industry unstandard and which overlaps the patents in question.



Q Okay. With respect to the ECU control of the fuel pump, which is one of the things you listed as not being in the OMC engine, the ECU control of a fuel pump is an element in the '374 patent, correct?
A It is in the '374 patent, yes.
Q Right. So the OMC engine in and of itself would not anticipate the '374 patent, correct?
A Well, actually, my clarification -- and forgive me for doing this on the fly. I may correct it later. But my understanding of the '374 -- there's actually a difference between the '374 patent and the '803 patent with relationship to the fuel pump. In the '803 patent, it teaches, I believe it's in the specification, that the pump can be controlled to various power levels, thus saving some electrical energy and also probably reducing noise, et cetera. In the '374 patent, that control is actually altered or changed to see the control as just including an on/off function. The OMC system does manage the fuel pump on/off function. It does not manage the variable power. So it does apply to the '374 but not to the '803.
Q So the OMC prior art in and of itself anticipates the '374 patent but not the '803?
A It includes what would be called fuel pump control. And to the degree that that's an inventive



element, and I understand that that's a legal question, I read the '803 patent as requiring fuel pump control. But I did not read it specifically as to requiring either variable power or on/off. But I do see that in the case of the '374 that it is clearly on/off in claims. And therefore, I know that it does make obvious the '374 patent, and it may given claim constructions and some other readings make the '803 patent obvious.
Q In and of itself?
A In and of itself.
Q Okay. With respect to the -- going back to your report as it relates to the Bosch technical paper in combination with the OMC engine, so we're at the bottom of page nine now in section 4.4.1, to make sure we're on the same page here.
A Yes. I'm with you.
Q You state, "A PSA would have understood the benefits of the elements of the '803 and '374 claims not taught in the OMC system and would have been motivated to incorporate them into a two stroke fuel injection system." That's what you said in your report --
A Correct.
Q -- would be a reason for the motivation to combine these references, right?
A Yes.

Q Okay. So that would presuppose that a person of ordinary skill in the art would have understood what elements were missing in the two inventions, right?

A Again, you know, I will explain that this is written more by an engineer than it is by a lawyer. But what I intended to say there was that if it is reasonable to believe that a person of ordinary skill in the art would see the need, for instance, of a engine cooling temperature sensor and that it would be straightforward either by that person's own knowledge from experience or from numerous references to find that the information he needed to introduce that feature into the control system, he would then overlap the '803 and '374 but not -- I am not suggesting that somehow the person of ordinary skill in the art is motivated to duplicate the '803 or '374 patent.

Q Well, what you do say is that a PSA, a person of ordinary skill in the art, would have understood the benefits of the elements of the '803 and the '374 claims not taught in the OMC system, right?

A Right. I said that, and today I'm letting you know that to the degree that I could only write to a certain amount of detail here, I anticipated explaining certain details. This is one of them as an example. I did not mean to suggest that the person of ordinary skill



in the art would have been handed an '803 patent and say, here, go duplicate it. What I meant to say was that a person of ordinary skill in the art would have been given an assignment to fuel inject a small two-stroke engine and would have found the information in the public domain to do that.

Q Well, isn't it true that in the literature, there would be many, many, many other things that the person of ordinary skill in the art could go look at --

A Absolutely.

Q -- when given that assignment?

A Yes.

Q But it's your opinion that he would have focused -- he or she would have focused in on those three things?

A Could have.

Q Could have?

A Could have, yes, absolutely.

Q But it's not your opinion that they would have?

A Well, if you're talking probability, and we've just given this assignment to a hundred engineers, then ten of them would have found these and combined them. But I'm not saying that all ninety would.

Q Okay. Ten of the people that were people of ordinary skill in the art would have solved the problem,



and the other 90 would not have?

A No, I didn't say that. The other 90 would have found other references to combine to solve the problem.

Q Okay. So basically, you're saying one in ten people of ordinary skill in the art would have found these references that render the invention obvious?

A No. Any specific reference. And please understand I use the one in ten as an example, Tony. I'm not looking to provide that as some sort of a technical estimation of a hundred engineers and what they would do. What I'm explaining is that there is a degree of probability associated with the solving of a problem and that I can understand that a certain number of engineers given that same assignment would have accomplished it specifically as I have described it here. But in all reasonableness, not all of them would have. So I'm just illustrating that there is some probability associated with it. I do have confidence that it would have been easily accomplished given the experience of a person of ordinary skill in the art and the information that was available at that time.

Q Okay. Well, let's see what else you cite in your report.

MR. HORSTMAN: We've been going more than an hour and-a-half. Can we take a break?



MR. DE ALCUAZ: Yeah, happy to take a break. Sure. Actually, can I just finish on the combinations and the suggestions? I'll try and do it quickly.

MR. HORSTMAN: Sure.

BY MR. DE ALCUAZ:

Q There's not very many more, and I think that would be a more logical point, and that way I can confer with Rob about where we go from here because time is a-wasting as well.

With respect to page 10 in your report that discusses in 4.4.3, the "OMC combined with NEC Technical Paper," you say, "the PSA would recognize the absence of the elements of the '803 and the '374 claims not taught in the OMC system" and that that would have provided a motivation to go combine references to find those missing elements. Doesn't that presuppose a knowledge of the '803 and the '374 claims?

A No. Those elements exist outside of the '803 and '374 patents. Again, forgive me for using a convenient way of stating it. My intention was not to say that he would have read the '803 or '374. What I am saying is there are elements that are described in the '803 patent that are not in the, in this case the OMC system, and that a person of ordinary skill in the art

would have been aware of those elements, not via the '803 patent or the '374. He just would have been available and aware of those elements, and then he would have found a way to introduce those elements into the system.
Q Well, isn't it true that there's a nearly infinite number of other elements that he could have gone off and looked for to try and improve the performance of that engine?
A Well, and here again, I have some benefit, because I would ask the same question. But I have the benefit of having been a person of ordinary skill in the art in this time frame with the same assignment, and I know that I did use Bosch handbooks and that I was aware of Mercury Marine engines and that my experience at Ford Motor Company on four-stroke engines was used in the solution of the problem. So yes, you're right. There are many, many places that the person of ordinary skill in the art could have gathered this information. These are some examples of those.
Q Well, no, that wasn't my question. My question was, isn't it true that in addition to whatever the missing features were in the particular combination we're discussing, there's a myriad of other potential features that people of ordinary skill in the art could have looked to in different publications. Isn't that right?



A Well, just so you know, the system that we developed, and I say we, Intelligent Controls developed –
Q I'm going to interrupt you.
A But let me finish this answer.
Q All right.
A The system that we developed independent of any patents or any other work, we were asked by Cuyuna to fuel inject a two-stroke engine, and the system that we gave them and described included throttle angle, engine speed, engine coolant temperature sensor, barometric pressure and inlet air temperature. And it coordinated the fuel and the injection of fuel on the basis of an ignition pulse. So what I'm telling you is that, yes, there are a myriad, there are thousands of combinations. But given the nature of the problem being solved and the information that was available at the time, it was reasonable for this person of ordinary skill in the art to come up with a system similar to and effectively equal to the '803 or '374 patent.
Q Just to follow up on that answer. Were all the sensors that you described that were in the Cuyuna engine actually used in the Cuyuna engine –
A No.
Q – or were some of the sensors we're talking



about here only contemplated for –
A That's correct. They were contemplated. But it's not a coincidence that the sensors that were contemplated were the same sensors as were used in the '803 system.
Q By the way, is there any place in your report that you say that a part of the motivation that you had for believing that it was legally permissible and appropriate for combining these prior art references was your own personal experience at ICI or Ford Motor?
A I don't know.
Q Well, there isn't, is there?
A I don't know.
Q Okay. Let's go on, and we'll get done and take a break. With respect to the page 10, you say, a person of ordinary skill in the art, the bottom of the page, "would have combined the teachings of the Bosch Handbook with the following additional materials to make the claims of the '803 and the '374 patented system obvious." So isn't what you're saying there that a person of ordinary skill in the art would have been motivated in hindsight to combine Bosch with these references in order to have the same thing that was in the '803 and the '374 patent?
A You've asked that, and I've answered it.



Q Well, have I correctly quoted your report?
A Again, I'll state it again. Forgive the fact that it was written by an engineer who tried to be economical with words and in this case stated something in a way that can and apparently has been read incorrectly. What I am stating is that a person of ordinary skill in the art with the assignment of fuel injecting a two-stroke engine would have been motivated to combine these references in a way that would have developed a system that would have made the '803 and '374 patents obvious.
Q Okay. I'll skip over a couple here in the interest of time. At the bottom of page 11, you state, "A PSA would have been motivated to combine the Ohmori teachings with the Okumura teachings because the Ohmori paper taught the use of all of the elements of the '803 and '374 claims not taught by the Okumura system and a PSA would have understood the benefit of having each of these elements in his or her EFI system." So again, isn't what you're saying in your report anyway that, existing from today, that a person of ordinary skill in the art would have been aware of the missing elements when compared to the '803 and '374 patent and would have gone looking for them to duplicate those – the claim systems?

pressure, the only two points at which those two signals would be to your way of thinking equal would be at start-up and at wide open throttle, correct?
A Right.
Q Okay.
A And I say wide open throttle. But the system can be designed such that at some lower rpm a throttle that might only be three-quarters could also approximate. But the point is that it is not a cruising condition. It's typically an accelerating condition.
Q Okay. Can you tell me what units were used to store the fuel values in the analog system in the Mercury Marine engine?
A No.
Q Do you know if the units were a unit representing a fuel value?
A No.
Q You mentioned earlier that you were, at a time were a person of ordinary skill in the art?
A Correct.
Q What time was that?
A The -- well, to -- I suppose I still am. But when I started work at Ford Motor Company in '73, probably by the time I was late '70s, I would classify myself as a person of ordinary skill in the art.



Q Okay. In 1986 or so, how many years of experience in fuel system designs did you have?
A In electronic fuel injection, about ten. Ten.
Q Okay. Were you a person of ordinary skill in the art at that point or greater than ordinary skill in the art the way you've defined ordinary skill in the art?
A I've met my description of a person of ordinary skill in the art.
Q Did you exceed your description by at least a few years of experience?
A Well, my intention in describing a person of ordinary skill in the art was the minimum. It was not my intention to describe the average. So in my mind, I might have been average or even a little more than average but not off the scale of my description of a person of ordinary skill in the art.
Q Okay. As you sit here today as the expert on behalf of two of the parties in this case, do you consider yourself to be a person of above ordinary skill in the art?
A Again, I would characterize above average. But I know there are many people who are more skilled in the art than I am, especially given that I haven't had hands-on experience in ten, twelve years.
Q With respect to your testimony that the Mercury



Marine system stored an Alpha-N fuel table, did the Mercury Marine store an Alpha-N fuel table in a data processor?
A Yes.
Q Using what definition of data processor?
A The definition offered in the 1993 IEEE dictionary.
Q Is that the definition you used for purposes of all of your obviousness and anticipation analysis with respect to the '803 and the '374 patent?
A All of my analysis was done in the context of that definition, yes.
Q Okay. With respect to the Mercury Marine engine, did you say that you had actually seen this engine at some point?
A Uh-huh.
Q When was that?
A In the early '80s.
Q And where was that?
A At Mercury Marine.
Q Can you tell me what year, please?
A It would have been '83 or '84.
Q All right.
A Eighty-four -- it could have been as late as '85, but it would have been '83 to '84, in that time



frame.
Q And which Mercury Marine engine do you recall seeing?
A It was an engine that was shown to us, to me, maybe it was an us, but at least to me, as an example of the engine that they wanted our control unit to be able to operate.
Q Okay. And how do you link up that engine with the engine we're talking about here that's described in all this material in your report?
A It was described to me as their Formula 1 engine.
Q Okay. And with respect to your looking at that engine, did you tear it down?
A No.
Q Did you reverse engineer it?
A No.
Q Did you drive it?
A Maybe. I can't remember whether we drove it or not. We had several on lake test drives. By far, the majority of those were with our control unit. But one or more of those test drives might have been with the example engine.
Q Okay. With respect to the OMC engine, which, as I understand your testimony, included a microprocessor,

226

would a person of ordinary skill in the art have had access to the software, source code, microcode, however it was stored in, in the microprocessor that implemented the OMC system?
A Possibly.
Q Why do you say possibly?
A There's a method that's --
Q Yeah.
A There's a method that's not too uncommon, particularly with digital systems, where engineers have found ways of shorting two pins and reading one, two, or three other pins and downloading the program on the microprocessor.
Q Okay. Is it your testimony that a person of ordinary skill in the art would have needed to do that to understand the operation of the OMC engine?
A No.
Q Is it your understanding or position with respect to your opinions that in order for a person of ordinary skill in the art -- I'm sorry -- to understand the OMC engine as you've described it in your report, that that person would need to have physical access to an engine?
A That would be preferable. I would have to go back and look at my analysis to know whether the elements

227

that I found were findable on documents other than what I assumed would be available to the person of ordinary skill in the art in the presence of the engine.
Q Okay. Well, you rely on the OMC engine and the Mercury Marine engine as distinct from the documents describing those engines as the prior art, correct?
A In addition to the documents, yes.
Q Oh, so you rely on those documents?
A Absolutely.
Q Do you rely on those documents as the prior art or as documents that indicate what the attributes of the engine were?
A As part of the prior art. Those documents were provided with the engine when the engine was sold.
Q Okay. With respect to your anticipation opinion based upon the -- let's put these in logical order here -- based upon the Mercury Marine engine, it is the engine itself as distinct from the documents that you testify anticipates the invention, correct?
A I'm sorry. Say that again, please.
Q With respect to your opinion that the 1986 Mercury Marine fuel injected engine anticipates the inventions in the patents ensued, you're referring to the engine as the thing that anticipates as distinct from documents, correct?

228

A No. Again, that's probably too simplistic of a description. But I considered the engine and the documents that were provided with the engine as the prior art.
Q Okay. Does your report say that the Mercury Marine engine anticipated the claims of the invention or that the Mercury Marine engine together with all the documents anticipate the invention?
A Well, the report does say that I used Mercury Marine materials to come to my conclusion. And that's -- that included the engine and the provided materials.
Q Okay. So would it be more correct for your report to read that the Mercury Marine engine together -- itself together with all the documents you reviewed about the Mercury Marine engine anticipates the inventions and the patents ensued?
MR. HORSTMAN: Objection, argumentative. You can answer.
THE WITNESS: Well, I think it says that. But also, I believe that the publicly available documents were sufficient to provide a person of ordinary skill in the art with enough information to develop the system. I did in some cases use documents that were not publicly available to validate and/or check the

229

information that I read on the documents that I did feel were publicly available.
BY MR. DE ALCUAZ:
Q Okay. Is there any single thing or document that either is or describes the Mercury Marine engine that taken by itself discloses all of the elements of the claimed inventions in the two patents ensued?
A I don't know. I would have to redo my analysis and look at the individual items that I considered to see if any one of them had every claim element.
Q Okay. When you saw this engine in 1983 or thereabouts, did you take any notes about what the engine had by way of attributes?
A I actually developed a specification that I understood was similar to the strategy and the system that was on the engine, so -- but I don't remember whether that information was provided to me or in what form that information was provided to me. I would guess that I did get some of the information from the engine and some of it from Mr. Stearzel and some of it from documents that he provided me.
Q And we're talking about your visit to Mercury Marine --
A Correct.
Q -- in '83, '84, thereabouts?

230

A Correct.
Q Okay. Is there any document you still possess that would remind you what you learned and saw at that time?
A Yes.
Q What's that?
A It's a specification that I wrote for Mercury Marine, and that's been provided to you.
Q Okay. Any other documents you can think of?
A I know there were letters written, but I think really the specification is the clearest indicator.
Q Okay. At one point in your report, I think it's in section 4.4, you refer to the Mercury -- I'm sorry -- to the OMC 1985 engine as a production engine.
A Uh-huh.
Q This is the engine where, to our information, before 1987 there was only relatively few made and sold. Do you think it's fair to characterize an engine where there was fewer than 20 copies sold before the critical date here as a production engine?
MR. HORSTMAN: Objection, argumentative. You can answer.
THE WITNESS: Again, as an engineer, I use the word production. I know that what I -- my inference or connotation was publicly

231

available, and I didn't use that term.
BY MR. DE ALCUAZ:
Q Okay. With respect to the -- on the Soltau reference, the Soltau reference is a reference you cited in your paper, correct?
A Uh-huh.
Q I'm sorry. You have to say yes or no, please.
A Yes.
Q I know it's getting late, but we'll try and stick with it.
A Okay.
Q And the Soltau paper is a paper that you at least recite as something you considered in your report.
A Yes.
Q All right. The Soltau paper seems to describe that for -- seems to state that "for every inch of mercury pressure drop in the atmosphere, there is a result of fewer requirement on the order of 3 percent." Is that, to your knowledge, conventional wisdom?
A Yes.
Q Okay. Was that information, to your knowledge, relatively -- well, sorry -- well known in the art in 1985 and 1986, that correlation?
A There was a correlation between barometric absolute pressure -- it was actually a term of air

232

density. So there were two terms to understand the air density, and they were inlet air temperature and -- I should just say air temperature and barometric pressure. And as those varied, as is typically varied as altitude changes, there is a change in the required amount of fuel to be delivered to the engine.
Q All right.
A And that relationship was well understood.
Q Okay.
A Whether it was 3 percent to per inch of mercury, I can't say whether that was the characteristic without looking at it more.
Q Okay. With respect to the OMC engine, are you familiar with the testimony that folks gave and the documents that depict a set of four switches that were used to change the fuel on that?
A Yes.
Q Okay. And is it consistent with your understanding that, depending on what the position of those switches were, you could go up either 2 or 4 percent depending over a range of say 12 to 16 percent?
A Yes. This is the OMC?
Q Yes.
A Yes.
Q Okay. What was the purpose of those switches as

233

you understood the OMC engine -- well, withdraw that question for just a time here. Mr. Maier testified that those switches in that resulting 12 to 16 percent change in the possible fuel mixture was to compensate for humidity. Do you agree with that?
A I agree that that is one change that you could, one compensation you could use them for. Personally, my experience with people that I knew that were associated with the racing tended to like to make adjustments on their own. And I can easily understand that OMC would have provided a system to give them some of that adjustment. I think, again, one rationale could be humidity. On a very hot, humid day in Detroit compared to a very dry day at some lake in the desert, you could have a legitimate change in the airflow per cylinder filling. But it also, I think, offered the driver or the operator an opportunity to tune the engine.
Q How much of a change in the fuel mixture would be dictated, to your way of thinking, given a maximum change in humidity basically from 100 percent down to zero?
A Right. I don't know.
Q Would it be less than a percent?
A I would have to do an analysis.
Q Okay. Do you have any --

234

A There are other considerations. As the humidity changes, the tendency to detonate also changes. And it could easily be that as the humidity went down, the operator would use additional fuel to manage that detonation, and that could be 6, 8, 10 percent.
Q Given the fact that the Soltau article, which you cite as something you considered, talks about a 3 percent change for every inch of mercury pressure drop, do you think that the most likely use of those switches or the intended use of those switches was to compensate for changes in barometric pressure when you move the boat from Lake Mead to Lake Tahoe?
A Is this OMC?
Q Yeah.
A No. That had an automatic system. There's no question that that system was automatic and dynamic in its control.
Q Were you ever in the physical presence of the OMC 1985 engine?
A Yes.
Q So you've seen both the Mercury Marine and the OMC engine?
A Yes.
Q When were you physically in the presence of the 1985 OMC racing engine?

235

A That would have been '84, '85, maybe as late as '86, in that time frame.
Q And when you were in the physical presence of that OMC 1985 engine, did you get a chance to tear it apart, look inside of it, figure out how it worked?
A As I remember, I know I was in the presence of a fully assembled engine. I know I was in the presence of several of the components, including wiring harnesses and sensors and ECU. But I do not specifically remember doing any tear down myself.
Q Did anyone give you a copy of the source code for the OMC engine at the time when you observed it? By source code, I mean the code that operated in the microprocessor.
A Yeah. At the time, I may have been given a, what we call the documentation file or a spec file that would have described at a higher level the function of the engine. But I doubt very much that I was given source code. I don't -- source code really isn't very useful in understanding -- well, at least not for me, in understanding how the system works in the hands of somebody else. Source code could be learned from more so, but I have tended to learn more from the higher level description.
MR. DE ALCUAZ: Okay. Let's take a break.

236

THE VIDEOGRAPHER: We are going off the record. The time now is 5:35.
(Recess, 5:35 p.m. until 5:59 p.m.)
THE VIDEOGRAPHER: We are back on the record. The time now is 5:59.
BY MR. DE ALCUAZ:
Q Mr. Berry, referring to page 12 of your report, which is Exhibit 853, under the heading 4.7, you state an opinion about three-quarters of the way down the page, "In my opinion, the 'fuel table' provided to the PTO by Chasteen is not representative or typical of a fuel table that would be created in the development of the two stroke fuel injection system described in the '803 and the '374 patents." Have you been asked to form any other opinion with regard to the fuel table other than those that are expressed in this paragraph -- sorry -- in this section 4.7 of your report? I'll withdraw that and be more specific.
A Thank you.
Q Were you asked to form an opinion by counsel that the fuel table and the issues you described relating to the fuel table rendered the patent invalid?
MR. HORSTMAN: Objection, mischaracterization. You can answer.
THE WITNESS: I know that enablement is a

237

term used and that it deals with the ability to use the information presented in the patent to then build an operable system. And that is a consideration in making a patent valid. But I was not asked to carry this thought into whether I felt that it made the patent valid or invalid.
BY MR. DE ALCUAZ:
Q Okay. In the beginning of your report, you recite section 112, which is the specification section of the patent codes with regard to written description enablement and best mode. But I'm understanding your answer to be that you have not and you do not intend to express any opinion as to whether the disclosure of the '803 and the '374 patent enables -- discloses the best mode or discloses adequate.
A You bring up a good point. I know that in the context this is an invalidity report. I was asked whether or not in my opinion the patent was valid. To some degree, I am looking at the enablement to determine the validity. So I'll correct myself. This, my opinion relative to the enablement does -- is part of my opinion on whether or not the patent is valid.
Q Okay. What standard was explained to you, if any, for determining whether a patent does or does not