UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

REPORT AND RECOMMENDATION

* * * * * * * * * * * * * * * * * * *

Arctic Cat, Inc., a Minnesota Corporation,

Plaintiff,

vs.

Injection Research Specialists, Inc., a Colorado corporation, and Pacer Industries, Inc., a Missouri corporation,

Defendants.

and

Injection Research Specialists, Inc., a Colorado corporation, and Pacer Industries, Inc., a Missouri corporation,

Counterclaimants,

vs.

Arctic Cat, Inc., a Minnesota corporation, and Suzuki Motor

Corporation, a Japanese
Corporation,

Counterdefendants. Civ. No. 01-543 (MJD/RLE)

* * * * * * * * * * * * * * * * * * *

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Motion of Arctic Cat, Inc. ("Arctic Cat"), and Suzuki Motor Corporation ("Suzuki"), for Summary Judgment on the Basis of Invalidity of the '803 Patent Under Title 35 U.S.C. §103 for obviousness, and the Motion of Arctic Cat, and Suzuki, for Summary Judgment of No Infringement of the '803 Patent.

On May 25, 2004, the Court conducted a Markman Hearing, at which the parties argued their construction of the claims of the '803 Patent. See, Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 391 (1996). On the following day -- May 26, 2004 -- the Court heard argument on the Motions, at which time, Arctic Cat appeared by Annamarie A. Daley, and Andrew W. Horstman, Esqs.; Suzuki appeared by Thomas H. Jenkins, and William F. Forsyth, Esqs.; and Injection Research Specialists, Inc., and Pacer Industries, Inc. (herein

collectively referred to as "IRS"), appeared by Anthony de Alcuaz, and Robert J. Blanch, Esqs.

For reasons which follow, we recommend that the Motion of Arctic Cat, and Suzuki, for Summary Judgment on the Basis of Invalidity of the '803 Patent Under Title 35 U.S.C. §103, for obviousness, be denied, and we recommend that the Motion of Arctic Cat, and Suzuki, for Summary Judgment of No Infringement of the '803 Patent be granted, in part.

II. Factual and Procedural Background

Arctic Cat is a manufacturer of snowmobiles, while Suzuki is a manufacturer of engines which, with regularity, are employed in snowmobiles. Suzuki supplied Arctic Cat with engines for use in Arctic Cat's snowmobiles. IRS claims that the Arctic Cat snowmobiles, which were equipped with Suzuki engines, infringe upon IRS's patents.

One of the patents, which is at issue in this litigation, is United States Patent No. 34,803 (the "'803 Patent"), which was issued on December 6, 1994, and which is a reissue of United States Patent No. 4,901,701 (the "'701 Patent"). Also at issue is United States Patent No. 5,813,374 (the "'374 Patent"), which was issued on September 29, 1988, and which claims priority, as a continuation of the '803 Patent. The '374 Patent contains broader claims than the '803 Patent. United States Patent

No. 6,062,202 (the "'202 Patent"), which was issued on May 16, 2000, is a continuation of the '374 Patent. All of the patents cover Electronic Fuel Ignition ("EFI") systems.

In addition, United States Patent No. 34,079 (the "'079 Patent") is also involved in the case. The '079 Patent is a reissue of United States Patent No. 5,024,205 (the "'205 Patent"). The '079 Patent is directed to a narrow improvement in EFI systems -- specifically, a battery conservation circuit that disconnects the battery from the electronic control unit ("ECU") of the EFI system, if the ECU determines the battery voltage is falling low.

In 1990, IRS filed suit against Polaris Industries ("Polaris"), Fuji Heavy Industries, Ltd. ("Fuji") -- which was Polaris's engine supplier -- and Unisia JECS Corporation ("JECS") -- which was the company that supplied an EFI system to Polaris. In that suit, which the parties refer to as the "Polaris Litigation," IRS alleged that Polaris, and Fuji, had misappropriated IRS's trade secrets and that Polaris, Fuji, and JECS, had infringed upon the '701 and '205 Patents. The suit was stayed during the reissue proceedings which involved the '701 and '205 Patents, and which resulted in the issuance of the '803 and the '079 Patents.

After that reissuance, the Court granted Summary Judgment in favor of Polaris, Fuji, and JECS, on the patent infringement claims, finding that none of those entities had infringed the '803 or the '079 Patents. The trade secret claims went to Trial, at which IRS ultimately succeeded, and was awarded a Verdict of approximately $44.6 million. JECS also supplied Suzuki with EFI-systems for use in Suzuki engines, which are, in turn, installed in Arctic Cat's snowmobiles. JECS is not, however, the only supplier of EFI-systems to Suzuki for use in the Arctic Cat snowmobiles.

While the Polaris suit was pending, IRS wrote to Arctic Cat, accusing it of infringing the '803 Patent, and notifying Arctic Cat that IRS would, by "no later than [the] conclusion of the Polaris litigation, [] bring suit against [Arctic Cat] for infringement of the '803 patent claims, and for other causes of action based on misuse by [Arctic Cat] of the information supplied by IRS in 1988 and 1989." Arctic Cat, Inc. v. Injection Research Specialists, Inc., 2001 WL 1628634 at *1 (D. Minn., September 12, 2001)(Order denying IRS's Motion to Dismiss), quoting Doscotch Declaration, Exhibit 8. IRS did bring suit against Arctic Cat, alleging claims of trade secret misappropriation, and fraud. However, no patent infringement claims were asserted against Arctic Cat until this action was commenced.

On March 28, 2001, Arctic Cat commenced this action, which seeks a Declaratory Judgment of non-infringement, and invalidity, of the ‘803 Patent and the ‘374 Patent. On September 26, 2001, IRS filed Counterclaims alleging infringement of the ‘803 Patent against both Arctic Cat and Suzuki. Also, on September 26, 2001, IRS applied for a reissue of the ‘374 Patent in the United States Patent and Trademark Office.

We reserve further, more elaborate, discussion of the factual and procedural background of the parties’ claims and defenses for recitation, as appropriate, in the context of each, individual Motion, for the pertinent background information varies according to the Motion under consideration. Consequently, with the foregoing as a backdrop, we turn to the merits of the parties’ Motions.

## III. Discussion

A. Standard of Review. Rule 56(c) of the Federal Rules of Civil Procedure provides that Summary Judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Rule 56(c), Federal Rules of Civil Procedure. Only disputes over facts that might affect the outcome of the suit

under the governing substantive law will properly preclude the entry of Summary Judgment. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also, Liquid Dynamics Corporation v. Vaughan Company, Inc., 355 F.3d 1361, 1367 (Fed. Cir. 2004). Summary Judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. Id. Summary Judgment is to be granted only where the evidence is such that no reasonable Jury could return a Verdict for the nonmoving party. Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact, and that the movant is entitled to Judgment as a matter of law. See, Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also, Itron, Inc. v. Benghiat, 169 F. Supp.2d 1073, 1080 (D. Minn. 2001). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the Record. See, Vette Co. v. Aetna Casualty & Surety Co., 612 F.2d 1076 (8th Cir. 1980); see also, Transclean Corporation v. Bridgewood Services, Inc., 290 F.3d 1364, 1369 (Fed. Cir. 2002). However, the nonmoving party may not merely rest upon allegations, or denials, in its pleadings, but it must set forth

specific facts by affidavits or otherwise showing that there is a genuine issue for Trial. See, Burst v. Adolph Coors Co., 650 F.2d 930, 932 (8th Cir. 1981).

1. Standard of Review -- Patent Infringement. A determination of patent infringement is a two-step inquiry. W.E. Hall Co., Inc. v. Atlanta Corrugating, LLC, 370 F.3d 1343, 1350 (Fed. Cir. 2004), citing Anchor Wall Sys. v. Rockwood Retaining Walls, Inc., 340 F.3d 1298, 1306 (Fed. Cir. 2003). The Court must first interpret the claim, and determine the scope, and the meaning, of the asserted patent claims, and then compare the properly construed claims to the allegedly infringing device. Liquid Dynamics Corp. v. Vaughan Co., Inc., supra at 1367; see also, Durel Corporation v. Osram Sylvania Inc., 256 F.3d 1298, 1303 (Fed. Cir. 2001). The first step -- that of claim construction -- is a question of law. Transclean Corp. v. Bridgewood Services, Inc., supra at 1370, citing Markman v. Westview Instruments, Inc., supra at 970-71; see also, Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998). The second step -- that of comparing the properly construed claims to the accused product -- is a question of fact. Liquid Dynamics Corp. v. Vaughan Co., Inc., supra at 1367, citing Bai v. L & L Wings, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

2. Standard of Review -- Invalidity for Obviousness. "Likewise, a determination of obviousness begins with a construction of the patent claims, followed by a comparison of the properly construed claims to the prior art." Transclean Corp. v. Bridgewood Services, Inc., 77 F. Supp.2d 1045, 1065 (D. Minn. 1999), aff'd in relevant part, 290 F.3d 1364 (Fed. Cir. 2002), citing Key Pharmaceuticals v. Hercon Laboratories Corp., 161 F.3d 709, 714 (Fed. Cir.1998); see also, Norian Corporation v. Stryker Corporation, 363 F.3d 1321, 1325 (Fed. Cir. 2001); U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997); Teleflex Inc. v. KSR Intern. Co., 298 F. Supp.2d 581, 591 (E.D. Mich. 2003); Rogers v. Desa Intern., Inc., 166 F. Supp.2d 1202, 1204 (E.D. Mich. 2001).

A determination that a patent is invalid, as obvious under Title 35 U.S.C. §103(a), requires a finding that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Title 35 U.S.C. §103(a). "The ultimate determination of whether an invention would have been obvious under section 103(a) is a legal conclusion based on underlying findings of fact." Velander v. Garner, 348 F.3d 1359, 1363 (Fed. Cir. 2003), citing In re Kotzab, 217 F.3d 1365, 1369 (Fed. Cir.

2000); see also, Akamai Technologies, Inc. v. Cable & Wireless Internet Services, 344 F.3d 1186, 1195 (Fed. Cir. 2003)("While the ultimate conclusion of obviousness is for the court to decide as a matter of law, several factual inquiries underlie this determination."). Necessarily, we begin our analysis of the Motions with claim construction.

B. Legal Analysis. Arctic Cat and Suzuki argue that the Court's claim construction, in the Polaris Litigation, constitutes collateral estoppel, or issue preclusion, as to this litigation. As we detailed, in our Report and Recommendation of August 6, 2004 -- in which we recommended that Arctic Cat's, and Suzuki's, Motion for Summary Judgment on res judicata grounds be denied -- on February 11, 1997, the Polaris Court granted the Motion of JECS for Summary Judgment on IRS's claims of infringement, and found that the JECS's EFI systems did not infringe the '803 Patent. In reaching its decision on infringement, the Court also set forth its construction of the claims in the '803 Patent.

At the outset, we expressly recognize that Arctic Cat, and Suzuki, are not rearguing their Motion for Summary Judgment on res judicata grounds, but rather, they now urge issue preclusion/collateral estoppel which, while based on similar policy rationales, is a separate and wholly different doctrine. As our Court of Appeals has

recently explained the distinction, "'"[r]es judicata" is the term traditionally used to describe two discrete effects: (1) what we now call claim preclusion (a valid final adjudication of a claim precludes a second action on that claim or any part of it); and (2) issue preclusion, long called "collateral estoppel" (an issue of fact or law, actually litigated and resolved by a valid final judgment, binds the parties in a subsequent action, whether on the same or a different claim).'" Leonard v. Southwestern Bell Corp. Disability Income Plan, 341 F.3d 696, 701 (8th Cir. 2003), quoting Thomas v. General Motors Corp., 522 U.S. 222, 233 n. 5 (1998).

For purposes of issue preclusion, the Federal Circuit Court of Appeals has determined that the law of the regional Circuit governs. See, Novartis Pharma-ceuticals Corp. v. Abbott Laboratories, 375 F.3d 1328, 1333 (Fed. Cir. 2004), citing RF Delaware, Inc. v. Pacific Keystone Technologies, Inc., 326 F.3d 1255, 1261 (Fed. Cir. 2003). "We look to state law in determining whether to apply issue preclusion * * *." Manion v. Nagin, 394 F.3d 1062, 1066 (8th Cir. 2005), quoting Liberty Mut. Ins. Co. v. FAB Bearings Co., 335 F.3d 752, 758 (8th Cir. 2003). Under Minnesota law, "[a] party is precluded from litigating an issue if the following conditions are met: 1) the issue to be litigated is identical to one already decided in a prior adjudication; 2) the earlier case resulted in a final judgment on the merits; 3) the party raising the issue was

a party to or in privity with a party to the prior case; and 4) the party was given a full and fair opportunity to be heard on the issue. Crumley v. City of St. Paul, 324 F.3d 1003, 1006 (8th Cir. 2003), citing Willems v. Com'r of Pub. Safety, 333 N.W.2d 619, 621 (Minn. 1993). Here, Arctic Cat and Suzuki are seeking to apply issue preclusion against IRS, which was a party to the Polaris Litigation, and which had a full and fair opportunity to litigate the claim construction issue. Accordingly, the third and fourth elements of issue preclusion are satisfied.

The first element is also satisfied, as it is only the claim construction of the '803 Patent to which Arctic Cat and Suzuki argue that issue preclusion applies, and the claims of the '803 Patent were previously construed in the Polaris Litigation. Further, IRS fully briefed and argued the issue of claim construction prior to the Court's ruling in the Polaris Litigation and, as such, the fourth element of issue preclusion is established. Moreover, the construction of the claims of the '803 Patent was essential to the Court's finding that JECS did not infringe the '803 Patent because, as we have expressed, the first step in considering any Motion for Summary Judgment, on the issue of infringement, is to "first interpret the claim and determine the scope and the meaning of the asserted patent claims, and then compare the properly construed claims

to the allegedly infringing device." Liquid Dynamics Corp. v. Vaughan Co., Inc., supra at 1367.

IRS responds that issue preclusion should not apply to the Polaris Court's Order of February 11, 1997, because it was not a final Judgment on the merits. In support of that argument, IRS advances the same contentions that it did in opposition to the finality of the same Order for res judicata purposes -- namely, that IRS entered into a covenant not to sue, which divested the Polaris Court of jurisdiction prior to the Court's dismissal with prejudice of all of the patent issues, and that it never appealed the Court's claim construction, as it was only an interlocutory ruling. Since we have already held, in the context of the Motion for Summary Judgment on res judicata grounds, that the Order of February 11, 1997, became a final Judgment on the merits when the Polaris Court issued its final Order of Dismissal on August 28, 1997, which dismissed all of the patent claims with prejudice, the finality of the Polaris Court's claim construction is the law of this case -- if our prior recommendation is adopted by the District Court -- and we need not address, in full, an issue that we have already resolved.[1]

[1]See, Hartley v. Mentor Corporation, 869 F.2d 1469, 1472 (Fed. Cir. 1989)
(continued...)

IRS also argues that issue preclusion should not apply because the Polaris Court's claim construction was in error. IRS relies on the holding of the Supreme Court, in Kremer v. Chemical Const. Corp., 456 U.S. 461, 481 (1982)[emphasis supplied], that a "[r]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of **procedures** followed in prior litigation." Here, IRS does not assert that the procedures followed by the Polaris Court were inadequate, or unfair, nor does the Record support, or so much as suggest, that the procedures followed by the Polaris Court were inappropriate. Rather, IRS argues that the Polaris Court's construction of the claims of the '803 Patent was flawed, in essence, because IRS disagrees with the construction that Court rendered.

---

[1](...continued)
("[A] stipulated final judgment may rest in part on a court's rulings during the course of a trial and in part on the agreement of the parties," and "[t]hus, that a judgment is entered by stipulation does not in an of itself remove the effect of a court's prior determination of specific issues in the litigation."); see also, Larken, Inc. v. Wray, 189 F.3d 729, 732 (8th Cir. 1999), citing Chase Manhattan Bank, N.A. v. Celotex Corp., 56 F.3d 343, 345 (2nd Cir. 1995)(Voluntary dismissal with prejudice)("When the parties to a previous lawsuit agree to dismiss a claim with prejudice, such a dismissal constitutes a 'final judgment on the merits' for purposes of res judicata."); Black Clawson Co., Inc. v. Kroenert Corp., 245 F.3d 759, 763 (8th Cir. 2001)("[T]he settlement agreement has the effect of a final judgment on the merits of the case."); cf., In re Piper Aircraft Distribution Sys. Antitrust Litig., 551 F.2d 213, 219 (8th Cir. 1977)(Res judicata and collateral estoppel generally inapplicable to voluntary dismissal without prejudice).

While IRS cites Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 332-33 (1971), for the proposition that an "issue may be relitigated if the court wholly failed to grasp the technical subject matter and issues in the suit," Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Responsive Brief Regarding Claim Construction of U.S. Patent No. Re. 34,803, at p. 3, the exception upon which IRS relies is extremely narrow in scope. In Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc., 170 F.3d 1373, 1380 (Fed. Cir. 1999), the Federal Circuit confronted the same objection to the application of issue preclusion -- that the prior decision was predicated on a failure to grasp the subject matter -- and concluded that the argument was "without merit." In explaining its ruling, the Court stated:

> As an initial matter, our role is limited to reviewing the district court's application of collateral estoppel, not the correctness of the jury verdicts in Mova [i.e., the earlier case]. Under Blonder-Tongue, a district court's inquiry into whether the plaintiff was afforded a full and fair opportunity to litigate is quite narrow and does not involve a judgment on the merits:
>
> > [I]t is clear from the case law that an inappropriate inquiry is whether the prior finding of invalidity was correct; instead, the court is only to decide whether the patentee had a full and fair opportunity to litigate the

> validity of his patent in the prior unsuccessful suit. Stevenson [v. Sears, Roebuck & Co.,] 713 F.2d [705], 709 [(Fed. Cir. 1983)] * * *; see also Mississippi Chem. Corp. v. Swift Agric. Chem. Corp., 717 F.2d 1374, 1379 * * * (Fed. Cir. 1983).
>
> The comprehensive Opinion and Order issued by the Mova court leave no question that, as a matter of law, Upjohn was in fact accorded a full and fair opportunity to litigate.

Id.

Indeed, in the case of Stevenson v. Sears, Roebuck & Co., 713 F.2d 705, 709 (Fed. Cir. 1983), which was favorably cited and quoted, by the Court in Pharmacia, the Federal Circuit applied issue preclusion even when the Judgment of invalidity followed an earlier Judgment of validity, which presented the Court with inconsistent prior rulings. No such inconsistency is presented here.

Moreover, we are not persuaded that the Polaris Court committed "one of those relatively rare instances where the courts wholly failed to grasp the technical subject matter and issues in suit." Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, supra at 333. To the extent that we, IRS, or Arctic Cat and Suzuki, for that matter, disagree with the Polaris Court's claim construction, an incorrect legal decision does not bar the application of issue preclusion. See, Ossman v. Diana

Corp., 825 F. Supp. 870, 876 (D. Minn. 1993). In Ossman, the Court explained as follows:

> Even if the Wisconsin court reached the wrong legal conclusion, that fact, without more, does not warrant the preclusion of collateral estoppel. Generally, the court does not consider the propriety of another court's ruling in determining whether it should give preclusive effect to the prior court's order. See e.g., Bates v. Union Oil Co. of California, 944 F.2d 647, 650 (9th Cir. 1991)("Even though a case may have been 'decided incorrectly, this is an insufficient basis to defeat the application of collateral estoppel."), cert. denied, 503 U.S. 1005 (1992); Disabled Am. Veterans v. Commissioner of Internal Revenue, 942 F.2d 309, 316 (6th Cir. 1991)("It requires more than mere belief that a case was wrongly decided to avoid the application of the collateral estoppel doctrine," and "[t]he defeated party cannot avoid the application of collateral estoppel merely because the defeated party wishes to reargue the law."), quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4425 (1981).

Lastly, IRS cites certain cases for the proposition that Courts do not apply issue preclusion to claim construction. Not only are all of those cases from outside of this jurisdiction, as well as the Federal Circuit -- and therefore, non-binding on this Court -- we agree with Arctic Cat, and Suzuki, that the cited cases are readily distinguishable from the facts, and the procedural history, that govern us here.

Specifically, IRS relies upon Graco Children Prods., Inc. v. Regalo Int'l, 77 F. Supp.2d 660, 663 (E.D. Pa. 1999), Kollmorgen Corp. v. Yaskawa Elec. Corp., 147 F. Supp.2d 464, 467-69 (W.D. Va. 2001), and Texas Instruments, Inc. v. Linear Technologies Corp., 182 F. Supp.2d 580, 589-90 (E.D. Tex. 2002), in urging that issue preclusion should not apply to a prior, adjudicated claims construction. However, in Graco, the Court declined to apply collateral estoppel, as the patentee won the case on the basis of the doctrine of equivalents, rendering the earlier Court's claim construction nonessential to the final Judgment of the case. See, Graco Children Prods., Inc. v. Regalo Int'l, supra at 664. In Kollmorgen, there was no final Judgment in the prior litigation, and so the earlier Court never applied its claim construction to a ruling on infringement. See, Kollmorgen Corp. v. Yaskawa Elec. Corp., supra at 469. Lastly, in Texas Instruments, the Court declined to apply issue preclusion, on a prior claims construction, where the patentee sought to bind an unrelated defendant with that construction -- a defendant who plainly did not have a full and fair opportunity to litigation the issue in the prior action. Clearly, these decisions are wholly inapposite.[2]

---

[2]Other cases, which were not cited by IRS, but which declined to apply (continued...)

In contrast to the cases, upon which IRS relies, there exists controlling Federal Circuit precedent, as well as decisions from other Circuits, which apply issue preclusion to a claim construction, in a subsequent infringement action, that involves the same patentee who, against a different, alleged infringer, seeks to avoid the collateral effects of that earlier construction where, as here, the claims construction was essential to the earlier Judgment. See, Pfaff v. Wells Electronics, Inc., 5 F.3d 514, 518 (Fed. Cir. 1993)("'[W]here a determination of the scope of a patent claims was made in a prior case, and the determination was essential to the judgment there on the issue of infringement, there is collateral estoppel in a later case on the scope of such claims.'"), quoting Molinaro v. Fannon/Courier Corp., 745 F.2d 651, 655 (Fed. Cir. 1984); see also, Hemphill v. Proctor & Gamble Co., 258 F. Supp.2d 410, 416 (D. Md. 2003), aff'd, 85 Fed.Appx. 765, 767 (Fed. Cir., January 15, 2004); Dynacore Holdings

---

[2](...continued)
collateral estoppel to a prior claims construction, are equally inapposite. See, RF Delaware, Inc. v. Pacific Keystone Technologies, Inc., 326 F.3d 1255, 1261-62 (Fed. Cir. 2003)(rejecting application of issue preclusion on claim construction where Summary Judgment was granted, in part, and denied, in part, but before the issues proceeded to Trial, the parties settled, and the Court never issued a final Order of Dismissal); Kim v. The Earthgrains Co., 2005 WL 66071 at *9 (N.D. Ill., January 11, 2005)(declining to apply collateral estoppel as the defendant was not a party to the earlier proceeding); Nilssen v. Motorola, Inc., 80 F. Supp.2d 921, 924 (N.D. Ill. 2000) (same).

Corporation v. U.S. Philips Corporation, 243 F. Supp.2d 31, 35-36 (S.D.N.Y.), aff'd, 363 F.3d 1263, 1274 (Fed. Cir. 2004)(acceding to the District Court's application of issue preclusion on claim construction to claims of infringement against a different product than litigated in the first action); Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1302, 1323-24 (Fed. Cir. 1987); Abbott Laboratories v. Impax Laboratories, Inc., 2003 WL 1563426 at *3-5 (N.D. Ill., March 26, 2003); Edberg v. CPI--The Alternative Supplier, Inc., 156 F. Supp. 2d 190, 195 (D. Conn. 2001); Home Diagnostics Inc. v. Lifescan, Inc., 120 F. Supp.2d 864, 867-68 (N.D. Cal. 2000); Abbott Laboratories v. Dey, L.P., 110 F. Supp.2d 667, 670-71 (N.D. Ill. 2000). IRS has drawn no case to our attention, which denied the application of collateral estoppel under the circumstances here presented, and our independent research has found none.

We do not ignore IRS's contention, that the application of collateral estoppel, arising from the Polaris Court's rulings, would be fundamentally unfair. While that argument is floated on little more than advocacy, there was a momentary pause, when the shroud of advocacy glissaded to reveal a critical truth. In support of its fundamental fairness argument, at the Hearing on May 25, 2004, counsel for IRS conceded as follows:

> So with respect to whether there was an opportunity to appeal, perhaps in those 8 days after that amended judgment and before the covenant, we could have, IRS could have appealed. But that gets to a different issue which I'll talk about in a minute which is what kind of right-thinking public policy would require that they appeal at that point when they won tens of millions of dollars on a different claim and they were proceeding with the case on that assumption.

Transcript of May 25, 2004, at pp. 73-74.

We are unable to discern any appreciable difference between choosing to allow a period, in which to appeal an adverse ruling to elapse, and agreeing to settle a cause, ostensibly, to destroy that right to appeal.

The simple fact is that the eight (8) day period was of IRS's choice -- they could have well decided that an appeal should proceed, or they could have deferred that decision for a longer period than eight (8) days -- for the shortening of the appeal period was purely of IRS's making. Here, however, IRS voluntarily chose to preclude their right to appeal -- not out of compulsion, but because that was IRS's intelligent and voluntary choice, at a time when IRS was represented by legal counsel. We see little difference between the options confronted by IRS, and those confronted by the gambler who, having won a significant booty, has to decide whether to "double his bet" or fold the cards. IRS was satisfied to "fold the cards" with a recovery of "tens

of millions of dollars," and we see nothing unfair in holding IRS to the decision it solely, and willfully, chose. Indeed, given IRS's belated recognition that it could, in fact, have appealed the claims construction performed by the Polaris Court, we may reasonably infer that challenging that decision, in IRS's view, was not worth the effort. While we understand IRS to argue that it should not now be bound by that election, it offers nothing in the law, or in the equities, to alter the inevitable consequence of what it chose to do -- settle one claim to the sacrifice of another. Here, there is no prejudice in the application of collateral estoppel, much less fundamental unfairness.

Accordingly, given the governing precedent, we are obligated to adopt the Polaris Court's construction of the claims of the '803 Patent where, as here, we find that IRS had a full and fair opportunity to litigate that issue to a final Judgment. Accordingly, we apply collateral estoppel to the issue of claim construction, as determined by the Polaris Court. Importantly, this application does not contradict our previous recommendation, that Summary Judgment for Arctic Cat and Suzuki, on res judicata grounds, should be denied. As we have previously explained, in reaching that recommendation, we concluded that, because the accused products, in this litigation are, by Arctic Cat's and Suzuki's own concession, "admittedly different" from the

accused products in the Polaris Litigation, it was not the same cause of action as was litigated in the Polaris Litigation. Unlike res judicata, which only bars the relitigation of the same claims by the same parties, issue preclusion bars the relitigation of the same issue that was previously litigated, even if the claims, or causes of action, are different in the subsequent litigation. See, Robb v. Hungerbeeler, 370 F.3d 735, 739 (8th Cir. 2004)("'Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.'"), quoting Montana v. United States, 440 U.S. 147, 153 (1979); see also, United States v. Wells, 347 F.3d 280, 285 (8th Cir. 2003).

It is only as to that issue of claim construction, to which we apply collateral estoppel here, as we do not apply, under the applicable law, that doctrine to the broader issues of infringement and invalidity. See, e.g., Jackson Jordan, Inc. v. Plasser American Corporation, 747 F.2d 1567, 1577-78 (Fed. Cir. 1984)("Theoretically, it would be possible to look only at claim interpretation, as a separate and distinct issue from validity or infringement and determine whether a party won or lost on that sub-issue."). Further, unlike res judicata, there is no requirement that the parties, or their privies, be parties in both actions, but instead, only the party against whom issue

preclusion is being asserted must have been a party to the prior litigation. See, Lane v. Peterson, 899 F.2d 737, 741 (8th Cir. 1990), cert. denied, 498 U.S. 823 (1990)("[A] party may rely upon collateral estoppel even though he or she is not bound by the prior judgment if the party against whom it is used had a full and fair opportunity and incentive to litigate the issue in the prior action."), citing Parklane Hosiery Co., v. Shore, 439 U.S. 322, 332 (1979). Thus, it is immaterial that Arctic Cat, and Suzuki, were not parties to the Polaris Litigation.

Of course, to the extent that the Polaris Court's claim construction is ambiguous, or fails to adequately define the claims for the purposes of the issues presented here, we would be compelled to look beyond the Polaris Court's claims construction. For now, however, we turn to claims construction and, where proper, we defer to the Polaris Court's construction of the claims in the '803 Patent.

1. Claims Construction. The construction of patent claims is a legal determination, exclusively within the province of the Court. Markman v. Westview Instruments, Inc., supra at 391 (1996). "On Summary Judgment, any factual issues underlying claim interpretation are not considered in a light most favorable to the nonmoving party, as the determination is to be made by the Court in the first instance."

Transclean Corp. v. Bridgewood Services, Inc., supra, 290 F.3d at 1066, citing Cybor v. FAS Technologies, Inc., supra at 1456.

a. Methodology. "Claim interpretation requires the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of invention." SmithKline Beecham Corp. v. Apotex Corp., 365 F.3d 1306, 1312 (Fed. Cir. 2004), citing ResQNet.com, Inc. v. Lansa, Inc., 346 F.3d 1374, 1378 (Fed. Cir. 2003); Phillips Petroleum Co. v. Huntsman Polymers Corp., 157 F.3d 866, 871 (Fed. Cir. 1998). "When construing claims, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." W.E. Hall Co., Inc. v. Atlanta Corrugating, LLC, 370 F.3d 1343, 1350 (Fed. Cir. 2004). "Claim construction begins with the language of the claims." Housey Pharmaceuticals, Inc. v. Astrazeneca UK Ltd., 366 F.3d 1348, 1351-52 (Fed. Cir. 2004), citing Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999). Further, the Court "indulges a 'heavy presumption' that the claim terms carry their ordinary and customary meaning." W.E. Hall Co., Inc. v. Atlanta Corrugating, LLC, supra at 1350, citing Johnson Worldwide Assocs. v. Zebco Corp., supra at 989.

If the claim language is ambiguous, Courts may consider extrinsic evidence, such as expert testimony or dictionaries, in order "to ascertain the plain and ordinary meaning of claim terms," but "the intrinsic record is used to resolve ambiguity in claim language or, where it is clear, trump inconsistent dictionary definitions." W.E. Hall Co., Inc. v. Atlanta Corrugating, LLC, supra at 1350, citing Kumar v. Ovonic Battery Co., Inc., 351 F.3d 1364, 1367-68 (Fed. Cir. 2003); see also, Housey Pharmaceuticals, Inc. v. Astrazeneca UK Ltd., supra at 1351-52)("Dictionaries and treatises may provide insight into a term's ordinary meaning thus defined."); Vanderlande Industries Nederland BV v. I.T.C., 366 F.3d 1311, 1318 (Fed. Cir. 2004)("[E]xtrinsic evidence can shed useful light on the relevant art -- and thus better allow a court to place itself in the shoes of a person of ordinary skill in the art."); Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202-03 (Fed. Cir. 2002); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Of course, "[i]f there is a discernable plain and ordinary meaning of the claim language, then this meaning usually defines the scope of the claims unless the patentee has explicitly disclaimed or clearly disavowed this meaning in the specification or prosecution history." Housey Pharmaceuticals, Inc. v. Astrazeneca UK Ltd., supra at 1351-52, citing Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir.

2004)(requiring "words or expressions of manifest exclusion or restriction" to be present before broad terms in a claim will be read narrowly in light of a narrow specification); Middleton, Inc. v. Minn. Mining Mfg. Co., 311 F.3d 1384, 1388 (Fed. Cir. 2002)("This court also considers the prosecution history to determine whether the applicant clearly and unambiguously disclaimed or disavowed any interpretation during prosecution in order to obtain claim allowance.").

"For example, the patentee may act as his own lexicographer and expressly define the term in the specification." Id.; see also, Liquid Dynamics Corp. v. Vaughan Co., Inc., supra at 1367; 3M Innovative Properties Co. v. Avery Dennison Corp., 350 F.3d 1365, 1370-71 (Fed. Cir. 2003). Courts can also look to the prosecution history. See, Liquid Dynamics Corp. v. Vaughan Co., Inc. supra at 1367. "When we use the prosecution history as source material, the prior art cited and the applicant's acquiescence with regard to that prior art indicate the scope of the claims, or in other words, what the claims do not cover." Id. at 1367-68.

b. Application. In their unadorned form, the claim elements that are disputed, and which implicate Arctic Cat's and Suzuki's invalidity and non-infringement arguments, relate to when, and if, fuel is injected in each engine cycle in the '803 Patent. Of course, those determinations necessarily rely upon how injection

timing, and injection amount, are derived. In addition, the parties dispute some collateral elements of the ‘803 Patent.

Arctic Cat and Suzuki argue that the claim elements of the ‘803 Patent should be construed to contain the following limitations: 1) fuel is injected during each and every cycle; 2) fuel is injected “when” the system senses a predetermined state of the engine; 3) injection timing is not computed for each engine cycle from instantaneous engine operating conditions; 4) the system must use a fuel map that stores the amount of fuel to be injected in volume; 5) the system must have two independent data processors; and 6) the preamble elements are limitations in all of the claims.

In response, IRS argues that the ‘803 Patent does not: 1) require that fuel be injected during each and every cycle; 2) require that fuel be injected at the same point in the cycle -- although, we note, that Arctic Cat and Suzuki do not argue that injection must occur at the same point in every cycle; 3) preclude injection timing that is computed from instantaneous engine operating conditions; 4) require a fuel map that stores the amount of fuel to be injected in units of volume; 5) require two independent data processors; and 6) the preamble elements are not claim limitations.

The determination of when injection occurs turns on the language of Claims 1, 2, 3, and 4, of the '803 Patent, which relates to the "timing sensing element." As the Polaris Court explained:

> The first disputed element is set forth in all four claims of the '803 Patent. Claim 1 is illustrative, describing a "timing sensing means for sensing each occurrence of a predetermined cyclically repeating state of said engine" that indicates to the EFI **when** to inject fuel into the engine. United States Patent No. Re. 34,803 (Dec. 6, 1994), at col. 15, l. 27-29.
>
> Claim 2 contains identical language. See, '803 Patent, at col. 16, l. 49-51. Claim 3 describes a "timing sensing means for generating an electrical signal responsive to a predetermined cyclically repeating occurrence in the engine." Id., at col. 18, l. 16-18. Similarly, claim 4 identifies as one of its steps "sensing a predetermined cyclically repeating occurrence in the rotation of the engine."

Declaration of Bruce C. Zotter in Support of Arctic Cat's and Suzuki's Opening Brief in Support of Claim Construction, Ex. 3 (Order of February 11, 1997), at pp. 3-4, 4 n. 2 [emphasis supplied].

The Polaris Court then determined that "'predetermined' meant being selected in advance, while the defendants asserted that, in view of the patent prosecution history, it should be understood to mean "nonvariable." Id. at 4. Such a construction is not particularly helpful in our sorting of the differences between Arctic Cat's, and

Suzuki's, purported claim limitations, or the asserted claim limitations espoused by IRS.

However, the Court went on to explain that the system's "EFI's control unit utilizes [the fuel] map to generate an electric pulse that operates the fuel injectors at the same predetermined point in time during an engine cycle for each cycle." Id. at 4, citing "In re Reissue application of Ronald E. Chasteen" (May 11, 1994); see id., Ex. 6, p. 26. The Court then reiterated that, "in the Chasteen device, **injection may be fixed to occur at ignition**, an event that is **variable** in that spark plugs may fire at **different points in the engine cycle** depending on engine speed." Id., Ex. 3 [emphasis supplied], citing "Fourth Supplemental Reissue Oath" of Ronald Chasteen (July 7, 1994); Id., Ex. 7, at p. 4. On that basis, the Court then concluded that "the patent claims and prosecution history indicate that the term 'predetermined' as used in the '803 Patent means selected in advance rather than nonvariable." Id. Ex. 3, at 4-5.

In resolving the parties' conflicting claim limitations, what is critical is not whether "predetermined" means "selected in advance," or "nonvariable," but that, in reaching an appropriate construction, the Polaris Court held that "injection may be

**fixed** to occur **at** ignition," and that having a "fixed" injection time does not mean that injection will occur at the same point in the engine cycle, as injection itself does not occur at the same point in each engine cycle. Id. [emphasis supplied]. An engine cycle, as the parties agree, is one revolution of the crankshaft. As a result, Arctic Cat's, and Suzuki's, purposed limitation -- that injection occur when the system sensing the predetermined state of the engine -- is exactly how the Polaris Court construed the claims of the '803 Patent. Although we again note that Arctic Cat, and Suzuki, do not make the argument which IRS attributes to them, IRS's assertion, that the '803 Patent does not require that fuel be injected at the same point in the cycle, is also consistent with the Polaris Court's claim construction, as the Court recognized that injection can be fixed to occur at ignition, while ignition occurs at different points in the engine cycle determining on revolutions per minute ("RPM").

In other words, the claim construction of the Polaris Court reasons that, while injection occurs when the timing sensing signal sends an electrical pulse to the injector, and the pulse is generated from the same predetermined point in the engine cycle -- that is, at ignition -- that does not mean that injection occurs at the same position of the crankshaft as ignition. Of course, if the predetermined point in the engine cycle was not ignition, but rather was, for example, the top dead center position of one of the

pistons, then injection would also occur at the same point in every rotation of the crankshaft. In short, injection is determined from the timing sensing signal, not the position of the crankshaft, and the timing sensing signal is determined from some predetermined point in the engine cycle, which can either be at a point in the revolution of the crankshaft, or at some other cyclically repeating event such as ignition, which is completely independent of the position of the crankshaft.

Even if we were not constrained, by issue preclusion, to adopt the Polaris Court's claim construction, we note that such a construction is consistent with the claim language. The language of Claim 1 requires that the device have the following features:

> (f) [a] timing sensing means for sensing each occurrence of a predetermined cyclically repeating state of said engine and for providing a timing signal indicative thereof;
>
> and
>
> (viii) [a] means for generating a control signal for opening said injection means for said determined injector open duration [open] interval at a predetermined point in time determined from said timing sensing signal.

Id., Ex. 1, at col. 15, l. 27-30; and col. 16, l. 10-14.

While IRS argues that the "determined from" language of Section viii does not mean that injection occurs at the same time that the timing sensing signal is sent from the

timing sensing means, as we have stated, we conclude that the Polaris Court properly construed the claims of the '803 Patent as describing a device that does, in fact, inject when the timing sensing means senses the predetermined event in the engine. IRS further argues that, necessarily, there would be a "natural" delay, from the moment the timing sensing means senses the predetermined state of the engine, to the moment that the injectors receive the control signal and actually inject. Whether the '803 Patent teaches any such delay is not clear from the language of the claims and, more importantly, is inconsistent with the Polaris Court's interpretation of the claim limitations.

As to the parties' disagreement, over whether fuel must be injected once during each and every engine cycle, the Polaris Court's Order is clear on this point. The Court held as follows:

> The second point of contention concerning the timing sensing element centers on the phrase "cyclically repeating." As the prosecution history makes clear, defendants are correct in interpreting this phrase as requiring injection to occur once per engine revolution at all engine speeds.

Id., Ex. 3, at p. 5.

The Court then observed as follows:

> It is uncontested that defendants' devices do not inject fuel in every cycle for each cycle, [and] [n]otably, at speeds

> below 3800 rpm, defendants' devices inject fuel on alternating cycles, or a "skip cycle'" Plaintiffs argue that because a snowmobile clutch engages at 3,500 to 4,000 rpm and the engine normally runs between 7,000 and 9,00[0] rpm, IRS's claim specification requiring cyclically-repeating injection should be interpreted to exclude that range of engine speeds at which defendants' devices operate on a skip cycle. Plaintiffs have failed, however, to point to any portion of the '803 Patent or prosecution history that supports their desired limitation. Thus, defendants' devices are neither exact nor substantial equivalents of the patented device. For these reasons, there can be no infringement.

Id.

As a consequence, not only did the Polaris Court explicitly find that injection must occur once each and every cycle, the Court granted the defendants' Motion for Summary Judgment based on its construction of the claim limitations that required injection every cycle, and on the Court's finding that the accused products did not inject fuel on every cycle. Accordingly, we find that the Polaris Court's claim construction is consistent with Arctic Cat's, and Suzuki's, proposed limitation that fuel be injected during each and every engine cycle. While, under the doctrine of issue preclusion, we are obligated to defer to the claims construction of the Polaris Court, we make plain that IRS has failed to present any cogent argument upon which we could responsibly reject that construction on its merits.

As for the parties' third disputed claim element -- whether injection timing is "computed," or based on instantaneous engine operating conditions -- the Polaris Court did not construe the claim elements of the '803 Patent with such a limitation in mind but, nonetheless, the Polaris Court determined that "injection may be fixed to occur at ignition, an event that is variable in that the spark plugs may fire at different points in the engine cycle depending on engine speed." Id. at 4. Thus, as we have interpreted the Polaris Court's claim construction, which is the only interpretation that gives effect to all of the Polaris Court's interpretations when considered in totality, under the '803 Patent, injection is not "computed" from instantaneous engine operating conditions, as injection may be **fixed** to occur at ignition, or some other cyclically repeating state of the engine. Thus, there is no mathematical computation, or calculation, involved.[3]

This finding is not contradicted by the language of Claim 1, which states that injection timing is "determined from [the] timing sensing signal" which, in turn, is determined from the timing sensor, that sends a signal at a fixed point in the engine

[3]"Computed" means "to determine [especially]. by mathematical means"; or "to determine or calculate by means of a computer." Merriam-Webster's Collegiate Dictionary (10th ed. 2001), at p. 237.

cycle. Id., Ex. 1, at col. 16, l. 10-14. The language does not suggest that the timing sensing signal, or the injection point, which is "determined from said timing sensing signal," is determined by any mathematical calculation. Id. Rather, it is a fixed occurrence that triggers the signal at the same point in each cycle.

We do not suggest that the patented device never computes, or calculates, based on the Polaris Court's construction, and our review of the Patent materials, namely Figure 2, reflects that computation, or calculation, is limited to computing, or calculating, the amount of fuel that should be injected based on such factors as air temperature, barometric pressure, and engine temperature. Id., Ex. 1, Fig. 2, at 309-313. Once that amount of fuel is calculated, the device next determines if the cyclically repeating event has occurred and, if it has, then the injectors open for a duration of time that corresponds to the amount of fuel that should be injected based on the calculation. Id., at 314-316. Thus, Figure 2 illustrates that any computation or calculation is performed prior to, and apart from, the fixed injection point -- as described by the Polaris Court -- which is fixed to coincide with the cyclically repeating event.

Next, the parties dispute what are the appropriate indicia of fuel amount, or quantity, which is stored in the fuel maps. Arctic Cat and Suzuki contend that the '803

Patent requires that fuel amount, or quantity, be stored in the fuel map in units of volume of fuel, rather than duration of injection. IRS argues that the claim language refers to a "fuel injection value," or a "fuel flow rate value," and does not specifically refer to volume. Thus, IRS contends that there are no proper indicia of fuel amount. Since this element of the '803 Patent was not construed by the Polaris Court, we commence our construction, as we must, with the claim language.

We read the disputed claims, which relate to fuel injection value, or fuel flow rate value, as bearing a "means-plus-function" format, as described in Paragraph 6, of Title 35 U.S.C. §112, which provides as follows:

> An element in a claim for a combination may be expressed as a means or step in performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material or acts described in the specification or equivalents thereof.

"The 'means' term in a means-plus-function limitation 'is essentially a generic reference for the corresponding structure disclosed in the specification.'" Itron, Inc. v. Benghiat, 169 F. Supp.2d 1073, 1082 (D. Minn. 2001), quoting Chiuminatta Concrete Concepts v. Cardinal Indus., 145 F.3d 1303, 1308 (Fed. Cir. 1998). "According to §112, ¶ 6, the structure disclosed in the specification is considered to

be a 'corresponding structure,' under that provision 'only if the specification links or associates that structure to the function recited in the claims.'" Id., quoting B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1424 (Fed. Cir. 1997).

"Choosing to write a patent claim in means-plus-function language comes at a cost because '[s]uch a claim does not cover every means for performing a specified function, but is limited to the corresponding structure described in the specification and equivalents thereof.'" Id., quoting Bradley D. Baugh, WMS Gaming Inc. v. International Game Technology, 15 Berkeley Tech L.J. 109, 110 (2000). Thus, Section 112, paragraph 6 "'operates to cut back on the type of means which could literally satisfy the claim language.'" CIVIX-DDI, LLC v. Microsoft Corp., 84 F. Supp.2d 1132, 1145 (D. Colo. 2000), quoting Johnston v. IVAC Corp., 885 F.2d 1574, 1580 (Fed. Cir. 1989).

We agree with Arctic Cat and Suzuki that "[t]he structure disclosed in the '803 patent that corresponds to the claim elements listed [] includes CPU 130, having a microprocessor 171 and a memory 173." Arctic Cat's and Suzuki's Opening Brief in Support of Claim Construction, at p. 17-18. We also agree that the "CPU receives and processes signals from various sensors, including air temperature sensor 136, engine temperature sensor 138, engine speed sensor 140, ignition timing sensor 142,

barometric pressure sensor 144, and throttle position sensor 146, and generates control signals to open and close each injector 94." Id. at 18. Further, we concur with Arctic Cat's and Suzuki's assessment that "[t]he structure that performs the function of [determining a base fuel injection value] includes programming in CPU 130 and specific data stored in the memory component 173." Id. Where we part company with Arctic Cat, and Suzuki, however, is that we do not read the claim language to require that the data stored in the memory component be stored in terms of volume.

The claim language requires a device with a "means for determining a total fuel injection value representative of the total fuel amount which is to be injected by said fuel injection means * * *." Id. at col. 17, l. 6-8. The claim language also requires a device with a "means for determining an injector open duration interval based on said total fuel injection value and a known fuel output rate capacity of said fuel injection means." Id. at col. 17, l. 14-17. Arctic Cat and Suzuki argue that this second step "would be unnecessary if the fuel flow values were stored as time rather than amount." Arctic Cat's and Suzuki's Opening Brief in Support of Claim Construction, at p. 17. Arctic Cat and Suzuki also rely on the specification, which describes the fuel value as "fuel amount." Id., citing Declaration of Bruce C. Zotter in Support of Arctic Cat's

<u>and Suzuki's Opening Brief in Support of Claim Construction</u>, Ex. 1, at col. 12, l. 63-65.

We find nothing in the claim language, or elsewhere, that requires that the fuel flow rate, or fuel value, or fuel amount, or fuel quantity -- in whatever terms one wants to characterize the data stored -- must be expressed in terms of volume. As we read the '803 Patent, the fuel map stores some value, or data, no doubt expressed in terms of "1s" and "0s," to represent the amount of fuel that is ultimately injected, but which must necessarily be sent to the injector, in terms of a duration of an electrical pulse, which stimulates the injector, and causes it to inject for the length of that electrical pulse. Computers, and injectors, do not speak in terms of volume, or time, but recognize only "1s" and "0s," and electrical components, like injector values, recognize only durations of electrical pulses. The chosen word to describe the value that is used in the fuel map, which is stored as data, is an issue of semantics, which matters not. In fact, the value could be translated into a unit of weight, as fuel has a known density, which could be calculated from its volume. To be described in terms of human comprehension, the values must be expressed in some quantifiable measurement of time, space, or weight, such as volume. Thus, we do not construe the

'803 Patent to contain a limitation that requires a fuel map that stores values only in units of volume.

Next, we consider the priming function, and the fuel pump control function. In its papers, IRS does not dispute Arctic Cat's, and Suzuki's, suggested construction of the "priming function," or the "fuel pump control function." Moreover, those are elements of the '803 Patent that the Polaris Court construed, and we are bound by that Court's prior constructions. With regard to the priming function, the Polaris Court observed as follows:

> Claim 1 of the '803 patent sets forth a means plus specification for facilitating start-up of a cold engine, the priming function, as follows:
>
> > [a] means for processing said engine speed sensing signal and said throttle position sensing signal and for generating a priming control signals [sic] to said fuel injection means for selectively injecting or not injecting fuel into a manifold means based on said engine speed signal and said throttle position signal.

<u>Declaration of Bruce C. Zotter in Support of Arctic Cat's and Suzuki's Opening Brief in Support of Claim Construction</u>, Ex. 3, at p. 5-6, quoting <u>id.</u>, Ex. 1, at col. 15, l. 44-50.

The Court then explained that, "[d]uring a cold start, the IRS engine injects fuel when engine speed is zero and the snowmobile's operator depresses the throttle beyond a

pre-determined angle." Id. at 6. The Court also distinguished the defendants' devices, observing that the "[d]efendants' devices, in contrast, are 'automatic.'" Id. at 6. The Court then concluded that, "although defendants' automatic priming system and IRS's operator-controlled system perform substantially the same function, the way in which the two devices execute that function are not substantially the same," as "[t]he single instance in which defendants' device considers both engine speed and throttle angle is related to a separate objective, controlling engine flooding, rather than comprising an integral part of the priming function." Id. at 6.

The fuel pump control function, which is embodied in Claim 1 of the '803, was described by the Polaris Court as "a means for receiving and processing said engine speed sensing signal for generating a pump control signal in response thereto for maintaining a pump at an optimum operating speed for providing a predetermined maximum operating pressure in a fuel circulation conduit means at said pump." Id., Ex. 3 at 7, quoting id., Ex. 1, at col. 16, l. 15-21. The Court proceeded to describe the patented device by contrasting it with the defendants' devices. The Court noted that the "[d]efendants assert that their devices do not infringe this element because they employ single-speed fuel pumps, whereas the patented device requires a variable-speed fuel pump." Id. The Court then observed that, "[i]f fuel pump speed were not

variable, the word 'optimum' would be rendered superfluous." Id. As stated, we are bound by this construction.

Arctic Cat and Suzuki next argue that the "Voltage Is Sensed From a Battery that Supplies Power to the CPU." Arctic Cat's and Suzuki's Opening Brief in Support of Claim Construction, at p. 24. Arctic Cat and Suzuki derive this limitation from the preamble. IRS argues that the preamble does not limit the claims in this instance. We agree with IRS.

"Whether the preamble of a claim is 'necessary to give life, meaning, and vitality' to the claim and is thus a limitation of that claim is a question of law that is reviewed without deference." Intertool, Ltd. v. Texar Corp., 369 F.3d 1289, 1293-94 (Fed. Cir. 2004), quoting Catalina Mktg., Int'l v. Coolsavings.com, 289 F.3d 801, 807-08 (Fed. Cir. 2002). As the Federal Circuit Court of Appeals, in Intertool, Ltd. v. Texar Corp., recently expressed:

> In general, a claim preamble is limiting if "it recites essential structure or steps, or if it is necessary to give 'life, meaning, and vitality' to the claim." [Catalina Mktg., Int'l v. Coolsavings.com,] supra at 808, quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999). However, if the body of the claim "describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention," id. at 809, the preamble is generally

> not limiting unless there is "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art," id. at 808.

Id. at 1294.

Here, we find that the patented device was described in sufficient detail in the body of the claim, and therefore, we hold that the preamble is not a limitation on the claims.

Lastly, the parties disagree over the proper construction of the element, in Claim 3, which pertains to a "second data processor." Arctic Cat and Suzuki argue that the '803 Patent requires a "second data processor" -- that is, one independent from the "first data processor." IRS argues that the claims do not require two identical data processors, or require two independent data processors. Instead, IRS urges that the two elements could be located in the same electronic module, or could be configured to operate in a single chip. Without question, Claim 3 refers to both a "first data processor," and a "second electronic data processor." Declaration of Bruce C. Zotter in Support of Arctic Cat's and Suzuki's Opening Brief in Support of Claim Construction, Ex. 1.

The parties agree that a "data processor" is a device that is capable of being used to preform operations on data. Arctic Cat and Suzuki, however, disagree with IRS's contention that a "memory chip" qualifies as a data processor. Since the

intrinsic evidence does not provide an unambiguous definition of a "data processor," we must look to extrinsic evidence. IRS points us to the dictionary definition of a "data processor," where the term is defined as "any system that can receive, transmit, or store data; many systems can also perform mathematical operations upon the data and tabulate or indicate the results." Declaration of Michael S. Wilcox in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opening Brief Regarding Claim Construction of U.S. Patent No. Re. 34,803, Ex. Q (The Penguin Dictionary of Electronics (2nd Ed. 1988), at p. 107).

We conclude that the misunderstanding here, and Arctic Cat's and Suzuki's misconstrued limitation, can be resolved by not limiting the definition of a data processor to a device that actually performs functions, but to include within the definition of a data processor a device that can either store data, or perform both functions on data and store data. As such, we find that data processor was employed in the Patent to refer to both a Central Processing Unit ("CPU"), and a memory chip, in conjunction with the CPU, which serves at least two data processing functions.[4]

---

[4]Recently, the Federal Circuit relied on dictionary definitions in order to explicate the meaning of both a "data processor," and a "storage means." In Gemstar-TV Guide Int'l, Inc. v. International Trade Com'n, 383 F.3d 1352, 1371-72 (Fed. Cir. (continued...)

Arctic Cat and Suzuki contend that the '803 Patent specification expressly

---

[4](...continued)
2004), the Court observed:

> Contemporaneous technical dictionaries defined "data processor" as "[a] device capable of performing operations on data, such as a digital computer, an analog computer, or a desk calculator," Charles J. Sippl, Computer Dictionary 117 (4th ed. 1986)("Computer Dictionary"), or " a device capable of performing data processing, such as a desk calculator, a punched card machine, or a computer," Jerry M. Rosenberg, Dictionary of Computers, Data Processing, and Telecommunications 128 (1984)("Dictionary of Computers"). These dictionaries also defined "storage" as "[a] device capable of receiving data, retaining them for an indefinite period of time, and supplying them upon command," Computer Dictionary at 473, and "a device, or part of a device, that can retain data," Dictionary of Computers at 504. General use dictionaries define "in" as "used as a functional word to indicate location or position in space or in some materially bound object." Webster's Third New International Dictionary 1139 (1993). From these definitions, the ordinary meaning of "storage means in a data processor" is a device capable of retaining data located within a data processing device or system.

We do not find appreciable differences between the dictionary definitions proffered by IRS, and those employed by the Federal Circuit, in a somewhat analogous context. Moreover, as we understand IRS's argument, the first and second data processors are not required to be separated, as one data processor can serve two different data processing functions, one of which is processing data for storage in a microchip. While not wholly free from doubt, we accede to IRS's construction of this patent claim.

distinguishes between data processors and memory chips. The former, Arctic Cat and Suzuki suggest, perform functions on data, while the latter merely stores data. Arctic Cat and Suzuki contend that the CPU, which is disclosed in the patent specifications as element 130, is described as including two structures, a data processor chip and a memory chip:

> CPU 130, in a preferred embodiment of the invention, comprises a conventional microprocessor chip 171 * * * and a conventional memory chip 173.

Declaration of Bruce C. Zotter in Support of Arctic Cat's and Suzuki's Opening Brief in Support of Claim Construction, Ex. 1, at col. 10, l. 7-10.

The confusion that arises, from employing the term "data processor" to refer to both a CPU and a memory chip, is illustrated by the Patent Examiner's remarks in connection with the prosecution history of the '374 Patent, which bears a relationship to the '803 Patent.

In Paper No. 4, which is dated November 29, 1995, the Examiner rejected application claims 8 and 18 of the '374 Patent, and noted that "[t]here is no support in the specification for the claimed first and second data processors of claims 8 & 18," as "[o]nly one processor is shown (i.e. CPU 130)." The Examiner goes on to note that, "[a]lthough the '374 Patent application claims a 'second data processor' in its corresponding claim 3, there was apparently no support for that processor either."

Id., Ex. 12, at p. 2-3. The Patent Examiner's confusion could be alleviated if the definition of a data processor is extended to include a memory storage device, or a "memory chip," as the above-quoted specification states that the CPU 130 contains two parts: 1) a microprocessor chip; and 2) a memory chip. The Patent Examiner, and Arctic Cat and Suzuki, as well, look at the CPU as being one data processor, while the dictionary definition of "data processor" would include both data processors -- the processing chip, and the memory chip -- working in the same electronic module -- the CPU -- as IRS suggests. Thus, as we construe the Patent claims, there must be two "data processors," and we define that term as including memory storage devices, and we do not adopt the narrow definition suggested by Arctic Cat, and Suzuki, that a data processor must perform functions on data. Contrary to the construction proposed by Arctic Cat, and Suzuki, we find nothing in the claim language to require that the two data processors must be separate entities.

The parties agree, and we concur, with IRS's construction of the "first data processing means," and that the data processing means is a means-plus-function element. Claim 2 states that the "data processing means" is a means "for receiving and processing said engine sensing signals comprising: means for receiving and processing said engine speed signal and throttle position signal for determining a base fuel

injection value; means for receiving and processing said air temperature signal and calculating an air temperature modification value of said base fuel injection value; means for receiving and processing said barometric pressure sensing signal for calculating barometric pressure modification value of said base fuel injection value."

Id., Ex. 1, col. 16, l. 59-col. 17, l. 2. The CPU is the structure that corresponds to the "first data processing means." According to IRS, the "first data processing means" is the combination of a microprocessor with a memory chip and equivalents thereof. We agree.

With claim construction completed, we turn to the Motions of Arctic Cat, and Suzuki, starting with their Motion for Summary Judgment of No Infringement of the '803 Patent.

2. The Motion of Arctic Cat and Suzuki for Summary Judgment of No Infringement.

a. Standard of Review. "The second step of an infringement analysis is the court's interpretation of the allegedly infringing device." Liquid Dynamics Corporation v. Vaughan Company, Inc., supra at 1369. At this step, "the Court compares the construed claims against the accused device and determines whether judgment as a matter of law is appropriate," and "[a] District Court may grant

summary judgment only 'when it is shown that the infringement issue can be reasonably decided only in favor of the movant, when all reasonable factual inferences are drawn in favor of the non-movant.'" Itron, Inc. v. Benghiat, supra at 1093, quoting Voice Techs. Group Inc. v. VMC Sys. Inc., 164 F.3d 605, 612 (Fed. Cir. 1999).

"To prove infringement, the patentee must show that the accused device meets each claim limitation, either literally or under the doctrine of equivalents." Dynacore Holdings Corp. v. U.S. Philips Corp., supra at 1274, citing Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc., 347 F.3d 1314, 1324 (Fed. Cir. 2003); see also, Liquid Dynamics Corp. v. Vaughan Co., Inc., supra at 1367; PSC Computer Products, Inc. v. Foxconn Intern., Inc., 355 F.3d 1353, 1357 (Fed. Cir. 2004). "Literal infringement [] requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." Caterpillar Inc. v. Deere & Co., 224 F.3d 1374, 1379 (Fed. Cir. 2000). "Functional identity and either structural identity or equivalence are both necessary." Id. "The tests for equivalence under §112 ¶6 and the doctrine of equivalents are closely related, and involve 'similar analyses of insubstantiality of differences.'" Id., quoting Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1267 (Fed. Cir. 1999).

"An element in the accused product is equivalent to a claim element if the differences between the two are 'insubstantial' to one of ordinary skill in the art." Cortland Line Co., Inc. v. Orvis Co., Inc., 203 F.3d 1351, 1359 (Fed. Cir. 2000), citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 40 (1997); see also, Caterpillar Inc. v. Deere & Co., supra at 1379 ("[A]n accused device is equivalent when it performs the identical function in substantially the same way to achieve substantially the same result."). "'Although equivalence is a factual matter normally reserved for a fact-finder, the trial court should grant summary judgment in any case where no reasonable fact finder could find equivalence.'" Cortland Line Co., Inc. v. Orvis Co., Inc., supra at 1359, quoting Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1423 (Fed. Cir. 1997).

b. Legal Analysis. Arctic Cat's and Suzuki's first argument, in support of their non-infringement Motion, is that the Accused Products do not inject fuel in each and every cycle. As previously stated, the Polaris Court construed the claims of the '803 Patent to require that fuel be injected in each and every cycle and, as issue preclusion applies to that decision, we are bound by the Polaris Court's construction in that regard. Thus, we must compare that limitation to the Accused

Products and, specifically, we must determine whether the Accused Products inject fuel in each and every cycle.

i. Injection in Every Cycle. At the outset, we note that Arctic Cat and Suzuki argue that the '803 claim limitations include not only that fuel will be injected in every cycle, but that a fuel amount sufficient for combustion will be injected in every cycle. While the Polaris Court held that injection must occur in each and every cycle, the Polaris Court did not render an opinion on the amount of fuel that must be injected in every cycle. As we have expressed, and as the '803 Patent makes clear -- especially the Figure 2 that we have previously referenced -- the computation or calculation that occurs in order to determine the amount of fuel to inject in each cycle is separate and apart from the injection timing element. In other words, the amount of fuel injected adds nothing to our understanding of how the '803 Patent teaches when fuel is injected, or if fuel is injected in every cycle. Thus, Arctic Cat's and Suzuki's added claim limitation, that an amount of fuel sufficient for combustion must be injected every cycle, is not supported by either the Polaris Court's claim construction, the language of the claims, or the specifications. Given Arctic Cat's and Suzuki's improper claim construction, much of the factual basis for their non-infringement analysis is inapplicable. Arctic Cat and Suzuki argue that the Accused

Products do not infringe this element of the '803 Patent for two reasons: 1) the fuel maps of the Accused Devices have zeros inserted; and 2) the Accused Products employ a skip-cycle feature.

A) Zeros in the Fuel Maps. As evidence of their non-infringement, Arctic Cat and Suzuki point to the zeros ("0s") in their fuel maps at instances of high engine speeds and low throttle, including at closed throttle. Fuel maps refer to a graph, which charts engine RPM on one axis, and throttle angle on the other. The value in the map for the corresponding RPM and throttle angle represents an amount of fuel that is injected when the given RPM is reached, and the operator is holding the throttle at the given angle. Arctic Cat and Suzuki contend that a zero in the fuel map represents instances when the RPM and throttle angle are such that no fuel is injected.

To support this assertion, Arctic Cat's and Suzuki's expert witness, Dr. Bernard R. Cuzzillo, conducted tests on several of the Accused Products, in which he attempted to simulate instances where a zero appeared in the fuel maps. Dr. Cuzzillo stated, in his expert report, that "a slight leakage" occurred during tests he performed on one of two JECS-equipped engines, and that a detectable amount of fuel flowed on the other device. Dr. Cuzzillo concluded that the two JECS-equipped

devices were representative of all of the Accused Products equipped with JECS EFI systems. Declaration of Christopher W. Day in Support of Arctic Cat's and Suzuki's Motion for Summary Judgment of No Infringement of the '803 Patent, Ex. C, Appx. 2, at p. 2-3.

In the test performed on the 1997 580 model, Dr. Cuzzillo reported that he did not conduct the test with gasoline, but rather, he used nitrogen. He opined that, since the viscosity of gasoline is higher than the viscosity of nitrogen, testing the devices with gasoline was unnecessary. Dr. Cuzzillo did relate that the results achieved with nitrogen were similar to the test results in the 2002 600 model, "in which a subsequent test with gasoline resulted in no detectable flow." Id. at 3. We note, however, that the 2002 600 device is not even equipped with a JECS EFI system, but rather, it employs a Kokusan EFI system. Thus, Dr. Cuzzillo's conclusion, which is based solely on the similarity of test results from a different device, that was made by a different manufacturer, is somewhat subjective.

In the test on the second device, a 1996 700, Dr. Cuzzillo used gasoline, and measured "156 mL/hr per injector," but he stated that "[t]he 156 mL/hr fuel rate is far below the rate needed to create a combustible mixture in the combustion chamber." Id. However, we interpret the Polaris Court's claim construction as only requiring fuel

to be injected every cycle, and as not limiting the claims to the amount of fuel, or even an amount needed for combustion. Thus, we find that, with respect to the JECS-equipped snowmobiles, Arctic Cat and Suzuki have failed to meet their burden of proof on non-infringement with respect to this element of the claims. Regardless, we note that, in our Report and Recommendation of August 6, 2004, we recommended that the Motion of Arctic Cat and Suzuki for Summary Judgment on Legal Estoppel, as to their use of JECS's EFI systems, be granted. Thus, if our Report and Recommendation is adopted, the Accused Products in this litigation will be limited to the Kokusan Denki ("Kokusan") EFI systems.[5]

We now turn to Dr. Cuzzillo's testing of the Accused Devices that were equipped with Kokusan EFI systems. Dr. Cuzzillo explained that he tested four Kokusan equipped devices which, he concluded, were representative of all of the

[5]During the course of the Markman Hearing, on May 25, 2004, we questioned counsel for Suzuki about the potential collateral estoppel/res judicata impact of the dismissal of the defendants' counterclaims in the Polaris case -- a question that generated post-Hearing briefs from each of the parties. See, Transcript of May 25, 2004, at p. 103. At the time that we made that inquiry, we had yet to rule on the Motion of Arctic Cat, and Suzuki, for Partial Summary Judgment based on res judicata and legal estoppel. See, Docket No. 401. We have now ruled on that prior Motion, as well as the application of collateral estoppel on claim construction, which obviates any further discussion of those issues.

accused Kokusan products. He related that he "measured a flowrate of about 15 mL per hour per injector on the 2000 600-B-EID ECU, and no detectable injection on the 1999 600-EID and 2002 600-C-EID ECUs." Id. Dr. Cuzzillo further reported that, in his tests of the 1999 600, which he tested only with nitrogen, only a "slight leakage appeared," but he again explained that gasoline's higher viscosity rendered a test with gasoline unnecessary. Id. However, Dr. Cuzzillo again based that assumption on the 2002 600 device -- the same device to which he referred in determining that a gasoline test of the JECS-equipped 1997 580 was unnecessary based on similar results in tests on the 2002 600 device. As stated, Dr. Cuzzillo's failure to perform tests with gasoline on the 1997 580 device, a decision he made based solely on the similarity of results achieved with nitrogen on the 2002 600 device, renders his test results somewhat subjective, and creates a triable issue of fact. Of course, Dr. Cuzzillo did report that he tested the 2002 600 device with gasoline, and discovered no detectable fuel injection.

Dr. Cuzzillo recounted that, in his testing of the 2003 785 device, he found a flow rate of 1567 mL/hr. He again opined that the fuel flow rate was well below the fuel flow rate needed for combustion. Thus, of the four Kokusan-equipped devices, which were tested by Dr. Cuzzillo, the 2000 600, and 1999 600, devices had some fuel

that was being detected, the 2002 600 device had no detectable fuel observed, while Dr. Cuzzillo opined that 1997 580 device probably would not inject fuel based on the similarity of results in tests conducted with nitrogen in both the 1997 580 device, and the 2002 600 device. Based upon those test results, and in the absence of any other evidence, we are unable to conclude that there is no evidence from which a Jury could find that a zero in the fuel map indicates that no fuel is being injected, as fuel flow at any zero on the map calls into question the accuracy of every zero on the map. Thus, Summary Judgment would be inappropriate.

Further, the attempt by Arctic Cat and Suzuki, and Dr. Cuzzillo, to explain away the detection of some fuel at RPMs, and throttle angles, where the fuel maps suggest that no fuel should be injected -- a zero -- by attributing the detectable fuel to leakage, as opposed to injection, must certainly fail at the Summary Judgment stage. At his deposition, Dr. Cuzzillo testified that, "if the fuel flow is so far below that needed for combustion, it doesn't meet the ordinary definition of injection, and it can be more likened to leakage." Id., Ex. J, at p. 173. Of course, we do not know "the ordinary definition of injection." Dr. Cuzzillo also stated that: "My interpretation is that the term 'injection' implies that it's an amount consistent with combustion," "[a]nd that's what the patent teaches, that's in the claim limitation, and moreover, that's the whole

purpose of an EFI system." Id. at p. 180. As a result, Dr. Cuzzillo's "ordinary definition of injection" is based on his interpretation of the claim limitations, and neither the Polaris Court, nor this Court, has construed the claims as has Dr. Cuzzillo.

Moreover, irrespective of whether one opines, that the fuel that is detected in instances of RPM and throttle angle, where there are zeros in the fuel maps, is derived from "injection" or "leakage," what is clear from Dr. Cuzzillo's deposition testimony is that, even when there are zeros in the fuel maps, the injectors are still sensing an electrical pulse, albeit a pulse of short duration. At his deposition, Dr. Cuzzillo testified as follows:

> Q So there is a pulse in the JECS system even when there is a zero in the fuel map, correct?
>
> A Right. Well, for both -- for all engines, actually. Both JECS and Kokusan.

Id. at p. 193.

Therefore, if one chooses to characterize the fuel that is detected as "leakage," it is, nonetheless, leakage that is occurring in connection with the injector receiving a pulse, which signals the injector to inject. Accordingly, even when Dr. Cuzzillo states that fuel was only leaking, it is a leakage attributable to an injection. Whether or not the injection, or leakage, was intended is immaterial.

Lastly, it is clear from the testimony of the experts, in this case, that a zero in the fuel map is nothing more than an approximation. In his deposition testimony, Dr. Cuzzillo testified as follows:

> Q And that zero in the fuel map corresponds to what, sir? Does that correspond to a desire to inject fuel?
>
> A Yes. Approximately no fuel.

Id. at p. 185.

Dr. Cuzzillo then observed that, "if you inject such a small amount of fuel that it's either unmeasurable or far below the lean misfire limit, it's approximately none." Id. at p. 186.

In sum, we find that Arctic Cat's and Suzuki's reliance on zeros in the fuel maps, as their proffered proof of non-infringement, fails to conclusively establish that the Accused Products do not inject fuel in every cycle, as at least some zeros are actually an amount greater than zero. We do not suggest that such evidence, as it is more thoroughly presented at Trial, will not warrant a finding of no infringement as to one or more products of Arctic Cat and Suzuki. We merely conclude, at this Summary Judgment stage, that the evidence, as it has here been presented, is not so conclusive as to merit an award of Judgment as a matter of law. Accordingly, we turn to their argument regarding the skip cycle feature.

B) Skip Cycle. As Dr. Cuzzillo explained in his expert report:

> Skip cycle is an operating regime in which the system injects only on every other crankshaft rotation (i.e. on every other engine cycle). In the EFI system specifications of the various engines indicated in Table 3, in this example the 2002 600-C-EID, section 2.2.10, title "Intermittent Injection Control," states that injection "is made once every 2 engine (crankshaft) revolutions." It further specifies that the conditions under which this occurs are speeds between 5000 and 7500 RPM and injector pulse durations less than 400 microseconds to begin skipping, and terminating when the pulse durations exceed 500 microseconds or when the speed exits the same range.

Id., Ex. C, Appx. 2, at p. 7.

To confirm the presence of the skip cycle feature in the Accused Products, Dr. Cuzzillo tested two engines, a 2002 600-C-EID, and a 2003 785-EID. Dr. Cuzzillo averred in his report that the tests, which were conducted on those two devices, revealed that no detectable injection occurred at high RPMs. Id.

Dr. Cuzzillo also noted the testing of IRS's expert, Dr. William B. Ribbens, who, in a report dated May 22, 2003, stated that the 2003 700-EID device, which he tested, did not employ a skip cycle feature even though Arctic Cat and Suzuki earlier stated that it did. Dr. Cuzzillo explained that, while the 2003 700-EID's microprocessor contained the algorithm to employ a skip cycle feature, the values

stored in the device were incorrect, which rendered the skip pulse feature non-functional.

Even though Dr. Cuzzillo successfully found that two of the Accused Products employ a skip cycle feature, and while Arctic Cat and Suzuki, through Dr. Cuzzillo, seem to shrug off the fact that the device tested by Dr. Ribbens was found not to employ a skip cycle feature, we only have three tests from which to determine whether a factual dispute exists as to the existence of skip pulse in the Accused Products -- one of which found that the Accused Product tested did not have a skip cycle feature. Thus, we find that Summary Judgment is inappropriate in this regard, as the proffered evidence is far from conclusive.

Further, with respect to the Accused Products that Dr. Cuzzillo tested, he never explicitly stated that the tests conclusively demonstrated that no fuel was injected in the cycle that was skipped. With respect to the 2002 600-C-EID, he reported only that "no detectable injection" occurred and, with respect to the 2003 785-EID, he stated only that "the flow rate corresponding to the shorted pulse is below the limit of detection." Id. Therefore, on this Record, we are unable to conclusively determine that no fuel is injected in the skipped cycle, especially in light of Dr. Cuzzillo's construction that some fuel -- an amount insufficient for combustion -- is no fuel.

Therefore, Summary Judgment on the first claim limitation -- that fuel be injected in every cycle -- would be improper, and we proceed to Arctic Cat's and Suzuki's argument that the Accused Products do not infringe because they employ computed injection, as opposed to the fixed injection timing that is described in the '803 Patent.

ii. Computed Injection Timing. As previously noted, the Polaris Court construed the '803 Patent claims to mean that injection is not "computed," but instead, can be fixed to occur at ignition, or some other cyclically repeating event. Therefore, we must determine whether the Accused Products compute when to inject, or inject at a predetermined cyclically repeating state of the engine, as described in the '803 Patent.

Dr. Cuzzillo explained, as follows, in his report:

> The specifications describe this computed timing for example in section 2.4, titled "Delay Control of Injection Start," (S0103221, pertaining to the 2002-600-C-EID). This section specifies that injection is delayed from the point in time when the engine crank position is detected. The amount of delay is the sum of 200 microseconds plus an amount that is computed from the current engine speed. The speed-based delay is computed from the entries in a lookup table (S0103239). The precise amount of this additional delay is interpolated between speeds, ranging from zero to 1400 microseconds.

Id., Ex. C, Appx. 2, at p. 10.

To confirm the presence of computed timing for injection, Dr. Cuzzillo "measured the injection timing on the four exemplar KD [the four Kokusan devices that he tested, and which he regarded as representative of all the accused Kokusan devices] equipped engines." Id. Dr. Cuzzillo averred that the tests confirmed the computed delay feature in the Accused Products. Id.

Dr. Cuzzillo displayed his findings in a graph. Id. at p. 10, Figure 1. On the horizontal axis of his graph he charted engine speed in RPM, and on the vertical axis he plotted the timing of the beginning of the injection pulse in degrees before top dead center ("BTDC"). The graph has two lines. One line is a linear line that shows a steady, but subtle, decline in time of injection in degrees BTDC as RPM increases. The second line is not a straight line, but rather, the graph depicts a pronounced dip in injection time in degrees BTDC around 2500 RPM, but then the injection time actually increases as RPM increases beyond 2500 RPM. Dr. Cuzzillo explained that the linear line represented the base delay time of 200 microseconds, while the curving line represented the computed delay time, which was 200 microseconds, plus an additional time that is added, depending on engine speed. Id. Dr. Cuzzillo's findings plainly demonstrate that the Accused Products employ computed injection timing, as we find that the time added to the 200 microseconds is computed.

IRS does not offer evidence to contradict Dr. Cuzzillo's findings but, rather, challenges the applicable claim construction, and argues that the Polaris Court found that injection timing in the patented device was variable, and therefore, that it computes, or calculates, injection timing. However, that is not the construction of the '803 Patent claims that was drawn by the Polaris Court. IRS focuses on the variable language, even though the language, which is critical to this determination, is the Polaris Court's statement that injection timing was fixed to coincide with a cyclically repeating event. As the Polaris Court explained, the '803 Patent described "variable" in the sense that injection did not have to occur at the same point in every cycle. It is possible to have injection that is fixed to coincide with a predetermined event, but which is also variable with respect to when injection occurs in relation to a position of the crankshaft. Injection that is predetermined to occur at a fixed event, and injection that varies from cycle to cycle, are not mutually exclusive. Injection that is fixed to coincide with a predetermined event, and injection that is computed, however, are mutually exclusive.

For example, the linear line on Dr. Cuzzillo's graph -- that is, Figure 1, which we have previously detailed -- demonstrates injection that is delayed, but not computed. Merely adding a 200 microsecond delay, after the timing sensing means senses the

predetermined cyclically repeating event, does not "compute" injection timing, it merely delays the injection timing, uniformly, 200 microseconds from each cyclically repeating event. The delay, and therefore, the injection, is still determined from the cyclically repeating event. The linear line in Figure 1 reflects that injection timing, from degrees BTDC , is not the same for each cycle, but gradually decreases as RPM increases, even though injection timing is fixed to occur 200 microseconds after the predetermined cyclically repeating state of the engine is sensed. As a result, the linear line shows injection timing that is both fixed and variable, just as in the '803 Patent.

A comprehension of Figure 1 also refutes IRS's argument that the '803 Patent embodies a device that naturally delays injection timing from the time that the predetermined cyclically repeating event is sensed. As Dr. Cuzzillo testified, "it's not a hardware delay, for example, that's simply caused by a propagation delay of the delay that we've been talking about which is caused by the length of time needed to generate enough current to generate enough magnetic field to pull the value off the seat." Declaration of Jill Kastner in Support of Injection Research Specialists, Inc.'s and Pacer Industries, Inc.'s Opposition to Arctic Cat's and Suzuki's Motion for Summary Judgment of No Infringement of the '803 Patent, Ex. 5, at p. 249. Thus, the

computed delay is not merely adding the same amount of delay to every injection but, rather, it is computing the amount of injection delay.

IRS makes much of Dr. Cuzzillo's testimony concerning certain operating conditions at which the Accused Products use the base 200 microsecond delay. Dr. Cuzzillo testified, in this respect, as follows:

> Q Well, there is no computation because under those operating condition [sic] there is always a 200-microsecond delay, isn't there?
>
> A Well, the processor still has to go through the process of delaying the counting out the 200 microseconds before it starts injection.
>
> Q Okay. So counting is the same thing as calculating or computing?
>
> A Well, sure. It's gotta count down from 200 microseconds somehow to count out time.

Id. at p. 248.

The discussion over the semantics of counting, calculating, and computing, is unnecessary, and IRS's assertion that, based on this testimony, and the fact that there are certain engine conditions at which no computed delay occurs, the Accused Products infringe some of the time, is unsupported in fact or law.

Figure 1 is again helpful to demonstrate why IRS's factual contention is unsupported. When one compares the two graphs in Figure 1 -- the linear line, which represents a fixed, non-computed delay, and the curving line, which represents a computed delay -- the two lines intersect only three times for all engine RPMs. As a consequence, the assertion that the Accused Products, which are represented by the curving line, infringe the '803 Patent some of the time, is a gross misstatement of the facts, as the linear line represents a fixed injection point that varies with engine speed, such as the '803 Patent device, and because the two lines only intersect at three points, the function of the two devices is markedly different.

Further, the '803 Patent explicitly states that injection is fixed to coincide with a predetermined cyclically repeating event that occurs each and every cycle. Thus, the '803 Patent describes a device that never computes and, accordingly, if the Accused Products compute at all, or most of the time, they are non-infringing. See, Ferguson Beauregard/Logic Controls, Division of Dover Resources, Inc., 350 F.3d 1327, 1346 (Fed. Cir. 2003).

In support of its argument, that a device that sometimes infringes, but not always, nevertheless infringes, IRS cites Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1343 (Fed. Cir. 2001), and Bell Communications Research, Inc. v. Vitalink

Communications Corp., 55 F.3d 615, 622-23 (Fed. Cir. 1995). While IRS's statement of the law is correct, at least in some instances, the facts here are readily distinguished. In Hilgraeve, the Court stated:

> [I]n determining whether a product claim is infringed, we have held that an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation.

Id. at 1343.

However, the Court so held in light of the fact that the tests were conducted on an accused device, under unusual circumstances, and therefore, the Court held that "the sale of a device may induce infringement of a method claim, even if the accused device is capable of non-infringing modes of operation in unusual circumstances." Id.

In contrast, here, the tests conducted on the Accused Products were conducted under standard operating modes. Further, the Accused Products are not "capable" of non-infringing modes of operation, but rather, the Accused Products operate in a non-infringing manner, but are capable, in some constrained conditions, of operating in an infringing manner. Unlike Hilgraeve, where non-infringement was the exception, here, with respect to the Accused Products, non-infringement is the rule, while infringing modes of operation are the predominant exception.

Rather, the facts here are more analogous to the circumstances in Ferguson Beauregard/Logic Controls, Division of Dover Resources, Inc., supra at 1346, which distinguishes the decision in Bell Communications Research, Inc. v. Vitalink Communications Corp., a case on which IRS relies, as follows:

> In that case, [Bell Communications], this court vacated a grant of summary judgment of non-infringement because the accused device sometimes, but not always, performed a limitation of the claimed invention. On remand, the court stated that "any future infringement analysis * * * should be undertaken with due attention to the principle that an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes."

Ferguson Beauregard/Logic Controls, Division of Dover Resources, Inc., supra at 1346, quoting Bell Communications Research, Inc. v. Vitalink Communications Corporation, supra at 622.

In distinguishing Bell Communications, the Court reasoned as follows:

> This is not a case, like Bell Communications, where the accused product sometimes accomplished the entire method of the claim. In order to accomplish the entire method of [the] claims [at issue], an adjustment must always be made. Thus, if Ferguson's device does not always make a correction, as the district court found it did not, then it never accomplishes the entire method of the claimed invention.

Bell Communications Research, Inc. v. Vitalink Communications Corporation, supra at 622 [internal citation omitted].

The same holds true here. Since the '803 Patent has been construed to require a device that always uses a fixed injection time, and since the Accused Products do not always use a fixed injection time, but instead, usually employ a computed injection time, the Accused Products do not infringe the '803 Patent.

Accordingly, we conclude that Arctic Cat, and Suzuki, are entitled to an award of Summary Judgment of No Infringement both as to IRS's claims of literal infringement, and under the doctrine of equivalence, as IRS expressly and unambiguously disclaimed that the '803 Patent employed a computed injection time, in order to distinguish the prior art of the Okumura Patent, and has failed to support an equivalence claim with evidence. Of course, the Summary Judgment would not extend to the Kokusan EFI system in the model year 2002 785 Suzuki engine, as Arctic Cat and Suzuki recognize that as the sole exception to a Summary Judgment on this ground.

While, in view of our recommendation, we need not reach Arctic Cat's and Suzuki's remaining non-infringement arguments, in the interests of completeness, we briefly address the Motion of Arctic Cat and Suzuki for Summary Judgment on the Basis of Invalidity.

3. The Motion of Arctic Cat and Suzuki for Summary Judgment on the Basis of Invalidity as Obvious.

a. Standard of Review. The invalidity of a patent for obviousness is governed by Title 35 U.S.C. §103(a), which provides as follows:

> A patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

"The ultimate determination of whether an invention would have been obvious under section 103(a) is a legal conclusion based on underlying findings of fact." Velander v. Garner, 348 F.3d 1359, 1363 (Fed. Cir. 2003), citing In re Kotzab, 217 F.3d 1365, 1369 (Fed. Cir. 2000); see also, Akamai Technologies, Inc. v. Cable & Wireless Internet Services, Inc, 344 F.3d 1186, 1195 (Fed. Cir. 2003)("While the ultimate conclusion of obviousness is for the court to decide as a matter of law, several factual inquiries underlie this determination.").

"The underlying factual inquiries include (1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; and (3) the differences between the claimed invention and the prior art." Id., citing Graham v. John Deere Co., 383 U.S. 1, 17 (1966); see also, National Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d

1319, 1334 (Fed. Cir. 2004)(listing the factors as: "'(1) the scope and content of the prior art; (2) the differences between the prior art and the claims; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness.'"), quoting Riverwood Int'l Corp. v. Mead Corp., 212 F.3d 1365, 1366 (Fed. Cir. 2000).

"If all the elements of an invention are found in a combination of prior art references, a proper analysis under [Section] 103 requires, inter alia, consideration of two factors: (1) whether the prior art would have suggested to those of ordinary skill in the art that they should make the claimed composition or device, or carry out the claimed process; and (2) whether the prior art would also have revealed that in so making or carrying out, those of ordinary skill would have a reasonable expectation of success." Id., citing In re Vaeck, 947 F.2d 488, 493 (Fed. Cir. 1991) ; In re Dow Chem. Co., 837 F.2d 469, 473 (Fed. Cir. 1988); see also, Noelle v. Lederman, 355 F.3d 1343, 1352-53 (Fed. Cir. 2004).

Further, "[w]hen a rejection depends on a combination of prior art references, there must be some teaching, suggestion, or motivation to combine the references." Akamai Technologies, Inc. v. Cable & Wireless Internet Services, supra at 1196, citing In re Geiger, 815 F.2d 686, 688 (Fed. Cir. 1987). "Although the suggestion to combine references may flow from the nature of the problem, the suggestion more

often comes from the teachings of the pertinent references, or from the ordinary knowledge of those skilled in the art that certain references are of special importance in a particular field." Akamai Technologies, Inc. v. Cable & Wireless Internet Services, supra at 1196 [internal citations omitted], citing Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc., 75F.3d 1568, 1573 (Fed. Cir. 1996), citing in turn, Ashland Oil, Inc. v. Delta Resins & Refractories, Inc., 776 F.2d 281, 297 n. 24 (Fed. Cir. 1985).

Therefore, "[w]hen determining the patentability of a claimed invention which combines two known elements, 'the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination.'" In re Beattie, 974 F.2d 1309, 1311-12 (Fed. Cir. 1992) , quoting Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co., 730 F.2d 1452, 1462 (Fed. Cir. 1984). "Although the ultimate determination of obviousness is a legal conclusion, '[t]he presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact.'" Medical Instrumentation and Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1221 (Fed. Cir. 2003), quoting In re Gartside, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

b. Legal Analysis. Arctic Cat and Suzuki assert that, before the issuance of the '803 Patent, the technology embodied in that Patent was already known. They contend that, before November of 1986, Outboard Marine Corporation ("OMC") manufactured and sold an EFI system almost identical to that envisioned by the '803 Patent. The only feature missing was an "engine temperature sensor." Arctic Cat and Suzuki maintain that the engine temperature sensor was also commonly used in EFI systems, such as those manufactured by Mercury Marine ("Mercury"). Arctic Cat and Suzuki further contend that one of ordinary skill in the art would have been motivated to combine the OMC EFI system, with the Mercury engine temperature sensor, so as to operate the OMC system in extreme weather conditions.

To support their assertion, that the OMC device included every limitation of the '803 Patent except an engine temperature sensor, Arctic Cat and Suzuki rely principally on the deposition testimony of James Nerstrom ("Nerstrom"), and Gerhard Maier ("Maier"). Nerstrom was deposed in the Polaris Litigation by Polaris. Thus, he may have been IRS's expert in that case, but an explanation of Nerstrom's role in the litigation is not provided. See, Declaration of Annamarie A. Daley, Ex. B ("Nerstrom

Deposition").[6] At the deposition of Nerstrom, Ms. Daley, who is counsel for Arctic Cat in this case, and who was counsel for Polaris in the Polaris Litigation, questioned Nerstrom on the characteristics of the OMC device. Id. at p. 128. However, in framing her questions, Ms. Daley quoted language from the '803 Patent. Id. For example, she asked if the OMC device had "a method of controlling the amount of fuel injected per at least one repetitive occurrence * * *?" Id. At one point, when Ms. Daley asked Nerstrom whether "the OMC EFI two-stroke cycle engine senses a predetermined cyclically-repeating occurrence in the rotation of the engine," Nerstrom asked, "Can you explain what -- what that sentence means?" Id. at 132.

As a result of the manner in which Ms. Daley framed her questions -- in terms of the language of the '803 Patent, rather than inquiring how the OMC device operated -- IRS objects to the admissibility of Nerstrom's deposition testimony as evidence. IRS argues that Nerstrom's deposition testimony is expert opinion testimony, because it requires him to construe the claim elements of the '803 Patent. IRS particularly objects because Nerstrom was not disclosed, by Arctic Cat or Suzuki, as an expert

---

[6]In its Memorandum in Opposition, IRS represents that Nerstrom is a former OMC employee. Memorandum in Opposition, at p. 2.

witness. In response, Arctic Cat and Suzuki contend that Nerstrom is a fact witness, who was providing facts about the parameters of the OMC device.

While we decline to resolve whether Nerstrom's testimony is properly construed as the opinions of an expert, or the factual observations of a witness, Nerstrom's deposition testimony fails to conclusively disclose the operation and characteristics of the OMC device. Rather, Nerstrom's testimony merely reveals that he believes that the OMC device senses a predetermined cyclically-repeating occurrence in the rotation of the engine, but we have no evidence before us to determine what that means in relation to the OMC device.

Further, Nerstrom's deposition testimony actually reveals a key difference between the '803 Patent device, and the OMC device, which is disclosed in the following exchange between Ms. Daley and Nerstrom:

> Q: (Ms. Daley). How is it that the OMC EFI two-stroke cycle engine determined when to open the injectors?
>
> A: (Nerstrom). There is a -- a sensor on the flywheel. * * * On -- on the bottom side of the flywheel, this is a trigger magnet. This magnet triggers ignition and it's also used to trigger injection, and it will trigger one bank of injectors and then a second bank of four injectors.
>
> Q: Now, does that -- is that timing then varied?

> A: No, the -- **the injection timing is the same for every revolution**. **It always injects at the same point**.
>
> Q: At the same point in relation to what?
>
> A: **In the same point in -- well, let's -- let's say in -- in the same -- in relation to the same point of top dead center of Cylinder No. 1 as a reference**.

Id. at 132-33 [emphasis supplied].

As we have previously explained, the Polaris Court construed the claims of the '803 Patent as allowing for variable injection timing, that is, injection timing that does not always inject at the same point in relation to top dead center of the cylinder. Rather, as we have noted, the Polaris Court's construction of the claims is that only the reference point for the timing sensing means must coincide with a cyclically repeating event, but that actual injection can occur at different, variable, points in relation to the position of the cylinder in the crankshaft. As a result, far from conclusively establishing that the OMC device is identical, in most respects, to the device embodied in the '803 Patent, Nerstrom's testimony actually creates a triable issue of fact, and thus, Summary Judgment on invalidity would be inappropriate.

Further, IRS also objects to the admissibility of the deposition of Maier, who developed the OMC device. Id., Ex. H, at pp. 84-85.[7] Maier was deposed in connection with this litigation. During his deposition, counsel for IRS repeatedly objected to his testimony insofar as he was construing the claims of the '803 Patent. Ms. Daley, who was questioning Maier on behalf of Arctic Cat, explained that Maier was only a fact witness. Id. at 272. However, Ms. Daley also questioned Maier regarding the parameters of the OMC device, by quoting language from the '803 Patent. Id. at 291 ("Did the OMC Formula One engine have a timing sensing means for generating an electrical signal responsive to a predetermined cyclically repeating occurrence in the engine?").

As stated, regardless of the admissibility of the deposition testimony of Nerstrom and Maier, we find that Arctic Cat and Suzuki have failed to meet their burden with respect to establishing facts that demonstrate that the OMC device contained all of the limitations of the '803 Patent, except a temperature sensor.

[7]Not only does IRS assert that Maier's testimony is inadmissible lay opinion evidence, but IRS also contends that Maier is a "very interested and biased witness, as well as an admitted perjurer." Memorandum in Opposition, at p. 12. Of course, the credibility of his testimony must be weighed by either the Court on Summary Judgment, or the Jury at Trial.

Accordingly, Summary Judgment on invalidity is inappropriate, and we recommend that the Motion be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1. That the Motion of Arctic Cat and Suzuki for Summary Judgment on the Basis of Invalidity of the '803 Patent Under [Title] 35 U.S.C. §103 [Docket No. 580] be denied.

2. That the Motion of Arctic Cat and Suzuki for Summary Judgment of No Infringement of the '803 Patent [Docket No. 583] be granted as to the Accused Products, with the singular exception of the Kokusan EFI system in the model year 2002 785-EID Suzuki engine.

February 18, 2005

s/ Raymond L. Erickson
Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties **by no later than March 7, 2005,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than March 7, 2005,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.