UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Arctic Cat, Inc., a Minnesota
Corporation,

                                  Plaintiff,

    vs.

Injection Research Specialists,
Inc., a Colorado corporation,
and Pacer Industries, Inc., a
Missouri corporation,

                             Defendants.

    and

Injection Research Specialists,
Inc., a Colorado corporation,
and Pacer Industries, Inc., a
Missouri corporation,

                          Counterclaimants,

    vs.

Arctic Cat, Inc., a Minnesota
corporation, and Suzuki Motor

Corporation, a Japanese
Corporation,

      Counterdefendants.   Civ. No. 01-543 (MJD/RLE)

  * * * * * * * * * * * * * * * * * * *

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Motions of the Plaintiff Arctic Cat, Inc. ("Arctic Cat"), and Counterdefendant Suzuki Motor Corporation ("Suzuki"), for Summary Judgment on the issues of Invalid Reissue, and False Reissue Oath.

A Hearing on the Motions was conducted on July 14, 2004, at which time, Arctic Cat appeared by Annamarie A. Daley and Aaron A. Myers, Esqs.; Suzuki appeared by Thomas J. Jenkins, Bruce C. Zotter, and William F. Forsythe, Esqs.; and the Defendants Injection Research Specialists, Inc., and Pacer Industries, Inc. ("IRS"), appeared by Anthony de Alcuaz and Robert J. Blanch, Esqs.

For reasons which follow, we recommend that the Motion of Arctic Cat, and Suzuki, for Summary Judgment based on Invalid Reissue be granted, and their Motion for Summary Judgment on False Issue Oath be denied.

## II.  Factual and Procedural Background

As this case makes evident, at times, the route to a patent is serpentine.  On November 12, 1987, Ronald Chasteen ("Chasteen") filed his patent application, which he later assigned to IRS.  See, Declaration of Christopher W. Day in Support of Arctic Cat's, and Suzuki's Motion for Summary Judgment Based on Invalid Reissue and False Reissue Oath ("Day Declaration"), Exh. 1.  Chasteen's initial patent application contained eight (8) claims.  Id.  The Patent Examiner noted that claims 1 through 8 covered two inventions -- a system for heating electronic fuel injection ("EFI") computer components, and another for an EFI system -- and required that IRS select one of the two inventions for patent prosecution.  Day Declaration, Exh. 2.  IRS selected the claims covering systems for heating computer components, and cancelled the claims covering EFI systems.  Day Declaration, Exh. 3.  Although the Patent Office allowed claims 1 through 3, Chasteen instructed his patent attorney, William O'Meara ("O'Meara"), to abandon that application as IRS's EFI system, which was then under development, "did not require computer chip temperature control circuitry."  Day Declaration, Exh. 11, at p. 2.

IRS then filed its first "continuation" application, Day Declaration, Exh. 5, which included a single claim covering an EFI system.  In choosing an EFI claim for

the continuation application, IRS selected claim 6 from its original application, rather than claim 5.  Given their expansively different contents, we read claim 6 as much more narrow in scope than claim 5, which is the only other EFI claim in IRS's original patent application.  See, <u>Day Declaration</u>, Exh. 5, at pp. 33-38. In explaining the selection of claim 6, O'Meara wrote to Chasteen, as follows:

> In [a March 16, 1989] meeting, you expressed a desire to file an inexpensive continuation application containing a single claim corresponding, with some modification, to claim 6 of the original IRS US 1 application.  We discussed the modifications to claim 6 at the meeting.

<u>Day Declaration</u>, Exh. 11, at p. 2.

As detailed in that same letter, the proposed modifications to claim 6 would broaden its coverage by eliminating the structure, which was recited in one entire claim element, as follows:

> Per your instructions at our meeting of March 16, 1989, I have prepared a continuation application having a Specification and drawings corresponding to your original case.  This application contains a single claim corresponding generally to claim 6 of your original case, but with modifications to claim paragraph (d) and eliminating original subparagraph (ix) of claim paragraph (I).

<u>Day Declaration</u>, Exh. 4, at p. 1.

The Patent Office allowed this claim on September 5, 1989, and established a deadline of December 5, 1989, for paying the issue fee.  See, <u>Day Declaration</u>, Exh. 6, at p. 1.

In November of 1989, O'Meara strategized, with Chasteen, and with the management of IRS, concerning the optional approaches that IRS might want to pursue, rather than to simply have the patent issue with the single claim.  For example, in a letter dated November 14, 1989, O'Meara observed that some persons at IRS wanted to accept the allowed claim of the continuation application, pay the fee to issue the patent, and obtain an early issuance of the patent.  In O'Meara's words:

> Some of the company officers are concerned about the effect that unauthorized use of IRS technology by Polaris, Artic [sic] Cat, and/or others may have on your investors and on your potential future customers and feel that early issuance of a patent corresponding to [the continuation application] may have a beneficial effect for the company.

Day Declaration, Exh. 11, at p. 3.

However, O'Meara was also aware that some at IRS wanted greater claim protection, as to claims 1 through 3 of the original patent application, and he recounted as follows:

> With respect to claim[s] 1-3 of [the original patent application], it is my understanding that you would like to obtain such claim protection because even though you are not currently using CPU [i.e., the Central Processing Unit] temperature control circuitry, [which is] the subject matter of claims 1-3, you feel that you or your competitors may need to use this technology in the future.

Id.

Then O'Meara detailed four options, with respect to United States patent protection,

for the consideration of IRS's management:

> (1)     Pay the issue fee and allow the IRS [continuation application] patent to issue in its present form;

> (2)     Pay the issue fee for IRS [continuation application patent] and, prior to issuance thereof, file a continuation application claiming formerly allowed claims 1-3 of the original [patent] application directed to CPU heating circuitry and also making claims which more broadly protect the fuel injection control system than that afforded by [the current continuation application].

> (3)     Same as (2) except allow [the current continuation application] to go abandoned and insert a claim corresponding to allowed claim 1 into the new continuation application.

> (4)     Abandon [the current continuation application], undertake no further continuation application filings, and simply rely on your trade secret rights for protection.

Id. at pp. 3-4.

O'Meara recommended the third option.  In O'Meara's language:

> It is our recommendation that you pursue the third option, i.e., (1) immediately file a continuation application having claims identical to those which were indicated to be allowable by the Patent Office in [the original patent application and the current continuation application] cases and also including claims directed to the same general subject matter as the [current continuation application] claim but of broader scope; (2) do not pay the issue fee for the

> [current continuation application patent], allowing this case
> to go abandoned effective December 5, 1989.

Id. at p. 4 [emphasis in original].

In effect, O'Meara was recommending that IRS file another continuation -- rather than to allow the Patent to issue -- which continuation would contain claims 1 through 3 of the original patent application, and claim 6 of the continuation application. The reasons for his recommendation were explained, by O'Meara, as follows:

> Issuance of a patent constitutes a publication which will, prospectively, terminate your trade secret rights and the associated right to recover damages for unauthorized use of your trade secret information. Much of the trade secret information which is described in your patent application may be lost at the time that IRS begins selling products embodying this technology, but it is not advisable to give these rights any sooner than necessary. We do not know whether the product announced by Artic [sic] Cat will actually be covered by claim 1 of [the current continuation application]. Thus, it is not advisable to give up IRS trade secret rights to obtain the early issuance of a patent which may not cover Artic [sic] Cat's new product.
>
> Furthermore, even if a patent issuing from [the current continuation application] did not cover the new Artic [sic] Cat product, early issuance of this patent would likely allow Artic [sic] Cat and/or your other competitors to modify their new product designs to avoid your patent on future machines before they made a substantial investment in those new product designs and before they built up a substantial inventory of infringing products.

- 7 -

> It is my understanding that you have recently conducted
> technology searches with respect to certain new product
> enhancements.  As we have discussed in the past, you have
> a legal duty to disclose information to the Patent Office
> which is material to the allowability of your patent claims.
> This duty is a continuing duty which ends only at the time
> that a patent issues.  Failure to comply with this duty may
> result in a finding of "inequitable conduct" and loss of all
> patent rights not only in the subject patent but also in all
> other patents which were filed as continuation applications
> from the same original patent application.  By abandoning
> the [current continuation application] and filing a
> continuation application, we would have an adequate
> opportunity to review any technology references which may
> have recently come to you attention.  If necessary, we
> would cite any pertinent references to the Patent Office so
> as to avoid any potential charge of "inequitable conduct" in
> future litigation.

Id. at pp. 4-5.

On November 27, 1989, in a tape-recorded telephone conversation, which has been

reduced to a written transcript, O'Meara discussed his recommendation, and

responded to questions from IRS's management, concerning the other options which

he had drawn to IRS's attention.  The conversation was extensive, and thoroughly

probed the concerns raised by IRS.  See, Day Declaration, Exh. 13.

In the course of that conversation, IRS made known its keen interest in retaining

the original application date of November 12, 1987.  Id. at pp. 1-2.  In addition, IRS

expressed its interest in having the continuation application issue for business strategic

reasons.  In the following exchange, the regular type reflects the statements of IRS's

management, while the italicized type denotes the statements of O'Meara:

> I guess my concerns are twofold:  1) We've had a long,
> lengthy discussion this morning among ourselves.  There
> are certain advantages to going ahead and getting the
> patents in place.  *Have you considered the trade secrecy*
> *thing.[1]*  I don't think that bears as much weight as we might
> have previously given it.  If we look at the marketplace out
> here, from a pure business standpoint, I believe that the
> patent, at this point in time, gives us some protection, gives
> us some business opportunity and provides an opportunity
> for us to have something in for us that we can actually show
> potential clients.   We do end up having a published
> document, if you will, but that published document in reality

---

[1] O'Meara appears to be referencing his fourth option, which was to rely on a claimed breach of trade secrets, by one of IRS's consultants who, assertedly, was "hired" from IRS by Polaris Industries.  See, <u>Day Declaration</u>, Exh. 11, at p. 2.  We further note that O'Meara's reference to a reliance upon "trade secrets," as opposed to securing a patent on the continuation application, may have been somewhat prophetic, as IRS lost its patent infringement lawsuit against Polaris Industries, but won its conjoined breach of trade secret action.

> doesn't really release any of what I call secrets.  They would still have to come up with formulas, data and everything else to make this thing work.

Id. at p. 5.

O'Meara, however, expressed concern about competitors having the opportunity to design around IRS's patent if the continuation application were to issue as a patent, and he cautioned as follows:

> *Okay.  There is one further consideration and this may be a big one.  By letting this information out now, you are giving your competition a chance to look at your Patent Application, to look at your specifications and, potentially, to dance around what you are doing as opposed to putting them in a position where they are committing themselves to a particular type of design that's going to infringe your patent so that they are going to be locked into something where you can request a license from them.*

Id.

IRS was unconcerned, as they viewed the second option, which had been proposed by O'Meara, and which contemplated a second continuation application, would effectively monopolize, for the benefit of IRS, the otherwise competitive market.  In the words of IRS:

> I agree with you, but with the [second continuation] effort if we are going to press for the battery and timing device and the heat control, we think we've probably locked off 99% of the entry available for people who are going to be building this thing no matter [what] it looks like.

Id.

Being cautiously circumspect, O'Meara had another problem with allowing the issuance of the continuation application as a patent, which he did not want to "memorialize" in his letter to IRS of November 14, 1989.  See, Day Declaration, Exh. 13, at p. 3 (*"There is another wrinkle to this whole thing that I didn't put into the letter, on purpose, just because I don't necessarily want to memorialize this situation * * *."*).  In O'Meara's judgment, the Patent Examiner, in allowing the single claim in the continuation application, had done so for what could be argued was the wrong reason, and O'Meara felt that the Patent Examiner should be afforded an opportunity to correct the ambiguity in his allowance.

In this context, and most particularly in conjunction with his recommended third option, O'Meara expressed, in the following exchange with IRS, the desirability of expanding upon the one claim of the allowed continuation application:

> The other thing is, can't you clean up this language in your Continuance [sic]?  *Yes, we can and we intend to do that. Put down broader claims.*

Id. at p. 5.

*   *   *

> But we're going to clean that up with this Continuance [sic]. *Well, what the problem with this language in this*

> *particular Application is that it casts doubt as to the allowability of the claim in this particular case. Now, I agree. In the Continuation Application we're going to put in a broader set of claims anyway and if we can get those that's great. Then this particular Application won't make that much difference one way or the other. If we can get broader claims, then this particular patent won't make too much difference if it's allowable or not allowable because we'll have another broader patent later on to protect ourselves with.*

<u>Id.</u> at p. 6.

As noted, IRS opted for the issuance of the continuation application, and the filing of a second continuation application so as to address the previously allowed claims 1 through 3 of the original patent application. The continuation patent application issued as the '701 Patent on February 20, 1990.

On November 30, 1989, O'Meara transmitted to Chasteen a copy of a proposed second continuation application, which had four claims, and he explained as follows:

> Per your instructions, this application includes claims 1-3 corresponding to claims 1-3 which were allowed in the abandoned [original patent] application, and also includes a claim 4 based upon claim 1 of the allowed [continuation application] claim and including the changes which you and I discussed over the phone.

<u>Day Declaration</u>, Exh. 16, at p. 1.

As we have previously noted, claims 1 through 3 of the original patent application covered a system for heating computer components and were identical to the claims that had been allowed by the Patent Office, but which IRS had elected to abandon.

The referenced claim 4 covered an EFI system that was broader than the claim that had been allowed in the first continuation application -- that is, claim 1 of the '701 Patent -- in the following three respects:  1) the proposed claim 4 eliminated the '701 Patent's claim element requiring a battery; 2) claim 4 eliminated the '701 Patent's claim element requiring the CPU to control the fuel pump; and 3) claim 4 recited a pressure sensor for "air pressure," and not for "barometric air pressure," as required in the '701 Patent.  See, Day Declaration, Exh. 17, at pp. 30-34, and Exh. 18, at columns 14-16. On December 4, 1989, O'Meara filed the second continuation, which included claim 4, but that claim was subsequently cancelled, on "double patenting" grounds, before the second continuation application was issued, on November 6, 1990, as Patent '712.

Thereafter, on February 18, 1992, IRS filed a request to reissue the '701 Patent, so as to add six (6) broader claims.  As required by the Rules of the Patent Office, IRS was obligated to submit an oath which would identify each error in the '701 Patent that it sought to correct, and would explain how each error arose.  See, 37 C.F.R. §1.175.  In his original reissue oath, Chasteen averred that the error in the '701 Patent

was that he "claimed less than he had a right to claim in the patent." Day Declaration, Exh. 20, at ¶2. The Patent Office rejected Chasteen's original oath, and IRS filed Chasteen's first supplemental oath, which was rejected as conclusory, in that Chasteen did not identify who discovered the errors and when that discovery occurred in terms of specific dates. See, Day Declaration, Exh. 23, at ¶2.

IRS then filed a second supplemental reissue oath which, Arctic Cat and Suzuki contend, contains the following false attestations:

> When disclosing the invention to my attorney I erroneously imparted to him the idea that all of these prototype elements should be included within the protection of the patent instead of seeing to it that the attorney was focused on the basic elements of my fuel injection system for two cycle engines.

Day Declaration, Exh. 24, at p. 7.

*   *   *

> I had no knowledge of the legal effect of including structural elements in the claim which were unnecessary in order to satisfy my statutory obligation to particularly point out and distinctly claim the subject matter which I regarded as my invention.

Id. at p. 8.

*   *   *

> I was not informed and did not know enough to ask regarding what I now understand is the customary approach

- 14 -

of submitting in the original application a series of claims to the invention which are both broad and narrow in their potential patent coverage.

Id.

\*   \*   \*

The single submitted claim in the continuation application, No. 345,081, filed April 28, 1989, was allowed on the first action by the patent examiner and, when allowed, I erroneously believed that the allowed claim, portraying essentially the entire prototype structure, was the proper approach to protecting an invention and represented the protection to which I was entitled for my invention in fuel injecting a two stroke-cycle engine.

Id. at p. 9.

\*   \*   \*

After the [Polaris] suit had progressed for several months, and generally in the September-December 1990 time frame, I was called upon to work with IRS's litigation attorneys in analyzing the content, scope and breadth of the claim of the Original Patent.  It was through this process that I began to learn the difference between a narrow claim and a broad patent claim.

Id.

The Patent Office accepted IRS's second supplemental reissue oath, explaining as

follows:

The new matter added to this second supplemental oath is considered to satisfy the requirements of 37 C.F.R. 1.175. Specifically, they address the fact that applicant and his

- 15 -

> attorneys considered the scope of his claims when they met
> to discuss the lawsuit and state when the consideration was
> made during that lawsuit.

Day Declaration, Exh. 25, at p. 3.

Notably, no submission was made to the Patent Office so as to corroborate IRS's

representation that Chasteen had been misinformed, by O'Meara, into claiming less in

his Patent than he had a right to claim.

As but one example, O'Meara was not called upon to verify that Chasteen's

aspersions of fault, as to O'Meara's legal counsel, were either accurate or justified.

Rather, in conjunction with Chasteen's second supplemental reissue oath, IRS's then

legal counsel, Richard W. Hanes ("Hanes"), filed a "Remarks and Argument" which

urged, in pertinent part, as follows:

> The description of how the errors were discovered also has
> been supplemented in the Second Oath to include date
> ranges and a more detailed description of how the
> discovery of the error was made.  While it may be possible
> to even further detail the events, transactions and
> conversations which led to the discovery of the error by the
> affiant, to do so would compromise a fundamental right of
> the affiant and patent owner -- the attorney/client privilege.
> That basic right is hereby claimed by the affiant and the
> patent owner.  Certainly, the information required to be
> supplied by the affiant to demonstrate than an error arose
> without deceptive intent does not have to be of such
> compass as to violate the attorney/client privilege.
> Requiring particulars and detail in addition to those now

- 16 -

> present in the submitted Second Oath would violate the
> attorney/client privilege.  The facts now set forth therein are
> sufficient to demonstrate a lack of deceptive intent and
> satisfy the applicable regulation.

Order of September 30, 2003 [Docket No. 348], at pp. 6-7, quoting Exhibit F to
Mieghem Decl., at p. 4.

The Patent Examiner was persuaded by IRS's invocation of the attorney/client

privilege, as the Examiner ruled as follows:

> Applicant states that he has limited his changes to the
> original declaration in his latest supplemental declaration
> based on alleged attorney client privilege -- an issue which
> is difficult to resolve other than to require a confidential
> submission of additional material in a sealed envelope to the
> examiner for his consideration on the merits -- see MPEP
> Section 724.02.
>
> Before that avenue needs to be explored, however, the
> second supplemental reissue oath will be treated on its
> merits.

Day Declaration, Exh. 25, at p. 3.

As a consequence, the Patent Examiner, who granted the reissuance, was not privy to

the exchanges, between O'Meara, and IRS and Chasteen, which we have detailed.

On December 6, 1994, the reissue was granted, and the '701 Patent was

reissued as the '803 Patent, with far broader claims than the '701 Patent.  The reissue

occurred notwithstanding Polaris Industries' two protests to that reissuance, based on

- 17 -

prior art, and the reexamination, which was undertaken by the Patent Office on the basis of those protests.

### III.  Discussion

Arctic Cat and Suzuki have a two-pronged argument in support of Summary Judgment, both predicated on the reissuance of the '701 Patent as the '803 Patent. First, they contend that the reissuance statute, Title 35 U.S.C. §251, is only intended to correct "errors" which result from "inadvertence, accident, or mistake," and that the '701 Patent did not issue with a single claim because of an inadvertence, accident or mistake -- that is, an error correctable by reissue -- because IRS deliberately elected to have the '701 Patent issue, notwithstanding advice from IRS's attorney, that the patent application should be abandoned.  Secondly, Arctic Cat and Suzuki argue that Chasteen's second supplemental reissue oath contained at least five (5) averments which were false, and were intended to deceive.  Accordingly, Arctic Cat and Suzuki seek a Judgment of invalidity as to the '803 Patent on the grounds that it was improperly issued.

In response, IRS contends that "Arctic Cat and Suzuki improperly attempt to eliminate the need to prove deceptive intent but argue alternatively that Mr. Chasteen did deceive the Patent Office in his reissue oath," and that the "heart of Arctic Cat's

and Suzuki's argument is that Mr. Chasteen's reissue oath statements concerning what he understood about patent law and what information was provided to him by his attorney are false." IRS's Opposition to Arctic Cat's and Suzuki's Motion for Summary Judgment based on Invalid Reissue and False Reissue Oath ("IRS's Opposition), at p. 9. In addition, IRS urges that "[t]he evidence does not support this conclusion and certainly does not support taking the issues of Mr. Chasteen's state of mind and credibility away from a jury." Id.

We conclude that a different standard applies to the claim that the '803 Patent was invalidly reissued, as any error, contemplated by Section 251, was not presented, than applies to the issue involving a false reissue oath. We are persuaded that Arctic Cat, and Suzuki, are entitled to Summary Judgment on the invalidity of the reissuance, but the question of a false reissue oath necessarily involves a finding of an intent, on Chasteen's part, to deceive, which raises Jury issues.

A. Standard of Review. In patent law, as elsewhere, "[s]ummary judgment is only appropriate if the evidence fails to create a genuine issue of material fact." Med. Instrumentation and Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1220 (Fed. Cir. 2003), cert. denied, --- U.S. ---. 124 S.Ct. 1715 (2004), citing Rule 56(c), Federal Rules of Civil Procedure. Here, too, "all factual inferences are to be drawn in favor

of the nonmoving party." Id., citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

255 (1986).  Of course, "in ruling on a motion for summary judgment, the judge must

view the evidence presented through the prism of the substantive evidentiary burden."

Anderson v. Liberty Lobby, Inc., supra at 254; see also, CFMT, Inc. v. Yieldup

Intern. Corp., 349 F.3d 1333, 1337 (Fed. Cir. 2003).

"A patent is presumed valid."  Molecular Dynamics, Inc. v. Leica, Inc., 1999

WL 111789 at *7 (N.D. Calif., February 23, 1999), citing Title 35 U.S.C. §282.

Therefore, "[o]n a summary judgment motion to invalidate a patent, the party asserting

invalidity bears a heavy burden."  AT&T Corp. v. Microsoft Corp., 2004 WL 292321

at *1 (S.D.N.Y., February 17, 2004), citing Tillotson, Ltd. v. Walbro Corp., 831 F.2d

1033, 1036 (Fed. Cir. 1987), and Schumer v. Lab. Computer Sys., Inc., 308 F.3d

1304, 1315 (Fed. Cir. 2002).  "When looking at * * * proffered evidence of invalidity,

it must be kept in mind that issued patents enjoy a presumption of validity, and

therefore the evidence to show invalidity must be clear and convincing."  Med.

Instrumentation and Diagnostics Corp. v. Elekta AB, supra at 1220, citing Schumer

v. Lab. Computer Sys., Inc., supra at 1315-16.  "In the case of reissue patents, the

movant's burden is 'made heavier' because the reissue patent has undergone 'a fresh

- 20 -

examination.'"   AT&T Corp. v. Microsoft Corp., supra at *1, quoting Interconnect

Planning Corp. v. Feil, 774 F.2d 1132, 1139 (Fed. Cir. 1985).

Patents may be reissued if the requisites of Title 35 U.S.C. §251 have been fully

satisfied.  In pertinent part, Section 251 provides as follows:

> Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Director shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent.

"Whether the statutory requirements of 35 U.S.C. §251 have been met is a question

of law," but "[t]his legal conclusion can involve underlying factual questions."  Hester

Indus., Inc. v. Stein, Inc., 142 F.3d 1472, 1479 (Fed. Cir. 1998), cert. denied, 525

U.S. 947 (1998), citing In re Clement, 131 F.3d 1464, 1468 (Fed. Cir. 1997).

"The 'error' requirement limits the availability of a reissue patent to certain

correctable errors."  Id., citing In re Amos, 953 F.2d 613, 616 (Fed. Cir. 1991).  As

explained in Hester:

> In considering the "error" requirement, we keep in mind that the reissue statute is "based on fundamental principles of

> equity and fairness, and should be construed liberally."  In re Weiler, 790 F.2d 1576, 1579, 229 USPQ 673, 675 (Fed. Cir. 1986).  We also keep in mind that "not every event or circumstance that might be labeled 'error' is correctable by reissue."  Id.  Indeed, the reissue procedure does not give the patentee the right "to prosecute de novo his original application."  Id. at 1582, 790 F.2d 1576, 229 USPQ at 677; see also Mentor Corp. v. Coloplast, Inc., 998 F.2d 992, 995, 27 USPQ2d 1521, 1524 (Fed. Cir. 1993).

Hester Indus., Inc. v. Stein, Inc., supra at 1479.

Otherwise stated, "[t]he reissue procedure is only available to correct error in claims in patents as originally issued," and "'[t]he reissue statute was not enacted as a panacea for all patent prosecution problems, nor as a grant to the patentee of a second opportunity to prosecute de novo his original application.'"  Nupla Corp. v. IXL Mfg. Co., 114 F.3d 191, 195 (Fed. Cir. 1997), quoting In re Weiler, 790 F.2d 1576, 1582 (Fed. Cir. 1986).  "If the alterations which the reissue applicant made were not to correct an 'error,' they could not be made during reissue."  Id.

"The use of the word 'error' [within the meaning of Section 251] instead of the words 'inadvertence, accident or mistake,' which appeared in the corresponding section, 35 U.S.C. §64, Section 4916 R.S., of the patent statutes prior to the recodification of 1952, does not involve a substantive change, and the same type of error is necessary to justify a reissue after the enactment of the Patent Act of 1952 as

before." In re Byers, 230 F.2d 451, 454 (C.C.P.A. 1956); see also, In re Jarlais, 233 F.2d 323, 327-28 (C.C.P.A. 1956). "Accordingly, decisions as to what constituted inadvertence, accident or mistake under the prior law are pertinent here." Id. "It is well settled that the deliberate withdrawal or amendment of a claim in order to obtain a patent does not involve the inadvertence, accident or mistake and is not an error of the kind which will justify a reissue of the patent including the matter withdrawn." Id. at 455.

As a consequence, "[i]t is evident that since the deliberate cancellation of a claim in order to obtain a patent constitutes a bar to the obtaining of the same claim by reissue, it necessarily also constitutes a bar to the obtaining of a claim which differs from that canceled only in being broader." Id. at 456. In fact, "'[t]he deliberate withdrawal of a claim in order to secure a patent is conclusive of the presumption that there has been no inadvertence, accident, or mistake, and the invention thus abandoned cannot be regained either by construing the claims of the patent broadly or by obtaining a reissue with broadened claims,'" and "'[t]he rule is the same whether the claims sought by reissue or otherwise are identical, substantially the same, or broader than the abandoned claims.'" Id., quoting In re Murray, 64 F.2d 788, 791-92 (C.C.P.A. 1933), quoting, in turn, Ex parte White, 1928 C.D. 6.

Lastly, it stands to reason that, if the claimed error proves to be one that is not remediable under Section 251 then, ipso facto, the other requisites of that statute are also inapplicable, since the statute, by its very terms, does not apply.   As a consequence, if the error is not correctable under Section 251, then the party claiming invalidity need not satisfy the "deceptive intention" requirement.   The cases so hold. See, e.g., In re Watkinson, 900 F.2d 230 (Fed. Cir. 1990)(Court holds that patent applicant's acquiescence in a restriction requirement in her original patent application was not an error correctable by reissue, without reference to deceptive intention); In re Weiler, supra at 1582 ("[Applicant] and the Solitor argue as though the 'error' to be corrected by reissue were a subjective error," and "[i]t is not," for "[w]e do not here deal with 'deceptive intention.'"); In re Mead, 581 F.2d 251, 256-57 (Fed. Cir. 1978)("conscious choice" not to file continuing application not "error"); In re Byers, supra at 454 (deliberate amendment of claim not "error").   On the other hand, as the plain language of Section 251 makes clear, the error of  patentees in claiming "less than they had a right to claim," without "deceptive intention," is an error correctable by reissuance.   See, Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1575 (Fed. Cir. 1991).

B.   <u>Legal Analysis</u>.  Our analysis commences with a recognition that "[o]ne of the most commonly asserted 'errors' in support of a broadening reissue is the failure of the patentee's attorney to appreciate the full scope of the invention during the prosecution of the original patent application" -- which is the error claimed by IRS. <u>Hester Indus., Inc. v. Stein, Inc.</u>, supra at 1479, citing <u>In re Amos</u>, supra at 616. Plainly, if that "error" is substantiated, then it is "a form of error" that "has generally been accepted as sufficient to satisfy the 'error' requirement of §251." <u>Id.</u> at 1480, citing <u>In re Clement</u>, supra at 1468.  Moreover, we accept "that an examiner's decision on an original or reissue application is 'evidence the court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence,' and that, upon reissue, the burden of proving invalidity was 'made heavier.'"  <u>Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.</u>, 807 F.2d 955, 961 (Fed. Cir. 1986), quoting <u>Interconnect Planning Corp. v. Feil</u>, supra at 1139, quoting, in turn, <u>Fromson v. Advance Offset Plate, Inc.</u>, 755 F.2d 1549, 1555 (Fed. Cir. 1985).

Notwithstanding the deference that is due to the Patent Examiner, we are presented, here, with an uncontested evidentiary Record,[2] the most crucial components of which were never seen by the Patent Examiner in conjunction with IRS's reissuance application, or otherwise. IRS largely faulted O'Meara for its error in claiming less than it had a right to claim, but flatly refused to present competent evidence on that issue by invoking the attorney-client privilege, and the Patent Examiner desisted, and assumed that IRS, through Chasteen, was accurate in his sworn representations. There the matter would have rested, but for the insistence of Arctic Cat, and Suzuki, to have access to the communications between IRS and O'Meara. Although IRS staunchly opposed that access, we were persuaded that IRS

---

[2]IRS moved to strike certain of the exhibits, which were attached to the "Day Declaration," as being incompetent, and IRS, again, maintains its objection that the communications between IRS, and O'Meara, are privileged. Once again, we reject the claim of privilege for reasons we have previously detailed. See, Order of September 30, 2003 [Docket No. 348]. As to the other specific Objections, see Docket No. 630, we recommend that they be denied as moot, as we have relied on the prosecution history presented by the parties, and the communications, by letter and telephone, between O'Meara and representatives of IRS -- the same communications upon which IRS has relied in responding to the Motions. Accordingly, "there are no underlying material facts as to which there is a genuine issue in dispute," and "[a]ll that remains is the ultimate legal conclusion as to whether the asserted reissue claims fail to meet the 'error' requirement * * *." Hester Indus. v. Stein, Inc., 142 F.3d 1472, 1484 (Fed. Cir. 1998), cert. denied, 525 U.S. 947 (1998).

could not have the advantage of using the attorney-client privilege as both a sword, and a shield -- that is, employing those privileged communications so as to secure a reissuance, while invoking the privilege to deflect any attempt by the Patent Examiner to inquire further into the representations of error Chasteen was making.

Our ruling -- that the attorney-client privilege had been waived -- was adopted by the District Court, the Honorable Michael J. Davis presiding, who also denied IRS's request for a Stay of that ruling and, subsequently, the United States Court of Appeals for the Federal Circuit denied both a Petition for a Writ of Mandamus, and the interlocutory appeal that IRS took on that same issue.  See, Arctic Cat v. Injection Research Specialists, Inc., 89 Fed.Appx. 736, 2004 WL 474002 (Fed. Cir., February 24, 2004).  Indeed, while a ruling was awaiting on its appeal, IRS adopted the patently unorthodox posture of refusing to abide by the rulings of this Court, thereby requiring the Court to issue a further Order, on February 12, 2004, directing IRS to comply by a date-certain, or face the imposition of sanctions.[3]  But for the Orders of this Court,

---

[3]IRS's defiance of the Orders of the Court is particularly problematic given the apparent absence of applicable legal authority for its appeal, which caused the Court of Appeals to admonish IRS by noting that its "dogged citation to the minority view of the United States Court of Appeals for the Third Circuit is not well received." Arctic Cat Inc. v. Injection Research Specialists, Inc., 89 Fed.Appx. 736, 2004 WL

(continued...)

as undisturbed on appeal, the communications, which we have detailed, between IRS and O'Meara, would have remained fully obscured from critical review.

As a consequence, we have considered information that IRS consciously elected to shield from the Patent Examiner and, while we would have preferred to defer to the Examiner's decision on reissuance, the simple fact is that the Examiner had less than a full Record to consider on the core, critical question for reissuance. With that pivotal, uncontradicted evidence before us, the conclusion is inescapable that, if IRS and Chasteen claimed less than they had a right to claim in the '701 Patent, it was solely because they had made the deliberate, conscious choice to pay the applicable fee, secure the original Patent -- limited to one claim -- for business reasons which were sufficient to them, despite the diametrically opposed advice of O'Meara that IRS should seek broader claims before the issuance of that Patent. If O'Meara bears any fault, it rests solely in his powers of persuasion -- for IRS was not to be deterred from the issuance of the '701 Patent, notwithstanding compelling arguments to the contrary, including that it may have been improperly issued.

---

[3](...continued)
474002 at *1 (Fed. Cir. 2004). We now have a full understanding as to why IRS so desperately sought to keep those claimed confidences concealed.

Had IRS forthrightly disclosed those critical communications to the Patent Examiner, or had the Patent Examiner pressed for the disclosure of those communications, we are presented with no reason to believe that the Examiner would have found an "error" that was correctable under Section 251 and, indeed, our finding is to the contrary. While IRS seeks to distinguish the cases, upon which Arctic Cat and Suzuki rely, and which we find apposite, by asserting that, "[i]n those cases the Federal Circuit reviewed the Patent Office's findings of fact on a clearly erroneous standard of review and without a presumption of validity." IRS's Opposition, at p. 8. While IRS importunes that the "standard this Court must apply is very different" -- in that "this Court should give due deference to the Patent Office's decision to grant IRS's reissue application" -- the point IRS misses is that the holdings, upon which Arctic Cat and Suzuki rely, parallel our obligation to determine, on the entire Record presented, whether an error, which is correctable by Section 251, allowed the reissuance that IRS obtained.[4]

_____

[4]IRS's reliance upon Ball Corp. v. United States, 729 F.2d 1429, 1437 (Fed. Cir. 1984) is unavailing for, whatever else may be said about Ball, the patent holder there did not obtain a reissuance of broader claims, but rather, of claims characterized as being "intermediate." Here, the scope of the claims, which were secured by IRS through reissuance, were unquestionably broader than the singular, and narrower, claim

(continued...)

We conclude, as a matter of law -- since the evidence on this issue presents no genuine issue of material fact -- that the error on which IRS sought reissuance was not correctable under Section 251, because IRS elected, voluntarily and knowingly, to get all that it wanted with the issuance of the '701 Patent.  Only when it was staging for its infringement battle with Polaris Industries did IRS second-guess its original decision to secure the protections of the '701 Patent -- a decision which contravened the counsel of its patent attorney, who told IRS that it should secure broader claims, rather than have the one claim of the '701 Patent issue.[5]  IRS's deliberate choice was

---

[4](...continued)
in the '701 Patent.

[5]Chasteen, and IRS, profess that IRS was not sufficiently knowledgeable about matters of patent law to know the distinction between "broad" and "narrow" claims. A simple review of the communications, between O'Meara and IRS, belies any such contention.  As the Court explained, in In re Weiler, 790 F.2d 1576, 1583 n. 4 (Fed. Cir. 1986):

> Weiler's reliance on allegations of the inventors' ignorance of drafting and claiming technique and counsel's ignorance of the invention is unavailing.  Those allegations could be frequently made, and, if accepted as establishing error, would require the grant of reissues on anything and everything mentioned in a disclosure.  Weiler supplies no facts indicating how the ignorance relied on caused any error as the basis of his failure to claim the subject matter of claims 13 and 19.  As indicated in the text §251 does not

(continued...)

not the product of "inadvertence, accident or mistake," as it was the conscious, intelligent choice of a business which sought to secure a hold -- perhaps as great as 99% -- on the marketplace of its patented product.  Accordingly, we recommend that the Motion for Summary Judgment of Invalidity on Invalid Reissue of Arctic Cat, and Suzuki, be granted.

Arctic Cat, and Suzuki, invite us to proceed further, and find that IRS, through Chasteen, made false statements in the oaths of reissuance.  In our view, the evidence strongly weighs toward such a finding, but we conclude that it is not ours to make. IRS rightly notes that issues of deceptive intention are poor candidates for Summary Judgment, unless an admission of devious intent, or evidence of like kind, exists. While we find inexplicable IRS's reticence in disclosing, as a simple matter of candor,

-----

[5](...continued)
> authorize a patentee to re-present his application.  Insight resulting from hindsight on the part of new counsel does not, in every case, establish error.

The very same may be said here.  Although Chasteen averred, in purely conclusory tones, that he did not know broad from narrow, and that hindsight gave him such insight, the communications between O'Meara and IRS categorically refute that assertion.  IRS wanted the '701 Patent to issue, immediately, and O'Meara's counsel to seek broader claims was rejected as a pure economic, business judgment.  IRS offers nothing to explain why it should not be held to the decision it willfully elected to make, and the Record before us presents none.

that it considered four options prior to electing the issuance of the '701 Patent, we recognize that IRS somehow, we think wholly mistakenly, considered such a disclosure as prohibited by the attorney-client privilege.  Indeed, the falsity of IRS's representations to the Patent Examiner appear self evident, although the falsity may not have been prompted by deceptive intent.

Here, the issue of deceptive intent is contested, and hotly so.  For each thrust that Arctic Cat and Suzuki advance on deception, IRS parries with inferences of fact that, under the regimen of Summary Judgment, must be drawn in IRS's favor. Inescapably, the issue of deceptive intention is heavily fact-laden, and we decline to parse the evidence, here, that we have reviewed in the Record, which supports either a showing of falsehood or, perhaps, of naivete, or innocent mistake, as to the five representations that Arctic Cat, and Suzuki, have identified, since the end result would necessarily be the same -- the presence of genuine issues of plainly material fact.  In contrast, no such deceptive intention impacts, let alone controls, our analysis of the existence of an "error" correctable under Section 251, but such a determination is central to a finding of a false oath.  As a consequence, we recommend that the Motion of Arctic Cat, and Suzuki, for Summary Judgment on False Reissue Oath be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That IRS's Objection to Evidence Submitted in Support of Arctic Cat's and Suzuki's Motion for Summary Judgment on Invalid Reissue and False Reissue Oath [Docket No. 630] be denied as moot.

2.      That the Motion of Arctic Cat, and Suzuki, for Summary Judgment based on Invalid Reissue and on False Reissue Oath [Docket No. 621] be granted insofar as Arctic Cat, and Suzuki, seek Summary Judgment on Invalid Reissue, and be denied insofar as Arctic Cat, and Suzuki, seek Summary Judgment on False Reissue Oath.


Dated: March 14, 2005          *s/Raymond L. Erickson*

                               Raymond L. Erickson
                               UNITED STATES MAGISTRATE JUDGE

                               **NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1©)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than March 28, 2005,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this

procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than March 28, 2005,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.