# Exhibit E

--k, Peter W.

| | |
|---|---|
| -m: | Clark, Peter W. |
| | Thursday, April 04, 2002 1:34 PM |
| | Bernstein, John H. |
| ject: | Injection Research Specialists |

I,
eviewed the Motion to Modify Protective Orders regarding the two previous IRS lawsuits in which we were involved. The eading only seeks access to the documents produced by JECS. It does not seek access to any documents produced by ris, Fuji, Suzuki, or Arctic Cat. The pleading states: "After the conclusion of the action, both counsel for IRS and er and counsel for JECS retained copies of the previously produced documents." Additionally, the pleading states: JECS argues that IRS and Pacer's previous counsel should not have retained the documents in question after the olorado litigation concluded. It is true that IRS and Pacer's previous counsel innocently retained the previously produced iments despite the terms of the protective order." We only retained the documents at the request of the new California isel. Peter Van Mieghem, counsel for IRS, then states in his declaration: "Counsel for IRS and Pacer are still in ssession of the JECS previously produced documents which were innocently retained by prior counsel who *mistakenly* *not follow instructions in the Colorado Protective Orders to destroy or return them.*" (emphasis added)

e pleading has been sent to all known counsel of the last 10 years from both Colorado cases. Counsel for Polaris may vaken to the fact that we still have their documents and start raising issues. Same for counsel for the other defendants.

iew counsel has portrayed our firm as too stupid to follow the protective orders. I would suggest that we send a letter to S, Brad Beck, and Van Mieghem informing them that we will be destroying all confidential documents in our possession, th the exception of the JECS documents (only retaining the JECS documents pending the instant motion). We should proceed to have the documents shredded. If questions about documents retained are asked, we will have the dates hen the documents were destroyed. The protective orders allow us to return or destroy the documents at our option. l additional client documents could be turned over to Gary Lozow at Isaacson. This would get us mostly out of this mess. d greatly reduce the number of boxes in storage.

Exhibit No.: 1043
Deponent: Clark
Date/RPR: 5/6/04 mH
Hunter + Geist, Inc.

K00024

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

COPY

| | | |
|---|---|---|
| ARCTIC CAT, INC., a Minnesota corporation, Plaintiff, v. INJECTION RESEARCH SPECIALISTS, INC., a Colorado corporation, and PACER INDUSTRIES, INC., a Missouri corporation, Defendants. | ) | Civil Action No. 01-CV-543 (MJD/RLE) |
| INJECTION RESEARCH SPECIALISTS, INC., a Colorado corporation, and PACER INDUSTRIES, INC., a Missouri corporation, Counterclaimants, v. ARCTIC CAT, INC., a Minnesota corporation, and SUZUKI MOTOR CORPORATION, a Japanese corporation, Counterclaim Defendants. | ) | |

VIDEOTAPE 30(b)(6) DEPOSITION OF: PETER W. CLARK
June 5, 2003

Q. Why did you review some boxes?
A. If I knew specifically from the description what it was and why we no longer wanted it, I went ahead and marked it for shredding. Some took further review or I had to look to see exactly what they were.
Q. As you reviewed documents, did you select some for shredding and select others to retain?
A. I was involved in the decision process.
Q. Of deciding which ones to shred and which ones to retain?
A. Yes.
Q. Who else was involved in that decision process?
MR. CAULEY: You can identify the people.
A. Brad Beck, John Bernstein, I believe Peter Van Mieghem from McDermott, Will & Emery. There may have been others at McDermott.
Q. (BY MR. JENKINS) What happened to the documents that were retained?
A. They have all been sent to someone.
Q. Did you send them out?
A. Yes.

Q. Who did you send them to?

A. Without looking at the index, I don't know for sure. Some were sent to Peter Van Mieghem, some were sent to Brad Beck.

Q. And they would have been sent in the time frame of May to June of 2002; is that correct?

A. Well, some were sent earlier. I created the index in 1999, and as soon as I was able to, I got rid of each box. So I would say boxes left from March of 1999 -- well, probably not that soon. But from April of '99 until the final box was gone sometime last summer.

Q. What criteria did you use to decide which documents should be shredded and which documents should be retained?

MR. CAULEY: I will object and instruct the witness not to answer.

Q. (BY MR. JENKINS) Are you following your counsel's instruction?

A. Yes.

Q. Did you receive guidelines from anyone as to which documents should be shredded and which documents

should be retained?

MR. CAULEY: If those guidelines came from anyone inside of Kutak Rock or any counsel for IRS, then I'm instructing you not to answer.

A. Then I cannot answer.

Q. (BY MR. JENKINS) Does Exhibit 108 reflect -- well, let me ask it a different way. Where did the descriptions that appear in Exhibit 108 come from?

A. Well, from looking at this, they appear to be based on the descriptions that I used in my index.

Q. These descriptions would have referred to file titles that appeared in the boxes that are identified here; is that correct?

A. If they had titles.

Q. Is it your understanding that all the documents that fell within the scope of these file titles have been destroyed as indicated in this document?

A. I have not compared this document to my index, but based on -- assuming it's the same -- if I marked it as shredded, it was shredded and is gone.

Q. Is there an index of the documents that were

objecting to your question or not.

MS. DALEY: Well, you've asked me to rephrase the question. I'm not going to rephrase it right now. I just want to know if you are instructing him not to answer the question I've asked.

MR. CAULEY: I am instructing him not to answer to the extent -- I am instructing him not to reveal any attorney-client or work-product communications.

I think -- if to the extent that her question asks for your normal procedure, you can answer that.

THE DEPONENT: Then I would need to hear the question again.

MS. DALEY: Can you read the question back, please.

(The question beginning on page 71, line 8, was read back as follows: "Is it a fair assumption to say that you would transfer documents to Brad Beck if someone told you to transfer them to Mr. Beck, and you would transfer the documents to McDermott, Will if someone told you to transfer them to McDermott, Will?")

THE DEPONENT: Yes.

Q. (BY MS. DALEY) To the extent you were told to transfer documents to Brad Beck, was it the same person each time who told you to transfer documents to Mr. Beck?

MR. CAULEY: I'm going to instruct the witness not to answer.

Q. (BY MS. DALEY) Are you following your counsel's instructions?

A. Yes.

Q. To the extent you were told to transfer documents to McDermott, Will, was it the same person who told you to transfer documents to McDermott, Will?

MR. CAULEY: Instruct the witness not to answer.

Q. (BY MS. DALEY) Are you following your counsel's instructions?

A. Yes.

Q. I just want to make sure the record is clear on what questions we can't go into. Who told you to transfer documents to Brad Beck?

MR. CAULEY: I instruct the witness not to answer.

Q. (BY MS. DALEY) Are you following your counsel's instructions?
A. Yes.
Q. Who told you to transfer documents to McDermott, Will?
MR. CAULEY: Instruct the witness not to answer.
Q. (BY MS. DALEY) Are you following your counsel's instructions?
A. Yes.
Q. Let me make sure the record is clear on another matter as well. In response to some of Mr. Jenkins's questions, your counsel instructed you not to answer some questions. Is it your intention that every time your counsel is instructing you not to answer a question that you are going to follow and have followed your counsel's instructions?
A. Yes.
Q. You've been, you said, a litigation paralegal working on the various files involving IRS; is that correct?
A. Yes.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| ARCTIC CAT, INC., a Minnesota corporation, Plaintiff, v. INJECTION RESEARCH SPECIALISTS, INC., a Colorado corporation, and PACER INDUSTRIES, INC., a Missouri corporation, Defendants. | Civil Action No. 01-CV-543 (MJD/RLE) |
| INJECTION RESEARCH SPECIALISTS, INC., a Colorado corporation, and PACER INDUSTRIES, INC., a Missouri corporation, Counterclaimants, v. ARCTIC CAT, INC., a Minnesota corporation, and SUZUKI MOTOR CORPORATION, a Japanese corporation, Counterclaim Defendants. | |

COPY

VIDEOTAPE 30(b)(6)DEPOSITION OF: PETER W. CLARK - Volume II
May 6, 2004

Q. In that conversation, did Mr. Beck make a statement and then say, Now, do you understand what I just said to you?
A. Not that I recall.
Q. Let me show you, then, sir, what we have previously marked as Exhibit 1033. This appears to be a copy of a memo to the file from Mr. Clark, dated May 2, 2002, regarding document retention. It has control number K 00029. Do you recognize this document, sir?
A. Yes, I do.
Q. Is this a memorandum you wrote to Kutak's IRS file after your telephone conversation with Brad Beck on May 2, 2002?
A. Yes.
Q. Did you write this file memorandum immediately after talking to Mr. Beck?
A. I would assume it was very shortly after.
Q. And it was your intent to record exactly what you had discussed with him?
A. Yes.
MR. de ALCUAZ: Objection. Misstates the witness's testimony.
Q. (BY MR. HORSTMAN) You say in the first sentence, "Pursuant to my telephone conversation with Brad Beck this afternoon, Kutak Rock has been given permission to destroy

all of the files that it has retained in storage except: All documents produced by" then there is the word "Fuji" that's crossed out, handwriting "JECS," "All translations of any documents produced by," again, "Fuji" is crossed out and "JECS" is written in, "All pleadings and correspondence." Do you see where I read that?

A. Yes.

Q. Is that the statement you made in your memo you wrote after talking with Brad Beck?

A. Yes.

Q. Is it your handwriting -- let me withdraw that.

Did you write in the word "JECS" instead of "Fuji"?

A. Yes.

Q. And crossed out "Fuji"?

A. Yes.

Q. When did you do that?

A. I don't recall. At some point I noticed that I had made a mistake.

Q. So your understanding after talking with Mr. Beck on May 2, 2002, was that everything in your possession could be destroyed except for these three categories you identified?

A. Yes.

Q. After May, 2002, did you ever receive any

communication from Mr. Beck, anyone at IRS, or anyone at McDermott, Will & Emery telling you that was an incorrect understanding on your part?

A. I don't believe so.

Q. The second sentence -- it looks like the second paragraph of Exhibit 1033 reads, "Brad received permission from current counsel in California and Rodney Preisser of IRS." Do you see that?

A. Yes.

Q. What did Mr. Beck say to you that left you with the conclusion that he had received permission from current counsel in California and Rodney Preisser?

A. I recall him saying he had spoken with California counsel and Rodney Preisser. And I don't recall the exact terminology, but my understanding was that it was permission to proceed.

Q. To proceed with destroying all the documents except for the JECS documents and all pleadings and correspondence?

A. Yes.

Q. Were some of the documents you were going to keep, in particularly the pleadings and correspondence, covered by the protective order?

A. Some of the pleadings were. Some of the pleadings were filed under seal.

Q. Did the protective order permit IRS to keep depositions of Polaris and Fuji?
A. As best I recall, the depositions had portions that were designated if they were confidential. It varied by deposition. I don't think all of them were available to IRS.
Q. At this time in May of 2002, did you go through the pleadings and correspondence to determine whether there were any confidential Polaris and Fuji materials that needed to be destroyed?
A. No.
Q. Were those -- excuse me. Let me withdraw that.
Were the pleadings and correspondence transferred to Isaacson?
A. Yes.
Q. Before that transfer took place, did anyone go through the pleadings and correspondence to determine if any confidential Polaris and Fuji material was still present?
A. No.
Q. Do you know if anyone at Isaacson went through those documents after receiving them to determine that?
A. Well, actually, the pleadings had been put in a separate box, the ones under seal.
Q. What happened to that separate box?
A. I believe it went to Isaacson.

Q. Do you know whether that box was ever destroyed?
A. I have no idea.
(Deposition Exhibit 1045 was marked.)
Q. I'm showing you, sir, what's been marked as Exhibit 1045. This document has control number K 00030 on it. It appears to be a copy of your May 2, 2002 file memorandum with handwritten notes on it. Do you recognize Exhibit 1045?
A. Yes, I do.
Q. Are the handwritten notes -- let me withdraw that.
Are some of the handwritten notes yours?
A. Yes.
Q. What appears to be a message that says, "John - Can I arrange with Mike Donovan to begin the shredding of the docs?" -- signed "Peter," is that your handwriting?
A. Yes.
Q. Is the "John," John Bernstein?
A. Yes.
Q. When did you send a copy of your file memorandum with this handwritten note to Mr. Bernstein?
A. May 2.
Q. Just to the right and slightly below your signature there appears to be the word "yes" with a circle then some initials next to it. Do you see that?
A. Yes.

Q. Is that Mr. Bernstein's handwriting?
A. Yes.
Q. Are those his initials?
A. Yes.
Q. Is it his handwriting on the "To" heading at the top of the memorandum that says "Peter Clark"?
A. Yes.
Q. When did you get this back from Mr. Bernstein?
A. I don't recall. It was shortly -- within a day or two of May 2.
Q. Who is Mike Donovan?
A. He is the head of our service center.
Q. Let me show you, sir, what was previously marked as Exhibit 1035. This has control number K 00031. Do you recognize this as a copy of your e-mail to Brad Beck on Wednesday, May 8, 2002?
A. Yes.
Q. In your second paragraph you say, "Unless I hear otherwise, we will only retain pleadings, correspondence, docs produced by JECS, and any translation materials regarding docs produced by JECS. All other documents will be destroyed, including depositions and IRS original documents. We have already sent 70 boxes to be shredded." Do you see that?
A. Yes.

Q. That's consistent with what you wrote in your file memorandum on May 2, correct?
MR. de ALCUAZ: Objection. Vague.
A. I believe it's consistent.
Q. (BY MR. HORSTMAN) Your understanding of what you were supposed to be doing hadn't changed between May 2 and May 8, had it?
A. No, it had not.
Q. Did Mr. Beck ever communicate with you that what you said in this second paragraph of Exhibit 1035 was incorrect?
A. No.
Q. Did anyone from IRS or IRS's California counsel communicate to you that what you were saying you were going to do in this second paragraph of Exhibit 1035 should not be done?
A. No.
Q. Do you know which 70 boxes had been sent to be shredded as of May 8, 2002?
A. It would be indicated on my index.
Q. How did you decide which boxes should be shredded first?
A. I started with the easy ones.
Q. What do you mean by that?
A. If I knew a box was all Polaris or Fuji or the May

Use, things that were solid boxes of one type of document and especially if they were on top because the boxes were stacked quite deep, then those were the ones I marked for shredding first.

(Deposition Exhibit 1046 was marked.)

Q. Let me show you, sir, what we have marked as Exhibit 1046. This is a document with control number K 00033. It appears to be a June 27, 2002 letter from Mr. Clark to Brad Beck. Do you recognize this, sir, as your letter?

A. Yes, I do.

Q. Is this letter a transmittal of certain of the JECS documents you were sending to Brad Beck?

A. Yes.

Q. In your second paragraph you indicate, "I also have not yet destroyed the boxes of original documents produced by IRS." Do you see that?

A. Yes.

Q. It was your understanding that you could, correct?

A. Yes.

Q. You go on to say, "These boxes include the engineering notebooks." Do you see that?

A. Yes.

Q. Which engineering notebooks?

A. They were part of the production in the Polaris

versus -- IRS versus Polaris case.
Q. So those included Mr. Chasteen's engineering notebooks?
A. I assume.
Q. When you wrote this letter on June 27, 2002, did you go back through the particular boxes of original documents that you had not destroyed to determine what was in them?
A. Some boxes I looked at; some boxes I used my index.
Q. What boxes did you look at?
A. It varied. If I knew what I meant on my index.
Q. Let me have you look here, if you would, sir, at Exhibit 1037, which is an exhibit that contains a copy of the index at least as of 12/30/2002. With the help of that index, can you tell me which particular boxes you may have looked at before sending Exhibit 1046 to Mr. Beck?
A. Based on my description of the original documents, I probably would have opened the box to look to see what it was prior to writing this letter.
Q. Can you give me the box number, though, if you would.
A. Well, 192 and 193, I've marked that they contained engineering notebooks, so I would have known that those were in the boxes.

Q. All right. Any other boxes?
A. Well, 189, 190, 191 all include IRS, what we considered, original documents.
Q. Who had you received those from?
A. I assume the client.
Q. Had you personally been the one to receive them at Kutak Rock when they came in?
A. Not all of them.
Q. Were the boxes identified as IRS original documents? For example, if someone came in and looked at Box 189, did it say "IRS original documents" on the outside of the box?
A. No. It said Box 189.
Q. Your index, Exhibit 1037, indicates that Boxes 189 to 194 were sent to Mr. Van Mieghem on July 25, 2002; is that correct?
A. Yes.
Q. Were they sent on that date?
A. I assume so.
Q. Did someone tell you to send those to Mr. Van Mieghem?
A. Yes.
Q. Who?
A. I assume Brad Beck.
Q. Do you have any communication from -- written

MR. de ALCUAZ: Objection. Calls for speculation. Assumes facts not in evidence.
A. I don't know.
Q. (BY MR. HORSTMAN) Well, who gave you the authority to send any documents that may have been covered under the protective order in Colorado to Mr. Beck?
A. Who gave me authority?
Q. Yes.
A. Brad.
Q. Did he tell you why he wanted all those depositions?
A. Not that I recall.
Q. Did the deposition transcripts you sent to Mr. Beck include deposition exhibits?
A. If the volume -- if it was bound into the volume, they would be attached.
Q. Did you go through those Boxes 154 through 158 to see whether there were any exhibits with the depositions?
A. I didn't look for the exhibits, no.
Q. Do you know whether there were any exhibits in those boxes that were covered by the protective order?
A. As we sit here today, no, I don't know.
Q. But you had authority to send those to Mr. Beck even if they were covered by the protective order?
A. Yes. Mr. Beck is under the protective order.

Q. Let me have you look, then, to page 12 in your index, Exhibit 1037. If you would, take a look at Boxes 2001 through --

MR. de ALCUAZ: You mean 201, don't you?

MR. HORSTMAN: Excuse me. Let me withdraw that question and just start with a clean one. Thank you.

Q. (BY MR. HORSTMAN) On page 12, if you would look at Box No. 201 and the description for that box and the descriptions for Boxes 202, 203, 204, and 205. Do you remember, sir, that these were boxes that Mr. Bernstein in his March 1, 2001 letter to Mr. Balch had suggested be returned to IRS?

A. It's possible.

Q. If you can find that in front of you, it's Exhibit 1031. Do you see that Boxes 201 through 205 are the group that Mr. Bernstein said in Exhibit 1031 Kutak wanted to return to IRS?

A. Yes.

Q. Those were instead shredded on June 26, 2002; is that correct?

A. Yes.

Q. Who gave you authority to shred those boxes instead of returning them to IRS?

A. My understanding is Brad Beck.

Q. Were you ever given a reason by Brad Beck or

MR. de ALCUAZ: Objection. Vague. Ambiguous.
A. The lawsuits were over. We destroyed the files.
Q. (BY MR. HORSTMAN) When the files were destroyed, this lawsuit was pending; did you know that?
A. At the time of 2002? Yes.
Q. Did IRS provide to Kutak any requests for production of documents that had already been sent out in the pending Minnesota case?
MR. de ALCUAZ: Objection. Asked and answered.
A. No, I did not see document requests.
Q. (BY MR. HORSTMAN) So no one from IRS ever advised you whether documents in Kutak's possession were covered by document requests that had already been made in the case?
A. Not to my recollection.
Q. Now, just so we are as clear as can be, when did you first find out about the waiver IRS gave through December 16, 2002?
A. I don't know if it was mentioned yesterday or not. I think it's today during my deposition that I have learned of this.
Q. Do you understand what the scope of that waiver is?
A. Not exactly, no.
Q. So there is no way you can tell me as Kutak's witness here today what documents from the Kutak attorneys'

files that were destroyed in 2002 would fall within that waiver?
MR. de ALCUAZ: Objection. Assumes facts not in evidence that any documents within those files were destroyed that related to that subject.
Q. (BY MR. HORSTMAN) You can answer.
A. These were old files from previous lawsuits. The documents date previous to at least '97. That's the best I can tell you about these documents.
Q. (BY MR. HORSTMAN) And you don't know whether they fell within the waiver that IRS has now provided, do you?
A. No, I do not.
Q. Now, let me have you look at page 12. You may still be there. Box 198, do you see the reference to "fuel maps" in the description?
A. Yes.
Q. What fuel maps were those?
MR. de ALCUAZ: Objection. Assumes facts not in evidence. I'm sorry, Counsel. Which box?
MR. HORSTMAN: 198.
MR. de ALCUAZ: Thank you.
A. I don't believe there were any fuel maps in there. I believe it was background materials regarding fuel maps, but I couldn't state specifically today what's in there.
Q. (BY MR. HORSTMAN) Well, who decided to describe

the background material as relating to fuel maps?
A. I created the index, and I'm assuming from this that that's the title of the jacket.
Q. What was the background material related to fuel maps that was in that box?
A. At this point, I don't recall.
Q. How extensive was it?
A. I don't know.
Q. How did you know that it related to fuel maps?
A. Well, if the title of the folder was "Fuel maps," that's what I put down, fuel maps.
Q. Who would have put the title on the folder?
A. At this point, it could have been one of 500 people.
Q. That many?
A. No.
Q. All right.
MR. de ALCUAZ: Avoid hyperbole, Mr. Clark.
THE DEPONENT: I'm sorry.
Q. (BY MR. HORSTMAN) It could have been IRS?
MR. de ALCUAZ: Objection. Assumes facts not in evidence.
A. I don't know.
Q. (BY MR. HORSTMAN) Did you recognize the handwriting identifying the folder?

A. I don't recall as I sit here today.
Q. There is also a reference to "Publicity" in Box No. 198. Do you know what that refers to?
A. I don't recall.
Q. Was that an original set of documents relating to advertisements or something of that nature?
MR. de ALCUAZ: Objection. Vague and ambiguous as to "original."
A. I don't recall.
Q. (BY MR. HORSTMAN) Now, it looks like part of the contents of Box 198 were shredded and part were not. Am I reading your index correctly?
A. No. The entire box was shredded.
Q. The entire box was shredded. Okay.
MR. HORSTMAN: All right, sir. I believe those are all the questions I have for you at this time. Thank you.
MR. de ALCUAZ: Give me a second to change gears here, Mr. Clark, and we'll get going.

EXAMINATION

BY MR. de ALCUAZ:
Q. At least initially, Mr. Clark, most of my questions are going to also refer to your index, so I would ask you to -- you've got it in front of you. Great.
Would you look, please, at the box numbered 182 on

# Exhibit G

KUTAK ROCK LLP

SUITE 3100
1801 CALIFORNIA STREET
DENVER, COLORADO 80202-2658

303-297-2400
FACSIMILE 303-292-7799

www.kutakrock.com

ATLANTA
CHICAGO
DES MOINES
FAYETTEVILLE
IRVINE
KANSAS CITY
LINCOLN
LITTLE ROCK
OKLAHOMA CITY
OMAHA
PASADENA
RICHMOND
SCOTTSDALE
WASHINGTON

TER W. CLARK
ALEGAL
clark@kutakrock.com
292-7757

December 16, 2002

**VIA HAND DELIVERY**

Bradley A. Beck, Esq.
Isaacson, Rosenbaum, Woods & Levy, P.C.
633 Seventeenth St., Suite 2200
Denver, CO 80202

Re: Arctic Cat subpoena

Dear Brad:

Pursuant to our telephone conversation last week, enclosed are the following boxes from the *IRS v. Polaris* and lawsuit:

| BOX NO. | DESCRIPTION |
|---|---|
| 249 | Correspondence: 1990 – 8/93 |
| 250 | Correspondence: 9/93 – 8/7/95 |
| 251 | Correspondence: 8/8/95 – 11/30/95 |
| 252 | Correspondence: 12/1/95 – 7/31/96 |
| 253 | Correspondence: 8/1/96 – 6/30/97 |
| 254 | Correspondence: 7/1/97 - end |

We understand that you will review these boxes and decide what to produce in response to the subpoena from Arctic Cat, dated December 4, 2002, served on Kutak Rock LLP. Kutak Rock LLP now has no remaining documents from the *IRS v. Polaris* litigation – all of our files have either been delivered to you or Mr. Van Mieghem, or they have been destroyed.

Exhibit No.: 1038
Deponent: Beck
Date/RPR: 5/5/04 mft
Hunter + Geist, Inc.

John Bernstein has requested that you contact us prior to disposing of the above-referenced boxes. We will decide at that time if we want them returned to us, or if they should be destroyed. Please do not hesitate to contact John or me if you have any questions. Thank you for your assistance in this matter.

Very truly yours,

Peter W. Clark
Paralegal

Enclosures
cc: John H. Bernstein, Esq.

**********************
*** TX REPORT ***
**********************

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 4018 |
| CONNECTION TEL | 13402000916502335599 |
| SUBADDRESS | |
| CONNECTION ID | McDERMOTT. WILL |
| ST. TIME | 03/15 09:24 |
| USAGE T | 06'25 |
| PGS. SENT | 26 |
| RESULT | OK |

# ISAACSON, ROSENBAUM, WOODS & LEVY, P.C.

ATTORNEYS & COUNSELORS AT LAW

## FAX TRANSMITTAL

| | |
|---|---|
| **Date:** | March 15, 2001 |
| **To:** | Anthony de Alcuaz |
| **Fax Number:** | 650-233-~~8599~~ 5599 |
| **Phone Number:** | 650-233-5500 |
| **From:** | Brad Beck |
| **Client/Matter:** | 313402-000 |
| **Total number of pages, including cover sheet:** | 26 |

COMMENTS:

Original documents will:

IRS/AC0266548