# Exhibit H

**KUTAK ROCK LLP**

SUITE 3100
1801 CALIFORNIA STREET
DENVER, COLORADO 80202-2658
303-297-2400
FACSIMILE 303-292-7799
www.kutakrock.com

ATLANTA
CHICAGO
DES MOINES
FAYETTEVILLE
IRVINE
KANSAS CITY
LINCOLN
LITTLE ROCK
OKLAHOMA CITY
OMAHA
PASADENA
RICHMOND
SCOTTSDALE
WASHINGTON

JOHN H. BERNSTEIN
john.bernstein@kutakrock.com
(303) 292-7730

December 23, 2002

*VIA FACSIMILE*

Jeffer Ali, Esq.
Merchant & Gould P.C.
3200 IDS Center
80 South Eighth St.
Minneapolis, MN 55402

Re: *Arctic Cat, Inc. v. Injection Research Specialists, Inc., et al.*
U.S. District Court, District of Minnesota, Case No. 01CV543

Dear Mr. Ali:

We are in receipt of your subpoena from the above referenced matter regarding our files from the *Injection Research Specialists, Inc. v. Polaris* litigation. All of our files from the *Injection Research Specialists, Inc. v. Polaris* litigation have either been destroyed under routine document destruction procedures or transferred to counsel for Injection Research Specialists, Inc. ("IRS"). Accordingly, we will not be producing any documents pursuant to the subpoena. Please contact Brad Beck, counsel to IRS, at Isaacson Rosenbaum Woods & Levy PC, telephone 303-292-5656, for further information regarding this matter. Thank you.

Sincerely,

John H. Bernstein

cc: Bradley A. Beck, Esq. (via facsimile)
Peter Van Mieghem, Esq. (via facsimile)

02-134183.01

# Exhibit I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

ARCTIC CAT, INC., a Minnesota corporation, Plaintiff, v. INJECTION RESEARCH SPECIALISTS, INC., a Colorado corporation, and PACER INDUSTRIES, INC., a Missouri corporation, Defendants.

INJECTION RESEARCH SPECIALISTS, INC., a Colorado corporation, and PACER INDUSTRIES, INC., a Missouri corporation, Counterclaimants, v. ARCTIC CAT, INC., a Minnesota corporation, and SUZUKI MOTOR CORPORATION, a Japanese corporation, Counterclaim Defendants.

COPY

Civil Action No. 01-CV-543 (MJD/RLE)

VIDEOTAPE 30(b)(6) DEPOSITION OF: JOHN H. BERNSTEIN
June 5, 2003

Sasso came to Kutak Rock in the fall of 1991. That's my recollection. I may be off a year or two -- or a year on one side or the other, but roughly that would be the time when the firm began representing that client.

To my knowledge, there has not been a formal disengagement of the representation, although it has not been active since the initial litigation involving -- I believe it was Polaris and Fuji.

Q. Is it your understanding that IRS -- excuse me. Is it your understanding that Kutak Rock represented Injection Research Specialists in a litigation against Polaris Industries, Fuji -- I believe it's Heavy Industries -- and UNISIA JECS?

A. That is my understanding, yes. We were -- yes.

Q. And did Kutak Rock also represent IRS in the trade-secret litigation that IRS filed against Arctic Cat and Suzuki and UNISIA JECS?

A. Are you referring to this Civil Action 97-Z-2606?

Q. Yes.

A. We were local counsel on that case.

Q. What was Kutak Rock's role in the litigation

against Polaris?

A. Well, through Ms. Sasso, while she was a partner with the law firm, we were lead counsel and represented IRS. Ms. Sasso left the firm, I believe, in January or February of 1996. That file did not transition to Ms. Sasso when she left Kutak. The client hired new lead counsel, which was a firm in Chicago, the name of which I am not familiar with. I know the individual name -- Ray Niro, I believe, was the lead counsel's name. We remained as essentially local counsel to Mr. Niro once he was retained by IRS.

Q. And then you were also retained to act as local counsel in the IRS litigation against Arctic Cat and Suzuki?

A. Very limited involvement, but we were technically local counsel. That would be correct.

Q. In addition to Ms. Sasso, who were the attorneys from Kutak Rock who represented IRS in the Polaris litigation?

A. Clearly Ms. Sasso -- or Ms. Sasso was the lead attorney and she did the lion's share of the work. There was another attorney at the firm at the time who worked

with her whose name was Tana Simard -- that's T-a-n-a, S-i-m-a-r-d. There may have been some associates other than Ms. Simard at the time who assisted Ms. Sasso, but I really don't have any recollection as to who that may be at this time.

Q. Do you know where Ms. Sasso is practicing today?

A. I think she is with Baker & Hostetler here in Denver.

Q. Is Ms. Simard -- is it Mr. or Ms.?

A. Ms.

Q. Is Ms. Simard still with Kutak Rock?

A. She is not.

Q. Do you know where she is practicing?

A. She is an in-house attorney with Qwest.

MR. JENKINS: I would like to mark as Exhibit 371 a letter dated May 30, 2003 with Kutak Rock letterhead. It also has several attachments.

(Deposition Exhibit 371 was marked.)

Q. (BY MR. JENKINS) Mr. Bernstein, is this a letter that you prepared?

A. Yes, it is. It's a letter that I signed, yes.

Q. Did you also compose the words of the letter?

A. I reviewed them and approved them.

Q. Who composed the words in the letter?

A. I believe that Peter Clark did. I may have revised them. I don't know. But it's -- Mr. Clark put together the first draft of it.

Q. The letter has what appear to be three attachments. The first is a December 23, 2002 letter, again signed by you; is that correct?

A. That's correct.

Q. The second is a February 18, 2002 letter from Brian P. Akers addressed to you?

A. Correct.

Q. And then there is a privilege log that's comprised of three pages.

A. That's correct.

Q. Who prepared the privilege log?

A. Mr. Clark.

Q. Who prepared the December 23, 2002 letter that you signed?

A. I don't recall who prepared that. Well, I think it was probably prepared by Mr. Clark and I signed

this. Whether or not I had revisions to it at the time, I don't know.

Q. What were the "routine document destruction procedures" that are referred to in this letter?

MR. CAULEY: Counsel, I'm going to object. I don't think that's within the scope of topic 3, and Mr. Bernstein has not been noticed in his individual capacity.

MR. JENKINS: Is it your position that I cannot ask him questions within his personal knowledge?

MR. CAULEY: Well, he hasn't been -- he has only been designated as a 30(b)(6) witness on topic 3 and he hasn't been noticed, nor is he appearing in his individual capacity; but you certainly can verify his signature and authenticate documents he has signed, but we are now into the scope of other topics on this deposition notice, and we have another witness who is designated for that to speak on behalf of Kutak Rock.

MR. JENKINS: Well, I think unquestionably this witness has personal knowledge that's relevant to those other topics, and I would ask him to be testifying on behalf of Kutak Rock, but it seems to me that I am

entitled to ask him information that's within the scope of his personal knowledge, which is something that we have routinely done in this litigation on both sides.

MS. DALEY: Again, Mr. Cauley, I would just add that at 30(b)(6) -- at least at one 30(b)(6) deposition that I have attended at which others from your office have been asking questions, they have asked questions of witnesses outside the scope of the topics that were designated and inquired into the personal knowledge of the witness. I recognize that you weren't at those depositions and you wouldn't be necessarily familiar with what others from your office have done, but as a form of clarification, I will just advise you of that.

MR. CAULEY: I'll allow Mr. Bernstein to answer that question, but in his individual capacity and not as a 30(b)(6) witness representing Kutak Rock.

Q. (BY MR. JENKINS) Let me restate the question. What were the "routine document destruction procedures" that are referred to in this December 23, 2000 letter that you signed?

A. Well, upon review of this, I think that's a misstatement. The documents that were destroyed would

have been pursuant to the protective orders that had been entered in the underlying case as opposed to our routine document destruction procedures. So that language is regretfully incorrect and should have stated "any documents that were destroyed was pursuant to the protective orders." Whatever the firm's routine document destruction procedures are were not implicated with respect to activities in this case.

Q. When you say they were destroyed pursuant to protective orders, can you elaborate on what you mean by that?

A. Well, I know there were some protective orders put in place in connection with the underlying case. I'm not personally knowledgeable about them, but I believe that the objective and intent of the law firm was to follow the terms of the protective orders and to proceed accordingly with respect to the documents that the firm had. Mr. Clark would be the more appropriate person to get further into that issue with you.

Q. Mr. Bernstein, did you authorize the destruction of documents from the earlier litigation that is referenced in this letter?

MR. CAULEY: I object. It's vague and ambiguous as to the term "authorize."

MS. DALEY: Can I also seek a clarification. What "earlier litigation" are we talking about?

A. Well, what I am referring to is the documents that we had from the Polaris litigation -- the first case.

Q. (BY MR. JENKINS) Let me show you a document that has been previously marked as Exhibit 108 in this litigation. Have you seen this document before?

A. No.

Q. Now, you said just a minute ago that you believe this letter should have said that the documents that had been destroyed were destroyed pursuant to protective orders that had been entered in earlier litigation.

A. Correct.

Q. And those protective orders had been entered in the Injection Research Specialists, Inc. versus Polaris litigation; is that your understanding?

A. That's what I believe to be the case, yes. I think there was -- from what I understand, there was

also one entered in the second case.

Q. The case involving Injection Research Specialists and Arctic Cat?

A. Is that the one that was ultimately dismissed in the tenth circuit?

Q. Yes. The one for which you signed the notice of appeal.

A. Right. I understand there was a protective order in that also.

Q. Now -- so when you signed this letter, it was your understanding that --

A. Which letter are you referring to?

Q. The December 23, 2002 letter.

MR. CAULEY: The second page of Exhibit 371?

MR. JENKINS: Yes.

Q. (BY MR. JENKINS) Well, let me rephrase the question. When you signed this letter, did you have an understanding as to why the documents had been destroyed?

A. Very -- well --

MR. CAULEY: I'm going to object and instruct the witness not to answer to the extent that it would

reveal privileged communications or attorney work product.

Q. (BY MR. JENKINS) When you say in this letter that "All of our files from the Injection Research Specialists, Inc. versus Polaris litigation have either been destroyed or transferred to counsel for Injection Research Specialists," were the documents that had been destroyed from that litigation destroyed pursuant to your authorization?

MR. CAULEY: Objection. It's vague and ambiguous as to the word "authorization."

A. I think -- I'll answer to the best that I can. I think the answer is no. As I understand the process -- and I think you will be better advised to obtain this information through Mr. Clark, who was personally involved in this and I was not -- is that I clearly did not authorize the destruction of any document, but there was a general understanding, as I understand it, that developed throughout a long period of time with respect to the disposition of these documents. But to answer your question, no, I authorized no destruction.

Q. (BY MR. JENKINS) Were you aware that the

documents were going to be destroyed before that actually occurred?

A. I don't know. I don't recall.

Q. Do you recall when you became aware that documents either were going to be destroyed or had been destroyed?

A. Not specifically, no.

Q. Who is Gary Lozow, L-o-z-o-w, Esquire?

A. Mr. Lozow is an attorney with the law firm of Isaacson Rosenbaum here in Denver -- or at least at the time that you are referencing him, he was an attorney at that law firm. He still may be. I don't know where he is currently.

Q. Who does he represent?

A. I don't know.

Q. Does he represent IRS?

MR. CAULEY: Objection. It's vague and ambiguous as to time.

A. There is an attorney in his office, Brad Beck, who represents or has represented -- has had a relationship with IRS. What Mr. Lozow's involvement is, I am unaware of it.

Q. (BY MR. JENKINS) In your letter from December 23, 2002, which is the second page of Exhibit 371, it refers to transferring documents to counsel for Injection Research Specialists.

A. Yes.

Q. Who was the counsel for Injection Research Specialists to whom documents were transferred?

MR. CAULEY: And I will just note that this is outside the scope of topic 3, but I will allow Mr. Bernstein to answer that question in his individual capacity.

A. To the best of my knowledge, documents -- and again I would request that you -- if you want the exact answer to this question, you should ask it to Mr. Clark and not to me. But as I understand it, documents have gone to Mr. Beck at Isaacson Rosenbaum, documents have gone to McDermott, Will & Emery, documents at one point have been transferred to Holland & Hart, I believe here in Denver, as well as to Shughart, Thompson & Kilroy, I believe is the name of the law firm. But I could not tell you specifically which documents are which, when they were transferred to which firm, or under what

circumstances they were transferred.

Q. (BY MR. JENKINS) Was Mr. Clark operating essentially independently in the handling of these documents?

A. No.

Q. Who was supervising him at Kutak Rock?

A. Well, until 2001, Tana Simard would have been supervising him. She left the firm, I believe, in -- sometime in the first quarter of 2001. After that, the case was very dormant, other than with respect to some of these issues relating to these documents.

I am the head of our litigation practice and -- although I do not have any institutional knowledge with respect to the underlying case here, other than just on a very general basis -- the burden of that, from our law firm's standpoint, fell on me. However, Mr. Clark, as I understood it, dealt very closely with lawyers in the firms in which IRS was being primarily represented in connection with the disposition of the documents. He clearly was not acting independently of anybody. Every step he took was pursuant to instruction.

Q. From whom?

A. You will have to ask him.

Q. Did anyone at Kutak Rock, to the best of your knowledge, approve the destruction of any documents from the Injection Research Specialists versus Polaris litigation?

MR. CAULEY: I object. It's vague and ambiguous as to the word "approve."

A. I would second the objection. This was a process that occurred through -- involving people with specific knowledge of the issues relating to the documents. That involved Mr. Clark from our law firm; it involved people that he was dealing with at other law firms. I guess from a supervisory standpoint, Mr. Clark certainly was supervised within the context of our firm. But did I approve this? Any specific destruction, I relied upon information, as I understood it to be with respect to the disposition of the documents, based upon what Mr. Clark was being told from those who had a vested interest in this matter.

Q. (BY MR. JENKINS) Does Kutak Rock have a standard operating procedure when it comes to destroying documents that includes authorization from a partner in

# Exhibit J

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

---

ARCTIC CAT, INC., a Minnesota corporation, )

Plaintiff, )

vs. )

INJECTION RESEARCH SPECIALISTS, INC., a Colorado corporation, and PACER INDUSTRIES, INC., a Missouri corporation, )

Defendants. )

Case No. 01-CV0543 (MJD/RLE)

---

VIDEOTAPED DEPOSITION OF CONRAD BAGNE

---

Tuesday, September 2, 2003
9:05 A.M.

Taken by Counsel for Counterclaim Defendants
at
LeGros, Buchanan & Paul
510 L Street, Suite 601
Anchorage, Alaska

COPY

employed by Arctic Slope Regional Corporation?
A **That is correct.**
Q What is your current position at Arctic Slope?
A **My current position is chief operating officer of Arctic Slope Regional Corporation.**
Q And can you -- can you give me a brief description of your job duties?
A **Primary duties have to deal with the various operating business units, and investments that the corporation has.**
**We have operating subsidiaries or divisions in half a dozen different industries. And my primary responsibility is the oversight of the managers of those divisions.**
Q Okay. Can you identify those industries in which Arctic Slope has operating business units?
A **Our largest activity -- It's easier to do this I think by size. But the energy service industry, which is our service group that does contractual support work, primarily on the North Slope of Alaska, but also in the Gulf Coast and elsewhere in the US, and some activities outside of the United States, as well.**
**Refining and fuel distribution, second group.**



**Engineering and construction are third group.**
**Government or technical services, fourth group.**
**There are some smaller businesses that tend to get grouped into sort of a miscellaneous category, that involve some tourism activity, cable television, and some -- some other smaller units.**
**And finally, is a -- actually, there's two others. One is resource -- resources, which is a -- land ownership that the corporation has, that deals with exploration of those lands for oil and gas and other mineral opportunities. And finally is sort of a passive catch-all of -- of investments that the corporation makes, that tend to be minority in nature, depending on the opportunity.**
Q Can you identify some of the passive investments that Arctic Slope has made?
A **Well, one of them would be -- certainly initially, was the Injection Research activity.**
**Some others have been a wireless communication system that we were involved in, a group, acquiring licenses for Bell out of ECS, or basically cell phone activity.**
**We have done some other communication related, television stations, radio stations. Some**



**purely financial, where we've -- just simply get put into that group, where it's been simply a participation in -- in an equity or a mutual fund type of opportunity, where we've put some money to work type thing.**
Q Was your investment in IRS Arctic Slope's first passive investment?
A **I don't believe so, no.**
Q Okay. What prompted the investment in IRS?
A **We had a -- another business relationship with the principals involved.**
Q And who were those principals?
A **John Balch, primarily.**
Q So Arctic Slope had a business relationship with John Balch that predated its investment in IRS; is that correct?
A **That's correct.**
Q What was the nature of that business relationship with Mr. Balch?
A **Mr. Balch was the principal of a consulting group that provided contract assistance, claim assistance. We engaged him in valuation of some contract claims.**
**I believe the firm was -- may have been called Excell, but I'm not certain about that.**



Q Over what period of time did Arctic Slope have this relationship with Excell and Mr. Balch, that related to his evaluation of contract claims?
A **Basically, early to mid '80s, I believe.**
Q So at some point, did Mr. Balch approach Arctic Slope about investing in IRS?
A **Yes, he did.**
Q When did that occur?
A **Mid '80s, I believe. I don't recall a specific date.**
Q Let me go back to ask you a few more questions about Arctic Slope.
How many employees does Arctic Slope have today, approximately?
MR. TURNER: Do you mean the entire corporation, including its subsidiaries, or no?
MR. JENKINS: Yes.
A **Approximately 6,000.**
Q And what were the corporation's revenues in the year 2002?
A **Approximately a billion dollars, somewhat less.**
MR. JENKINS: I'd like to mark as Exhibit 811 a document entitled Annual Report 2001 for Arctic Slope Regional Corporation.

Page 26

Q And in what connection have you seen this document?
**A I saw this document in the context of what we have produced.**
Q Okay. To the best of your recollection, is this summary of ASRC ownership in IRS shares accurate?
**A I am not sure about the dates exactly, but I believe so.**
Q For the date 6/8/90, there is no percentage indicated. Do you understand why there is no percentage indicated for that entry?
**A I do not.**
Q Okay. So as of 12/31/98, Arctic Slope owned 100 percent of IRS; is that correct?
**A I believe so.**
Q Does it continue to own 100 percent of IRS today?
**A I believe so.**
Q And has it for all times, between 12/31/98 and today?
**A Yes.**
Q Does IRS today have any employees?
**A I do not believe so.**
Q When was the last time it had employees?
**A I -- I wouldn't know, without having to ask**

Page 27

**someone.**
Q Does it have any officers?
**A Yes.**
Q Who are the officers?
**A Best of my recollection, the current officers are John Balch, Rodney Preisser and myself, maybe -- maybe another person in there. I'm not exactly sure.**
Q And what are the titles held by each of those three men?
**A I -- I think John is the chairman or president. Rodney may be a vice president. Myself, secretary/treasurer, something like that.**
Q Is Mr. Balch paid in his capacity as president of IRS?
**A No.**
Q Is Mr. Preisser paid in his capacity as vice president?
**A No.**
Q And are you paid in your capacity as a treasurer, or the secretary/treasurer?
**A No.**
Q When was the last time Mr. Balch was paid in his capacity as president of IRS?
**A I don't know that John was ever paid in that position as such. The last time he was paid has been**

Page 28

**probably a couple of years. I couldn't be exact.**
Q When would you estimate the last time Mr. Balch was paid by IRS?
**A I believe I said sometime in the last two years. I'm not sure I can be more specific than that. Not within the last six months; I'm sure of that. And sometime between that and the two-year period.**
Q What are Mr. Balch's responsibilities as president of IRS?
**A Well, as president, he's the CEO of the entity, so he's responsible for the primary business activities of the company.**
Q And what are the primary business opportunities of the company?
MR. TURNER: Activities, I believe he stated. Is your question so corrected?
MR. JENKINS: I'm sorry. Let me rephrase the question.
BY MR. JENKINS:
Q What are the primary business activities of the company?
**A Primary business activities are try to realize economic value from its main assets, which are the technology patents.**
Q And how is it going about trying to realize

Page 29

economic value from the technology patents?
**A Today or --**
Q Today.
**A Today. Well, unfortunately, today, the primary focus has been trying to protect those assets and assert some legal rights, which have -- have led us to where we are here this morning.**
Q In other words, suing for patent infringement?
**A That's part of it, yes.**
Q What else is there besides suing for patent infringement?
**A Well, making sure the assets are secure, seeing if there are business opportunities for utilization of the patent.**
**Again, this goes back to a prior relationship, but -- relationship the corporation had with the -- that IRS had with, initially, Eichlin and then Dana --**
THE COURT REPORTER: I'm sorry. You said --
THE WITNESS: Eichlin and then Dana.
**A -- in attempt to commercialize the patents and the technology, in the Polaris litigation, which, I mean, everyone's aware of, and ultimately, again, here today.**

Page 30

Q Is IRS currently pursuing any business opportunities for utilization of the patents, other than the lawsuit that has brought us here today?
**A I do not believe so, today.**
Q When was the last time it -- it pursued any business opportunities for utilization of the patents, other than the lawsuit that has brought us here today?
**A I think it's been several years. I couldn't put a specific date on it. It would be better answered by John.**
Q By Mr. Balch?
**A Yes.**
Q So is it fair to say that the only business activity of IRS today -- only ongoing business activity of IRS today is the lawsuit that has brought us to this deposition today?
**A I hate to say that's fair. But without editorializing, I think that's accurate.**
Q It's accurate that the lawsuit that brought us here today is the only business activity that IRS is pursuing today?
**A Correct.**
Q Who makes the business decisions for IRS?
**A Really depends on the decision. As the C -- John would provide the leadership, as far as**

Page 31

**direction.**
**The board would be involved in major decisions.**
**ASRC as a shareholder, if their major equity impacts back to us or requests back to us.**
Q Well, let me be more specific. Who made the business decision to assert the patents that have been asserted in this case against Arctic Cat and Suzuki?
MR. TURNER: I -- I assume your question means at the IRS level; is that correct? Otherwise, objection as to form, lack of foundation.
**A I'll go back in my prior answer, and say all of the ones I mentioned.**
Q Meaning yourself, Mr. Balch and Mr. Preisser?
**A Including those three, as well as myself as corporate, and others within ASRC corporate.**
Q Was Arctic Slope's approval required before IRS could bring the litigation that it has brought against Arctic Cat and Suzuki?
**A As a practical matter, yes.**
Q Who at Arctic Slope was involved in the decision to give approval to IRS bringing the lawsuit that has brought us to this deposition today?
**A Myself; our president, Jacob Adams; our chief financial officer, Frank Zirnkilton.**

Page 32

Q Anyone else?
**A Possibly our general counsel might have been. But for the most part, that was the input in that.**
Q Was it approved by the board of directors?
**A Only indirectly.**
Q What do you mean by that?
**A In the sense that the board would see a budget for IRS that indicated some activity, which would have been reported to the board as related to litigation. But it was not presented to the board for approval to file a lawsuit.**
Q As a practical matter, is Arctic Slope's approval required for any settlement in this case?
**A Yes.**
Q Are you aware that IRS brought a trade secret lawsuit against Arctic Cat and Suzuki in 1998?
MS. DALEY: You mean '97.
MR. JENKINS: Was it '97? Let me rephrase the question.
BY MR. JENKINS:
Q Are you aware that IRS filed a trade secret lawsuit against Arctic Cat and Suzuki in 1997?
**A Generally, yes.**
Q Was Arctic Slope's approval sought for the filing of that lawsuit?

Page 33

MR. CAULEY: Object --
MR. TURNER: Object -- Go ahead.
MR. CAULEY: I'm going to object, and instruct the witness not to answer, on the grounds of attorney-client privilege, work product and common-interest privilege.
MR. TURNER: I am going to instruct AS -- ASRC, Mr. Bagne speaking on behalf of ASRC, and personally, not to answer, but only to the extent that it involves an attorney-client communication, as you identify in your answer, and -- or an IRS work -- work-product privilege or attorney-client privilege for which ASRC is asserting a common-interest privilege.
MR. JENKINS: Good luck.
MR. TURNER: Good luck.
MR. JENKINS: Let me see if I can rephrase the question. Maybe I can help matters out by how I phrase the question.
(Off-the-record discussion.)
BY MR. JENKINS:
Q Was Arctic Slope's approval required for the filing of the trade secret lawsuit that IRS brought against Arctic Cat and Suzuki in 1997?
**A I believe so.**

Page 38

THE VIDEOGRAPHER: We are back on record at 10:23.
BY MR. JENKINS:
Q Mr. Bagne, I have a few questions to follow up on the last topic.
Who were the individuals involved in making the decision not to bring a patent infringement claim in the 1997 trade secret lawsuit filed against Arctic Cat and Suzuki?
MR. CAULEY: I am going to object, and instruct the witness not to answer, to the extent it would reveal attorney-client communications or invade the work-product or common-interest privileges.
MR. TURNER: I would so instruct the witness with respect to the ASRC privileges, but only to the extent that it would invade, and so instruct the witness not to answer.
MR. JENKINS: Mr. Cauley, it seems to me that at a minimum, I am entitled to know who was involved in the decision, in order to even evaluate whether or not there is an attorney-client privilege or work product here. And so I would ask you to reconsider your objection to the question of who was involved in the decision.
MR. CAULEY: I -- I only instructed him to

Page 39

the extent that his -- that his answer would require it. If the witness doesn't think that it requires it, then he can answer the question.
I didn't instruct him to answer the question that you posed, but I want to make sure that he doesn't reveal any attorney-client communications.
MR. TURNER: And my -- my answer is the same. I just want to make sure there is no implied waiver of attorney-client privilege, based on what I saw in the Balch deposition.
So you may go ahead and -- and answer, to the extent that it doesn't infringe upon the privileges.
A **The -- I don't recall the specific conversation or dialogue, where I can -- I can visualize people.**
**So the best way I can answer this is that those decisions were made by the people I believe I've described before, which were myself and Balch and Preisser, and possibly one of our executives.**
**And there could have been outside counsel, or if not outside counsel, possibly back in some of those discussions. But I cannot recall the specific meeting where I can list off my head people involved.**
Q When was that decision made?
MR. CAULEY: Same objections, and same

Page 40

instructions.
MR. TURNER: I believe you can answer this one. Go ahead.
A **Well, as I think was stated in the question, for a suit filed in 1997, those discussions would have been had around that time. I can't point to a specific date.**
Q Sometime shortly before the lawsuit itself was filed?
A **Presumably. I just -- I just can't be any more specific.**
Q Let me show you an exhibit that's been previously marked as Deposition Exhibit 380. Have you seen this document before?
A **Yes, I have.**
Q Can you briefly describe the document for me?
MR. TURNER: Objection. The document speaks for itself.
You may -- you may answer.
A **Without -- without going through it, as I recall, this was the -- I can turn pages and I can see what it is. But as I recall, this was a document where we brought Dana or their subsidiary, I believe, Pacer, into -- I would call it a joint litigation agreement, but it's called -- it's general.**

Page 41

**Anyway, an understanding among IRS, ourselves and Dana, as to proceeding forward quickly with costs in the litigation at hand. Maybe this is --**
Q Is this the litigation agreement that governs the -- the current litigation that has brought us to the deposition today?
A **I believe so. It's possible there's another document. But as I say, I don't -- I don't recall it. Also --**
Q Is -- I'm sorry, go ahead.
A **Like I said, it's also possible this has been updated or amended, but I just don't recall.**
Q Is -- is Dana funding -- partially funding the current litigation?
A **They are. I believe that's addressed in here. Paragraph E talks about a 75/25.**
Q And that's -- and that's how things are being handled in the current litigation?
A **In 2E, yes.**
Q Now, who owned the patents that are identified in this agreement, the '701 patent, the '205 patent, the '712 patent, and their -- their reissue patents when this memorandum of agreement was signed?
A **There was a transaction involving Dana or**

Page 42

**Pacer that goes back a few years, and our attempt to commercialize exactly where the ownership fell at this -- on the 13th of April in 2000. Frankly, I don't recall exactly.**

**I can look at the document, and it says: All right, title, interest, et cetera. So again, the document speaks for itself. But I don't recall specifically exactly where that fell at that time.**

Q Do you recall whether one of the purposes of this agreement was to address the ownership issue?

A **It was to address Dana's continued interest in those patents. And exactly how that was expressed, I -- I don't recall. I don't recall the details at this time.**

Q Who owns the patents today?

A **As between ourselves and IRS, I believe IRS.**

Q The third "Whereas" clause says that, "WHEREAS, in accordance with the terms of the Asset Purchase Agreement, all right, title and interest in the covered patents" -- I won't list them -- "and corresponding trade secrets and intellectual property relating thereto, were to be conveyed to Pacer within 60 days of the settlement of the Polaris Litigation subject only to the continuing obligations of Pacer to IRS contained in a Commission Agreement dated as of

Page 43

September 25, 1991...which has now expired." Do you see that?

A **I do.**

Q Now, would you also look over at Page 8, Paragraph 5, benefits to Pacer. "IRS agrees to assign the Licensed Patents to Pacer, retaining only a limited license, as set forth in paragraphs 1 and 4.B. above, upon execution of this Agreement."

Do you have an understanding as to whether the patents were in fact assigned from IRS to Pacer, in accordance with this paragraph?

A **I do not. I assume they were. And if we don't have the patents, we have the license. I'm not sure I make much distinction from a business standpoint one way or the other.**

Q So other than -- Well, let's look back at that paragraph -- Let me restate that.

Paragraph 5 refer -- refers back to Paragraph 1, which says, "Pacer hereby grants IRS a limited royalty and other fee free license with respect to the Licensed Patents and related trade secrets and intellectual property to pursue the Arctic Cat Litigation and against such other infringers of the Licensed Patents and related trade secrets and intellectual property."

Page 44

Do you interpret that as a license back to IRS to bring the current litigation?

A **That's what it says.**

MR. TURNER: Objection. The document speaks for itself.

Go ahead and answer.

A **I think so.**

MR. CAULEY: I also object. It calls for a legal conclusion.

MR. TURNER: Yes. I add that.

BY MR. JENKINS:

Q Other than this right to pursue the Arctic Cat litigation and other infringers of the licensed patents and related trade secrets and intellectual property, what assets does IRS have today?

A **There may be some -- there may still be some rights under the other relationship with Dana or Pacer. I just don't think so, no.**

Q So as you sit here today, you are not able to --

A **No.**

Q -- articulate any other assets?

What about capital? Does IRS have any capital?

MR. TURNER: Objection, lack of foundation,

Page 45

as to what the definition of the word "capital" is, specifically including whether it includes this license.

Go ahead and answer, if you can.

A **It is difficult to answer. Some accountant might put this -- this claim on the books as some value, and say that's capital in the corporation.**

Q Let me restate the question. Does IRS have any bank accounts?

A **Yes.**

Q Can you estimate for me the amount of funds in those bank accounts?

A **Nominal amounts of --**

Q What do you mean by "nominal"?

A **A few thousand dollars, if anything.**

Q Does IRS own any property, other than this -- Let me rephrase that.

Does IRS own any real property?

A **Not that I'm aware of.**

Q How are the litigation costs in this litigation paid? And by that, I mean are the bills sent directly to Arctic Slope and Dana, or does IRS pay for the litigation?

A **It has changed. But as of currently, litigation costs are reviewed and approved by IRS,**

Page 46

**forwarded to ASRC and Dana for payment remittance.**
Q So the checks are cut by Arctic Slope and Dana?
**A Correct. I'm not sure how Dana does it, but that's how we do it, or wire it, whichever.**
Q Do you have an agreement -- Actually, let me rephrase that.
Does Arctic Slope have an agreement with Mr. Balch that he will receive a portion of any proceeds that come from -- from this litigation?
**A There is an understanding of some sharing, and I don't recall the terms exactly.**
Q Are those terms memorialized in a document?
**A I don't recall whether that's something that we have just reached an understanding on, or whether there is a document that reflects that. And I haven't looked. I don't know whether this document does or not, but I don't believe so.**
MR. TURNER: You are referring, for the record, to exhibit --
THE WITNESS: Exhibit 380.
MR. TURNER: Thank you.
BY MR. JENKINS:
Q What is your best understanding of the agreement that has been reached with Mr. Balch about

Page 47

proceeds of this litigation?
**A My expectation is that -- I believe this would be reflected here, in Exhibit 380, is that the costs, to the extent they're paid by theirselves, ordain that to be recovered first.**
**There is then a 75/25 split with Dana, the 75 percent to IRS. And I believe that IRS' split is 80/20 with Mr. Balch, and possibly Balch and Preisser.**
Q And is there a separate agreement with Mr. Chasteen?
THE COURT REPORTER: With Mr. whom?
MR. JENKINS: Chasteen.
**A I don't recall any agreement with Mr. Chasteen. There is some understanding, but I don't recall a written agreement. I don't recall the terms or the understanding. John took care of that.**
MR. JENKINS: I'd like to show you a document that's been previously marked as Deposition Exhibit 384.
384 is a June 7th, 2000 letter from Rodney Preisser to Mr. Chasteen, with an attachment. That appears to be an agreement between Ronald Chasteen at Injection Research Specialists, Inc. Have you seen that agreement before?
**A I have.**

Page 48

Q That is your signature on the second page?
**A It is.**
Q And in Paragraph 3 of that agreement, "IRS agrees to compensate Chasteen for the services to be rendered IRS on a continuing basis the sum of 10% of the net proceeds, if any, derived from the Litigation."
Do you see that?
**A I do.**
Q Were you aware that Mr. Chasteen was going to be paid 10 percent of the net proceeds from the litigation?
**A Obviously, I was when I signed it. As I said, I didn't recall.**
Q Do you recall having discussions with either Mr. Balch or Mr. Preisser about compensating Mr. Chasteen for his services in the litigation?
**A Yes, I do.**
Q What can you tell me about those discussions?
MR. CAULEY: I am going to object, and instruct the witness not to answer it, to the extent that would invade the attorney-client, work-product or common-interest privilege.
MR. TURNER: Same with respect to ASRC, but

Page 49

only to the extent that it would invade those privileges, those privileges being the ASRC privileges, in my case.
**A I cannot answer that without reviewing those privileges --**
Q Now, let me --
**A -- violating those privileges.**
THE COURT REPORTER: What was the last part you said?
THE WITNESS: Violating those privileges.
BY MR. JENKINS:
Q Do you recall having discussions with Mr. Balch or Mr. Preisser or both?
**A Both.**
Q Was anyone else involved in those discussions?
**A Not that I recall.**
Q Which hat did you have on when you had those discussions with Mr. Balch and Mr. Preisser?
MR. TURNER: Objection as to form, it assumes there is no alternative answer, the form of which can be cured in this deposition.
MR. JENKINS: All right. Let me rephrase the question.
MR. CAULEY: Objection, vague and ambiguous,

Page 190

A 380?
MR. TURNER: The first one in the stack.
BY MS. DALEY:
Q Exhibit 380, in Paragraph 1 on Page 2.
**A Numbered 1?**
Q Yes, paragraph numbered 1 on Page 2 refers to the right to IRS to pursue the Arctic Cat litigation, and again, such other infringements of licensed patents.
My question, Mr. Bagne, is it your understanding that the patent claim that's referenced on Page 4 of Exhibit 840 is the patent claim, right, that's referenced in Paragraph 1 of Exhibit 380?
MR. TURNER: You can answer that question.
But I believe you have mischaracterized what Paragraph 1 says, by leaving out in the language, the language, quote, "and related trade secrets and intellectual property," paren, "(Infringement Claims)," close paren, close quote.
MS. DALEY: Well, Mr. Turner, you may not be familiar, but the trade secret claims have been dismissed already with prejudice, so I am --
MR. TURNER: I understand, but --
MS. DALEY: -- assuming they are not in this case.

Page 191

MR. TURNER: Well, to the extent that you are trying to characterize the patent claims in Exhibit 840 as all of the claims referred to in Paragraph 1, my objection stands.
So go ahead.
MS. DALEY: That wasn't what I was attempting to do.
MR. TURNER: Okay. Well, go ahead.
**A My understanding of what was communicated to me by Rodney in the letter of October 5 was, again, a very broad use of patent claims, to include whatever might have been referenced in the Exhibit 380, but could be more.**
Q And he goes on to say, again: If you choose not to move forward with the patent claims, we can look at -- at consulting efforts in the water deal, et cetera, et cetera.
Was it ASRC's choice to decide whether to move forward with the patent claims or not?
**A That was my belief, yes.**
Q And did ASRC decide to move forward with the patent claims?
MR. CAULEY: Object, as -- raise our privilege objections, to the extent that it would reveal any -- any communications covered by those.

Page 192

You can answer yes or no.
MR. TURNER: I join in that objection, with respect to the ASRC privileges.
And agree, you can answer that question with a yes or no answer.
**A Yes, we did.**
Q Why?
MR. TURNER: Objection. To the extent it involves ASRC privileges, I make the same objections, and make the same instructions.
MR. CAULEY: Make the same objections, and make the same instructions.
BY MS. DALEY:
Q I'm assuming that you can't answer without disclosing litigation strategy, Mr. Bagne --
**A That is correct.**
Q Okay. Let me ask this question. Did ASRC pay any federal taxes on any of the proceeds that it received from the Polaris litigation?
**A We are a taxpayer, or alternative minimum taxpayer. So to the extent that alternative minimum tax was paid in whatever year was involved, there would have been tax paid.**
MS. DALEY: I have no further questions at this time, subject to the pending and to-be-filed

Page 193

motions to compel regarding assertions of attorney-client privilege, et cetera.
MR. CAULEY: I have just a couple of questions.
EXAMINATION
BY MR. CAULEY:
Q Mr. Bagne, could you turn to Exhibit 826. It's the commission agreement.
**A A lot of these are out of order. Okay.**
Q Now, to your understanding, what compensation does -- has Pacer agreed to pay IRS pursuant to this agreement?
**A You are referring just to the commission agreement, or the whole transaction?**
Q I am referring to the commission agreement.
**A Commission agreement. Well, I think I called them royalties, but that's probably not the way they are characterized here.**
**This -- as the title says, "Commission Agreement," so they were paying as commissions and royalties and fees.**
**I guess without trying to define what the distinction is, in a businessman sense, they were paying a revenue, based on their revenue. And some of that was reflected in the commission; some of it was**

Page 182

This paragraph, little -- little four, states that John G. Balch shall have the ultimate control of the litigation and appeal.
My question is, is it your understanding that with respect to the litigation that brought us to this deposition here today, the litigation involving the patent claims against Arctic Cat and Suzuki, that Mr. Balch has the ultimate control?
MR. TURNER: Objection, same -- same objection. This agreement refers to litigation that is not that litigation, so it -- it misstates the agreement, and it's misleading.
MR. CAULEY: I will restate all of my previous objections.
A **No.**
Q So this provision does not apply to the control of the litigation which has brought us to this deposition?
A **John is handling the management of the case, and making most of the decisions as far as the strategy; ASRC is funding. If ASRC doesn't fund, it's all academic.**
Q Do you have an obligation to fund?
A **No.**
Q So it's within ASRC's discretion to fund or

Page 183

not to fund?
A **That is correct.**
Q If a judgment is entered against IRS, where would the money come to pay for it?
MR. TURNER: Objection, calls for a legal conclusion.
MR. CAULEY: Same, join in the objection. And I'll object, it's a hypothetical, lacks foundation.
A **If a judgment were entered against Injection Research, whatever assets Injection Research has.**
Q What assets does Injection Research have today?
MR. CAULEY: Asked and answered.
MR. TURNER: Yes, that's been asked and answered.
BY MS. DALEY:
Q What assets does IRS have today?
MR. TURNER: Asked and answered.
A **Well, as I said, it's whatever interest remains in the patents that are controlled by IRS.**
Q The right to pursue a lawsuit, right?
MR. TURNER: Same objection.
A **That is -- I think I answered that's what we're currently doing. Whether that's all there is, I**

Page 184

**guess I'd have to ask a little further.**
Q Any other asset that IRS has today?
MR. CAULEY: Asked and answered.
MR. TURNER: Asked and answered.
A **No.**
Q And if Arctic Slope Regional Corporation decides not to continue to send cash transfers, there wouldn't be any money in the checking account of IRS, right?
MR. TURNER: Objection, calls for speculation, hypothetical, lacks foundation.
In the context in which it's asked, if you can answer that, go ahead and do it.
MR. CAULEY: Join in those objections. It's also argumentative.
A **Again, what I think I answered previously when this question was asked was that today, the -- as far as any cash assets in a bank account, they are nominal.**
Q And that's because you're not making any cash transfers to IRS as of today, right?
MR. TURNER: Objection, misstates his testimony.
A **I believe what I stated previously was that we were paying the bills directly at this time, as far**

Page 185

**as the litigation.**
Q So there is no transfer of cash into an IRS bank account?
A **Right.**
MS. DALEY: We have to make a tape change.
THE VIDEOGRAPHER: Thank you. Let me conclude Tape 3, and move off record at 4:46.
(Brief break.)
THE VIDEOGRAPHER: We return to the record at 4:58, beginning Tape 4.
BY MS. DALEY:
Q Mr. Bagne, do you have Exhibits 839 and 840 before you?
A **I do.**
Q I'm going to ask you about 839 first. 839 is your letter dated October 2, 2000 to Mr. Balch at IRS, right?
A **That's correct.**
Q And near the end of that letter, about the third to last sentence, you say, "As to the potential recovery on IRS technology claims, I've seen nothing to encourage me further."
Did you mean to include in your reference to IRS technology claims IRS patent claims, as well?
A **Yes.**